# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Eric Romano, et al., individually and on behalf of all
others similarly situated, Plaintiffs,

v.

John Hancock Life Insurance Company (U.S.A.),
Defendant.

No. 19-cv-21147-JG

**EXPERT REPORT OF STEVEN K. GISSINER**

**August 23, 2021**

*Confidential - Pursuant to Protective Order*

*Confidential - Pursuant to Protective Order*

## Table of Contents

I.     **Introduction** ................................................................................................ 1

     A.    Qualifications ................................................................................ 1

     B.    Assignment ................................................................................... 5

II.    **Summary of Opinions** ............................................................................ 7

III.   **Background** ............................................................................................. 9

     A.    An Overview of Defined Contribution Plans ............................ 9

     B.    Recordkeeping Services ............................................................ 11

     C.    John Hancock and Retirement Plan Services Provided Under Its Group Variable Annuity Contracts ......................... 16

     D.    Named Plaintiffs ....................................................................... 17

     E.    Foreign Tax Credits ................................................................. 19

IV.   **Proposed Class Members, Who Are Responsible for Selecting Their Plans' Recordkeeper, Could Have Obtained Information on John Hancock's Allowance of Foreign Tax Credits If They Had Deemed Such Information Relevant to Their Investment Decision-Making** ................................................................ 21

     A.    Information on John Hancock's Allowance of Foreign Tax Credits Could Have Been Obtained Through Direct Inquiries with John Hancock or From Investment Product Prospectuses ............................................................. 21

     B.    Proposed Class Members, Not John Hancock, Are Responsible for Selecting Their Plan Recordkeeper and Plan Investment Options ...................... 26

V.    **Based on My Experience, It Is My Opinion that Additional Disclosures of John Hancock's Allowance of Foreign Tax Credits Would Not Have Affected How Many Proposed Class Members and Proposed Class Advisors Evaluated Recordkeepers and Investment Options** ................................................ 31

     A.    Foreign Tax Credits Are Not Among the Various Factors Plan Sponsors and Plan Advisors Typically Consider in their Evaluation of Plan Recordkeepers ................................................................ 31

     B.    Foreign Tax Credits Are Not Relevant Among the Various Factors Plan Sponsors and Plan Advisors of Retirement Plans Typically Consider in their Evaluation of Plan Investment Options, Including International Funds ................................................................ 41

VI.   **Based on My Experience, It Is My Opinion that Plaintiffs' Proposed Fee Concessions for Foreign Tax Credits Would Not Have Affected the Total Recordkeeping Fees for Many Plans of the Proposed Class** ........................ 46

     A.    Recordkeepers Do Not Generally Provide Fee Concessions for Foreign Tax Credits ............................................................. 47

*Confidential - Pursuant to Protective Order*

B. Fee Concessions for Foreign Tax Credits Proposed by Plaintiffs Are Unlikely to Materially Change a Plan's Total Recordkeeping Fee ..................... 49

C. Foreign Tax Credits Were Not Material to the Named Plaintiffs' Recordkeeping Fee Arrangement with John Hancock.......................................... 54

**VII.** **Contrary to Plaintiffs' Claim, John Hancock's Compensation Was Reasonable and In Line with the Fees Received by Other Recordkeepers ............... 58**

A. Plaintiffs' Claim that John Hancock Received "More than Reasonable Compensation" Is Implausible Given the Competitive Nature of the Retirement Plan Recordkeeping Industry ............................................................ 58

B. John Hancock's Total Plan Fees for the Named Plaintiff Plan at Inception Were in Line with the Total Plan Fees Received by Other Recordkeepers.......... 60

*Confidential - Pursuant to Protective Order*

## I.      Introduction

### A.      Qualifications

1.      I have worked in the retirement plan services industry for approximately 40 years in a variety of roles and with a wide range of responsibilities.  These responsibilities have spanned from serving as the lead consultant (Relationship Manager) for a wide range of defined contribution plan engagements to managing teams of individuals that included first-year consultants and experienced Senior Consultants and Directors providing retirement plan administrative services (*e.g.*, recordkeeping) for clients with retirement plans that had less than 100 participants to plans with more than 50,000 participants.  In addition to managing teams providing administrative (participant recordkeeping) and consulting services to clients, I have consulted with clients in the areas of retirement plan design, compliance, administrative procedures, employee communications, and investment education services.  With the exception of retirement plan administration, I currently provide these services to a variety of clients, including a number of Fortune 500 companies.

2.      In addition to the aforementioned consulting services, I currently consult with clients in the areas of retirement plan cost determination and fee benchmarking; assist plan sponsors and retirement plan committees in understanding and implementing administrative fee arrangements; develop and distribute Requests for Proposals ("RFPs") and Requests for Information ("RFIs") for retirement plan administrative services; consult with client personnel and plan committees regarding plan design issues and, if appropriate, modifications to existing plan features and provisions; review and present quarterly or semi-annual fund monitoring reports to client personnel and plan committees that have responsibility for selecting and monitoring the performance of plan investment funds; and provide consulting and expert witness

*Confidential - Pursuant to Protective Order*

services in the area of retirement plan fee litigation.  My experience with respect to the selection of investment funds for defined contribution retirement plans includes consulting with plan sponsors and committees that are establishing investment options for newly implemented plans, adding investment funds to their existing lineup within a new asset category (an international emerging markets fund, for example), replacing funds with alternative investments, or that have elected to reconfigure all or components of their investment fund lineup resulting from a service provider transition.

3.      Over the course of my career, I have consulted with hundreds of retirement plan sponsors with retirement plan arrangements ranging in size from less than $5 million to just below $9 billion in assets.  My experience includes working with a wide assortment of business organizations, including mutual fund companies, banks, insurance companies, and consulting firms.  At present, I consult with approximately 30 retirement plan clients on a recurring basis and an additional ten clients on a periodic or non-recurring basis.  This work is in addition to the aforementioned expert witness consulting services.

4.      After approximately four years of employment with two banks that provided investment management and administrative services for retirement plan clients, I joined Coopers & Lybrand in 1985 as a Consultant in the Retirement Plans Practice, where my responsibilities at that time were specific to the administration of defined contribution plans.  I advanced through the firm and became a Partner in 1995, assuming responsibility for the management of the Western Region Administrative Outsourcing Practice, which included defined contribution and defined benefit plan administration.

5.      During the 1985–2001 period, Coopers & Lybrand, as a stand-alone organization and then as a larger entity following the acquisition of the benefits consulting firm of Kwasha

*Confidential - Pursuant to Protective Order*

Lipton (and then later following the merger with Price Waterhouse, whereby the merged entity was renamed PricewaterhouseCoopers), was a significant provider of defined contribution administrative, consulting, employee communications, and total benefits (defined benefit pension plan and health and welfare plan administration) outsourcing services.[1]  A substantial number of the plans administered by our firm during this period were complex in nature and contained features that included multiple domestic, international, and fixed income investment options, stable value funds (by fund and class year), company stock funds, collective investment trusts, separately managed accounts, participant loans (including plans with more than one loan permitted to be outstanding), various in-service withdrawal options, numerous alternatives for the payment of benefits upon termination of employment or retirement, various payroll locations resulting in multiple recurring data file transmissions, and custom reporting requirements.

6.      In 2001, PricewaterhouseCoopers sold its retirement plan administrative servicing business to Mellon/Buck Consultants.  Prior to the sale of the business, I elected to leave the firm and, in March of 2001, was directly admitted as a Partner in the Human Capital Practice of Arthur Andersen.  Although Arthur Andersen did not offer retirement plan administrative services, the firm provided retirement plan consulting, compliance, and investment advisory services to a wide range of clients.

7.      The Human Capital Practice of Arthur Andersen was acquired by Clark/Bardes, Inc. (d/b/a Clark Consulting) in May of 2002.[2]  Clark Consulting provided retirement plan, investment advisory, and compensation consulting services, in addition to administering non-

---

[1] In its fiscal year ending June 2001, PricewaterhouseCoopers' administrative servicing business, branded as Unifi, had revenues of $351 million and approximately 2,100 employees.  (Klein, Camilla, "Mellon Completes Unifi Acquisition," *PlanSponsor*, January 4, 2002, available at: https://www.plansponsor.com/mellon-completes-unifi-acquisition/; Wheelan, Hugh, "Mellon Buys out PwC HR Consulting Subsidiary," *Investment & Pensions Europe*, November 28, 2001, available at: https://www.ipe.com/mellon-buys-out-pwc-hr-consulting-subsidiary/4745.article.)

[2] Clark/Bardes, Inc., Form 10-K, for the fiscal year ended December 31, 2002, p. 29.

*Confidential - Pursuant to Protective Order*

qualified retirement plans.  As a Senior Vice President at Clark Consulting, I established the

firm's retirement plan cost benchmarking services and, with the assistance of others at the firm,

marketed these services to current and prospective clients throughout the country.  During this

period, in addition to performing a substantial number of retirement plan cost benchmarking

projects, I was involved in various RFP projects performed for defined contribution retirement

plans, and I consulted with many plan sponsors on issues related to plan design, investment

selection, administration, employee communications, compliance, and investment education.

8.      In December 2003, I established an independent contractor arrangement with

Clark Consulting, pursuant to which I continued to provide consulting services to new and

existing clients.  These services were performed within the structure of my own limited liability

company, Orchard Hills Consulting ("OHC").  After the independent contractor arrangement

with Clark Consulting expired at the end of 2006, I continued to perform services on behalf of

clients (consistent with what has been described in paragraph 2 above) within the structure of my

own limited liability company and through independent contractor consulting arrangements with

two different investment advisory firms.

9.      In my career, I have managed (in a relationship management or consulting role)

more than 1,000 separate defined contribution plan servicing arrangements, completed nearly

600 retirement plan cost and fee benchmarking studies for clients, performed in excess of 160

RFP projects specific to the provision of defined contribution administrative services, and

managed teams of individuals (at one point, as many as 60) providing administrative,

compliance, and consulting services to a variety of clients and plans.  My current and prior

experience in performing participant recordkeeping services; managing defined contribution plan

engagements; consulting to plan sponsors and committees regarding plan features, provisions,

*Confidential - Pursuant to Protective Order*

and administrative issues; structuring administrative fee and revenue sharing payment arrangements; performing fee benchmarking studies; monitoring plan investments, and completing RFP and RFI projects has provided me with a high level of knowledge about how defined contribution plans are marketed, administered, and serviced.  This level of knowledge also extends to how plan sponsors and providers work on a collaborative basis to structure fee and service arrangements that correspond to the unique demographics and requirements of each individual plan sponsor, with a particular focus on ensuring that administrative and compliance services are performed in a manner consistent with the requirements and expectations of the plan sponsor, and, by extension, plan participants.

10.     My resume, which provides additional detail on my education, qualifications, and professional affiliations, is attached as **Appendix A**.  I am being compensated at the rate of $525 per hour for my time.  Personnel of Analysis Group, Inc. assisted me by performing research and analysis under my direction and guidance.  Neither my compensation nor that of Analysis Group is contingent upon my findings, the testimony I may give, or the outcome of this litigation.

**B.     Assignment**

11.     I have been engaged by Goodwin Procter, LLP ("Counsel"), counsel for Defendant, John Hancock Life Insurance Company (U.S.A.) (also referred to throughout this report as "John Hancock" or "Defendant"), in connection with the matter *Eric Romano, et al., individually and on behalf of all others similarly situated, v. John Hancock Life Insurance Company (U.S.A.)*, No. 19-cv-21147-JG.[3]  In this matter, Eric and Todd Romano (together,

---

[3] *Eric Romano, et al., individually and on behalf of all others similarly situated, v. John Hancock Life Insurance Company (U.S.A.)*, Plaintiffs' Motion for Class Certification and Incorporated Memorandum of Law, July 26, 2021 ("Plaintiffs' Motion for Class Certification").

*Confidential - Pursuant to Protective Order*

"Named Plaintiffs"), trustees of the Romano Law, PL 401(k) Plan ("Named Plaintiff Plan") seek

to represent a class ("Proposed Class"), defined as:

> All trustees of all defined-contribution employee benefit plans covered by the Employee Retirement Income Security Act of 1974 with which Hancock had group annuity contracts and recordkeeping agreements at any time from March 25, 2013 … and that have, since March 25, 2013, allocated assets through Hancock's Signature Platform to International Investment Options that have passed through foreign tax credits to Hancock.[4]

12.     Based on this definition, I refer to the period from March 25, 2013 to the present

as the "Proposed Class Period."  I also refer to the retirement plans associated with the Proposed

Class as the "Plans."

13.     Counsel has asked me to do the following:

1. Evaluate whether information on John Hancock's allowance of foreign tax credits was available to members of the Proposed Class, which include sponsors, trustees, and fiduciaries of the Plans (or "Proposed Class Members") or their advisors ("Proposed Class Advisors").

2. Evaluate whether John Hancock's alleged failure to disclose its allowance of foreign tax credits would have been material to Proposed Class Members' and Proposed Class Advisors' evaluations of recordkeepers and investment options.  As part of this evaluation, I have been asked to do the following:

    a. Identify the factors that plan sponsors and plan advisors of retirement plans typically consider when evaluating plan recordkeepers, and opine on whether foreign tax credits are among the various factors typically considered in the evaluation of plan recordkeepers, and, if so, the role they play in that evaluation.

    b. Identify the factors that plan sponsors and plan advisors of retirement plans typically consider when evaluating investment options for retirement plans, and opine on whether foreign tax credits are among the various factors typically considered in the evaluation of investment options, and if so, the role they play in that evaluation.

3. Evaluate whether John Hancock's alleged failure to disclose its allowance of foreign tax credits would have affected the Plans' recordkeeping fee arrangements with John Hancock.  As part of this evaluation, I have been asked to do the following:

    a. Describe how recordkeeping fee arrangements are established, including how and when recordkeepers for retirement plans offer fee concessions.

    b. Evaluate whether additional disclosures of John Hancock's allowance of foreign tax credits, and fee concessions for foreign tax credits, would have affected

---

[4] Plaintiffs' Motion for Class Certification, pp. 1, 11.

*Confidential - Pursuant to Protective Order*

recordkeeping fee arrangements between Proposed Class Members and John Hancock.

4. Evaluate Plaintiffs' claim that John Hancock received "more than reasonable compensation for the services it provided."[5]

14.     The documents, materials, and other information I considered when conducting my analysis and forming my opinions are listed in this report or in **Appendix B**.

## II.     Summary of Opinions

15.     The opinions expressed below in this report are the result of my review and analysis to date.  If additional information or materials become available, I reserve the right to update my opinions and analysis as appropriate.

1. If Proposed Class Members (or the Proposed Class Advisors) had deemed information on foreign tax credits relevant to the decision to select and retain John Hancock as recordkeeper, they could have obtained information on John Hancock's allowance of foreign tax credits.  (**Section IV**)

   a. In my experience, to the extent a plan sponsor or plan advisor is interested in obtaining information specific to foreign tax credits, they may make direct inquiries with the recordkeepers' sales representatives or other designated representatives (implementation consultant or account manager, for example).  In addition to such inquiries, information on foreign tax credits is also disclosed in investment product prospectuses.  (**Section IV.A**)

   b. Consistent with my experience, Proposed Class Members (who are often assisted by the Proposed Class Advisors) have discretionary authority to select and replace their Plan recordkeeper and Plan investment options.  As recordkeeper, John Hancock has no role in these decisions.  As such, to the extent a Proposed Class Member and/or the Proposed Class Advisor deems foreign tax credits to be important, that Proposed Class Member (with their Proposed Class Advisor) has discretion to: (1) select a different recordkeeper whose allowance of foreign tax credits is aligned with the Proposed Class Member's preferences; or (2) select investment options that do not pay foreign taxes.  (**Section IV.B**)

2. Based on my experience, it is my opinion that additional disclosures of John Hancock's allowance of foreign tax credits would not have affected how many Proposed Class Members and Proposed Class Advisors evaluated recordkeepers and investment options. (**Section V**)

   a. Plan sponsors (assisted by plan advisors) typically evaluate recordkeepers based on

---

[5] Plaintiffs' Motion for Class Certification, p. 7.

*Confidential - Pursuant to Protective Order*

whether the types and quality of administrative services offered by a recordkeeper align with their plan's, and by extension their plan participants', specific needs, and whether the overall fee for these services is reasonable.  In my nearly 40 years of experience working with retirement plans, I have never experienced, nor have I been aware of, foreign tax credits being relevant to the evaluations or selection of recordkeepers and/or investment options by plan sponsors and plan advisors.  For example, I have not seen, participated in, or responded to, RFPs that included a request for information regarding a recordkeeper's allowance of foreign tax credits. Likewise, apart from one recordkeeper referenced in documentary evidence in this matter, I have not encountered a recordkeeper that advertises fee concessions for foreign tax credits indicating that recordkeepers, with one noted exception, generally deem this feature to be irrelevant to their retirement plan clients.  (**Section V.A**)

b. Plan sponsors and plan advisors typically focus their evaluation of investment options on whether those investment options meet the investment needs and preferences of plan participants.  Based on my experience, it is my opinion that whether, or to what extent, an international investment option pays foreign taxes or allows foreign tax credits would have carried little, if any, relevance to whether Proposed Class Members and Proposed Class Advisors decide to select or retain certain investment options.  (**Section V.B**)

3. Based on my experience, it is my opinion that implementing a fee concession for foreign tax credits, as Plaintiffs assert, would not necessarily decrease total recordkeeping fees for many Plans of the Proposed Class.  (**Section VI**)

a. While recordkeepers may provide fee concessions (or discounts) for a variety of reasons, including to incentivize plan participants to contribute, to attract plans of a certain size during a competitive bidding process, or to incentivize established plans to remain on the recordkeeping platform, in my experience, they rarely, if ever, provide fee concessions for foreign tax credits.  (**Section VI.A**)

b. Based on my experience, it is my opinion that fee concessions for foreign tax credits proposed by Plaintiffs would not have been material to the overall recordkeeping fee arrangement for Plans of the Proposed Class.  Because recordkeepers have the ability to achieve the same total revenues by making offsetting adjustments to different components of total fees, a fee concession that would lower the total recordkeeping fee below a recordkeeper's required revenue can be offset by simultaneously increasing the compensation it collects from other fee components (or decreasing other fee concessions).  (**Section VI.B**)

c. Based on my review of the documentary evidence, it is my opinion that additional disclosures of John Hancock's allowance of foreign tax credits or fee concessions for foreign tax credits would not have affected the recordkeeping fee arrangement between the Named Plaintiffs and John Hancock for the Named Plaintiff Plan. Despite having information on foreign tax credits and access to John Hancock's sales representatives, the Named Plaintiffs and the Named Plaintiff Plan's advisor did not seek to renegotiate the recordkeeping fee arrangement with John Hancock, did not prioritize foreign tax credits while monitoring the Named Plaintiff Plan's

investments, and did not prioritize foreign tax credits when selecting a new recordkeeper in 2020.  (**Section VI.C**)

4. The compensation that John Hancock received for the services it provided were reasonable and in line with the fees received by other recordkeepers for servicing similarly-sized plans.  (**Section VII**)

   a. Plaintiffs' assertion that John Hancock received "more than reasonable compensation"[6] is inconsistent with the competitive nature of the retirement plan recordkeeping industry.  As one of the major providers of recordkeeping services to small defined contribution plans, John Hancock's ability to attract and retain retirement plans reflects that plan sponsors and plan advisors seeking recordkeeping services generally consider the services John Hancock provides and the compensation it receives in exchange for these services to be reasonable. (**Section VII.A**)

   b. Survey data supports that the compensation John Hancock received for the services it provided to the Named Plaintiff Plan as of its inception was reasonable and in line with the compensation that other recordkeepers received for servicing similarly-sized plans.  (**Section VII.B**)

## III.   Background

### A.   An Overview of Defined Contribution Plans

16.   Defined contribution plans have an important role in the U.S. retirement system. As of December 31, 2020, defined contribution plans contained approximately $9.5 trillion in assets across more than 845,000 plans.[7]  The substantial majority of these plans are small in nature, with approximately 93 percent having less than $10 million in assets.[8]

17.   Defined contribution plans, such as 401(k) plans, provide participants with opportunities to make tax-advantaged contributions for the purpose of accumulating assets that

---

[6] Plaintiffs' Motion for Class Certification, p. 7.

[7] PlanSponsor, "2021 Recordkeeping Survey: Industry Snapshot," June 21, 2021, available at: https://www.plansponsor.com/research/2021-recordkeeping-survey/?pagesec=2#Industry%20Snapshot.

[8] Data not reported in the PlanSponsor 2021 Recordkeeping Survey.  *See,* PlanSponsor, "2020 Recordkeeping Survey: Industry Snapshot," July 15, 2020, available at: https://www.plansponsor.com/research/2020-recordkeeping-survey/?pagesec=3#Industry%20Snapshot.

*Confidential - Pursuant to Protective Order*

can be used to provide income during retirement.  Unlike defined benefit pension plans,[9] defined contribution plans do not guarantee a specific or defined benefit at retirement, but rather define the methodology used to determine employee and employer contributions (hence the term *defined contribution* plan).  In a participant-directed defined contribution plan,[10] such as 401(k) plans, eligible employees may elect to defer a fixed amount or a specified percentage of their pre-tax (or in some instances after-tax) compensation to the plan (within limits set by the IRS and/or the provisions of the plan) and allocate their contributions among the available investment options selected and maintained by their plan sponsor.  Further, participants in 401(k) defined contribution plans are not taxed on their elective deferrals and appreciation in the value of their accounts until those amounts are distributed.[11]  Employers, or the sponsors of these plans, may elect to contribute additional contributions on behalf of employees, either as a matching contribution that is based on amounts contributed by eligible participants or as an additional discretionary contribution that is typically allocated on the basis of eligible participant compensation.  Employer contributions are deductible on the employer's federal income tax return (subject to deduction limitations).[12]

---

[9] Defined benefit plans are employer-based retirement programs that provide fixed, pre-established benefits for employees at retirement.  (Internal Revenue Service, "Defined Benefit Plan," available at: https://www.irs.gov/retirement-plans/defined-benefit-plan.)

[10] Participants typically direct the investment of their accounts in defined contribution retirement accounts and choose from the lineup of options offered in the plan.  (BrightScope/ICI, "The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016," June 2019, p. 5; BrightScope/ICI, "The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at ERISA 403(b) Plans, 2016," April 2020, p. 9.)

[11] Internal Revenue Service, "401(k) Plan Overview," available at: https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

[12] Internal Revenue Service, "401(k) Plan Overview," available at: https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

*Confidential - Pursuant to Protective Order*

### B.   Recordkeeping Services

18.    Retirement plans require a wide variety of services to be performed.  These services are broadly categorized as investment management services, administrative or recordkeeping services, employee communications and investment education, annual compliance testing, and annual government reporting services.  Typically, employers that sponsor defined contribution plans select service providers (commonly referred to as recordkeepers), such as John Hancock, to handle such operations in a manner consistent with their plans' provisions, features, and applicable regulatory requirements.[13]  In addition, and particularly with respect to smaller defined contribution plans, a third-party administrator ("TPA") will work with the recordkeeper to assist in the implementation of the plan, conduct annual testing, prepare government filings, and coordinate participant transactions (loans and withdrawals, for example).[14]  Investment management services involve managing plan investments while administrative services include managing the numerous daily operational functions the plan requires to perform accurately and efficiently.

19.    While most recordkeepers (either directly or in partnership with a TPA) provide many of the following administrative services, the structure, quality, and fees associated with such services may vary substantially across recordkeepers:[15]

- *Recordkeeping and Transaction Processing*.  These services include maintaining individual participant records specific to plan balances by fund and contribution type

---

[13] BrightScope/ICI, "The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016," June 2019, p. 41; BrightScope/ICI, "The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at ERISA 403(b) Plans, 2016," April 2020, pp. 43, 64.

[14] John Hancock, "Reflections on TPA Day and the value of partnership," October 16, 2019, available at: https://retirement.johnhancock.com/us/en/viewpoints/practice-management/Reflections-on-TPA-Day-and-the-value-of-partnership.

[15] For further discussion of the services provided to 401(k) plans, *see*, *e.g.*, Collins, S., et al., "The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2016," *ICI Research Perspective* 23, No. 4, June 2017, p. 3, available at: https://www.ici.org/pdf/per23-04.pdf.

*Confidential - Pursuant to Protective Order*

(*e.g.,* employer matching, employer discretionary, employee elective deferral, employee rollover, etc.), accepting and editing payroll files, directing contributions to participant-selected investments, tracking vesting amounts, and administering and executing daily transactions directed by participants.  Participant-directed transactions may include changes in contribution percentages and investment allocations, transfers of investments between funds, loan requests and loan repayments, loan re-amortizations, in-service withdrawal requests, payment requests resulting from termination of employment or retirement, and administering and reissuing (if required) checks that have not been cashed by plan participants.

- *Data Management*.  These services include enrolling new participants in the plan and maintaining employee demographic information (birth, hire, rehire, and termination dates, along with the status of the participant (*i.e.,* active, inactive, terminated), address information, division code or company location, contribution and investment elections, and hours of service data) for both active and terminated employees.  In addition to managing data, recordkeepers are also responsible for maintaining the security and integrity of participant data, and typically spend substantial amounts each year on cybersecurity measures to protect the accounts of plan participants.[16]  In recognition of the importance of securing participant data, the Department of Labor recently released guidance for plan sponsors, plan fiduciaries, plan participants, and recordkeepers regarding 401(k) plan cybersecurity best practices.[17]

- *Plan Design/Documentation*.  Recordkeepers consult with the plan sponsor on the design and administration of the plan, offer recommendations to improve plan participation and retirement income outcomes, and assist in the development of administrative processing procedures.  Recordkeepers also assist in preparing and distributing plan documents and annually required legal and regulatory notices and disclosures.

- *Plan Amendments/Regulatory Updates*.  These services include updating plan documents, participant forms, and disclosures to comply with new legal and regulatory requirements, and modifications that result from changes requested by the plan sponsor.

- *Transaction Approval*.  Participant loans, withdrawals, and distributions are subject to various legal and regulatory provisions, as well as plan-specific guidelines.  Recordkeepers are typically responsible for ensuring that such transactions are processed in accordance with applicable provisions.

- *Compliance.*  Numerous tests must be performed annually to ensure that plans do not discriminate in favor of highly compensated employees or provide benefits that exceed legal or regulatory limits.  Recordkeepers (or TPAs, if applicable) also often complete for plan sponsors annual Form 5500 filings in addition to the various schedules that accompany the filing.  Other services include preparing financial reports, and consulting

---

[16] Iacurci, G., "Empower's New 401(k) Cybersecurity Guarantee a Sign of the Times," *Investment News*, June 26, 2018, available at: https://www.investmentnews.com/empowers-new-401k-cybersecurity-guarantee-a-sign-of-the-times-74750.

[17] Department of Labor, "US Department of Labor Announces New Cybersecurity Guidance for Plan Sponsors, Plan Fiduciaries, Record-keepers, Plan participants," April 14, 2021, available at: https://www.dol.gov/newsroom/releases/ebsa/ebsa20210414.

*Confidential - Pursuant to Protective Order*

with and providing additional requested documentation to external plan auditors responsible for the preparation of audited financial statements.

- *Consulting/Special Services*.  Recordkeepers often assist with plan mergers or other changes necessitated by company acquisitions, distribute assets and transfer participant data in the event of a divestiture of a portion of a company, consult on changes to administrative procedures to accommodate plan design modifications, communicate and manage changes to investment options, and, when required, correct errors.

- *Communications/Investment Education*.  Recordkeepers prepare communications materials for new and existing plan participants and, on a recurring basis, offer retirement planning tools, software, and other forms of investment education materials. Recordkeepers may also, at the election of the plan sponsor, provide participants with asset allocation recommendations or managed account services. Managed account services are a form of investment management service whereby an investment manager selects and monitors a portfolio of investments for individual plan participants.

20.     As required by ERISA,[18] the assets of retirement plans that are administered

(recordkept) for plan participants are held by either an insurance company (on "annuity-based

recordkeeping platforms") or a trust company (on "trust-based recordkeeping platforms"),

depending on the preference and direction of the plan sponsor.[19]  Providers of annuity-based

recordkeeping platforms such as Empower (Great-West), Voya, John Hancock, OneAmerica,

and Prudential, offer group variable annuity contracts ("GVACs"),[20] where plan participants of

---

[18] 29 CFR § 2550.403a-1, 403b-1.  ("Except as otherwise provided in § 403b-1, all assets of an employee benefit plan shall be held in trust by one or more trustees pursuant to a written trust instrument. … The requirements of section 403(a) of the Act and section 403a-1 shall not apply - (1) To any assets of a plan which consist of insurance contracts or policies issued by an insurance company qualified to do business in a State.")

[19] "The Employee Retirement Income Security Act of 1974 (ERISA) requires that retirement plan assets—such as for 401(k)s—be held in a trust (with some exceptions). … Insurance companies and trust companies enter into distribution agreements with mutual fund companies that allow them to make the mutual fund shares available to participants. Insurance companies and trust companies also build and maintain the behind-the-scenes infrastructure (such as trading and accounting systems) that's needed to process participants' investment trades."  (John Hancock, "Group annuity or trust company—which is better for a 401(k) plan to make investments available?" July 7, 2021, available at: https://retirement.johnhancock.com/us/en/viewpoints/plan-design/group-annuity-or-trust-company-which-is-better-for-a-401-k--plan.)

[20] Empower Retirement, "Your financial future is our priority," available at: https://qa.empower-retirement.com/individuals/additional-financial-offerings/annuities.shtml; Voya Financial, "Annuities," available at: https://www.voya.com/article/annuities; Prudential, "Create a more secure retirement with protected income from an Annuity," available at: https://www.prudential.com/personal/annuities; OneAmerica, "Tax-deferred Future Income," available at: https://www.oneamerica.com/products-services/individuals-annuities; Deposition of Eric Romano, June 15, 2021 ("Eric Romano Deposition"), Exhibit 15 (Group Annuity Contract for the Romano Law, PL 401(k) Plan by John Hancock Life Insurance Company (U.S.A.), effective October 7, 2014).

*Confidential - Pursuant to Protective Order*

contracted retirement plans can invest in investment options made available through Separate Accounts owned by the insurance company.  Plan participants of plans on annuity-based platforms direct monies into "sub-accounts" within insurance company Separate Accounts.  The sub-account then purchases shares of a specific corresponding portfolio, such as a mutual fund, as directed by the participants and/or plan sponsors.[21]

21.     As GVACs are regulated by the Financial Industry Regulatory Authority ("FINRA") and individual state insurance departments, these contracts must be sold through registered broker-dealers and investment advisors.[22]  According to the July 2021 BrightScope/ICI Profile of 401(k) Plans, a widely-used source of information on the provisions and features of defined contribution plans, insurance companies are not only "the most common recordkeeper type for 401(k) plans," but also "more likely to provide recordkeeping services" for smaller 401(k) plans.[23]  More specifically, insurance companies serviced 56.1 percent of plans with less than $1 million in assets, 57.9 percent of plans with $1 million to $10 million in assets, and 49.5 percent of all plans reported in the BrightScope/ICI database.[24]

---

[21] Eric Romano Deposition, Exhibit 15 (Group Annuity Contract for the Romano Law, PL 401(k) Plan by John Hancock Life Insurance Company (U.S.A.), effective October 7, 2014, p. 3); Deposition of Keith Holden, July 21, 2021 ("Holden Deposition"), 44:19-46:13.

[22] FINRA, "Variable Annuities," available at: https://www.finra.org/investors/learn-to-invest/types-investments/annuities/variable-annuities; FINRA, "Application Of NASD Conduct Rules To Group Variable Contracts And Other Exempted Securities," available at: https://www.finra.org/rules-guidance/notices/97-27.  *See for example,* California Department of Insurance, "Variable Life and Variable Annuity," available at: http://www.insurance.ca.gov/0200-industry/0050-renew-license/0200-requirements/life-only/variable-contracts.cfm; State of Maine, "Understanding Annuities," available at: https://www.maine.gov/pfr/insurance/consumer/individuals_families/life_annuities_viaticals/annuities/understanding_annuities.html.

[23] BrightScope/ICI, "The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018," July 2021, p. 3.

[24] BrightScope/ICI, "The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018," July 2021, p. 44.

*Confidential - Pursuant to Protective Order*

22.     Trust-based recordkeeping platforms are an alternative to annuity-based recordkeeping platforms.  Investment fund companies such as Fidelity, Vanguard, and Charles Schwab, in addition to third-party administrators such as Alight Solutions, often offer trust-based recordkeeping platforms.[25]  Each plan using a trust-based recordkeeping platform establishes a trust that directly invests and owns shares in the investment options (*i.e.,* mutual funds and other securities) to which their participants direct money.[26]  As such, trusts own shares of the mutual funds to which plan participants allocate assets.  Unlike insurance companies on annuity-based recordkeeping platforms, trusts owned by plans on trust-based recordkeeping platforms do not file or pay U.S. taxes on an annual basis.  Both the Federal Thrift Savings Plan (the largest defined contribution plan in the U.S.[27]) and AT&T Wireless 401(k) Savings Plan (second largest defined contribution plan sponsored by a U.S. corporation[28]) disclose that plan assets are held in their respective trusts and are "exempt from [U.S.] taxation."[29]  Some insurance company

---

[25] Ramirez, D., "401(k) Recordkeeper: What They Do And What To Look For," *ForUsAll*, February 21, 2020, available at: https://www.forusall.com/401k-blog/401k-recordkeeper-what-they-do-and-what-to-look-for/; Fidelity, "Investment and Retirement Products," available at: https://clearingcustody.fidelity.com/app/item/RD_13569_42640/products-and-services/investment-and-retirement-products.html; Vanguard, "Defined Contribution Recordkeeping," available at: https://institutional.vanguard.com/solutions/dcrecordkeeping/consultativeexperience; Charles Schwab, "401(k) plan services paired with independent providers," available at: https://workplacefinancialservices.schwab.com/retirement-services/401k-plans-paired-independent-providers.

[26] Internal Revenue Service, "IRC 401(k) Plans — Establishing a 401(k) Plan," available at: https://www.irs.gov/retirement-plans/irc-401k-plans-establishing-a-401k-plan.

[27] Pension and Investments, "P&I 1,000 largest retirement plans: 2021," available at: https://researchcenter.pionline.com/v3/rankings/plan-sponsors/profiles/429708/overview.

[28] Pension and Investments, "P&I 1,000 largest retirement plans: 2021," available at: https://researchcenter.pionline.com/v3/rankings/plan-sponsors/profiles/429708/overview.

[29] Summary of the Thrift Savings Plan, p. 22, available at: https://www.tsp.gov/publications/tspbk08.pdf; AT&T Wireless 401(k) Savings Plan, Form 11-K, December 31, 2002, p. 8.

*Confidential - Pursuant to Protective Order*

recordkeepers that offer annuity-based recordkeeping platform services may also offer trust-based recordkeeping platform services.[30]

C.   **John Hancock and Retirement Plan Services Provided Under Its Group Variable Annuity Contracts**

23.   John Hancock offers, among other things, administrative and recordkeeping services to retirement plan sponsors.[31]   With over $160 billion of assets under management and administration ("AUMA") and servicing over 49,000 plans, John Hancock and its affiliates provide plan sponsors with, among other things, "streamlined administrative solutions," a "broad investment platform," and "insightful plan reporting."[32]   John Hancock provides plan sponsors access to plan and participant data and engages in trustee and custodial services, ERISA and consulting services, compliance testing, and other services.[33]   John Hancock and its affiliates are the fifth largest recordkeeping service provider (in terms of number of plans serviced) for defined contribution plans with less than $10 million in assets.[34]

24.   GVACs and recordkeeping agreements are offered by John Hancock through its Signature Platform.[35]   In accordance with the National Association of Insurance Commissioners

---

[30] John Hancock, "Group annuity or trust company—which is better for a 401(k) plan to make investments available?" July 7, 2021, available at: https://retirement.johnhancock.com/us/en/viewpoints/plan-design/group-annuity-or-trust-company-which-is-better-for-a-401-k--plan.

[31] John Hancock, "Retirement Plans," available at: https://retirement.johnhancock.com/us/en/retirement-products/retirement-plans.

[32] Data as of December 31, 2020.  John Hancock, "Retirement Plans," available at: https://retirement.johnhancock.com/us/en/retirement-products/retirement-plans.

[33] John Hancock Retirement Plan Services, "Your Retirement Plan Proposal: Prepared for [Redacted for CID] Retirement Plan," July 31, 2017, UBS00004545-565 at 552.

[34] PlanSponsor includes the following recordkeepers on its list of "Largest Recordkeepers, by 401(k)s With <$10MM in Assets": Paychex, Inc., ADP Retirement Services, American Funds, Empower Retirement, John Hancock, Ascensus, Principal Financial Group, Transamerica Retirement Solutions LLC, Voya Financial, and Newport.  (PlanSponsor, "2021 Recordkeeping Survey: Top Recordkeepers," June 21, 2021, available at: https://www.plansponsor.com/research/2021-recordkeeping-survey/?pagesec=8#Provider%20Rankings.)

[35] John Hancock, "Retirement Plan Fiduciaries, We're Here to *Help*," available at: https://retirement.johnhancock.com/us/en; Holden Deposition, 18:17-19:2.

*Confidential - Pursuant to Protective Order*

("NAIC") state requirements, assets held in GVACs offered by John Hancock are owned through Separate Accounts, which are maintained by John Hancock.[36]  As described above, plan participants direct their assets to their chosen investment options, which correspond to a sub-account owned by John Hancock, within its Separate Accounts which, in turn, purchases shares of a corresponding security.[37]  In other words, plan participants have an interest in units of the sub-account, while the sub-account owns corresponding shares of the underlying security.[38] Investments that underlie John Hancock sub-accounts may be managed by either John Hancock or external investment managers.  As I will discuss in more detail below in **Section IV.B**, John Hancock does not have any discretion as to the allocation of assets across the sub-accounts offered on its Signature Platform.

### D.  Named Plaintiffs

25.  From October 7, 2014 through March 22, 2021, the participants of the Named Plaintiff Plan invested assets through a GVAC issued by John Hancock.[39]  As trustees of the

---

[36] According to Rick Carlson, VP of Tax and Tax Controller at John Hancock, a "[s]eparate account is required under the NAIC state requirements where certain variable contracts are required to be separated from the general account."  (Deposition of Rick Carlson, April 29, 2021 ("Carlson Deposition"), 12:3-4, 48:4-7.)  *See also, Eric Romano, et al., individually and on behalf of all others similarly situated, v. John Hancock Life Insurance Company (U.S.A.),* Class Action Complaint, March 25, 2019 ("Complaint"), ¶ 13.

[37] Holden Deposition, 46:4-13.  ("Q Okay. And so the way it works then is if a participant has an account in a retirement plan, that participant will decide which investment option to direct a certain amount of its funds into and then John Hancock will shift money in a separate account into the corresponding subaccount; is that right?  A That's the basic flow of it.")

*See also,* John Hancock Retirement Plan Services, "Important information for Plan Sponsors," 2018, JH-ROMANO_037948-954 at 948 ("John Hancock makes available a platform of sub-accounts (the 'Funds') for selection by fiduciaries of qualified retirement plans, including participant directed plans."); Holden Deposition, 22:6-11, 44:19-45:21; Complaint, ¶¶ 22-24, 27.

[38] Holden Deposition, 55:25-56:3.  ("The participants in this case own units of John Hancock subaccounts and not units of the underlying mutual fund itself.")

[39] Eric Romano Deposition, Exhibit 15 (Group Annuity Contract for the Romano Law, PL 401(k) Plan by John Hancock Life Insurance Company (U.S.A.), effective October 7, 2014, p. 1); Confirmation of Total Discontinuance, March 22, 2021 (115534 Confirmation of Total Discontinuance.pdf).

*Confidential - Pursuant to Protective Order*

Named Plaintiff Plan, the Named Plaintiffs are the contract holders of the GVAC.[40]  The Named

Plaintiff Plan offered the employees of Romano Law, PL (including the Named Plaintiffs) a tax-

advantaged retirement savings plan. In addition, Romano Law, PL received tax deductions for its

employer contributions to the Named Plaintiff Plan. The Named Plaintiffs, as equal owners of

Romano Law, PL,[41] shared the benefit of these tax deductions.  As Eric Romano states in his

deposition, while the Named Plaintiff Plan provides "a valuable benefit for our employees," it

also "maximize[d] … the tax advantages for me and Todd."[42]  It is my understanding that

providing the Named Plaintiff Plan would lead to tax savings of more than $44,000 in 2014.[43]

26.     When the Named Plaintiffs entered into the GVAC, they were able to select from

approximately 200 unique investment options that were available to participants of the Named

Plaintiff Plan.[44]  The Recordkeeping Agreement between the Plan trustees (the Named Plaintiffs)

and John Hancock, dated June 18, 2014 ("2014 Recordkeeping Agreement"), outlines the

recordkeeping and administrative services offered by John Hancock as well as estimated annual

plan costs.[45]

---

[40] Eric Romano Deposition, Exhibit 15 (Group Annuity Contract for the Romano Law, PL 401(k) Plan by John Hancock Life Insurance Company (U.S.A.), effective October 7, 2014, p. 24)

[41] Eric Romano Deposition, 17:12-13.  ("Todd and I are 50/50 partners in Romano Law, PL.")

[42] Eric Romano Deposition, 50:20-25, 54:4-11.

[43] Eric Romano Deposition, Exhibit 6 (The Pension Studio, Romano & Romano 401(k) Profit Sharing Plan 2014 SH3% and ERPS, May 22, 2014, ROMANO-000121-126 at 126).

[44] Deposition of Todd Romano, June 17, 2021 ("Todd Romano Deposition"), Exhibit 59 (Recordkeeping Agreement prepared for Romano & Romano 401(k) Profit Sharing Plan by John Hancock Life Insurance Company (U.S.A.), June 18, 2014, ROMANO-000028-049 at 037-042); Eric Romano Deposition, Exhibit 15 (Group Annuity Contract for the Romano Law, PL 401(k) Plan by John Hancock Life Insurance Company (U.S.A.), effective October 7, 2014, Separate Account B Rider); *See also,* Holden Deposition, 45:12-22.

[45] Todd Romano Deposition, Exhibit 59 (Recordkeeping Agreement prepared for Romano & Romano 401(k) Profit Sharing Plan by John Hancock Life Insurance Company (U.S.A.), June 18, 2014, ROMANO-000028-049).

27.     As of year-end 2014, the Named Plaintiff Plan had nine participants with account balances and $128,146 in total plan assets.[46]  As of year-end 2020, the Named Plaintiff Plan had nine participants with account balances and $1,225,296 in total plan assets, of which Eric and Todd Romano held 63 percent.[47]  Throughout the Proposed Class Period, Mr. Christian Searcy, the Named Plaintiffs' "family friend",[48] was retained as the advisor for the Named Plaintiff Plan, and The Pension Studio was retained as the third-party administrator ("TPA").[49]

### E.     Foreign Tax Credits

28.     It is my understanding and my experience in reviewing insurance company documentation on behalf of various clients, that insurance companies, like John Hancock, are allowed foreign tax credits for foreign taxes paid by investments (mutual funds, for example) that have invested at least 50 percent of assets in foreign equities and have elected to "pass through" foreign tax credits to shareholders.[50]  Specifically, the Internal Revenue Service states "[a shareholder] may be able to claim the credit based on [their] share of foreign income taxes paid by the fund if [the mutual fund] chooses to pass the credit on to its shareholders."[51]  For example, the portfolio of the Templeton Global Bond Fund is composed of nearly 80 percent of holdings outside of the U.S., and it elected to pass through to its shareholders the foreign taxes

---

[46] Romano Law, PL 401(k) Plan Form 5500, 2014.

[47] The closing balance reported for Eric Romano and Todd Romano was $387,326.58 and $382,162.90, respectively. (John Hancock, Employer Financial Statement Year-to-Date: Jan/01/2020 to Dec/31/2020 for the Trustees of Romano Law, PL 401(k) Plan, Contract No. 115534, pp. 11-12, 15.)

[48] Mr. Searcy was first at UBS and later Pursuit Wealth Management.  *See,* Deposition of Christian Searcy, June 22, 2021 ("Searcy Deposition"), 48:2-12, 30:2-31:12.

[49] Searcy Deposition, 131:7-132:8.

[50] *See, e.g.,* Goldman Sachs Asset Management, "Goldman Sachs Funds: Tax Guide for 2020," 2020, p. 6, available at: https://www.gsam.com/content/dam/gsam/pdfs/us/en/tax-information/tax_guide.pdf?sa=n&rd=n.

[51] Internal Revenue Service, "Foreign Taxes that Qualify for the Foreign Tax Credit," available at: https://www.irs.gov/individuals/international-taxpayers/foreign-taxes-that-qualify-for-the-foreign-tax-credit.

and foreign tax credits with respect to foreign taxed transactions involving those holdings.[52] Thus, as the owner of the Separate Account and underlying sub-account, and hence, shareholder of the Templeton Global Bond Fund, John Hancock was allowed foreign tax credits as a result of foreign taxes paid by the mutual fund from 2013 through 2018.[53]

29.     In contrast to annuity-based recordkeeping platforms, where the insurance company is the owner of the underlying assets and would pay U.S. income taxes and may be allowed foreign tax credits that reduce its U.S. income taxes (relative to not being allowed the credit), it is my understanding that trusts established for retirement plans operating on trust-based recordkeeping platforms do not pay U.S. income taxes.  Because the trusts established for tax-qualified retirement plans are not subject to U.S. income taxes, they do not have any U.S. income taxes against which to offset the foreign taxes.  This arrangement also applies to other forms of tax-qualified accounts, such as individual IRA accounts and rollover IRAs.[54]

---

[52] *See, e.g.,* John Hancock, "Asset Manager Profiles: Templeton Global Bond Fund," July 2021, JH-ROMANO_043165-171 at 168.

[53] Deposition of Xin Wang, May 11, 2021 ("Wang Deposition"), 115:15-21; Wang Deposition, Exhibit 18, JH_Romano_038562; Wang Deposition, Exhibit 19, JH_Romano_038563; Wang Deposition, Exhibit 20, JH_Romano_038564; Wang Deposition, Exhibit 21, JH_Romano_038565; Wang Deposition, Exhibit 22, JH_Romano_038566; Wang Deposition, Exhibit 23, JH_Romano_038567.

[54] *See, e.g.,* Zoll, Adam, "A Taxing Dilemma: Foreign Investments and Your Retirement Account," *Morningstar*, March 1, 2013, available at: https://www.morningstar.com/articles/587000/a-taxing-dilemma-foreign-investments-and-your-retirement-account.

*Confidential - Pursuant to Protective Order*

IV.   **Proposed Class Members, Who Are Responsible for Selecting Their Plans' Recordkeeper, Could Have Obtained Information on John Hancock's Allowance of Foreign Tax Credits If They Had Deemed Such Information Relevant to Their Investment Decision-Making**

A.   **Information on John Hancock's Allowance of Foreign Tax Credits Could Have Been Obtained Through Direct Inquiries with John Hancock or From Investment Product Prospectuses**

30.   Plaintiffs in this matter claim that John Hancock failed to "disclose its receipt and retention of the Plan Foreign Tax Credits in the [GVAC] or its ERISA 408(b)(2) disclosure statements,"[55] recordkeeping agreements with Plans, and "standardized disclosures disseminated to Plans and their participants."[56]   However, in my experience, to the extent a plan sponsor or plan advisor is interested in obtaining information specific to foreign tax credits, the plan sponsor or plan advisor would generally make direct inquiries with the recordkeepers' sales representatives or other designated representatives (implementation consultant or account manager, for example).   In addition to such inquiries, as I will discuss below, information on foreign tax credits is also disclosed in investment product prospectuses.[57]

31.   In my experience, plan advisors are typically aware that some investments may pay foreign taxes and that insurance companies may be allowed foreign tax credits.   To qualify

---

[55] Complaint, ¶ 36.

[56] Plaintiffs' Motion for Class Certification, p. 6.

[57] For example, John Hancock directs plan sponsors to "call … to obtain the Fund Sheet for the group annuity investment option sub-accounts and/or to obtain a prospectus … for the sub-accounts' underlying fund, that are available on request. The prospectuses … for the sub-accounts' underlying funds contain complete details on investment objectives, risks, fees, charges and expenses as well as other information about the underlying funds which should be carefully considered before investing."  (John Hancock Retirement Plan Services, "Important information for Plan Sponsors," 2018, JH-ROMANO_037948-954 at 954.)  *See also,* Franklin Templeton Investments, Form N-CSR of the Templeton Income Trust, August 31, 2015, p. 52; Franklin Templeton Investments, Form N-1A of the Templeton Income Trust, December 24, 2014, at 'Investments in foreign securities'.

*Confidential - Pursuant to Protective Order*

as investment advisors, plan advisors are generally registered with the SEC[58] and are required to pass tests administered by FINRA demonstrating knowledge of various investments available in the marketplace, including the implications of foreign taxes on those investments.[59]  Mr. Searcy, for example, testified that he became aware of foreign tax credits through his education and financial certifications.[60]  Based on my nearly 40 years of experience as a consultant and investment advisor to various types of retirement plans, it is my opinion that to the extent a plan advisor has questions about whether a recordkeeper is allowed foreign tax credits for foreign taxes paid, or more generally how a recordkeeper accounts for certain fees or revenues, it is common for them to make inquiries directly with the recordkeeper's sales representative or designated account manager.  For example, if information on the foreign tax credits associated with international investments which pay foreign taxes becomes relevant to my evaluation of a recordkeeper, which it has not, I would make similar inquiries with the recordkeeper's sales representative or account manager, and/or review relevant documentation specific to foreign tax credits.

---

[58] "Investment advisers generally are regulated by the SEC or state securities authorities. The SEC typically regulates investment advisers that have assets under management in excess of $100,000,000. Investment advisers that do not meet this threshold generally are regulated by the states." (Securities and Exchange Commission, "Investment Adviser Public Disclosure," available at: https://adviserinfo.sec.gov/.)  Mr. Searcy, for example, through his company Pursuit Wealth Management, LLLP, is an SEC-registered investment advisor.  (Deposition of Melanie Martinez McDonald, July 7, 2021 ("Martinez Deposition"), Exhibit 134 (Pursuit Wealth, Form ADV Part 2A Brochure, August 27, 2020, CDSJR00409-437 at 430).)

[59] *See, e.g.,* FINRA, "Investment Advisers," available at: https://www.finra.org/investors/learn-to-invest/choosing-investment-professional/investment-advisers; FINRA, "Qualification Exams," available at: https://www.finra.org/registration-exams-ce/qualification-exams.

[60] Searcy Deposition, 169:22-170:11.  ("Q. When did you first come to that understanding [of foreign tax credits], if you remember? A. Hard to say for certain because I don't remember all the classes I took, but I would guess in one of my two financial accounting classes, either undergrad or MBA, would probably be the first time that I may have run into the term or the concept. … I can't say for certain, but it definitely could have come up during either the CFP [Certified Financial Planner] or CPWA [Certified Private Wealth Advisor] when it comes to the taxes and retirement planning sections.")

32.     Consistent with my experience, Mr. Bruce Cobey, Regional VP of Retirement Plan Services at John Hancock, testified in deposition that Mr. Searcy, who advised the Named Plaintiff Plan, reached out to John Hancock to inquire about whether John Hancock provides fee concessions in connection with the foreign tax credits John Hancock is allowed against foreign taxes paid.[61]  Further, deposition testimony also supports that Mr. Searcy reached out to various other recordkeepers to obtain similar information about their platforms and to better understand foreign tax credits.[62]

33.     In addition to making direct inquiries with recordkeeping sales representatives or other service provider personnel, information on foreign tax credits is disclosed in prospectuses of the underlying mutual funds of each John Hancock sub-account.  These mutual fund prospectuses, which are issued by the managers of each mutual fund and can be accessed or requested by Proposed Class Members and Proposed Class Advisors,[63] disclose whether and how much in foreign taxes the underlying mutual fund paid. For example, the 2015 prospectus of the Templeton Global Bond Fund, a fund that was available on the Named Plaintiff Plan lineup throughout the Proposed Class Period,[64] reported a "Foreign Tax Paid" of $0.0102 per share and stated that "[a]t August 31, 2015, more than 50% of the Fund's total assets were invested in

---

[61] Deposition of Bruce Cobey, May 4, 2021 ("Cobey Deposition"), 74:9-22.  ("I had a conversations with Christian that that was the case, that we do not credit foreign tax credits.")

[62] Searcy Deposition, 177:4-14.

[63] *See, e.g.,* 30(b)(6) Deposition of Bonnie Deodat Hamilton, July 19, 2021 ("Hamilton 30(b)(6) Deposition"), 85:24-86:12, 87:2-19, 91:14-92:15, 107:20-108:12; John Hancock Retirement Plan Services, "Important information for Plan Sponsors," 2018, JH-ROMANO_037948-954 at 954.

[64] *See, e.g.,* Statement of Assets and Liabilities of the Sub-Accounts of John Hancock Life Insurance Company (U.S.A.) for Contract # 115534, the Trustees of Romano Law, PL 401(k) Plan, 2014-2018: JH-ROMANO_041236-249, JH-ROMANO_041250-264, JH-ROMANO_041265-282, JH-ROMANO_041283-306, JH-ROMANO_041307-332; Email from Katy Norusis to Eric Romano et al. re: 404a-5 Notice (re 401k), ROMANO-000269-290 at 279.

securities of foreign issuers."[65]  Additionally, I note that Mr. Searcy's UBS and Fi360

monitoring reports for the Named Plaintiff Plan noted that fund prospectuses "are available by

contacting your financial consultant."[66]  To the extent Proposed Class Members would have

deemed information on foreign tax credits to be relevant to their investment decision-making

processes, it would have been incumbent on Proposed Class Members, who are responsible for

selecting their Plan's investment options, and Proposed Class Advisors who assist them, to

review disclosure documents and agreements for plan services, including these prospectuses.

34.     Contrary to Plaintiffs' assertion, based on my experience, I find John Hancock's

disclosures consistent with the disclosures of other recordkeepers operating in the same capacity.

I have not encountered any recordkeepers who have provided the additional disclosures that

Plaintiffs call for in their GVACs, recordkeeping agreements, 408(b)(2) Statements, or other plan

documents.  While the GVAC states that John Hancock "uses all revenue received from the

underlying mutual fund … to reduce the [Administrative Maintenance Charge] for the Sub-

account,"[67] in my experience, the term, "revenue" referenced in this statement is commonly used

---

[65] The 2015 prospectus of the Templeton Global Bond Fund reports "a detailed analysis of foreign tax paid, foreign source income, and foreign source qualified dividends as reported by the Fund."  The information provided includes by share class, the per share amounts of foreign tax paid and foreign source income.  (Franklin Templeton Investments, Form N-CSR of the Templeton Income Trust, August 31, 2015, at Templeton Global Bond Fund, pp. 38, 52.)

Similarly, the Registration Statement of the Templeton Income Trust, which includes the Templeton Global Bond Fund, notes that "[u]nder certain circumstances, the Fund may elect to pass-through foreign tax credits to shareholders, although it reserves the right not to do so."  In addition, the registration statement outlines that "[t]he Fund may be subject to foreign withholding taxes on income or gains from its investments in certain foreign securities. If more than 50% of the Fund's total assets at the end of a fiscal year is invested in foreign securities, the Fund may elect to pass through to you your pro rata share of the foreign taxes paid by the Fund. Both the Fund and you must meet certain holding period requirements in order for you to claim a credit for foreign taxes on foreign source dividends."  (Franklin Templeton Investments, Form N-1A of the Templeton Income Trust, December 24, 2014, at 'Investments in foreign securities'.)

[66] *See, e.g.,* Fi360, Monitoring Report Prepared for Romano Law Group, July 21, 2020, CDSJR00307-356 at 307; UBS DC Report for Romano Law Group, January 15, 2019, UBS00006354-396 at 382.

[67] Eric Romano Deposition, Exhibit 15 (Group Annuity Contract for the Romano Law, PL 401(k) Plan by John Hancock Life Insurance Company (U.S.A.), effective October 7, 2014, at Separate Account Details, p. 2).

*Confidential - Pursuant to Protective Order*

and understood by retirement industry professionals, including plan advisors, recordkeepers, other service providers, and plan sponsors, to refer to revenue sharing payments, including 12b-1 fees or sub-transfer agency fees, that investment management companies may pay to John Hancock.  Based upon my knowledge of industry custom and usage, the "revenues" referenced in this statement are unrelated to foreign tax credits.

35.     Plaintiffs' specific claim that John Hancock did not "disclose its receipt and retention of the Plan Foreign Tax Credits in … its ERISA 408(b)(2) statements"[68] also reflects a misunderstanding of the purpose of 408(b)(2) statements.  Introduced to address concerns over fee transparency and conflicts of interest, 408(b)(2) disclosures are intended to provide comprehensive disclosures on direct compensation (such as the charges deducted from participant accounts) and indirect compensation (such as investment revenue used towards plan costs) received by service providers with respect to services provided to plans, such as recordkeepers.[69]  In my experience, retirement industry professionals, including plan advisors, recordkeepers, other service providers, and plan sponsors, do not consider foreign tax credits to be direct or indirect compensation received by service providers and hence, do not expect service providers to disclose their "receipt and retention" in 408(b)(2) disclosures.  In my regular course of business, I have reviewed and analyzed hundreds of 408(b)(2) disclosures across more than 20 recordkeepers — none have explicitly referenced foreign taxes or foreign tax credits.

36.     Based on my experience as an administrative services provider, retirement plan consultant, and investment consultant, as well as my review of depositions taken in this matter

---

[68] Complaint, ¶ 36; *see also,* Plaintiffs' Motion for Class Certification, p. 8.

[69] Department of Labor, "Final Regulation Relating to Service Provider Disclosures Under Section 408(b)(2)," February 2012, available at: https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf.

*Confidential - Pursuant to Protective Order*

and public disclosures that were accessible to Proposed Class Members and Proposed Class

Advisors, it is my opinion that Proposed Class Members or Proposed Class Advisors could have

obtained information on John Hancock's allowance of foreign tax credits if they had deemed

such information relevant to their investment decision-making.

### B. Proposed Class Members, Not John Hancock, Are Responsible for Selecting Their Plan Recordkeeper and Plan Investment Options

37.     Consistent with my experience with how recordkeepers in the marketplace

operate, John Hancock provides the menu of available services and investment options from

which each Proposed Class Member (and Proposed Class Advisor, if applicable) – who have

chosen John Hancock as their recordkeeper – selects.  As is typical across the industry, John

Hancock does not have any discretionary authority or control over how each Proposed Class

Member manages or selects the services to be received by each Proposed Class Plan.[70]  For

example, as explained by Keith Holden (VP and Head of Retirement Platform Development and

Management for North America at John Hancock), while John Hancock "assume[s]

responsibility" for the "day-to-day administration of the separate accounts," John Hancock is

"acting on instructions from plans and participants" and "execut[es] transactions as a result of

that."[71]  Similarly, recordkeeping agreement samples that I have reviewed in this case dated from

---

[70]  The recordkeeping agreements between each Proposed Class Member and John Hancock document the relative roles of the parties.  Specifically, it states:

> …none of the services provided under this [recordkeeping] agreement are performed by John Hancock, its affiliates, or employees as a fiduciary (as that term is defined in ERISA) of the plan and its related trust…. The Plan trustee(s) shall retain the authority and responsibility for reviewing the plan documents, ensuring compliance with ERISA…, and instructing John Hancock accordingly.  John Hancock will not have any discretionary authority or responsibility for the management or control of the separate accounts.

(Todd Romano Deposition, Exhibit 59 (Recordkeeping Agreement prepared for Romano & Romano 401(k) Profit Sharing Plan by John Hancock Life Insurance Company (U.S.A.), June 18, 2014, ROMANO-000028-049 at 029).)

[71]  Holden Deposition, 17:20-23, 77:19-21, 79:13-16.

*Confidential - Pursuant to Protective Order*

2016 to 2019 describe John Hancock's sub-accounts as "conduit vehicle[s]."[72]  Hence, as the recordkeeper, John Hancock does not have discretion over which investment options Proposed Class Members (assisted by the Proposed Class Advisors, if applicable) select to offer, or how Plan participants allocate their assets across the available investment options offered on their respective Plan lineup.[73]

38.     Consistent with this understanding, John Hancock does not require the Proposed Class Members to select for their Plan investment options associated with international investments that may pay foreign taxes.  I have also seen no evidence of any attempt by John Hancock to encourage Proposed Class Members to select any international investment option, nor am I aware of instances where John Hancock inappropriately encouraged or recommended that plan participants allocate assets to international investment options.  For example, the Named Plaintiffs (assisted by Mr. Searcy) selected the Templeton Global Bond Fund, a fund for which John Hancock was allowed foreign tax credits,[74] for the Named Plaintiff Plan lineup.

---

[72] *See, e.g.,* Hamilton 30(b)(6) Deposition, Exhibit 104 (Recordkeeping Agreement prepared for Ho Test - Sample Case by John Hancock Life Insurance Company (U.S.A.), March 4, 2019, JH-ROMANO_000870-900 at 871).  ("To the extent John Hancock maintains a sub-account(s) in which the Plan invests, each such sub-account serves solely as a conduit vehicle … John Hancock is a limited fiduciary with respect to the sub-account for the exclusive purposes of holding Plan assets in such sub-account(s) … Otherwise, John Hancock shall act in a non-discretionary capacity and shall act only in accordance with directions from trustee(s), participants and beneficiaries, as provided in this agreement, the contract and the supplementary documents.")  *See also,* Hamilton 30(b)(6) Deposition, Exhibit 102 (Recordkeeping Agreement prepared for Sample Client by John Hancock Life Insurance Company (U.S.A.), September 6, 2017, JH-ROMANO_000746-775 at 747); Hamilton 30(b)(6) Deposition, Exhibit 101 (Recordkeeping Agreement prepared for John Hancock Sample Case by John Hancock Life Insurance Company (U.S.A.), December 22, 2016, JH-ROMANO_000612-639 at 613); Hamilton 30(b)(6) Deposition, Exhibit 99 (Recordkeeping Agreement prepared for John Hancock Sample Case by John Hancock Life Insurance Company (U.S.A.), March 7, 2016, JH-ROMANO_000551-577 at 552).

[73] John Hancock, "Retirement Plans," available at: https://retirement.johnhancock.com/us/en/retirement-products/retirement-plans.  ("John Hancock Retirement Plan Services, LLC, John Hancock Life Insurance Company (U.S.A.), and John Hancock Life Insurance Company of New York each make available a platform of investment alternatives to sponsors or administrators of retirement plans without regard to the individualized needs of any plan. Unless otherwise specifically stated in writing, each such company does not, and is not undertaking to, provide impartial investment advice or give advice in a fiduciary capacity.")

[74] Wang Deposition, Exhibit 18, JH_Romano_038562; Wang Deposition, Exhibit 19, JH_Romano_038563; Wang Deposition, Exhibit 20, JH_Romano_038564; Wang Deposition, Exhibit 21, JH_Romano_038565; Wang Deposition, Exhibit 22, JH_Romano_038566; Wang Deposition, Exhibit 23, JH_Romano_038567.

*Confidential - Pursuant to Protective Order*

Moreover, it was the decision of individual Named Plaintiffs Plan's participants to determine whether to allocate assets to the Templeton Global Bond Fund.[75]  As recordkeeper, John Hancock has no role in these plan sponsor and participant-specific investment decisions.  In my experience I have not encountered a recordkeeper, functioning in the same capacity as John Hancock with respect to Plans on the Signature Platform, that had discretion over the investment options offered on individual plan lineups, or how participant assets are allocated across investment options.[76]  As described above, the 2014 Recordkeeping Agreement between the Named Plaintiff Plan and John Hancock states that "John Hancock will not have any discretionary authority or responsibility for the management or control of the separate accounts."[77]

     39.     In contrast to the recordkeeper's (John Hancock, for example) role and consistent with industry practices,[78] documents in this matter state that the Proposed Class Members (which include plan fiduciaries and trustees) are responsible for selecting their Plan's recordkeeper, their Plan's underlying investment options, and establishing the administrative fee arrangement

---

[75] Statement of Assets and Liabilities of the Sub-Accounts of John Hancock Life Insurance Company (U.S.A.) for Contract # 115534, the Trustees of Romano Law, PL 401(k) Plan, 2014-2018: JH-ROMANO_041236-249, JH-ROMANO_041250-264, JH-ROMANO_041265-282, JH-ROMANO_041283-306, JH-ROMANO_041307-332.

[76] This excludes instances in which recordkeepers, such as Alight or Fidelity, for example, provide managed accounts services (in addition to recordkeeping services) to plans, whereby the recordkeeper explicitly agrees to direct the participant assets.

[77] Todd Romano Deposition, Exhibit 59 (Recordkeeping Agreement prepared for Romano & Romano 401(k) Profit Sharing Plan by John Hancock Life Insurance Company (U.S.A.), June 18, 2014, ROMANO-000028-049 at 029).

[78] To this point, publications by the Department of Labor and Internal Revenue Service state that plan fiduciaries are responsible for, among other things, understanding the terms of their plan, as well as selecting and monitoring service providers. (Department of Labor, "Fiduciary Education Campaign - Getting It Right - Know Your Fiduciary Responsibilities," available at: https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/fiduciary-responsibilities/fiduciary-education-campaign; Internal Revenue Service, "A Plan Sponsor's Responsibilities," available at: https://www.irs.gov/retirement-plans/plan-sponsor/a-plan-sponsors-responsibilities; Department of Labor, "Meeting Your Fiduciary Responsibilities," September 2020, available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.)

*Confidential - Pursuant to Protective Order*

through which their Plan will pay for the services it selects to receive.[79]  To further inform their investment decisions, many plan fiduciaries and trustees may undertake fiduciary training, receive investment education, or participate in retirement and investment seminars, many of which are often offered by the providers themselves or the Proposed Class Advisors.  Because GVACs are required to be sold through registered broker-dealers and investment advisors, Proposed Class Members are often, if not always, aided in their decision-making by investment professionals, who have passed FINRA-administered tests, and have demonstrated knowledge of investments.[80]  It is the duty and responsibility of these Proposed Class Advisors, who are either paid from the assets of the Plan (and by extension from the accounts of plan participants) or directly by retirement plan sponsors, to help Proposed Class Members, among other things, navigate the marketplace for recordkeeping services, negotiate with service providers, as well as evaluate, select, and monitor recordkeeping services and investment options.  Regardless of each Proposed Class Advisor's role, it is also the responsibility of the Proposed Class Members, such as the Named Plaintiffs, for "selecting the investment providers and the investment options, and for monitoring their performance."[81]

---

[79] For example, the recordkeeping agreement between John Hancock and the Named Plaintiff Plan shows that John Hancock requires each Proposed Class Member to affirmatively agree to select and monitor funds for their respective Plans, and to select the Plan lineup from among all the investment options John Hancock offers on its platform.  *See, e.g.,* Todd Romano Deposition, Exhibit 59 (Recordkeeping Agreement prepared for Romano & Romano 401(k) Profit Sharing Plan by John Hancock Life Insurance Company (U.S.A.), June 18, 2014, ROMANO-000028-049 at 037-042).

[80] *See, e.g.,* FINRA, "Investment Advisers," available at: https://www.finra.org/investors/learn-to-invest/choosing-investment-professional/investment-advisers; FINRA, "Qualification Exams," available at: https://www.finra.org/registration-exams-ce/qualification-exams.  Generally, in my experience, plan sponsors and fiduciaries of small plans typically receive assistance from professional advisors.  For example, a 2017 study published by Alliance Bernstein reports that among the approximately 600 plans surveyed with less than $50 million in assets (including 202 plans with less than $1 million in assets), over 80 percent use a financial advisor. (Alliance Bernstein, "Inside the Minds of Plan Sponsors," 2017, pp. ii, 15, available at: https://www.alliancebernstein.com/investments/us/retirement/resources/pdf/FINAL_DCI-6150-1117.pdf.)

[81] Department of Labor, "What You Should Know About Your Retirement Plan," p. 25, available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/what-you-should-know-about-your-retirement-plan.pdf.

*Confidential - Pursuant to Protective Order*

40.     While there is substantial variation among plan sponsors with respect to the extent to which they rely on plan advisors, Proposed Class Advisors, such as Mr. Searcy, can and typically do have a significant influence on the processes Proposed Class Members undertake to select recordkeepers, investment options, and service features.  For example, the Named Plaintiffs relied heavily on the advice of Mr. Searcy,[82] and testified that they were not "savvy investors",[83] did not receive fiduciary training,[84] are unaware of international investments on the Plan's lineup,[85] and "don't recall ever seeing a review of any international funds."[86]  In some instances, while the Proposed Class Members are ultimately responsible for making selection decisions, Proposed Class Advisors, like Mr. Searcy, can recommend that a Proposed Class Member select John Hancock as its Plan recordkeeper.  Likewise, a Proposed Class Advisor who considers it important to offer Plan participants exposure to international securities would advise the Proposed Class Member to offer one or more international funds on the Plan lineup.

41.     Given the respective roles of John Hancock and Proposed Class Members (who are assisted by Proposed Class Advisors), to the extent a Proposed Class Member and/or a Proposed Class Advisor would have deemed foreign tax credits to be important, that Proposed Class Member (with their Proposed Class Advisor) has discretion to: (1) select a different

---

[82] Todd Romano Deposition, 152:12-154:2.  ("Again, we placed a lot of trust and reliance on Christian for his recommendations when it came to investment decisions.")

[83] Todd Romano Deposition, 39:12-15.

[84] Todd Romano Deposition, 11:17-18, 109:16-25.  ("Q. When you became a trustee of the 401(k) plan, did you get trained on what your duties were as a trustee of the plan? A. Specific training, nothing that I can recall. Again, we place a lot of reliance on Christian Searcy to help us make decisions that are best for our plan. Q. Did you take any steps to educate yourself, to make sure you knew and understood your fiduciary responsibilities with respect to the plan? A. No specific steps that I can recall, no.")

[85] Todd Romano Deposition, 238:18-20.  ("Q. Do you have funds in international investments in the lineup in your Fidelity plan? A. I don't know off the top of my head.")

[86] Todd Romano Deposition, 259:1-10.

*Confidential - Pursuant to Protective Order*

recordkeeper whose allowance of foreign tax credits is aligned with the Proposed Class

Member's preferences; or (2) select investment options that do not pay foreign tax credits.

## V.   Based on My Experience, It Is My Opinion that Additional Disclosures of John Hancock's Allowance of Foreign Tax Credits Would Not Have Affected How Many Proposed Class Members and Proposed Class Advisors Evaluated Recordkeepers and Investment Options

42.     In my nearly 40 years of experience working with retirement plans, I have never

experienced, nor have I been aware of, foreign tax credits being relevant to the evaluations of

recordkeepers or investment options for retirement plans.  Instead, as I describe below, there are

a multitude of factors and considerations that influence whether a recordkeeper or investment

options available from that recordkeeper are appropriate for a plan, including the types and

quality of administrative services offered by a recordkeeper, the overall fee for these services,

and the asset-class exposure (diversification) provided by the investment options available to the

plan sponsor.  Based on my experience, it is my opinion that for many Proposed Class Members

and Proposed Class Advisors, additional disclosures of foreign tax credits would not have

affected their decision to select and retain John Hancock as recordkeeper or their decision to

select and retain investment options for their respective Plans.

### A.   Foreign Tax Credits Are Not Among the Various Factors Plan Sponsors and Plan Advisors Typically Consider in their Evaluation of Plan Recordkeepers

43.     In my nearly 40 years of experience working in the retirement plan industry, I

have not encountered any plan sponsors or plan advisors that considered foreign tax credits in

their evaluations of recordkeepers.  As I discuss below, additional disclosures of foreign tax

credits would not have affected the types and quality of the administrative services provided by

recordkeepers, the service needs of plan sponsors and plan participants, and the overall fee for

these services.  For these reasons, it is my opinion that additional disclosures would not have

*Confidential - Pursuant to Protective Order*

affected how many Proposed Class Members and Proposed Class Advisors evaluated recordkeepers, or how they negotiated and established recordkeeping agreements with John Hancock.  By focusing solely on John Hancock's disclosure of its allowance of foreign tax credits, Plaintiffs ignore the numerous other factors that plan sponsors and plan advisors of defined contribution plans typically consider and prioritize in their evaluation and selection of plan recordkeepers.

> 1.  Plan sponsors and plan advisors typically focus their evaluation of recordkeepers on the types and quality of administrative services recordkeepers offer and the overall fee for these services

44.     As discussed above in **Section III.B.**, the primary role of recordkeepers of retirement plans is to provide various administrative services, such as, but not limited to, maintaining the account balances of plan participants, providing for the safekeeping of plan assets, processing transactions on behalf of plan participants and plan sponsors, maintaining and managing plan data, and providing compliance services and investment education.  While plans vary substantially in how they evaluate and prioritize the various types of services a recordkeeper may provide, plan sponsors and plan advisors tend to focus their evaluations on whether the types and quality of administrative services offered by a recordkeeper and the overall fee for these services align with their plan's, and by extension their plan participants', specific needs.  In my experience, the disclosures that a recordkeeper does or does not provide about foreign tax credits allowed has no bearing on the level and quality of recordkeeper services.  Given my experience with and observations on how plan sponsors and plan advisors of retirement plans evaluate recordkeepers, it is my opinion that additional disclosures of John Hancock's allowance of foreign tax credits would not have affected how many Proposed Class Members and Proposed Class Advisors evaluated John Hancock's recordkeeping services.

*Confidential - Pursuant to Protective Order*

45.     It is my experience that plan sponsors (and plan advisors, if applicable) focus their evaluation on recordkeeping services and features that relate to the day-to-day operations of a retirement plan including (but not limited to): the availability of automatic enrollment provisions and other added features (*e.g.*, automatic contribution escalation), the accuracy and efficiency of administrative processing, functionality and ease of use of participant websites, effectiveness of employee communications and investment education, timely and comprehensive compliance and testing services, useful and timely produced plan sponsor reports, effective participant reporting and messaging, access to emerging technologies, availability of a broad range of investment alternatives, consistent levels of relationship management that support the goals and objectives of the plan sponsor, the ability on the part of the provider to improve retirement income outcomes for participants, and fees.[87]  Plan sponsors (and plan advisors, if applicable) also generally value and consider the reputation of the recordkeeper.  It is my experience that a recordkeeper's disclosure of its allowance of foreign tax credits, which does not directly affect how a recordkeeper carries out its day-to-day operations, would not have been considered by plan sponsors (and plan advisors, if applicable) in their evaluation of a recordkeeper.

46.     Plan sponsors (and plan advisors, if applicable) vary in terms of how they prioritize the various administrative services offered by recordkeepers.  The administrative support a retirement plan requires varies substantially from plan to plan and those individualized needs often determine the types of recordkeeping and administrative services plan sponsors (and plan advisors, if applicable) prioritize during their recordkeeper search.  In my experience, the

---

[87] For example, according to the 2019 Deloitte Defined Contribution Benchmarking Survey, plan sponsors who have had a recordkeeping change within the last five years identified "[o]verall cost to plan" (25 percent), "[q]uality of recordkeeping services" (21 percent), and "[o]verall relationship" (17 percent) as the top three most important factors considered.  (Deloitte, "The Retirement Landscape Has Changed–Are Plan Sponsors Ready?" 2019, p. 26, available at: https://www2.deloitte.com/content/dam/Deloitte/us/Documents/human-capital/us-2019-defined-contribution-benchmarking.pdf.)

*Confidential - Pursuant to Protective Order*

factors that often affect a plan's administrative servicing needs and preferences include, among other things, the complexity of plan provisions and features, the size of a plan, number of participants, employee hiring activity, organizational complexity of the plan sponsor, the ability on the part of the plan sponsor to support the plan, the demographics of plan participants (*e.g.*, average age, turnover percentages, compensation rates, and payroll frequency), and the level of investment knowledge on the part of plan participants and the plan sponsor.  It is well-recognized in the retirement industry that selecting and retaining a recordkeeper that best addresses a plan's specific needs may entail making trade-offs between services and features that the plan sponsors may desire, and the fees for such services.  For example, guidance provided by the Department of Labor to plan sponsors for evaluating service providers states that "cheaper is not necessarily better" and that "generally the more services provided, the higher the fees."[88]  In my experience, it common for plan sponsors (and plan advisors, if applicable) to select and retain a recordkeeper that can address their plans' needs and preferences even though another recordkeeper may offer somewhat lower fees.  For example, documentary evidence shows that in evaluating potential recordkeepers in 2020, the Named Plaintiffs and Mr. Searcy placed a premium on certain recordkeeping services and qualities, (*i.e.,* access to a variety of investment options and easy-to-

---

[88] Department of Labor, "A Look at 401(k) Plan Fees," September 2019, pp. 1-3, available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

use participant interface) and knowingly selected a recordkeeper (Fidelity) that would provide such services over proposals submitted by other lower-fee recordkeepers (OneAmerica).[89]

47.     It is my experience that John Hancock is particularly popular with start-up plans because it frequently waives contribution minimums (which benefits small and start-up plans with low assets), is a well-recognized brand name with sufficient scale, offers a large menu of investment options from which plan sponsors can select, and provides easy-to-understand participant education materials.  In addition, John Hancock will often collaborate with third-party administrators (TPAs) that provide additional administrative and compliance support for retirement plan sponsors.  Consistent with my experience, a representative of the Pension Studio, the Named Plaintiff Plan's TPA, suggested John Hancock in response to Mr. Searcy's request for recommendations of a recordkeeper that would be a "good fit for a startup [plan]," because John Hancock has "low annual addition[al] requirements."[90]  Based on my experience, I expect that for many Proposed Class Members, the benefits of John Hancock's services, including its willingness to accommodate start-up plans, would have outweighed any benefits that additional disclosures of John Hancock's allowance of foreign tax credits would bring to their Plan.

---

[89]   For example, during the 2020 recordkeeper RFP process, Mr. Searcy received two proposals from Fidelity: one that offered the Named Plaintiff Plan access to all investment options on its Fidelity' platform for 52 bps, and one that offered the Named Plaintiff Plan access to proprietary Fidelity target date funds for 40 bps.  Despite the availability of a lower fee option, Mr. Searcy only presented the Named Plaintiffs with the higher fee arrangement because he preferred access to a variety of investment options. (Searcy Deposition, 150:4-18.)  As part of the same RFP process, the Named Plaintiffs selected Fidelity over OneAmerica despite the fact that Fidelity's total recordkeeper fees were approximately 7 bps higher then OneAmerica's based on the rationale that "the increased technology (especially with the functioning ap [*sic*]) coupled with the single login integration and brand recognition [of Fidelity] outweigh the slight fee difference." (Eric Romano Deposition, Exhibit 34 (Minutes of Investment Committee Meeting, Romano Law, PL 401(k) Plan, November 19, 2020, pp. 1-2).)

[90] Email from Christian Searcy to Ellen Quinlan, RE: Romano Law Group, June 16, 2014, UBS00000764-765 at 764.

*Confidential - Pursuant to Protective Order*

      2.     The Request for Proposal processes retirement plans undertake to evaluate recordkeepers do not typically consider foreign tax credits

48.    The processes plan sponsors of defined contribution plans undertake to evaluate an administrative and recordkeeping service provider, such as John Hancock, vary from plan to plan.  Many plans, in my experience, undertake a Request for Proposal ("RFP") process, in which plan sponsors solicit proposals from a select group of recordkeepers that are deemed to be capable of meeting the servicing requirements of the plan sponsor and, by extension, the participants of the plan.  For many plans, the process of selecting the firms to receive the RFP documents, and the more detailed processes associated with developing, distributing, evaluating, and presenting the results of the RFP to the plan sponsor, is often performed by the plan advisor (such as Mr. Searcy) who typically has an established understanding of the market for recordkeeping services.  In some instances, plan sponsors, such as the Named Plaintiffs in 2014, may choose to forego an RFP process and instead rely on analysis conducted by, or recommendations provided by, plan advisors, such as Mr. Searcy, to inform their recordkeeper selection process.[91]  Regardless of a plan sponsor's approach to evaluating how the various features, functionality, and fees offered by potential recordkeeping providers meet the specific needs and preferences of their plans,[92] plan sponsors rarely, if ever, in my experience, consider foreign tax credits.

---

[91] I have not seen any documentary evidence in this matter reflecting that the Named Plaintiffs or Mr. Searcy conducted an RFP process related to the selection of John Hancock as recordkeeper for the Named Plaintiff Plan in 2014.

[92] A Department of Labor guide on fiduciary responsibilities states that: "Hiring a service provider in and of itself is a fiduciary function. When considering prospective service providers, provide each of them with complete and identical information about the plan and what services you are looking for so that you can make a meaningful comparison."  (Department of Labor, "Meeting Your Fiduciary Responsibilities," September 2020, available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.)

*Confidential - Pursuant to Protective Order*

49.     Over the course of my career, I have performed over 160 RFPs specific to the administration and investment management of defined contribution retirement plans and have also participated, as a respondent, in various RFPs specific to recordkeeping services and retirement and investment consulting services.  Throughout these projects, despite the general knowledge that investment options may pay foreign taxes, I have not conducted a single RFP on behalf of a retirement plan client that has requested information regarding a recordkeeper's allowance of foreign tax credits.  I have also not responded to an RFP where a plan sponsor has inquired about whether a recordkeeper is allowed foreign tax credits for foreign taxes paid.

50.     Consistent with my experience, industry guidance on how to conduct a recordkeeper RFP does not reference foreign tax credits.  Specifically, to assist plan sponsors (and plan advisors, if applicable) of defined contribution plans in conducting meaningful recordkeeper RFPs, industry organizations such as the Society of Professional Asset-Managers and Recordkeepers ("SPARK") and the National Association of Plan Administrators ("NAPA") issue templates which list various considerations that the respective organization deems relevant in the evaluation of a recordkeeper.[93]  The SPARK template, which is 69 pages long and addresses, among other things, specific transaction processing, communications and investment education, and compliance services, does not reference foreign tax credits.  Likewise, the NAPA template, which lists over 100 qualities relative to a recordkeeping RFP process, also does not reference foreign tax credits.

---

[93] The SPARK Institute, Inc., "Request for Proposal (RFP) Guide: Selecting Defined Contribution Plan Service Providers (4th Edition)," January 2018, available at: https://www.sparkinstitute.org/pdf/SPARK%20RFP%20Guide%204.0.pdf; National Association of Plan Administrators, "Recordkeeping Platform Assessment," available at: https://www.napa-net.org/industry-intel/recordkeeping-platform-assessment.

*Confidential - Pursuant to Protective Order*

51.     Even though foreign tax credits are not referenced in these industry templates, to the extent foreign tax credits were relevant to a plan sponsor or plan advisor, they could request that the recordkeeper provide such information in their custom-drafted RFPs.  However, consistent with my experience, examples of publicly available RFPs that I identified through my research reflect that plan sponsors and plan advisors typically do not request, and therefore do not consider, information on whether a recordkeeper was allowed foreign tax credits.  For example, RFPs issued by the Columbus Consolidated Government 457 Deferred Compensation Plan in March 24, 2021,[94] the County of Fresno Deferred Compensation Plan in September 26, 2019,[95] and the State of Wisconsin Deferred Compensation Program in April 9, 2021[96] make detailed requests for information on how a recordkeeper's system implements transactions,[97] the type of information that will be included in participant communications and investment education materials,[98] and the types of investment services a recordkeeper will provide.[99]  None of these RFP examples include references to foreign taxes or foreign tax credits.

---

[94] Request for Proposals, RFP No. 21-0029, 457 Deferred Compensation Plan - Recordkeeping, Administrative and Participant Education (Annual Contract) issued by Columbus Consolidated Government, March 24, 2021.

[95] Memorandum re: Recommendation of the Ad-Hoc Deferred Compensation Plan Record-keeper RFP Subcommittee, September 26, 2019.

[96] Request for Proposal ETJ0061 Administrative Services for the Wisconsin Deferred Compensation Program, issued by the State of Wisconsin, April 9, 2021.

[97] *See, e.g.,* Request for Proposal ETJ0061 Administrative Services for the Wisconsin Deferred Compensation Program, issued by the State of Wisconsin, April 9, 2021, pp. 26-30.

[98] *See, e.g.,* Request for Proposals, RFP No. 21-0029, 457 Deferred Compensation Plan - Recordkeeping, Administrative and Participant Education (Annual Contract) issued by Columbus Consolidated Government, March 24, 2021, pp. 23-25.

[99] *See, e.g.,* Memorandum re: Recommendation of the Ad-Hoc Deferred Compensation Plan Record-keeper RFP Subcommittee, September 26, 2019, pp. 27-33.

3. Foreign tax credits are not typically featured among the wide variety of services that recordkeepers advertise

52. Recordkeepers offer and advertise a wide variety of services, which include, but are not limited to, custodial services that involve the safekeeping of plan assets, the collection of contributions from plan sponsors and participants, and the disbursement of benefits to plan participants. Recordkeepers may also offer and advertise various administrative or operational services ("administrative services"), including recordkeeping and transaction processing (crediting contributions to individual plan accounts; accounting for individual participant account balances by investment fund and contribution type; updating balances to reflect daily investment returns); data management (maintaining employee demographic data necessary to administer the plan); assistance with plan design and the preparation of required plan documents; assistance with evaluating the plan investment lineup, participation rates, participant servicing requirements, and other plan features; completion of plan amendments as necessary; approval and processing of individual participant transactions, annual compliance services (Form 5500 filings and required participant and plan sponsor disclosures); discrimination testing; communications and investment education services; and consulting on matters related to issues specific to the plan sponsor or more broadly due to changes in legal and regulatory requirements.

53. I am only aware of one recordkeeper, Securian Financial ("Securian"), that advertises that "foreign tax credits are credited back to the separate accounts that generated them."[100] However, there are a number of reasons why plan sponsors select and retain (or do not select and retain) Securian that do not relate to the fee concessions for foreign tax credits that Securian provides. As described above, plan sponsors would typically evaluate Securian's

---

[100] Securian Financial, "Why Choose Securian Financial?" available at: https://www.securian.com/products-services/employers/retirement-plans/why-securian.html.

*Confidential - Pursuant to Protective Order*

services more broadly, focusing on the quality, cost, and types of services offered.  The fact that most recordkeepers do not advertise fee concessions for foreign tax credits indicates that most recordkeepers generally deem this feature to be irrelevant to retirement plan clients and/or that most recordkeepers generally do not provide fee concessions for foreign tax credits.

54.      As of December 31, 2020, Securian serviced approximately 2,600 defined contribution plans,[101] just a fraction of the nearly 850,000 defined contribution plans[102] in the U.S., and just 5.2 percent of the number of defined contribution plans serviced by John Hancock and its affiliates as of the same date[103]—reflecting that approximately 99.7 percent of defined contribution plans in the U.S. found the services and fees offered by other recordkeepers to be more suitable than the services and fees that Securian offered, regardless of any benefits Securian may provide through additional disclosures of, or fee concessions for, foreign tax credits.  For example, when asked why a client would choose a different recordkeeper over Securian, which offers fee concessions for foreign tax credits, Mr. Searcy responded that "[t]here's technology advantages, brand recognition, you know, single log-on type things, things like that, that sometimes outweigh other factors like foreign tax credits."[104]

---

[101] PlanSponsor, "2021 Recordkeeping Survey: Securian Financial," June 21, 2021, available at: https://www.plansponsor.com/research/2021-recordkeeping-survey/?pagesec=9&pid=41&pname=Securian-Financial#Providers.

[102] PlanSponsor, "2021 Recordkeeping Survey: Industry Snapshot," June 21, 2021, available at: https://www.plansponsor.com/research/2021-recordkeeping-survey/?pagesec=3#Industry%20Snapshot.

[103] According to PlanSponsor's 2021 Recordkeeping Survey, of the 845,522 defined contribution plans in the United States, John Hancock and its affiliates serve 49,603 plans while Securian serves 2,589 plans.  (PlanSponsor, "2021 Recordkeeping Survey," June 21, 2021, available at: https://www.plansponsor.com/research/2021-recordkeeping-survey/.)

[104] Searcy Deposition, 191:20-192:4.

*Confidential - Pursuant to Protective Order*

**B.     Foreign Tax Credits Are Not Relevant Among the Various Factors Plan Sponsors and Plan Advisors of Retirement Plans Typically Consider in their Evaluation of Plan Investment Options, Including International Funds**

55.     As discussed above, like other recordkeepers, John Hancock has no discretion over which investment options Proposed Class Members choose to offer on their investment lineup.  Rather, once a Proposed Class Member selects a recordkeeper and agrees to the level of administrative services to be provided and the fees for such services, they must then develop (in conjunction with the Proposed Class Advisor, if applicable) an investment lineup that would be consistent with the needs and preferences of their Plan participants.  As part of this decision, Proposed Class Members and Proposed Class Advisors have discretion to determine how many, if any, international investment options that may pay foreign taxes to include on their Plan lineup.  As I will discuss below, compared to the typical considerations plan sponsors and plan advisors of retirement plans undertake to assess whether an international investment option addresses the needs of plan participants, the disclosure of foreign tax credits is relatively insubstantial.  Based on my experience, it is my opinion that additional disclosures of John Hancock's allowance of foreign tax credits would not have been material to the processes many Proposed Class Members and Proposed Class Advisors undertake to evaluate investment options.

1.     While plan lineup design and investment option selection varies from plan to plan, most, if not all, plans offer investment options that provide participants exposure to international securities that may pay foreign taxes

56.     Most, if not all, plans that I have worked with offer or have offered at least one international investment option that may pay foreign taxes.  Indeed, in each year throughout the Proposed Class Period, Vanguard reports that "[v]irtually all [surveyed] plans [on Vanguard's

*Confidential - Pursuant to Protective Order*

trust-based recordkeeping platform] offered international equity funds."[105]  BrightScope and the

Investment Company Institute also report that as of 2018 (the last year for which data are

available), 98.5 percent of audited plans offered an international equity fund, and 22.3 percent of

audited plans offered an international bond fund.[106]  For example, one of the five individual

funds offered by the Federal Thrift Savings Plan, the largest defined contribution plan in the

U.S.,[107] is an international stock index fund ("I Fund").[108]  International investment options are

ubiquitous among defined contribution plans, because they provide participants with the

opportunity to diversify their portfolios with exposure to international securities, and reduce

portfolio risk.  As Vanguard explains: "[m]arkets outside the United States don't always rise and

fall at the same time as the domestic market, so owning pieces of both can level out some of the

volatility in your portfolio."[109]  However, while most, if not all, retirement plans offer

international investment option(s), plan sponsors, with assistance from plan advisors, have

discretion over the type, the number of, and specific international investment options to offer on

their respective plan lineups.

57.     As a general matter, in my experience, plan sponsors and plan advisors typically

focus their plan lineup design and investment option selection on whether those investment

options meet the investment needs and preferences of plan participants.  This is particularly true

---

[105] Vanguard reports that 97 percent of plans on the Vanguard recordkeeping platform offered an international equity fund.  *See,* Vanguard, "How America Saves 2020," pp. 60-61; Vanguard, "How America Saves 2014," pp. 48-49.

[106] BrightScope/ICI, "The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018," July 2021, p. 33.

[107] Pension and Investments, "Defined Contribution Rankings by Assets," available at: https://researchcenter.pionline.com/v3/rankings/plan-sponsors/datatable?adobe_mc=MCMID%3D02619879799699172531934419913317642811%7CMCORGID%3D1 38FFF2554E6E7220A4C98C6%2540AdobeOrg%7CTS%3D1629303500.

[108] Thrift Savings Plan, "Fund Information," March 2021, pp. 1, 11-12.

[109] Vanguard, "International investing," available at: https://investor.vanguard.com/investing/investment/international-investing.

*Confidential - Pursuant to Protective Order*

for participant-directed defined contribution plans.  To address the varying needs of plans, recordkeepers vary in terms of the number and variety (*i.e.,* in terms of asset classes, fund families, etc.) of investment options they offer on their recordkeeping platform.  In this matter, John Hancock's Signature Platform offered the Named Plaintiffs approximately 200 investment options to select for the Named Plaintiff Plan as of October 2014 (ranging from small cap equity funds and global bond funds to target date funds).[110]

58.     In my experience, plan-specific participant demographics are typically used to inform investment menu design and decisions associated with specific fund selections.  Some of these demographic factors that plan sponsors consider include the diversification of the participant population with respect to age, education levels, access to investment education and financial planning materials, and levels of participant engagement.  Deposition testimony shows that such demographics were considered during the selection of investment options for the Named Plaintiff Plan.  Eric Romano testified that, "[w]e discussed offering a wide range of investments so that, you know, we would have options to suit everybody's needs. Our employees obviously have different goals and are at different stages in life."[111]

59.     This variation in plan investment needs translates to variations in how plan sponsors design their plan lineups to provide international exposure to their plan participants.  For example, to the extent a plan's participants are less comfortable in making investment decisions, plan sponsors (and plan advisors, if applicable) will commonly provide simple, diversified, and stand-alone investments, such as managed account services or target-date funds,

---

[110] *See,* Todd Romano Deposition, Exhibit 59 (Recordkeeping Agreement prepared for Romano & Romano 401(k) Profit Sharing Plan by John Hancock Life Insurance Company (U.S.A.), June 18, 2014, ROMANO-000028-049 at 037-042); Eric Romano Deposition, Exhibit 15 (Group Annuity Contract for the Romano Law, PL 401(k) Plan by John Hancock Life Insurance Company (U.S.A.), effective October 7, 2014, Separate Account B Rider); Holden Deposition, 18:19-19:2.

[111] Eric Romano Deposition, 81:3-7.

*Confidential - Pursuant to Protective Order*

which include international investment components by design.  Alternatively, if plan participants are comfortable in making their own investment decisions, plan sponsors (and plan advisors, if applicable) may offer an array of international investment options associated with various geographies and market capitalizations to enable their participants to develop diversified portfolios consistent with the level of investment risk and investment time horizon of each individual participant.

      2.    When evaluating international funds, plan sponsors focus on whether the fund addresses participant needs and not on whether, or to what extent, the fund pays foreign taxes

60.     In my nearly 40 years of industry experience, I have never experienced, nor have I been aware of, foreign tax credits being relevant to the evaluations of international investment options for retirement plans.  Specifically, over the course of my career I have reviewed and assisted in the development of Investment Policy Statements for over 50 plan clients and have consulted with various investment advisors on the development of investment fund evaluation metrics.  During this time, I have never encountered plan sponsors or plan advisors that evaluated international funds based on whether, and to what extent, they pay foreign taxes and/or whether recordkeepers were allowed foreign tax credits as a result.  My experiences are consistent with the Investment Policy Statement for the State of Florida's Deferred Compensation Plan, which makes no reference to foreign tax credits in terms of selecting and monitoring plan investments.[112]  Similarly, the Investment Policy Statement drafted for the

---

[112] State of Florida Employees Deferred Compensation Plan: Investment Policy for Product Selection and Retention, 2016, available at:  https://sf01.myfloridacfo.com/docs-sf/deferred-compensation-libraries/dc-documents/administrative-documents/investment-policy.pdf?sfvrsn=db7ba35b_8.

*Confidential - Pursuant to Protective Order*

Named Plaintiff Plan by Mr. Searcy, a document that typically describes a plan fiduciary's investment process, does not reference foreign tax credits.[113]

61.     As a general matter, plan sponsors and plan advisors evaluate funds, including international funds, based on multiple qualitative and quantitative factors, including performance (near-term and long-term relative to benchmarks and peer groups), style consistency (the fund remains consistent with its asset category), risk, manager tenure, and performance in up and down markets.  Plan sponsors and plan advisors typically also consider the fees associated with each investment option and what portion, if any, of an investment's fee is used to offset the costs for administrative services.  For international funds, plan sponsors and plan advisors also typically consider geographical allocations.

62.     Foreign taxes are an investment attribute shared by many international investment options.  However, like other investment options, there are many other factors or investment attributes, such as trading costs, fund administrative fees, and asset management fees, that may increase or decrease the returns to an investment.  Rather than evaluating the reasonableness of individual factors and investment attributes that may affect returns, plan sponsors and plan advisors typically evaluate international investment options based on, among other things, their net of fee returns which encompasses both gains derived from investing in international securities as well as any taxes, foreign or otherwise, and other investment attributes that may increase or decrease returns.  This approach is commonly taken regardless of whether an international investment option is being offered on an annuity-based recordkeeping platform or a trust-based recordkeeping platform.  For example, based on my understanding of how net of fees

---

[113] It is my understanding that the draft Investment Policy Statement was not formally adopted by the Named Plaintiffs.  (Searcy Deposition, Exhibit 108 (Investment Policy Statement for Romano Law Group, prepared on May 18, 2020, CDSJR00063-075); Searcy Deposition, 117:2-8; Eric Romano Deposition, 74:6-11, 118:6-25.)

*Confidential - Pursuant to Protective Order*

returns are calculated, the net of fees return to the I Fund reflects any foreign taxes withheld on dividends received by the I Fund; however, the Federal Thrift Savings Plan does not pay U.S. taxes or receive foreign tax credits.[114]

63.      In contrast to the quantitative and qualitative fund attributes described above, including net returns, whether and how foreign tax credits are available or disclosed carry little, if any, relevance to whether an investment option addresses the overall investment needs of plan participants.  Given the importance of the other investment attributes discussed above, plan sponsors typically do not consider foreign tax credits in their evaluation of investment options.

## VI.      Based on My Experience, It Is My Opinion that Plaintiffs' Proposed Fee Concessions for Foreign Tax Credits Would Not Have Affected the Total Recordkeeping Fees for Many Plans of the Proposed Class

64.      Plaintiffs imply that John Hancock was required to provide Plans with fee concessions for foreign tax credits.[115]  However, this implication conflicts with industry practices with respect to when and how many recordkeepers provide fee concessions.  Moreover, it is unlikely that fee concessions for foreign tax credits, as proposed by Plaintiffs, would have decreased the total recordkeeping fees collected by John Hancock.  John Hancock, like most other recordkeepers in the marketplace, prices plans based on an evaluation of John Hancock's expected revenues given each Plan's specific attributes (*e.g.,* plan assets, number of participants,

---

[114] Summary of the Thrift Savings Plan, p. 22, available at: https://www.tsp.gov/publications/tspbk08.pdf.

[115] Specifically, Plaintiffs state in the Complaint that, "the Plan's assets were diminished by the amount of the foreign tax credits retained by [John Hancock] but not credited to the Plan and the income those overcharges would have earned had they been properly credited to the Plan's Account."  (Complaint, ¶ 2.)  *See also,* Plaintiffs' Motion for Class Certification, pp. 4-5.

*Confidential - Pursuant to Protective Order*

annual contributions, etc.), their overall servicing requirements,[116] the costs to John Hancock to provide requested services, and market pressures.[117]  Based on my experience, it is my opinion that John Hancock could have achieved the same total expected revenues by offering fee concessions for foreign tax credits and simultaneously increasing other fees (or reducing other fee concessions).

A.      **Recordkeepers Do Not Generally Provide Fee Concessions for Foreign Tax Credits**

65.      In my experience, while recordkeepers provide fee concessions (or fee discounts) for various reasons, recordkeepers do not generally provide fee concessions for foreign tax credits.  As a general matter, fee concessions are negotiated on a plan-by-plan basis based on not only the recordkeeper's pricing objectives but also the services individual plan sponsors choose to receive from their recordkeeper.  Documentary evidence in this matter reflects that recordkeepers often provide fee concessions for various reasons but rarely do so for foreign tax credits.  For example, to attract plans of a certain size or to further incentivize plan participants to save for retirement, recordkeepers often provide fee concessions if plan assets meet certain minimums.[118]  For instance, the Named Plaintiff Plan's 2014 Recordkeeping Agreement

---

[116] 30(b)(6) Deposition of Joe Almada, July 21, 2021 ("Almada 30(b)(6) Deposition"), 31:15-32:5. ("And obviously, what I would say in any kind of business, that's where the plan then gets kind of submitted through this sort of overall process to draw pricing and obviously our pricing is really kind of heavily dependent on four or five key factors, which is really understanding -- what are the total assets in that plan, what are the total participants and what's the contribution of that particular plan. And then obviously, you know, within sort of those three or four key data points, we're able to assess what is the administration in the recordkeeping fee that we would charge for that particular plan.")  *See also,* Almada 30(b)(6) Deposition, 22:19-23:2, 32:21-23, 54:6-16, 81:5-15.

[117] Almada 30(b)(6) Deposition, 61:8-19. ("With respect to recordkeeping fees in general, right, what we charge plan sponsors, yes, I mean, obviously over time we've had to, I'd say, adjust kind of what we charge recordkeeping fees in general from plan to plan just given the way the overall market works. So yeah, over time, obviously with any product company service, you're pricing does evolve and does change and needs to change relative to the individual market in that time.")

[118] For example, the OneAmerica proposals for the Named Plaintiff Plan show that OneAmerica provides fee concessions based on the plan balance.  (OneAmerica, "Romano Law Group 401k Plan Cost Information," expires

*Confidential - Pursuant to Protective Order*

identified a 15 basis point credit allocated to participants with a non-zero account balance at the end of each month.[119]  John Hancock offered additional fee concessions if the Named Plaintiff Plan's total assets exceeded $1 million or if a participant's annual average transfer amount exceeds $10,000 annually.[120]

66.     Recordkeepers may also issue fee concessions to incentivize established plans to remain on their recordkeeping platform.  For example, during the 2020 RFP process, John Hancock offered to reduce the estimated recordkeeping fees it collected from the Named Plaintiff Plan by 38 basis points ("bps") if the Named Plaintiff Plan retained John Hancock.[121] Recordkeepers may also provide fee concessions if plan sponsors include certain investment options, such as funds managed by the recordkeeper, in the plan lineup.  Fidelity, for example, proposed a 12 bps reduction in its annual administration fee if the Named Plaintiffs chose to offer Fidelity Target Date funds on the Named Plaintiff Plan lineup.[122]

67.     Finally, recordkeepers may also offer fee concessions in an effort to compete with other recordkeepers.  Mr. Almada, Head of Pricing for U.S. Retirement at John Hancock, for

---

November 15, 2020, Searcy_Christian-00000180; OneAmerica, "Romano Law Group 401k Plan Cost Information," expires November 15, 2020, Searcy_Christian-00000181.)

[119] According to the Supplemental Information Guide, "[t]he contract-level charge stated above is calculated net of an annualized credit of 0.150% that is available to the Plan and which will be allocated to each participant with an account balance at the end of each month. The annualized credit applies when (i) the cost of the Class of Funds selected for this proposal is greater than (ii) the rate of the total asset-based compensation payable to the intermediaries and John Hancock, if applicable (as described in the Details of estimated annual plan costs section of the Recordkeeping Agreement)."  (Todd Romano Deposition, Exhibit 61 (Supplemental Information Guide prepared for Romano & Romano 401(k) Profit Sharing Plan, June 18, 2014, ROMANO-000090-107 at 093, 100).)

[120] Todd Romano Deposition, Exhibit 59 (Recordkeeping Agreement prepared for Romano & Romano 401(k) Profit Sharing Plan by John Hancock Life Insurance Company (U.S.A.), June 18, 2014, ROMANO-000028-049 at 033-034); Todd Romano Deposition, Exhibit 61 (Supplemental Information Guide prepared for Romano & Romano 401(k) Profit Sharing Plan by John Hancock Life Insurance Company (U.S.A.), June 18, 2014, ROMANO-000090-107 at 092-093).

[121] Letter from John Hancock to Eric Romano, Re: Offer to lower fee for ROMANO LAW, PL (Contract No. 115534), August 14, 2020, Searcy_Christian-00000145.

[122] Searcy Deposition, Exhibit 117 (Fidelity Defined Contribution WorkPlace Services, "Schedule of Fees and Services," August 12, 2020, pp. 10, 12).

*Confidential - Pursuant to Protective Order*

example, testified that depending on the plan, John Hancock may adjust its pricing to match a competitor's pricing.[123]  However, the availability of such fee concessions may depend on how the plan advisor negotiates with the recordkeeper.  Mr. Cobey, Regional VP of Retirement Plan Services at John Hancock, described the process between John Hancock and plan advisors, detailing that what he "may try to do is go back to [his] underwriting department" if the plan's advisor is "getting multiple proposals."[124]

68.     This negotiation process is consistent with my experience in assisting plan sponsors with conducting RFPs and selecting recordkeepers.  It is not uncommon for plan sponsors and plan advisors to leverage one recordkeeper's fee proposal to negotiate and obtain more favorable pricing from another recordkeeper.  In addition, it is my experience that in certain instances, an incumbent recordkeeper participating in an RFP process may respond to competitive market pressures by offering fee concessions.  However, in my nearly 40 years of industry experience, I have only encountered one recordkeeper (Securian) in the marketplace that claims to provide fee concessions for foreign tax credits.  However, as I will discuss below, Securian's fee concessions for foreign tax credits do not necessarily reduce the total amount of compensation it collects for providing recordkeeping services to retirement plans.

**B.     Fee Concessions for Foreign Tax Credits Proposed by Plaintiffs Are Unlikely to Materially Change a Plan's Total Recordkeeping Fee**

1.     Fee concessions must be evaluated in the context of each Plan's overall recordkeeping fee arrangement

69.     To understand why a fee concession is unlikely to affect a Plan's total recordkeeping fee, it is necessary to understand how recordkeeping fee arrangements are

---

[123] Deposition of Joe Almada, May 7, 2021 ("Almada Deposition"), 6:25-7:4, 23:21-24:4.
[124] Cobey Deposition, 11:18-25, 87:14-88:10.

*Confidential - Pursuant to Protective Order*

established and structured, and how fee concessions for foreign tax credits, if provided, would be incorporated into that structure.

70.     Recordkeeping fee arrangements are complex, consist of multiple inter-related fee components, and reflect the individualized nature of the services each plan sponsor selects to receive from recordkeepers.  In this matter, the total compensation that recordkeepers receive, which I refer to as "total recordkeeping fees," are established by recordkeeping fee arrangements negotiated between each Proposed Class Member and John Hancock.  According to Mr. Almada, "every plan that [John Hancock] price[s] out is priced individually, right.  So each plan has its own recordkeeping fees based off that particular plan's specs, so every plan would have a separate recordkeeping fee that we would charge."[125]  Typically, at the outset of each contract, recordkeepers such as John Hancock estimate the "required revenue," or the compensation they will accept for providing the combination of services selected by a plan given the plan's characteristics such as plan assets, number of participants, and anticipated growth trajectory over time.[126]  Based on this required revenue, the recordkeeper then works with individual plan sponsors and plan advisors to establish a fee arrangement through which total recordkeeping fees would be collected.

71.     Total recordkeeping fees can be collected through various and distinct fee components, including asset-based fees collected from participant accounts or the plan sponsor, fixed per participant fees collected from participant accounts or the plan sponsor, and revenue

---

[125] Almada 30(b)(6) Deposition, 59:19-24.

[126] *See,* Almada 30(b)(6) Deposition, 22:19-23:2, 31:15-32:5, 119:17-25.

*Confidential - Pursuant to Protective Order*

sharing payments received from investment managers of the plan's investment options.[127]  In my experience, provided the total recordkeeping fees enable the recordkeeper to achieve its required revenue amount, recordkeepers are generally flexible in how fees may be paid and how fees are allocated across participant account balances.  For various plan-specific reasons, one plan may prefer that its recordkeeper collects all of its compensation through asset-based fees collected from participant accounts, while another plan may prefer that its recordkeeper use a combination of fixed per participant fees and revenue sharing payments to collect total recordkeeping fees.[128] Plan sponsors may also opt to pay for a portion of, or all, recordkeeping fees themselves. Alternatively, plan sponsors may elect to have plan participants pay for all of the recordkeeping fees.[129]  Moreover, regardless of the allocation of recordkeeping fees across plan sponsors and plan participants, fees may be asset-based (a defined percentage of assets), based on number of participant accounts (a fixed dollar amount per participant), or a combination of the two methods.  For example, the Named Plaintiffs in this matter elected to have Named Plaintiff Plan participants pay for recordkeeping services through asset-based and flat dollar charges applied to

---

[127] *See, e.g.,* John Hancock, Plan Review for Romano Law, PL | 115534, February 5, 2019, UBS00006456-495 at 476; Todd Romano Deposition, Exhibit 61 (Supplemental Information Guide prepared for Romano & Romano 401(k) Profit Sharing Plan by John Hancock Life Insurance Company (U.S.A.), June 18, 2014, ROMANO-000090-107 at 100).

[128] Almada 30(b)(6) Deposition, 35:9-18, 43:3-18, 117:14-118:20.

[129] Eric Romano Deposition, 87:15-88:12.  ("Q. Okay. Did you make a decision that the cost for the John Hancock services would be paid through the plan as opposed to seperately [*sic*] paid for by Romano Law, PL? A. I think that we did, yes. I think it was explained to us that typically the fees would be taken from the fund assets. So everybody in the plan would pay kind of proportionate or pro-rata share of the fees for their share of the assets that were in the plan. … Q. Do you remember Christian discussing with you that you had an alternative option to pay John Hancock's fees seperately [*sic*] from participant accounts and instead from the company or from the law firm itself? A. I don't recall that conversation specifically. … As I sit here now, I don't recall if I knew that at that time. I know that now I think from more recent discussions we had regarding the Fidelity plan, but I'm not sure I knew that in 2014. I just don't remember.")

*Confidential - Pursuant to Protective Order*

participant account balances.[130]  Because recordkeeping fee arrangements vary substantially

from plan to plan, fee concessions must be evaluated within the context of each plan's overall

recordkeeping fee arrangement.

> **2.**     **Implementing a fee concession for foreign tax credits, as Plaintiffs assert, would not necessarily decrease total recordkeeping fees**

72.     Because the various fee components of a plan's recordkeeping fee arrangement

are inter-related, the provision of a fee concession for foreign tax credits, as Plaintiffs propose,

may not materially decrease the total recordkeeping fees received by John Hancock.  For

example, to ensure that it is adequately compensated for the combination of services it provides,

if a fee concession for a specific plan sponsor lowers the total recordkeeping fee below a

recordkeeper's required revenue, the recordkeeper can offset this decrease in compensation by

simultaneously increasing the compensation it collects from other fee components (or decreasing

other fee concessions).

73.     As discussed above, Securian[131] is the only recordkeeper I am aware of that

actively advertises fee concessions for foreign tax credits as a feature of its recordkeeping

arrangements.[132]  However, despite its provision of foreign tax credits, the total compensation

Securian collects for providing recordkeeping services to a plan is not necessarily lower than the

---

[130] Todd Romano Deposition, Exhibit 59 (Recordkeeping Agreement prepared for Romano & Romano 401(k) Profit Sharing Plan by John Hancock Life Insurance Company (U.S.A.), June 18, 2014, ROMANO-000028-049 at 033-034); Todd Romano Deposition, Exhibit 61 (Supplemental Information Guide prepared for Romano & Romano 401(k) Profit Sharing Plan by John Hancock Life Insurance Company (U.S.A.), June 18, 2014, ROMANO-000090-107 at 092-093, 100).

[131] Like John Hancock, Securian provides retirement services through GVACs.  *See, e.g.,* Securian, "Plan Sponsor," available at: https://www.securianretirementcenter.com/sponsor/main/#/basicLogin.  ("Securian Retirement's qualified plan products are offered through a group variable annuity contract issued by Minnesota Life Insurance Company, a Securian Financial Group affiliate.")

[132] Securian, "Why Choose Securian Financial?" available at: https://www.securian.com/products-services/employers/retirement-plans/why-securian.html.

*Confidential - Pursuant to Protective Order*

compensation other recordkeepers, who do not provide fee concessions for foreign tax credits, collect for offering similar services.  Take for example, the RFP responses Mr. Searcy received from UBS, Fidelity, John Hancock, and Securian for an unnamed plan with 36 participants and approximately $6 million in assets.[133]  Among the four RFP respondents, Securian was the only recordkeeper to offer fee concessions for foreign tax credits.  Specifically, Securian's RFP response included seven investment options that were associated with a foreign tax credit ranging from 1 basis point (*e.g.,* DFA Emerging Markets) to 10 basis points (*e.g.,* Parametric International Equity Investor).[134]  However, while the specific services and details of each proposed fee arrangement differ, a comparison of the fee arrangement proposed by each of the four respondents indicates that Securian's total recordkeeping fees (35 bps[135]) were at least 11 bps higher than the recordkeeping fee that Fidelity (18 to 22 bps[136]), John Hancock (22 bps[137]), and UBS (23.6 bps[138]) proposed, and would have more than offset the 1 to 10 bps fee concession for foreign tax credits that it provided.  Hence, while Securian did provide a fee concession for

---

[133] Email from [Redacted for CID] to Christian Searcy re: RE: Update Provider Analysis: [Redacted for CID], August 5, 2017, and attached proposals, UBS00004497-590 at 522, 533, 537, 557, 567.

[134] Email from [Redacted for CID] to Christian Searcy re: RE: Update Provider Analysis: [Redacted for CID], August 5, 2017, and attached proposals, UBS00004497-590 at 576-577.

[135] Securian's total recordkeeping fee is based on its contract asset charge.  Securian's proposal states that any revenue sharing amounts Securian receives from investment options provided will be credited towards the contract asset charge for that investment option. (Email from [Redacted for CID] to Christian Searcy re: RE: Update Provider Analysis: [Redacted for CID], August 5, 2017, and attached proposals, UBS00004497-590 at 567-569.)

[136] Email from [Redacted for CID] to Christian Searcy re: RE: Update Provider Analysis: [Redacted for CID], August 5, 2017, and attached proposals, UBS00004497-590 at 533, 537.

[137] Email from [Redacted for CID] to Christian Searcy re: RE: Update Provider Analysis: [Redacted for CID], August 5, 2017, and attached proposals, UBS00004497-590 at 557.

[138] UBS's recordkeeping fee is calculated as the sum of (1) a 20 bps platform fee that may be offset by any form of revenue sharing paid by each fund in the plan, and (2) a $60 per participant fee that equates to ~3.6 bps based on the plan's 36 participants and approximately $5,944,254 in plan assets. (Email from [Redacted for CID] to Christian Searcy re: RE: Update Provider Analysis: [Redacted for CID], August 5, 2017, and attached proposals, UBS00004497-590 at 522.)

*Confidential - Pursuant to Protective Order*

foreign tax credits, its total recordkeeping fees, even after reflecting those foreign tax credits,
were higher than the total recordkeeping fees other recordkeepers estimated for the same plan.

74.     This Securian example highlights that Plaintiffs' claim that John Hancock should
have provided fee concessions for foreign tax credits completely ignores how recordkeeping fee
arrangements are established and structured.  Given that John Hancock can adjust fee
components within a fee arrangement to ensure that its required revenue is met, it is my opinion
that implementing a fee concession for foreign tax credits, as Plaintiffs assert, would not
necessarily decrease total recordkeeping fees.

### C.     Foreign Tax Credits Were Not Material to the Named Plaintiffs' Recordkeeping Fee Arrangement with John Hancock

75.     Documentary evidence reflects that additional disclosures of John Hancock's
allowance of foreign tax credits or fee concessions for foreign tax credits would not have
affected the recordkeeping fee arrangement between the Named Plaintiffs and John Hancock for
the Named Plaintiff Plan.  Despite having information on foreign tax credits and access to John
Hancock's sales representatives, the Named Plaintiffs and Mr. Searcy never sought to renegotiate
the recordkeeping fee arrangement between the Named Plaintiff Plan and John Hancock
throughout the Proposed Class Period, or to replace John Hancock with a recordkeeper that could
incorporate fee concessions for foreign tax credits in its new recordkeeping fee arrangement—
indicating that foreign tax credits are not relevant to how the Named Plaintiffs select
recordkeepers or negotiate fee arrangements.

*Confidential - Pursuant to Protective Order*

76.     The documents in this case suggest that Mr. Searcy was aware of foreign tax

credits from at least July 2013, if not earlier,[139] when he received a proposal from a sales

representative at Securian that included fee concessions for foreign tax credits.[140] Mr. Searcy

also testified that he had conversations with sales representatives from various recordkeepers,

including John Hancock, regarding foreign tax credits during the Proposed Class Period.[141]

Despite his understanding of foreign tax credits, his awareness of the fee concessions for foreign

tax credits marketed by Securian, and his conversations with Mr. Cobey at John Hancock,

Mr. Searcy did not seek to renegotiate the Named Plaintiff Plan's fee arrangement to obtain fee

concessions for foreign tax credits.[142]

77.     Mr. Todd Romano also testified that he and Eric Romano discussed the concept of

foreign tax credits as early as 2017 or 2018.[143] Despite their awareness of foreign tax credits,

---

[139] Mr. Searcy also testified that the "first time that [he] may have run into the term or the concept" of foreign tax credits was during his financial accounting classes or "during either the CFP [Certified Financial Planner] or CPWA [Certified Private Wealth Advisor] when it comes to the taxes and retirement planning sections." (Searcy Deposition, 169:22-170:11.)

[140] *See, e.g.,* Email from John McGuire to Christian D. Searcy, re: [Redacted for CID], July 26, 2013, and attachments, UBS00000018-145 at 030-034; Email from John McGuire to Christian D. Searcy, re: [Redacted for CID], July 26, 2013, and attachments, UBS00000149-203 at 149, 153-156.

[141] Searcy Deposition, 174:7-21. ("Q. Do you recall any conversations with Bruce Cobey about foreign tax credits? A. I can't say I recall a specific conversation with Bruce. I do recall in general asking recordkeepers about it. Remember I mentioned the guy had the marketing thing about it, the other company that was pitching that they refunded the foreign tax credits. Q. Securian? A. Yes, that one. So when I read that I think I asked the providers that I was using if they got foreign tax credits and if so what they did with them. I seem to remember not really getting much response from anybody. So I don't remember who I would have talked to at all the different companies, but I think I asked that question.") *See also,* Cobey Deposition, 41:25-43:23.

[142] *See, e.g.,* Martinez Deposition, 86:2-5; Eric Romano Deposition, 174:1-175:4; Todd Romano Deposition, 216:1-5.

[143] Todd Romano Deposition, 12:8-13:5. ("A. I recall -- I guess my first recollection is speaking to my brother Eric Romano about foreign tax credits. I believe it came up at some point based on some discussions he had had with Christian Searcy, our financial advisor. I recall several years ago just discussing it in general terms with my brother Eric. Q. Do you recall when that conversation with your brother Eric took place? A. I would have to say three or four years ago. Q. Is that 2018? Does that sound right? A. I would say 2017 or 2018, yes, ma'am, as best as I can recall. … I recall that he mentioned he had a discussion with Christian Searcy. There was some indication that under our current 401(k) plan at the time with John Hancock that there were certain foreign tax credits that perhaps were not -- were being maintained by the plan and were not being provided to us as plan members or our employees as plan participants and that was -- that was it.")

*Confidential - Pursuant to Protective Order*

foreign tax credits were not prioritized or relevant to their selection and monitoring of the Named

Plaintiff Plan investment options throughout the Proposed Class Period.  For example,

Mr.  Searcy testified that foreign taxes were not a selection or monitoring criterion for the

Named Plaintiff Plan.[144]  Melanie Martinez, Chief Compliance Officer and Financial Advisor at

Pursuit Wealth Management, also testified that she is not aware of any discussions on foreign tax

credits during Named Plaintiff Plan committee meetings during the Proposed Class Period.[145]

      78.    Documentary evidence also reflects that the Named Plaintiffs and Mr. Searcy did

not prioritize (or, according to the meeting minutes, discuss) foreign tax credits when selecting a

new recordkeeper in November 2020.[146]  Even though both Named Plaintiffs and Mr. Searcy

were aware of foreign tax credits at the time of the 2020 RFP process, Mr. Searcy and the Named

Plaintiffs only reviewed responses from recordkeepers that did not provide fee concessions for

foreign tax credits (Fidelity, John Hancock, and OneAmerica), and ultimately selected Fidelity,

which services plans on a trust-based recordkeeping platform.[147]  As of his deposition in 2021,

Mr. Eric Romano testified that he is not aware whether Fidelity provides any fee concessions for

---

[144] Searcy Deposition, 98:19-99:20, 114:25-115:4, 125:4-10, 164:23-165:3.  Ms. Martinez also testified that foreign taxes were not a criterion for a fund being replaced or removed from the Named Plaintiff Plan.  (Martinez Deposition, 59:8-11, 60:15-25.)

[145] Martinez Deposition, 9:4-9, 95:4-7.  ("Q. Have you been at any investment committee meeting for the Romano Law 401(k) plan where foreign tax credits were discussed? A. No.")

[146] Eric Romano Deposition, Exhibit 34 (Minutes of Investment Committee Meeting, Romano Law, PL 401(k) Plan, November 19, 2020).

[147] Eric Romano Deposition, Exhibit 34 (Minutes of Investment Committee Meeting, Romano Law, PL 401(k) Plan, November 19, 2020).

foreign tax credits.[148,149]  However, Mr. Searcy testified that it is his "understanding that [recordkeepers that use trust-based recordkeeping platforms such as Fidelity] do not have the ability to file for the foreign tax credit" and do not offer credits to participants or plans for foreign tax credits.[150]

79.     That John Hancock did not provide additional disclosures of or fee concessions for foreign tax credits did not affect the impression of the Named Plaintiffs or their advisor on the overall level and quality of administrative services John Hancock provided.  In fact, deposition testimony by Mr. Searcy and Ms. Martinez indicate that the Named Plaintiffs were generally satisfied with the recordkeeping services the Named Plaintiff Plan received from John Hancock.  For example, meeting minutes from May 2018 recorded by Melanie Martinez noted "Christian and I obtained general feedback on the 401K plan. Todd and Eric seem pleased with where everything stands."[151]  Mr. Searcy further testified that "on the service metric John Hancock has always been above average service level" and except for some "frustration in the international large cap value space for a period of time," Mr. Searcy has "no recollection about general dissatisfaction of the investment lineup."[152]

---

[148] Eric Romano Deposition, 205:11-25.  ("Q. As you sit here today do you know whether or not Fidelity credits to the plan or participants any foreign tax credits that are generated with respect to investments that are made through the Fidelity platform? A. I don't know. Q. Okay. You testified earlier that was a rationale for conducting this RFP was because of your concern about the way John Hancock treated credits, right? That was your testimony? A. Correct. Q. But as part of the RFP the winning bid went to somebody for whom, even as you sit here today, you don't know how that credit foreign credits taxed passed on by mutual funds invested through the plan, correct? A. Specifically, that's correct.")

[149] Similarly, Mr. Todd Romano testified that he "[does not] recall ever even thinking about [selecting an insurance company versus a fund company] as a consideration, no."  (Todd Romano Deposition, 130:5-10.)

[150] Searcy Deposition, 180:22-181:6.  *See also,* Searcy Deposition, 203:12-16.  ("Q. So this is consistent with your understanding that today the Romano Law plan utilizing a trust product does not utilize and is unable to utilize foreign tax credits with that trust structure, correct? A. Correct.")

[151] Martinez Deposition, Exhibit 145 (Minutes of Investment Committee Meeting, May 7, 2018, ROMANO-001717-747 at 745).

[152] Searcy Deposition, 69:18-20; 142:19-143:1.

80.     Based on the evidence described above, it is my opinion that additional disclosures of John Hancock's allowance of foreign tax credits or fee concessions for foreign tax credits would not have affected the recordkeeping fee arrangement between the Named Plaintiffs and John Hancock for the Named Plaintiff Plan.

## VII.    Contrary to Plaintiffs' Claim, John Hancock's Compensation Was Reasonable and In Line with the Fees Received by Other Recordkeepers

### A.    Plaintiffs' Claim that John Hancock Received "More than Reasonable Compensation"[153] Is Implausible Given the Competitive Nature of the Retirement Plan Recordkeeping Industry

81.     Plaintiffs assert that John Hancock received "more than reasonable compensation."[154]  However, this assertion is inconsistent with the competitive nature of the retirement plan recordkeeping industry.  In my experience, competition among plan recordkeepers for plan clients precludes any recordkeeper, including John Hancock, from charging unreasonable fees to informed plans.[155]  Specifically, although there is no specific requirement to do so, certain plan sponsors, with assistance from plan advisors, will conduct RFPs or RFIs every five years to understand whether the services they are receiving from their recordkeeper are appropriate given their fees, and whether a recordkeeper change is warranted.[156] In addition to RFPs and RFIs, retirement plan sponsors will also formally benchmark their fees

---

[153] Plaintiffs' Motion for Class Certification, p. 7.

[154] Plaintiffs' Motion for Class Certification, p. 7.

[155] As discussed in **Section IV.B.**, because GVACs are required to be sold through registered broker-dealers and investment advisors, Proposed Class Members are often, if not always, aided in their decision-making by Proposed Class Advisors.

[156] Umpierrez, Amanda, "Important Considerations for the RFP Process," *PlanSponsor,* September 3, 2020, available at: https://www.plansponsor.com/in-depth/important-considerations-rfp-process/.

*Confidential - Pursuant to Protective Order*

for the purpose of assessing the reasonableness of those fees.[157]  Given the frequency with which many plan sponsors and plan advisors evaluate recordkeepers, in my experience, recordkeepers that charge unreasonable fees for the bundle of services that they provide would see substantial declines in the number of plans serviced over time as plan clients replace them with recordkeepers that charge more reasonable fees or provide higher levels of service for comparable fees.  Consistent with my experience, industry publication *Investment News* reports that over the last decade, "[c]ompetition has driven record keepers to undercut each other on pricing, sometimes to an irrational degree, in order to win new business – a trend that, if it continues, could drive some firms out of business."[158]

82.     If, as Plaintiffs claim, John Hancock received unreasonable compensation for the services it provides, retirement plans would stop retaining John Hancock as plan recordkeeper. On the contrary, in 2020, John Hancock and its affiliates added 4,888 defined contribution plans to its servicing platforms, the seventh highest among all defined contribution plan recordkeepers.[159]  Also as of 2020, John Hancock and its affiliates were the fifth largest provider (in terms of the number of plans serviced) to 401(k) plans with less than $10 million in assets.[160] John Hancock's ability to attract and retain retirement plans reflects that, contrary to Plaintiffs' claim, plan sponsors and plan advisors seeking recordkeeping services generally consider the

---

[157] According to the 2020 Callan DC Trends Survey "nearly 9 in 10 plan sponsors (88.9%) benchmarked the level of plan fees as part of their fee evaluation process" with the survey further noting that "[i]n the majority of cases, the consultant/adviser conducted the benchmarking (83.5%)."  (Callan Institute, "2020 Defined Contribution Trends Survey," p. 41.)

[158] Iacurci, Greg, "Adjusting to the Squeeze of Fee Compression," *Investment News*, November 9, 2019, available at: https://www.investmentnews.com/adjusting-to-the-squeeze-of-fee-compression-170635.

[159] PlanSponsor, "2021 Recordkeeping Survey: Top Recordkeepers," June 21, 2021, available at: https://www.plansponsor.com/research/2021-recordkeeping-survey/?pagesec=8#Provider%20Rankings.

[160] PlanSponsor, "2021 Recordkeeping Survey: Top Recordkeepers," June 21, 2021, available at: https://www.plansponsor.com/research/2021-recordkeeping-survey/?pagesec=8#Provider%20Rankings.

services John Hancock provides and the compensation it receives in exchange for these services to be reasonable.

83.     Competition among recordkeepers also implies that if offering fee concessions for foreign tax credits enabled a recordkeeper to offer lower total fees for the same bundle of services than its competitors, other recordkeepers would have to offer similar fee concessions to remain competitive.  However, with the exception of Securian, I am unaware of any recordkeepers that provide fee concessions for foreign tax credits, indicating that fee concessions for foreign tax credits do not result in lower total fees.

### B.     John Hancock's Total Plan Fees for the Named Plaintiff Plan at Inception Were in Line with the Total Plan Fees Received by Other Recordkeepers

84.     A comparison of the Named Plaintiff Plan's total plan fees at inception to the total plan fees of other providers in 2014 demonstrates that the compensation that John Hancock collected was reasonable.  Specifically, the fee arrangement that the Named Plaintiff Plan established with John Hancock in 2014 resulted in total plan fees that were below the average total plan fees that Pension Data Source, Inc.[161] reported for similar-sized plans as of September 30, 2014.[162]  As documented in the 2014 Recordkeeping Agreement, the Named Plaintiff Plan's recordkeeping fee arrangement was based on the following plan-specific assumptions:[163]

---

[161] Pension Data Source is a widely recognized industry resource for 401(k) comparative fee information.  Pension Data Source data are based on fee schedules that it obtained from surveyed service providers.

[162] Huntley, D.W., Valletta, J.W., *401K Averages Book*, 15th Edition, 2015.

[163] Todd Romano Deposition, Exhibit 59 (Recordkeeping Agreement prepared for Romano & Romano 401(k) Profit Sharing Plan by John Hancock Life Insurance Company (U.S.A.), June 18, 2014, ROMANO-000028-049 at 033).

*Confidential - Pursuant to Protective Order*

**Table 1**
**Assumptions Underlying the**
**2014 Named Plaintiff Plan Recordkeeping Agreement**

| | |
|---|---|
| Total number of participants | 9 |
| Total recurring contributions expected in the first 12 months | $50,000 |
| Total external transfer amount expected in the first 12 months | $0 |
| Average recurring contribution amount per participant expected in the first 12 months | $5,556 |
| Average transfer amount per participants in the first 12 months | $0 |

85.     Based on these assumptions, John Hancock, the Named Plaintiffs, and Mr. Searcy

executed a recordkeeping agreement which entailed asset-based fees of 1.988% plus a $24 per

participant fee.[164]  Given the Named Plaintiff Plan's 9 participants and $50,000 total expected

contributions (*see,* **Table 1**), this results in total plan fees equivalent to 2.42%,[165] or $134 per

participant.[166]

**Table 2**
**Comparison of Named Plaintiff Plan Total Plan Fees to 401(k) Average Survey Data**
**(% of Plan Assets)[167]**

| Named Plaintiff Plan Total Plan Fees | 401(k) Averages Total Plan Fees for Plans with 10 Participants and $100,000 in Assets Reported by Pension Data Source, Inc. | | | | |
|---|---|---|---|---|---|
| | Minimum | 25th Percentile | 50th Percentile | 75th Percentile | Maximum |
| 2.42% | 1.75% | 3.40% | 4.00% | 4.71% | 6.61% |

---

[164] Todd Romano Deposition, Exhibit 59 (Recordkeeping Agreement prepared for Romano & Romano 401(k) Profit Sharing Plan by John Hancock Life Insurance Company (U.S.A.), June 18, 2014, ROMANO-000028-049 at 033); Todd Romano Deposition, Exhibit 61 (Supplemental Information Guide prepared for Romano & Romano 401(k) Profit Sharing Plan, June 18, 2014, ROMANO-000090-107 at 093, 100).

[165] 2.42% = 1.988% fees plus $24 multiplied by 9 participants divided by $50,000.

[166] $134 per participant = 2.42% fees multiplied by $50,000 divided by 9 participants.

[167] Huntley, D.W., Valletta, J.W., *401K Averages Book*, 15th Edition, 2015, p. 64.

*Confidential - Pursuant to Protective Order*

**Table 3**
**Comparison of Named Plaintiff Plan Total Plan Fees to 401(k) Average Survey Data**
**($ per Participant)[168]**

| | 401(k) Averages Total Plan Fees for Plans with 10 Participants and $100,000 in Assets Reported by Pension Data Source, Inc. | | |
|---|---|---|---|
| Named Plaintiff Plan Total Plan Fees | Low | Average | High |
| $134 | $175 | $397 | $661 |

86.     Compared to total plan fees reported by Pension Data Source, Inc. for plans with 10 participants and $100,000 in assets, the Named Plaintiffs Plan's total plan fees were lower than the average.  As shown in **Table 2**, the Named Plaintiff Plan's total plan fee of 2.42% was lower than at least 75 percent of the total plan fees that resulted from fee schedules of surveyed providers.  Similarly, **Table 3** shows that the Named Plaintiff Plan's per participant total plan fee of $134 was $41 less than the lowest per participant total plan fee ($175) that resulted from the fee schedules of surveyed providers.  The results of these comparisons indicate that the compensation John Hancock expected to receive for servicing the Named Plaintiff Plan at its inception was reasonable.


Respectfully submitted, this 23rd day of August 2021,


_____

Steven K. Gissiner


_____

[168] Huntley, D.W., Valletta, J.W., *401K Averages Book*, 15th Edition, 2015, p. 62.

*Confidential - Pursuant to Protective Order*

**Appendix A**
**Steven K. Gissiner**

1700 Shadford Road
Ann Arbor, MI 48103
(734) 913-2901 (office); (813) 712-0879 (cell); steven.gissiner@orchardhillsconsulting.com

## Summary of Professional Experience

Approximately 40 years of diversified retirement plan, investment consulting, and administrative services experience, including working with client companies and retirement plan service providers to ensure the effective management and administration of qualified retirement plan arrangements. Areas of expertise include plan design and consulting, plan cost and administrative fee benchmarking, addressing operational inefficiencies, preparing and evaluating defined contribution plan Requests for Proposals, and enhancing employee education, communications, plan compliance, and fiduciary governance. Additional experience includes fee litigation consulting and expert witness services.

## Experience

**Principal, Orchard Hills Consulting LLC**                                      **1/2004 to Present**
- Provides comprehensive retirement and, through partner firms, investment consulting services to a broad range of tax-exempt and for-profit clients. Partner firms for which I serve as a non-employee Registered Investment Representative include Capital Research + Consulting of Pasadena, CA and BKS Retirement of Clearwater, FL.
- Assists clients in the structuring and management of retirement plan service arrangements to ensure reasonable and appropriate fees and services, high levels of employee participation, adherence to legal and regulatory requirements, and continued improvements in the areas of administration, participant asset allocation, and cost management.
- Provides expert witness and consulting services specific to retirement plan fee litigation, including Court testimony with respect to Tussey v. ABB and consulting support provided on behalf of American Airlines, Cerner Corporation, Franklin Templeton, Novitex Enterprise Solutions, Oracle Corporation, Pioneer Natural Resources, SERCO, Inc., West Corporation, and University of Pennsylvania.

**Senior Vice President, Clark Consulting LLC.**                           **5/2002 to 12/2003**
- Managed Midwest office and performed retirement plan consulting, investment advisory, fee benchmarking, and compensation consulting projects on behalf of firm clients.
- Left to form Orchard Hills Consulting and maintained consulting relationship with Clark until 2006.

**Partner, Arthur Andersen LLC**                                          **3/2001 to 5/2002**
- Direct admit Partner to the Human Capital Practice with overall responsibility for retirement and compensation consulting services performed by staff within the Great Lakes Region (seven offices).
- Human Capital Practice acquired by Clark Consulting in May 2002.

**Partner, PricewaterhouseCoopers LLC**                            **8/1985 to 3/2001**
- Increasing responsibilities over a 17-year period, including serving as West Region Managing Partner while maintaining overall responsibility for administrative outsourcing services performed for more than 200 clients in the final years of employment.
- Served as relationship manager and lead consultant for multiple defined contribution plans.
- Elected to leave firm due to the sale of the administrative outsourcing practice to Mellon/Buck Consultants.

*Confidential - Pursuant to Protective Order*

**Additional Prior Experience**

Served as a Trust Officer for retirement plans administered by Harter Bank and First National Bank of Cincinnati (1981-1985).

**Education**

University of Akron, MBA, Finance.
Muskingum University, BA, Business Administration Summa Cum Laude, With Distinction.

**Deposition Testimony in Past Four Years**

- Robert Sims, et al., Plaintiffs, v. BB&T Corporation, et al, Defendants, No. 1:15-cv-732-CCE-JEP, deposition date of December 4, 2017.

- Joan Obeslo, et al., Plaintiffs, v. Great-West Capital Management, LLC and Great-West Life & Annuity Insurance Co., et al., Defendants, No. 16-cv-00230-CMA-MJW and No.16-cv-03162-CMA-MJW; and Duplass, Zwain, Bourgeois, Pfister & Weinstock APLC 401(k) Plan, Plaintiff, v. Great-West Capital Management, Defendant, No.16-cv-01215-CMA-MJW, deposition date of April 13, 2018.

- Mary Bell, et al., Plaintiffs v. ATH Holding Company, LLC, et al., Defendants, Case No. 1:15-cv-02062-TWP-MPB, August 24, 2018.

- Maria Terraza, Plaintiff v. Safeway Inc, Case No. 3:16-cv-03994-JST and Dennis Lorenz, Plaintiff v. Safeway Inc., Case No. 4-16-cv-04903-JST, June 14, 2018.

- Clifton Marshall, et al., Plaintiffs v. Northrop Grumman Corporation, et al., Defendants, Case No. 16-CV-6794AB (JCx), November 12, 2018.

- David B. Tracey, et al., Plaintiffs v. Massachusetts Institute of Technology, et al., Defendants, Case No. 1:16-cv-11620-NMG, July 2, 2019.

- Melissa Haley, Individually and On Behalf of Others Similarly Situated, Plaintiff, v. Teachers Insurance and Annuity Association, Defendant, Case No. 1:17-cv-00855-JPO, deposition date of October 16, 2020

- Jaime H. Pizaro, et al., Plaintiffs v. The Home Depot Inc., et al., Defendants, Case No. 1:18-cv-01566-LMM, deposition date of May 28, 2021.

**Publications in Past Ten Years**

- *"Commentary on Vanderbilt University and Duke University Fee Litigation"* Bloomberg Law Review, December 8, 2016.

- *"Lower Cost Clean Shares May Not Provide Expected Benefits to Plan Participants"* Bloomberg BNA Insights, June 28, 2017.

- *"INSIGHT: Issues and Considerations for Retirement Plan Sponsors Resulting From Increased Adoption and Usage of Managed Account Services"* Bloomberg BNA Insights, November 15, 2018.

- *"INSIGHT: A Guide to Avoid Becoming an Unfair Target of ERISA Litigation"* Bloomberg Law, March 10, 2020.

*Confidential - Pursuant to Protective Order*

**Appendix B**
**Documents Considered**

| | Bates Range |
|---|---|
| **Legal Documents and Depositions** | |
| *Eric Romano, et al. individually and on behalf of all others similarly situated, v. John Hancock Life Insurance Company (U.S.A.)*, Class Action Complaint, March 25, 2019 | |
| Defendant John Hancock Life Insurance Company (U.S.A.)'s Responses and Objections to Plaintiffs' First Set of Interrogatories, July 14, 2021 | |
| *Eric Romano, et al. individually and on behalf of all others similarly situated, v. John Hancock Life Insurance Company (U.S.A.)*, Plaintiffs' Motion for Class Certification and Incorporated Memorandum of Law, July 26, 2021, and exhibits thereto | |
| 30(b)(6) Deposition of Bonnie Deodat Hamilton, July 19, 2021, and exhibits thereto | |
| 30(b)(6) Deposition of Joe Almada, July 21, 2021, and exhibits thereto | |
| Deposition of Rick Carlson, April 29, 2021, and exhibits thereto | |
| Deposition of Bruce Cobey, May 4, 2021, and exhibits thereto | |
| Deposition of Joe Almada, May 7, 2021 | |
| Deposition of Xin Wang, May 11, 2021, and exhibits thereto | |
| Deposition of Eric Romano, June 15, 2021, and exhibits thereto | |
| Deposition of Todd Romano, June 17, 2021, and exhibits thereto | |
| Deposition of Christian Searcy, June 22, 2021, and exhibits thereto | |
| Deposition of Melanie Martinez McDonald, July 7, 2021, and exhibits thereto | |
| Deposition of Keith Holden, July 21, 2021, and exhibits thereto | |
| **Produced Documents and Data** | |
| *Statement of Assets and Liabilities of the Sub-Accounts of John Hancock Life Insurance Company (U.S.A.) for Contract # 115534, the Trustees of Romano Law, PL 401(k) Plan* | |
| Statement of Assets and Liabilities, January 9, 2015 | JH-ROMANO_041236-249 |
| Statement of Assets and Liabilities, December 31, 2015 | JH-ROMANO_041250-264 |
| Statement of Assets and Liabilities, December 30, 2016 | JH-ROMANO_041265-282 |
| Statement of Assets and Liabilities, December 29, 2017 | JH-ROMANO_041283-306 |
| Statement of Assets and Liabilities, December 31, 2018 | JH-ROMANO_041307-332 |
| *Emails* | |
| Email from John McGuire to Christian D. Searcy, re: [Redacted for CID], July 26, 2013, and attachments | UBS00000018-145 |
| Email from John McGuire to Christian D. Searcy, re: [Redacted for CID], July 26, 2013, and attachments | UBS00000149-203 |
| Email from Christian D. Searcy to Ellen Quinlan re: RE: Romano Law Group, June 16, 2014 | UBS00000764-765 |
| Email from Christian Searcy to Eric Romano, Todd Romano re: FW: Proposal for Romano & Romano 401(k) Profit Sharing Plan, June 24, 2014 | ROMANO-001253-255 |
| Email from Katy Norusis to Eric Romano et al., re: 404a-5 Notice (re 401k), October 2, 2014 | ROMANO-000269-290 |
| Email from John McGuire to Christian D. Searcy, re: FW: Off-lease only, July 2, 2015 | UBS00001852-941 |
| Email from John M. McGuire to Christian Searcy, re: Update: Securian Foreign Tax Credits as of 11/30/16, December 5, 2016 | UBS00003632-653 |
| Email from [Redacted for CID] to Christian Searcy re: RE: Update Provider Analysis: [Redacted for CID], August 5, 2017, and attached proposals | UBS00004497-590 |
| *Romano Law, PL Monitoring Reports* | |
| UBS DC Report for Romano Law Group, May 23, 2016 | UBS00004417-454 |
| UBS DC Report for Romano Law Group, November 3, 2016 | UBS00004455-492 |
| UBS DC Report for Romano Law Group, January 19, 2017 | UBS00004334-374 |
| UBS DC Report for Romano Law Group, February 2, 2018 | UBS00005276-317 |
| UBS DC Report for Romano Law Group, February 2, 2018 | UBS00005328-369 |
| UBS DC Report for Romano Law Group, August 2, 2018 | UBS00005938-981 |
| UBS DC Report for Romano Law Group, October 19, 2018 | UBS00006212-253 |
| UBS DC Report for Romano Law Group, January 15, 2019 | UBS00006354-396 |
| UBS DC Report for Romano Law Group, April 24, 2019 | UBS00006782-6823 |
| UBS DC Report for Romano Law Group, April 24, 2019 | UBS00006825-866 |
| Fi360, Monitoring Report Prepared for Romano Law Group, July 21, 2020 | CDSJR00307-356 |

*Confidential - Pursuant to Protective Order*

**Appendix B**
**Documents Considered**

| | Bates Range |
|---|---|
| ***Romano Law, PL Meeting Minutes*** | |
| Minutes of Investment Committee Meeting, November 5, 2015 | ROMANO-000167 |
| Minutes of Investment Committee Meeting, January 19, 2017 | ROMANO-000168 |
| Minutes of Investment Committee Meeting, May 11, 2017 | ROMANO-000169 |
| Minutes of Investment Committee Meeting, August 14, 2017 | ROMANO-000170 |
| Minutes of Investment Committee Meeting, November 1, 2017 | ROMANO-000171 |
| Minutes of Investment Committee Meeting, March 12, 2018 | UBS00005373 |
| Minutes of Investment Committee Meeting, May 7, 2018 | UBS00005707-708 |
| Minutes of Investment Committee Meeting, August 2, 2018 | ROMANO-000174 |
| Minutes of Investment Committee Meeting, October 29, 2018 | ROMANO-000175 |
| Minutes of Investment Committee Meeting, February 13, 2019 | ROMANO-000193 |
| Minutes of Investment Committee Meeting, May 20, 2019 | UBS00006878 |
| Minutes of Investment Committee Meeting, August 10, 2020 | CDSJR00218-219 |
| The Pension Studio, Romano Law, PL: Annual Meeting Agenda, October 29, 2018 | UBS00006277 |
| The Pension Studio, Romano Law, PL: Annual Meeting Agenda, February 13, 2019 | ROMANO-000196 |
| The Pension Studio, Romano Law, PL: Annual Meeting Agenda, February 13, 2019 | UBS00006608 |
| ***Other Produced Documents*** | |
| [Redacted for CID], 401k Investment Committee Meeting Minutes, April 18, 2017 | UBS00004088-091 |
| Confirmation of Total Discontinuance, March 22, 2021 | |
| Fidelity, Schedule of Fees and Services Prepared for [Redacted], August 12, 2020 | Searcy_Christian-00000152 |
| John Hancock Retirement Plan Services, Contract Investment Allocation for Romano Law, PL (115534), July 13, 2018 | UBS00005982-985 |
| John Hancock Retirement Plan Services, "Important information for Plan Sponsors," 2018 | JH-ROMANO_037948-954 |
| John Hancock Retirement Plan Services, Investment Option Selection, September 5, 2014 | ROMANO-000127-128 |
| John Hancock Retirement Plan Services, Plan Review for Romano Law, PL | 115534, February 5, 2019 | UBS00006456-495 |
| John Hancock Retirement Plan Services, Plan Review for Romano Law, PL | 115534, May 18, 2020 | CDSJR00220-258 |
| John Hancock Retirement Plan Services, "Supplemental Eligible Indirect Compensation Disclosures," November 2018 | JH-ROMANO_041333-354 |
| John Hancock Retirement Plan Services, "Your Retirement Plan Proposal: Prepared for [Redacted for CID] Retirement Plan," July 31, 2017 | UBS00004545-565 |
| John Hancock, "Asset Manager Profiles: Templeton Global Bond Fund," July 2021 | JH-ROMANO_043165-171 |
| John Hancock, Contract Investment Administration Instructions, 2018 | UBS00005709-735 |
| John Hancock, Contract Investment Administration Instructions, effective September 2018 | UBS00006036-065 |
| John Hancock, Employer Financial Statement Year-to-Date: Jan/01/2020 to Dec/31/2020 for the Trustees of Romano Law, PL 401(k) Plan, Contract No. 115534 | |
| John Hancock, Executive Summary & Key Benchmarks for Romano Law, PL|115534, June 30, 2020 | CDSJR00304-306 |
| John Hancock, Romano Law, PL: Contract Snapshot, November 3, 2015 | UBS0002829 |
| John Hancock, Romano Law, PL: Investment Allocation, November 3, 2015 | UBS00002830-831 |
| Letter from John Hancock to Eric Romano, Re: Offer to lower fee for ROMANO LAW, PL (Contract No. 115534), August 14, 2020 | Searcy_Christian-00000145 |
| OneAmerica, Employee Education Program, 2018 | Searcy_Christian-00000179 |
| OneAmerica, My OneCheck Online by MasteryPOINT, 2016 | Searcy_Christian-00000178 |
| OneAmerica, RetirementTrack: The next chapter in target date series, 2020 | Searcy_Christian-00000199 |
| OneAmerica, Romano Law Group 401k Plan | Searcy_Christian-00000215 |
| OneAmerica, Romano Law Group 401k Plan | Searcy_Christian-00000182 |
| OneAmerica, Romano Law Group 401k Plan Cost Information, expires November 15, 2020 | Searcy_Christian-00000181 |
| OneAmerica, Romano Law Group 401k Plan Cost Information, expires November 15, 2020 | Searcy_Christian-00000180 |
| OneAmerica, Sample Proposed Fund Lineup ZRS | Searcy_Christian-00000219 |
| Principal, Romano Law, PL: Informal Business Valuation and Business Planning Report, August 2017 | UBS00005467-492 |
| Romano Law, PL 401(K) Plan PPA PS/401(k) VS AA Plan Document Summary, October 29, 2018 | UBS00006278-279 |
| Romano Law, PL 401(K) Plan PPA PS/401(k) VS AA Plan Document Summary, February 13, 2019 | UBS00006609-610 |
| Romano Law, PL: Transaction Information, January 1, 2017 - October 26, 2018 | UBS00006280 |
| Romano Law, PL: Transaction Information, January 1, 2018 - December 31, 2018 | UBS00006611 |

*Confidential - Pursuant to Protective Order*

**Appendix B**
**Documents Considered**

| | Bates Range |
|---|---|
| **Publicly Available Documents and Data** | |
| | |
| ***Form 5500*** | |
| Romano Law, PL 401(k) Plan Form 5500, 2014 | |
| Romano Law, PL 401(k) Plan Form 5500, 2015 | |
| Romano Law, PL 401(k) Plan Form 5500, 2016 | |
| Romano Law, PL 401(k) Plan Form 5500, 2017 | |
| Romano Law, PL 401(k) Plan Form 5500, 2018 | |
| Romano Law, PL 401(k) Plan Form 5500, 2019 | |
| | |
| ***Other Publicly Available Documents and Data*** | |
| 29 CFR § 2550.403a-1, 403b-1 | |
| Alliance Bernstein, "Inside the Minds of Plan Sponsors," 2017, available at: https://www.alliancebernstein.com/investments/us/retirement/resources/pdf/FINAL_DCI-6150-1117.pdf | |
| AT&T Wireless 401(k) Savings Plan, Form 11-K, December 31, 2002 | |
| BrightScope/Investment Company Institute (ICI), "The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016," June 2019 | |
| BrightScope/Investment Company Institute (ICI), "The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018," July 2021 | |
| BrightScope/Investment Company Institute (ICI), "The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at ERISA 403(b) Plans, 2016," April 2020 | |
| California Department of Insurance, "Variable Life and Variable Annuity," available at: http://www.insurance.ca.gov/0200-industry/0050-renew-license/0200-requirements/life-only/variable-contracts.cfm | |
| Callan Institute, "2020 Defined Contribution Trends Survey" | |
| Charles Schwab, "401(k) plan services paired with independent providers," available at: https://workplacefinancialservices.schwab.com/retirement-services/401k-plans-paired-independent-providers | |
| Clark/Bardes, Inc., Form 10-K, for the fiscal year ended December 31, 2002 | |
| Collins, S., et al., "The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2016," ICI Research Perspective Vol. 23, No. 4, June 2017, available at: https://www.ici.org/pdf/per23-04.pdf | |
| Deloitte, "The Retirement Landscape Has Changed–Are Plan Sponsors Ready?" 2019, available at: https://www2.deloitte.com/content/dam/Deloitte/us/Documents/human-capital/us-2019-defined-contribution-benchmarking.pdf | |
| Department of Labor, "A Look at 401(k) Plan Fees," September 2019, available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf | |
| Department of Labor, "Fiduciary Education Campaign - Getting It Right - Know Your Fiduciary Responsibilities," available at: https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/fiduciary-responsibilities/fiduciary-education-campaign | |
| Department of Labor, "Final Regulation Relating to Service Provider Disclosures Under Section 408(b)(2)," February 2012, available at: https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf | |
| Department of Labor, "Meeting Your Fiduciary Responsibilities," September 2020, available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf | |
| Department of Labor, "US Department of Labor Announces New Cybersecurity Guidance for Plan Sponsors, Plan Fiduciaries, Record-keepers, Plan participants," April 14, 2021, available at: https://www.dol.gov/newsroom/releases/ebsa/ebsa20210414 | |
| Department of Labor, "What You Should Know About Your Retirement Plan," available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/what-you-should-know-about-your-retirement-plan.pdf | |
| Empower Retirement, "Your financial future is our priority," available at: https://qa.empower-retirement.com/individuals/additional-financial-offerings/annuities.shtml | |
| Fidelity, "Investment and Retirement Products," available at: https://clearingcustody.fidelity.com/app/item/RD_13569_42640/products-and-services/investment-and-retirement- | |
| FINRA, "Application Of NASD Conduct Rules To Group Variable Contracts And Other Exempted Securities," available at: https://www.finra.org/rules-guidance/notices/97-27 | |
| FINRA, "Investment Advisers," available at: https://www.finra.org/investors/learn-to-invest/choosinginvestment-professional/investment-advisers | |
| FINRA, "Qualification Exams," available at: https://www.finra.org/registration-exams-ce/qualification-exams | |
| FINRA, "Variable Annuities," available at: https://www.finra.org/investors/learn-to-invest/types-investments/annuities/variable-annuities | |
| Franklin Templeton Investments, Form N-1A of the Templeton Income Trust, December 24, 2014 | |

**Appendix B**
**Documents Considered**

| | Bates Range |
|---|---|
| Franklin Templeton Investments, Form N-CSR of the Templeton Income Trust, August 31, 2015 | |
| Goldman Sachs Asset Management, "Goldman Sachs Funds: Tax Guide for 2020," 2020, available at: https://www.gsam.com/content/dam/gsam/pdfs/us/en/tax-information/tax_guide.pdf?sa=n&rd=n | |
| Huntley, D.W., Valletta, J.W., *401K Averages Book*, 15th Edition, 2015 | |
| Iacurci, Greg, "Adjusting to the Squeeze of Fee Compression," Investment News, November 9, 2019, available at: https://www.investmentnews.com/adjusting-to-the-squeeze-of-fee-compression-170635 | |
| Iacurci, Greg, "Empower's New 401(k) Cybersecurity Guarantee a Sign of the Times," Investment News, June 26, 2018, available at: https://www.investmentnews.com/empowers-new-401k-cybersecurity-guarantee-a-sign-of-the-times-74750 | |
| Internal Revenue Service, "401(k) Plan Overview," available at: https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview | |
| Internal Revenue Service, "A Plan Sponsor's Responsibilities," available at: https://www.irs.gov/retirement-plans/plan-sponsor/a-plan-sponsors-responsibilities | |
| Internal Revenue Service, "Defined Benefit Plan," available at: https://www.irs.gov/retirement-plans/defined-benefit-plan | |
| Internal Revenue Service, "Foreign Taxes that Qualify for the Foreign Tax Credit," available at: https://www.irs.gov/individuals/international-taxpayers/foreign-taxes-that-qualify-for-the-foreign-tax-credit | |
| Internal Revenue Service, "IRC 401(k) Plans — Establishing a 401(k) Plan," available at: https://www.irs.gov/retirement-plans/irc-401k-plans-establishing-a-401k-plan | |
| John Hancock, "Group annuity or trust company—which is better for a 401(k) plan to make investments available?" July 7, 2021, available at: https://retirement.johnhancock.com/us/en/viewpoints/plan-design/group-annuity-or-trust-company-which-is-better-for-a-401k--plan | |
| John Hancock, "Reflections on TPA Day and the value of partnership," October 16, 2019, available at: https://retirement.johnhancock.com/us/en/viewpoints/practice-management/Reflections-on-TPA-Day-and-the-value-of-partnership | |
| John Hancock, "Retirement Plan Fiduciaries, We're Here to *Help* ," available at: https://retirement.johnhancock.com/us/en | |
| John Hancock, "Retirement Plans," available at: https://retirement.johnhancock.com/us/en/retirement-products/retirement-plans | |
| Klein, Camilla, "Mellon Completes Unifi Acquisition," PlanSponsor, January 4, 2002, available at: https://www.plansponsor.com/mellon-completes-unifi-acquisition/ | |
| Memorandum re: Recommendation of the Ad-Hoc Deferred Compensation Plan Record-keeper RFP Subcommittee, September 26, 2019 | |
| National Association of Plan Administrators, "Recordkeeping Platform Assessment," available at: https://www.napa-net.org/industry-intel/recordkeeping-platform-assessment | |
| OneAmerica, "Tax-deferred Future Income," available at: https://www.oneamerica.com/products-services/individuals-annuities | |
| Pension and Investments, "Defined Contribution Rankings by Assets," available at: https://researchcenter.pionline.com/v3/rankings/plan-sponsors/datatable?adobe_mc=MCMID%3D02619879796991725319344199131764281 1%7CMCORGID%3D138FFF2554 E6E7220A4C98C6%2540AdobeOrg%7CTS%3D1629303500 | |
| Pension and Investments, "P&I 1,000 largest retirement plans: 2021," available at: https://researchcenter.pionline.com/v3/rankings/plan-sponsors/profiles/429708/overview | |
| PlanSponsor, "2020 Recordkeeping Survey: Industry Snapshot," July 15, 2020, available at: https://www.plansponsor.com/research/2020-recordkeeping-survey/?pagesec=3#Industry%20Snapshot | |
| PlanSponsor, "2021 Recordkeeping Survey," June 21, 2021, available at: https://www.plansponsor.com/research/2021-recordkeeping-survey | |
| PlanSponsor, "2021 Recordkeeping Survey: Industry Snapshot," June 21, 2021, available at: https://www.plansponsor.com/research/2021-recordkeeping-survey/?pagesec=2#Industry%20Snapshot | |
| PlanSponsor, "2021 Recordkeeping Survey: Securian Financial," June 21, 2021, available at: https://www.plansponsor.com/research/2021-recordkeeping-survey/?pagesec=9&pid=41&pname=Securian-Financial#Providers | |
| PlanSponsor, "2021 Recordkeeping Survey: Top Recordkeepers," June 21, 2021, available at: https://www.plansponsor.com/research/2021-recordkeeping-survey/?pagesec=8#Provider%20Rankings | |
| Prudential, "Create a more secure retirement with protected income from an Annuity," available at: https://www.prudential.com/personal/annuities | |
| Ramirez, D., "401(k) Recordkeeper: What They Do And What To Look For," *ForUsAll* , February 21, 2020, available at: https://www.forusall.com/401k-blog/401k-recordkeeper-what-they-do-and-what-to-look-for/ | |
| Request for Proposal ETJ0061 Administrative Services for the Wisconsin Deferred Compensation Program, issued by the State of Wisconsin, April 9, 2021 | |
| Request for Proposals, RFP No. 21-0029, 457 Deferred Compensation Plan - Recordkeeping, Administrative and Participant Education (Annual Contract) issued by Columbus Consolidated Government, March 24, 2021 | |
| Securian Financial, "Why Choose Securian Financial?" available at: https://www.securian.com/products-services/employers/retirement-plans/why-securian.html | |

*Confidential - Pursuant to Protective Order*

**Appendix B**
**Documents Considered**

| | Bates Range |
|---|---|
| Securian, "Plan Sponsor," available at: https://www.securianretirementcenter.com/sponsor/main/#/basicLogin | |
| Securities and Exchange Commission, "Investment Adviser Public Disclosure," available at: https://adviserinfo.sec.gov/ | |
| State of Florida Employees Deferred Compensation Plan: Investment Policy for Product Selection and Retention, 2016, available at: https://sf01.myfloridacfo.com/docs-sf/deferred-compensation-libraries/dc-documents/administrative-documents/investment-policy.pdf?sfvrsn=db7ba35b_8 | |
| State of Maine, "Understanding Annuities," available at: https://www.maine.gov/pfr/insurance/consumer/individuals_families/life_annuities_viaticals/annuities/understanding_annuities.html | |
| Summary of the Thrift Savings Plan, available at: https://www.tsp.gov/publications/tspbk08.pdf | |
| The SPARK Institute, Inc., "Request for Proposal (RFP) Guide: Selecting Defined Contribution Plan Service Providers (4th Edition)," January 2018, available at:  https://www.sparkinstitute.org/pdf/SPARK%20RFP%20Guide%204.0.pdf | |
| Thrift Savings Plan, "Fund Information," March 2021 | |
| Umpierrez, Amanda, "Important Considerations for the RFP Process," PlanSponsor, September 3, 2020, available at https://www.plansponsor.com/in-depth/important-considerations-rfp-process/ | |
| Vanguard, "Defined Contribution Recordkeeping," available at: https://institutional.vanguard.com/solutions/dcrecordkeeping/consultativeexperience | |
| Vanguard, "How America Saves 2014" | |
| Vanguard, "How America Saves 2020" | |
| Vanguard, "International investing," available at: https://investor.vanguard.com/investing/investment/international-investing | |
| Voya Financial, "Annuities," available at: https://www.voya.com/article/annuities | |
| Wheelan, Hugh, "Mellon Buys out PwC HR Consulting Subsidiary," Investment & Pensions Europe, November 28, 2001, available at: https://www.ipe.com/mellon-buys-out-pwc-hr-consulting-subsidiary/4745.article | |
| Zoll, Adam, "A Taxing Dilemma: Foreign Investments and Your Retirement Account," *Morningstar*, March 1, 2013, available at: https://www.morningstar.com/articles/587000/a-taxing-dilemma-foreign-investments-and-your-retirement-account | |