# EXHIBIT B

*CONFIDENTIAL - Pursuant to Protective Order*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| Eric Romano, et al., individually and on behalf of all others similarly situated, Plaintiffs,<br><br>v.<br><br>John Hancock Life Insurance Company (U.S.A.), Defendant. | No. 19-cv-21147-JG |

**REBUTTAL REPORT OF STEVEN K. GISSINER**

**October 8, 2021**

*CONFIDENTIAL - Pursuant to Protective Order*

# TABLE OF CONTENTS

I.     **Introduction** ................................................................................................ 1

    A.     Assignment .......................................................................................... 1

    B.     Preparation of Rebuttal Report ........................................................... 1

II.    **Summary of Opinions** ................................................................................ 2

III.   **Plaintiffs' Experts Mischaracterize John Hancock's Role as Recordkeeper of the Plans** ................................................................... 3

    A.     Contrary to Mr. Pingree's Assertions, John Hancock Did Not Serve as an ERISA 3(21) or 3(38) Investment Fiduciary to the Plans ...................................... 4

    B.     Consistent with Industry Practices of Other Recordkeepers, John Hancock Does Not Have Discretionary Authority Over How Plan Assets Are Invested ............................................................................. 5

IV.    **Contrary to Plaintiffs' Experts' Assertions, Retirement Industry Professionals Do Not Consider Foreign Tax Credits To Be "Compensation" or "Revenues" Received By Recordkeepers** ............... 10

V.     **Contrary to Mr. Levy's Assertion, The Provision of Fee Concessions for Foreign Tax Credits Is Not Considered "Best Practice"** .............................. 12

VI.    **It Is Unlikely That Fee Concessions For Foreign Tax Credits, as Proposed By Plaintiffs, Would Have Affected How Plan Sponsors Evaluated John Hancock and its Fees** ............................................................ 14

    A.     Disclosures of Foreign Tax Credits Are Unlikely to Factor into an Evaluation of John Hancock and Its Fees ............................................. 14

    B.     As Demonstrated by the Named Plaintiffs and Mr. Searcy, Information on John Hancock's Allowance of Foreign Tax Credits Could Have Been Obtained Through Direct Inquiries with John Hancock or From Investment Product Prospectuses ......................................................... 17

*CONFIDENTIAL - Pursuant to Protective Order*

## I.   INTRODUCTION

### A.   Assignment

1.       My name is Steven K. Gissiner.  I have been engaged by Goodwin Procter, LLP ("Counsel"), counsel for Defendant, John Hancock Life Insurance Company (U.S.A.) (also referred to throughout this report as "John Hancock" or "Defendant"), in connection with the matter *Eric Romano, et al., individually and on behalf of all others similarly situated, v. John Hancock Life Insurance Company (U.S.A.)*, No. 19-cv-21147-JG.  I previously filed an expert report as part of the proceedings at the merits stage in the above-captioned matter on August 23, 2021 (my "Initial Report").  In this report, I adopt the same defined terms and acronyms that were used in my Initial Report.

2.       For this report, Counsel has requested that I review, and, where appropriate, respond to certain opinions offered by Plaintiffs' experts, Roger L. Levy in his expert report dated August 23, 2021 ("Levy Report") and Bruce D. Pingree in his expert report dated August 23, 2021 ("Pingree Report") (collectively, "Plaintiffs' Experts").

### B.   Preparation of Rebuttal Report

3.       The documents, materials, and other information that I have relied on in forming my opinions are listed in this report or in **Appendix A**.  I also relied on the knowledge that I obtained in the preparation of my Initial Report.  My analysis and conclusions are based on the information available at present.  If additional information or materials become available, I reserve the right to update my opinions and analysis as appropriate.  My Initial Report sets forth my qualifications and my compensation, which have not changed.

*CONFIDENTIAL - Pursuant to Protective Order*

## II.    SUMMARY OF OPINIONS

1. Since submitting my Initial Report, I have reviewed the reports filed by Plaintiffs' Experts.  I continue to hold the opinions that I expressed in my Initial Report, and I have the following additional opinions.

2. Plaintiffs' Experts mischaracterize John Hancock's role as recordkeeper of the Plans. Plaintiffs' Experts' opinions that John Hancock is required to "disclose its use of foreign tax credits,"[1] to "pass on the benefit of foreign tax credits to the eligible accounts of Plan participants,"[2] and to resolve any "conflict of interests" with respect to plan assets in favor of Plans,[3] are predicated on their incorrect assumption that John Hancock has discretionary authority and control with respect to the plan assets.  Not only did John Hancock not serve as a 3(21) or a 3(38) investment fiduciary under ERISA to the Plans as Plaintiffs' Experts appear to assert, John Hancock also disclosed to Plans that it does not have discretionary authority over how plan assets are invested.

3. Contrary to Plaintiffs' Experts' assertions, retirement industry professionals do not consider foreign tax credits to be "compensation" or "revenues" received by recordkeepers.  As such, in my view, retirement industry professionals would not expect John Hancock to disclose foreign tax credits in 408(b)(2) Disclosure Statements or provide fee concessions for foreign tax credits.

4. Based on my experience, the provision of fee concessions for foreign tax credits is not regarded as "best practice" as Plaintiffs' Experts assert.[4]  Securian is the only recordkeeper I have encountered in my 40 years of experience working with plan sponsors and recordkeepers, that claims to provide fee concessions for foreign tax credits. The fact that no other recordkeeper has adopted Securian's practice indicates that the provision of fee concessions for foreign tax credits is not consistent with industry practice and not relevant to how recordkeepers and plan sponsors negotiate and establish recordkeeping fees.

5. Contrary to Plaintiffs' Experts' assertions, Proposed Class Members were not "deprived" of the information necessary to evaluate John Hancock and the reasonableness of its fees.

    i. As an initial matter, foreign tax credits are unlikely to factor into a Proposed Class Member's evaluation of John Hancock and its fees.  Because individual fee components associated with retirement plan administrative services (*i.e.,* recordkeeping fees, revenue credits, individual participant transaction fees, for example) can be adjusted, evaluations of whether a plan's recordkeeping fees are reasonable typically do not focus on individual fee concessions, but instead focus on whether the types and quality of administrative services offered by a

---

[1] Pingree Report, p. 22.

[2] Levy Report, ¶ 25.

[3] Levy Report, ¶ 25.

[4] Levy Report, ¶ 27.

*CONFIDENTIAL - Pursuant to Protective Order*

recordkeeper, and the ***total fees*** for these services align with the plan's, and by extension the plan participants', specific needs.

ii.  Moreover, even if a plan sponsor or plan advisor determines that fee concessions for foreign tax credits were relevant to how they evaluate recordkeepers and total recordkeeper fees, which in my experience is unlikely, they could obtain this information by making direct inquiries with the recordkeeper or through disclosures made available from investment product prospectuses. For example, the Named Plaintiffs and Mr. Searcy were able to obtain information on whether John Hancock and other recordkeepers provided fee concessions in connection with the foreign tax credits allowed against foreign taxes paid, but chose not to utilize this information to inform its contract negotiations with John Hancock or with other service providers during the 2020 RFP process.

## III.   PLAINTIFFS' EXPERTS MISCHARACTERIZE JOHN HANCOCK'S ROLE AS RECORDKEEPER OF THE PLANS

4.  Plaintiffs' Experts mischaracterize John Hancock's role as recordkeeper of the Plans. Plaintiffs' Experts' opinions that John Hancock is required to "disclose its use of foreign tax credits,"[5] to "pass on the benefit of foreign tax credits to the eligible accounts of Plan participants,"[6] and to resolve any "conflict of interests" with respect to plan assets in favor of Plans,[7] are predicated on their incorrect assumption that John Hancock has discretionary authority and control with respect to the plan assets. As I discuss below, Plaintiffs' Experts mischaracterize John Hancock's role and responsibilities with respect to the Plans, and ignore that, like other recordkeepers in the industry, John Hancock does not have discretionary authority over how plan assets are invested.

---

[5] Pingree Report, p. 22.

[6] Levy Report, ¶ 25.

[7] Levy Report, ¶ 25.

3

*CONFIDENTIAL - Pursuant to Protective Order*

A.      **Contrary to Mr. Pingree's Assertions, John Hancock Did Not Serve as an ERISA 3(21) or 3(38) Investment Fiduciary to the Plans**

5.      Plaintiffs' Experts' reports utilize, but fail to define, varying terms to describe John Hancock's role with respect to the Plans, including "investment fiduciary,"[8] "fiduciary holding Plan assets,"[9] and so on.  Mr. Pingree appears to incorrectly assume, without evidentiary support, that John Hancock simultaneously served as both a 3(38) and a 3(21) investment fiduciary under ERISA[10] while Mr. Levy asserts that because John Hancock failed to define its fiduciary responsibilities, that there were "no limits" to it.[11]  These assertions are unsupported and incorrect.

6.      John Hancock's role as recordkeeper is distinct and different from the role of 3(21) and 3(38) investment fiduciaries under ERISA.  Based on my experience, retirement industry professionals commonly use the term, "ERISA 3(21) investment fiduciary" to refer to a paid professional who provides investment recommendations to the plan sponsor/trustee.  In this arrangement, which is typically documented in an investment advisory agreement, the plan sponsor/trustee (or appointed committee) retains the ultimate decision-making authority for the investments and may accept or reject the recommendations made by the ERISA 3(21) investment fiduciary.[12]  In contrast, the term, "ERISA 3(38) investment fiduciary" is commonly understood by retirement industry professionals to refer to a paid professional who accepts fiduciary status

---

[8] *See for example,* Pingree Report, pp. 21-22.

[9] *See for example,* Levy Report, ¶¶ 23-25.

[10] Pingree Report, p. 11, fn 6, 7.

[11] Levy Report, ¶ 22.

[12] Fisher Investments, "3(21) vs. 3(38) Fiduciary Services Q&As," June 2016, available at https://www.fisher401k.com/sites/default/files/media_library/pdf/3(21)_vs_3(38)_Fiduciary_Services_FAQ.pdf.

*CONFIDENTIAL - Pursuant to Protective Order*

and exercises discretion over plan investments.[13]  Plan sponsors may delegate certain discretionary duties related to the selection, monitoring, and replacement of plan investment options to ERISA 3(38) investment fiduciaries.  This arrangement, including the specific fiduciary duties delegated to the investment manager, is also typically documented in an investment management agreement.  Plaintiffs' Experts have not presented, and I have not encountered, any evidence in this matter that suggests that John Hancock was contracted as either an ERISA 3(21) or an ERISA 3(38) investment fiduciary by any Plans in the Proposed Class, including the Named Plaintiff Plan, nor have I seen any indication that the parties believed that John Hancock was acting as such.  For example, the 2014 Recordkeeping Agreement between John Hancock and the Named Plaintiff Plan reflects that while John Hancock offered the Named Plaintiffs the option to receive ERISA 3(21) investment advisory services provided by a third-party, Wilshire Advisors LLC (not John Hancock), the Named Plaintiffs did not select this option.[14]  Further, it is my understanding, based on my experience, that John Hancock does not offer ERISA 3(38) investment management services to plans such as the Named Plaintiff Plan utilizing its Signature platform.

### B.      Consistent with Industry Practices of Other Recordkeepers, John Hancock Does Not Have Discretionary Authority Over How Plan Assets Are Invested

7.      The fiduciary roles Plaintiffs' Experts assign to John Hancock are wholly inconsistent with the roles and responsibilities as described in John Hancock's agreement with the Named Plaintiff Plan, as well as the well-understood and established roles and

---

[13] Fisher Investments, "3(21) vs. 3(38) Fiduciary Services Q&As," June 2016, available at https://www.fisher401k.com/sites/default/files/media_library/pdf/3(21)_vs_3(38)_Fiduciary_Services_FAQ.pdf.

[14] Todd Romano Deposition, Exhibit 59 (Recordkeeping Agreement prepared for Romano & Romano 401(k) Profit Sharing Plan by John Hancock Life Insurance Company (U.S.A.), June 18, 2014, ROMANO-000028-049).

*CONFIDENTIAL - Pursuant to Protective Order*

responsibilities that recordkeepers, like John Hancock, undertake.  As such, retirement industry professionals would not expect John Hancock to disclose its use of foreign tax credits, provide fee concessions for foreign tax credits, or resolve any perceived "conflicts of interest" with respect to plan assets in favor of Plans, as Plaintiffs' Experts assert.[15]

8.      As discussed in **Section IV.B** of my Initial Report and contrary to Plaintiffs' Experts' assertions, John Hancock does not have discretionary authority or control over how each Proposed Class Member manages or selects the services to be received, or the investment options to be offered, by each Plan.  In particular, John Hancock does not have discretion over, nor does it directly provide investment advice as to, which investment options Proposed Class Members (assisted by the Proposed Class Advisors, if applicable) select to offer to Plan participants, or how Plan participants allocate their assets across the available investment options offered on their respective Plan lineup.[16]

9.      Plaintiffs' Experts ignore that John Hancock's roles and responsibilities as they pertain to the management and control of assets held in Separate Accounts are documented in the 2014 Recordkeeping Agreement between John Hancock and the Named Plaintiff Plan as well as the 2014 Group Annuity Contract for the Named Plaintiff Plan.  Specifically, the 2014 Recordkeeping Agreement clearly states that John Hancock is a "limited fiduciary" and does not have discretionary authority for the management of the separate accounts:

> …none of the services provided under this [recordkeeping] agreement are performed by John Hancock, its affiliates, or employees as a fiduciary (as that term

---

[15] Pingree Report, pp. 19-22; Levy Report, ¶¶ 23-25.

[16] John Hancock, "Retirement Plans," available at https://retirement.johnhancock.com/us/en/retirement-products/retirement-plans.  ("John Hancock Retirement Plan Services, LLC, John Hancock Life Insurance Company (U.S.A.), and John Hancock Life Insurance Company of New York each make available a platform of investment alternatives to sponsors or administrators of retirement plans without regard to the individualized needs of any plan. Unless otherwise specifically stated in writing, each such company does not, and is not undertaking to, provide impartial investment advice or give advice in a fiduciary capacity.")

*CONFIDENTIAL - Pursuant to Protective Order*

is defined in ERISA) of the plan and its related trust…. To the extent John Hancock maintains a separate account(s) in which the plan invests, John Hancock is a limited fiduciary for the exclusive purposes of holding plan assets in its separate accounts(s)…and **acting only in accordance with directions from trustees(s), participants and beneficiaries.** The Plan trustee(s) shall retain the authority and responsibility for reviewing the plan documents, ensuring compliance with ERISA…, and instructing John Hancock accordingly. **John Hancock will not have any discretionary authority or responsibility for the management or control of the separate accounts.**[17]

10.     Similarly, the GVAC between John Hancock and the Named Plaintiff Plan ("2014 GVAC") also states that John Hancock "does not assume any fiduciary responsibility of the [Trustees of Romano Law, PL 401(k) Plan], Plan administrator, Plan Sponsor, or any other Fiduciary of the Plan…"[18]

11.     Consistent with the 2014 Recordkeeping Agreement and 2014 GVAC, documentary evidence reflects that the Named Plaintiffs and Mr. Searcy exercised discretionary authority in selecting John Hancock as recordkeeper, in choosing all of the services the Named Plaintiff Plan will receive from John Hancock, and in identifying all of the investment options offered on the Named Plaintiff Plan lineup.  For example, the Named Plaintiffs, with Mr. Searcy's assistance, selected each of the funds available on the Named Plaintiff Plan lineup.  Eric Romano testified that "when we implemented the plan, we talked with Christian generally about the types of investments to offer. We discussed offering a wide range of investments so that, you know, we would have options to suit everybody's needs."[19] Mr. Searcy further explained his selection process for assisting plan sponsors with investment option selection:

---

[17] **Emphasis added.**  Todd Romano Deposition, Exhibit 59 (Recordkeeping Agreement prepared for Romano & Romano 401(k) Profit Sharing Plan by John Hancock Life Insurance Company (U.S.A.), June 18, 2014, ROMANO-000028-049 at 029).

[18] Eric Romano Deposition, Exhibit 15 (Group Annuity Contract for the Romano Law, PL 401(k) Plan by John Hancock Life Insurance Company (U.S.A.), effective October 7, 2014, p. 9).

[19] Eric Romano Deposition, 81:1-5. *See also,* Eric Romano Deposition, 95:7-96:15.

*CONFIDENTIAL - Pursuant to Protective Order*

…in general on plans like this that started with a group annuity chassis underneath them there was typically a universe of funds that was offered by the plan recordkeeper and then sometimes, as is the case with John Hancock, there was a narrowed down list. … So if there was already a narrowed down list I usually started with the narrowed down list and from that list did my due diligence as far as returns, cost of the fund, expenses, some modern portfolio theory statistics, like Alpha and Sharpe and things of that nature, and we would come to try to have the best option available in each category.[20]

12.     Plaintiffs' Experts have not presented, and I have not encountered, evidence indicating that John Hancock exercised any discretion or control over how the Named Plaintiffs selected Plan investment options, or how Named Plaintiff Plan participants allocated assets across Plan investment options.

13.     John Hancock's responsibilities as described in the 2014 Recordkeeping Agreement are consistent with how other recordkeepers describe their responsibilities to plans they service and are not "self-styled" as Mr. Levy asserts.[21]  Rather, it is common for recordkeeping agreements between other recordkeepers and plan sponsors to include language stating that the recordkeeper does not have any discretion over plan assets.  For example:

    i.   The Recordkeeping Services Agreement template associated with Capital Group Retirement Plan Services states: "Nothing in this Agreement will be deemed to impose any obligation on the [Capital Group Retirement Plan Services] to monitor, control or in any way exercise any powers or discretion in the administration of the Plan or in the handling of any Plan assets, including but not limited to the selection, the acquisition or disposition of any funds, securities, or other assets of the Plan."[22]

    ii.  The Administrative Services Agreement between Massachusetts Mutual Life Insurance Company ("MassMutual") and Republic Mortgage Insurance Company dated November 3, 2016, states that MassMutual "acts solely as a non-fiduciary service provider to the Plan Sponsor…[and] has no discretion in matters of plan

---

[20] Searcy Deposition, 91:16-92:4. *See also,* Searcy Deposition, 98:5-99:11.

[21] Levy Report, ¶ 22.

[22] Recordkeeping Services Agreement between Capital Group Retirement Plan Services and unnamed Employer, p. 4, available at https://americanfundsretirement.retire.americanfunds.com/pdf/rpdrfm-025_rkd_agree.pdf.

*CONFIDENTIAL - Pursuant to Protective Order*

administrative and management including, but not limited to…the investment of plan assets."[23]

    iii. The OneAmerica Service Agreement & Fee Disclosure between American United Life Insurance Company ("AUL") and the BVCAP 403(b) Plan states that AUL "exercises no direction with respect to the investment made by it and only purchases securities that directly correspond to the investment account within the AUL separate account that has been selected by the Plan participant."[24]

    iv. The Paychex Retirement Services Agreement template states: "Paychex' Services under this Agreement are limited to those of a recordkeeper and provider of non-discretionary administrative Services at the direction of the Client…Paychex does not act as a fiduciary and will not be named as a fiduciary as that term is defined under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or the Internal Revenue Code of 1986 as amended (the "Code"). Paychex does not have, and will not exercise, any discretionary authority, control, or responsibility with respect to Plan assets or the administration of the Plan."[25]

14. To put into perspective, approximately 34 recordkeepers provide recordkeeping services to defined contribution retirement plans as of September 2020.[26]  In my experience working with many of these recordkeepers, I have not encountered a recordkeeper that has exercised discretion over the investment options offered on individual plan lineups, or how participant accounts are allocated across the available investment options, without providing specific disclosures acknowledging that it is acting as a fiduciary under Section 3(21) or Section

---

[23] MassMutual Administrative Services Agreement between Massachusetts Mutual Life Insurance Company and Republic Mortgage Insurance Company, November 3, 2016, p. 5, available at https://mmfg.asc-net.com//TPADocs/asc299/561031043-001-002174_0001_0000-Republic_Mortga-Custom_MM_DC_ASA-V22088814382.pdf.

[24] OneAmerica Services Agreement & Fee Disclosure between American United Life Insurance Company and the BVCAP 403(b) Plan, August 23, 2017, p. 6, available at http://www.capbv.org/wp-content/uploads/2017/08/One-America-Service-Agreement-and-Fee-Disclosure.pdf.

[25] Paychex Retirement Services Agreement, December 2020, p. 12, available at https://download.paychex.com/pas_pbs/formfiles/service_agreement.pdf.

[26] Pensions & Investments, "DC Record Keepers," as of September 30, 2020, available at https://researchcenter.pionline.com/v3/rankings/dc-record-keeper/datatable.

*CONFIDENTIAL - Pursuant to Protective Order*

3(38) of ERISA.[27]  Similarly, I have not encountered a plan sponsor that contracted a recordkeeper directly for services similar to those John Hancock provided to Plans on the Signature Platform and expected the recordkeeper to exercise discretion and authority over its plan assets or in selecting the services and investment options offered to its plan.  In my experience, retirement industry professionals do not expect that an insurance company like John Hancock will operate in a fiduciary capacity by holding plan investments that are subject to direction by plan participants or trustees, like the Proposed Class Members.

## IV.  CONTRARY TO PLAINTIFFS' EXPERTS' ASSERTIONS, RETIREMENT INDUSTRY PROFESSIONALS DO NOT CONSIDER FOREIGN TAX CREDITS TO BE "COMPENSATION" OR "REVENUES" RECEIVED BY RECORDKEEPERS

15.     Mr. Levy asserts that John Hancock is required "to credit the foreign tax credits back to the separate accounts that generated them and to disclose such foreign tax credits" because they are considered to be "revenues" and "indirect compensation" received by John Hancock in exchange for holding Plan assets in its Separate Accounts.[28]  Likewise, Mr. Pingree

---

[27] This excludes instances in which recordkeepers, such as Vanguard or Empower, for example, provide a separate managed account service (in addition to recordkeeping services) to plans, whereby a separate business unit or affiliate of the recordkeeper explicitly agrees in writing to direct the investment of participant accounts.  For example, in its Vanguard Managed Account Program Services Agreement, VAI, a separate division of Vanguard that provides managed account services to retirement plans states: "With respect to plans subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), VAI acknowledges and agrees that it is a fiduciary under Section 3(21) of ERISA and an investment manager under Section 3(38) of ERISA with respect to the investment of your account, other than restricted investments." (Vanguard Managed Account Program Service Agreement, May 2019, available at  https://legaldocs.financialengines.io/Vanguard/Vanguard_Managed_Accounts/Vanguard_ MA_ServiceAgmt _Privacy.pdf.)  Likewise, Advised Asset Group, LLC, a subsidiary of the Great-West Life & Annuity Insurance Company that offers investment advisory services, states in its Advisory Services Agreement that "AAG acknowledges that, as a registered investment advisor, it owes a fiduciary duty to participants with respect to investment advice is provides." (Advised Assets Group, LLC, Advisory Services Agreement, October 28, 2019, p. 3, available at http://roadvantage.com/wp-content/uploads/2021/05/AAG-TOS_AAG-IRA_final_DRM_49-bps.pdf.pdf.)

[28] Levy Report, ¶¶ 11, 24.

*CONFIDENTIAL - Pursuant to Protective Order*

asserts that John Hancock failed to disclose foreign tax credits which have "monetary value" and are hence considered "compensation" and/or "revenues."[29]

16.     Mr. Levy's and Mr. Pingree's broad interpretation of the term "compensation" conflicts with industry custom and practices.  In my experience, retirement industry professionals, including plan advisors, recordkeepers, other service providers, and plan sponsors, do not consider foreign tax credits to be direct or indirect compensation received by service providers, and hence do not expect service providers to disclose their "receipt and retention" in 408(b)(2) Disclosure Statements.  Mr. Levy and Mr. Pingree also incorrectly equate foreign tax credits to "revenues" John Hancock receives from underlying mutual funds and sub-accounts that are used to offset recordkeeping fees, and which John Hancock is required to disclose in its 408(b)(2) Disclosure Statements.[30]  In my experience, the term "revenue" is commonly used and understood by retirement industry professionals, including plan advisors, recordkeepers, other service providers, and plan sponsors, to refer to revenue sharing payments, including 12b-1 fees or sub-transfer agency fees, that investment management companies may pay to John Hancock in return for services provided on behalf of the mutual fund.  Based upon my knowledge of industry custom and how these amounts are defined, the "revenues" as reported on 408(b)(2) Disclosure Statements are unrelated to foreign tax credits.  Given the well-understood interpretations of the terms "compensation" and "revenues" with respect to 408(b)(2) Disclosure Statements, in my view, John Hancock is not expected, or required to, disclose or provide fee concessions for foreign tax credits.

---

[29] Pingree Report, pp. 18-19, 21.

[30] Levy Report, ¶ 24.

*CONFIDENTIAL - Pursuant to Protective Order*

17.     As discussed in my Initial Report, in my regular course of business, I have reviewed and analyzed hundreds of 408(b)(2) disclosures across more than 20 recordkeepers — none have explicitly referenced foreign taxes or foreign tax credits.  Further, 408(b)(2) disclosures regulations set forth by the Department of Labor ("DOL") do not reference foreign tax credits and do not require such disclosure.[31]

## V.     CONTRARY TO MR. LEVY'S ASSERTION, THE PROVISION OF FEE CONCESSIONS FOR FOREIGN TAX CREDITS IS NOT CONSIDERED "BEST PRACTICE"

18.     Mr. Levy asserts that "[i]t is a best practice for insurance companies who issue group variable annuity contracts and receive foreign tax credits from mutual funds held in the insurance company's separate accounts to credit such foreign tax credits back to the separate accounts that generated them and to disclose such foreign tax credits as indirect compensation."[32] Mr. Levy makes this assertion even though he acknowledges that most insurance company recordkeepers do not follow this practice and that he is only aware of one recordkeeper (Securian) that follows this purported "best practice."[33]

19.     Regardless of whether the provision of fee concessions for foreign tax credits by a single recordkeeper is "best practice" as Mr. Levy asserts, it is certainly not industry practice. As discussed in my Initial Report, the competitive nature of the recordkeeping industry implies

---

[31] Initial Report, ¶ 35.  I further note that the Internal Revenue Service ("IRS") and the DOL requires all employee benefit plans with more than 100 participants to file an annual report detailing, among other things, the direct and indirect compensation the plan provided to plan service providers, such as recordkeepers.  While the IRS and DOL provides extensive instructions on what constitutes direct and indirect compensation to service providers, they do not list tax credits, foreign or otherwise, as among those items.  (Department of Treasury Internal Revenue Services and Department of Labor Employee Benefits Security Administration, "2020 Instructions for Form 5500 Annual Return/Report of Employee Benefit Plans," available at https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2020-instructions.pdf.)

[32] Levy Report, ¶ 11.  *See also,* Levy Report, ¶ 27.

[33] Levy Report, ¶¶ 27-29.

*CONFIDENTIAL - Pursuant to Protective Order*

that if offering fee concessions for foreign tax credits enabled a recordkeeper to propose lower total fees for the same bundle of services than its competitors, other recordkeepers would have to offer similar fee concessions in order to remain competitive.[34]  Yet, Securian is the only recordkeeper I have encountered in my 40 years of experience working with plan sponsors and recordkeeping service providers, that claims to provide fee concessions for foreign tax credits.

20.     Despite Mr. Levy's unsupported assertion that Securian reflects industry "best practices," Securian services only a small fraction of the total number of U.S. defined contribution plans.  As of December 31, 2020, Securian serviced approximately 2,600 defined contribution plans,[35] or 0.3 percent of the nearly 850,000 defined contribution plans[36] in the U.S. Further, Securian administers just 5.2 percent of the total number of defined contribution plans serviced by John Hancock and its affiliates as of the same date.[37]  Securian's small market share reflects that approximately 99.7 percent of defined contribution plans in the U.S. found services and fees offered by other recordkeepers to be more suitable than the services and fees that Securian offered, regardless of Securian's alleged fee "concessions" for (and disclosures concerning) foreign tax credits.  The fact that no other recordkeeper has adopted Securian's practice indicates that the provision of fee concessions for foreign tax credits is not consistent

---

[34] Initial Report, Section VII.A.  For example, Mr. Almada, Head of Pricing for U.S. Retirement at John Hancock, for example, testified that depending on the plan, John Hancock may adjust its pricing to match a competitor's pricing. (Almada Deposition, 6:25-7:4, 23:21-24:4.)  *See also*, Almada 30(b)(6) Deposition, 60:8-12.

[35] PlanSponsor, "2021 Recordkeeping Survey: Securian Financial," June 21, 2021, available at https://www.plansponsor.com/research/2021-recordkeeping-survey/?pagesec=9&pid=41&pname=Securian-Financial#Providers.

[36] PlanSponsor, "2021 Recordkeeping Survey: Industry Snapshot," June 21, 2021, available at https://www.plansponsor.com/research/2021-recordkeeping-survey/?pagesec=3#Industry%20Snapshot.

[37] According to PlanSponsor's 2021 Recordkeeping Survey, of the 845,522 defined contribution plans in the U.S., John Hancock and its affiliates serve 49,603 plans while Securian serves 2,589 plans.  (PlanSponsor, "2021 Recordkeeping Survey: John Hancock," June 21, 2021, available at https://www.plansponsor.com/research/2021-recordkeeping-survey/?pagesec=9&pid=23&pname=John-Hancock#Providers; PlanSponsor, "2021 Recordkeeping Survey: Securian Financial," June 21, 2021, available at https://www.plansponsor.com/research/2021-recordkeeping-survey/?pagesec=9&pid=41&pname=Securian-Financial#Providers.)

*CONFIDENTIAL - Pursuant to Protective Order*

with industry practice and is therefore not relevant to how recordkeepers and plan sponsors establish recordkeeping fees.

## VI.   IT IS UNLIKELY THAT FEE CONCESSIONS FOR FOREIGN TAX CREDITS, AS PROPOSED BY PLAINTIFFS, WOULD HAVE AFFECTED HOW PLAN SPONSORS EVALUATED JOHN HANCOCK AND ITS FEES

21.      Mr. Pingree states that, because John Hancock did not disclose its use of foreign tax credits, "the Plaintiffs were deprived of an accurate opportunity to monitor the performance of the investment fiduciary Defendant and the reasonableness of its fees."[38]  This assertion is false and demonstrates a fundamental misunderstanding of how plan sponsors evaluate recordkeepers and how recordkeeping fee arrangements are negotiated and established.  This assertion also conflicts with documentary evidence indicating that the Named Plaintiff Plan, with assistance from Mr. Searcy, had access to information concerning whether John Hancock and recordkeepers provided fee concessions in connection with the foreign tax credits that are allowed against foreign taxes paid and were not "deprived" of the information necessary to evaluate John Hancock and the reasonableness of its fees.

### A.      Disclosures of Foreign Tax Credits Are Unlikely to Factor into an Evaluation of John Hancock and Its Fees

22.      As discussed in **Section V** of my Initial Report, plan sponsors and plan advisors typically focus their recordkeeper evaluations on whether the types and quality of administrative services offered by a recordkeeper, and the overall total fee for these services, align with their plan's, and by extension their plan participants', specific needs.  In my experience, the disclosures that a recordkeeper does or does not provide about foreign tax credits allowed have

---

[38] Pingree Report, p. 22.

*CONFIDENTIAL - Pursuant to Protective Order*

no bearing on the level and quality of recordkeeper services.  Given my experience with and observations on how plan sponsors and plan advisors of retirement plans evaluate recordkeepers, it is my opinion that additional disclosures of John Hancock's allowance of foreign tax credits would not have affected how many Proposed Class Members and Proposed Class Advisors evaluated John Hancock's recordkeeping services.

23.     Further, because of how recordkeeping fee arrangements are negotiated and established, based on my experience, whether a recordkeeper does or does not provide fee concessions for foreign tax credits is unlikely to affect whether a plan's total recordkeeping fees are reasonable.  As discussed in **Section VI.B** of my Initial Report, John Hancock, like most other recordkeepers in the marketplace, prices plans based on an evaluation of John Hancock's required revenue given each Plan's specific attributes (*e.g.,* plan assets, number of participants, annual contributions), their overall servicing requirements,[39] the costs to John Hancock to provide requested services, and market pressures.[40]  To ensure that it is adequately compensated for the combination of services it provides, if a fee concession provided to a specific plan sponsor lowers total recordkeeping fees below the required revenue for that specific plan, the recordkeeper can offset this decrease in compensation by simultaneously increasing the compensation it collects from other fee components (or by decreasing other fee concessions).

---

[39] Almada 30(b)(6) Deposition, 30:15-31:5.  ("And obviously, what I would say in any kind of business, that's where the plan then gets kind of submitted through this sort of overall process to draw pricing and obviously our pricing is really kind of heavily dependent on four or five key factors, which is really understanding -- what are the total assets in that plan, what are the total participants and what's the contribution of that particular plan. And then obviously, you know, within sort of those three or four key data points, we're able to assess what is the administration in the recordkeeping fee that we would charge for that particular plan.")  *See also,* Almada 30(b)(6) Deposition, 21:19-22:2, 31:21-23, 52:24-53:10, 79:22-81:4.

[40] Almada 30(b)(6) Deposition, 59:25-60:12.  ("With respect to recordkeeping fees in general, right, what we charge plan sponsors, yes, I mean, obviously over time we've had to, I'd say, adjust kind of what we charge recordkeeping fees in general from plan to plan just given the way the overall market works. So yeah, over time, obviously with any product company service, you're [*sic*] pricing does evolve and does change and needs to change relative to the individual market in that time.")

*CONFIDENTIAL - Pursuant to Protective Order*

For example, a recordkeeper offering a revenue sharing credit of 0.05 percent (5 basis points or "bps") on total plan assets can offset this reduction in revenue by increasing other fee components, such as individual participants annual loan maintenance fees, distribution and withdrawal fees, or imposing separate and additional charges for annual compliance testing.

24.      Indeed, as discussed in **Section VI.B.2** of my Initial Report, even though Securian claims to provide fee concessions for foreign tax credits, documentary evidence shows that it can and does charge higher recordkeeping fees to offset the decrease in revenue it collects as a result of the fee concession for foreign tax credits.  Specifically, the RFP responses Mr. Searcy received from UBS, Fidelity, John Hancock, and Securian for an unnamed plan in 2017 shows that while Securian did provide a fee concession for foreign tax credits, its total recordkeeping fees, even after reflecting those foreign tax credits, were higher than the total recordkeeping fees the other three recordkeepers offered to the same plan.  This suggests, in my view, that the fee concession for foreign tax credits that Securian advertises is more of a marketing tactic than a rebate provided "in the best interests of a plan," as Mr. Levy suggests.[41]

25.      Because individual fee components can be adjusted, evaluations by plan sponsors and plan advisors of whether a plan's total recordkeeping fees are reasonable typically do not focus on individual fee concessions.  Rather, these evaluations typically focus on whether the types and quality of administrative services offered by a recordkeeper and the overall total fee for these services align with their plan's, and by extension their plan participants', specific needs.

---

[41] Levy Report, ¶ 27.

*CONFIDENTIAL - Pursuant to Protective Order*

**B.     As Demonstrated by the Named Plaintiffs and Mr. Searcy, Information on John Hancock's Allowance of Foreign Tax Credits Could Have Been Obtained Through Direct Inquiries with John Hancock or From Investment Product Prospectuses**

26.     Even if a plan sponsor or plan advisor determines that fee concessions for foreign tax credits would be relevant to how they evaluate recordkeepers and total recordkeeper fees, which in my experience is unlikely, this information can be obtained by making direct inquiries with the recordkeeper or by reviewing disclosures made in investment product prospectuses.  It is common for plan sponsors and plan advisors to make inquiries directly with the recordkeeper's sales representative or designated account manager on matters related to fees and services.  For example, if information on the foreign tax credits associated with international investments which pay foreign taxes were relevant to my evaluation of a recordkeeper, which it has not been, I would make inquiries with the recordkeeper's sales representative or account manager, and/or review relevant documentation specific to foreign tax credits.  Consistent with this, deposition testimony reflects that during the Proposed Class Period, Mr. Searcy reached out to John Hancock, as well as other recordkeepers, to inquire about whether they provided fee concessions in connection with the foreign tax credits that are allowed against foreign taxes paid.[42]  Likewise, John Hancock disclosures direct Proposed Class Members to contact John Hancock representatives to the extent they require more information on plan investments.[43]

27.     Moreover, as Mr. Levy asserts in his report,[44] information on whether an underlying mutual fund paid foreign taxes may be disclosed in the prospectuses of the mutual

---

[42] Searcy Deposition, 177:4-14; Cobey Deposition, 74:9-22.  ("I had a conversations [*sic*] with Christian that that was the case, that we do not credit foreign tax credits.")

[43] John Hancock Retirement Plan Services, "Important information for Plan Sponsors," 2018, JH-ROMANO_037948-954 at 954.

[44] Levy Report, ¶ 26.

*CONFIDENTIAL - Pursuant to Protective Order*

funds held by the separate account.  These prospectuses are issued by the managers of each mutual fund and are publicly available (and hence and can be accessed or requested by anyone including Proposed Class Members and Proposed Class Advisors).[45]  For example, the 2015 prospectus of the Templeton Global Bond Fund, a fund that was available on the Named Plaintiff Plan lineup throughout the Proposed Class Period,[46] reported a "Foreign Tax Paid" of $0.0102 per share and stated that "[a]t August 31, 2015, more than 50% of the Fund's total assets were invested in securities of foreign issuers."[47]  Additionally, the John Hancock fund fact sheet for the Templeton Global Bond Fund states that "[f]oreign securities are subject to increased costs because there are generally higher commission rates on transactions, transfer taxes, higher custodial costs, and the potential for foreign tax charges on dividend and interest payments."[48]  I

---

[45] *See, e.g.,* Hamilton 30(b)(6) Deposition, 85:24-86:12, 87:2-19, 91:14-92:15, 107:20-108:12; John Hancock Retirement Plan Services, "Important information for Plan Sponsors," 2018, JH-ROMANO_037948-954 at 954.

[46] *See, e.g.,* Statement of Assets and Liabilities of the Sub-Accounts of John Hancock Life Insurance Company (U.S.A.) for Contract # 115534, the Trustees of Romano Law, PL 401(k) Plan, 2014-2018: JH-ROMANO_041236-249, JH-ROMANO_041250-264, JH-ROMANO_041265-282, JH-ROMANO_041283-306, JH-ROMANO_041307-332; Email from Katy Norusis to Eric Romano et al. re: 404a-5 Notice (re 401k), ROMANO-000269-290 at 279.

[47] The 2015 prospectus of the Templeton Global Bond Fund reports "a detailed analysis of foreign tax paid, foreign source income, and foreign source qualified dividends as reported by the Fund."  The information provided includes by share class, the per share amounts of foreign tax paid and foreign source income.  (Franklin Templeton Investments, Form N-CSR of the Templeton Income Trust, August 31, 2015, at Templeton Global Bond Fund, pp. 38, 52.)

Similarly, the Registration Statement of the Templeton Income Trust, which includes the Templeton Global Bond Fund, notes that "[u]nder certain circumstances, the Fund may elect to pass-through foreign tax credits to shareholders, although it reserves the right not to do so."  In addition, the registration statement outlines that "[t]he Fund may be subject to foreign withholding taxes on income or gains from its investments in certain foreign securities. If more than 50% of the Fund's total assets at the end of a fiscal year is invested in foreign securities, the Fund may elect to pass through to you your pro rata share of the foreign taxes paid by the Fund. Both the Fund and you must meet certain holding period requirements in order for you to claim a credit for foreign taxes on foreign source dividends."  (Franklin Templeton Investments, Form N-1A of the Templeton Income Trust, December 24, 2014, at 'Investments in foreign securities'.)

[48] John Hancock, "Templeton Global Bond Fund," July 2021, JH-ROMANO_043165-171 at 166.

*CONFIDENTIAL - Pursuant to Protective Order*

note that similar language appears in other fund fact sheets for funds that invest in foreign securities and which were on the Named Plaintiff Plan lineup.[49]

28.     Given the accessibility of foreign tax credit information, I disagree with Mr. Pingree's statement that Proposed Class Members were "deprived of an accurate opportunity to monitor the performance of the investment fiduciary Defendant and the reasonableness of its fees."[50]  For example, as discussed above, the Named Plaintiffs and Mr. Searcy obtained information on whether John Hancock (and other recordkeepers) provided fee concessions in connection with the foreign tax credits that are allowed against foreign taxes paid.  Despite having this information, the Named Plaintiffs and Mr. Searcy never sought to renegotiate the recordkeeping fee arrangement between the Named Plaintiff Plan and John Hancock throughout the Proposed Class Period, or to replace John Hancock with Securian, the only recordkeeper that would incorporate fee concessions for foreign tax credits in its new recordkeeping fee arrangement—indicating that foreign tax credits were not relevant to how the Named Plaintiffs select recordkeepers or negotiate fee arrangements.  Indeed, as a result of their 2020

---

[49] *See, e.g.,* John Hancock, "T. Rowe Price Retirement 2025," July 2021, JH-ROMANO_043193-199 at 194; John Hancock, "International Equity Index Fund," July 2021, JH-ROMANO_043097-104 at 098; John Hancock, "Dodge & Cox International Stock Fund," July 2021, JH-ROMANO_043065-070 at 066; John Hancock, "Capital World Growth and Income Fund," July 2021, JH-ROMANO_043052-057 at 053; John Hancock, "New World Fund," July 2021, JH-ROMANO_043032-037 at 033; John Hancock, "New Perspective Fund," July 2021, JH-ROMANO_043026-031 at 027.

[50] Pingree Report, p. 22.

*CONFIDENTIAL - Pursuant to Protective Order*

recordkeeper RFP process, the Named Plaintiffs and Mr. Searcy selected Fidelity, a recordkeeper that does not provide fee concessions for foreign tax credits.[51,52]

Respectfully submitted, this 8th day of October 2021,

Steven K. Gissiner

---

[51] Eric Romano Deposition, 205:11-25.  ("Q. As you sit here today do you know whether or not Fidelity credits to the plan or participants any foreign tax credits that are generated with respect to investments made through the Fidelity platform? A. I don't know. Q. Okay. You testified earlier that was a rationale for conducting this RFP was because of your concern about the way John Hancock treated credits, right? That was your testimony? A. Correct. Q. But as part of the RFP the winning bid went to somebody for whom, even as you sit here today, you don't know how that credit foreign credits taxed passed on by mutual funds invested through the plan, correct? A. Specifically, that's correct.")

[52] Similarly, Mr. Todd Romano testified that he "[does not] recall ever even thinking about [selecting an insurance company versus a fund company] as a consideration, no."  (Todd Romano Deposition, 130:5-10.)

*Confidential - Pursuant to Protective Order*

## Appendix A
## Incremental Documents Considered

| | Bates Range |
|---|---|
| **Legal Documents and Depositions** | |
| Expert Report of Roger L. Levy, August 23, 2021, and materials cited therein | |
| Expert Report Prepared by: Barry Mukamal, CPA/PFS/ABV/CFE/CFF/CIRA, August 23, 2021, and materials cited therein | |
| Expert Witness Report of Bruce D. Pingree, August 23, 2021, and materials cited therein | |
| Expert Report of Steven K. Gissiner, August 23, 2021, and materials cited therein | |
| | |
| **Produced Documents** | |
| John Hancock, "New Perspective Fund," July 2021 | JH-ROMANO_043026-031 |
| John Hancock, "New World Fund," July 2021 | JH-ROMANO_043032-037 |
| John Hancock, "Capital World Growth and Income Fund," July 2021 | JH-ROMANO_043052-057 |
| John Hancock, "Dodge & Cox International Stock Fund," July 2021 | JH-ROMANO_043065-070 |
| John Hancock, "International Equity Index Fund," July 2021 | JH-ROMANO_043097-104 |
| John Hancock, "T. Rowe Price Retirement 2025," July 2021 | JH-ROMANO_043193-199 |
| | |
| **Publicly Available Documents** | |
| Advised Assets Group, LLC, Advisory Services Agreement, October 28, 2019, available at http://roadvantage.com/wp-content/uploads/2021/05/AAG-TOS_AAG-IRA_final_DRM_49-bps.pdf.pdf | |
| Department of Treasury Internal Revenue Services and Department of Labor Employee Benefits Security Administration, "2020 Instructions for Form 5500 Annual Return/Report of Employee Benefit Plans," available at https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2020-instructions.pdf | |
| Fisher Investments, "3(21) vs. 3(38) Fiduciary Services Q&As," June 2016, available at https://www.fisher401k.com/sites/default/files/media_library/pdf/3(21)_vs_3(38)_Fiduciary_Services_FAQ.pdf | |
| MassMutual Administrative Services Agreement between Massachusetts Mutual Life Insurance Company and Republic Mortgage Insurance Company, November 3, 2016, available at https://mmfg.asc-net.com//TPADocs/asc299/561031043-001-002174_0001_0000-Republic_Mortga-Custom_MM_DC_ASA-V22088814382.pdf | |
| OneAmerica Services Agreement & Fee Disclosure between American United Life Insurance Company and the BVCAP 403(b) Plan, August 23, 2017, available at http://www.capbv.org/wp-content/uploads/2017/08/One-America-Service-Agreement-and-Fee-Disclosure.pdf | |
| Paychex Retirement Services Agreement, December 2020, available at https://download.paychex.com/pas_pbs/formfiles/service_agreement.pdf | |
| Pensions & Investments, "DC Record Keepers," as of September 30, 2020, available at https://researchcenter.pionline.com/v3/rankings/dc-record-keeper/datatable | |
| PlanSponsor, "2021 Recordkeeping Survey: John Hancock," June 21, 2021, available at https://www.plansponsor.com/research/2021-recordkeeping-survey/?pagesec=9&pid=23&pname=John-Hancock#Providers | |
| Recordkeeping Services Agreement between Capital Group Retirement Plan Services and unnamed Employer, available at https://americanfundsretirement.retire.americanfunds.com/pdf/rpdrfm-025_rkd_agree.pdf | |
| Vanguard Managed Account Program Service Agreement, May 2019, available at https://legaldocs.financialengines.io/Vanguard/Vanguard_Managed_Accounts/Vanguard_MA_ServiceAgmt_Privacy.pdf | |