# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.:  19-21147-CIV-GOODMAN

ERIC ROMANO, et al.,
individually and on behalf of
all others similarly situated,

               Plaintiffs,

vs.

JOHN HANCOCK LIFE INSURANCE
COMPANY (U.S.A.),

               Defendant.
_____/


REMOTE VIDEOTAPED DEPOSITION OF

STEVEN K. GISSINER


Pages 1 through 231


Thursday, October 28, 2021
10:01 a.m. - 5:25 p.m.


Stenographically Reported By:
Denise Sankary, RPR, RMR, CRR

Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 2

1  REMOTE APPEARANCES:
2
   On behalf of Plaintiffs:
3
       PODHURST ORSECK, P.A.
4      SunTrust International Center
       One Southeast Third Avenue, Suite 2300
5      Miami, Florida 33131
       305-358-2800
6      BY: MATTHEW P. WEINSHALL, ESQUIRE
       mweinshall@podhurst.com
7
   and
8
       SEARCY, DENNEY, SCAROLA,
9      BARNHART & SHIPLEY, P.A.
       2139 Palm Beach Lakes Boulevard
10     P.O. Drawer 3626
       West Palm Beach, Florida 33402-3626
11     561-686-6300
       BY: BORIS L. ZHADANOVSKIY, ESQUIRE
12     email: zhadanovskiyteam@searcylaw.com
13
14
   On behalf of Defendant:
15
       GOODWIN PROCTER, P.A.
16     100 Northern Avenue
       Boston, Massachusetts 02210
17     617-570-1153
       BY: JAMES O. FLECKNER, ESQUIRE
18     jfleckner@goodwinlaw.com
       BY: MICHAEL VAGLICA, ESQUIRE
19     mvaglica@goodwinlaw.com
20
21
22 ALSO PRESENT:
23     Bailey Diaz, Videographer
24     Ketty Saez, Assistant Vice President and Senior
       Counsel at John Hancock Life Insurance Company
25

Page 3

1                    I N D E X
2  Examination                        Page
   STEVEN K. GISSINER
3
4  Direct     By Mr. Weinshall          5
   Cross      By Mr. Fleckner          215
5
6  Certificate of Oath                 228
   Certificate of Reporter             229
7  Read and Sign Letter to Witness     230
   Errata Sheet (forwarded upon execution)   231
8
9                 E X H I B I T S
   No.                                Page
10 150  10/08/21 Rebuttal Report of Steven K.   14
       Gissiner
11
   151  08/23/21 Expert Report of Steven K.   15
12     Gissiner
13 152  Article titled: A Guide to Avoid   58
       Becoming an Unfair Target of ERISA
14     Litigation
15 153  Statute 29 U.S. Code Section 1002   66
16 154  Supplemental Information Agreement   70
       and Group Variable Annuity Agreement
17
   155  Rule 408(b)(2)                 164
18
   156  Mr. Levy's Report              179
19
   157  John Hancock Disclosure        194
20
21 158  408(b)(2) disclosures specific to the   197
       Romano plan
22     (Reporter's Note: Exhibits to be provided
       by Plaintiffs' Counsel.)
23
24
25

Page 4

1      The following proceedings began at 10:01 a.m.:
2           THE VIDEOGRAPHER:  Good morning.  We're
3      now on the record.  This begins Videotape
4      Number 1 in the deposition of Steven K.
5      Gissiner taken in the matter of Eric Romano
6      versus John Hancock Life Insurance, in the
7      United States District Court, Southern District
8      of Florida.  Today is October 28, 2021, and the
9      time is 10:01 a.m.
10          This deposition is being taken remotely
11     via web conferencing at the request of Podhurst
12     Orseck, P.A.  The videographer is Bailey Diaz
13     of Magna Legal Services, and the court reporter
14     is Denise Sankary of Magna Legal Services.
15          Will counsel and all parties present state
16     their appearances for the record and whom they
17     represent, after which the court reporter will
18     swear in the witness.
19          MR. WEINSHALL:  This is Matt Weinshall of
20     Podhurst Orseck on behalf of the plaintiffs.
21          MR. ZHADANOVSKIY:  Boris Zhadanovskiy from
22     Searcy Denney on behalf of the plaintiffs.
23          MR. FLECKNER:  This is Jamie Fleckner of
24     Goodwin on behalf of the defendant.  With me is
25     my colleague, Michael Vaglica, and in-house

Page 5

1      counsel, Ketty Saez.  And we may be joined by a
2      second in-house counsel for John Hancock, Paul
3      Gallagher.
4           THE COURT REPORTER:  Thank you.
5           Mr. Steven Gissiner, would you raise your
6      right hand, please.
7           I can't see him.  Hold on.
8           Do you swear the testimony your about to
9      give today will be the truth, the whole truth,
10     and nothing but the truth?
11          THE WITNESS:  I do.
12          THE COURT REPORTER:  Thank you.
13          DIRECT EXAMINATION
14     BY MR. WEINSHALL:
15     Q.  Great.  Mr. Gissiner, can you please state
16     your name again for the record?
17     A.  Steven, S-T-E-V-E-N, middle initial K, and
18     Gissiner, G-I-S-S, as in Sam, I-N-E-R.
19     Q.  Thank you.
20          You've been deposed before, correct?
21     A.  Yes.
22     Q.  Okay.  So you're probably familiar with
23     the ground rules, but I'm just going to go over a
24     few of them to make sure we're on the same page,
25     okay?



Page 6

1        A.  Sure.
2        Q.  You understand you're testifying here
3   today under oath; is that right?
4        A.  Yes.
5        Q.  And you understand that's the same oath
6   that you would take in a court of law; is that
7   right?
8        A.  Yes.
9        Q.  Okay.  I'm going to be asking you a series
10  of questions.
11          If at any point you don't understand a
12  question I've asked, will you let me know?
13       A.  Yes.
14       Q.  Okay.  The flipside to that is, if you
15  answer a question I've asked, I'm going to assume
16  that you understand it; is that fair?
17       A.  Yes.
18       Q.  Okay.  From time to time, your attorney
19  may make objections to my questions.  Despite his
20  objections, you're required to answer my questions
21  unless he specifically instructs you not to answer.
22          Do you understand that?
23       A.  Yes, I do.
24       Q.  Okay.  The court reporter is taking down
25  everything that's being said here today.  For that

Page 7

1   reason, it's important that we not speak over each
2   other.  It's also important for you to provide
3   audible responses in order to get an accurate
4   transcript.  Our goal today is to get an accurate
5   transcript.
6          Do you understand that?
7        A.  Yes, I do.
8        Q.  Anytime you need a break when a question
9   is not pending, please let me know and we'll try to
10  accommodate you, okay?
11       A.  Yes.
12       Q.  Have you taken any medication or consumed
13  any alcohol that would impact your ability to
14  understand my questions or affect your ability to
15  provide truthful answers to those questions?
16       A.  No.
17       Q.  Are you suffering from any medical
18  condition that would affect your ability to
19  understand my questions or affect your ability to
20  provide truthful answers to my questions?
21       A.  No.
22       Q.  Okay.  Do you have any documents in front
23  of you?
24       A.  I have three documents in front of me.
25  The -- my expert report, my rebuttal report, and

Page 8

1   Mr. Levy's affirmative report.
2        Q.  Okay.  Do any of those documents have
3   handwriting on them?
4        A.  No, they don't.
5        Q.  Okay.  Do you have any applications open
6   on your computer other than Microsoft Teams and
7   AgileLaw?
8        A.  No.
9        Q.  Okay.  If you open any other applications
10  during the course of the deposition, do you agree
11  that you will inform us at that time?
12       A.  I do.
13       Q.  Okay.  Is anyone else in the room with
14  you?
15       A.  No.
16       Q.  Approximately how many times have you been
17  deposed before?
18       A.  Eleven.
19       Q.  Okay.  Were each of those as a -- as an
20  expert witness?
21       A.  Yes.
22       Q.  Okay.  In each case, did you serve as an
23  expert witness for a defendant?
24       A.  Yes.
25       Q.  What did you do to prepare for today's

Page 9

1   deposition?
2        A.  Just over the course of the last couple
3   weeks, reviewed my report, reviewed my footnotes,
4   reviewed the plaintiffs' reports, and met with
5   counsel.
6        Q.  And did you review any deposition
7   transcripts?
8        A.  I did if they were referenced in my
9   report.
10       Q.  Okay.  So you didn't review the transcript
11  of the deposition of Roger Levy; is that right?
12       A.  No, I did not.  I understand that was
13  taken yesterday.
14       Q.  Okay.  How about the deposition transcript
15  of Bruce Pingree?
16       A.  No, I did not.
17       Q.  Okay.  How about the deposition transcript
18  of David LaRue?
19       A.  I'd have to look at my notes, but I don't
20  recall reviewing that one.  Again, unless it was
21  referenced in my report, I did not review it.
22       Q.  Okay.  Did you review the report of David
23  LaRue?
24       A.  No, I did not.
25       Q.  So you mentioned that you spoke with



Page 10

1    Mr. Fleckner to prepare for today's deposition; is
2    that right?
3         A.  That's correct.
4         Q.  When did you speak with him?
5         A.  Yesterday.
6         Q.  For how long?
7         A.  I believe it was approximately three and a
8    half hours.
9         Q.  Okay.  Did you speak with him before
10   yesterday in connection with your preparation?
11        A.  No.
12        Q.  Okay.  Approximately how much time have
13   you spent working on this matter?
14        A.  Since inception?
15        Q.  Yes.
16        A.  I'm only going to be able to approximate.
17   I'd have to actually go look at my billing records
18   to confirm, but best guess would be probably between
19   70 and 90 hours.
20        Q.  Okay.  Are you associated with a
21   consulting firm that provides litigation support?
22        A.  Yes.  Actually, two firms.
23        Q.  Which firms are those?
24        A.  Cornerstone and Analysis Group.
25        Q.  Was one of those firms retained to assist

Page 11

1    you in this case?
2         A.  Yes.
3         Q.  Which one?
4         A.  Analysis Group.
5         Q.  Okay.  So in addition to the 70 to 90
6    hours that you worked in this matter, do you know
7    approximately how much time Analysis Group has spent
8    on the matter?
9         A.  I do not.
10        Q.  Do you know approximately how much in fees
11   Analysis Group has charged in the matter?
12        A.  No.
13        Q.  Okay.  Are you compensated for your work
14   in the case?
15        A.  Am I, myself?  Yes.
16        Q.  At what rate?
17        A.  525 an hour.
18        Q.  Okay.  And do you receive any compensation
19   from the amount that Analysis Group has paid?
20        A.  No, I don't.
21        Q.  Do you know how you came to be retained in
22   this matter?
23        A.  I don't recall the specific date, but I
24   believe it was initially an inquiry from Analysis
25   Group.

Page 12

1         Q.  Do you know approximately when?
2         A.  I don't know approximately when.  I'd
3    actually have to go back and look, but my guess
4    would be it was probably at some point last year,
5    but I, again, don't know the specific date.
6         Q.  So at some point in 2020, you think?
7         A.  I believe so.  That's my best
8    recollection.  I would actually have to go back
9    and -- and look to confirm that date.
10        Q.  Okay.  But even though you were retained a
11   full year ago, you've only spent 70 to 90 hours on
12   the case?
13        A.  Well, I think there was a period of time
14   where there was an initial inquiry.  So when I say
15   reaching out a year ago, that doesn't necessarily
16   mean I began working on it.  So if I go -- if I look
17   at my expert report, the initial expert report was
18   completed in August, and then the rebuttal report
19   was completed in October.  So what typically happens
20   is, is you oftentimes will be approached, but it may
21   take awhile before you actually start to begin
22   working on an engagement.
23        Q.  So when did you start working on the
24   report that you filed in this case?
25        A.  Just based on the completion date, it

Page 13

1    would have probably been started, again, probably
2    in -- in June or July.
3         Q.  Okay.  Have you worked with the Goodwin
4    Procter firm before?
5         A.  Yes.
6         Q.  Okay.  Approximately how many times?
7         A.  I don't know, specifically.  I do know
8    that I worked with them, I believe, on a matter
9    related to TIAA and then, you know, a number of
10   years ago a matter related to Tussey versus ABB.
11        Q.  Okay.  Did you also recently work with
12   them in a case in the district of Nebraska?
13        A.  Which specific case are you referring to?
14   The stadium?
15        Q.  Yes.
16        A.  Yes.  Yeah, I'm sorry.  I forgot that one.
17        Q.  That one is a third one that you worked
18   on?
19        A.  Yes.
20        Q.  Okay.  And each time, you were retained by
21   Goodwin Procter to serve as an expert for a
22   defendant in an ERISA case; is that right?
23        A.  Correct.
24        Q.  Okay.  Have you ever served as an expert
25   witness for a plaintiff in an ERISA case?



Page 14

1       A.  I never have, and I've never actually ever
2   been asked to.
3       Q.  Okay.  Have you ever served as a witness
4   for John Hancock before?
5       A.  No.
6       Q.  Have you ever served as a consultant for
7   John Hancock?
8       A.  No.
9       Q.  All right.  You have access to the
10  AgileLaw platform; is that right?
11      A.  Yes, I do.
12      Q.  I'm going to show you a first exhibit that
13  we'll mark for the deposition, which will be marked
14  as Exhibit 150 in the case.
15          (Thereupon, marked as Exhibit 150.)
16  BY MR. WEINSHALL:
17      Q.  Can you see that?
18      A.  Yep.
19      Q.  And is this the rebuttal report that you
20  prepared in this matter?
21      A.  Yeah, I just clicked on it.  Yes.  Yeah,
22  it is.
23      Q.  And scroll down to the second-to-last
24  page.
25          Is that your signature?

Page 15

1       A.  It is.
2       Q.  Okay.  Appendix A is titled "Incremental
3   Documents Considered."  Is that right?
4       A.  That's correct.
5       Q.  Okay.  Other than these documents and
6   those listed on your initial report, did you
7   consider any other materials when preparing your
8   rebuttal opinions?
9       A.  Nothing other than what's listed here.
10      Q.  Okay.  Are you aware of any corrections
11  that need to be made to the report?
12      A.  None that I'm aware of.
13      Q.  Do you have any intention to supplement
14  the opinions in this report, as you sit here today?
15      A.  Not at this time, no.
16      Q.  I believe in your report you said you
17  reserve the right to update or refine your opinions.
18          Do you have any such updates at this time?
19      A.  No.
20      Q.  Let's mark as an exhibit your initial
21  report.  Please let me know if you can see
22  Exhibit 151.
23          (Thereupon, marked as Exhibit 151.)
24      A.  Yes, I see it.
25

Page 16

1   BY MR. WEINSHALL:
2       Q.  Is this the initial report that you
3   submitted in this case?
4       A.  It is.
5       Q.  Okay.  If you scroll down to page 65 of
6   the PDF, is that your signature?
7       A.  Sorry, I'm a little slower than you.
8           Yes, that's my signature.  65.
9       Q.  Okay.  And Exhibit A shows your -- your CV
10  or your resumé; is that right?
11      A.  That's correct.
12      Q.  Do you have any updates to this resumé?
13      A.  The only thing that would need to be
14  updated would be the most recent deposition I took
15  which would be in the stadium matter.
16      Q.  Okay.  Appendix B is a list of the
17  documents you considered for your initial report; is
18  that right?
19      A.  Yes.
20      Q.  Are there any other documents that should
21  be listed here that are not currently listed that
22  you considered for your initial report?
23      A.  No.
24      Q.  Are you aware of any corrections that need
25  to be made in your initial report?

Page 17

1       A.  No.
2       Q.  Do you have any intent to supplement the
3   report, as you sit here today?
4       A.  Not at this time.
5       Q.  Other than preparing for this deposition
6   and the reports that you prepared, have you
7   performed any additional work in this case since
8   submitting your report?
9       A.  No.
10      Q.  Did you write both reports?
11      A.  Yes.
12      Q.  Did you write them in their entirety?
13      A.  Yes.
14      Q.  Did anybody else help you with the
15  reports?
16      A.  Analysis Group provides drafting
17  assistance with respect to the completion of
18  reports.
19      Q.  So what does drafting assistance mean?
20      A.  It basically means that they assist in
21  formatting the report, preparing the exhibits,
22  proof -- proofing the document, things of that
23  nature.
24      Q.  Who decided which documents you would
25  review in preparing your report?



1      A.  That would be my decision.
2      Q.  You understand the documents that are on
3  the -- both appendices do not include all of the
4  documents in this case?
5      A.  I'm aware, yes.
6      Q.  Okay.  And how did you receive those
7  documents?
8      A.  Documents that I use are posted to an
9  Analysis Group site client portal, if you will, and
10  then I have access to those documents.
11      Q.  So did counsel for Hancock post documents
12  to that site initially?
13      A.  I don't know who actually posted the
14  documents.  I just know that when they're posted to
15  that site, that's when I have access to them.
16      Q.  Okay.  So who determined which documents
17  to post to that site initially?
18      A.  Initially, it would be my determination as
19  to what documents I would like to see, and then
20  Analysis Group would facilitate the acquisition of
21  those documents and post them to the portal.
22      Q.  Okay.  So did you make certain requests
23  for certain categories of documents?
24      A.  Can you help me define "categories"?
25      Q.  Well, sure.

1      How did you make the initial determination
2  of which documents you wanted to see?
3      A.  Well, I think as you kind of go through
4  the report, what you're looking at is documents that
5  are in support of my opinion relative to, you know,
6  this particular matter.  So for example, you know,
7  if I want to see a deposition that references
8  foreign tax credits, if I want to see a prospectus
9  that references foreign tax credits, Analysis Group
10  will assist me in obtaining them.
11      Q.  You have a number of e-mails that are
12  listed in the documents that you considered, right?
13      A.  Can you point me to which ones,
14  specifically?
15      Q.  Sure.  Page 68 of your report.
16      A.  Page 68?
17      Q.  Yeah.  Page 68 of the PDF.
18      A.  Yes.
19      Q.  Okay.  You understand that many more
20  e-mails than these were produced in this case,
21  right?
22      A.  I don't know that.  I only know the ones
23  that I had requested and have access to.  I mean,
24  certainly, I would guess there are probably more
25  than that.

1      Q.  Okay.  So what request did you make that
2  yielded these e-mails?
3      A.  Well, I think what we were looking for was
4  in connection with foreign tax credits, Mr. Searcy's
5  involvement with the Romanos looking for whether
6  that was a factor in the decision the Romanos made
7  with respect to selecting Hancock at the outset, you
8  know, whether -- whether Mr. Searcy communicated to
9  them about foreign tax credits at that time, whether
10  there were other RFPs presented to them at that
11  time, and then, you know, what happened in 2020 when
12  they made the decision to change providers.
13      Q.  Okay.  You understand that none of the
14  e-mails here are from 2020, correct?
15      A.  No, the most recent one was 2017.
16      Q.  Okay.  So in connection with this report,
17  you asked for e-mails regarding decision in 2020?
18      A.  No.  What that was, I think, part of the
19  depositions that I read in the matter related to
20  2020.
21      Q.  Okay.  But in answering my previous
22  question about requests for e-mails, you mentioned a
23  decision in 2020.
24      So are you now saying that is not what you
25  requested in connection with e-mails?

1      MR. FLECKNER:  Objection.
2      A.  What I was referring to was in 2020 the
3  vendor change.  So if I misspoke, I apologize, but
4  initially, they, you know -- you know, had e-mails
5  related to foreign tax credits which I commented on.
6  And then in deposition testimony, there were
7  references to an RFI conducted in 2020, at which
8  point in time they made a change to Fidelity.
9      BY MR. WEINSHALL:
10      Q.  I understand that, but my question is
11  different.  It's about the e-mails that you
12  generated -- that are generated on this list here.
13  I want to know how these particular e-mails were
14  selected.
15      So is your testimony that these e-mails
16  came to you because you requested e-mails about the
17  2020 decision to find a new service provider?
18      A.  No.
19      Q.  Okay.  So your testimony is that these
20  e-mails came to you because you asked for e-mails
21  about Mr. Searcy's discussions with the plan
22  fiduciaries and John Hancock; is that right?
23      A.  What I was looking for was trying to gain
24  a better understanding of, first and foremost,
25  whether there were any communications in 2014 and



Page 22

1    2015 regarding foreign tax credits, and then some
2    information regarding the pricing of Securian who
3    was presented by Mr. Searcy as a potential provider
4    on behalf of other clients of his.
5        Q.   And when you were only produced the
6    e-mails that are listed here, did you ask if there
7    were any other e-mails that were relevant to
8    questions that you were investigating?
9        MR. FLECKNER:  Objection.
10       A.   No, I did not.
11   BY MR. WEINSHALL:
12       Q.   So you relied on counsel to provide you
13   the responsive e-mails?
14       A.   Well --
15       MR. FLECKNER:  Objection.
16       A.   Excuse me.  So again, I requested
17   information as to whether there were other proposals
18   Mr. Searcy might have been involved in that involved
19   Securian.  We wanted to see whether there was
20   information as to the pricing of those different
21   proposals, you know, assessing specifically whether
22   foreign tax credits impacted pricing.
23   BY MR. WEINSHALL:
24       Q.   I don't see here the tax forms that John
25   Hancock filed.

Page 23

1        Q.   You didn't review those; is that right?
2        A.   Their corporate tax return?
3        Q.   Yeah.
4        A.   No.
5        Q.   And you didn't review the Form 1118
6    either?
7        A.   No, that would have been beyond the scope
8    of my reports, so no, I did not review it.
9        Q.   Okay.  The exhibits that are listed in
10   this report and your rebuttal report, did you read
11   the entirety of all those documents?
12       THE VIDEOGRAPHER:  Mr. Weinshall, it looks
13   like he fell off.
14       MR. WEINSHALL:  What?
15       THE VIDEOGRAPHER:  It looks like he fell
16   off the call.
17       Should we go off the record?
18       MR. WEINSHALL:  Mr. Gissiner did?
19       THE VIDEOGRAPHER:  Yes, sir.
20       MR. WEINSHALL:  Yeah, we should go off the
21   record then.
22       THE VIDEOGRAPHER:  The time is 10:26 a.m.,
23   and we're going off the record.
24       (Recess taken.)
25       THE VIDEOGRAPHER:  The time is currently

Page 24

1    11:04 a.m., and we're back on the record.
2    BY MR. WEINSHALL:
3        Q.   Great.  So just to be clear on the record,
4    Mr. Gissiner, we just took a break there because
5    your computer crashed and you've set yourself up on
6    a new computer; is that right?
7        A.   That's correct.
8        Q.   All right.  And with this new computer, I
9    just want to make sure the only apps that are open
10   are Microsoft Teams and AgileLaw; is that right?
11       A.   That is correct.
12       Q.   So before we got interrupted by technical
13   issues, I had asked you as to all the documents
14   listed in the appendices and cited in your two
15   reports, did you read the entirety of each of those
16   documents?
17       A.   I would have to say yes.  There might have
18   been, you know, parts of certain documents that I
19   might have skimmed through, but yeah.  Yeah, I would
20   have read everything.
21       Q.   Have any other experts retained by John
22   Hancock commented on your report prior to it being
23   issued?
24       A.   Not to my knowledge.
25       Q.   Did you consult with anybody else about

Page 25

1    your report?
2        A.   No.
3        Q.   Okay.  When you made factual assertions in
4    your two reports, was it your practice to support
5    those assertions with cites to the evidence you were
6    relying upon to make those assertions?
7        A.   Can you kind of clarify your question for
8    me?  So when I make factual assertions, you're
9    asking if I attempt to cite something?  Is that what
10   you're saying?  I'm not -- maybe you can rephrase
11   your question.
12       Q.   Yes.  You have a number of footnotes in
13   your report; is that right?
14       A.   Yes, that is correct.
15       Q.   And what is the purpose of those footnotes
16   when they follow a sentence?
17       A.   Oh, okay.  So for example, if I'm citing a
18   fact that John Hancock is ranked in the top five
19   with respect to a number of small plan -- number of
20   small plan service, I will cite to a plan sponsor
21   survey that supports that information.  That's an
22   example.
23       Q.   Okay.  So in general, is it fair to say
24   that the footnotes are included to identify what
25   documents you're relying upon to make the assertions



Page 26

1    in your report?
2        A.  That's -- that's fair.
3        Q.  Okay.  And are there any factual
4    statements in your report that you intended to
5    support with citations to particular evidence but
6    did not?
7        A.  No.
8        Q.  What percentage of your income per year is
9    related to work on litigation?
10       A.  It varies by year, obviously.  So I would
11   say it's fair to state that last year was a smaller
12   percentage.  This year, it's probably approximating
13   40 to 50 percent.
14       Q.  Okay.  How about the year before the
15   pandemic?
16       A.  So that would be what, 2019?  Probably in
17   the 30 percent range.  I'd have to actually go back
18   at billing records and look, but -- but I think the
19   case volume has increased over the last couple
20   years, which has impacted income.
21       Q.  Okay.  So approximately how much have you
22   earned as being an expert in the most recent full
23   year?
24       A.  In this year?
25       Q.  Uh-huh.

Page 27

1        A.  Or prior year?
2        Q.  Well, let's start in this one.
3        A.  Again, I'm going to guess, but somewhere
4    in the neighborhood of 300,000 maybe.
5        Q.  Okay.  And that's around 40 to 50 percent
6    of your total income?
7        A.  Yeah.  Again, it -- it -- I don't
8    typically determine that until the end of the year,
9    but, you know, based on other revenue that I
10   generate from my recurring practice, that would be
11   about 40 to 50 percent.
12       Q.  Let's go briefly over your background.
13           Did you -- do you have a college degree?
14       A.  I do.
15       Q.  From where?
16       A.  Did you say "where"?
17       Q.  Yes.
18       A.  I have a BA degree from Muskingum
19   University.  And for the court reporter, I'll spell
20   it.  It's M-U, S as in Sam, K-I-N-G-U-M.  And then I
21   have an MBA from the University of Akron.
22       Q.  Okay.  Other than those two degrees, do
23   you have any other degrees from institutions?
24       A.  No.
25       Q.  When did you receive the MBA?

Page 28

1        A.  I believe it was 1984 or 1985.  I don't
2    know the specific year.
3        Q.  Okay.  Have you ever worked for an
4    insurance company?
5        A.  No.
6        Q.  Okay.  You mentioned in your report that
7    you have some experience providing administrative
8    services including participant recordkeeping
9    services to retirement plans; is that right?
10       A.  That's correct.
11       Q.  Okay.  Was any of that experience for an
12   issuer of group annuity contracts?
13           (Reporter clarification.)
14       A.  Yes.  So for example, when I was at
15   Coopers & Lybrand and PricewaterhouseCoopers, we
16   would perform recordkeeping services, and if there
17   was a stable value fund option on the platform, that
18   would be through a -- that would have been likely
19   through a GVA.
20       BY MR. WEINSHALL:
21       Q.  But the overall structure of the
22   retirement plans when you were working for
23   PricewaterhouseCoopers, was that through a trust
24   format or through a group annuity platform?
25       A.  There could have been.  I don't recall.  I

Page 29

1    mean, that was quite a long time ago.  There could
2    have been plans that were structured in the form of
3    a group annuity platform, and there were certainly
4    plans that were structured under a trustee platform.
5    I mean, over the course of my experience with
6    Coopers & Lybrand, we probably administered close to
7    a thousand different plans.  So I can't recall a
8    specific plan, but it -- I think it's fair to state
9    that there would have been plans that had a GVA
10   platform.
11       Q.  Okay.  But you don't have any recollection
12   specifically of that?
13       A.  No, no, that was -- that was a long, long
14   time ago.
15       Q.  Okay.  So is it fair to say your opinions
16   are not based on that experience then?
17       A.  No, my opinions are based on more recent
18   experience with group annuity platforms.
19       Q.  Okay.  So what is your more recent
20   experience with group annuity platforms?
21       A.  So it would really fall into a number of
22   different ways, but mostly from what I would call
23   either a consulting standpoint as a retirement
24   consultant or from the standpoint of serving as an
25   investment consultant on behalf of clients using



MAGNA ►
LEGAL SERVICES

Page 30

1    those platforms.
2        Q.  Okay.  And in each of those roles that you
3    just referred to, your clients are not the service
4    provider; is that right?
5        A.  No, they would be the plan sponsor.
6        Q.  Okay.  So the experience you're relying on
7    today as an expert is -- is as a consultant to plan
8    sponsors; is that right?
9        A.  Correct.
10       Q.  Prior to this case, has the issue of
11   foreign tax credits come up in your work with
12   retirement plans?
13       A.  No, it has not.
14       Q.  Okay.  But prior to this case, you were
15   generally aware of what foreign tax credits are; is
16   that right?
17       A.  Yes.
18       Q.  Okay.  And prior to this case, were you
19   aware that issuers of group annuity contracts
20   retained a benefit for foreign tax credits?
21           MR. FLECKNER:  Objection.
22       A.  When you say "benefit," can you define
23   what it is that you're referring to?
24   BY MR. WEINSHALL:
25       Q.  Do you understand what the word "benefit"

Page 31

1    means?
2        A.  I understand the word "benefit," but I'm
3    asking if you can maybe describe it in -- in a
4    context.
5            Are you referring to an economic benefit
6    or something like that or a tax benefit?  So maybe
7    if you could define it better for me.
8        Q.  Okay.  An economic benefit.
9            Were you aware that issuers of group
10   annuity contracts receive an economic benefit from
11   foreign tax credits in connection with their work on
12   separate accounts prior to this case?
13           MR. FLECKNER:  Objection.
14       A.  So my understanding is, is that insurance
15   companies are the ownership of separate account
16   assets, and therefore, may be entitled to foreign
17   tax credits that can be used to offset income on
18   their corporate tax return.
19   BY MR. WEINSHALL:
20       Q.  Okay.  And you understand that that may
21   provide a benefit to those insurance companies; is
22   that right?
23           MR. FLECKNER:  Objection.
24       A.  To the extent that it reduces taxable
25   income, there may be a benefit, sure.

Page 32

1    BY MR. WEINSHALL:
2        Q.  Okay.  And so my question is, were you
3    aware prior to this case of that benefit to issuers
4    of group annuity contracts?
5        A.  Yes, in -- in my experience, I have
6    reviewed, you know, group annuity contracts from
7    various providers, and -- and that is something
8    that's disclosed typically in -- in, say, for
9    example, a product prospectus.  It might appear,
10   for, for example, an individual participant's
11   product.  So it is something that I was aware of.
12       Q.  Okay.  Can you give me an example of where
13   such a disclosure was made?
14       A.  Yeah.  So for example, if you look at a --
15   and I've looked at these before.  If you look at,
16   for example, a TIAA group annuity product, TIAA will
17   maintain on their platform separate account assets,
18   and they will indicate in -- I can't recall the
19   specific product, but I recall seeing it.  They will
20   indicate that they are -- may be entitled to foreign
21   tax credits.
22       Q.  Okay.  Did you see any disclosures like
23   that on Hancock's platform?
24       A.  When you say "platform," you're referring
25   to what specific documents?

Page 33

1        Q.  Well, any documents in this case that
2    you've reviewed.
3        A.  None of the documents that I reviewed
4    specifically indicated that.
5        Q.  Okay.  Other than TI -- TIAA, what does
6    that stand for?
7        A.  I think it's Teachers Individual Annuity
8    Association.
9        Q.  Okay.  But it's a service provider like
10   Hancock to 401(k) plans?
11       A.  Mostly in higher end, mostly 403(b) plans.
12       Q.  Okay.  But they're similar to 401(k) plans
13   in that they're tax-advantaged retirement plans; is
14   that right?
15       A.  Yes.
16       Q.  Are you aware of any other service
17   providers that make a disclosure like the one you
18   just described?
19       A.  None that come immediately to mind.  I
20   think -- I would have to actually go back and look,
21   but I believe -- I do believe in the past that I've
22   seen maybe disclosure documents from like Mass
23   Mutual or something that might make that same
24   reference.
25       Q.  Okay.  Do you hold any academic positions?

9  (Pages 30 to 33)





Page 34

1     A.   No.
2     Q.   Have you ever held any academic positions?
3     A.   You mean like a professor, something like
4  that?
5     Q.   Yes.
6     A.   No.
7     Q.   Okay.  You're not an attorney; is that
8  right?
9     A.   That's correct.
10     Q.   How would you describe your field of
11  expertise?
12     A.   Broadly defined, I would say that I've
13  got, you know, 40 years of experience with
14  consulting on retirement plan arrangements, that I
15  have a very good knowledge of retirement plan
16  recordkeeping, fiduciary oversight, investment
17  consulting, retirement plan design, how
18  recordkeeping fees are structured, and have done so
19  within the context of working with large plans as
20  well as small plans.
21     Q.   Okay.  You're not an expert on the proper
22  legal interpretation of ERISA; is that right?
23     A.   From a legal perspective, no.  I would
24  say, you know, from a practical perspective working
25  with clients, there's -- there's that component of

Page 35

1  it, but certainly not -- no, I'm not opining on the
2  legal issues surrounding ERISA.
3     Q.   Okay.  You said there's a practical
4  component in working with clients in response to my
5  question about whether you're an expert on legal
6  interpretation.
7        What does that mean?
8     A.   You know, well, for example, you know,
9  if -- if under ERISA a retirement plan is, you know,
10  required to have a plan document and that plan
11  document contains certain provisions and features, I
12  don't get involved in writing the plan document, but
13  I may consult with a client as to:  Do you want to
14  have an automatic enrollment provision?  Do you want
15  to have a matching contribution?  What is your
16  eligibility requirements?
17        So assisting them in developing the
18  provisions of the plan, and then ultimately, either
19  an attorney or a provider will produce a document
20  that is reflective of those decisions made by the
21  plan sponsor.
22     Q.   Do you have an understanding of what ERISA
23  requires of fiduciaries to retirement plans?
24        MR. FLECKNER:  Objection.
25     A.   Yes.  In a broad sense, yes.

Page 36

1  BY MR. WEINSHALL:
2     Q.   What is that understanding?
3     A.   Well, basically from -- I mean, it's -- it
4  could be a very long answer.
5        So do you -- could you maybe narrow it
6  down as to what specific area you would like me to
7  discuss?
8     Q.   Just in general, what is your
9  understanding of a fiduciary's obligations to a
10  plan?
11        MR. FLECKNER:  Objection.
12     A.   Well, in very general terms, ERISA
13  requires that plan sponsors act in the best interest
14  of plan participants with respect to how the plan is
15  managed, so engage in prudent activities with
16  respect to the oversight of the plan.  And then
17  within that context, there's, you know, various
18  disclosure requirements that plan sponsors have to
19  provide.  There's various other tasks associated
20  with that that become part of that plan oversight.
21  BY MR. WEINSHALL:
22     Q.   And are you an expert as to what ERISA
23  requires of fiduciaries?
24     A.   No, I would say that I approach it from
25  what I said before, a practical standpoint.  So

Page 37

1  there are, you know, obviously, attorneys and so
2  forth out there that are expert on the law.  I don't
3  opine on legal requirements of ERISA.  What I do is
4  assist plan sponsors in helping them meet those
5  requirements from what I would call a practical
6  perspective.
7     Q.   So how do you first determine what those
8  requirements are?
9     A.   Well, for example, one of the things that
10  ERISA suggests as a best practice would be obviously
11  to monitor the funds for performance.  And so as a
12  consultant, you know, I may assist the committee or the plan
13  sponsor in, you know, serving as a 3(21) fiduciary
14  to provide oversight of the investments, to make
15  suggestions with respect to investment fund changes,
16  to report to the committee on the performance of the
17  plan, and to make recommendations as to changing
18  alternative -- you know, changing to different funds
19  if one is viewed to be underperforming.  So that
20  would be one example.
21     Q.   You said one of the things that ERISA
22  suggests as a best practice would be to monitor
23  funds performance; is that right?
24     A.   Yeah, I don't know specifically if it's a
25  suggestion or just part of what I had said before



Page 38

1  about the prudent management of the plan, but it's
2  not uncommon for plan sponsors to have someone
3  provide oversight of the investment options.
4      Q.  Okay.  But how would you go about
5  determining if that is a requirement of ERISA?
6      MR. FLECKNER:  Objection.
7      A.  I wouldn't determine it.  I myself would
8  not make a determination as to whether that's a
9  requirement or not.  I would work with a plan
10  sponsor that has deemed that something that they
11  wanted to accomplish, and then I would facilitate,
12  whether it's through firms that I work with or other
13  firms, to have that accomplished.
14  BY MR. WEINSHALL:
15      Q.  And ultimately, would you agree that
16  whether or not monitoring the performance of the
17  plan is a requirement of ERISA is a legal question?
18      A.  I think it's a legal question that I think
19  a plan sponsor would have to make a determination.
20      Q.  Okay.  You mentioned earlier that you
21  understand there's certain disclosure obligations
22  for fiduciaries under ERISA; is that right?
23      MR. FLECKNER:  Objection.  Misstates.
24      A.  Yes.  So for example, whether it's -- yes.
25

Page 39

1      BY MR. WEINSHALL:
2      Q.  And what is your understanding of those
3  disclosure obligations?
4      A.  Well, I mean, they fall into various
5  areas.  So first, retirement plans are required to
6  perform and prepare a Form 5500 which documents
7  activity for the year, includes various schedules
8  depending on the size of the plan, may include
9  audited financial statements depending on the size
10  of the plan.  That would be one example.
11      Q.  Okay.  Any others?
12      A.  Plan sponsors are required to provide
13  participants with what's referred to as 404(a)(5)
14  disclosure notice which provides information to the
15  participants on the investments of the plan and
16  related fees, and then service providers are
17  required to provide plan sponsors with what's
18  referred to as 408(b)(2) disclosure notice which is
19  specific to the plan sponsors' arrangement with the
20  service provider.
21      Q.  And what is your understanding of what
22  needs to be disclosed under Rule 408(b)(2)?
23      A.  I believe that we reference that in my
24  report, but basically, in a very general sense,
25  there's two components of a 408(b)(2) disclosure

Page 40

1  notice.  There's direct compensation and what's
2  referred to as indirect compensation.
3      Q.  Okay.  And both need to be disclosed; is
4  that right?
5      MR. FLECKNER:  Objection.  Calls for a
6  legal conclusion.
7      You can answer, if you know.
8      A.  There's certain components of indirect
9  compensation that, depending on the amount, do not
10  need to be disclosed.
11  BY MR. WEINSHALL:
12      Q.  Okay.  But if they exceed a certain
13  amount, then they do need to be disclosed, is your
14  understanding?
15      MR. FLECKNER:  Objection.
16      A.  I believe that is correct, yeah.  I would
17  be happy to look in my report and pull up that
18  exhibit.
19  BY MR. WEINSHALL:
20      Q.  Okay.  Are you presenting yourself as an
21  expert as to what does and does not need to be
22  disclosed under Rule 408(b)(2)?
23      MR. FLECKNER:  Objection.
24      A.  No.  What I'm -- what I am opining on is
25  is what I see in -- what I commonly see with

Page 41

1  408(b)(2) disclosures and my understanding of, as a
2  practitioner in the area, what I've seen with
3  different disclosure documents, what I see with
4  5500s.  I wouldn't call myself a legal -- I'm not
5  offering a legal opinion as to what is required to
6  be disclosed.
7  BY MR. WEINSHALL:
8      Q.  Okay.  So ultimately, you would agree that
9  what is required to be disclosed is a legal
10  question?
11      A.  I think I would fall back to what the
12  Department of Labor has indicated as to what is to
13  be disclosed to plan sponsors.  So they've provided
14  guidance to plan sponsors that, as a practitioner, I
15  follow in terms of helping plan sponsors understand
16  what's in a 408(b)(2) disclosure notice.
17      Q.  And is that a legal determination, or is
18  it a determination that's based on industry
19  practice?
20      MR. FLECKNER:  Objection.
21      A.  It's based on industry practice.
22  BY MR. WEINSHALL:
23      Q.  That's the determination that you're
24  providing to your clients; is that right?
25      A.  Yes, I mean, so if -- if XYZ company



Page 42

```
 1   produces a 408(b)(2) notice on behalf of a client, I
 2   will review it, and, you know, if a client requests,
 3   you know, discussion as to what's specifically
 4   included in there, right?  I'm not -- I'm not
 5   opining as to whether XYZ company followed the
 6   letter of the law as to what was produced.  I will
 7   look as it as to whether it's consistent with the
 8   DOL regulations on that subject.
 9       Q.  Okay.  So what you just described was
10   looking at a 408(b)(2) disclosure and considering
11   whether it's consistent with Department of Labor
12   guidance according to your understanding of industry
13   practice; is that right?
14       A.  And my understanding -- my understanding
15   of the regulations.
16       Q.  Okay.  And you mean your -- your
17   understanding of what those regulations legally
18   require?
19           MR. FLECKNER:  Objection.
20       A.  Again, you're using the term "legally
21   require," and what I'm saying is, it's based on a
22   practical experience.
23       BY MR. WEINSHALL:
24       Q.  Okay.  But my question is, in this case,
25   whether something needs to be disclosed or not, is
```

Page 43

```
 1   that ultimately a legal question?
 2       A.  When you say "something needs to be
 3   disclosed," what are you referring to, specifically?
 4       Q.  For example, a benefit received by a
 5   foreign -- in connection with a foreign tax credit,
 6   whether that needs to be disclosed in a Rule
 7   408(b)(2) disclosure.
 8           Do you agree that that is a legal
 9   question?
10       A.  I can say from my own experience, I've
11   never seen it disclosed, so from a practical sense,
12   my opinion would be that that's not something that
13   has to be disclosed.  If the DOL or some other
14   entity makes a determination as to whether that's to
15   be disclosed, that would be outside of my purview.
16       Q.  Okay.  But ultimately, would you agree
17   that the answer to that question depends on
18   interpretation of what a regulation requires?
19       A.  No, I don't -- I don't necessarily agree
20   with that.  So again, there is, in my experience,
21   having reviewed the DOL regs as well as reviewing,
22   you know, dozens of different white papers either
23   issued by consulting firms or recordkeepers, I've
24   never seen any reference to foreign tax credits as
25   being something that has to be disclosed on a
```

Page 44

```
 1   408(b)(2) disclosure notice.
 2       Q.  Okay.  I understand that.
 3           But the question of -- I'm not asking
 4   whether it has been or hasn't been disclosed, I'm
 5   asking the question of whether or not it is required
 6   to be disclosed under the regulation is ultimately a
 7   legal question; is that right?
 8           MR. FLECKNER:  Objection.
 9       A.  I don't know if it's a legal question.  I
10   think it would ultimately be something that I would
11   think that the Department of Labor would have to
12   determine as to whether that's something to be
13   disclosed.  And again, in the DOL's regulation,
14   there is no reference to it.  So given the fact that
15   there's no reference to it, it would be my
16   interpretation, again, as a practitioner, that it's
17   not something that needs to be disclosed.
18       BY MR. WEINSHALL:
19       Q.  Okay.  And ultimately, you're relying on
20   the Department of Labor's interpretation of the
21   regulation because that is the agency that has the
22   legal obligation to enforce the regulation, right?
23           MR. FLECKNER:  Objection.
24       A.  That's a -- sorry, that's a bit beyond my
25   expertise as to enforcing the regulation.  I
```

Page 45

```
 1   certainly do know that if plan sponsors do not -- if
 2   recordkeepers don't provide that fee disclosure
 3   notice and plan sponsors don't receive it, that
 4   there could be, you know, penalties associated with
 5   that, but, you know, ultimately, the DOL produces
 6   regulations that describe what's to be disclosed in
 7   a 408(b)(2) disclosure notice.  Recordkeepers that
 8   prepare those notices are subject to adherence to
 9   those regulations, and plan sponsors that receive
10   them are, you know -- basically, you know, have to,
11   you know, either work with a consultant or their
12   recordkeeper to understand what those disclosures
13   indicate because, again, you know, the reason for
14   the disclosures, going back to when they were
15   established, was to improve fee transparency.
16       BY MR. WEINSHALL:
17       Q.  As to fee transparency, what does that
18   mean?
19       A.  Well, basically, to help a plan sponsor
20   gain a better understanding of the various ways that
21   service providers, whether it's the recordkeeper or
22   an investment adviser, are collecting fees.
23       Q.  Are you offering any opinions as to
24   whether John Hancock breached its fiduciary duties
25   in this case?
```

12  (Pages 42 to 45)

Page 46

```
 1        A.  Fiduciary duties in what regard?
 2        Q.  Under ERISA.
 3        A.  That -- that's too broad.  I mean, the
 4   question is -- is -- are you referring to -- again,
 5   you have to kind of define it for me a little bit
 6   more.
 7        Q.  Well, are you offering an opinion whether
 8   in this case either that John Hancock did or did not
 9   breach any fiduciary duties in this case?
10        A.  I am not offering that opinion, no.
11        Q.  Okay.  So you're not offering an opinion
12   that John Hancock did not breach any fiduciary
13   duties; is that right?
14        A.  Subject to -- I think, again, when you
15   refer to breach of fiduciary duties, those can cover
16   any number of different things, so I think it would
17   be better if you could maybe be more specific as to
18   a specific area that you're interested in.
19        Q.  Okay.  In connection with John Hancock's
20   treatment of foreign tax credits, are you offering
21   an opinion as to whether John Hancock breached any
22   fiduciary duties under ERISA?
23        A.  No.  No, I'm not.  I'm not offering that
24   specific opinion.
25        Q.  Okay.  Are you offering -- in connection
```

Page 47

```
 1   with John Hancock's treatment of foreign tax
 2   credits, are you offering an opinion as to whether
 3   John Hancock engaged in any prohibited transactions
 4   of ERISA?
 5        A.  No.
 6        Q.  Are you offering any opinions in
 7   connection with John Hancock's treatment of foreign
 8   tax credits as to whether John Hancock functioned as
 9   a fiduciary with respect to the plan?
10        (Reporter clarification.)
11        A.  Sorry, could you repeat the question?
12   BY MR. WEINSHALL:
13        Q.  Sure.  In connection with John Hancock's
14   treatment of foreign tax credits, are you offering
15   any opinions as to whether John Hancock functioned
16   as a fiduciary under ERISA with respect to the plan?
17        A.  As they pertain to foreign tax credits?
18        Q.  Yes.
19        A.  No.
20        Q.  As it pertains to any other issue in this
21   case, are you offering an opinion as to whether John
22   Hancock functioned as a fiduciary under ERISA?
23        A.  They functioned as a limited fiduciary as
24   defined in the supplemental information agreement
25   and in the group variable annuity agreement.
```

Page 48

```
 1        Q.  Okay.  So you are -- you are offering an
 2   opinion that John Hancock functioned as a fiduciary
 3   in those specific roles.
 4        Other than those, are you offering an
 5   opinion one way or the other as to whether John
 6   Hancock served as a fiduciary in this case?
 7        MR. FLECKNER:  Objection.
 8        A.  So let's -- let's parse the question.  So
 9   I am not offering an opinion as to whether John
10   Hancock served as a fiduciary with respect to the
11   treatment of foreign tax credits.  In my report, I
12   refer to the limited fiduciary role described by
13   John Hancock in their service agreements.  So I just
14   want to make sure that I separate the two out and
15   not answer as if they're an aggregate.
16   BY MR. WEINSHALL:
17        Q.  Okay.
18        A.  So I did serve as a limited fiduciary with
19   respect to the plan.
20        Q.  Okay.  And you're not offering an opinion
21   there, you said, you're just reciting what the
22   document says; is that right?
23        A.  That's correct.
24        Q.  Okay.  So you're also not offering an
25   opinion in this case that John Hancock did not serve
```

Page 49

```
 1   as a fiduciary in -- with respect to any issue in
 2   this case, right?
 3        MR. FLECKNER:  Objection.
 4        A.  I'm not sure I understand the question.
 5   BY MR. WEINSHALL:
 6        Q.  Okay.  Well, I think -- I think we got the
 7   answers already.
 8        Are you offering any opinions as to
 9   whether the plaintiffs breached any fiduciary duties
10   in this case?
11        A.  No.
12        Q.  Okay.  Are you offering any opinions as to
13   whether any members of the potential class breached
14   any fiduciary duties?
15        A.  And again, I'm going to ask, when you say
16   "fiduciary duties," what is it you're referring?  I
17   mean, again, I can't comment on -- on each and every
18   plan.  So I can't comment as to whether the entire
19   class engaged in a breach of fiduciary duties,
20   because I'd have to look at each and every
21   individual plan.
22        Q.  And you haven't done that, right?
23        A.  No.
24        Q.  So you're not offering any opinions then
25   as to whether any class member has breached any
```



Page 50

1   fiduciary duties, right?
2       A.  No.
3       Q.  I'm not right, or I am right?
4       A.  No.  I mean, to the extent that each and
5   every individual plan, whether they engaged in a
6   fiduciary breach in any number of different areas,
7   no, I'm not offering that opinion.
8       Q.  Have you published any work regarding
9   foreign tax credits?
10      A.  No.
11      Q.  Have you provided expert testimony in any
12  other litigation regarding foreign tax credits?
13      A.  No.
14      Q.  And you testified earlier, your work as a
15  consultant over the past 40 years, you have not
16  worked on any issues regarding foreign tax credits;
17  is that right?
18      A.  No.
19      Q.  It's not right, or it is right?
20      A.  I have not.
21      Q.  Okay.  Did you make any assumptions in
22  preparing the opinions articulated in the two
23  reports?
24      A.  I'm sorry, what do you mean by
25  "assumptions"?

Page 51

1       Q.  Sure.  Did you assume certain things to be
2   true in preparing the opinions that you set forth in
3   your two reports.
4       A.  Did I assume certain things to be true?
5   I don't quite follow the -- the question.
6       Q.  All right.  Well, for example, sometimes
7   an expert will say, a damages expert will say, I
8   assume that -- that the plaintiff will establish
9   liability and so I'm just going to calculate
10  damages.
11          Did -- my question is, did -- did counsel
12  for John Hancock instruct you to accept certain
13  assumptions as true in order to prepare your
14  reports?
15      A.  No.
16      Q.  Okay.  Did you develop an opinion one way
17  or the other as to whether foreign tax credits
18  provide a benefit to John Hancock in this case?
19      A.  I think we talked about that before.  So
20  to the extent that foreign tax credits reduce
21  corporate tax liability, then that would be a
22  benefit to John Hancock.
23      Q.  Okay.  So you understand as just a factual
24  matter that John Hancock does receive a benefit from
25  the reduction of corporate tax liability in

Page 52

1   connection with its -- the foreign tax credits it
2   receives from its separate accounts; is that right?
3       MR. FLECKNER:  Objection.
4       A.  Again, in a general sense.  Again, I did
5   not look at the specific -- you know, I'm not
6   opining on their specific tax returns.  You know,
7   there could be foreign tax credits that are offset
8   by taxes in other areas.  But beyond that, I mean,
9   it's just simply, you know, there could be benefits
10  associated with foreign tax credits.
11  BY MR. WEINSHALL:
12      Q.  Okay.  So you just -- you took that as a
13  given in preparing your reports; is that right --
14      MR. FLECKNER:  Objection.
15  BY MR. WEINSHALL:
16      Q.  -- for giving an opinion?
17      MR. FLECKNER:  Objection.
18      A.  Well, I -- I didn't necessarily take it as
19  a given.  Just I know based on my own individual
20  experience how foreign tax credits work, both with
21  respect to my 401(k) account and with respect to my
22  personal account.
23  BY MR. WEINSHALL:
24      Q.  And what is your experience there?
25      A.  So in my -- in my 401(k) account, if --

Page 53

1   and I have a stock that's in both.  If Sanofi pays a
2   dividend, that dividend is distributed to my account
3   net of foreign taxes withheld, and because it's a
4   401(k) account, I do not have the benefit of the
5   foreign tax credit.  So if they distribute to me a
6   thousand dollars in dividends, they withhold
7   20 percent, $80 flows into my retirement account --
8   or $800 flows into my retirement account.
9           Same stock held in my personal account,
10  same fact pattern, except at the end of the year,
11  Fidelity provides me with a report that shows me the
12  amount of foreign tax credits, and then I can use
13  those foreign tax credits as a credit against
14  taxable income.
15      Q.  Okay.
16      A.  Its not -- again, it's not available to me
17  in the 401(k), it is available to me in my personal
18  account.
19      Q.  And do you -- what is the service provider
20  for your 401(k)?
21      A.  Fidelity.
22      Q.  And is that on a trust platform or a group
23  annuity contract?
24      A.  It's on a trust platform.
25      Q.  Did you review the report of Professor

14  (Pages 50 to 53)



Page 54

```
 1    DeSimone, the rebuttal report of Professor DeSimone
 2    in connection with this case?
 3          MR. FLECKNER:  Objection.
 4       A.  I'd have to go look in my report.  I might
 5    have reviewed it as part of the rebuttal, but can
 6    you tell me specifically what --
 7       BY MR. WEINSHALL:
 8       Q.  It was -- it was produced on the same day
 9    that you produced your rebuttal, so it would not be
10    something that was available to you to prepare your
11    rebuttal.  It would be something that would be after
12    your rebuttal.
13       A.  After my rebuttal report was prepared, I
14    don't recall reviewing it then.
15       Q.  What is your understanding of how separate
16    accounts work at Hancock in connection with group
17    annuity contracts and 401(k) funds?
18       A.  Generally, what happens is is that if a
19    separate account is established, that the assets --
20    when John Hancock establishes a separate account,
21    they are the owner of the assets, and individual
22    retirement plans can participate in the group
23    annuity contract or the available investment funds
24    that are part of that separate account.
25          I think what's -- what's different about
```

Page 55

```
 1    group annuity contracts is is that the owner of the
 2    assets is the insurance company.  That's in contrast
 3    to trustee plans where the owner of the assets is
 4    the trust company.  And then, you know,
 5    participating retirement plans, whether it's in a --
 6    within the group annuity can then select from the
 7    various investment options that are part of the
 8    separate account.
 9       Q.  And is it your understanding that the
10    issuer of the group annuity contracts and the
11    owner of the separate account, in this case, John
12    Hancock, was then obligated to pass back to the
13    policyholders the investment returns from the
14    separate accounts?
15          MR. FLECKNER:  Objection.
16       A.  When you say, for example, the investment
17    experience of the separate accounts?
18       BY MR. WEINSHALL:
19       Q.  Yes.
20       A.  Yes.  So to the extent that, you know, a
21    mutual fund is part of the separate account, then
22    yes, the experience of that mutual fund is then
23    passed through to what I would call the unitholders
24    of the separate account.
25       Q.  And that would be the retirement plans for
```

Page 56

```
 1    their -- their participants, right?
 2       A.  Correct.
 3       Q.  Okay.  You agree that retirement plan
 4    service providers, like John Hancock in this case,
 5    are required to report direct compensation and
 6    indirect compensation on annual 408(b)(2)
 7    disclosures?
 8          MR. FLECKNER:  Objection.  Calls for a
 9    legal conclusion.
10          You can answer, if you know.
11       A.  I could just tell you from a practical
12    experience working with not just providers such as
13    John Hancock, but also other providers, that direct
14    and indirect compensation amounts are reported on
15    408(b)(2) disclosure notices.
16       BY MR. WEINSHALL:
17       Q.  And those are issued annually; is that
18    right?
19       A.  I don't necessarily know if they're issued
20    annually.  Some service providers don't necessarily
21    provide them annually, but, you know, again, for the
22    most part, what I've seen is that generally they're
23    produced annually.
24       Q.  Okay.  And the purpose of these
25    disclosures is to provide an assurance that the data
```

Page 57

```
 1    necessary to separate the components is available
 2    and accessible; is that right?
 3          MR. FLECKNER:  Objection.
 4       A.  So you said is the -- could you repeat
 5    your question?  I was focusing on the word
 6    "assurance."
 7       BY MR. WEINSHALL:
 8       Q.  Sure.  These disclosures provide assurance
 9    that the data necessary to separate the components
10    is available and accessible; is that right?
11          MR. FLECKNER:  Objection.
12       A.  No, I wouldn't describe the 408(b)
13    disclosures as doing that.
14       BY MR. WEINSHALL:
15       Q.  Have you written any articles that have
16    been published regarding ERISA?
17       A.  Regarding ERISA in what context?  I mean,
18    just an article about ERISA or articles that touch
19    on ERISA topics?
20       Q.  Touch on ERISA topics.
21       A.  Yes.
22       Q.  Okay.  Have you written an article called
23    "A Guide to Avoid Becoming an Unfair Target of ERISA
24    Litigation"?
25       A.  Yes.
```



Page 58

1      Q.  Let me show you what we'll mark as
2  Exhibit 152.
3         (Thereupon, marked as Exhibit 152.)
4    BY MR. WEINSHALL:
5      Q.  Is this the article that you just
6  testified you wrote?
7      A.  Yes, it is.
8      Q.  And you wrote this article, correct?
9      A.  Yes.  I'm just smiling because it was
10  right in the middle of the pandemic, so I -- right
11  when it started.
12      Q.  Okay.  Can you read -- go down to the
13  second-to-last -- the second page under final
14  comments.
15         Do you see that?
16      A.  Page 2 or 3, please?
17      Q.  Page 2.
18      A.  Oh, final comments.  Yes, I see that.
19      Q.  Okay.  Can you read the last sentence, not
20  the italicized one, but the one above that?
21      A.  "These disclosures, in addition to
22  information readily available from plan sponsor
23  sites offered by service providers, provides the
24  assurance that the data necessary to separate fee
25  components is available and accessible."

Page 59

1      Q.  Okay.  So did you write that?
2      A.  I did.
3      Q.  Okay.  And do you now disagree with what
4  you wrote?
5      A.  Let me just read it again.
6         No, I don't -- I don't -- I don't
7  disagree.
8      Q.  Okay.  So when you testified earlier --
9  when I asked you earlier, do the 408(b)(2)
10  disclosures provide assurance that the data
11  necessary to separate the components is available
12  and accessible, and you testified no, that was not
13  correct; is that right?
14         MR. FLECKNER:  Objection.
15      A.  Yeah, because if you read the sentence, I
16  said, "These disclosures, in addition to information
17  that's readily available from the plan sponsor sites
18  offered by service providers."
19    BY MR. WEINSHALL:
20      Q.  Okay.  So it's -- it's not that -- the
21  only distinction you're making is, when you answered
22  no to my question, it was because you had in your
23  mind that there also was information readily
24  available from plan sponsor sites offered by service
25  providers?

Page 60

1      A.  Well, yeah, in addition to, you know,
2  information that can be obtained directly from the
3  plan sponsor provider.  So I -- if I recall
4  correctly, your -- your question was specific to
5  408(b)(2) disclosures.  But here, oftentimes that if
6  a plan sponsor wants additional information
7  regarding fees and so forth, they can obtain that
8  from their recordkeeping site or they can obtain
9  that from the plan sponsor or the service providers
10  themselves.
11      Q.  Okay.  But do you agree with this
12  statement now, now that you've read it, that was
13  published in your article?
14      A.  Yeah, I'm comfortable with that statement.
15      Q.  Okay.  Let's go to your rebuttal report.
16      A.  Okay.  And that is document -- that's 151,
17  right?
18      Q.  I think that's the first exhibit that we
19  marked in this case.
20      A.  Okay.  First exhibit.  I'm sorry.  Okay.
21  I'm there.
22      Q.  If you look at the summary of opinions,
23  which I think is --
24      A.  Page 4?
25      Q.  -- page 4.

Page 61

1         Do you see that?
2      A.  Yes.
3      Q.  Okay.  In your second opinion, you state
4  that, "The plaintiffs' experts predicate their
5  opinions on the assumption that Hancock served as a
6  fiduciary," and your opinion is that Hancock was not
7  a fiduciary under ERISA 3(21) and 3(38); is that
8  right?
9      A.  That's correct.
10      Q.  Okay.  So earlier, when I had asked you
11  whether you were offering an opinion as to whether
12  Hancock was a fiduciary, you said no, was that not
13  correct?
14      A.  I think I answered the question that the
15  role that fiduciary -- the -- the role John Hancock
16  had as a fiduciary was a limited fiduciary, and we
17  talked about how that was disclosed in the
18  agreement, the supplemental service agreement.
19         So when I responded to your question, I
20  did state that Hancock did have a limited fiduciary
21  role.  That limited fiduciary role was described in
22  the documents provided to plan sponsors, in this
23  case, Romano, and here, I'm stating that they did
24  not serve as an ERISA 3(21) or ERISA 3(38)
25  investment fiduciary.



Page 62

1     Q.  Okay.  So you are now offering an
2 affirmative opinion that John Hancock did not
3 serve as an ERISA 3(21) or 3(38) fiduciary; is that
4 right?
5     A.  That is correct.
6     Q.  Okay.  And that is based on your
7 understanding of what those provisions of ERISA
8 require; is that right?
9       MR. FLECKNER:  Objection.
10     A.  It's based on my just practical
11 experience.  So as a consultant, I work for firms
12 that serve as an ERISA 3(21) fiduciary and I work
13 for firms that serve as an ERISA 3(38) fiduciary.
14 So it's not a legal definition of the term, it's
15 just based on practical experience with clients.
16   BY MR. WEINSHALL:
17     Q.  Okay.  But you just quoted in here ERISA
18 3(21) and 3(38).
19       Those are statutes, correct?
20       MR. FLECKNER:  Objection.
21     A.  Yeah.  Yes, but they're also terminology
22 to define the role of an adviser.
23   BY MR. WEINSHALL:
24     Q.  Okay.  And ultimately what defines that
25 role is statutes, correct?

Page 63

1     A.  As I understand it, correct.
2     Q.  So ultimately, the question of
3 whether someone is or is not a fiduciary is
4 determined by whether or not the standard set forth
5 in those statutes is met, correct?
6       MR. FLECKNER:  Objection.
7     A.  No, not necessarily.  That's not correct.
8   BY MR. WEINSHALL:
9     Q.  Okay.  So you're saying if a Court
10 determines that someone is a fiduciary under those
11 standards, then they are not a fiduciary?
12     A.  What I'm stating is is that ERISA 3(21)
13 and ERISA 3(38) fiduciary definitions are
14 well-defined, but someone, a plan sponsor, for
15 example, could become an ERISA 3(21) fiduciary just
16 by virtue of the actions taken with respect to the
17 plan.
18       So you could be designated, as the firm I
19 work with is, that we are serving as an ERISA 3(21)
20 fiduciary, and in our documents, we will describe
21 what that entails or whether we serve as an ERISA
22 3(38) fiduciary.
23       So again, my opinion here is not based on
24 a statute interpretation, it's again based on
25 practical experience as to working with clients that

Page 64

1 use 3(21) or 3(38) investment fiduciaries.
2     Q.  So you're -- you're talking about your
3 documents that acknowledge someone is a 3(21) or
4 3(38) fiduciary; is that right?
5     A.  Correct.
6     Q.  Okay.  So do you have an opinion as to
7 whether if someone does not acknowledge him or
8 herself as a 3(21) or 3(38) fiduciary, that person
9 can still be -- meet the criteria of those statutes?
10       MR. FLECKNER:  Objection.
11     A.  Again, subject to, you know, a legal
12 interpretation, yes.  If someone who is not a
13 designated investment fiduciary acts like a
14 fiduciary, then yes, in theory, they could -- they
15 could be named as one.
16   BY MR. WEINSHALL:
17     Q.  Okay.  So your -- but your opinion here as
18 to whether John Hancock was a 3(21) or 3(38)
19 fiduciary is just based on the fact that John
20 Hancock did not say it was a 3(21) or 3(38)
21 fiduciary; is that right?
22     A.  Well, that, and again, just based on my
23 experience in the industry.  So again, I've worked
24 with, you know, thousands of different retirement
25 plans.  So I think it's fair to state that not only

Page 65

1 is my opinion based on documents, but also based on
2 practical industry experience.
3     Q.  Right.  And the experience you're talking
4 about there is whether or not a service provider
5 identifies itself as a 3(21) or 338 fiduciary?
6     A.  Whether they formally identify it or just
7 my understanding of how, you know, the industry
8 structures itself.
9     Q.  Okay.  That last part is what I'm not
10 understanding.
11       Are you offering an opinion as to, aside
12 from whether or not Hancock identified itself as a
13 3(21) or 3(38) fiduciary, whether its conduct meets
14 those criteria?
15     A.  No.
16     Q.  Okay.  Are you aware of any provision in
17 ERISA that allows a service provider to limit the
18 scope of its fiduciary duties?
19       MR. FLECKNER:  Objection.
20     A.  No.  I mean, that -- that sounds like
21 something that would require some type of legal
22 interpretation.  So I'm -- I'm not -- I just -- I'm
23 aware of the different, you know, definitions of
24 fiduciary, right, but I'm not aware of, you know,
25 what ERISA mandates.



Page 66

1      BY MR. WEINSHALL:
2          Q.  Okay.  I just want to make sure we're
3      talking about the same thing with 3(21) and 3(38).
4              You're referring to the statute that's
5      codified at 29 USC Section 1002; is that right?
6          MR. FLECKNER:  Objection.
7          A.  I don't know if I cited that in my report.
8      I -- I don't know the specific code section you're
9      referring to.
10     BY MR. WEINSHALL:
11         Q.  Okay.  Let me show it to you then.
12     Exhibit 153.
13             (Thereupon, marked as Exhibit 153.)
14         A.  Okay.  I have it.
15     BY MR. WEINSHALL:
16         Q.  You've seen this statute before, I
17     presume?
18         MR. FLECKNER:  Objection.
19     BY MR. WEINSHALL:
20         Q.  Mr. Gissiner, have you seen this statute
21     before?
22         A.  I don't recall seeing this, specifically.
23     I may have in the past looked at it, but...
24         Q.  Okay.  So if you scroll to page 5 of the
25     PDF?

Page 67

1          A.  Okay.
2          Q.  Subpart 21(A) in the middle of the page.
3          A.  Yes, 21(A).  Yep.
4          Q.  Okay.  When you're referring to a 3(21)
5      fiduciary, are you referring to this 21, you know,
6      Subsection 21 of this statute?
7          A.  So specifically, 3(21) fiduciary, as I
8      understand it, is subparagraph 2.
9          Q.  "Someone who renders investment advice for
10     a fee or other compensation, direct or indirect,
11     with respect to any monies or other property of such
12     plan or has any authority or responsibility to do
13     so."
14             Is that the section you're referring to?
15         A.  Correct.
16         Q.  Okay.  So when you're saying a 3(21)
17     fiduciary, you're not referring to romanette i or
18     romanette iii; is that right?
19         MR. FLECKNER:  Objection.
20         A.  That is correct.
21     BY MR. WEINSHALL:
22         Q.  Okay.  Let's scroll down to paragraph 38,
23     which is on page 12.
24         A.  Okay.
25         Q.  When you're saying 3(38) in your report,

Page 68

1      does it refer to this section?
2          A.  Yeah, so it would be -- let me just read
3      through here.
4              So it would be A, 3(38).
5          Q.  Okay.  You see the statute.  It says, "If
6      the term investment manager meets any fiduciary,"
7      and then parentheses "other than a trustee or named
8      fiduciary as defined in Section 1102(a)(2) of this
9      title," and then it -- scroll down to C, it says,
10     "It has acknowledged in writing that he is a
11     fiduciary with respect to the plan."
12             Do you see that?
13         A.  That's what it states.
14         Q.  Okay.  And do you have any understanding
15     about whether or do you have any opinion as to
16     whether John Hancock meets the criteria of 38(C)?
17         MR. FLECKNER:  Objection.
18         A.  Specific to how the plans are serviced and
19     how they're defined, no.
20     BY MR. WEINSHALL:
21         Q.  Okay.  And with respect to the
22     recordkeeping agreement where John Hancock
23     identifies itself as a limited fiduciary, do you
24     have any opinion as to whether that meets the
25     criteria of 38(C)?

Page 69

1          MR. FLECKNER:  Objection.
2          A.  So are you -- I'm sorry.  Maybe rephrase
3      your question.
4              So are you saying that John Hancock has
5      acknowledged in writing that it's a fiduciary with
6      respect to the plan in relation to their limited
7      fiduciary role?  Because I see C as being part of
8      38.
9      BY MR. WEINSHALL:
10         Q.  Right.  It is part of 38.  So my question
11     is, are you -- are you expressing an opinion as to
12     whether John Hancock's acknowledgment in the
13     recordkeeping agreement, that it is serving as a
14     limited fiduciary meets the criteria of Section
15     38(C)?
16         MR. FLECKNER:  Objection.
17         A.  No.  In my opinion, as it's stated in the
18     report, John Hancock is not serving as an ERISA
19     3(38) fiduciary, and therefore, would not be
20     required to acknowledge that in writing.
21     BY MR. WEINSHALL:
22         Q.  Okay.  I don't think that answers the
23     question, so maybe I'm not being clear.
24             My question is, first, you understand that
25     in the recordkeeping agreement that John Hancock


MAGNA
LEGAL SERVICES

Page 70

1  entered into with the plaintiffs in this case, that
2  it identified itself as a limited fiduciary; is that
3  right?
4      A.  That's correct.  And maybe it would be
5  helpful if we could bring that agreement up and we
6  could point to it.
7      Q.  Okay.  Let's do that.
8      A.  And I think there's actually two.  There
9  would be the Supplemental Information Agreement and
10  then the Group Variable Annuity Agreement.
11     Q.  Okay.  I just marked Exhibit 154.  It
12 actually has another exhibit number on it that's
13 been marked elsewhere.
14         (Thereupon, marked as Exhibit 154.)
15     A.  Okay.  There's also -- I think this may
16 not be the complete amount of disclosure, because I
17 believe, in addition to this document, there's also
18 a supplemental information guide that also includes
19 language regarding fiduciary status.
20     BY MR. WEINSHALL:
21     Q.  Okay.  We can look at that, but the
22 question I'm asking you is about page 2 of this PDF.
23     A.  Okay.
24     Q.  Okay.  So when we were talking earlier
25 about John Hancock identifying itself as a limited

Page 71

1  fiduciary, it does so under the fiduciary status
2  section of this document where it says "to the
3  extent," that sentence starting there; is that
4  right?
5      A.  Yes, right.  "To the extent that John
6  Hancock," yep.
7      Q.  Okay.  So my question for you is, are you
8  offering an opinion as to whether this language in
9  the recordkeeping agreement does or does not meet
10 the criteria of 38(C) in the statute we just looked
11 at in Exhibit 153 for a fiduciary who has
12 acknowledged in writing that he is a fiduciary with
13 respect to the plan?
14     A.  Yeah, because if you go on, it says --
15 describes what their role is, "holding assets,
16 voting proxies, acting only in accordance with
17 directions from the trustees, participants, and
18 beneficiaries as provided in this agreement."
19         So the fact that they are acting on the
20 instructions of the plan trustees and/or
21 participants, that -- and then if you read the last
22 sentence, "John Hancock will not have any
23 discretionary authority or responsibility for
24 management or control of the asset -- of the
25 separate accounts."

Page 72

1          So by virtue of that language, yes, John
2  Hancock is not acting as an ERISA 3(38) fiduciary as
3  defined in that statute, and I think that -- the
4  fact that they -- it states, "John Hancock will not
5  have any discretionary authority or responsibility
6  for the management or control of the separate
7  accounts."
8      Q.  Okay.  So then you are offering an opinion
9  as to whether -- just to make sure I'm clear about
10 this, you are offering an opinion as to whether that
11 language in the recordkeeping agreement meets the
12 criteria of 38(C) in Exhibit 153?
13     A.  As my understanding is as a practitioner,
14 yes.  So my understanding of an ERISA 3(38)
15 fiduciary is you have discretion over the management
16 of plan assets.  Here, they're stating that they do
17 not.
18     Q.  Okay.  But if you look at Exhibit 153
19 again, Section 38(C) does not say anything about
20 discretion of plan assets, does it?
21     A.  That may be stated somewhere else, but I
22 think when I see the term "power" -- power to,
23 manage, acquire, or dispose of, it doesn't
24 necessarily use the word "discretion," but -- but
25 there may be elsewhere in the document, but I think

Page 73

1  "the power to," to me, means discretion to.
2      Q.  I see.
3          So you're -- you're making an
4  interpretation of what that word means?
5      A.  I'm not making an interpretation as to
6  that specific term.  You know, I'm falling back to
7  what I've seen in my experience as to what an ERISA
8  3(38) fiduciary is.
9      Q.  Okay.  But in terms of whether or not this
10 acknowledgment in the recordkeeping agreement meets
11 all of the criteria of Section 38, would you agree
12 that ultimately is a -- a legal question?
13     A.  No, I wouldn't.  I think that -- I think
14 that the responsibilities of an ERISA 3(38)
15 fiduciary are typically well-defined in a service
16 agreement, and so I don't believe that I have to
17 offer a legal opinion as to how my understanding of
18 ERISA 3(38), you know, responsibilities are
19 performed.
20     Q.  I'm not asking you about how they perform,
21 I'm asking you whether they meet the criteria of
22 this statute.
23     A.  You're talking about does John Hancock, or
24 when you say "meet the criteria," what are you --
25     Q.  I'm talking about the language that we

19  (Pages 70 to 73)



Page 74

1  read in Exhibit 154, whether that meets the criteria
2  of this particular statute.
3          Are you offering an --
4      A.  Yeah, it's my opinion that it does not.
5      Q.  Right.  And other than your own
6  understanding of what this language means, is there
7  any other basis to that opinion?
8          MR. FLECKNER:  Objection.  He answered.
9      You can answer again.
10     A.  Yeah, 40 years of industry experience.
11  BY MR. WEINSHALL:
12     Q.  Okay.  And that industry experience, how
13  does that inform what the language of this statute
14  is?
15     A.  So by way of example, if a plan sponsor
16  selects Financial Engines to serve as participants,
17  Financial Engines will produce an agreement that
18  describes their fiduciary status with respect to
19  individual participant accounts and they will
20  describe in detail their ability to manage
21  individual participant accounts and assume ERISA
22  3(38) fiduciary responsibility.
23          So I've seen multiple agreements in that
24  regard.  I've certainly seen multiple agreements
25  where an investment adviser has a responsibility for

Page 75

1  the investment of a plan, and again, they describe
2  their fiduciary role and responsibility and
3  acknowledge their fiduciary responsibility with
4  respect to ERISA 3(38) services.
5          And then lastly, I've seen similar
6  documents related to ERISA 3(21) fiduciary services.
7      Q.  Okay.  So you've seen documents where
8  service providers either do or do not identify
9  themselves as ERISA 3(38) fiduciaries; is that
10  right?
11     A.  What I've seen is, is they don't
12  necessarily -- they don't -- they don't produce
13  documents that say we -- we're not serving -- they
14  will produce documents if they service as an ERISA
15  3(38) fiduciary and describe those roles and
16  responsibilities.
17          In this matter here, the documents that
18  are being produced are John Hancock describing its
19  limited fiduciary responsibilities.  They're not
20  making any additional disclosures related to ERISA
21  3(38) responsibilities.
22     Q.  Okay.  So because your prior experience is
23  that service providers who take on these
24  responsibilities, identify them specifically, and
25  that's not in this document, then you conclude that

Page 76

1  John Hancock is therefore not a 3(38) provider; is
2  that right?
3      A.  Well, I think what I would -- I would
4  rephrase your statement to state that in this
5  particular document and other documents that I've
6  seen, John Hancock has not described itself as an
7  ERISA 3(38) fiduciary.  They have described
8  themselves as a limited fiduciary with specific
9  roles and responsibilities as defined here.  I've
10  seen other documents where, again, I've referenced
11  Financial Engines as an example where they clearly
12  define and acknowledge their ERISA 3(38) role and
13  responsibility.
14     Q.  Okay.  Would you agree that it's possible
15  for a -- an ERISA service provider to intend not to
16  be a 3(38) fiduciary but still meet the criteria
17  under the statute?
18     A.  You have to give me an example.
19     Q.  Well, for example, is it possible that --
20  that a service provider that does not understand or
21  is incorrect in its understanding of what the
22  statute requires may not provide the disclosure that
23  you've seen, but still, it meets the three criteria
24  that you see listed in 3(38)?
25     A.  Well, I guess I better answer that by

Page 77

1  example.  So let's say that Mr. Searcy decides on
2  his own that one of the investments in the Romano
3  plan needed to be changed and he did so on his own
4  without consultation with the committee or without
5  consultation with the trustees.  If he were to
6  engage in that activity, that would seem to mean
7  that now he's taking on the responsibility of the
8  power to manage, acquire, or dispose of any assets
9  of a plan.
10          So that would be an example of where
11  someone could either inadvertently or intentionally
12  take on the responsibility of an ERISA 3(38)
13  fiduciary without acknowledging that in writing.
14     Q.  Okay.  And ultimately, whether that person
15  or that entity meets the criteria of 3(38) is a
16  legal question, right?
17     A.  Well, again, I'm not opining on the legal
18  definition of it.  I'm simply, you know, falling
19  back to what my understanding is.  So as I
20  understand it, you know, again, I'm giving you my
21  opinion as to my understanding of ERISA 3(38)
22  fiduciaries.  I'm not offering anything beyond what
23  I experience in my own practice.
24     Q.  Okay.  Have you experienced someone in
25  your own practice taking on what you just described

MAGNA
LEGAL SERVICES

1   as a role like Mr. Searcy?
2       A.  Not in my experience, no.
3       Q.  But ultimately, would you agree that if a
4   Court determines that the actions of a service
5   provider meet the criteria of this provision, it
6   does not matter what other participants within the
7   industry believe?
8           MR. FLECKNER:  Objection.
9       A.  That's kind of a hypothetical answer, so
10  could you -- I struggled with the question.
11          Could you repeat the question?
12  BY MR. WEINSHALL:
13      Q.  Sure.  If a Court determines that a
14  service provider meets the criteria of either a
15  3(38) or 3(21), would you agree that that entity is
16  a fiduciary regardless of what other professionals
17  in the industry believe?
18          MR. FLECKNER:  Objection.
19      A.  Well, again, I think that if a Court makes
20  that determination, that would be the opinion of
21  that specific Court, right, that specific judge.  I
22  can't comment as to how that would manifest itself
23  across the industry.
24  BY MR. WEINSHALL:
25      Q.  Okay.  But in terms of that specific Court

1   and that specific service provider and that specific
2   instance, what would matter is that the Court
3   determines that the criteria of the statute are met,
4   not what other industry professionals believe,
5   correct?
6           MR. FLECKNER:  Objection.
7       A.  If a Court -- if a Court ultimately makes
8   that determination, as they've done in other cases,
9   yeah, that may supercede what other professionals
10  think.  It may not change their opinion, and it may
11  be specific to one unique case.
12  BY MR. WEINSHALL:
13      Q.  Okay.  And would you agree that -- that
14  industry professionals also follow developments in
15  legal opinions with the help of attorneys and that
16  that can sometimes change what industry
17  professionals understand to be fiduciary
18  obligations?
19          MR. FLECKNER:  Objection.
20      A.  Again, I think it's fair to state over
21  time that depending on, you know, various legal
22  rulings, service providers, industry professionals
23  may change their approach to servicing clients,
24  sure.
25

1   BY MR. WEINSHALL:
2       Q.  And then they also under -- develop
3   different understandings of what it means to be a
4   fiduciary or what actions give rise to fiduciary
5   obligations?
6       A.  Well, beyond whether -- you know, again,
7   ultimately, whether the DOL makes those changes as a
8   result of the court ruling, I couldn't comment on.
9   But again, as I mentioned before, you know,
10  professionals do modify service approaches based on
11  what they've seen with various court rulings.
12          MR. WEINSHALL:  Okay.  Why don't we take a
13  short break.  We've been going for a little
14  while.  Let's go off the record.
15          Are we off the record?
16          MR. VAGLICA:  It doesn't look like the
17  videographer is on unless that's the Bailey
18  Diaz.
19          MR. WEINSHALL:  Bailey is the
20  videographer.
21          Bailey, are you on?
22          THE VIDEOGRAPHER:  Yes, sir.
23          MR. WEINSHALL:  Okay.  Did you hear me
24  that we'd like to go off the record?
25          THE VIDEOGRAPHER:  Yes.  The time is

1   12:24 p.m., and we're going off the record.
2           (At this time, a luncheon recess was taken
3   from 12:24 p.m. to 1:04 p.m.)
4           THE VIDEOGRAPHER:  The time is 1:04 p.m.
5   and we're back on the record.
6   BY MR. WEINSHALL:
7       Q.  All right.  We left off, I think, at
8   paragraph 2 of the summary of your opinions in your
9   rebuttal report.  So I wanted to move to paragraph
10  3.
11      A.  Of the rebuttal?
12      Q.  Of the rebuttal summary opinions in
13  Section 2.
14      A.  Oh, I thought you said paragraph 30.
15  You're saying paragraph 3.
16          Is that what you said, or paragraph 30?
17      Q.  No, I said paragraph 3.
18      A.  Oh, okay.  Got it.
19          MR. FLECKNER:  Paragraph 3 of the summary,
20  not of the body?
21          MR. WEINSHALL:  That's correct.
22      A.  Okay.  Got it.  So we're on page 2.
23  BY MR. WEINSHALL:
24      Q.  Correct.
25          So your third opinion in rebuttal is that




Page 82

1   retirement industry professionals do not consider
2   foreign tax credits to be, quote, "compensation" or,
3   quote, "revenues" received by recordkeepers; is that
4   right?
5       A.  That's my opinion.
6       Q.  Okay.  Did you take a survey of retirement
7   industry professionals to reach that opinion?
8       A.  No.
9       Q.  Okay.  Did you speak with any other
10  retirement industry professionals regarding this
11  question to reach this opinion?
12      A.  No.
13      Q.  Do you agree that if -- even if retirement
14  industry professionals do not generally consider
15  foreign tax credits to be compensation or revenues,
16  that if a Court decides that they do meet the
17  criteria of compensation under the applicable ERISA
18  regulation, then they must be disclosed?
19          MR. FLECKNER:  Objection.
20      A.  Well, again, I think there's two parts to
21  your question.  So we had talked about this earlier.
22  So to the extent that a Court deems foreign tax
23  credits to be revenue, then I think retirement
24  industry professionals would obviously, as I
25  indicated before, modify their opinions.

Page 83

1       Q.  The second part of your decision would be
2   whether they would have to be disclosed, and that
3   would potentially not necessarily -- I don't know if
4   a Court would be able to opine on that or if that
5   would be the responsibilities of the Department of
6   Labor.
7           BY MR. WEINSHALL:
8       Q.  Okay.  Do you understand that the
9   Department of Labor produces its opinions, in part,
10  by relying on judicial opinions?
11          MR. FLECKNER:  Objection.
12      A.  I don't know if they necessarily do that
13  or not.
14          BY MR. WEINSHALL:
15      Q.  Okay.  And you've read Department of Labor
16  guidance before?
17      A.  Yes.
18      Q.  Okay.  Have you read in any of that
19  guidance reference to judicial opinions?
20      A.  Not that I recall, no.
21      Q.  Okay.  So you've never seen a Department
22  of Labor guidance document referred to opinions from
23  courts?
24      A.  Not that I recall, no.
25      Q.  Your fourth opinion, moving down this

Page 84

1   list, is that Securian's practice of passing on a
2   benefit for foreign tax credits to group annuity
3   contract policyholders is not a best practice; is
4   that right?
5           MR. FLECKNER:  Objection.  Misstates.
6       A.  That's not what I stated.  What I stated
7   here -- and let me look at it.  I disagree with the
8   statement that plaintiffs' experts consider it to be
9   a best practice.
10          BY MR. WEINSHALL:
11      Q.  So how is that different from saying it is
12  not a best practice?
13      A.  Well, I'm stating that plaintiffs view
14  that as a best practice, and as I indicated here, I
15  disagree with that opinion.  Securian is the only
16  recordkeeper, as noted here, that does it.  No other
17  recordkeeper in the industry does it, and I think
18  it's fair to state that Securian itself is not --
19  is, you know, kind of a small plan provider.  So if
20  plaintiffs are asserting it as a best practice, then
21  it's a best -- then no other provider in the
22  industry other than Securian is doing it.
23      Q.  Right.  Mr. Gissiner, that's a recitation
24  of facts that Securian does it, and it's your
25  understanding no others do it?

Page 85

1       A.  Correct.
2       Q.  Are you expressing an opinion as to
3   whether it is or is not a best practice?
4       A.  Let me go into the narrative of the report
5   itself.
6       Q.  So you don't -- without reading your
7   report, you don't know if you're offering an opinion
8   one way or the other?
9       A.  I'm going to go into my report and look
10  and follow up on that specific opinion.
11      Q.  Okay.  But could you answer the question I
12  just asked?  Without reading your report, you don't
13  know one way or the other whether you're offering an
14  opinion as to whether this practice is a best
15  practice; is that right?
16      A.  I'm -- just bear with me for a second as I
17  go through it.
18      Q.  So you're refusing to answer my question,
19  Mr. Gissiner?
20      A.  No.
21      Q.  Well, Mr. Gissiner, I asked you, without
22  looking at your report, can you tell me whether or
23  not you offer that opinion?
24      A.  Am I not allowed to look at my report?
25      Q.  Well, you are allowed to look at your




Page 86

1    report, but I'm asking you, if you do not -- do you
2    need to look at your report to know whether or not
3    you offer that opinion?
4        A.  My opinion is this:  Mr. Levy, as outlined
5    in paragraph 18, asserts that it's a best practice
6    for insurance companies who issue group variable
7    annuity contracts and receive foreign tax credits to
8    credit those foreign tax credits back to the
9    separate accounts.  And then I go on to state that
10   Mr. Levy asserts that he -- Mr. Levy acknowledges
11   that most insurance company recordkeepers do not
12   follow this practice.
13       So Mr. Levy asserts that it's a best
14   practice.  My opinion, as stated in 19, is it's not
15   an industry practice.  So I'm not making a
16   determination as to whether it's a best practice or
17   not.  I'm simply stating that Mr. Levy described it
18   as a best practice, but in the industry, it is not a
19   practice itself.  No other provider does it.
20       Q.  Okay.  So I'm missing what you're adding
21   to Mr. Levy's report then, because Mr. Levy
22   acknowledges, I believe, that no other company of
23   which he is aware does it.
24       So what are you adding?
25       A.  What am I adding?

Page 87

1        Q.  Yeah.  What are you rebutting if you're
2    not disagreeing with him it's a best practice?
3        A.  I'm not -- what I'm stating is, is that,
4    as I indicated in the report, it's not industry
5    practice.
6        Q.  Okay.  So you were -- then after reviewing
7    your report, am I correct that you are not offering
8    an opinion one way or the other whether Securian's
9    practice represents a best practice?
10       A.  Again, Mr. Levy's interpretation is that
11   it's a best practice.  I'm saying it's not industry
12   practice.
13       Q.  I understand.  And that's not the question
14   I asked.  I know what Mr. Levy said, and I know you
15   described it as not an industry practice.
16       A.  Right.
17       Q.  My question is, are you offering an
18   opinion one way or the other whether Securian's
19   practice is a best practice?
20           MR. FLECKNER:  Objection.
21       A.  That opinion is not stated in my report.
22   BY MR. WEINSHALL:
23       Q.  And you are not planning to offer an
24   opinion one way or the other at trial, correct?
25       A.  If asked at trial as to whether Securian

Page 88

1    is engaging in a best practice, I would state, as I
2    indicated in my report, that that's Mr. Levy's
3    opinion; it's not an industry practice.
4        Q.  Okay.  Is it possible, Mr. Gissiner, for a
5    practice to be a best practice but not be widely
6    adopted in the industry?
7        A.  You'd have to give me an example.
8        Q.  Okay.  Well, let's say in the industry, a
9    number of service providers engage in a practice
10   that is inconsistent with ERISA obligations, but a
11   minority of service providers comply with those
12   obligations.
13       Would you then say that the industry
14   practice is that -- is not a best practice?
15           MR. FLECKNER:  Objection.
16       A.  So are you saying -- so -- so let me
17   backtrack.  So you're saying like if -- if a service
18   provider engages in a practice that's not consistent
19   with ERISA?
20   BY MR. WEINSHALL:
21       Q.  Right.
22       A.  So if a service provider engages -- excuse
23   me -- in a practice that's not consistent with
24   ERISA, then that would be defined in my terms as a
25   practice that's not consistent with ERISA.

Page 89

1        Q.  That could also be an industry practice,
2    right?  It's possible, theoretically, for many
3    participants in the industry to engage in a practice
4    that's not consistent with ERISA, right?
5        A.  That's a broad hypothetical.  I don't -- I
6    don't know how that would be possible.
7        Q.  Is it theoretically possible that many
8    different service providers are engaging in a
9    practice that is not consistent with ERISA?
10           MR. FLECKNER:  Objection.
11       A.  Again, that's not consistent with my
12   experience.
13   BY MR. WEINSHALL:
14       Q.  Okay.  I know, in your opinion, most
15   service providers comply with ERISA.
16       Is that what your experience has been?
17       A.  It's my experience that providers in the
18   industry administer plans in accordance with their
19   fiduciary responsibilities and that it's my
20   experience that those responsibilities as defined by
21   a service provider are consistent with ERISA.
22       Q.  Okay.  You're distinguishing, it seems
23   like in this opinion, between an industry practice
24   and a best practice.
25       Will you define what those terms mean?

23  (Pages 86 to 89)



Page 90

1        A.  I didn't use the term "best practice";
2  Mr. Levy did.
3        Q.  Okay.  So what do you mean by industry
4  practice?
5        A.  Industry practice, in my view, is
6  policies, procedures, approaches adopted by the
7  industry relative to retirement plan arrangements.
8        Q.  Okay.  So in other words, like the -- the
9  predominant practice in the industry; is that right?
10       A.  I wouldn't necessarily say -- well,
11  predominant, but again, you're -- you're talking
12  about many, many different things that extend across
13  the industry.
14       Q.  Okay.  And do you -- do you use the term
15  "best practice" in your work?
16       A.  In some instances, yes.
17       Q.  Okay.  What do you mean when you use that
18  term?
19       A.  So if consulting with a plan sponsor, I
20  may say that, based on what I see in the industry,
21  it would be appropriate to include, let's say, for
22  example, in an investment fund lineup a certain
23  number of index funds to provide participants with
24  passively managed investment options.  It's
25  ultimately up to the plan sponsor as to determine if

Page 91

1  that's a best practice, but I can say that that's a
2  practice that's consistent with what I see across
3  the industry.
4        Q.  Okay.  I asked you for a definition of
5  "best practice" and you used the term "best
6  practice" in that definition.
7            Can you use -- can you define the term
8  "best practice" without using that term?
9            MR. FLECKNER:  Objection.
10       A.  I'm not sure I follow.
11  BY MR. WEINSHALL:
12       Q.  Okay.  I asked you, what do you mean by
13  the term "best practice," and you gave me an example
14  where you said you would recommend something and it
15  would be up to the plan to determine whether that's
16  a best practice, meaning you just gave me an answer
17  that defined "best practice" with the phrase "best
18  practice," which is not answering my question.
19       A.  Okay.  So what I would say would be that
20  it is a best practice to consider usage of index
21  fund options in an investment fund lineup.  It is a,
22  in my opinion, best practice to utilize the services
23  of an external consultant to assist in monitoring
24  investments.  The term "best practice," in my view,
25  is not defined legally, it's generally the opinion

Page 92

1  of a plan sponsor, attorney, or consultant operating
2  in the industry.
3        Q.  An opinion as to what?
4        A.  As to what they themselves believe to be
5  a, quote, "best practice."
6        Q.  Okay.  And so is that different than --
7  is -- best practice, in your mind, does that have a
8  different meaning than industry practice?
9        A.  Yes, it can.
10       Q.  Okay.  Give me an example.
11       A.  I have encountered investment consultants
12  that argue against the use of target date funds.  So
13  they may, as they define it, consider not using
14  target date funds as a best practice.  That's their
15  definition, but industry-wide, target date funds are
16  pretty common.  So you could argue that an
17  individual consultant might deem something to be a
18  best practice, but that conflicts with what the
19  industry is doing.
20       Q.  Okay.  Are there any practices that -- in
21  your role as a consultant that you recommend to do
22  or recommend not to do that are industry practices?
23  In other words, is there an example like that, that
24  you just provided me, that -- that you use in your
25  work as a consultant?

Page 93

1        A.  Well, I think, for example, if I'm meeting
2  with a client that's not currently using an
3  investment adviser, I would say that, you know, from
4  a standpoint of plan oversight, it is, you know, a
5  recommended best practice.  It is a typical industry
6  practice to use an external adviser to monitor the
7  investments of the plan.
8        Q.  Okay.  So I think you just gave me an
9  example where you said an industry practice aligns
10  with a best practice.
11           Is there any example in your consulting
12  experience where there's a practice that you
13  recommend that does not align with industry
14  practice?
15       A.  Not -- not in my experience, no.
16       Q.  So there's nothing like that example of
17  industry practice being to use index funds but an
18  adviser recommending against them.
19       A.  I think it depends on -- it depends.  So
20  for example, today in the industry, you're seeing
21  more and more fixed fee arrangements.  So the
22  industry is clearly moving in that direction, but I
23  don't recommend that a plan sponsor immediately go
24  to a fixed fee arrangement.  Those are decisions
25  that they have to make on their own.

MAGNA
LEGAL SERVICES

Page 94

1    Q.  Okay.  So is it fair to say that the
2  practices of the industry change over time?
3    A.  They can.
4    Q.  Okay.  And is it fair to say that the
5  understanding within the industry of what represents
6  a best practice also changes over time?
7        MR. FLECKNER:  Objection.
8    A.  It has, yes.
9  BY MR. WEINSHALL:
10    Q.  Was there a period of time when a majority
11  of recordkeepers and service providers did not
12  disclose the 12b-1 fees that they received?
13        MR. FLECKNER:  Objection.
14    A.  Well, I think it, again depends, but, you
15  know, prior to fee disclosure requirements in 2012,
16  there could have been recordkeepers or investment
17  advisers that did not disclose their receipt of
18  12b-1 fees.
19  BY MR. WEINSHALL:
20    Q.  Okay.  You were working in the retirement
21  industry before and after 2012, right?
22    A.  Correct.
23    Q.  Okay.  Before that regulation was enacted,
24  were there some recordkeepers and service providers
25  that disclosed the 12b-1 fees that they received

Page 95

1  even though their regulation had not been enacted
2  yet?
3    A.  Yes.
4    Q.  Okay.  And that is now a best practice to
5  make those disclosures, right?
6        MR. FLECKNER:  Objection.
7    A.  I wouldn't say it's a best practice.  I
8  would say that that's now a requirement that the DOL
9  imposed.
10  BY MR. WEINSHALL:
11    Q.  Okay.  So before it was a requirement, was
12  it considered a best practice then?
13    A.  I wouldn't define it that way.  I think it
14  was how certain service providers elected to provide
15  information to plan sponsors.
16    Q.  Okay.  But it was their practice of doing
17  so, right?
18    A.  I would say that, again, depending on the
19  service provider, yes.
20    Q.  Okay.
21    A.  And again, we're not referring only to
22  just recordkeepers here.  We're also referring to
23  investment advisers.
24    Q.  Okay.  Let's move to the fifth opinion in
25  the summary.  You state, "Contrary to the

Page 96

1  plaintiffs' experts' assertions, proposed class
2  members were not, quote, 'deprived,' of the
3  information necessary to evaluate John Hancock and
4  the reasonableness of its fees."  Is that right?
5    A.  Correct.  That's what's stated.
6    Q.  Is it your testimony that John Hancock
7  completely disclosed to plaintiffs and class members
8  the benefits it received for foreign tax credits?
9        MR. FLECKNER:  Objection.
10        (Reporter clarification.)
11  BY MR. WEINSHALL:
12    Q.  Go ahead, Mr. Gissiner.
13    A.  Yeah, I'm looking at the specific
14  narrative in my report.  So if we go to paragraph 26
15  of the report, I highlight the fact that information
16  with respect to foreign tax credits can be obtained
17  by making direct inquiries with the recordkeeper or
18  by reviewing disclosures made in investment product
19  prospectuses.
20        And then consistent with deposition
21  testimony, Mr. Searcy did reach out to John Hancock,
22  as well as other recordkeepers, to inquire about fee
23  concessions in connection with foreign tax credits.
24  Mr. Levy then goes on to assert that information on
25  whether a mutual fund -- underlying mutual fund

Page 97

1  paying -- paying foreign taxes may be disclosed in
2  the prospectus.  Of the mutual fund, these
3  prospectuses are publicly available, and certainly,
4  I mean, you can go on to Morningstar or any mutual
5  fund site and obtain a product prospectus.
6        And then, you know, closing opinion on 28,
7  I disagree with Mr. Pingree's opinion that proposed
8  class members were deprived of an accurate
9  opportunity to monitor the performance of
10  investments and the reasonableness of fees.
11        So my opinion here is is that they were
12  not deprived of that information.  There's certainly
13  any number of sources available to plan sponsors
14  either through their adviser or through their
15  recordkeeper to obtain that information.
16    Q.  Okay.  Mr. Gissiner, I don't think that
17  answered my question.
18    A.  I'm sorry.
19    Q.  My question is, is it your testimony that
20  John Hancock fully disclosed to plaintiffs and class
21  members the benefits it received from foreign tax
22  credits?
23        MR. FLECKNER:  Objection.
24    A.  You're referring to John Hancock.  My
25  opinion is is that that information was available in

25  (Pages 94 to 97)



Page 98

```
 1   product prospectuses available through John Hancock.
 2   There's nothing in my opinion that I can read where
 3   I state what you just referred to.
 4       BY MR. WEINSHALL:
 5       Q.  So you're not giving an opinion that John
 6   Hancock fully disclosed to plaintiffs and class
 7   members the benefits it received from foreign tax
 8   credits, right?
 9       A.  My opinion was that such information was
10   available to plaintiffs in this matter.
11       Q.  Okay.  Your -- your opinion is that some
12   information was available, but that's not my
13   question.
14           My question is, did John Hancock disclose
15   it?
16       MR. FLECKNER:  Objection.
17       A.  Well, I would have to go and look at each
18   and every one.  So for example, in this
19   particular matter, it does appear that if they had a
20   discussion with Mr. Searcy about foreign tax
21   credits, then John Hancock provided that
22   information.  They disclosed it.
23           You know, I know that there's numerous
24   other plans in this case.  You'd have to look at
25   each and every one to determine whether those
```

Page 99

```
 1   individual plan sponsors received information on
 2   foreign tax credits.
 3       BY MR. WEINSHALL:
 4       Q.  Okay.  Well, let's separate what you just
 5   said there.
 6           First, Mr. Gissiner, are you aware of any
 7   evidence in the record that John Hancock told
 8   plaintiffs, not Mr. Searcy, but plaintiffs about the
 9   benefits it received from foreign tax credits?
10       A.  I'd have to go back and look at Mr. -- the
11   two Romano depositions.
12       Q.  You have these reports, Mr. Gissiner.  You
13   state exactly that the plaintiffs may have --
14   plaintiffs and Mr. Searcy were able to obtain
15   information.
16           I'm asking you, do you have an opinion,
17   have you stated an opinion whether John Hancock
18   disclosed to plaintiffs, not Mr. Searcy, the
19   benefits it received from foreign tax credits?
20       MR. FLECKNER:  Objection.
21       A.  Do I have an opinion in that regard?
22       BY MR. WEINSHALL:
23       Q.  Yes.
24       A.  I did not state that opinion, no.
25       Q.  You did not.  Okay.
```

Page 100

```
 1           And you're not aware of any evidence in
 2   the record that indicates that John Hancock
 3   disclosed to plaintiffs, not Mr. Searcy, the
 4   benefits it received from foreign tax credits,
 5   correct?
 6       A.  And with respect to plaintiffs, you're
 7   referring to the Romano plans itself?
 8       Q.  Yes.
 9       A.  Or other plans?
10       Q.  Romano plans.
11       A.  I'm -- I'm not aware of anything, no.
12       Q.  Okay.  Now, you just referred to
13   information regarding foreign tax credits that might
14   be available in prospectuses, right?
15       A.  Well, if it's applicable in a prospectus,
16   I wouldn't say it might be available; it would be
17   available.
18       Q.  Okay.  Would that information disclose
19   that the precise amount that John Hancock benefited
20   from foreign tax credits?
21       MR. FLECKNER:  Objection.
22       A.  Would it disclose the precise amount on
23   the prospectus itself?  I don't -- no, I don't think
24   so.
25
```

Page 101

```
 1       BY MR. WEINSHALL:
 2       Q.  Okay.  Would it disclose John Hancock's
 3   decision to not provide a passthrough benefit to
 4   group annuity contracts of the foreign tax credit
 5   benefit?
 6       MR. FLECKNER:  Objection.
 7       A.  What do you -- when you say "passthrough
 8   benefit," what are you defining that as?
 9       BY MR. WEINSHALL:
10       Q.  Well, you used the term "fee concession,"
11   right?
12       A.  Right.
13       Q.  What does that mean?
14       A.  Well, with -- within the context of a
15   retirement plan service agreement, a provider may
16   pass on to the plan sponsor a fee concession, as in
17   the case of the Romano plans, a reduction in the
18   separate account charged.
19       Q.  Okay.  So the documents you're referring
20   to that address foreign tax credits, do any of those
21   disclose that John Hancock will or will not pass on
22   to the plans a fee concession in connection with the
23   benefits it receives from foreign tax credits?
24       MR. FLECKNER:  Objection.
25       A.  So do any of the documents that I reviewed
```

26  (Pages 98 to 101)





Page 102

```
 1    indicate whether John Hancock would pass through
 2    foreign tax credits?  Is that your question?
 3       BY MR. WEINSHALL:
 4       Q.  Yes.
 5       A.  None that I saw, no.
 6       Q.  Okay.  So even with the information that
 7    you say is available, the complete set of
 8    information regarding the extent of John Hancock's
 9    benefit performed tax credits and what it does with
10    those -- those benefits is not disclosed in the
11    documents that you reviewed, correct?
12       A.  If you're referring to --
13          MR. FLECKNER:  Objection.
14       A.  Yeah, if you're referring specifically to
15    the benefits John Hancock as an organization
16    received from foreign tax credits, it's not
17    disclosed in any documents that I received.  I do
18    believe it would be disclosed in their annual
19    report, I think, or annual report filing, but it
20    would be an aggregate amount not specific to
21    retirement plans.
22       BY MR. WEINSHALL:
23       Q.  Did you review the annual report?
24       A.  I'd have to go back and look.  Again, I
25    don't want to take up too much time looking, but I
```

Page 103

```
 1    don't recall reviewing it, but -- but certainly,
 2    if -- if they do receive the benefit of foreign tax
 3    credits, I would assume that would be reported in
 4    the annual report.
 5       Q.  But you understand that John Hancock's
 6    annual report consolidates information from various
 7    businesses, right?
 8          MR. FLECKNER:  Objection.
 9       A.  Yes.
10       BY MR. WEINSHALL:
11       Q.  Okay.  So the information about the
12    benefit John Hancock receives from group annuity
13    contracts under ERISA, you would not expect to find
14    that broken out in the annual report, would you?
15          MR. FLECKNER:  Objection.
16       A.  I don't know.  I don't know if that's the
17    case or not.
18       BY MR. WEINSHALL:
19       Q.  Okay.  Well, you didn't -- you didn't
20    review any annual reports for your opinions in this
21    case, right?
22       A.  No, I'm -- I'm recalling now that I think
23    what I recall is the one expert in this matter who
24    did perform the damages calculation, and he
25    highlighted the amount of foreign tax credits in his
```

Page 104

```
 1    report.  And that could be what I was thinking of
 2    when I thought about the foreign tax credit.
 3       Q.  You understand you're talking about
 4    Mr. Mukamal's report?
 5          (Reporter clarification.)
 6       A.  I don't remember the specific name, but I
 7    do recall his report included a damages calculation
 8    based on the amount of foreign tax credits.
 9       BY MR. WEINSHALL:
10       Q.  Okay.  So if his calculation relied on the
11    confidential tax documents of John Hancock, then you
12    would agree that the information regarding the
13    extent of the benefit John Hancock received from
14    foreign tax credits was not available publicly,
15    right?
16          MR. FLECKNER:  Objection.
17       A.  Yeah, I don't know.
18       BY MR. WEINSHALL:
19       Q.  Okay.  So you don't know one way or the
20    other whether the extent of the benefit John Hancock
21    received from foreign tax credits is publicly
22    available?
23          MR. FLECKNER:  Objection.
24       A.  I don't.
25
```

Page 105

```
 1       BY MR. WEINSHALL:
 2       Q.  And so if we assume that the information
 3    about the extent that John Hancock benefited from
 4    foreign tax credits was not publicly available, is
 5    it correct to say that plaintiffs were not deprived
 6    of any information regarding foreign tax credits?
 7          MR. FLECKNER:  Objection.
 8       A.  Again, as I alluded to in my report, had
 9    they asked or requested information from John
10    Hancock as Mr. Searcy did, then they were provided
11    with information as to foreign tax credits.  I can't
12    comment as to whether they were provided with
13    specific amounts.
14       BY MR. WEINSHALL:
15       Q.  Okay.  You read testimony regarding what
16    Mr. Searcy was told regarding foreign tax credits,
17    right?
18       A.  I read his deposition, correct.
19       Q.  Okay.  And do you recall what he was told?
20       A.  I don't.
21       Q.  You don't.
22          But he was not told the precise amounts
23    that John Hancock benefited from foreign tax
24    credits, right?
25          MR. FLECKNER:  Objection.
```

27 (Pages 102 to 105)




Page 106

```
 1        A.  I don't believe so, but I'd have to go
 2   through his deposition.
 3        BY MR. WEINSHALL:
 4        Q.  Okay.  So have you seen any evidence in
 5   the record that if an investment adviser or a plan
 6   fiduciary asked John Hancock to identify the benefit
 7   it received from foreign tax credits, that John
 8   Hancock would do so?
 9            MR. FLECKNER:  Objection.
10        A.  That they would do so?
11        BY MR. WEINSHALL:
12        Q.  Yes.
13        A.  So -- so are you saying -- so if -- if
14   somebody asked John Hancock if they could provide
15   information on foreign tax credits, would John
16   Hancock do so?
17        Q.  Not just general information.  That's a --
18   that is a vague term.  I'm asking --
19        A.  Okay.
20        Q.  -- if anyone had asked John Hancock to
21   identify the benefits it receives from foreign tax
22   credits, that John Hancock would do so?
23            MR. FLECKNER:  Objection.
24        A.  As to a specific amount?
25
```

Page 107

```
 1        BY MR. WEINSHALL:
 2        Q.  Yes.
 3        A.  I've not seen that, no.
 4        Q.  Okay.  Is it a duty of a plan fiduciary to
 5   monitor the reasonableness of the compensation paid
 6   to service providers?
 7            MR. FLECKNER:  Objection.  Calls for a
 8        legal conclusion.
 9            You can answer.
10        A.  Plan fiduciary being the plan sponsor?
11        BY MR. WEINSHALL:
12        Q.  Yes.
13        A.  Yeah, I would say with respect to typical
14   industry practices, plan sponsors do have a
15   responsibility to monitor the reasonableness of
16   fees.
17        Q.  Okay.  Is that something you advise your
18   clients to do?
19        A.  Yes.
20        Q.  Okay.  And to effectively monitor the
21   reasonableness of the compensation paid to service
22   providers, is it necessary to understand the full
23   amount of compensation that a service provider
24   receives?
25            MR. FLECKNER:  Objection.
```

Page 108

```
 1        A.  As defined by direct and indirect
 2   compensation consistent with the 408(b)(2)
 3   disclosures, yes.
 4        BY MR. WEINSHALL:
 5        Q.  Okay.  So if you assume for the sake of
 6   this question that foreign -- that the benefits of
 7   foreign tax credits are considered compensation
 8   under Regulation 408(b)(2), then it would be
 9   necessary for plan fiduciaries to have that
10   information to discharge their monitoring duty,
11   correct?
12            MR. FLECKNER:  Objection.
13        A.  Yeah.  So it's -- so again, hypothetical
14   question.  So it's my understanding, consistent with
15   the regulations, that foreign tax credits are not
16   considered compensation earned by a service
17   provider.  So consistent with that definition, I do
18   not consider that's something that has to be
19   disclosed.  If at some point in the future that
20   definition changes, then -- and the regulations
21   change, then yeah, consistent with that, it would be
22   something that I would assume that they would have
23   to disclose.  But as of today, I've not seen any
24   indication that they're required to do so.
25
```

Page 109

```
 1        BY MR. WEINSHALL:
 2        Q.  Right.  That didn't answer my question,
 3   though.
 4            So my question is -- it is a hypothetical,
 5   right?
 6            Let's assume for the hypothetical that the
 7   benefits that John Hancock received from foreign tax
 8   credits constitute compensation under the current
 9   Regulation 408(b)(2), okay?
10        A.  Uh-huh.
11        Q.  All right.  So would you agree that if
12   that assumption is correct under this hypothetical,
13   then it is necessary for plan fiduciaries to have
14   that information in order to discharge their
15   monitoring duty?
16            MR. FLECKNER:  Objection.  In your
17        hypothetical, are all other elements of the
18        regulation satisfied or not?
19            MR. WEINSHALL:  Yes.
20        A.  Yeah, because I think -- I think that's an
21   important distinction because there are other
22   components of the regulations that define disclosure
23   requirements.
24            So to answer your hypothetical question,
25   consistent with all things being equal and all other
```



Page 110

1   provisions of the regulations are satisfied, if
2   someone deems foreign tax credits to be compensation
3   for purposes of a plan, then in that hypothetical
4   situation, I would -- I would say that that would be
5   something that would have to be disclosed to plan
6   sponsors.
7          BY MR. WEINSHALL:
8          Q.   Okay.  And just continuing that, it would
9   be something that plan sponsors or plan fiduciaries
10   would have to have information on to discharge their
11   monitoring duties, correct?
12          MR. FLECKNER:  Same objection.
13          A.   Yeah, I mean, consistent with other fees
14   and costs associated with their plan.  You know, so
15   again, foreign tax credits are just one component in
16   your hypothetical example.  There would be other
17   things that they would have to look at.
18          BY MR. WEINSHALL:
19          Q.   Right.  Okay.  The basis of your romanette
20   opinion under 5 that "Foreign tax credits are
21   unlikely to factor into a proposed class member's
22   evaluation of John Hancock and its fees," is that,
23   basically, other fees can be adjusted up or down to
24   generate the same amount of revenue; is that right?
25          A.   Yeah.  So typically what happens is a

Page 111

1   service provider will have a required revenue amount
2   for their plan, and that required revenue amount can
3   be encompassed of a number of different fee
4   components.  If foreign tax credits, for whatever
5   reason in your hypothetical example, are passed
6   through, that impacts the required revenue amount.
7   It doesn't necessarily mean that costs go up or
8   costs go down.  It's just a component of the
9   required revenue percentage.
10          Q.   This is actually your hypothetical in
11   romanette i, right, where you said if the
12   concessions are given for foreign tax credits, then
13   you believe a service provider would adjust other
14   fees; is that right?
15          A.   Yeah, consistent with what I would
16   describe as the required revenue amount or required
17   revenue percentage.
18          Q.   Now, does that opinion itself
19   assume that the service provider considers the
20   foreign tax credit benefits to be the equivalent of
21   fees or revenue, because otherwise, there would be
22   nothing to adjust?
23          A.   No.  So again, using Securian as an
24   example, Securian says that they pass through
25   foreign tax credits to individual participants that

Page 112

1   are specific to the fund that produces those
2   credits.  Their decision to reduce expense ratios on
3   funds doesn't change, in my view, how they would
4   price plans.  They price plans based on a required
5   revenue percentage.
6          So if my required revenue percentage is X,
7   and I reduce my required revenue by Y based on,
8   let's say, for example, a foreign tax credit, if I,
9   as a provider, still have to get to that required
10   revenue percentage, I may change fees in other
11   areas.
12          Q.   Okay.  I'm not sure I understood some of
13   that.
14          I think you said -- you gave an example of
15   Securian there, and you said that Securian doesn't
16   change how it prices plans based on its revision of
17   fee concessions for foreign tax credits; is that
18   right?
19          A.   Yeah.  So we're referring to paragraph or
20   opinion 3 of the rebuttal, correct?
21          Q.   This is paragraph -- this is on page 2, 5,
22   romanette i.
23          MR. FLECKNER:  So still on the summary,
24   right?
25          A.   Okay.  Yeah, so -- so what I'm focusing

Page 113

1   there in the opinion is that decisions regarding
2   recordkeeping services and fees encompass a number
3   of different factors, and typically, a plan sponsor
4   doesn't focus on just one individual fee component
5   like foreign tax credits but instead looks at, you
6   know, the level of services and the total of fees
7   for these services consistent with the plan sponsor
8   and plan participant's needs.
9          So what the opinion is stating is that
10   as an individual matter, the provision of passing
11   through foreign tax credits, in my opinion, that
12   individual component is not the single factor a plan
13   sponsor would look at in terms of deciding whether
14   to select a service provider.
15          BY MR. WEINSHALL:
16          Q.   Okay.  And because you say here, these can
17   be, quote, "adjusted," right?
18          A.   Correct.
19          Q.   Okay.  And what you mean by that is if the
20   benefit of foreign tax credits is -- if a service
21   provider has to give back the benefit that it
22   receives from a foreign tax credit, it will adjust
23   its fees to recover that benefit in a different way?
24          MR. FLECKNER:  Objection.
25          A.   They may choose not to.



Page 114

```
 1      BY MR. WEINSHALL:
 2      Q.  Well, they -- if they choose not to, then
 3   the overall fees that are charged to a plan will go
 4   down, right?
 5      A.  Not necessarily, no.
 6      Q.  Well, if they choose not to adjust their
 7   other fees, their other fees stay the same and they
 8   give fee concessions, then the other fees -- then
 9   the total fees will go down, correct?
10      A.  Absent any other changes, correct.  So for
11   example -- yeah, all things being equal, if -- if
12   they pass through some form of foreign tax credit to
13   the plan sponsor, and again, recognizing that only
14   one recordkeeper does it, the administrative fees
15   don't go down.  In the case of Securian, the
16   investment fees of a specific fund option go down.
17      So the administrative fees in the Securian
18   matter, which is the only one that does it, the
19   administrative fees themselves do not change.  What
20   Securian is doing is reducing the expense ratio of
21   certain funds that provide foreign tax credits which
22   benefit the individual participants invested in that
23   fund.  They are not reducing the administrative
24   expenses that they charge to the plan overall.
25      Q.  Okay.
```

Page 115

```
 1      A.  So that's an important -- again, that's a
 2   very important distinction because when we talk
 3   about foreign tax credits, the assumption is, well,
 4   Securian does it, and that benefits everyone.  And
 5   that's not the case.
 6      Q.  But it benefits those plans that allocate
 7   assets to funds that invest in -- that generate
 8   foreign tax credits, right?
 9      A.  Not plans, participants.
10      Q.  And participants make up plans, right?
11      A.  Yes, but I mean, in a -- in a real life
12   sense, it would benefit only those participants that
13   choose to invest in that fund that produces the
14   foreign tax credit.
15      Q.  Okay.
16      A.  Participants are part of plans, but it
17   doesn't benefit the plan, it benefits the
18   participants in the plan.
19      Q.  But if you were to give the credit to the
20   plan instead of the participant, it would benefit
21   the plan, right?
22      MR. FLECKNER:  Objection.
23      A.  I don't see how you could do that.  Based
24   on what Securian is doing, I -- I -- the benefit
25   goes to the participant of the fund, not the plan.
```

Page 116

```
 1      BY MR. WEINSHALL:
 2      Q.  Okay.  But if you passed on the benefit
 3   instead of what Securian is doing, if you did it a
 4   different way where you reduced the overall expenses
 5   or gave the money to the separate account, wouldn't
 6   that benefit the plan itself?
 7      MR. FLECKNER:  Objection.
 8      A.  It -- it could.  Again, it would depend on
 9   the -- the methodology that you're referring to in
10   your hypothetical.
11      BY MR. WEINSHALL:
12      Q.  Okay.  Do you know whether John Hancock
13   considers the benefits it receives from foreign tax
14   credits when setting its overall fees?
15      THE WITNESS:  I'm sorry.  Go ahead, Jamie.
16   I interrupted you.
17      MR. FLECKNER:  Yeah, if you could just
18   pause so I have an opportunity to interpose any
19   objection so we don't speak over each other.
20      THE WITNESS:  Yeah, my -- I apologize.
21      MR. FLECKNER:  So I interposed an
22   objection.
23      You can answer, if you know the question.
24      A.  And Matt, if you could -- I apologize.
25      Could you repeat the question?
```

Page 117

```
 1      BY MR. WEINSHALL:
 2      Q.  Sure.  Do you know whether John Hancock
 3   considers the benefits it receives from foreign tax
 4   credits when setting its overall fees?
 5      MR. FLECKNER:  Objection.
 6      A.  And when you say "fees," are you referring
 7   to specific retirement plans?
 8      BY MR. WEINSHALL:
 9      Q.  When it sets the fees that it charges to
10   retirement plans on its group annuity contract
11   platform.
12      A.  No, I don't.
13      Q.  You don't.
14      Did you review the testimony of
15   Mr. Almeida?
16      MR. FLECKNER:  Objection.
17      A.  I believe I did.
18      MR. FLECKNER:  Which of the two pieces of
19   testimony of Mr. Almeida are you referring to,
20   Mr. Weinshall?
21      BY MR. WEINSHALL:
22      Q.  Well, Mr. Gissiner, let me ask you, did
23   you -- do you understand that Mr. Almeida gave two
24   depositions in the case?
25      A.  Yeah, in my initial report, I noted that I
```





Page 118

1    reviewed his deposition testimony from May 7, 2021.
2        Q.  Okay.  And so if John Hancock sets its
3    fees independently of the benefits that it receives
4    from foreign tax credits, then would you expect
5    its -- would you expect John Hancock to adjust its
6    fees if it was required to provide those benefits to
7    policyholders?
8            MR. FLECKNER:  Objection.
9        A.  So you said -- it was a long question.
10           So you said if John Hancock was required
11   to disclose them, or if John Hancock used foreign
12   tax credit to set their fees?
13           BY MR. WEINSHALL:
14       Q.  Right.  So let me ask it again.
15           So if John Hancock sets the fees that it
16   charges group annuity contracts independently of the
17   benefits it receives from foreign tax credits, then
18   would you expect John Hancock to adjust its fees if
19   it was required to pass on those benefits to
20   policyholders?
21           MR. FLECKNER:  Objection.
22       A.  I think that would be -- my experience
23   would be that would be something that would have to
24   be looked at on a specific plan-by-plan basis.
25

Page 119

1           BY MR. WEINSHALL:
2        Q.  But when making this opinion that you
3    offer here that fees can be adjusted by the
4    recordkeeper, wouldn't it be necessary for the
5    recordkeeper to then factor in the benefits or lack
6    of benefits it receives from -- from foreign tax
7    credits?
8            MR. FLECKNER:  Objection.
9        A.  No, no.
10           BY MR. WEINSHALL:
11       Q.  Why not?
12       A.  Well, again, you have a required revenue
13   percentage.  That required revenue percentage is
14   determined by the plan sponsor specific to an
15   individual plan.  That required revenue percentage
16   changes over time.  So depending on growth and
17   assets, depending on asset allocation, the amount of
18   revenue a provider may receive in an asset-based fee
19   arrangement can go up or down.  So if that
20   recordkeeper or plan sponsor had to start passing
21   through foreign tax credits, it doesn't necessarily
22   mean that there's going to be an adjustment in fees.
23   Fees could go up or fees could go down, it just
24   depends on an individual-by-individual plan.
25           MR. FLECKNER:  Mr. Weinshall, I'll note

Page 120

1    for the record, we can't often see your face.
2    I don't know if that's an issue for the
3    videographer, but oftentimes your face goes out
4    of the picture frame.
5            MR. WEINSHALL:  I don't mean to.
6    Can you see it now?
7            MR. FLECKNER:  It's better.  Thank you.
8            MR. WEINSHALL:  I don't think I'm being
9    recorded.  I think only the witness is.
10   Is that right, Bailey?
11           THE VIDEOGRAPHER:  That is correct, only
12   the witness is being recorded.
13           MR. FLECKNER:  Okay.  Thank you.
14           BY MR. WEINSHALL:
15       Q.  So is it your assumption that the fees
16   that are currently charged by John Hancock to
17   retirement plans like the Romanos correspond to the
18   required revenue percentage that Hancock has
19   determined it must receive from plan sponsor?
20           MR. FLECKNER:  Objection.
21       A.  Well, again, when you say "correspond to,"
22   they can -- they -- a recordkeeper may have a
23   required revenue percentage, but as I indicated
24   before, that required revenue percentage changes
25   over time.

Page 121

1           So whether the revenue specific to the
2    Romano plan is equal to the required revenue amount
3    by John Hancock would have to be determined at some
4    point in time as to whether, you know, let's say,
5    for example, as an RFP or something like that.
6            So again, at the outset, there's a
7    required revenue percentage that John Hancock, in
8    this case, communicated to the Romanos as to what
9    they needed to service the plan, but again, the
10   actual revenue received will vary over time.
11           BY MR. WEINSHALL:
12       Q.  Okay.  And if John Hancock receives more
13   than what it communicates as its required revenue,
14   would that excess amount constitute an excess of
15   reasonable compensation?
16           MR. FLECKNER:  Objection.
17       A.  Not necessarily, no.  You would have to
18   assess the level of compensation relative to plans
19   of similar size.
20           BY MR. WEINSHALL:
21       Q.  In romanette ii, the fifth summarized
22   opinion, you state, "For example, the named
23   plaintiffs and Mr. Searcy were able to obtain
24   information on whether John Hancock and other
25   recordkeepers provided fee concessions in connection



Page 122

1  with the foreign tax credits allowed against foreign
2  taxes paid."
3          Do you see that?
4      A.  Yes.
5      Q.  Okay.  So what evidence are you aware of
6  that the named plaintiffs, not Mr. Searcy, obtained
7  this information?
8      A.  I believe -- and we can go into the
9  rebuttal report itself.
10         MR. FLECKNER:  I'll note for the record, I
11  was precluded from learning this information
12  when I asked it because counsel for plaintiffs
13  said the lawyer was present and I wasn't
14  entitled to know this information, but
15  Mr. Gissiner can still answer.
16         MR. WEINSHALL:  I would say that that is
17  quite an improper objection.  You're supplying
18  the witness with an answer.  I will move to
19  strike that.
20     A.  I apologize.  I'm looking through my
21  report.
22         Yes, I believe that, you know, I did
23  review the deposition of the two Romanos and
24  Mr. Searcy, and I do recall Mr. Romano being asked
25  about the foreign tax credits in his deposition.

Page 123

1  I'm specifically referring to Footnote 51 and 52.
2      BY MR. WEINSHALL:
3      Q.  Okay.  So 51, let's read what you quoted
4  there.
5          "As you sit here today, do you know
6  whether or not Fidelity credits to the plan or
7  participants any foreign tax credits that are
8  generated with respect to investments made through
9  the Fidelity platform?
10         "ANSWER:  I don't know.
11         "QUESTION:  Okay.  You testified earlier
12  that was your rationale for conducting this RFP was
13  because of your concern about the way John Hancock
14  treated credits, right?  That was your testimony?
15         "ANSWER:  Correct.
16         "But as part of the RFP, the winning bid
17  went to somebody for whom, even as you sit here
18  today, you don't know how that credit, foreign
19  credits tax passed on by mutual fund invested
20  through the plan, correct?
21         "Assuming that's correct."
22         So that -- that is Footnote 51, right?
23     A.  Yeah, that was from Mr. Romano's
24  deposition.
25     Q.  From Eric Romano's deposition, right?

Page 124

1      A.  Correct.
2      Q.  Okay.  52, Mr. Todd Romano states here in
3  your report -- testified that he does not recall
4  ever thinking about selecting an insurance company
5  versus a fund company as a consideration, no.
6          So you think that that supports your
7  statement that the named plaintiffs obtained
8  information on whether John Hancock and other
9  recordkeepers provided fee concessions in connection
10  with foreign tax credits allowed?
11     A.  Yes.  And this is also -- excuse me.  This
12  is also referenced in paragraph 77 of my affirmative
13  report, and there's some additional deposition
14  testimony relevant to this specific subject.
15     Q.  Okay.  So this deposition testimony,
16  paragraph 77 of your report, refers to Mr. Todd and
17  Eric Romano learning of foreign tax credits as early
18  as 2017 or '18, correct?
19     A.  That's what it states.
20     Q.  Okay.  Do you have any understanding of
21  when the plan entered into the group annuity
22  contract with John Hancock?
23     A.  2014.
24     Q.  Okay.  So is there any testimony, any
25  evidence in the record indicating that the

Page 125

1  plaintiffs, not Mr. Searcy, was made aware of John
2  Hancock's treatment of foreign tax credits prior to
3  entering into their agreement with John Hancock?
4      A.  No.  Paragraph 76 refers to Mr. Searcy
5  specifically learning about foreign tax credits in
6  July of 2013.  I don't know whether he discussed
7  that with the Romanos or not.
8      Q.  Okay.  So you have no basis then to offer
9  an opinion that the named plaintiffs were able to
10  obtain information on whether John Hancock and other
11  recordkeepers provided fee concessions in connection
12  with the foreign tax credits allowed prior to
13  entering into their agreement with John Hancock,
14  correct?
15     A.  That's correct, and just, you know, to
16  make sure that we clarify, the named plaintiffs in
17  2014 did not conduct an RFP, so Mr. Searcy presented
18  them with John Hancock as the single provider.  So
19  in my view, if they did have -- they wouldn't have
20  been informed as to whether there were other
21  recordkeepers out there that didn't pass through or
22  didn't obtain foreign tax credits.  So again, it
23  wasn't a comprehensive RFP process like it was in
24  2020.
25     Q.  Okay.  But again, you have no evidence in



Page 126

1   the record that the Romanos themselves received any
2   information about foreign tax credits prior to
3   entering into the contract with John Hancock; is
4   that right?
5       A.  Nothing in the record that would indicate
6   that, no.
7       Q.  Okay.  Let's move down to Section 3 of
8   your rebuttal report starting with paragraph 4.
9       A.  Could you give me the paragraph?  I'm
10  sorry, did you just --
11      Q.  Section 3 of the rebuttal report.
12          MR. FLECKNER:  You said the -- we're still
13      on the summary, not the main -- there's two
14      paragraph 4s.  There's a paragraph 4 in the
15      summary and a paragraph 4 in the text.
16          Which paragraph 4 are you referring to?
17          MR. WEINSHALL:  I'm talking about
18      paragraph 4 in the text.
19          MR. FLECKNER:  Thank you.
20      A.  Okay.  Thank you.  Okay.
21  BY MR. WEINSHALL:
22      Q.  So you are criticizing plaintiffs' experts
23  here for assuming that John Hancock is a fiduciary;
24  is that right?
25      A.  The term "fiduciary" is not used in that

Page 127

1   paragraph.
2       Q.  I'm talking about the section overall,
3   Section 3.
4       A.  So what I'm opining here is is that they
5   are mischaracterizing their role as recordkeeper in
6   that John Hancock is required to disclose its use of
7   foreign tax credits to pass on those benefits to the
8   participants' eligible accounts, conflicts of
9   interest, so on and so forth.  So I am not making a
10  fiduciary determination.  I am saying that plaintiffs
11  seem to mischaracterize John Hancock's roles and
12  responsibilities.
13      Q.  Mr. Gissiner, just look on the next page.
14          Do you not say that, "Contrary to
15  Mr. Pingree's assertion, John Hancock did not serve
16  as an ERISA 3(21) and 3(38) investment fiduciary
17  into the plans"?
18      A.  Yes, that's what's stated in that
19  paragraph.
20      Q.  Okay.  I'm talking about the entirety of
21  Section 3 --
22      A.  Okay.
23      Q.  -- so that's paragraph -- paragraphs 4
24  through --
25      A.  Okay.  I understand now.  Correct.  Thank

Page 128

1   you.
2       Q.  Yeah.  4 through 14.
3       A.  Okay.
4       Q.  So you are contesting in those paragraphs
5   whether John Hancock is serving as a fiduciary; is
6   that right?
7       A.  Yes, I do not believe that John Hancock is
8   serving as an ERISA 3(21) or 3(38) investment
9   fiduciary.
10      Q.  Okay.  And is an investment fiduciary
11  different from a different type of fiduciary?
12      A.  You can also have what's referred to as an
13  ERISA 3(16) fiduciary.
14      Q.  And what type of fiduciary is that?
15      A.  Typically, a fiduciary that assumes
16  responsibility for certain administrative tasks.
17      Q.  Do you believe John Hancock meets the
18  criteria of that?
19      A.  No.
20      Q.  Okay.  If a Court concludes that John
21  Hancock does meet the criteria of the statutory
22  provisions that you reference, would you agree that
23  it then has the obligation to resolve conflicts of
24  interest in favor of the plan?
25          MR. FLECKNER:  Objection.

Page 129

1       A.  Well, I think we would have to define that
2   rule -- with respect to that specific ruling what
3   specific conflicts of interest we're referring to.
4   BY MR. WEINSHALL:
5       Q.  Well, you didn't do that when saying --
6   when criticizing plaintiffs' experts for saying,
7   resolving any conflicts of interest with respect to
8   the plan.
9       A.  Right.  And neither -- Mr. Levy did not
10  define the conflict of interest I heard.  I don't
11  recall him doing so.
12      Q.  You don't recall him stating that there
13  was a conflict of interest with what John Hancock
14  should do with the benefits of foreign tax credits?
15      A.  We'd have to go back and look at his
16  report, but certainly, he did reference his opinion
17  that maybe there could have been a conflict of
18  interest.  We'd have to bring up his report and look
19  at it.
20      Q.  Okay.  Well, just in general, is a
21  fiduciary required to resolve conflicts of interest
22  that arise within the scope of their fiduciary
23  obligation in favor of the plan?
24          MR. FLECKNER:  Objection.
25      A.  I don't know the specific answer to that



MAGNA ▶
LEGAL SERVICES

Page 130

```
 1    question or not.
 2      BY MR. WEINSHALL:
 3        Q.  If you don't know, then why are you
 4    criticizing Mr. Levy for -- for saying -- for saying
 5    so?
 6        A.  I'm criticizing Mr. Levy for the view that
 7    John Hancock served as an ERISA 3(21) and ERISA
 8    3(38) fiduciary.
 9        Q.  But you don't limit that.
10          You say -- you're criticizing him for
11    saying, "resolving any conflict of interest with
12    respect to plan assets," do you not?
13          MR. FLECKNER:  Objection.
14        A.  Okay.  Hang on a second.  Something
15    just -- there we go.
16          All right.  So if we read the first
17    paragraph, Mr. Levy's opinions are predicated on the
18    incorrect assumption that John Hancock has
19    discretionary authority and control with respect to
20    plan assets.
21          I'm stating, based on my opinion, that
22    John Hancock does not have discretionary control
23    over plan assets, neither as an ERISA 3(21) or a
24    3(38) fiduciary.
25
```

Page 131

```
 1      BY MR. WEINSHALL:
 2        Q.  I understand that, but you also state in
 3    that paragraph, do you not, sir, that you disagree
 4    with Mr. Levy's statement that John Hancock was
 5    required to resolve any conflict of interest with
 6    respect to the plan assets --
 7        A.  What --
 8          MR. FLECKNER:  Objection.  Misstates.
 9          THE COURT REPORTER:  I'm sorry.  You
10    interrupted.
11          THE WITNESS:  I did.  I'm sorry.
12      BY MR. WEINSHALL:
13        Q.  So do you state that or not, Mr. Gissiner?
14        A.  What I'm stating is that Mr. Levy's
15    opinion is as stated here, and his opinion, in my
16    view, is based on his mischaracterization of John
17    Hancock's roles and responsibilities with respect to
18    the plans.
19        Q.  So if -- if that part of your opinion is
20    wrong, right, that -- that John Hancock is, in fact,
21    a fiduciary, then you don't have an opinion one way
22    or the other as to whether it must resolve conflicts
23    of interest in favor of the plan?
24        A.  Well, yes, of course.  Consistent with
25    what we talked about before, if a Court determines
```

Page 132

```
 1    that John Hancock was an ERISA 3(21) fiduciary or an
 2    ERISA 3(38) fiduciary, then it would be fair to
 3    state that if there were conflicts of interest, then
 4    those would have to be resolved in a manner in favor
 5    of the plans.
 6        Q.  Okay.  And I thought you testified earlier
 7    that you're not offering a legal opinion as to
 8    whether the criteria of 3(21) and 3(38) have been
 9    satisfied by John Hancock; is that right?
10        A.  Not a legal opinion, no, but just based on
11    practical industry experience.
12        Q.  Okay.  So -- so your opinion is just based
13    on what you believe a service provider would
14    consider its role to be; is that fair?
15        A.  No.  So in the documents itself, in this
16    specific manner, John Hancock did define its
17    fiduciary role.  So the documents in this matter
18    indicated that they were a limited fiduciary.  I saw
19    no evidence in the record that John Hancock assumed
20    the expanded fiduciary 3(21) or 3(38) role.
21          So my opinion is based on the documents in
22    the matter, but again, also based on, you know, my
23    knowledge and experience in the industry.
24        Q.  Okay.  So just to break that down, your
25    opinion about whether or not John Hancock is a 3(21)
```

Page 133

```
 1    or 3(38) fiduciary is based on, one, what the
 2    documents themselves say, right?
 3          MR. FLECKNER:  Objection.
 4        A.  Well, in a sense, it's what the documents
 5    don't say.
 6      BY MR. WEINSHALL:
 7        Q.  Okay.  So -- so another way of stating it
 8    is that because the documents do not say that John
 9    Hancock will be a fiduciary under 3(21) or 3(38),
10    they are not such a fiduciary; is that right?
11          MR. FLECKNER:  Objection.
12        A.  As I indicated before, their specific
13    documents define their fiduciary responsibility.
14      BY MR. WEINSHALL:
15        Q.  And you don't believe that those
16    responsibilities meet the criteria of 3(21) or
17    3(38); is that right?
18          MR. FLECKNER:  Objection.
19        A.  That is correct.
20          THE WITNESS:  Sorry, Jamie.
21        A.  Correct.
22      BY MR. WEINSHALL:
23        Q.  Okay.
24        A.  And that opinion is further, I guess, for
25    lack of a better term, outlined in paragraph 6.
```

34  (Pages 130 to 133)



Page 134

1      Q.  Are the assets of a retirement plan that
2  are placed into a separate account considered plan
3  assets, in your experience?
4          MR. FLECKNER:  Objection.
5      A.  When you define "separate account," could
6  you be more specific?
7    BY MR. WEINSHALL:
8      Q.  Sure.  Well, you understand that the way
9  the group annuity contract was set up under the John
10 Hancock signature platform is that it set up
11 separate accounts where retirement assets were
12 placed; is that right?
13     A.  Yeah.  So within the context of a group
14 variable annuity, separate account assets are assets
15 of the insurance company.
16     Q.  Okay.  Do -- do you -- does the
17 insurance -- does the retirement industry consider
18 those assets that are in a separate account that we
19 just referenced plan assets?
20         MR. FLECKNER:  Objection.
21     A.  When you say "retirement industry," who do
22 you mean?
23    BY MR. WEINSHALL:
24     Q.  Well, you used the phrase "retirement
25 professionals" throughout this report, so that same

Page 135

1  community.
2      A.  Well -- well, I think auditors would note
3  in their audited financial statements who the
4  ownerships of the assets are and would highlight
5  that in their audited financial statements.  So
6  auditors would consider them to be assets of the
7  insurance company.  Plan sponsors, depending on
8  their individual plan sponsors, may or may not
9  consider them to be plan assets, you know, but the
10 reality is is that they're assets of the insurance
11 company.
12         So I can only say based on my professional
13 opinion how I would view it and -- and determine
14 how, you know, other professionals -- depending on
15 the individual professional, you would have to kind
16 of have them respond to that question.
17     Q.  It seems like you're not comfortable
18 giving an opinion on how retirement professionals
19 would understand that term; is that right?
20     A.  Again, if I talked to somebody from
21 Principal Financial Group and asked them about this
22 specific plan and who the ownerships of the assets
23 were, they would tell me.  If I talked to somebody
24 else that maybe is less familiar with insurance
25 products, they may consider them plan assets.

Page 136

1          So plan assets can be -- you almost have
2  to almost fully define plan assets as to who is the
3  specific owner, because plan assets, in my view, is
4  kind of a broad term that's used across the
5  industry.
6          So I would much prefer to use the term
7  "ownership of the assets" as opposed to the broader
8  term "plan assets," because the broader term "plan
9  assets" is just something that kind of is ubiquitous
10 across the industry and is not really something that
11 is quantified by definition.
12         You raised your eyebrows.  You didn't like
13 that answer.  But what I'm trying to say is if
14 somebody said to me, what were the plan assets of
15 the Romano plan, I would look up the 5500 and say
16 their plan assets are equal to $1 million.
17     Q.  Who did you say -- who did you say raised
18 their eyebrows?
19     A.  I -- I thought I saw you raise your
20 eyebrows, because I was kind of like going long with
21 my answer, so I wanted to try to step back and
22 quantify it a little bit by example.
23     Q.  So you're referring to me there?
24     A.  Yes.
25     Q.  So is it your testimony that there's no

Page 137

1  standard of understanding of plan assets within the
2  retirement professional industry?
3      A.  As I indicated before, it's a broad
4  industry term.
5      Q.  What is -- and what does it mean in the
6  broad industry term?
7          MR. FLECKNER:  Objection.
8      A.  The balance, if you will, of a specific
9  retirement plan.
10    BY MR. WEINSHALL:
11     Q.  Okay.  And for a retirement plan that is
12 funded through group annuity contracts, that balance
13 would equal the amount that's in the separate
14 accounts, correct?
15     A.  The attributable portion of the separate
16 account.  Not the entire separate account, but
17 whatever units are owned by the individual plan as
18 part of the separate account.
19     Q.  Okay.  And in your role as an adviser to
20 fiduciaries, would you advise them to treat those
21 assets in separate accounts as though they are the
22 assets of the plan?
23         MR. FLECKNER:  Objection.
24     A.  Again, it depends on for what purpose.  So
25 for example, if you're talking about, you know,

35 (Pages 134 to 137)



Page 138

```
1    completing a Form 5500, you would use those separate
2    account assets to define what has to be reported on
3    Schedule H of the Form 5500.
4       Q.   And does the term "plan assets" show up on
5    the Form 5500?
6       A.   There's a dollar amount indicated on Form
7    5500 with different terms, "beginning asset
8    balance," "ending asset balance." I don't know if
9    the specific term is "plan assets" or not.  I
10   believe it's just "assets."
11      Q.   Well, within the context of that form,
12   that means assets of the plan, right?
13           MR. FLECKNER:  Objection.
14      A.   Well, again, assets of the plan, assets of
15   the separate account, or assets of the trust, you
16   know, because again, when you -- in a different
17   vernacular, when we talk about trust products, they
18   are also not plan assets, they're assets of the
19   trust.
20   BY MR. WEINSHALL:
21      Q.   All right.  So you're saying that -- that
22   to gain an understanding of -- of how different
23   professionals understand the term, you'd want to
24   talk to those different professionals and ask them
25
```

Page 139

```
1    that question?
2       A.   Well, again, as I indicated before, plan
3    assets has a broad industry definition, again, used
4    in multiple contexts.
5       Q.   But it's fair to say that some in the
6    industry would -- would understand the assets of a
7    separate account tied to a group annuity contract to
8    reflect the plan assets, right?
9       A.   Within the context of the broad definition
10   of plan assets, yes.  Yeah.
11      Q.   You talked about discretion in your
12   paragraphs within Section 3.
13           What does it mean to have discretion over
14   a plan's assets?
15      A.   The ability to select funds, for example.
16   So an ERISA 3(38) fiduciary has the discretion to
17   select the specific investment options for a plan.
18      Q.   So that's an example of -- of having
19   discretion, but does that essentially mean that
20   discretion means the ability to make a decision
21   without getting input from the plan?
22           MR. FLECKNER:  Objection.
23      A.   I think you'd have to help me out with a
24   more specific example.
25
```

Page 140

```
1    BY MR. WEINSHALL:
2       Q.   Well, the example you just gave of
3    selecting a fund for the plan, right?
4       A.   Right.
5       Q.   So discretionary authority only exists if
6    the entity making that selection can do so without
7    getting approval of the plan to make that selection,
8    right?  Otherwise, the plan is the one making the
9    selection.
10      A.   Yeah.  So in this example, if -- if
11   somebody -- if an entity is designated as an ERISA
12   3(38) fiduciary and they acknowledge that
13   appointment in writing and the plan sponsor has
14   granted the authority to that entity to manage the
15   assets of the plan at their discretion, then yes,
16   they do not have to get the approval of the plan
17   sponsor to make those investment decisions.
18      Q.   Okay.  So it's -- then discretion in this
19   sense means sort of making a decision without
20   consulting or getting the input of -- of the plan;
21   is that fair?
22           MR. FLECKNER:  Objection.
23      A.   Within the context as I just described an
24   ERISA 3(38) fiduciary, correct.
25
```

Page 141

```
1    BY MR. WEINSHALL:
2       Q.   Okay.  Did you see any evidence in the
3    record that Hancock consulted with plans, either the
4    Romano plan or the plans that make up the class,
5    regarding how to treat the benefits it received from
6    foreign tax credits?
7           MR. FLECKNER:  Objection.
8       A.   No.
9    BY MR. WEINSHALL:
10      Q.   If you assume for the sake of this
11   question that the benefit of foreign tax credits are
12   plan assets, okay?
13      A.   Okay.
14      Q.   That assumption?
15      A.   I don't agree, but I'll assume.
16      Q.   Okay.  Then you would agree that John
17   Hancock has discretion over that particular asset,
18   right?
19           MR. FLECKNER:  Objection.
20      A.   And then when you say "discretion," you
21   mean what exactly?  The discretion to do what with
22   it?
23   BY MR. WEINSHALL:
24      Q.   The discretion to do what it wishes to do
25   with it.
```




Page 142

```
 1        A.  Well, under the assumption that if a
 2   foreign tax credit is deemed to be a plan asset and
 3   John Hancock is appointed as an ERISA 3(38)
 4   fiduciary, then yes, they would be -- have been
 5   granted the authority, if you will, or the
 6   discretion, if you will, with respect to that
 7   foreign tax credit.
 8        Q.  Okay.  But that's a little bit of a
 9   different hypothetical than the one I'm asking.
10        A.  Okay.
11        Q.  So leaving aside the appointment as a
12   3(38), would you agree that an entity -- you've
13   given an example before of an entity that -- that
14   takes the authority to make a fund selection even
15   though it's not granted that authority in the plan,
16   right?  Do you recall that earlier?
17        A.  Yeah.  So for example, if somebody in
18   practice does it without the authority to do so?
19        Q.  Yes.
20        A.  Yes, then -- then they could, in theory,
21   be by design, assuming an ERISA -- an additional --
22   ERISA additional responsibility that they did not
23   confirm to with respect to that plan sponsor.
24        Q.  Okay.  And that's because if -- in your
25   understanding, if someone or an entity exercises
```

Page 143

```
 1   discretion over plan assets, regardless of whether
 2   the plan authorizes it, then that person assumes
 3   fiduciary responsibilities, right?
 4        A.  Yeah, I believe in -- in fiduciary --
 5   fiduciary responsibilities can be assigned, but they
 6   can also be a product of the function of the
 7   individual.
 8        Q.  Okay.  So going back to the hypothetical,
 9   if we assume that foreign tax credits, the benefits
10   received from foreign tax credits are an asset of
11   the plan -- I understand you disagree with the
12   assumption, but if we assume that that is true, then
13   is it fair to say that John Hancock, in keeping
14   those foreign tax credits for itself without
15   consulting with the plan, exercised discretion over
16   those foreign tax credits?
17        MR. FLECKNER:  Objection.
18        A.  Yeah, based on your hypothetical answer
19   or -- excuse me, based on your hypothetical
20   situation, if those foreign tax credits were deemed
21   to be assets of the plan and John Hancock did
22   something, administered or retained those foreign
23   tax credits on their own, then they're assuming some
24   additional fiduciary responsibility.  But again,
25   it's, as you indicated, a hypothetical.
```

Page 144

```
 1   BY MR. WEINSHALL:
 2        Q.  Okay.  Paragraph 9 of your report,
 3   rebuttal report, you state, "Plaintiffs' experts
 4   ignore that John Hancock's roles and
 5   responsibilities as they pertain to the management
 6   and control of assets held in separate accounts are
 7   documented in the 2014 recordkeeping agreement;" is
 8   that right?
 9        A.  That's what it states.
10        Q.  Okay.  You're aware, however, that
11   Mr. Levy actually quoted language from the 2014
12   recordkeeping agreement, correct?
13        A.  I'd have to go back and review his report.
14        Q.  Okay.  You have it in front of you, right?
15        A.  I do.
16        And we're talking about his affirmative
17   report or his rebuttal report?
18        Q.  His affirmative report.  I can mark it as
19   an exhibit.
20        A.  That would be great.  Thank you.
21        Yeah, I think it's -- I think I have it.
22   He does quote from paragraph 21.
23        Q.  Okay.  So paragraph 21 of Mr. Levy's
24   report, which you're looking at, he quotes from the
25   recordkeeping agreement; is that right?
```

Page 145

```
 1        A.  That's correct.
 2        Q.  Okay.  So I think it would be more
 3   accurate in paragraph 9 to say that your opinion is
 4   that Mr. Levy misunderstands the roles and
 5   responsibilities, not that he ignores the statement
 6   of responsibilities in the recordkeeping agreement,
 7   right?
 8        MR. FLECKNER:  Objection.
 9        A.  I'm just reviewing the report, so bear
10   with me.
11        So in Mr. Levy's report, he does quote in
12   paragraph 21 the limited fiduciary status, and then
13   he goes on in paragraph 22 to state that, "The
14   recordkeeping agreement does not explain what limit
15   is placed on John Hancock's fiduciary
16   responsibilities as a result of its self-styled
17   limited fiduciary status with respect to holding
18   plan assets.  And in the absence of that
19   explanation, it's reasonable to conclude that --
20   determine that no way limits the fiduciary
21   responsibilities of John Hancock that arise from its
22   holding plan assets."
23        So I think he's taking the view that in
24   the absence of the specific definition, there were
25   no limits to their fiduciary responsibilities.
```

37  (Pages 142 to 145)

MAGNA ▶
LEGAL SERVICES

Page 146

1    BY MR. WEINSHALL:
2        Q.  And you -- you disagree with that
3    interpretation, correct?
4        A.  Correct.
5        Q.  Okay.  But it's not correct to say that he
6    ignores the statements in the 2014 recordkeeping
7    agreement, right?  He actually quotes that.
8        MR. FLECKNER:  Objection.  Misstates.
9        A.  Well, I think to be fair, in paragraph 9,
10   I'm saying plaintiffs' experts, so I could also be
11   referencing Mr. Pingree in that example.
12   BY MR. WEINSHALL:
13       Q.  Well, that would be plaintiffs' expert,
14   not experts, correct?
15       A.  Yes.  In paragraph 9, it says plaintiffs'
16   experts, which would include Mr. Levy and
17   Mr. Pingree.
18       Q.  Okay.  So then a more accurate statement
19   would be that Mr. Levy does not ignore it but that
20   he -- you just disagree with his interpretation,
21   correct?
22       MR. FLECKNER:  Objection.  Misstates.
23       A.  Yeah, I don't -- where am I -- I'm not
24   specifically referencing Mr. Levy in that paragraph.
25

Page 147

1    BY MR. WEINSHALL:
2        Q.  In the section before that, Mr. Gissiner,
3    the end of paragraph 7, which you're referring to
4    this section here, you quote both the Levy report
5    and the Pingree report, do you not?
6        A.  Yes, I do.
7        Q.  Okay.  So you are talking about both
8    Mr. Pingree and Mr. Levy in this section of your
9    report, correct?
10       A.  Yeah, that's correct.  I think earlier we
11   were talking, I think you were referring
12   specifically to Mr. Levy and then referencing his
13   report.
14       Q.  I am.
15       A.  Okay.
16       Q.  That's -- your paragraph 9 does not
17   distinguish between Mr. Levy or Mr. Pingree but
18   refers to both, correct?
19       A.  That's -- that's plaintiffs' experts,
20   correct, that refers to both.
21       Q.  Okay.  And so I'm asking you about the
22   accuracy of this statement that plaintiffs' experts
23   ignore that John Hancock's roles and
24   responsibilities are documented in the 2014
25   recordkeeping agreement.

Page 148

1        Mr. Pingree does not ignore that because
2    he actually -- he quotes it, right?
3        MR. FLECKNER:  Objection.  Misstates.
4        Objection.  Misstates.
5        A.  I -- I think what I'm stating here is that
6    our documented plaintiffs' expert -- John Hancock's
7    roles and responsibilities are documented in the
8    recordkeeping agreement.
9        So it is fair that Mr. Levy does reference
10   that, but then he goes on to state that because that
11   limited fiduciary assets -- or limited fiduciary
12   definition is not defined, that there are no limits
13   to their fiduciary responsibilities.
14   BY MR. WEINSHALL:
15       Q.  And I understand you disagree with that
16   conclusion, but that's not what I'm asking you
17   about.  I'm asking about this one statement in your
18   report.
19       It's not correct to say that Mr. Levy
20   ignores the statement of roles and responsibilities
21   in the recordkeeping agreement, correct?
22       MR. FLECKNER:  Objection.
23       A.  I think if you're asking me to change the
24   language in the report, I'm comfortable with the
25   language in the report.

Page 149

1    BY MR. WEINSHALL:
2        Q.  You're comfortable saying he ignores it
3    even though he quotes it?
4        MR. FLECKNER:  Objection.  Misstates.
5        A.  What I'm stating is is that John Hancock
6    request's roles and responsibilities as they pertain
7    are documented in the 2014 agreement.
8    BY MR. WEINSHALL:
9        Q.  You didn't state that; you said that
10   plaintiffs' experts ignore that statement.
11       Is that what you said?
12       MR. FLECKNER:  Objection.
13       A.  I think what I'm stating is that John
14   Hancock's roles and responsibilities are defined in
15   the recordkeeping agreement.  I think Mr. Levy is
16   saying that their responsibilities extend beyond
17   what's in that recordkeeping agreement, and what I'm
18   stating is that these responsibilities are
19   defined in that agreement, not unlimited, as
20   Mr. Levy asserts.
21   BY MR. WEINSHALL:
22       Q.  If you'll skip ahead, Mr. Gissiner, to
23   paragraph 14 in this section.  You state,
24   "Retirement industry professionals do not expect an
25   insurance company like John Hancock will operate in



Page 150

1    a fiduciary capacity by holding plan investments
2    that are subject to direction by plan participants
3    or trustees like the proposed class members."
4         Is that your conclusion at the end of that
5    paragraph?
6         A.  Excuse me, the end of paragraph 14?
7         Q.  Yes.
8         A.  Yes, that's what it states.
9         Q.  Okay.  Did you conduct a survey of
10   retirement industry professionals to determine what
11   their expectations are?
12        A.  No, that's just -- I did not conduct a
13   specific survey, no.
14        Q.  Did you speak with any other retirement
15   industry professionals to determine what their
16   expectations are regarding your statements in this
17   last part of the paragraph?
18        A.  Yeah.  Over the course of my career, I
19   certainly have spoken with a number of different
20   individuals regarding, you know, the fiduciary
21   responsibilities of various recordkeepers.
22        Q.  Okay.  Which -- which professionals have
23   you spoken to that informed you that they did not
24   expect an insurance company like John Hancock to
25   operate in a fiduciary capacity by holding plan

Page 151

1    investments that are subject to direction by plan
2    participants or trustees?
3         A.  Well, in terms of just different RFPs,
4    I've interacted with numerous individuals who, as
5    part of an RFP response, will confirm that they do
6    not operate in a fiduciary capacity.  Certainly,
7    individuals with Fidelity that I've interacted with.
8    Again, it's just simply based on my experience that
9    insurance company providers and recordkeepers do not
10   assume 3(38) responsibility for the investments in
11   their plans as recordkeepers.
12        Q.  Okay.  You mentioned Fidelity as the only
13   specific entity that you spoke with in your
14   experience.
15        Fidelity does not offer group annuity
16   contracts, does it?
17        A.  No, they don't.
18        Q.  Okay.  Have you spoken with any group
19   annuity contract providers that provide a basis for
20   this last opinion?
21        A.  Yeah.  Over the course of my career, I've
22   solicited and received RFPs from Principal, VALIC,
23   Lincoln Financial Group, Great-West, those are the
24   four off the top of my head.  VALIC interacted with
25   sales professionals at those various companies.

Page 152

1         Q.  Okay.  So the statements in response to
2    the RFPs that the service provider was not assuming
3    certain fiduciary responsibilities is what the basis
4    is of your opinion here?
5         A.  Yeah.  So typically as part of our RFPs,
6    you'll receive copies of draft recordkeeping
7    agreements, and as part of those agreements, you do
8    see what their level of fiduciary responsibilities
9    are.
10        Q.  Okay.  Now, in terms of -- so when you're
11   referring to retirement industry professionals here,
12   you're referring to those who work for service
13   providers; is that right?
14        A.  Yes, and, you know, probably I would have
15   to go back and look, but I think also, you know,
16   individuals over the course of time that have
17   written articles and -- on this subject.
18        Q.  Okay.  But that doesn't include plan
19   sponsors or plan fiduciaries, right?
20        A.  As to their understanding of how assets
21   work?
22        Q.  Yep.
23        A.  No.  I disagree with that, because I have
24   interacted with plan sponsors that have had group
25   annuity arrangements, and we've discussed, you know,

Page 153

1    the structure of those arrangements, how they
2    operate, if they wanted to transition out of that
3    arrangement, what would need to be done and things
4    of that nature.
5         Q.  Okay.  But are you saying that those
6    conversations led you to conclude that plan sponsors
7    and plan fiduciaries do not expect an insurance
8    company to operate in a fiduciary capacity by
9    holding plan assets?
10        A.  That would be yeah, sure.
11        Q.  Okay.  Which -- which plan sponsors or
12   plan fiduciaries told you that that was their
13   expectation?
14        A.  You want -- you want specific plan sponsor
15   names?  I would have to go back and look and provide
16   them for you.  I mean, over the course of my career
17   you're talking about, you know, consulting on, you
18   know, hundreds of different plans.
19        Q.  And you're saying that those hundreds of
20   different plans you had conversations with the plan
21   sponsors and plan fiduciaries who told you they did
22   not expect that the service provider holding plan
23   investments would be serving in a fiduciary
24   capacity.
25        A.  Fiduciary -- yes.

39  (Pages 150 to 153)



Page 154

```
1       Q.  Okay.  Can you think of one example where
2   someone told you that?
3       A.  Yeah.  So for example, I consulted with a
4   hospital in Florida that, at one point in time, had
5   their retirement plans administered by VALIC under a
6   group annuity arrangement.  They transitioned that
7   from group annuity arrangement to Fidelity.  So they
8   went from a group annuity to a trustee product.
9   They understood as part of that transition that the
10  investment funds that they had on the VALIC platform
11  were limited to the funds that were available under
12  that product.  I believe it was called VALIC
13  portfolio director.  They understood that when they
14  went to the trustee platform, that they would need
15  to designate an ERISA 3(21) fiduciary to provide
16  oversight with respect to the investments, and they
17  understood that VALIC had no fiduciary
18  responsibility as an ERISA 3(21) fiduciary with
19  respect to those assets.
20          So in that specific example, they were
21  aware that when they moved to the new platform, that
22  they had to appoint an ERISA 3(21) fiduciary if they
23  wanted to provide oversight with respect to the plan
24  and knew as part of that process that VALIC did not
25  do that for them.
```

Page 155

```
1       Q.  Okay.  But prior to you informing them of
2   this, they did not understand that; is that correct?
3       A.  I can't say for certain.  I think they did
4   know that they were in, you know, typically when
5   providers are in group annuity products, they know
6   that there's a certain number of investment options
7   available to them.  I would have to go back and look
8   at the agreements, but typically those contracts
9   fully describe the level of fiduciary responsibility
10  that the insurance company will take consistent with
11  what John Hancock did here.
12      Q.  Okay.  But John Hancock's statement here
13  did say it was a limited fiduciary when holding plan
14  assets; is that correct?
15      A.  Yeah, they define their limited fiduciary
16  role.
17      Q.  Okay.  And is it your experience that
18  other service providers also identify themselves as
19  limited fiduciaries?
20      A.  Yes, whether it's an insurance product or
21  a trust product.
22      Q.  Okay.  So then it would be fair for
23  retirement industry professionals to expect that
24  insurance companies serve as at least, quote,
25  limited fiduciaries as defined in their agreements,
```

Page 156

```
1   right?
2       A.  Insurance companies, and I think also, as
3   I indicated before, trustee plan arrangements.
4       Q.  Okay.  So that would be a yes to my
5   question; is that right?
6       A.  Yes.
7           MR. FLECKNER:  Matt, if we're moving to a
8   new subject, it's been about two hours, I
9   wonder if we could have a break.
10          MR. WEINSHALL:  Yes.
11          Let's go off the record.
12          THE VIDEOGRAPHER:  It is 2:51 p.m.  We're
13  going off the record.
14          (Recess taken.)
15          THE VIDEOGRAPHER:  The time is 3:09 p.m.,
16  and we're back on the record.
17      BY MR. WEINSHALL:
18      Q.  Mr. Gissiner, let's turn to the next
19  section of your rebuttal report starting with
20  paragraph -- sorry, Section 4 which concerns whether
21  foreign tax credits are considered compensation or
22  revenues received by the recordkeeper.
23          Do you see that?
24          (Reporter clarification.)
25      A.  You're referring specifically to paragraph
```

Page 157

```
1   15?
2   BY MR. WEINSHALL:
3       Q.  That's where it starts.
4       A.  Okay, thank you.
5       Q.  So first let me ask you, Mr. Gissiner, are
6   you offering an opinion in this case as to whether
7   the benefits of foreign tax credits that John
8   Hancock received constitute or meet the criteria for
9   compensation under Regulation 408(b)(2)?
10      A.  Yeah.  So my opinion is framed more
11  specifically in paragraph 16 towards the bottom.
12  "Revenues are related to services provided on behalf
13  of the plan and as noted here are unrelated to
14  foreign tax credits."
15      Q.  Okay.  You reference revenue.  I'm
16  using -- I'm asking you about a different term.  The
17  word "compensation," you understand that that is
18  defined in Regulation 408(b)(2)?
19      A.  Yes, two terms, compensation direct and
20  indirect.
21      Q.  And do you know -- do you recall what the
22  meaning of the word "compensation" is under this
23  regulation?
24      A.  Well, there's two definitions.  There's a
25  direct compensation definition and an indirect
```



Page 158

1    compensation definition. We can certainly pull up
2    the regulations and they define them.
3        Q. Okay. But you don't recall off the top of
4    your head what the word "compensation" is defined to
5    mean in the regulation?
6        A. So specific to direct compensation, it
7    represents services paid by the plan -- or excuse
8    me, fees paid by the plan directly to the retirement
9    plan service provider. So an example of direct
10   compensation would be a recordkeeping fee debited
11   against the accounts of plan participants.
12          Indirect compensation refers to the
13   exchange of compensation by an intermediary. So
14   revenue-sharing such as 12b-1 fees is an example of
15   indirect compensation, because it's not paid by the
16   plan directly. It's paid by the fund company to the
17   service provider.
18       Q. Now let me -- I don't think you're
19   answering the question. You're -- you're giving me
20   examples of what indirect and direct compensation
21   are. I'm asking you, do you know whether or not the
22   regulation defines simply the word "compensation."
23       A. Again, as I understand the regulations,
24   the word "compensation" is defined as direct and
25   indirect. We would have to pull up the regulations

Page 159

1    to see if the term is defined more broadly.
2        Q. Okay. We'll do that. Well, let me ask
3    you before I pull that up. Are you -- your opinion
4    here as to whether foreign tax credits are
5    compensation, are you offering an opinion as to
6    whether the benefits of foreign tax credits meet the
7    criteria of that regulation, or are you offering an
8    opinion as to the way you believe industry
9    professionals understand the term?
10       A. Based on my understanding of the
11   regulations, based on my understanding of how it's
12   treated across the industry, I do not consider
13   foreign tax credits to be compensation.
14       Q. Okay. That again did not answer my
15   question. Are you offering an opinion as to whether
16   the benefits of foreign tax credits constitute
17   compensation under the regulation?
18       A. It's my opinion that the regulations do
19   not include any references to foreign tax credits as
20   compensation in return for services provided on
21   behalf of the plan.
22          So again, as noted in my report, based on
23   my knowledge of industry custom how these amounts
24   are defined, revenues as reported on 408(b)(2)
25   disclosures are unrelated to foreign tax credits.

Page 160

1        Q. Mr. Gissiner, you answered that question
2    by saying whether or not foreign tax credits are
3    referenced. That's not what I asked. My question
4    is, you understand there's a regulation regarding
5    the disclosure of compensation, right?
6        A. Correct.
7        Q. Okay. And that regulation is Rule
8    408(b)(2), right?
9        A. Correct.
10       Q. Okay. And you understand that that
11   regulation may contain a definition of compensation,
12   correct?
13       A. Definition of direct and indirect,
14   correct.
15       Q. Okay. And are you offering an opinion
16   whether the benefits of foreign tax credits meet
17   that specific definition?
18       A. The direct compensation direction --
19   definition or the indirect compensation definition?
20       Q. Either one.
21       A. Well, why don't we bring it up and take a
22   look at what the disclosure notices state.
23       Q. But you don't know without looking at the
24   regulation whether you're offering an opinion that
25   foreign tax credits meet it?

Page 161

1        A. There's nothing in the regulations that
2    refer to foreign tax credits as being indirect or
3    direct compensation.
4        Q. That's not my question. My question is,
5    you don't know without looking at the regulation
6    whether or not you are offering an opinion as to
7    whether foreign tax credits meet the definition of
8    compensation.
9        A. Again, we would have to pull up the
10   definition of compensation, because again, I'm
11   thinking in terms of direct and indirect and maybe
12   it would be helpful to see how compensation is
13   defined in the regulations and then how that's
14   further defined as direct and indirect compensation.
15       Q. Okay. But without looking at the statute,
16   can you tell me whether you're offering an opinion
17   on it or not?
18       A. I'm offering the opinion that foreign tax
19   credits are not something that -- are not referenced
20   in the 408(b)(2) regulations. Therefore, for
21   purposes of 408(b)(2), either with respect to direct
22   and indirect compensation, they're not something
23   that are reported on a 408(b)(2).
24       Q. Okay. Just to break down what you said
25   there, first you're offering an opinion that foreign

MAGNA ►
LEGAL SERVICES

Page 162

1    tax credits are not something that are referenced in
2    the 408(b)(2), and you just used the word foreign
3    tax credits, that phrase does not appear in that
4    regulation; is that right?
5         A.   The word foreign tax credit does not
6    appear in the 408(b)(2) regulations.
7         Q.   Okay.  And that's something that anybody
8    can understand by just reading the regulation,
9    right?
10        A.   By -- yeah, sure, of course.
11        Q.   Okay.  All right.  Then the next step
12   you're saying, for purposes of 408(b)(2), they are
13   not something, meaning foreign tax credits are not
14   something that are reported on a 408(b)(2)
15   disclosure; is that right?
16        A.   That is correct.  That is not something
17   that I've seen reported as an industry practice.
18        Q.   Okay.  So other than saying that the words
19   foreign tax credits do not appear in the regulation,
20   and that as a general practice you have not seen
21   foreign tax credits reported on a Rule 408(b)(2)
22   disclosure, are you offering any other opinions as
23   to whether the benefits of foreign tax credits
24   constitute compensation under the regulation?
25        A.   I do not believe that they constitute

Page 163

1    either direct or indirect compensation under the
2    regulations.
3         Q.   Okay.  You don't, and that is because the
4    words foreign tax credits do not appear in the
5    regulation, and you've never seen them referenced as
6    such in other 408(b)2 disclosures; is that correct?
7         A.   Right, and then also consistent with what
8    the regulations describe as direct and indirect
9    compensation.  So the regulations do include various
10   examples of what is direct and indirect
11   compensation.
12        Q.   Okay.
13        A.   That's not referenced in those examples.
14        Q.   Okay.  So that just comes from your
15   reading and understanding of the language of the
16   regulation.
17        A.   It's in the regulations.
18        Q.   You've read those regulations and applied
19   them to the facts to conclude that foreign tax
20   credits do not fall within those examples, correct?
21        MR. FLECKNER:  Objection.
22        A.   That is correct.
23   BY MR. WEINSHALL:
24        Q.   This is Exhibit 155, which is Rule
25   408(b)(2).

Page 164

1         (Thereupon, marked as Exhibit 155.)
2         MR. FLECKNER:  Is there a particular part
3    you would like us to look at, Matt?
4         MR. WEINSHALL:  Yep.
5    BY MR. WEINSHALL:
6         Q.   First let me ask you, Mr. Gissiner, is
7    this the regulation you're talking about?
8         A.   Well, I'm looking at the document, it
9    says, "General statutory exemption for services or
10   office space."  So why is the document only
11   referring to the statutory exemption for services or
12   office space?
13        So if you look at definitions 1, 2, and 3
14   of the document, they're referencing specifically
15   office space.
16        Q.   Mr. Gissiner, you just testified earlier
17   that you relied on a regulation.  You don't know
18   whether this is the regulation or not?
19        A.   I don't believe that it is, just simply
20   because there's that initial reference to statutory
21   exemption for services or office space.
22        Q.   Okay.
23        A.   Effective November 14, 2012.  I believe
24   the DOL 408(b)(2) regulations came out before this
25   date.

Page 165

1         Q.   Okay.  Do you see the number of the
2    regulation?  What is it?
3         A.   255 408(b)(2) paragraph 2.
4         MR. FLECKNER:  Mr. Weinshall, is there a
5    specific provision, because he's just looked at
6    408(b)(2) paragraph A which he said he's not
7    relying on.  Are you asking him if he's relying
8    on other portions of this regulation?
9         MR. WEINSHALL:  Mr. Fleckner, you don't
10   have to interpose an answer for your client.  I
11   will ask the questions.
12   BY MR. WEINSHALL:
13        Q.   But I believe you just testified regarding
14   the title of this regulation, correct, Mr. Gissiner?
15        A.   Yes, yes, that is correct.
16        So I'm wondering if this is a component --
17        Q.   I'm sorry?
18        A.   I'm wondering if this is a component of
19   the overall regulations.  But anyway, we can
20   continue if you would like.
21        Q.   Okay.  Let's look at page 4.
22        Actually, before I do that, let's look up
23   at page 2 of the PDF.  Are you there?
24        A.   I am, yes.
25        Q.   Okay.  Do you see on the top of it it




Page 166

1  says, "Reasonable contract or arrangement" in
2  Subsection C, and in Subsection 1 says, "pension
3  plan disclosure." And then romanette i says
4  "General. No contract or arrangement for services
5  between a covered plan and a covered service
6  provider, nor any extension or renewal, is
7  reasonable within the meaning of Section 408(b)(2)
8  of the act and paragraph A2 of this section, unless
9  the requirements of this paragraph C1 are satisfied.
10 The requirements of this paragraph C1 are
11 independent of fiduciary obligations under Section
12 404 of the act."
13      Do you see that, Mr. Gissiner?
14  A.  That's what it states.
15  Q.  Okay.  Now, do you recognize this now as
16 Rule 408(b)(2) that requires the disclosure of
17 compensation?
18  A.  Again, I'm having trouble with the first
19 page, because the first page is referencing general
20 statutory exemption for services or office space.
21 So I'm wondering if maybe we can pull up a document
22 that doesn't have that specific reference, because
23 what I'm struggling with is whether this is a
24 specific carve-out for services or office space.
25  Q.  You see the word "or" there, right?

Page 167

1  A.  Yeah, I do.  I do.
2  Q.  Okay.
3  A.  Thank you.
4      Okay, so let's continue.
5  Q.  Okay.  Now, let's scroll down.  Later on
6  you'll see, we'll get to a definition of
7  compensation, paragraph 7.
8      I'm sorry, not paragraph 7.  Page 7 of the
9  PDF.
10  A.  Page 7?
11  Q.  Yes.
12  A.  Okay.
13  Q.  Okay.  Do you see romanette vii Section B
14 compensation?  Do you see that on the page?
15  A.  Yes.
16  Q.  Okay.  Do you see where it says,
17 "Compensation is anything of monetary value."
18      Do you see that?
19  A.  Yes.
20  Q.  Okay.  Have you seen that before?
21  A.  Yes, I've seen that before.
22  Q.  Okay.  So now you understand the word
23 "compensation" in the regulation means anything of
24 monetary value, correct?
25  A.  In this specific definition, yes.

Page 168

1  Q.  In this regulation.
2  A.  In this -- in this paragraph.
3  Q.  And then that paragraph it says, the
4 beginning of that says, "for the purposes of C1,"
5 which is what we just read before, right?
6  A.  Yes.  So there's a definition of
7 compensation and then further definitions below in
8 paragraphs, 1, 2, and 3.
9  Q.  Okay.  You seem -- you seem somewhat
10 unfamiliar with this regulation; is that fair?
11  A.  No, no, I'm not.
12  Q.  You're not, okay, but you don't recognize
13 different parts of it, correct?
14  A.  I'm sorry?
15  Q.  You don't recognize the entirety of this
16 regulation, correct?
17  A.  No, I'm -- I'm attempting to review
18 through it.  I'm familiar with the regulation.
19 Again, as I indicated before, I was thrown a little
20 bit at the beginning with the reference to office
21 space, but now I'm -- now I'm back on point.
22  Q.  Okay.  So when you were first shown the
23 regulation, you were not confident that it was
24 Regulation 408(b)(2), correct?
25  A.  Only because I have not seen it in this

Page 169

1  particular form because it's from Westlaw.  I've
2 seen the regulations as posted on the DOL site.  So
3 it could have just been difference in the
4 formatting.  And then as I indicated before, just
5 what we talked about earlier, about services and
6 office space.
7  Q.  Okay.  So you understand that compensation
8 is defined in this regulation to mean anything of
9 monetary value, correct?
10  A.  Well, in that particular paragraph, yes,
11 and then further defined below.
12  Q.  Okay.  Is it your testimony then that the
13 benefits that John Hancock received from foreign tax
14 credits are -- do not have monetary value?
15  A.  The tax benefits would have monetary
16 value.  I would not consider those tax benefits to
17 be compensation for purposes of the plan.
18  Q.  Okay.  And so you are interpreting this
19 provision to mean it does not cover foreign tax
20 credits; is that right?
21      MR. FLECKNER:  Objection.
22  A.  I would venture to say that if we searched
23 for the term "foreign tax credits" in this document,
24 it would not appear.
25

43 (Pages 166 to 169)



Page 170

```
 1        BY MR. WEINSHALL:
 2        Q.  Okay.  So you are making the conclusion
 3   that because foreign tax credits are not listed in
 4   this document, that the benefits of foreign tax
 5   credits do not fall within the definition of
 6   compensation; is that right?
 7        MR. FLECKNER:  Objection.
 8        A.  Well, again, we're going to have to go
 9   through the document in detail, because there are
10   definitions of compensation as monetary value, but
11   then there are further clarifications here as to...
12        BY MR. WEINSHALL:
13        Q.  Well, Mr. Gissiner, you're the one who
14   offered an opinion in your report in paragraph 16.
15   Are you saying you did not go through the regulation
16   to offer that opinion?
17        MR. FLECKNER:  Objection.
18        A.  No, I did go through it.
19        BY MR. WEINSHALL:
20        Q.  Well, then other than the fact that
21   foreign tax credits are not identified specifically,
22   what other basis do you have to opine that foreign
23   tax credits -- the benefits of foreign tax credits
24   do not constitute compensation?
25        MR. FLECKNER:  Objection.
```

Page 171

```
 1        A.  Well, again, if we go to paragraph --
 2   page 2, so there's a definition of covered service
 3   provider.  And then further the definition of
 4   compensation, service -- services as a fiduciary or
 5   registered investment adviser.  Services provided
 6   directly to the plan as a fiduciary.  Services
 7   provided as a fiduciary to an investment contract.
 8   Services provided directly to the covered plan as an
 9   investment adviser.  Certain recordkeeping or other
10   brokerage services and other services for indirect
11   compensation.
12        So foreign tax credit may have a monetary
13   value, but in my opinion are not something that is
14   reported because of, you know, again, what you see
15   here in paragraph -- subparagraph B and C.
16        BY MR. WEINSHALL:
17        Q.  So you believe B and C exclude foreign tax
18   credits from compensation?
19        A.  Well, foreign tax credits are not
20   compensation provided to a recordkeeper in return
21   for services provided on behalf of the plan.
22        Q.  But that is -- this definition here in
23   romanette iii defines what a covered service
24   provider is.  It doesn't define what compensation
25   is, correct?
```

Page 172

```
 1        A.  Right, but a covered service provider has
 2   to disclose compensation.
 3        Q.  Right.  And do you disagree that John
 4   Hancock fits within the definition of a
 5   recordkeeping service in Subsection B of that
 6   provision?
 7        A.  John Hancock is providing recordkeeping
 8   services, correct.
 9        Q.  Okay.  So it's a covered service provider,
10   correct?
11        A.  That is correct.
12        Q.  Okay.  So it's a covered service provider,
13   so it must disclose compensation, and the question
14   is whether compensation includes the benefit of
15   foreign tax credits.  And my question to you is,
16   other than foreign tax credits not appearing
17   specifically in this rule, do you have any other
18   basis to opine that foreign tax credits are not
19   compensation under this rule?
20        MR. FLECKNER:  Objection.
21        A.  Just bear with me for a second.
22        All right.  So if you go to the top of
23   paragraph 4 or page 4, I would not consider foreign
24   tax credits to fall under the definition of indirect
25   compensation, because they are not provided in
```

Page 173

```
 1   connection with services provided on behalf of the
 2   plan.
 3        BY MR. WEINSHALL:
 4        Q.  Okay.  So you agree -- let's just break
 5   that down.  You believe that foreign tax credits --
 6   the benefits of foreign tax credits do have monetary
 7   value, right?
 8        A.  I think they can have monetary value.  I
 9   think it would depend on the specific tax situation.
10        Q.  Right.  Okay.  So if they -- if John
11   Hancock received those foreign tax credits in
12   connection with the services, the recordkeeping
13   services it provides, then it would meet the
14   definition of compensation that must be disclosed,
15   right?
16        A.  "If" you're saying.  If John Hancock
17   received foreign tax credits related to the services
18   provided on behalf of the plan?
19        Q.  Yes.
20        A.  Okay.  So if I go back to paragraph 2, how
21   would the description of that arrangement between
22   the payer and the covered service provider be
23   defined?  So in other words, who would be the payer
24   of foreign tax credits?
25        Q.  Well, indirect compensation doesn't
```



Page 174

1  identify a payer, does it?
2      A.  Well, it says here in this section,
3  "Identification of the services for which the
4  indirect compensation will be received,
5  identification of the payer of the indirect
6  compensation and a description of the arrangement
7  between the payer and the covered service provider,
8  an affiliate subcontractor," so on and so forth.  So
9  in my experience indirect compensation typically
10  means when a fund company provides a revenue-sharing
11  arrangement, a fee, if you will, to a fund
12  recordkeeper in return for services provided on
13  behalf of the fund.  A foreign tax credit in my view
14  is not something that falls into this definition.
15  It's not in return for a service.  It's the result
16  of the U.S. tax code.  There's not a specific
17  arrangement between -- in other words, if I think of
18  who the payer of the foreign tax credit is, it would
19  be either the U.S. government, I guess, or the
20  foreign entity.
21      Q.  Okay.  Well, you understand that foreign
22  tax credits arise from the payment of foreign taxes,
23  correct?
24      A.  Yes, they arise from -- from foreign tax
25  withholdings, correct.

Page 175

1      Q.  Right.  And ultimately it's the separate
2  accounts that pay those foreign taxes, right?
3      A.  It's the owner of the separate accounts
4  that pays those taxes.  So in this example, Hancock.
5      Q.  Okay.  But ultimately Hancock passes that
6  investment experience including the payment of
7  foreign taxes to the retirement plans, correct?
8          MR. FLECKNER:  Objection.
9      A.  Hancock passes through the investment
10  experience.
11   BY MR. WEINSHALL:
12      Q.  Net of the payment of taxes to the
13  retirement fund, correct?
14      A.  Yes.  So I think it would be similar to
15  how a trust works.  So the investment means of a
16  portfolio.
17      Q.  All right.  So ultimately the payment of
18  foreign taxes for assets that are held in a separate
19  account decrease the plan assets by the amount of
20  the foreign taxes paid, correct?
21      A.  As they would in a trust product, correct.
22      Q.  Okay.  So my question for you is, if you
23  understand, and you said you did, that foreign tax
24  credits can have monetary value, if you assume then
25  that those foreign tax credits are received, quote,

Page 176

1  in connection with the services described, means
2  recordkeeping services, would they need to be
3  disclosed under this provision?
4      A.  If the foreign tax credits were somehow
5  related to recordkeeping services and satisfied all
6  these other definitions?
7      Q.  Yes.
8      A.  But then the issue is is, how do you pass
9  through a foreign tax credit to a nontaxable entity.
10      Q.  This doesn't talk about passing through.
11  This talks about disclosure, right?
12      A.  It talks about disclosure in the sense
13  that disclosure meaning direct or indirect
14  compensation in return for services provided on
15  behalf of the fund.  So I don't see -- again, as I
16  indicated before, any reference to foreign tax
17  credits as being considered to be direct or indirect
18  compensation.
19      Q.  Okay.  So it sounds like your conclusion
20  then is based on the absence of foreign tax credits
21  appearing in this regulation and your reading of
22  these two provisions of the regulation; is that
23  fair?
24          MR. FLECKNER:  Objection.  Misstates.
25      A.  Well, you know, again, you know, as I

Page 177

1  understand foreign tax credits, foreign tax credits
2  can only be taken by the owner of the security.  So
3  with respect to a group annuity, Hancock is the
4  owner of the security, therefore, they are entitled
5  to the foreign tax credits, not the plan.
6          Within a trust product it's a little bit
7  different.  The trust is a tax-exempt entity.  Any
8  foreign tax credits are not available to the trust.
9  So that informs me as to my opinion, in addition to
10  what is clearly industry practice surrounding the
11  treatment of foreign tax credits.
12   BY MR. WEINSHALL:
13      Q.  Okay.  So it's industry practice and your
14  reading of this statute.
15      A.  Right.  And even Securian, which itself
16  says that pass-through foreign tax credits does not
17  pass those tax credits through their general
18  account.  They only reduce the investment options
19  specific to funds that provide the foreign tax
20  credit.
21      Q.  Okay.  But what difference does that last
22  point make?
23      A.  Because Securian isn't passing through
24  foreign tax credits, nor are they treating them as
25  compensation for purposes of their services.



Page 178

1    They're just simply reducing the expense ratio of a
2  specific fund option.
3       Q.   But if they pass through the benefit, then
4  they're not actually receiving the benefit, right?
5       A.   If they pass through the benefit to the
6  plan?
7       Q.   Yeah.
8       A.   They're still receiving the benefit.
9  They're just simply reducing the expense ratio of a
10  specific investment option.
11      Q.   And you looked at Securian's 408(b)(2)
12  disclosures?
13      A.   I have.
14      Q.   And do they disclose foreign tax credits?
15      A.   No.  They allude to them in their
16  disclosures, but they don't disclose the amounts.
17      Q.   But they allude to them.
18      A.   There's a reference in one of the
19  footnotes of a disclosure that references they may
20  receive foreign tax credits.
21      Q.   I see.  And John Hancock does not have the
22  similar disclosure in its 408(b)(2) disclosure; is
23  that right?
24      A.   They do not reference foreign tax credits
25  in their 408(b)(2) disclosures.

Page 179

1      Q.   Okay.  Let's look at paragraph 15.  You
2  say that Mr. Levy asserts that John Hancock is
3  required to credit foreign tax credits because they
4  are considered to be, quote, revenues; is that
5  right?
6      A.   Rebuttal report?
7      Q.   Yep.
8      A.   Yes, that's what paragraph 15 states.
9      Q.   Okay.  And then you cite Mr. Levy's report
10  at paragraphs 11 and 24 for that, correct?
11      A.   I'm sorry.  This -- I'm having a hard time
12  with the document size.  So bear with me for a
13  second.
14         Yes.  Are you referring to Footnote 29 and
15  30?
16      Q.   Yep.
17         I'm referring to actually Footnote 28.
18      A.   Oh, okay.  Thank you.
19      Q.   Okay.  And you cited paragraph 11 and
20  paragraph 24 attributing this to Mr. Levy.  I marked
21  Exhibit 156 as Mr. Levy's report.
22         (Thereupon, marked as Exhibit 156.)
23  BY MR. WEINSHALL:
24      Q.   Can you show me where in either of those
25  paragraphs Mr. Levy states that John Hancock is

Page 180

1  required to credit foreign tax credits back to
2  separate accounts, because they are considered to
3  be, quote, revenues?
4         Mr. Gissiner, you cited two paragraphs of
5  Mr. Levy's report.  It seems like you're taking a
6  while to --
7      A.   Yeah, I'm just going through them.
8      Q.   I'm asking you a simple question.  Where
9  does he say that foreign tax credits are considered
10  to be revenues?
11      A.   So in paragraph 24 he does reference the
12  term "indirect compensation," and he does also
13  reference the term "revenue."
14      Q.   He does, but he never says there that
15  foreign tax credits are revenue, does he?
16      A.   He may not state that specifically.
17      Q.   So when you stated the opposite in your
18  report, you're not correct; is that right?
19      A.   Pardon me?
20      Q.   So when you said that he did say that in
21  your report, you were not correct.
22      MR. FLECKNER:  Objection.
23  BY MR. WEINSHALL:
24      Q.   Mr. Gissiner, are we waiting to answer?
25      A.   I'm reviewing paragraph 25.

Page 181

1      So I think the way I read paragraph 15,
2  I'm stating that Mr. Levy said that Hancock should
3  credit -- require to credit foreign tax credits back
4  to the separate accounts that generated them and
5  disclose such foreign tax credits, and then he used
6  the term "revenues" and "indirect compensation"
7  throughout his report.  I don't know if he
8  specifically defined foreign tax credits as revenue,
9  but certainly if he's opining that they should be
10  credited back to the plan sponsors, then he's
11  obviously considering that to be revenue, if you
12  will.
13      Q.   So you don't know if he defines foreign
14  tax credits to be revenue, but you say, without
15  qualification, in your report he asserts that they
16  are considered to be revenues?
17      MR. FLECKNER:  Objection.
18      A.   Well, again, I think if they are credited
19  back to plan participants, then those would be
20  revenues for purposes of the 408(b)(2) disclosures.
21  BY MR. WEINSHALL:
22      Q.   408(b)(2) refers to compensation, not
23  revenue, right?
24      A.   Yeah, compensation and revenue is
25  generally considered to be the same thing.

46  (Pages 178 to 181)



MAGNA
LEGAL SERVICES

Page 182

1    Q.  Sometimes.  Not always.
2         So my question is about this quote,
3   because you used the quote which means you're saying
4   this is something he said.  It's not correct to say
5   that Mr. Levy said that foreign tax credits are
6   considered to be, quote, revenues.  You agree with
7   me?
8         MR. FLECKNER:  Objection.  Misstates.
9    A.  The quote is to credit the foreign tax
10  credits back to the separate accounts that generated
11  them and to disclose such foreign tax credits.
12  BY MR. WEINSHALL:
13   Q.  No, Mr. Levy -- Mr. Gissiner.  You said,
14  because they, meaning foreign tax credits, are
15  considered to be revenues.  Did you not write that?
16   A.  Which paragraph are you referring to?
17   Q.  Paragraph 15, because they, meaning
18  foreign tax credits, are considered to be revenues.
19  You represent that to be Mr. Levy's assertion,
20  correct?
21        MR. FLECKNER:  Objection.  You're on
22  paragraph 15 now, not paragraph 16 of
23  Mr. Gissiner's rebuttal?
24        MR. WEINSHALL:  I always said paragraph
25  15, yes.

Page 183

1         MR. FLECKNER:  I'm sorry.  So you're now
2   referring to Footnote 28 in?
3         MR. WEINSHALL:  Referring to Footnote 28
4   and Mr. Gissiner's statement in the body of the
5   text.
6         MR. FLECKNER:  I see.  Thank you.
7   BY MR. WEINSHALL:
8    Q.  Did you write that, Mr. Gissiner?
9    A.  Yes, I did write that.
10   Q.  And it's not correct, because Mr. Levy did
11  not say, they, foreign tax credits, are considered
12  to be revenues, did he?
13   A.  Not that specific language, no.  Obviously
14  he referenced the term "revenue" and "indirect
15  compensation" throughout his report, but he did not
16  specifically state...  So I mean, in subparagraph C
17  of his report, he does state that or to credit
18  foreign tax credits back to the separated --separate
19  accounts that generated them and disclose such
20  foreign tax credits as indirect compensation.
21        (Reporter clarification.)
22   A.  So I'm referring to subparagraph B of
23  paragraph 11.
24  BY MR. WEINSHALL:
25   Q.  Okay.  So you refer to them as indirect

Page 184

1   compensation, not a revenue, correct?
2    A.  That's correct, in that paragraph.
3    Q.  Okay.  And you only cite paragraphs 11 and
4   24 here, and neither of those paragraphs does he say
5   foreign tax credits are considered to be revenues,
6   correct?
7    A.  Not as defined specifically in that
8   paragraph.  He does refer to the term "revenue"
9   throughout the report.
10   Q.  So Mr. Gissiner, this is not a correct
11  statement, correct?
12        MR. FLECKNER:  Objection.
13   A.  So I think we're -- I think we're dealing
14  with semantics here.  I consider to be --
15  compensation and revenues to be the same thing.  So
16  as noted in subparagraph C, he's referring to the
17  crediting of foreign tax credits as indirect
18  compensation.
19  BY MR. WEINSHALL:
20   Q.  Mr. Gissiner, you didn't state you
21  considered them to be same thing.  You said that
22  this is what Mr. Levy asserts, and he did not
23  actually assert that, correct?
24   A.  He did assert in subparagraph -- he did
25  assert that foreign tax credits should be returned

Page 185

1   to the plan as indirect compensation.
2    Q.  Okay.  But Mr. Gissiner, again, you said
3   Mr. Levy asserted that foreign tax credits are
4   considered to be revenues, and Mr. Levy did not say
5   that, correct?
6         Mr. Gissiner, we're waiting for your
7   answer.
8    A.  So I'm looking at the bottom of paragraph
9   24 where he states that, "Thus, indirect
10  compensation, which we talked about in subparagraph
11  11, in the form of fees and revenue received by
12  Hancock from the mutual funds, which were supposed
13  to be applied for the benefit of the plan and is
14  disclosed as such."
15        MR. FLECKNER:  Is there another question,
16  Mr. Weinshall?
17  BY MR. WEINSHALL:
18   Q.  Mr. Gissiner, I asked for -- that
19  statement you just read to me did not state that
20  foreign tax credits are considered to be revenues,
21  did they?
22   A.  He did not state that specifically.
23   Q.  And you said that he did.
24   A.  We could -- we could argue the point.  I
25  think that it's fair to state that he would consider




Page 186

```
 1   foreign tax credits to be revenue.  He doesn't
 2   define it that way.  He does refer to it as indirect
 3   compensation that should have been disclosed to plan
 4   participants.
 5       Q.  So you're refusing to acknowledge that you
 6   made a mistake here.
 7       A.  If your question is, does Mr. Levy
 8   specifically define foreign tax credits as revenue,
 9   I don't think that I see that in my report.
10       Q.  You don't see it in his report or in your
11   report?
12       A.  I'm sorry, in his report.
13       Q.  But you do see that you do state it
14   in your report.
15       A.  Yes.
16       Q.  Okay.  Paragraph 17 of your report you
17   state that, "No 408(b)(2) disclosure of something
18   like 20 recordkeepers have explicitly referenced
19   foreign tax credits."  Is that right?
20       A.  That is correct.  When we say specifically
21   the -- that is correct with the exception as I
22   mentioned before, there's an allusion -- or Securian
23   disclosure does allude to foreign tax credits but
24   doesn't provide specifics as to dollar amounts.
25       Q.  Okay.  So I'm wondering why you used the
```

Page 187

```
 1   word "explicitly" there.  Besides Securian
 2   disclosure, are there other disclosures that
 3   reference foreign tax credits in some non-explicit
 4   way?
 5       A.  In a 408(b)(2) disclosure notice, no.
 6       Q.  Paragraph 20 of your rebuttal you comment
 7   that, Securian's market share point, I guess,
 8   3 percent means that 99.7 percent define
 9   contribution plans in the U.S. have selected other
10   recordkeepers.
11       Is that right?
12       A.  That's correct.
13       Q.  A big portion of those 99.7 percent have
14   selected trust platforms, not group annuity
15   contracts, right?
16       MR. FLECKNER:  Objection.
17       A.  Well, I think you have to go back and look
18   at my initial report.  Typically for plans under
19   10 million in assets, group annuity platforms are
20   much more common.  I think some are in the
21   neighborhood of 50 percent or so.
22       So in terms of numbers of plans, a large
23   number of plans have selected group annuity
24   platforms other than trust platforms.
25
```

Page 188

```
 1       BY MR. WEINSHALL:
 2       Q.  Okay.  But that means some large
 3   percentage as well have selected trust platforms and
 4   have not selected group annuity contracts, right?
 5       MR. FLECKNER:  Objection.
 6       A.  Yeah.  I think -- I think it's fair to
 7   state that both group annuity platforms and trust
 8   platforms are recordkeeping platforms selected by
 9   different plan sponsors based on their specific
10   requirements.
11       BY MR. WEINSHALL:
12       Q.  Let's go to paragraph 24.  You said, "The
13   documentary evidence shows that Securian can and
14   does charge higher recordkeeping fees, quote, to
15   offset the decrease in revenue it collects as a
16   result of a fee concession for foreign tax credits."
17   Is that right?
18       A.  That's what's stated here, correct.
19       Q.  Okay.  And you reached this conclusion
20   just by comparing the total fees charged by Securian
21   to other insurers, right?
22       A.  Specifically referencing the RFP responses
23   that Mr. Searcy received, correct.
24       Q.  Okay.  But you never spoke to anyone at
25   Securian about its pricing practices, right?
```

Page 189

```
 1       A.  I'm familiar with their pricing practices,
 2   but no, I've not spoken to anybody directly.
 3       Q.  Okay.  And it's possible that Securian's
 4   fees are higher because its other services cost more
 5   or are different or are of a different quality,
 6   right?
 7       A.  There's numerous ways that -- yeah, I
 8   mean, there's numerous factors that influence
 9   industry pricing.
10       Q.  Okay.  So your basis for saying that the
11   higher price for Securian is there to, quote, offset
12   the decrease in revenue is not based on any evidence
13   other than the fact that it charged a higher price,
14   which could be the result of something else, right?
15       A.  Well, in this specific example, you have
16   RFP responses from four providers who are quoting on
17   the same plan who are obviously assuming a certain
18   cash flow asset amount.  So the fact that Securian
19   charges more, it basically can be used to offset
20   decreases in revenue from other areas.
21       Q.  Well, you didn't say can be used.  You
22   said that is the reason; to offset.
23       A.  Yeah, I believe that's the case.  Again,
24   we go back to the required revenue amount.  If
25   you're reducing revenue from one source, you have to
```



Page 190

1  increase revenue in another area.
2     Q.  But you have no basis to say that is why
3  Securian charged a higher fee, because you said they
4  could have offered different services too, right?
5     A.  That is a possibility.
6     Q.  Okay.  So this is speculation on your part
7  then.
8     MR. FLECKNER:  Objection.
9     A.  Yeah.  Again, I think that there's a
10  component there of, you know, Securian being the
11  only one that does it.  They don't have a large
12  market share.  In the initial fee quotes that were
13  provided, they charged more for services, so I think
14  as somebody who practicians in the area, it's
15  typical that if you're receiving a discount in one
16  area, you're charging higher fees in another area.
17  BY MR. WEINSHALL:
18     Q.  But you don't know what the source of
19  those higher fees are in this particular instance,
20  correct?
21     A.  No.
22     Q.  I'm correct or incorrect?
23     A.  You're correct.
24     Q.  Okay.  And then you said at the bottom of
25  that, "This suggests in my view that the fee

Page 191

1  concession for foreign tax credits that Securian
2  advertises is more of a marketing tactic."
3     Is that what you said?
4     A.  That's correct.
5     Q.  Okay.  Do you have any doubt that Securian
6  does in fact credit back foreign tax credits to the
7  accounts that generate them?
8     A.  Do I have any doubt?
9     Q.  Right, that Securian actually does what it
10  states it will do.
11     A.  I can state that they -- I can state that
12  in their disclosure documents they say they may do
13  it, and, you know, there may be specific instances
14  where they don't, but I think it's probably fair to
15  state that if that's something that they market to
16  the industry, then that would be something that they
17  do.
18     Q.  Okay.  So it's not just something that's
19  marketed but something that they actually provide to
20  plans, right?
21     MR. FLECKNER:  Objection.
22     If you know.
23     A.  Yeah, as we talked about before, they
24  provide investment management fee reductions for
25  funds on their platform that provide foreign tax

Page 192

1  credits.
2  BY MR. WEINSHALL:
3     Q.  So, but you don't know whether this is
4  something that Securian does because it believes
5  it's consistent with its fiduciary duties or because
6  they see it as a marketing tactic, do you?
7     A.  Well, I think that they may have the
8  interpretation that that's something that they do
9  from a fiduciary standpoint, but certainly as he
10  indicated before, they're the only one that does it.
11  So in their view that's what they deemed to be their
12  approach.
13     Q.  Okay.
14     A.  They also state that they rebate all
15  revenue-sharing dollars to the plan as well.
16     Q.  Okay.  So you -- and you have not spoken
17  to anyone at Securian regarding this practice,
18  right?
19     A.  No.
20     Q.  So you don't know if this is something
21  that they consider just a marketing tactic or
22  something that fulfills a fiduciary obligation,
23  correct?
24     A.  I have in the past received through my
25  affiliation with BKS Retirement periodic e-mails

Page 193

1  regarding what they communicate to advisers with
2  respect to their platform, and they highlight in
3  those communications the crediting of foreign tax
4  credits, and they also note that on their website.
5     Q.  Okay.  So they promote it, but --
6     A.  They promote it, yes, correct.
7     Q.  But to testify that it's more of a
8  marketing tactic than something that's provided in
9  the best interest of the plan, you would have to
10  understand exactly what Securian thinks of it,
11  right?
12     A.  Yes.
13     Q.  And you don't know that, correct?
14     A.  Other than what's on their -- other than
15  what's on their website.
16     Q.  Okay.  Let's go to your --
17     MR. WEINSHALL:  You know, if we could take
18  a short break here, it's 4:15.
19     MR. FLECKNER:  Okay.  Bailey, are you
20  going to turn us off?
21     MR. WEINSHALL:  Yes.  I was just unmuting.
22  The time is 4:15 p.m., and we are going
23  off the record.
24     (Recess taken.)
25     THE VIDEOGRAPHER:  The time is 4:33 p.m.,

49 (Pages 190 to 193)





Page 194

```
 1        and we're back on the record.
 2        BY MR. WEINSHALL:
 3        Q.  I have another exhibit for you.  This is
 4   what we'll mark as Exhibit 157.  Please let me know
 5   when you can see it.  It was previously marked as a
 6   different exhibit number in another deposition.
 7        (Thereupon, marked as Exhibit 157.)
 8        A.  Okay.  The John Hancock disclosure, okay.
 9        BY MR. WEINSHALL:
10        Q.  Yep.  Have you seen this document before?
11        A.  Is this specific to the Romano plan?
12        Q.  So this is a document formerly referred to
13   as a Summary of Administrative Maintenance Charges
14   and Revenue Sharing Received.  Do you see that near
15   the top?
16        A.  Yes, I see that.
17        Q.  Okay.  And if you look at the Romano
18   retirement -- recordkeeping agreement, which is
19   Exhibit 154, there's a document called Summary of
20   Administrative Maintenance Charges and Revenue
21   Sharing Received that's listed as a document that's
22   included with the plan.  Do you see that?
23        A.  On which page of the agreement?
24        Q.  Page 2 of the recordkeeping agreement or
25   really page 1.  Page 2 of the PDF.
```

Page 195

```
 1        A.  Page 2 of the PDF, okay.
 2        MR. FLECKNER:  Do you mean page 4 of the
 3   PDF?
 4        MR. WEINSHALL:  I'm sorry?
 5        MR. FLECKNER:  Which -- were you referring
 6   back to the recordkeeping agreement?
 7        MR. WEINSHALL:  Yes, I was referring back
 8   to the recordkeeping agreement to identify this
 9   particular document as -- to identify a
10   document with that title being referenced in
11   the Romano plan.
12        MR. FLECKNER:  Okay.
13        BY MR. WEINSHALL:
14        Q.  Do you see that, sir?
15        MR. FLECKNER:  I think you meant page 4 of
16   the recordkeeping agreement, of the PDF on my
17   iteration.  Exhibit 154?
18        MR. WEINSHALL:  Yeah.  No, it shows up to
19   me as paragraph 2 -- I'm sorry, page 2.
20        MR. FLECKNER:  Of the PDF.  I see where
21   you are.  I apologize.  Yes, I see.  You're
22   looking at the bullet points at the top of
23   page 2, correct?
24        MR. WEINSHALL:  Yes.
25        MR. FLECKNER:  I see.  Okay.  My
```

Page 196

```
 1   apologies.
 2        BY MR. WEINSHALL:
 3        Q.  Mr. Pingree, do you see that -- I'm sorry,
 4   Mr. Gissiner?
 5        A.  So I'm looking at page 2 of Exhibit
 6   Number 154, and there's three -- referencing -- are
 7   you talking about the Supplemental Information Guide
 8   Investment Comparative Chart, those documents?
 9        Q.  Yes.  Do you see there's a document listed
10   there called Summary of Administrative Maintenance
11   Charges and Revenue Sharing Received?
12        A.  Yes.
13        Q.  Okay.  And if you come back to 157, do you
14   see that's the same title that's given that this
15   document was called formerly referred to as?
16        A.  Yes.
17        Q.  Okay.  So my question for you is, is it
18   your understanding in the retirement professional
19   industry, foreign tax credits are not considered
20   indirect compensation that would be disclosed; is
21   that right?
22        A.  Correct.
23        Q.  Okay.  So then is it your testimony that
24   the amounts that are shown in this document as
25   revenue from the underlying fund, that does not
```

Page 197

```
 1   include the benefit of foreign tax credits?
 2        MR. FLECKNER:  Objection.
 3        A.  That would be my understanding of this
 4   document.  Again, because they're referred to 12b-1
 5   fees and subtransfer agent fees.
 6        BY MR. WEINSHALL:
 7        Q.  Okay, thank you.
 8        And if we can look at one more exhibit,
 9   158.
10        (Thereupon, marked as Exhibit 158.)
11        A.  Okay, I have it.
12        BY MR. WEINSHALL:
13        Q.  Have you seen this document before?
14        A.  Yeah, these are the 408(b)(2) disclosures
15   specific to the Romano plan.
16        Q.  Okay.  And if you scroll down to page 6 of
17   the PDF.  Let me know when you're there.
18        A.  Okay.
19        Q.  Do you see it says, in the third paragraph
20   it says, "In general, the revenue from the
21   underlying fund (12b-1 STA) other is paid to John
22   Hancock by the underlying fund and other
23   fund-related sources pursuant to agreements or
24   arrangements between John Hancock and the underlying
25   fund and/or their affiliates.  Such revenue includes
```



Page 198

```
 1   12b-1 subtransfer agency, shareholder service, and
 2   other fees."
 3       Do you see that?
 4       A.  Yes, that's what it states.
 5       Q.  So is it your opinion that foreign tax
 6   credits do not fall in the category of other fees in
 7   this document?
 8       A.  Yes.
 9       Q.  And that's based on your reading of this
10   document and your understanding of industry
11   practice; is that right?
12       A.  As well as what we had talked about
13   before, the 408(b)(2) disclosure regulations which
14   does not include references to foreign tax credits.
15       Q.  All right.  Returning to your initial
16   report, in your work as a consultant, you've
17   evaluated recordkeepers to provide advice to either
18   plan advisers or plan sponsors, right?
19       A.  When you say I evaluated recordkeepers and
20   provided advice to plan sponsors, is that what your
21   question was?
22       Q.  Yes.
23       A.  So yes, as part of, for example, an RFP or
24   as part of a recurring engagement, you are
25   evaluating recordkeeping services.
```

Page 199

```
 1       Q.  Okay.  And do you distinguish that from a
 2   service provider's role as an issuer of a group
 3   annuity contract?
 4       MR. FLECKNER:  Objection.
 5       You can answer.
 6       A.  Well, when you're evaluating
 7   recordkeepers, in effect you're evaluating the
 8   platform.  So in the -- in the case of a group
 9   annuity contract you're evaluating the recordkeeper,
10   but also the platform under which the product
11   operates.
12   BY MR. WEINSHALL:
13       Q.  And so it's one and the same, the
14   recordkeeper and the issuer?
15       A.  Well, from -- from the standpoint of my
16   evaluation, I simply view it as part of an overall
17   servicing platform.
18       Q.  Okay.  Because the recordkeeper and the
19   issuer are the same entity, is that why, or some
20   other reason?
21       A.  Because they're the same entity?
22       Q.  Is that why?
23       A.  They may not necessarily be the same
24   entity, but typically when you're evaluating a group
25   annuity platform, one of the evaluation components
```

Page 200

```
 1   you have are, you know, investment fund
 2   availability.  Investment fund availability, you
 3   know, becomes a product of the servicing platform,
 4   which then ultimately becomes part of the overall
 5   recordkeeping servicing of the plan.
 6       Q.  But ultimately the investment options that
 7   are available to a platform are the responsibility
 8   of the issuer of the group annuity contract, not the
 9   recordkeeper; is that right?
10       A.  The investment responsibility for fund
11   selection is the responsibility of the plan sponsor.
12       Q.  Okay.  But it's in connection with the
13   group annuity contract issuer, right?
14       A.  The group annuity provider makes available
15   to plan sponsors various investment options on their
16   platform.
17       Q.  Okay.  And in analyzing a particular
18   recordkeeping option and platform, do you separate
19   your analysis about the recordkeeper providing
20   recordkeeping services and a group annuity contract
21   issuer?
22       A.  It's typically incorporated into an entire
23   analysis.  Again, there may be components where
24   you're focusing, for example, as I alluded to
25   before, what investment options are available on a
```

Page 201

```
 1   specific platform.  So from that standpoint, that --
 2   I realize that is not part of the recordkeeping
 3   component, but it is part of the overall -- what I
 4   would call the overall plan experience.
 5       Q.  When you do this work of analyzing a
 6   recordkeeper, do you owe fiduciary duties to the
 7   plans that have retained you?
 8       MR. FLECKNER:  Objection.
 9       A.  No.  I'm not operating in a fiduciary
10   capacity.
11   BY MR. WEINSHALL:
12       Q.  Okay.  In any of the work that you do, do
13   you operate in a fiduciary capacity?
14       A.  As we talked about before, the firm that I
15   work with, two of the firms that I work with serve
16   as ERISA 3(21) fiduciaries with respect to certain
17   clients.
18       Q.  And what role do you have that you serve
19   as a fiduciary?
20       A.  Well, with respect to 3(21) fiduciary, our
21   role is to monitor investment funds, determine
22   whether those funds are meeting specific performance
23   criteria, make recommendations to the committee as
24   to whether a fund can be -- should be retained or
25   removed, but ultimately the responsibility falls to
```



1    the committee to make that decision.
2        Q.   And in doing that work, have you ever
3    considered the impact of foreign tax credits on
4    either the compensation of recordkeepers or the
5    return of the investment?
6        A.   Never.
7        Q.   Okay.  So if plaintiffs' view of the law
8    is correct, in this case would that mean that you
9    breached your fiduciary duties in that role?
10       MR. FLECKNER:  Objection.
11       A.   No, I don't believe so.
12   BY MR. WEINSHALL:
13       Q.   Why not?
14       A.   Because foreign tax credits are not a
15   factor that is used in the industry to either
16   select, monitor, or retain investment funds in a
17   lineup.  There are numerous other factors that are
18   used to determine the selection and retention of an
19   investment fund option.
20       Q.   So you're talking about the particular
21   mutual funds that are available as a menu to a
22   retirement plan; is that right?
23       (Reporter clarification.)
24       A.   Yes.  What I'm referring to is, when
25   either selecting or evaluating an investment fund,

1    you are assessing that fund option using any number
2    of different criteria, none of which in my practice
3    has ever involved the crediting of foreign tax
4    credits.
5    BY MR. WEINSHALL:
6        Q.   Okay.  So have you ever served in any
7    fiduciary capacity where you monitored the fees
8    charged by a recordkeeper?
9        A.   Not in a fiduciary capacity, no.
10       Q.   Okay.  You mentioned that group variable
11   annuity contracts are generally sold through
12   broker-dealers; is that right?
13       A.   That's correct.
14       Q.   Okay.  Are broker-dealers in your
15   experience considered fiduciaries of a plan?
16       MR. FLECKNER:  Objection.
17       A.   I think they can be.
18   BY MR. WEINSHALL:
19       Q.   What in your experience would a
20   broker-dealer have to do in order to be considered a
21   fiduciary?
22       A.   Well, in this specific example as to
23   Mr. Searcy, they would be assuming responsibility of
24   selecting and monitoring, reporting on plan
25   investments.

1        Q.   And would it be necessary for the
2    broker-dealer to state that it is assuming a
3    fiduciary responsibility to be considered a
4    fiduciary?
5        A.   Well, let's make sure we define the terms
6    correctly, because you're using the term
7    "broker-dealer," which the term broker-dealer is
8    actually an entity.  When we refer to ERISA 3(21)
9    fiduciary, specifically you're referring to the
10   investment advisory firm.  So Mr. Searcy may have a
11   different broker-dealer that he uses, but his firm,
12   Pursuit Wealth Management, would be the 3(21)
13   fiduciary.
14       Q.   Okay.  Do you provide services like
15   Mr. Searcy provided in this case?
16       A.   Define services.
17       Q.   Recommending service providers.
18       A.   We conduct RFPs on behalf of plan
19   sponsors.  We do not recommend service providers.
20       Q.   So you conduct RFPs and then the plan
21   sponsor chooses among the options that come back to
22   you?
23       A.   That is correct.
24       Q.   Okay.  And how is that different than what
25   Mr. Searcy did?

1        A.   Well, I think initially what Mr. Searcy
2    did, at least in 2014, is he didn't present any
3    options.  So in that context that's what's
4    different.  So in 2020 he presented various
5    alternatives as part of an RFP process.
6        Q.   Okay.  And that's -- that's similar to the
7    work you do?
8        A.   Yes.
9        Q.   Okay.  And is it your testimony that an
10   investment adviser does not present different
11   options but presents one option to a plan, then that
12   investment adviser is serving as a fiduciary to the
13   plan?
14       A.   That would serve -- that to me would be
15   kind of a legal conclusion.  I think Mr. Searcy's
16   role as adviser with respect to the Romano plan in
17   my definition falls under ERISA 3(21).
18       Q.   But you just -- I'm confused.  You just
19   said it was a legal conclusion, and then you gave me
20   the conclusion?
21       A.   I'm sorry.  I said I'm not making a legal
22   definition as to whether that decision not to offer
23   other alternatives was a fiduciary -- made
24   Mr. Searcy a fiduciary.  What made Mr. Searcy a
25   fiduciary was when he would take on the additional



MAGNA
LEGAL SERVICES

1    role of advising the plan sponsor as to the
2    selection of investment funds.
3        Q.   Okay.  So recommending John Hancock or
4    selecting John Hancock does not make him a
5    fiduciary.
6        A.   I -- I can't say that one way or another.
7        Q.   And did you say somewhere in this report
8    that Mr. Searcy is a 3(21) fiduciary for his advice
9    regarding the selection of investment funds?
10       A.   I would have to go back and look, but
11   certainly I think there's documentation in the
12   materials, meeting minutes, for example, investment
13   advisory reports that would inform me that he was
14   operating in that capacity.
15       Q.   You testified earlier that these reports
16   contain all the opinions that you intend to present
17   at trial; is that right?
18       A.   That's correct.
19       Q.   So if there's nothing in this report that
20   says Mr. Searcy served as a fiduciary, then that's
21   not something you're going to be opining on at
22   trial, correct?
23       A.   If it's not specifically stated, I'm
24   comfortable -- I'm sorry.  We're going to -- I'm
25   going to go back and look at what's noted in the

1    report.
2        So in my report, if I did not explicitly
3    state that Mr. Searcy was a fiduciary based on what
4    I've seen in terms of disclosure documents, his
5    receipt of compensation from the plan, deposition
6    testimony, he certainly served in that capacity as a
7    3(21) fiduciary.  So he received in this particular
8    instance direct compensation from the plan.
9        Q.   So when I asked you earlier today if you
10   were planning to supplement your report, you said
11   no, that's not correct.
12       A.   I don't feel it's necessary to supplement
13   my report to just simply define that he was an ERISA
14   3(21) fiduciary.
15       Q.   Well, you didn't state it in your report
16   did you, Mr. Gissiner?
17       A.   No, and I didn't think it would be
18   necessary to state that specifically.  What we
19   referred to in the report was Mr. Searcy's role and
20   involvement in the selection of John Hancock at the
21   outset as well as his role and involvement during
22   the RFP process.
23       Q.   Mr. Gissiner, are you or are you not
24   intending to supplement your report by stating the
25   opinion that Mr. Searcy served as a fiduciary?

1        A.   I am not going to supplement my report.
2        Q.   Let's go to paragraph -- sorry -- page 33
3    of your report.
4        A.   Okay.
5        Q.   Footnote 87 cites a survey from Deloitte.
6    Do you see that?
7        A.   Yes.
8        Q.   And you relied on that survey?
9        A.   In support of my opinion in addition to my
10   own experience.
11       Q.   Okay.  So that's your opinion, it's a
12   reliable source on which an expert like yourself
13   would base an opinion?
14       A.   Yes.
15       Q.   Okay.  Do you agree that the most
16   significant factor of a plan sponsor is when
17   evaluating a recordkeeping change is the overall
18   cost to the plan?
19       A.   Well, the survey identifies that as being
20   specific to plan sponsors.  I think it's fair to
21   state that plan sponsors have other criteria that
22   they use to determine level of importance.  So with
23   respect to the survey, that was the highest
24   percentage, but with respect to my individual client
25   experience, they may prioritize other factors beyond

1    total plan cost.
2        Q.   But the survey is a reliable basis on
3    which to base an opinion on, right?
4        A.   The survey indicates that 25 percent of
5    plan sponsors identify overall cost to plan, quality
6    of service, and overall relationship as the most
7    important factors.  Suffice to say that the survey
8    is not comprehensive of each and every plan sponsor,
9    and each and every plan sponsor will have different
10   criteria that they use to assess what they consider
11   to be most important with respect to recordkeeping
12   services.
13       Q.   So according to this survey, if foreign
14   tax credits were credited to plans and the cost of
15   the plan were to decline, that would be important to
16   plan sponsors, correct?
17       MR. FLECKNER:  Objection.
18       A.   It would be important to 25 percent of the
19   plan sponsors included in this survey.
20   BY MR. WEINSHALL:
21       Q.   Paragraph 47, you state that --
22       A.   I'm sorry.  Just -- I want to just
23   rephrase on 40 -- on my last response.
24       It would also have to be foreign tax
25   credit in the context of other fee arrangements.  So

Page 210

```
 1   as to what -- if that would be important.
 2        Q.  Okay.  Paragraph 47 bottom of page 35 you
 3   said, "Based on my experience, I expect that for
 4   many proposed class members the benefits of John
 5   Hancock services, including its willingness to
 6   accommodate startup plans, would have outweighed any
 7   benefits that additional disclosures to John
 8   Hancock's allowance of foreign tax credits would
 9   bring to their plan."
10        Do you see that?
11        A.  Yes.
12        Q.  Okay.  Did you speak with any proposed
13   class members to reach this conclusion?
14        A.  No, I did not.
15        Q.  Okay.  Did you conduct a survey to reach
16   this conclusion?
17        A.  No, I did not.
18        Q.  So you are speculating about the
19   preferences of proposed class members; is that
20   right?
21        A.  Well, again, I don't necessarily use the
22   term "speculation."  I would say that, again, in my
23   experience, that there are other benefits associated
24   with recordkeeping services other than foreign tax
25   credits, and that in my experience the passing
```

Page 211

```
 1   through or the provision of foreign tax credits
 2   would have offset -- would not have offset the other
 3   benefits provided by John Hancock.  Again, just
 4   based on my experience.
 5        Q.  That's your prior experience, but then
 6   you're extrapolating that experience as to the
 7   entire proposed class, right?
 8        A.  Well, again, I think that's what's
 9   relevant here is, if you -- if you surveyed each and
10   every proposed class member, I think that, you know,
11   they would have various reasons why they selected
12   John Hancock, you know.
13        So for example, with respect to the Romano
14   plan, foreign tax credits did not have any
15   consideration with respect to the selection of
16   Hancock or later Fidelity as their provider.
17        Q.  But you didn't conduct a survey to
18   understand that that is an accurate prediction,
19   correct?
20        A.  I did not conduct a survey of proposed --
21   excuse me, class members.
22        Q.  Paragraph 50 you mention industry guidance
23   on recordkeeper RFP processes, and you mentioned two
24   organizations, NAPA and Spark; is that right?
25        A.  Yes, sir.
```

Page 212

```
 1        Q.  And you state that neither of the
 2   guidelines published by these organizations mentions
 3   foreign tax credits; is that right?
 4        A.  That is correct.
 5        Q.  Is there any evidence that you cite that
 6   these organizations considered the impact of foreign
 7   tax credits and then elected to not include them in
 8   their guidance?
 9        A.  I think as I stated here, there are no
10   references to foreign tax credits in either of their
11   RFP templates.  As to whether they actually
12   considered that as part of their template, I cannot
13   answer.
14        Q.  Okay.  Let's go near the end here.
15   Section C starting on page 54.
16        A.  Okay.
17        Q.  Okay.  This section from paragraph 75 to
18   80 is based on your reading on the, quote,
19   "documentary evidence regarding whether foreign tax
20   credits were material to the named plaintiffs'
21   recordkeeping fee agreement with John Hancock."  Is
22   that right?
23        A.  Correct.
24        Q.  Okay.  So this is simply your assessment
25   of that evidence; is that right?
```

Page 213

```
 1        A.  And supported in the information that
 2   follows.
 3        Q.  The information that follows is simply
 4   citations to the evidence, nothing else, right?
 5        A.  Yeah, it's referring specifically to the
 6   named plaintiffs and referring specifically to their
 7   deposition testimony.
 8        Q.  Okay.  Section 7 of your initial report
 9   starting on page 58, you considered the
10   reasonableness of the fees that John Hancock earned;
11   is that right?
12        A.  That is correct.
13        Q.  But you did not consider the additional
14   benefits that John Hancock received from foreign tax
15   credits in assessing that reasonableness; is that
16   right?
17        A.  That's correct, because as we talked about
18   before, I do not consider that to be direct or
19   indirect compensation.
20        Q.  Okay.  But if it is considered
21   compensation, then that's an additional amount that
22   might push the fees that John Hancock receives in
23   excess of what's considered reasonable; is that
24   right?
25        MR. FLECKNER:  Objection.
```



Page 214

1    A.  Not necessarily, no.
2    BY MR. WEINSHALL:
3    Q.  Not necessarily, but it could.
4    A.  Well, again, as I talked about before in
5  using Securian as an example, securities provision
6  of foreign tax credits does not reduce their
7  administrative fee.  It reduces the fee of the
8  specific investment option selected by the
9  participant.
10    Q.  Right.  But in terms of the amount of
11  compensation that the recordkeeper receives, whether
12  it comes from the participant or the plan, the role
13  of a fiduciary in monitoring the reasonableness is
14  to understand how much the recordkeeper receives,
15  right?
16    A.  Yes, but again, in the Securian example,
17  what they describe as foreign tax credits does not
18  impact the revenue that they receive.
19    Q.  That they receive from the plan, but it
20  does impact the revenue received from participants,
21  is that what you're saying?
22    A.  Well, again, no.  If -- if Securian passes
23  through an expense ratio reduction of 5 basis points
24  for the TIAA-CREF International Fund, the provision
25  of foreign tax credit simply reduces the cost of

Page 215

1  that fund to the individual participant.  It's not
2  reducing what Securian charges for recordkeeping
3  services.
4    Q.  But it overall reduces the amount of
5  compensation -- it reduces the amount of benefits
6  that Securian receives, correct?
7    MR. FLECKNER:  Objection.
8    A.  No, it reduces the amount of -- excuse me.
9  It reduces the investment management fees, and to
10  the extent that Securian is foregoing a portion of
11  foreign tax credits without increasing any fees in
12  other areas, it could be considered a reduction in
13  their revenue.
14    MR. WEINSHALL:  All right.  At this time,
15  Mr. Gissiner, I don't have further questions.
16    THE WITNESS:  Okay.
17    MR. FLECKNER:  I have a few follow-up
18  questions, Mr. Gissiner, on some of the things
19  that Mr. Weinshall discussed with you earlier.
20    MR. WEINSHALL:  I will then reserve my
21  right to ask additional questions.
22    MR. FLECKNER:  Okay.
23    CROSS-EXAMINATION
24  BY MR. FLECKNER:
25    Q.  If you can turn to Exhibit 150,

Page 216

1  Mr. Gissiner, that's your rebuttal report.
2    A.  Yes, I have it.
3    Q.  Okay.  If I could direct your attention to
4  paragraph 9.
5    A.  And which page is it on, Jamie?
6    Q.  Yeah, page 8 of the PDF, sir.
7    A.  Okay, thank you.
8    Okay, thank you.
9    Q.  And do you see that?
10    A.  At the top of the page?
11    Q.  Yes.  So in the middle of page 6 of that
12  rebuttal report, which is page 8 of the PDF,
13  paragraph 9 appears in the middle of the page.
14    A.  Okay.  All right.  I am seeing it on
15  paragraph 9 appearing at the bottom of page 8 of my
16  PDF, so.
17    Q.  Correct.  Correct.  First sentence states,
18  "Plaintiffs' experts ignore that John Hancock's
19  roles and responsibilities as they pertain to the
20  management and control of assets held in separate
21  accounts are documented in the 2014 recordkeeping
22  agreement between John Hancock and the named
23  plaintiff plan as well as the 2014 group annuity
24  contract for the named plaintiff plan."
25    Did I read that accurately?

Page 217

1    A.  That's what it states.
2    Q.  And below that you have a block quotation
3  from the recordkeeping agreement, correct?
4    MR. WEINSHALL:  Objection to the form.
5    A.  Yes.
6    BY MR. FLECKNER:
7    Q.  And in the last sentence of your block
8  quotation you have in bold letters, "John Hancock
9  will not have any discretionary authority or
10  responsibility for the management or control of the
11  separate accounts."  Is that correct?
12    A.  That's what it states.
13    Q.  It uses the term "management" or "control"
14  as did the first sentence of your paragraph 9,
15  correct?
16    MR. WEINSHALL:  Objection to form.
17    A.  Correct.
18    BY MR. FLECKNER:
19    Q.  Your first sentence in paragraph 9 is
20  limited to whether Mr. Levy or the other plaintiffs'
21  expert ignored John Hancock's roles and
22  responsibilities as they pertain to the management
23  and control of assets as further described, correct?
24    MR. WEINSHALL:  Objection to form.
25    A.  Correct.





1    BY MR. FLECKNER:
2        Q.  Okay.  So now if we go to Mr. Levy's
3    paragraph 24 identified in your language that
4    Mr. Weinshall directed you to earlier -- I'm sorry,
5    21.
6        A.  21?
7        Q.  Paragraph 21.  Does Mr. Levy include in
8    his quotation from the recordkeeping agreement the
9    bolded sentence about management and control?
10       A.  He does not.
11       Q.  So is it fair to say that Mr. Levy's
12   quotation ignores the portion of the recordkeeping
13   agreement addressing management and control?
14       A.  Yes, he does not state that in his
15   paragraph 21.
16       Q.  Okay.  If we can go back to your initial
17   report, which is Exhibit 151.
18       A.  Yes, I'm there.
19       Q.  And if you can go to the page that
20   Mr. Weinshall pointed you to, which is page 68 of
21   the PDF.
22       A.  Okay.  Page 68?
23       Q.  Of the PDF, correct.  It's "Appendix B,
24   Documents Considered" at the top.
25       A.  Okay.

1        Q.  Do you see that?
2        A.  Yes.
3        Q.  And in the second section identified
4    "produced documents and data," in the second
5    subsection there's a list of e-mails.  Do you see
6    that?
7        A.  Under other produced documents, Jamie?
8        Q.  It says "produced documents and data."  It
9    begins, "Statements of assets and liabilities to the
10   subaccounts," blah, blah, blah, and then there's a
11   second section.
12       A.  Okay.  It's just on a different page of
13   mine, so I apologize.  Thank you.
14       Q.  I see.  And it looks like there's eight
15   e-mails there, all dated 2017 and prior; is that
16   correct?
17       A.  Correct.
18       Q.  Okay.  There's no e-mails in that section
19   dated after August 2017, correct?
20       A.  Correct.
21           MR. WEINSHALL:  Objection to form.
22       BY MR. FLECKNER:
23       Q.  If you go up to the top of the page under
24   the section that says "Legal documents and
25   depositions."  Do you see that?

1        A.  Yes.
2        Q.  And you'll see there's listed a number of
3    depositions and exhibits thereto, correct?
4        A.  Yes.
5        Q.  That includes the depositions of Eric
6    Romano, Todd Romano, Christian Searcy, correct?
7           MR. WEINSHALL:  Objection.
8        A.  Correct.
9        BY MR. FLECKNER:
10       Q.  And does this indicate that you also
11   reviewed the exhibits to those deposition
12   transcripts?
13       A.  Yes, because they're -- yes, exactly
14   correct, because they're noted below.
15       Q.  And if the exhibits to those deposition
16   transcripts included e-mails subsequent to 2017, did
17   you also review those e-mails?
18       A.  No.
19       Q.  No?  You only reviewed the e-mails that
20   are specifically listed in the section that says
21   e-mails.
22       A.  Correct.
23       Q.  I see.  Okay.  You were asked a question
24   by Mr. Weinshall about disclosures made by a TIAA
25   group annuity product.  Do you remember that?

1        A.  That was a while ago, but yes.
2        Q.  Okay.  And I think you mentioned, if I'm
3    correct, that your opinion was that or your
4    experience was that you had observed a disclosure in
5    that TIAA prospectus of that product concerning
6    foreign tax credits, correct?
7        A.  Correct.
8        Q.  Was that a group variable annuity product
9    that utilized separate accounts that themselves
10   invested in only one prespecified mutual fund?
11       A.  It was a -- could you repeat the question?
12       Q.  Sure.  Let me ask you -- I'll ask you it
13   this way.
14          The separate accounts that are at issue in
15   this case are divided into subaccounts, correct?
16       A.  Yes.
17          MR. WEINSHALL:  Objection to form.
18       BY MR. FLECKNER:
19       Q.  Does each subaccount in this case offered
20   by John Hancock itself invest in only one
21   prespecified mutual fund?
22       A.  Yes.
23       Q.  Did the TIAA group variable annuity
24   product that you mentioned earlier similarly only
25   have separate accounts invested in one prespecified



Page 222

```
 1   mutual fund?
 2        A.  My recollection is that it did not.
 3        Q.  Okay.  So when you were asked by
 4   Mr. Weinshall earlier this morning whether you
 5   had seen a disclosure by a group annuity provider
 6   as to foreign tax credits in relation to their
 7   separate accounts, do you have any knowledge of
 8   any separate accounts like the ones here by John
 9   Hancock that only invest in one prespecified mutual
10   fund that include disclosures about foreign tax
11   credits?
12        MR. WEINSHALL:  Objection to form.
13        A.  So that was a long question.  So could you
14   repeat it?
15     BY MR. FLECKNER:
16        Q.  Sure.  You said that the TIAA separate
17   accounts that you referenced earlier this morning
18   are different than the John Hancock separate
19   accounts at issue in this case, correct?
20        MR. WEINSHALL:  Objection to form.
21        A.  Correct.
22     BY MR. FLECKNER:
23        Q.  So my question is -- and you answered this
24   morning to Mr. Weinshall that you had seen
25   disclosures by annuity providers with respect to
```

Page 223

```
 1   the type of separate account offered by TIAA,
 2   correct?
 3        A.  Correct.
 4        MR. WEINSHALL:  Objection to form.
 5     BY MR. FLECKNER:
 6        Q.  So my question is, have you seen
 7   disclosures by annuity providers that offer the
 8   type of separate accounts as issued -- that are at
 9   issue here that invest only in one prespecified
10   mutual fund disclosures that reference foreign tax
11   credits?
12        MR. WEINSHALL:  Objection to form.
13        A.  No.
14     BY MR. FLECKNER:
15        Q.  What was the answer?
16        A.  No.
17        Q.  Okay.  I would like to go to your rebuttal
18   report, which is at document 150.  And -- do you
19   have that open?
20        A.  I do.
21        Q.  Okay.  And Mr. Weinshall asked you a
22   number of questions about page 4 of the PDF
23   concerning your summary of opinions at Number 3.  Do
24   you remember those questions?
25        A.  Yes.
```

Page 224

```
 1        Q.  Those -- that summary on page 3 isn't the
 2   entirety of your view as to the topic identified at
 3   that summary, correct?
 4        MR. WEINSHALL:  Objection to form.
 5        A.  It is the summary of the opinion, the
 6   summary.
 7     BY MR. FLECKNER:
 8        Q.  Okay.  And you further elaborate on the
 9   entirety of your opinion in the text at, looks like,
10   paragraphs 5, 6 -- 5 and 6, correct?
11        MR. WEINSHALL:  Objection to form.
12     BY MR. FLECKNER:
13        Q.  You can answer the question.
14        A.  Yes.
15        Q.  Okay.  And your basis for the opinion as
16   expressed in paragraphs 5 and 6 is based on what
17   you've observed in the industry as people in the
18   industry as they define the concepts of a 3(38)
19   fiduciary to 3(21) fiduciary?
20        MR. WEINSHALL:  Objection to form.  It's
21   really an impressive amount of leading.
22        A.  That's correct.
23     BY MR. FLECKNER:
24        Q.  Okay.  That's not based on -- is your
25   analysis based on a legal opinion based on the texts
```

Page 225

```
 1   of those statutes?
 2        A.  No.  I mean, one could easily look up the
 3   definition of ERISA 3(21) fiduciary on Google, and
 4   you would get multiple definitions that would be
 5   readily accessible.
 6        Q.  You were asked earlier by Mr. Weinshall
 7   about what discretion means to you as it relates to
 8   3(38) fiduciary status.  Do you recall those
 9   questions?
10        A.  Yes.
11        Q.  And I just want to be clear about how --
12   what you view to be discretion in terms of 3(38)
13   fiduciary status.
14        Does discretion mean to you -- strike
15   that.
16        In order to have no discretion, would that
17   mean that a recordkeeper calls the client before
18   taking any action?
19        A.  If they have no discretion?
20        Q.  Yes.
21        A.  Can you give me an example?
22        Q.  Sure.  So if a recordkeeper like John
23   Hancock offers a subaccount that invests solely in
24   one prespecified mutual fund, say the Vanguard World
25   ETF, and that fund has been selected by 5,000 plans,
```

57 (Pages 222 to 225)



Page 226

1 and 2,000 participants across those 5,000 plans
2 executed -- instruct John Hancock as to trade in
3 their account for that fund.  When John Hancock
4 aggregates all those instructions, does it need to
5 call each plan trustee before it executes the trade
6 with the Vanguard ETF fund?
7     A.  No.
8         MR. FLECKNER:  All right.  I have no
9 further questions subject to any redirect.
10        MR. WEINSHALL:  I don't have any
11 additional questions.
12        MR. FLECKNER:  All right.  Steve, you're
13 free to go.
14        THE VIDEOGRAPHER:  I apologize.  Before we
15 go off the record, I just have to go over
16 transcripts.
17        Do either of you guys require a video copy
18 of today's deposition?
19        MR. WEINSHALL:  Whatever our standing
20 order is.
21        THE VIDEOGRAPHER:  Okay.
22        MR. FLECKNER:  Yeah, us too.  I just don't
23 remember.  We probably will, Bailey.  I just
24 don't remember what our order is.
25        THE VIDEOGRAPHER:  Fair enough.  All

Page 227

1 right.  And is that the same thing for the
2 transcript as well?
3         MR. FLECKNER:  Yeah.  I think the
4 transcript we've asked for a rough and an
5 expedited given the court schedule.
6         THE VIDEOGRAPHER:  All right.  And just to
7 help the video, so we can go off the record, I
8 wasn't sure if it was stated, is he going to
9 read or sign -- read and sign?
10        MR. FLECKNER:  Read and sign is what we've
11 been doing.
12        THE VIDEOGRAPHER:  All right.  So with no
13 further questions, it is 5:25 p.m. on
14 October 28, 2021, and we're going off the
15 record.
16        (The proceedings concluded at 5:25 p.m.)
17
18
19
20
21
22
23
24
25

Page 228

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF PINELLAS

     I, the undersigned authority, certify
that STEVEN K. GISSINER appeared remotely before
me and was duly sworn on the 28th day of October,
2021.
     Signed this 1st day of November, 2021.

_Denise Sankary_
DENISE SANKARY, RPR, RMR, CRR
Notary Public, State of Florida
My Commission No. GG 944837
Expires: 1/27/24

Page 229

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF PINELLAS

     I, DENISE SANKARY, Registered Merit
Reporter, do hereby certify that I was authorized
to and did stenographically report the foregoing
remote videotaped deposition of STEVEN K.
GISSINER; pages 1 through 228; that a review of
the transcript was requested; and that the
transcript is a true record of my stenographic
notes.
     I FURTHER CERTIFY that I am not a
relative, employee, attorney, or counsel of any
of the parties, nor am I a relative or employee
of any of the parties' attorneys or counsel
connected with the action, nor am I financially
interested in the action.
     Dated this 1st day of November, 2021.

_Denise Sankary_
DENISE SANKARY, RPR, RMR, CRR

58  (Pages 226 to 229)

MAGNA
LEGAL SERVICES

Page 230

WITNESS NOTIFICATION LETTER
DATE:   November 1, 2021
TO:     Steven K. Gissiner
          c/o James O. Fleckner, Esquire
        GOODWIN PROCTER, P.A.
        100 Northern Avenue
        Boston, Massachusetts 02210
          jfleckner@goodwinlaw.com

IN RE: Romano v. John Hancock Insurance Company
       Deposition taken on October 28, 2021
       Magna Legal Services Job No. 761571

The transcript of the above-referenced proceeding
has been prepared and is being provided to your
office for review by the witness.
We respectfully request that the witness complete
their review within 30 days and return the errata
sheet to our office at the below address or via
email to:  production@magnals.com.

Sincerely,

DENISE SANKARY, RPR, RMR, CRR
Magna Legal Services
866-624-6221
www.magnals.com

CC via transcript:
Matthew Weinshall, Esquire

Page 231

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
In Re:  ROMANO V. JOHN HANCOCK LIFE INSURANCE
   Case No.:  19-21147-CIV-GOODMAN
          STEVEN K. GISSINER
            October 28, 2021

PAGE   LINE     CHANGE          REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.

_____      _____
Date             STEVEN K. GISSINER

59 (Pages 230 to 231)



| A | | | | |
|---|---|---|---|---|

**A**

**a.m** 1:17 4:1,9
23:22 24:1
**A2** 166:8
**ABB** 13:10
**ability** 7:13,14,18
7:19 74:20 139:15
139:20
**able** 10:16 83:4
99:14 121:23
125:9
**above-referenced**
230:10
**absence** 145:18,24
176:20
**Absent** 114:10
**academic** 33:25
34:2
**accept** 51:12
**access** 14:9 18:10
18:15 19:23
**accessible** 57:2,10
58:25 59:12 225:5
**accommodate** 7:10
210:6
**accomplish** 38:11
**accomplished**
38:13
**account** 31:15
32:17 52:21,22,25
53:2,4,7,8,9,18
54:19,20,24 55:8
55:11,21,24
101:18 116:5
134:2,5,14,18
137:16,16,18
138:2,16 139:7
175:19 177:18
223:1 226:3
**accounts** 31:12
52:2 54:16 55:14
55:17 71:25 72:7
74:19,21 86:9
127:8 134:11
137:14,21 144:6

158:11 175:2,3
180:2 181:4
182:10 183:19
191:7 216:21
217:11 221:9,14
221:25 222:7,8,17
222:19 223:8
**accuracy** 147:22
**accurate** 7:3,4 97:8
145:3 146:18
211:18
**accurately** 216:25
**acknowledge** 64:3
64:7 69:20 75:3
76:12 140:12
186:5
**acknowledged**
68:10 69:5 71:12
**acknowledges**
86:10,22
**acknowledging**
77:13
**acknowledgment**
69:12 73:10
**acquire** 72:23 77:8
**acquisition** 18:20
**act** 36:13 166:8,12
**acting** 71:16,19
72:2
**action** 225:18
229:18,19
**actions** 63:16 78:4
80:4
**activities** 36:15
**activity** 39:7 77:6
**acts** 64:13
**actual** 121:10
**adding** 86:20,24,25
**addition** 11:5 58:21
59:16 60:1 70:17
177:9 208:9
**additional** 17:7
60:6 75:20 124:13
142:21,22 143:24
205:25 210:7
213:13,21 215:21

226:11
**address** 101:20
230:13
**addressing** 218:13
**adherence** 45:8
**adjust** 111:13,22
113:22 114:6
118:5,18
**adjusted** 110:23
113:17 119:3
**adjustment** 119:22
**administer** 89:18
**administered** 29:6
143:22 154:5
**administrative**
28:7 114:14,17,19
114:23 128:16
194:13,20 196:10
214:7
**adopted** 88:6 90:6
**advertises** 191:2
**advice** 67:9 198:17
198:20 206:8
**advise** 107:17
137:20
**adviser** 45:22 62:22
74:25 93:3,6,18
97:14 106:5
137:19 171:5,9
205:10,12,16
**advisers** 94:17
95:23 193:1
198:18
**advising** 206:1
**advisory** 204:10
206:13
**affect** 7:14,18,19
**affiliate** 174:8
**affiliates** 197:25
**affiliation** 192:25
**affirmative** 8:1
62:2 124:12
144:16,18
**agency** 44:21 198:1
**agent** 197:5
**aggregate** 48:15

102:20
**aggregates** 226:4
**AgileLaw** 8:7 14:10
24:10
**ago** 12:11,15 13:10
29:1,14 221:1
**agree** 8:10 38:15
41:8 43:8,16,19
56:3 60:11 73:11
76:14 78:3,15
79:13 82:13
104:12 109:11
128:22 141:15,16
142:12 173:4
182:6 208:15
**agreement** 3:16,16
47:24,25 61:18,18
68:22 69:13,25
70:5,9,10 71:9,18
72:11 73:10,16
74:17 101:15
125:3,13 144:7,12
144:25 145:6,14
146:7 147:25
148:8,21 149:7,15
149:17,19 194:18
194:23,24 195:6,8
195:16 212:21
216:22 217:3
218:8,13
**agreements** 48:13
74:23,24 152:7,7
155:8,25 197:23
**ahead** 96:12 116:15
149:22
**Akron** 27:21
**al** 1:3
**alcohol** 7:13
**align** 93:13
**aligns** 93:9
**allocate** 115:6
**allocation** 119:17
**allowance** 210:8
**allowed** 85:24,25
122:1 124:10
125:12

**allows** 65:17
**allude** 178:15,17
186:23
**alluded** 105:8
200:24
**allusion** 186:22
**Almeida** 117:15,19
117:23
**alternative** 37:18
**alternatives** 205:5
205:23
**amount** 11:19 40:9
40:13 53:12 70:16
100:19,22 102:20
103:25 104:8
106:24 107:23
110:24 111:1,2,6
111:16 119:17
121:2,14 137:13
138:7 175:19
189:18,24 213:21
214:10 215:4,5,8
224:21
**amounts** 56:14
104:2 105:13,22
159:23 178:16
186:24 196:24
**analysis** 10:24 11:4
11:7,11,19,24
17:16 18:9,20
19:9 200:19,23
224:25
**analyzing** 200:17
201:5
**and/or** 71:20
197:25
**annual** 56:6 102:18
102:19,23 103:4,6
103:14,20
**annually** 56:17,20
56:21,23
**annuity** 3:16 28:12
28:24 29:3,18,20
30:19 31:10 32:4
32:6,16 33:7
47:25 53:23 54:17



54:23 55:1,6,10
70:10 84:2 86:7
101:4 103:12
117:10 118:16
124:21 134:9,14
137:12 139:7
151:15,19 152:25
154:6,7,8 155:5
177:3 187:14,19
187:23 188:4,7
199:3,9,25 200:8
200:13,14,20
203:11 216:23
220:25 221:8,23
222:5,25 223:7
**answer** 6:15,20,21
36:4 40:7 43:17
48:15 56:10 74:9
76:25 78:9 85:11
85:18 91:16 107:9
109:2,24 116:23
122:15,18 123:10
123:15 129:25
136:13,21 143:18
159:14 165:10
180:24 185:7
199:5 212:13
223:15 224:13
**answered** 59:21
61:14 74:8 97:17
160:1 222:23
**answering** 20:21
91:18 158:19
**answers** 7:15,20
49:7 69:22
**anybody** 17:14
24:25 162:7 189:2
**Anytime** 7:8
**anyway** 165:19
**apologies** 196:1
**apologize** 21:3
116:20,24 122:20
195:21 219:13
226:14
**appear** 32:9 98:19
162:3,6,19 163:4

169:24
**appearances** 2:1
4:16
**appeared** 228:9
**appearing** 172:16
176:21 216:15
**appears** 216:13
**appendices** 18:3
24:14
**Appendix** 15:2
16:16 218:23
**applicable** 82:17
100:15
**applications** 8:5,9
**applied** 163:18
185:13
**appoint** 154:22
**appointed** 142:3
**appointment**
140:13 142:11
**approach** 36:24
79:23 192:12
**approached** 12:20
**approaches** 80:10
90:6
**appropriate** 90:21
**approval** 140:7,16
**approximate** 10:16
**approximately**
8:16 10:7,12 11:7
11:10 12:1,2 13:6
26:21
**approximating**
26:12
**apps** 24:9
**area** 36:6 41:2
46:18 190:1,14,16
190:16
**areas** 39:5 50:6
52:8 112:11
189:20 215:12
**argue** 92:12,16
185:24
**arrangement** 39:19
93:24 119:19
153:3 154:6,7

166:1,4 173:21
174:6,11,17
**arrangements**
34:14 90:7 93:21
152:25 153:1
156:3 197:24
209:25
**article** 3:13 57:18
57:22 58:5,8
60:13
**articles** 57:15,18
152:17
**articulated** 50:22
**aside** 65:11 142:11
**asked** 6:12,15 14:2
20:17 21:20 24:13
59:9 61:10 85:12
85:21 87:14,25
91:4,12 105:9
106:6,14,20
122:12,24 135:21
160:3 185:18
207:9 220:23
222:3 223:21
225:6 227:4
**asking** 6:9 25:9
31:3 44:3,5 70:22
73:20,21 86:1
99:16 106:18
142:9 147:21
148:16,17,23
157:16 158:21
165:7 180:8
**assert** 96:24 184:23
184:24,25
**asserted** 185:3
**asserting** 84:20
**assertion** 127:15
182:19
**assertions** 25:3,5,6
25:8,25 96:1
**asserts** 86:5,10,13
149:20 179:2
181:15 184:22
**assess** 121:18
209:10

**assessing** 22:21
203:1 213:15
**assessment** 212:24
**asset** 71:24 119:17
138:8,9 141:17
142:2 143:10
189:18
**asset-based** 119:18
**assets** 31:16 32:17
54:19,21 55:2,3
71:15 72:16,20
77:8 115:7 119:17
130:12,20,23
131:6 134:1,3,11
134:14,14,18,19
135:4,6,9,10,22
135:25 136:1,2,3
136:7,8,9,14,16
137:1,21,22 138:2
138:5,10,11,13,15
138:15,16,19,19
139:3,6,8,10,14
140:15 141:12
143:1,21 144:6
145:18,22 148:11
152:20 153:9
154:19 155:14
175:18,19 187:19
216:20 217:23
219:9
**assigned** 143:5
**assist** 10:25 17:20
19:10 37:4,12
91:23
**assistance** 17:17,19
**Assistant** 2:24
**assisting** 35:17
**associated** 10:20
36:19 45:4 52:10
110:14 210:23
**Association** 33:8
**assume** 6:15 51:1,4
51:8 74:21 103:3
105:2 108:5,22
109:6 111:19
141:10,15 143:9

143:12 151:10
175:24
**assumed** 132:19
**assumes** 128:15
143:2
**assuming** 123:21
126:23 142:21
143:23 152:2
189:17 203:23
204:2
**assumption** 61:5
109:12 115:3
120:15 130:18
141:14 142:1
143:12
**assumptions** 50:21
50:25 51:13
**assurance** 56:25
57:6,8 58:24
59:10
**attempt** 25:9
**attempting** 168:17
**attention** 216:3
**attorney** 6:18 34:7
35:19 92:1 229:15
**attorneys** 37:1
79:15 229:17
**attributable** 137:15
**attributing** 179:20
**audible** 7:3
**audited** 39:9 135:3
135:5
**auditors** 135:2,6
**August** 12:18
219:19
**authority** 67:12
71:23 72:5 130:19
140:5,14 142:5,14
142:15,18 217:9
228:8
**authorized** 229:7
**authorizes** 143:2
**automatic** 35:14
**availability** 200:2,2
**available** 53:16,17
54:10,23 57:1,10



58:22,25 59:11,17
59:24 97:3,13,25
98:1,10,12 100:14
100:16,17 102:7
104:14,22 105:4
154:11 155:7
177:8 200:7,14,25
202:21
**Avenue** 2:4,16
230:4
**Avoid** 3:13 57:23
**aware** 15:10,12
16:24 18:5 30:15
30:19 31:9 32:3
32:11 33:16 65:16
65:23,24 86:23
99:6 100:1,11
122:5 125:1
144:10 154:21
**awhile** 12:21

**B**

**B** 3:8 16:16 167:13
171:15,17 172:5
183:22 218:23
**BA** 27:18
**back** 12:3,8 24:1
26:17 33:20 41:11
45:14 55:12 73:6
77:19 81:5 86:8
99:10 102:24
113:21 129:15
136:21 143:8
144:13 152:15
153:15 155:7
156:16 168:21
173:20 180:1
181:3,10,19
182:10 183:18
187:17 189:24
191:6 194:1 195:6
195:7 196:13
204:21 206:10,25
218:16
**background** 27:12
**backtrack** 88:17

**Bailey** 2:23 4:12
80:17,19,21
120:10 193:19
226:23
**balance** 137:8,12
138:9,9
**BARNHART** 2:9
**base** 208:13 209:3
**based** 12:25 27:9
29:16,17 41:18,21
42:21 52:19 62:6
62:10,15 63:23,24
64:19,22 65:1,1
80:10 90:20 104:8
112:4,7,16 115:23
130:21 131:16
132:10,12,21,22
133:1 135:12
143:18,19 151:8
159:10,11,22
176:20 188:9
189:12 198:9
207:3 210:3 211:4
212:18 224:16,24
224:25,25
**basically** 17:20
36:3 39:24 45:10
45:19 110:23
189:19
**basis** 74:7 110:19
118:24 125:8
151:19 152:3
170:22 172:18
189:10 190:2
209:2 214:23
224:15
**Beach** 2:9,10
**bear** 85:16 145:9
172:21 179:12
**Becoming** 3:13
57:23
**began** 4:1 12:16
**beginning** 138:8
168:4,20
**begins** 4:3 219:9
**behalf** 1:4 2:2,14

4:20,22,24 22:4
29:25 42:1 157:12
159:21 171:21
173:1,18 174:13
176:15 204:18
**believe** 10:7 11:24
12:7 13:8 15:16
28:1 33:21,21
39:23 40:16 70:17
73:16 78:7,17
79:4 86:22 92:4
102:18 106:1
111:13 117:17
122:8,22 128:7,17
132:13 133:15
138:11 143:4
154:12 159:8
162:25 164:19,23
165:13 171:17
173:5 189:23
202:11
**believes** 192:4
**beneficiaries** 71:18
**benefit** 30:20,22,25
31:2,5,6,8,10,21
31:25 32:3 43:4
51:18,22,24 53:4
84:2 101:3,5,8
102:9 103:2,12
104:13,20 106:6
113:20,21,23
114:22 115:12,17
115:20,24 116:2,6
141:11 172:14
178:3,4,5,8
185:13 197:1
**benefited** 100:19
105:3,23
**benefits** 52:9 96:8
97:21 98:7 99:9
99:19 100:4
101:23 102:10,15
106:21 108:6
109:7 111:20
115:4,6,17 116:13
117:3 118:3,6,17

118:19 119:5,6
127:7 129:14
141:5 143:9 157:7
159:6,16 160:16
162:23 169:13,15
169:16 170:4,23
173:6 210:4,7,23
211:3 213:14
215:5
**best** 10:18 12:7
36:13 37:10,22
84:3,9,12,14,20
84:21 85:3,14
86:5,13,16,18
87:2,9,11,19 88:1
88:5,14 89:24
90:1,15 91:1,5,5,8
91:13,16,17,17,20
91:22,24 92:5,7
92:14,18 93:5,10
94:6 95:4,7,12
193:9
**better** 21:24 31:7
45:20 46:17 76:25
120:7 133:25
**beyond** 23:7 44:24
52:8 77:22 80:6
149:16 208:25
**bid** 123:16
**big** 187:13
**billing** 10:17 26:18
**bit** 44:24 46:5
136:22 142:8
168:20 177:6
**BKS** 192:25
**blah** 219:10,10,10
**block** 217:2,7
**body** 81:20 183:4
**bold** 217:8
**bolded** 218:9
**Boris** 2:11 4:21
**Boston** 2:16 230:5
**bottom** 157:11
185:8 190:24
210:2 216:15
**Boulevard** 2:9

**breach** 46:9,12,15
49:19 50:6
**breached** 45:24
46:21 49:9,13,25
202:9
**break** 7:8 24:4
80:13 132:24
156:9 161:24
173:4 193:18
**briefly** 27:12
**bring** 70:5 129:18
160:21 210:9
**broad** 35:25 46:3
89:5 136:4 137:3
137:6 139:3,9
**broader** 136:7,8
**broadly** 34:12
159:1
**broken** 103:14
**broker-dealer**
203:20 204:2,7,7
204:11
**broker-dealers**
203:12,14
**brokerage** 171:10
**Bruce** 9:15
**bullet** 195:22
**businesses** 103:7

**C**

**C** 68:9 69:7 166:2
171:15,17 183:16
184:16 212:15
**c/o** 230:3
**C1** 166:9,10 168:4
**calculate** 51:9
**calculation** 103:24
104:7,10
**call** 23:16 29:22
37:5 41:4 55:23
201:4 226:5
**called** 57:22 154:12
194:19 196:10,15
**calls** 40:5 56:8
107:7 225:17
**capacity** 150:1,25



151:6 153:8,24
201:10,13 203:7,9
206:14 207:6
**career** 150:18
151:21 153:16
**carve-out** 166:24
**case** 1:2 8:22 11:1
11:14 12:12,24
13:12,13,22,25
14:14 16:3 17:7
18:4 19:20 26:19
30:10,14,18 31:12
32:3 33:1 42:24
45:25 46:8,9
47:21 48:6,25
49:2,10 51:18
54:2 55:11 56:4
60:19 61:23 70:1
79:11 98:24
101:17 103:17,21
114:15 115:5
117:24 121:8
157:6 189:23
199:8 202:8
204:15 221:15,19
222:19 231:3
**cases** 79:8
**cash** 189:18
**categories** 18:23,24
**category** 198:6
**CC** 230:21
**Center** 2:4
**certain** 18:22,23
24:18 35:11 38:21
40:8,12 51:1,4,12
90:22 95:14
114:21 128:16
152:3 155:3,6
171:9 189:17
201:16
**certainly** 19:24
29:3 35:1 45:1
74:24 97:3,12
103:1 129:16
150:19 151:6
158:1 181:9 192:9

206:11 207:6
**Certificate** 3:5,6
228:1 229:1
**certify** 228:8 229:7
229:14
**change** 20:12 21:3
21:8 79:10,16,23
94:2 108:21 112:3
112:10,16 114:19
148:23 208:17
231:6
**changed** 77:3
**changes** 37:15 80:7
94:6 108:20
114:10 119:16
120:24 231:2
**changing** 37:17,18
**charge** 114:24
188:14
**charged** 11:11
101:18 114:3
120:16 188:20
189:13 190:3,13
203:8
**charges** 117:9
118:16 189:19
194:13,20 196:11
215:2
**charging** 190:16
**Chart** 196:8
**choose** 113:25
114:2,6 115:13
**chooses** 204:21
**Christian** 220:6
**citations** 26:5 213:4
**cite** 25:9,20 179:9
184:3 212:5
**cited** 24:14 66:7
179:19 180:4
**cites** 25:5 208:5
**citing** 25:17
**clarification** 28:13
47:10 96:10 104:5
156:24 183:21
202:23
**clarifications**

170:11
**clarify** 25:7 125:16
**class** 49:13,19,25
96:1,7 97:8,20
98:6 110:21 141:4
150:3 210:4,13,19
211:7,10,21
**clear** 24:3 69:23
72:9 225:11
**clearly** 76:11 93:22
177:10
**clicked** 14:21
**client** 18:9 35:13
42:1,2 93:2 98:18
165:10 208:24
225:17
**clients** 22:4 29:25
30:3 34:25 35:4
41:24 62:15 63:25
79:23 107:18
201:17
**close** 29:6
**closing** 97:6
**code** 3:15 66:8
174:16
**codified** 66:5
**colleague** 4:25
**collecting** 45:22
**collects** 188:15
**college** 27:13
**come** 30:11 33:19
196:13 204:21
**comes** 163:14
214:12
**comfortable** 60:14
135:17 148:24
149:2 206:24
**comment** 49:17,18
78:22 80:8 105:12
187:6
**commented** 21:5
24:22
**comments** 58:14,18
**Commission**
228:16
**committee** 37:12

37:16 77:4 201:23
202:1
**common** 92:16
187:20
**commonly** 40:25
**communicate**
193:1
**communicated**
20:8 121:8
**communicates**
121:13
**communications**
21:25 193:3
**community** 135:1
**companies** 31:15
31:21 86:6 151:25
155:24 156:2
**company** 1:7 2:24
28:4 41:25 42:5
55:2,4 86:11,22
124:4,5 134:15
135:7,11 149:25
150:24 151:9
153:8 155:10
158:16 174:10
230:7
**Comparative** 196:8
**comparing** 188:20
**compensated** 11:13
**compensation**
11:18 40:1,2,9
56:5,6,14 67:10
82:2,15,17 107:5
107:21,23 108:2,7
108:16 109:8
110:2 121:15,18
156:21 157:9,17
157:19,22,25
158:1,4,6,10,12
158:13,15,20,22
158:24 159:5,13
159:17,20 160:5
160:11,18,19
161:3,8,10,12,14
161:22 162:24
163:1,9,11 166:17

167:7,14,17,23
168:7 169:7,17
170:6,10,24 171:4
171:11,18,20,24
172:2,13,14,19,25
173:14,25 174:4,6
174:9 176:14,18
177:25 180:12
181:6,22,24
183:15,20 184:1
184:15,18 185:1
185:10 186:3
196:20 202:4
207:5,8 213:19,21
214:11 215:5
**complete** 10:16
102:7 230:12
**completed** 12:18,19
**completely** 96:7
**completing** 138:1
**completion** 12:25
17:17
**comply** 88:11 89:15
**component** 34:25
35:4 110:15 111:8
113:4,12 165:16
165:18 190:10
201:3
**components** 39:25
40:8 57:1,9 58:25
59:11 109:22
111:4 199:25
200:23
**comprehensive**
125:23 209:8
**computer** 8:6 24:5
24:6,8
**concepts** 224:18
**concern** 123:13
**concerning** 221:5
223:23
**concerns** 156:20
**concession** 101:10
101:16,22 188:16
191:1
**concessions** 96:23



111:12 112:17
114:8 121:25
124:9 125:11
**conclude** 75:25
145:19 153:6
163:19
**concluded** 227:16
**concludes** 128:20
**conclusion** 40:6
56:9 107:8 148:16
150:4 170:2
176:19 188:19
205:15,19,20
210:13,16
**condition** 7:18
**conduct** 65:13
125:17 150:9,12
204:18,20 210:15
211:17,20
**conducted** 21:7
**conducting** 123:12
**conferencing** 4:11
**confident** 168:23
**confidential** 104:11
**confirm** 10:18 12:9
142:23 151:5
**conflict** 129:10,13
129:17 130:11
131:5
**conflicts** 92:18
127:8 128:23
129:3,7,21 131:22
132:3
**confused** 205:18
**connected** 229:18
**connection** 10:10
20:4,16,25 31:11
43:5 46:19,25
47:7,13 52:1 54:2
54:16 96:23
101:22 121:25
124:9 125:11
173:1,12 176:1
200:12
**consider** 15:7 82:1
82:14 84:8 91:20

92:13 108:18
132:14 134:17
135:6,9,25 159:12
169:16 172:23
184:14 185:25
192:21 209:10
213:13,18
**consideration**
124:5 211:15
**considered** 15:3
16:17,22 19:12
95:12 108:7,16
134:2 156:21
176:17 179:4
180:2,9 181:16,25
182:6,15,18
183:11 184:5,21
185:4,20 196:19
202:3 203:15,20
204:3 212:6,12
213:9,20,23
215:12 218:24
**considering** 42:10
181:11
**considers** 111:19
116:13 117:3
**consistent** 42:7,11
88:18,23,25 89:4
89:9,11,21 91:2
96:20 108:2,14,17
108:21 109:25
110:13 111:15
113:7 131:24
155:10 163:7
192:5
**consolidates** 103:6
**constitute** 109:8
121:14 157:8
159:16 162:24,25
170:24
**consult** 24:25 35:13
**consultant** 14:6
29:24,25 30:7
37:12 45:11 50:15
62:11 91:23 92:1
92:17,21,25

198:16
**consultants** 92:11
**consultation** 77:4,5
**consulted** 141:3
154:3
**consulting** 10:21
29:23 34:14,17
43:23 90:19 93:11
140:20 143:15
153:17
**consumed** 7:12
**contain** 160:11
206:16
**contains** 35:11
**contesting** 128:4
**context** 31:4 34:19
36:17 57:17
101:14 134:13
138:12 139:9
140:23 205:3
209:25
**contexts** 139:4
**continue** 165:20
167:4
**continuing** 110:8
**contract** 53:23
54:23 84:3 117:10
124:22 126:3
134:9 139:7
151:19 166:1,4
171:7 199:3,9
200:8,13,20
216:24
**contracts** 28:12
30:19 31:10 32:4
32:6 54:17 55:1
55:10 86:7 101:4
103:13 118:16
137:12 151:16
155:8 187:15
188:4 203:11
**Contrary** 95:25
127:14
**contrast** 55:2
**contribution** 35:15
187:9

**control** 71:24 72:6
130:19,22 144:6
216:20 217:10,13
217:23 218:9,13
**conversations**
153:6,20
**Coopers** 28:15 29:6
**copies** 152:6
**copy** 226:17
**Cornerstone** 10:24
**corporate** 23:2
31:18 51:21,25
**correct** 5:20 10:3
13:23 15:4 16:11
20:14 24:7,11
25:14 28:10 30:9
34:9 40:16 48:23
56:2 58:8 59:13
61:9,13 62:5,19
62:25 63:1,5,7
64:5 67:15,20
70:4 79:5 81:21
81:24 85:1 87:7
87:24 94:22 96:5
100:5 102:11
105:5,18 108:11
109:12 110:11
112:20 113:18
114:9,10 120:11
123:15,20,21
124:1,18 125:14
125:15 127:25
133:19,21 137:14
140:24 144:12
145:1 146:3,4,5
146:14,21 147:9
147:10,18,20
148:19,21 155:2
155:14 160:6,9,12
160:14 162:16
163:6,20,22
165:14,15 167:24
168:13,16,24
169:9 171:25
172:8,10,11
174:23,25 175:7

175:13,20,21
179:10 180:18,21
182:4,20 183:10
184:1,2,6,10,11
184:23 185:5
186:20,21 187:12
188:18,23 190:20
190:22,23 191:4
192:23 193:6,13
195:23 196:22
202:8 203:13
204:23 206:18,22
207:11 209:16
211:19 212:4,23
213:12,17 215:6
216:17,17 217:3
217:11,15,17,23
217:25 218:23
219:16,17,19,20
220:3,6,8,14,22
221:3,6,7,15
222:19,21 223:2,3
224:3,10,22
**corrections** 15:10
16:24
**correctly** 60:4
204:6
**correspond** 120:17
120:21
**cost** 189:4 208:18
209:1,5,14 214:25
**costs** 110:14 111:7
111:8
**counsel** 2:24 3:22
4:15 5:1,2 9:5
18:11 22:12 51:11
122:12 229:15,17
**COUNTY** 228:5
229:4
**couple** 9:2 26:19
**course** 8:10 9:2
29:5 131:24
150:18 151:21
152:16 153:16
162:10
**court** 1:1 4:7,13,17



5:4,12 6:6,24
27:19 63:9 78:4
78:13,19,21,25
79:2,7,7 80:8,11
82:16,22 83:4
128:20 131:9,25
227:5
**courts** 83:23
**cover** 46:15 169:19
**covered** 166:5,5
171:2,8,23 172:1
172:9,12 173:22
174:7
**crashed** 24:5
**credit** 43:5 53:5,13
86:8 101:4 104:2
111:20 112:8
113:22 114:12
115:14,19 118:12
123:18 142:2,7
162:5 171:12
174:13,18 176:9
177:20 179:3
180:1 181:3,3
182:9 183:17
191:6 209:25
214:25
**credited** 181:10,18
209:14
**crediting** 184:17
193:3 203:3
**credits** 19:8,9 20:4
20:9 21:5 22:1,22
30:11,15,20 31:11
31:17 32:21 43:24
46:20 47:2,8,14
47:17 48:11 50:9
50:12,16 51:17,20
52:1,7,10,20
53:12,13 82:2,15
82:23 84:2 86:7,8
96:8,16,23 97:22
98:8,21 99:2,9,19
100:4,13,20
101:20,23 102:2,9
102:16 103:3,25

104:8,14,21 105:4
105:6,11,16,24
106:7,15,22 108:7
108:15 109:8
110:2,15,20 111:4
111:12,25 112:2
112:17 113:5,11
113:20 114:21
115:3,8 116:14
117:4 118:4,17
119:7,21 122:1,25
123:6,7,14,19
124:10,17 125:2,5
125:12,22 126:2
127:7 129:14
141:6,11 143:9,10
143:14,16,20,23
156:21 157:7,14
159:4,6,13,16,19
159:25 160:2,16
160:25 161:2,7,19
162:1,3,13,19,21
162:23 163:4,20
169:14,20,23
170:3,5,21,23,23
171:18,19 172:15
172:16,18,24
173:5,6,11,17,24
174:22 175:24,25
176:4,17,20 177:1
177:1,5,8,11,16
177:17,24 178:14
178:20,24 179:3
180:1,9,15 181:3
181:5,8,14 182:5
182:10,11,14,18
183:11,18,20
184:5,17,25 185:3
185:20 186:1,8,19
186:23 187:3
188:16 191:1,6
192:1 193:4
196:19 197:1
198:6,14 202:3,14
203:4 209:14
210:8,25 211:1,14

212:3,7,10,20
213:15 214:6,17
215:11 221:6
222:6,11 223:11
**criteria** 64:9 65:14
68:16,25 69:14
71:10 72:12 73:11
73:21,24 74:1
76:16,23 77:15
78:5,14 79:3
82:17 128:18,21
132:8 133:16
157:8 159:7
201:23 203:2
208:21 209:10
**criticizing** 126:22
129:6 130:4,6,10
**Cross** 3:4
**CROSS-EXAMI...**
215:23
**CRR** 1:21 228:15
229:22 230:17
**current** 109:8
**currently** 16:21
23:25 93:2 120:16
**custom** 159:23
**CV** 16:9

_____

**D**

**D** 3:1
**damages** 51:7,10
103:24 104:7
**data** 56:25 57:9
58:24 59:10 219:4
219:8
**date** 11:23 12:5,9
12:25 92:12,14,15
164:25 230:2
231:24
**dated** 219:15,19
229:20
**David** 9:18,22
**day** 54:8 228:10,12
229:20
**days** 230:12
**dealing** 184:13

**debited** 158:10
**decided** 17:24
**decides** 77:1 82:16
**deciding** 113:13
**decision** 18:1 20:6
20:12,17,23 21:17
83:1 101:3 112:2
139:20 140:19
202:1 205:22
**decisions** 35:20
93:24 113:1
140:17
**declare** 231:21
**decline** 209:15
**decrease** 175:19
188:15 189:12
**decreases** 189:20
**deem** 92:17
**deemed** 38:10
142:2 143:20
192:11
**deems** 82:22 110:2
**defendant** 1:8 2:14
4:24 8:23 13:22
**define** 18:24 30:22
31:7 46:5 62:22
76:12 89:25 91:7
92:13 95:13
109:22 129:1,10
132:16 133:13
134:5 136:2 138:2
155:15 158:2
171:24 186:2,8
187:8 204:5,16
207:13 224:18
**defined** 34:12
47:24 68:8,19
72:3 76:9 88:24
89:20 91:17,25
108:1 148:12
149:14,19 155:25
157:18 158:4,24
159:1,24 161:13
161:14 169:8,11
173:23 181:8
184:7

**defines** 62:24
158:22 171:23
181:13
**defining** 101:8
**definition** 62:14
77:18 91:4,6
92:15 108:17,20
127:10 136:11
139:3,9 145:24
148:12 157:25
158:1 160:11,13
160:17,19,19
161:7,10 167:6,25
168:6 170:5 171:2
171:3,22 172:4,24
173:14 174:14
205:17,22 225:3
**definitions** 63:13
65:23 157:24
164:13 168:7
170:10 176:6
225:4
**degree** 27:13,18
**degrees** 27:22,23
**Deloitte** 208:5
**Denise** 1:21 4:14
228:15 229:6,22
230:17
**Denney** 2:8 4:22
**Department** 41:12
42:11 44:11,20
83:5,9,15,21
**depend** 116:8 173:9
**depending** 39:8,9
40:9 79:21 95:18
119:16,17 135:7
135:14
**depends** 43:17
93:19,19 94:14
119:24 137:24
**deposed** 5:20 8:17
**deposition** 1:12 4:4
4:10 8:10 9:1,6,11
9:14,17 10:1
14:13 16:14 17:5
19:7 21:6 96:20



105:18 106:2
118:1 122:23,25
123:24,25 124:13
124:15 194:6
207:5 213:7
220:11,15 226:18
229:9 230:7
**depositions** 20:19
99:11 117:24
219:25 220:3,5
**deprived** 97:8,12
105:5
**deprived,'** 96:2
**describe** 31:3 34:10
45:6 57:12 63:20
74:20 75:1,15
111:16 155:9
163:8 214:17
**described** 33:18
42:9 48:12 61:21
76:6,7 77:25
86:17 87:15
140:23 176:1
217:23
**describes** 71:15
74:18
**describing** 75:18
**description** 173:21
174:6
**design** 34:17
142:21
**designate** 154:15
**designated** 63:18
64:13 140:11
**DeSimone** 54:1,1
**Despite** 6:19
**detail** 74:20 170:9
**determination**
18:18 19:1 38:8
38:19 41:17,18,23
43:14 78:20 79:8
86:16
**determine** 27:8
37:7 38:7 44:12
90:25 91:15 98:25
135:13 145:20

150:10,15 201:21
202:18 208:22
**determined** 18:16
63:4 119:14
120:19 121:3
**determines** 63:10
78:4,13 79:3
131:25
**determining** 38:5
**develop** 51:16 80:2
**developing** 35:17
**developments**
79:14
**Diaz** 2:23 4:12
80:18
**difference** 169:3
177:21
**different** 21:11
22:20 29:7,22
37:18 41:3 43:22
46:16 50:6 54:25
64:24 65:23 80:3
84:11 89:8 90:12
92:6,8 111:3
113:3,23 116:4
128:11,11 138:8
138:17,23,25
142:9 150:19
151:3 153:18,20
157:16 168:13
177:7 188:9 189:5
189:5 190:4 194:6
203:2 204:11,24
205:4,10 209:9
219:12 222:18
**direct** 3:4 5:13 40:1
56:5,13 67:10
96:17 108:1
157:19,25 158:6,9
158:20,24 160:13
160:18 161:3,11
161:14,21 163:1,8
163:10 176:13,17
207:8 213:18
216:3
**directed** 218:4

**direction** 93:22
150:2 151:1
160:18
**directions** 71:17
**directly** 60:2 158:8
158:16 171:6,8
189:2
**director** 154:13
**disagree** 59:3,7
84:7,15 97:7
131:3 143:11
146:2,20 148:15
152:23 172:3
**disagreeing** 87:2
**discharge** 108:10
109:14 110:10
**disclose** 94:12,17
98:14 100:18,22
101:2,21 108:23
118:11 127:6
172:2,13 178:14
178:16 181:5
182:11 183:19
**disclosed** 32:8
39:22 40:3,10,13
40:22 41:6,9,13
42:25 43:3,6,11
43:13,15,25 44:4
44:6,13,17 45:6
61:17 82:18 83:2
94:25 96:7 97:1
97:20 98:6,22
99:18 100:3
102:10,17,18
108:19 110:5
173:14 176:3
185:14 186:3
196:20
**disclosure** 3:19
32:13 33:17,22
36:18 38:21 39:3
39:14,18,25 41:3
41:16 42:10 43:7
44:1 45:2,7 56:15
70:16 76:22 94:15
109:22 160:5,22

162:15,22 166:3
166:16 176:11,12
176:13 178:19,22
178:22 186:17,23
187:2,5 191:12
194:8 198:13
207:4 221:4 222:5
**disclosures** 3:20
32:22 41:1 45:12
45:14 56:7,25
57:8,13 58:21
59:10,16 60:5
75:20 95:5 96:18
108:3 159:25
163:6 178:12,16
178:25 181:20
187:2 197:14
210:7 220:24
222:10,25 223:7
223:10
**discount** 190:15
**discretion** 72:15,20
72:24 73:1 139:11
139:13,16,19,20
140:15,18 141:17
141:20,21,24
142:6 143:1,15
225:7,12,14,16,19
**discretionary** 71:23
72:5 130:19,22
140:5 217:9
**discuss** 36:7
**discussed** 125:6
152:25 215:19
**discussion** 42:3
98:20
**discussions** 21:21
**dispose** 72:23 77:8
**distinction** 59:21
109:21 115:2
**distinguish** 147:17
199:1
**distinguishing**
89:22
**distribute** 53:5
**distributed** 53:2

**district** 1:1,1 4:7,7
13:12
**divided** 221:15
**dividend** 53:2,2
**dividends** 53:6
**document** 17:22
35:10,11,12,19
48:22 60:16 70:17
71:2 72:25 75:25
76:5 83:22 164:8
164:10,14 166:21
169:23 170:4,9
179:12 194:10,12
194:19,21 195:9
195:10 196:9,15
196:24 197:4,13
198:7,10 223:18
231:21
**documentary**
188:13 212:19
**documentation**
206:11
**documented** 144:7
147:24 148:6,7
149:7 216:21
**documents** 7:22,24
8:2 15:3,5 16:17
16:20 17:24 18:2
18:4,7,8,10,11,14
18:16,19,21,23
19:2,4,12 23:11
24:13,16,18 25:25
32:25 33:1,3,22
39:6 41:3 61:22
63:20 64:3 65:1
75:6,7,13,14,17
76:5,10 101:19,25
102:11,17 104:11
132:15,17,21
133:2,4,8,13
191:12 196:8
207:4 218:24
219:4,7,8,24
**doing** 57:13 84:22
92:19 95:16
114:20 115:24



116:3 129:11
202:2 227:11
**DOL** 42:8 43:13,21
45:5 80:7 95:8
164:24 169:2
**DOL's** 44:13
**dollar** 138:7 186:24
**dollars** 53:6 192:15
**doubt** 191:5,8
**dozens** 43:22
**draft** 152:6
**drafting** 17:16,19
**Drawer** 2:10
**duly** 228:10
**duties** 45:24 46:1,9
46:13,15,22 49:9
49:14,16,19 50:1
65:18 110:11
192:5 201:6 202:9
**duty** 107:4 108:10
109:15

--- E ---

**E** 3:1,8
**e-mails** 19:11,20
20:2,14,17,22,25
21:4,11,13,15,16
21:20,20 22:6,7
22:13 192:25
219:5,15,18
220:16,17,19,21
**earlier** 38:20 50:14
59:8,9 61:10
70:24 82:21
123:11 132:6
142:16 147:10
164:16 169:5
206:15 207:9
215:19 218:4
221:24 222:4,17
225:6
**early** 124:17
**earned** 26:22
108:16 213:10
**easily** 225:2
**economic** 31:5,8,10

**effect** 199:7
**Effective** 164:23
**effectively** 107:20
**eight** 219:14
**either** 23:6 29:23
35:18 43:22 45:11
46:8 75:8 77:11
78:14 97:14 141:3
160:20 161:21
163:1 174:19
179:24 198:17
202:4,15,25
212:10 226:17
**elaborate** 224:8
**elected** 95:14 212:7
**elements** 109:17
**Eleven** 8:18
**eligibility** 35:16
**eligible** 127:8
**email** 2:12 230:13
**employee** 229:15
229:16
**enacted** 94:23 95:1
**encompass** 113:2
**encompassed** 111:3
**encountered** 92:11
**enforce** 44:22
**enforcing** 44:25
**engage** 36:15 77:6
88:9 89:3
**engaged** 47:3 49:19
50:5
**engagement** 12:22
198:24
**engages** 88:18,22
**engaging** 88:1 89:8
**Engines** 74:16,17
76:11
**enrollment** 35:14
**entails** 63:21
**ENTER** 231:2
**entered** 70:1
124:21
**entering** 125:3,13
126:3
**entire** 49:18 137:16

200:22 211:7
**entirety** 17:12
23:11 24:15
127:20 168:15
224:2,9
**entitled** 31:16
32:20 122:14
177:4
**entity** 43:14 77:15
78:15 140:6,11,14
142:12,13,25
151:13 174:20
176:9 177:7
199:19,21,24
204:8
**equal** 109:25
114:11 121:2
136:16 137:13
**equivalent** 111:20
**Eric** 1:3 4:5 123:25
124:17 220:5
**ERISA** 3:13 13:22
13:25 34:22 35:2
35:9,22 36:12,22
37:3,10,21 38:5
38:17,22 46:2,22
47:4,16,22 57:16
57:17,18,19,20,23
61:7,24,24 62:3,7
62:12,13,17 63:12
63:13,15,19,21
65:17,25 69:18
72:2,14 73:7,14
73:18 74:21 75:4
75:6,9,14,20 76:7
76:12,15 77:12,21
82:17 88:10,19,24
88:25 89:4,9,15
89:21 103:13
127:16 128:8,13
130:7,7,23 132:1
132:2 139:16
140:11,24 142:3
142:21,22 154:15
154:18,22 201:16
204:8 205:17

207:13 225:3
**errata** 3:7 230:12
231:1
**Esquire** 2:6,11,17
2:18 230:3,22
**essentially** 139:19
**establish** 51:8
**established** 45:15
54:19
**establishes** 54:20
**et** 1:3
**ETF** 225:25 226:6
**evaluate** 96:3
**evaluated** 198:17
198:19
**evaluating** 198:25
199:6,7,9,24
202:25 208:17
**evaluation** 110:22
199:16,25
**evidence** 25:5 26:5
99:7 100:1 106:4
122:5 124:25
125:25 132:19
141:2 188:13
189:12 212:5,19
212:25 213:4
**exactly** 99:13
141:21 193:10
220:13
**Examination** 3:2
5:13
**example** 19:6 25:17
25:22 28:14 32:9
32:10,12,14,16
35:8 37:9,20
38:24 39:10 43:4
51:6 55:16 63:15
74:15 76:11,18,19
77:1,10 88:7
90:22 91:13 92:10
92:23 93:1,9,11
93:16,20 98:18
110:16 111:5,24
112:8,14 114:11
121:5,22 136:22

137:25 139:15,18
139:24 140:2,10
142:13,17 146:11
154:1,3,20 158:9
158:14 175:4
189:15 198:23
200:24 203:22
206:12 211:13
214:5,16 225:21
**examples** 158:20
163:10,13,20
**exceed** 40:12
**exception** 186:21
**excess** 121:14,14
213:23
**exchange** 158:13
**exclude** 171:17
**excuse** 22:16 88:22
124:11 143:19
150:6 158:7
211:21 215:8
**executed** 226:2
**executes** 226:5
**execution** 3:7
**exemption** 164:9
164:11,21 166:20
**exercised** 143:15
**exercises** 142:25
**exhibit** 14:12,14,15
15:20,22,23 16:9
40:18 58:2,3
60:18,20 66:12,13
70:11,12,14 71:11
72:12,18 74:1
144:19 163:24
164:1 179:21,22
194:3,4,6,7,19
195:17 196:5
197:8,10 215:25
218:17
**exhibits** 3:22 17:21
23:9 220:3,11,15
**exists** 140:5
**expanded** 132:20
**expect** 103:13
118:4,5,18 149:24



150:24 153:7,22
155:23 210:3
**expectation** 153:13
**expectations**
150:11,16
**expedited** 227:5
**expense** 112:2
114:20 178:1,9
214:23
**expenses** 114:24
116:4
**experience** 28:7,11
29:5,16,18,20
30:6 32:5 34:13
42:22 43:10,20
52:20,24 55:17,22
56:12 62:11,15
63:25 64:23 65:2
65:3 73:7 74:10
74:12 75:22 77:23
78:2 89:12,16,17
89:20 93:12,15
118:22 132:11,23
134:3 151:8,14
155:17 174:9
175:6,10 201:4
203:15,19 208:10
208:25 210:3,23
210:25 211:4,5,6
221:4
**experienced** 77:24
**expert** 3:11 7:25
8:20,23 12:17,17
13:21,24 26:22
30:7 34:21 35:5
36:22 37:2 40:21
50:11 51:7,7
103:23 146:13
148:6 208:12
217:21
**expertise** 34:11
44:25
**experts** 24:21 61:4
84:8 126:22 129:6
144:3 146:10,14
146:16 147:19,22

149:10 216:18
**experts'** 96:1
**Expires** 228:17
**explain** 145:14
**explanation** 145:19
**explicitly** 186:18
187:1 207:2
**expressed** 224:16
**expressing** 69:11
85:2
**extend** 90:12
149:16
**extension** 166:6
**extent** 31:24 50:4
51:20 55:20 71:3
71:5 82:22 102:8
104:13,20 105:3
215:10
**external** 91:23 93:6
**extrapolating**
211:6
**eyebrows** 136:12
136:18,20

————————

**F**

**face** 120:1,3
**facilitate** 18:20
38:11
**fact** 25:18 44:14
53:10 64:19 71:19
72:4 96:15 131:20
170:20 189:13,18
191:6
**factor** 20:6 110:21
113:12 119:5
202:15 208:16
**factors** 113:3 189:8
202:17 208:25
209:7
**facts** 84:24 163:19
231:21
**factual** 25:3,8 26:3
51:23
**fair** 6:16 25:23 26:2
26:11 29:8,15
64:25 79:20 84:18

94:1,4 132:2,14
139:5 140:21
143:13 146:9
148:9 155:22
168:10 176:23
185:25 188:6
191:14 208:20
218:11 226:25
**fall** 29:21 39:4
41:11 163:20
170:5 172:24
198:6
**falling** 73:6 77:18
**falls** 174:14 201:25
205:17
**familiar** 5:22
135:24 168:18
189:1
**favor** 128:24
129:23 131:23
132:4
**features** 35:11
**fee** 45:2,15,17
58:24 67:10 93:21
93:24 94:15 96:22
101:10,16,22
111:3 112:17
113:4 114:8
119:18 121:25
124:9 125:11
158:10 174:11
188:16 190:3,12
190:25 191:24
209:25 212:21
214:7,7
**feel** 207:12
**fees** 11:10 34:18
39:16 45:22 60:7
94:12,18,25 96:4
97:10 107:16
110:13,22,23
111:14,21 112:10
113:2,6,23 114:3
114:7,7,8,9,14,16
114:17,19 116:14
117:4,6,9 118:3,6

118:12,15,18
119:3,22,23,23
120:15 158:8,14
185:11 188:14,20
189:4 190:16,19
197:5,5 198:2,6
203:7 213:10,22
215:9,11
**fell** 23:13,15
**Fidelity** 21:8 53:11
53:21 123:6,9
151:7,12,15 154:7
211:16
**fiduciaries** 21:22
35:23 36:23 38:22
64:1 75:9 77:22
108:9 109:13
110:9 137:20
152:19 153:7,12
153:21 155:19,25
201:16 203:15
**fiduciary** 34:16
37:13 45:24 46:1
46:9,12,15,22
47:9,16,22,23
48:2,6,10,12,18
49:1,9,14,16,19
50:1,6 61:6,7,12
61:15,16,16,20,21
61:25 62:3,12,13
63:3,10,11,13,15
63:20,22 64:4,8
64:13,14,19,21
65:5,13,18,24
67:5,7,17 68:6,8
68:11,23 69:5,7
69:14,19 70:2,19
71:1,1,11,12 72:2
72:15 73:8,15
74:18,22 75:2,3,6
75:15,19 76:7,8
76:16 77:13 78:16
79:17 80:4,4
89:19 106:6 107:4
107:10 126:23,25
127:10,16 128:5,9

128:10,11,13,14
128:15 129:21,22
130:8,24 131:21
132:1,2,17,18,20
133:1,9,10,13
139:16 140:12,24
142:4 143:3,4,5
143:24 145:12,15
145:17,20,25
148:11,11,13
150:1,20,25 151:6
152:3,8 153:8,23
153:25 154:15,17
154:18,22 155:9
155:13,15 166:11
171:4,6,7 192:5,9
192:22 201:6,9,13
201:19,20 202:9
203:7,9,21 204:3
204:4,9,13 205:12
205:23,24,25
206:5,8,20 207:3
207:7,14,25
214:13 224:19,19
225:3,8,13
**fiduciary's** 36:9
**field** 34:10
**fifth** 95:24 121:21
**filed** 12:24 22:25
**filing** 102:19
**final** 58:13,18
**financial** 39:6
74:16,17 76:11
135:3,5,21 151:23
**financially** 229:18
**find** 21:17 103:13
**firm** 10:21 13:4
63:18 201:14
204:10,11
**firms** 10:22,23,25
38:12,13 43:23
62:11,13 201:15
**first** 14:12 21:24
37:7 39:5 60:18
60:20 69:24 99:6
130:16 157:5



161:25 164:6
166:18,19 168:22
216:17 217:14,19
**fits** 172:4
**five** 25:18
**fixed** 93:21,24
**Fleckner** 2:17 3:4
4:23,23 10:1 21:1
22:9,15 30:21
31:13,23 35:24
36:11 38:6,23
40:5,15,23 41:20
42:19 44:8,23
48:7 49:3 52:3,14
52:17 54:3 55:15
56:8 57:3,11
59:14 62:9,20
63:6 64:10 65:19
66:6,18 67:19
68:17 69:1,16
74:8 78:8,18 79:6
79:19 81:19 82:19
83:11 84:5 87:20
88:15 89:10 91:9
94:7,13 95:6 96:9
97:23 98:16 99:20
100:21 101:6,24
102:13 103:8,15
104:16,23 105:7
105:25 106:9,23
107:7,25 108:12
109:16 110:12
112:23 113:24
115:22 116:7,17
116:21 117:5,16
117:18 118:8,21
119:8,25 120:7,13
120:20 121:16
122:10 126:12,19
128:25 129:24
130:13 131:8
133:3,11,18 134:4
134:20 137:7,23
138:14 139:22
140:22 141:7,19
143:17 145:8

146:8,22 148:3,22
149:4,12 156:7
163:21 164:2
165:4,9 169:21
170:7,17,25
172:20 175:8
176:24 180:22
181:17 182:8,21
183:1,6 184:12
185:15 187:16
188:5 190:8
191:21 193:19
195:2,5,12,15,20
195:25 197:2
199:4 201:8
202:10 203:16
209:17 213:25
215:7,17,22,24
217:6,18 218:1
219:22 220:9
221:18 222:15,22
223:5,14 224:7,12
224:23 226:8,12
226:22 227:3,10
230:3
**flipside** 6:14
**Florida** 1:1 2:5,10
4:8 154:4 228:4
228:16 229:3
**flow** 189:18
**flows** 53:7,8
**focus** 113:4
**focusing** 57:5
112:25 200:24
**follow** 25:16 41:15
51:5 79:14 85:10
86:12 91:10
**follow-up** 215:17
**followed** 42:5
**following** 4:1
**follows** 213:2,3
**Footnote** 123:1,22
179:14,17 183:2,3
208:5
**footnotes** 9:3 25:12
25:15,24 178:19

**foregoing** 215:10
229:8 231:21
**foreign** 19:8,9 20:4
20:9 21:5 22:1,22
30:11,15,20 31:11
31:16 32:20 43:5
43:5,24 46:20
47:1,7,14,17
48:11 50:9,12,16
51:17,20 52:1,7
52:10,20 53:3,5
53:12,13 82:2,15
82:22 84:2 86:7,8
96:8,16,23 97:1
97:21 98:7,20
99:2,9,19 100:4
100:13,20 101:4
101:20,23 102:2
102:16 103:2,25
104:2,8,14,21
105:4,6,11,16,23
106:7,15,21 108:6
108:7,15 109:7
110:2,15,20 111:4
111:12,20,25
112:8,17 113:5,11
113:20,22 114:12
114:21 115:3,8,14
116:13 117:3
118:4,11,17 119:6
119:21 122:1,1,25
123:7,18 124:10
124:17 125:2,5,12
125:22 126:2
127:7 129:14
141:6,11 142:2,7
143:9,10,14,16,20
143:22 156:21
157:7,14 159:4,6
159:13,16,19,25
160:2,16,25 161:2
161:7,18,25 162:2
162:5,13,19,21,23
163:4,19 169:13
169:19,23 170:3,4
170:21,22,23

171:12,17,19
172:15,16,18,23
173:5,6,11,17,24
174:13,18,20,21
174:22,24 175:2,7
175:18,20,23,25
176:4,9,16,20
177:1,1,5,8,11,16
177:19,24 178:14
178:20,24 179:3
180:1,9,15 181:3
181:5,8,13 182:5
182:9,11,14,18
183:11,18,20
184:5,17,25 185:3
185:20 186:1,8,19
186:23 187:3
188:16 191:1,6,25
193:3 196:19
197:1 198:5,14
202:3,14 203:3
209:13,24 210:8
210:24 211:1,14
212:3,6,10,19
213:14 214:6,17
214:25 215:11
221:6 222:6,10
223:10
**foremost** 21:24
**forgot** 13:16
**form** 23:5 29:2 39:6
114:12 138:1,3,6
138:7,12 169:1
185:11 217:4,16
217:24 219:21
221:17 222:12,20
223:4,12 224:4,11
224:20
**formally** 65:6
**format** 28:24
**formatting** 17:21
169:4
**formerly** 194:12
196:15
**forms** 22:24
**forth** 37:2 51:2

60:7 63:4 127:9
174:8
**forwarded** 3:7
**four** 151:24 189:16
**fourth** 83:25
**frame** 120:4
**framed** 157:10
**free** 226:13
**front** 7:22,24
144:14
**fulfills** 192:22
**full** 12:11 26:22
107:22
**fully** 97:20 98:6
136:2 155:9
**function** 143:6
**functioned** 47:8,15
47:22,23 48:2
**fund** 28:17 37:15
55:21,22 90:22
91:21,21 96:25,25
97:2,5 112:1
114:16,23 115:13
115:25 123:19
124:5 140:3
142:14 158:16
174:10,11,13
175:13 176:15
178:2 196:25
197:21,22,25
200:1,2,10 201:24
202:19,25 203:1
214:24 215:1
221:10,21 222:1
222:10 223:10
225:24,25 226:3,6
**fund-related**
197:23
**funded** 137:12
**funds** 37:11,18,23
54:17,23 90:23
92:12,14,15 93:17
112:3 114:21
115:7 139:15
154:10,11 177:19
185:12 191:25



201:21,22 202:16
202:21 206:2,9
**further** 133:24
161:14 168:7
169:11 170:11
171:3 215:15
217:23 224:8
226:9 227:13
229:14
**future** 108:19

**G**

**G-I-S-S** 5:18
**gain** 21:23 45:20
138:23
**Gallagher** 5:3
**general** 25:23 36:8
36:12 39:24 52:4
106:17 129:20
162:20 164:9
166:4,19 177:17
197:20
**generally** 30:15
54:18 56:22 82:14
91:25 181:25
203:11
**generate** 27:10
110:24 115:7
191:7
**generated** 21:12,12
123:8 181:4
182:10 183:19
**getting** 139:21
140:7,20
**GG** 228:16
**Gissiner** 1:13 3:3
3:10,12 4:5 5:5,15
5:18 23:18 24:4
66:20 84:23 85:19
85:21 88:4 96:12
97:16 99:6,12
117:22 122:15
127:13 131:13
147:2 149:22
156:18 157:5
160:1 164:6,16

165:14 166:13
170:13 180:4,24
182:13 183:8
184:10,20 185:2,6
185:18 196:4
207:16,23 215:15
215:18 216:1
228:9 229:10
230:3 231:4,24
**Gissiner's** 182:23
183:4
**give** 5:9 32:12
76:18 80:4 88:7
92:10 113:21
114:8 115:19
126:9 225:21
**given** 44:14 52:13
52:19 111:12
142:13 196:14
227:5
**giving** 52:16 77:20
98:5 135:18
158:19
**go** 5:23 10:17 12:3
12:8,16 19:3
23:17,20 26:17
27:12 33:20 38:4
54:4 58:12 60:15
71:14 80:14,24
85:4,9,17 86:9
93:23 96:12,14
97:4 98:17 99:10
102:24 106:1
111:7,8 114:3,9
114:15,16 116:15
119:19,23,23
122:8 129:15
130:15 144:13
152:15 153:15
155:7 156:11
170:8,15,18 171:1
172:22 173:20
187:17 188:12
189:24 193:16
206:10,25 208:2
212:14 218:2,16

218:19 219:23
223:17 226:13,15
226:15 227:7
**goal** 7:4
**goes** 96:24 115:25
120:3 145:13
148:10
**going** 5:23 6:9,15
10:16 14:12 23:23
27:3 45:14 49:15
51:9 80:13 81:1
85:9 119:22
136:20 143:8
156:13 170:8
180:7 193:20,22
206:21,24,25
208:1 227:8,14
**good** 4:2 34:15
**Goodwin** 2:15 4:24
13:3,21 230:4
**Google** 225:3
**government** 174:19
**granted** 140:14
142:5,15
**great** 5:15 24:3
144:20
**Great-West** 151:23
**ground** 5:23
**group** 3:16 10:24
11:4,7,11,19,25
17:16 18:9,20
19:9 28:12,24
29:3,18,20 30:19
31:9 32:4,6,16
47:25 53:22 54:16
54:22 55:1,6,10
70:10 84:2 86:6
101:4 103:12
117:10 118:16
124:21 134:9,13
135:21 137:12
139:7 151:15,18
151:23 152:24
154:6,7,8 155:5
177:3 187:14,19
187:23 188:4,7

199:2,8,24 200:8
200:13,14,20
203:10 216:23
220:25 221:8,23
222:5
**growth** 119:16
**guess** 10:18 12:3
19:24 27:3 76:25
133:24 174:19
187:7
**guidance** 41:14
42:12 83:16,19,22
211:22 212:8
**guide** 3:13 57:23
70:18 196:7
**guidelines** 212:2
**guys** 226:17
**GVA** 28:19 29:9

**H**

**H** 3:8 138:3
**half** 10:8
**Hancock** 1:7 2:24
3:19 4:6 5:2 14:4
14:7 18:11 20:7
21:22 22:25 24:22
25:18 33:10 45:24
46:8,12,21 47:3,8
47:15,22 48:2,6
48:10,13,25 51:12
51:18,22,24 54:16
54:20 55:12 56:4
56:13 61:5,6,12
61:15,20 62:2
64:18,20 65:12
68:16,22 69:4,18
69:25 70:25 71:6
71:22 72:2,4
73:23 75:18 76:1
76:6 96:3,6,21
97:20,24 98:1,6
98:14,21 99:7,17
100:2,19 101:21
102:1,15 103:12
104:11,13,20
105:3,10,23 106:6

106:8,14,16,20,22
109:7 110:22
116:12 117:2
118:2,5,10,11,15
118:18 120:16,18
121:3,7,12,24
123:13 124:8,22
125:3,10,13,18
126:3,23 127:6,15
128:5,7,17,21
129:13 130:7,18
130:22 131:4,20
132:1,9,16,19,25
133:9 134:10
141:3,17 142:3
143:13,21 145:21
149:5,25 150:24
155:11 157:8
169:13 172:4,7
173:11,16 175:4,5
175:9 177:3
178:21 179:2,25
181:2 185:12
194:8 197:22,24
206:3,4 207:20
210:5 211:3,12,16
212:21 213:10,14
213:22 216:22
217:8 221:20
222:9,18 225:23
226:2,3 230:7
231:3
**Hancock's** 32:23
46:19 47:1,7,13
69:12 101:2 102:8
103:5 125:2
127:11 131:17
144:4 145:15
147:23 148:6
149:14 155:12
210:8 216:18
217:21
**hand** 5:6
**handwriting** 8:3
**Hang** 130:14
**happened** 20:11



happens 12:19
  54:18 110:25
happy 40:17
hard 179:11
head 151:24 158:4
hear 80:23
heard 129:10
held 34:2 53:9
  144:6 175:18
  216:20
help 17:14 18:24
  45:19 79:15
  139:23 227:7
helpful 70:5 161:12
helping 37:4 41:15
higher 33:11
  188:14 189:4,11
  189:13 190:3,16
  190:19
highest 208:23
highlight 96:15
  135:4 193:2
highlighted 103:25
hold 5:7 33:25
holding 71:15
  145:17,22 150:1
  150:25 153:9,22
  155:13
hospital 154:4
hour 11:17
hours 10:8,19 11:6
  12:11 156:8
hundreds 153:18
  153:19
hypothetical 78:9
  89:5 108:13 109:4
  109:6,12,17,24
  110:3,16 111:5,10
  116:10 142:9
  143:8,18,19,25

I
I-N-E-R 5:18
identification 174:3
  174:5
identified 65:12

70:2 170:21 218:3
  219:3 224:2
identifies 65:5
  68:23 208:19
identify 25:24 65:6
  75:8,24 106:6,21
  155:18 174:1
  195:8,9 209:5
identifying 70:25
ignore 144:4
  146:19 147:23
  148:1 149:10
  216:18
ignored 217:21
ignores 145:5 146:6
  148:20 149:2
  218:12
ii 121:21
iii 67:18 171:23
immediately 33:19
  93:23
impact 7:13 202:3
  212:6 214:18,20
impacted 22:22
  26:20
impacts 111:6
importance 208:22
important 7:1,2
  109:21 115:1,2
  209:7,11,15,18
  210:1
imposed 95:9
impressive 224:21
improper 122:17
improve 45:15
in-house 4:25 5:2
inadvertently
  77:11
inception 10:14
include 18:3 39:8
  90:21 146:16
  152:18 159:19
  163:9 197:1
  198:14 212:7
  218:7 222:10
included 25:24

42:4 104:7 194:22
  209:19 220:16
includes 39:7 70:18
  172:14 197:25
  220:5
including 28:8
  175:6 210:5
income 26:8,20
  27:6 31:17,25
  53:14
inconsistent 88:10
incorporated
  200:22
incorrect 76:21
  130:18 190:22
increase 190:1
increased 26:19
increasing 215:11
Incremental 15:2
independent
  166:11
independently
  118:3,16
index 90:23 91:20
  93:17
indicate 32:18,20
  45:13 102:1 126:5
  220:10
indicated 33:4
  41:12 82:25 84:14
  87:4 88:2 120:23
  132:18 133:12
  137:3 138:7 139:2
  143:25 156:3
  168:19 169:4
  176:16 192:10
indicates 100:2
  209:4
indicating 124:25
indication 108:24
indirect 40:2,8 56:6
  56:14 67:10 108:1
  157:20,25 158:12
  158:15,20,25
  160:13,19 161:2
  161:11,14,22

163:1,8,10 171:10
  172:24 173:25
  174:4,5,9 176:13
  176:17 180:12
  181:6 183:14,20
  183:25 184:17
  185:1,9 186:2
  196:20 213:19
individual 32:10
  33:7 49:21 50:5
  52:19 54:21 74:19
  74:21 92:17 99:1
  111:25 113:4,10
  113:12 114:22
  119:15 135:8,15
  137:17 143:7
  208:24 215:1
individual-by-in...
  119:24
individually 1:4
individuals 150:20
  151:4,7 152:16
industry 41:18,21
  42:12 64:23 65:2
  65:7 74:10,12
  78:7,17,23 79:4
  79:14,16,22 82:1
  82:7,10,14,24
  84:17,22 86:15,18
  87:4,11,15 88:3,6
  88:8,13 89:1,3,18
  89:23 90:3,5,7,9
  90:13,20 91:3
  92:2,8,19,22 93:5
  93:9,13,17,20,22
  94:2,5,21 107:14
  132:11,23 134:17
  134:21 136:5,10
  137:2,4,6 139:3,6
  149:24 150:10,15
  152:11 155:23
  159:8,12,23
  162:17 177:10,13
  189:9 191:16
  196:19 198:10
  202:15 211:22

224:17,18
industry-wide
  92:15
influence 189:8
inform 8:11 74:13
  206:13
information 3:16
  22:2,17,20 25:21
  39:14 47:24 58:22
  59:16,23 60:2,6
  70:9,18 95:15
  96:3,15,24 97:12
  97:15,25 98:9,12
  98:22 99:1,15
  100:13,18 102:6,8
  103:6,11 104:12
  105:2,6,9,11
  106:15,17 108:10
  109:14 110:10
  121:24 122:7,11
  122:14 124:8
  125:10 126:2
  196:7 213:1,3
informed 125:20
  150:23
informing 155:1
informs 177:9
initial 5:17 12:14
  12:17 15:6,20
  16:2,17,22,25
  19:1 117:25
  164:20 187:18
  190:12 198:15
  213:8 218:16
initially 11:24
  18:12,17,18 21:4
  205:1
input 139:21
  140:20
inquire 96:22
inquiries 96:17
inquiry 11:24
  12:14
instance 79:2
  190:19 207:8
instances 90:16



191:13
**institutions** 27:23
**instruct** 51:12
226:2
**instructions** 71:20
226:4
**instructs** 6:21
**insurance** 1:7 2:24
4:6 28:4 31:14,21
55:2 86:6,11
124:4 134:15,17
135:7,10,24
149:25 150:24
151:9 153:7
155:10,20,24
156:2 230:7 231:3
**insurers** 188:21
**intend** 76:15
206:16
**intended** 26:4
**intending** 207:24
**intent** 17:2
**intention** 15:13
**intentionally** 77:11
**interacted** 151:4,7
151:24 152:24
**interest** 36:13
127:9 128:24
129:3,7,10,13,18
129:21 130:11
131:5,23 132:3
193:9
**interested** 46:18
229:19
**intermediary**
158:13
**International** 2:4
214:24
**interpose** 116:18
165:10
**interposed** 116:21
**interpretation**
34:22 35:6 43:18
44:16,20 63:24
64:12 65:22 73:4
73:5 87:10 146:3

146:20 192:8
**interpreting** 169:18
**interrupted** 24:12
116:16 131:10
**invest** 115:7,13
221:20 222:9
223:9
**invested** 114:22
123:19 221:10,25
**investigating** 22:8
**investment** 29:25
34:16 37:15 38:3
45:22 54:23 55:7
55:13,16 61:25
64:1,13 67:9 68:6
74:25 75:1 90:22
90:24 91:21 92:11
93:3 94:16 95:23
96:18 106:5
114:16 127:16
128:8,10 139:17
140:17 154:10
155:6 171:5,7,9
175:6,9,15 177:18
178:10 191:24
196:8 200:1,2,6
200:10,15,25
201:21 202:5,16
202:19,25 204:10
205:10,12 206:2,9
206:12 214:8
215:9
**investments** 37:14
39:15 77:2 91:24
93:7 97:10 123:8
150:1 151:1,10
153:23 154:16
203:25
**invests** 225:23
**involved** 22:18,18
35:12 203:3
**involvement** 20:5
207:20,21
**issue** 30:10 47:20
49:1 86:6 120:2
176:8 221:14

222:19 223:9
**issued** 24:23 43:23
56:17,19 223:8
**issuer** 28:12 55:10
199:2,14,19 200:8
200:13,21
**issuers** 30:19 31:9
32:3
**issues** 24:13 35:2
50:16
**italicized** 58:20
**iteration** 195:17

**J**

**James** 2:17 230:3
**Jamie** 4:23 116:15
133:20 216:5
219:7
**jfleckner@good...**
2:18 230:5
**Job** 230:8
**John** 1:7 2:24 3:19
4:6 5:2 14:4,7
21:22 22:24 24:21
25:18 45:24 46:8
46:12,19,21 47:1
47:3,7,8,13,15,21
48:2,5,9,13,25
51:12,18,22,24
54:20 55:11 56:4
56:13 61:15 62:2
64:18,19 68:16,22
69:4,12,18,25
70:25 71:5,22
72:1,4 73:23
75:18 76:1,6 96:3
96:6,21 97:20,24
98:1,5,14,21 99:7
99:17 100:2,19
101:2,21 102:1,8
102:15 103:5,12
104:11,13,20
105:3,9,23 106:6
106:7,14,15,20,22
109:7 110:22
116:12 117:2

118:2,5,10,11,15
118:18 120:16
121:3,7,12,24
123:13 124:8,22
125:1,3,10,13,18
126:3,23 127:6,11
127:15 128:5,7,17
128:20 129:13
130:7,18,22 131:4
131:16,20 132:1,9
132:16,19,25
133:8 134:9
141:16 142:3
143:13,21 144:4
145:15,21 147:23
148:6 149:5,13,25
150:24 155:11,12
157:7 169:13
172:3,7 173:10,16
178:21 179:2,25
194:8 197:21,24
206:3,4 207:20
210:4,7 211:3,12
212:21 213:10,14
213:22 216:18,22
217:8,21 221:20
222:8,18 225:22
226:2,3 230:7
231:3
**joined** 5:1
**judge** 78:21
**judicial** 83:10,19
**July** 13:2 125:6
**June** 13:2

**K**

**K** 1:13 3:3,10,11
4:4 5:17 228:9
229:9 230:3 231:4
231:24
**K-I-N-G-U-M**
27:20
**keeping** 143:13
**Ketty** 2:24 5:1
**kind** 19:3 25:7 46:5
78:9 84:19 135:15

136:4,9,20 205:15
**knew** 154:24
**know** 6:12 7:9 11:6
11:10,21 12:1,2,5
13:7,7,9 15:21
18:13,14 19:5,6
19:22,22 20:8,11
21:4,4,13 22:21
24:18 27:9 28:2
32:6 34:13,24
35:8,8,9 36:17
37:1,13,18,24
40:7 42:2,3 43:22
44:9 45:1,4,5,10
45:10,11,13 52:5
52:6,9,19 55:4,20
56:10,19,21 60:1
64:11,24 65:7,23
65:24 66:7,8 67:5
73:6,18 77:18,20
79:21 80:6,9 83:3
83:12 84:19 85:7
85:13 86:2 87:14
87:14 89:6,14
93:3,4 94:15 97:6
98:23,23 103:16
103:16 104:17,19
110:14 113:6
116:12,23 117:2
120:2 121:4
122:14,22 123:5
123:10,18 125:6
125:15 129:25
130:3 132:22
135:9,14 137:25
138:9,17 150:20
152:14,15,25
153:17,18 155:4,4
155:5 157:21
158:21 160:23
161:5 164:17
171:14 176:25,25
181:7,13 190:10
190:18 191:13,22
192:3,20 193:13
193:17 194:4



197:17 200:1,3
211:10,12
**knowledge** 24:24
34:15 132:23
159:23 222:7

**L**

**L** 2:11
**Labor** 41:12 42:11
44:11 83:6,9,15
83:22
**Labor's** 44:20
**lack** 119:5 133:25
**Lakes** 2:9
**language** 70:19
71:8 72:1,11
73:25 74:6,13
144:11 148:24,25
163:15 183:13
218:3
**large** 34:19 187:22
188:2 190:11
**LaRue** 9:18,23
**lastly** 75:5
**law** 6:6 37:2 42:6
202:7
**lawyer** 122:13
**leading** 224:21
**learning** 122:11
124:17 125:5
**leaving** 142:11
**led** 153:6
**left** 81:7
**legal** 1:22 4:13,14
34:22,23 35:2,5
37:3 38:17,18
40:6 41:4,5,9,17
43:1,8 44:7,9,22
56:9 62:14 64:11
65:21 73:12,17
77:16,17 79:15,21
107:8 132:7,10
205:15,19,21
219:24 224:25
230:8,18
**legally** 42:17,20

91:25
**let's** 15:20 27:2,12
48:8,8 60:15
67:22 70:7 77:1
80:14 88:8 90:21
95:24 99:4 109:6
112:8 121:4 123:3
126:7 156:11,18
165:21,22 167:4,5
173:4 179:1
188:12 193:16
204:5 208:2
212:14
**letter** 3:6 42:6
230:1
**letters** 217:8
**level** 113:6 121:18
152:8 155:9
208:22
**Levy** 9:11 86:4,10
86:10,13,17,21
87:14 90:2 96:24
129:9 130:4,6
144:11 145:4
146:16,19,24
147:4,8,12,17
148:9,19 149:15
149:20 179:2,20
179:25 181:2
182:5,13 183:10
184:22 185:3,4
186:7 217:20
218:7
**Levy's** 3:18 8:1
86:21 87:10 88:2
130:17 131:4,14
144:23 145:11
179:9,21 180:5
182:19 218:2,11
**liabilities** 219:9
**liability** 51:9,21,25
**life** 1:7 2:24 4:6
115:11 231:3
**limit** 65:17 130:9
145:14
**limited** 47:23 48:12

48:18 61:16,20,21
68:23 69:6,14
70:2,25 75:19
76:8 132:18
145:12,17 148:11
148:11 154:11
155:13,15,19,25
217:20
**limits** 145:20,25
148:12
**Lincoln** 151:23
**LINE** 231:6
**lineup** 90:22 91:21
202:17
**list** 16:16 21:12
84:1 219:5
**listed** 15:6,9 16:21
16:21 19:12 22:6
23:9 24:14 76:24
170:3 194:21
196:9 220:2,20
**litigation** 3:14
10:21 26:9 50:12
57:24
**little** 16:7 46:5
80:13 136:22
142:8 168:19
177:6
**long** 10:6 29:1,13
29:13 36:4 118:9
136:20 222:13
**look** 9:19 10:17
12:3,9,16 26:18
32:14,15 33:20
40:17 42:7 49:20
52:5 54:4 60:22
70:21 72:18 80:16
84:7 85:9,24,25
86:2 98:17,24
99:10 102:24
110:17 113:13
127:13 129:15,18
136:15 152:15
153:15 155:7
160:22 164:3,13
165:21,22 179:1

187:17 194:17
197:8 206:10,25
225:2
**looked** 32:15 66:23
71:10 118:24
165:5 178:11
**looking** 19:4 20:3,5
21:23 42:10 85:22
96:13 102:25
122:20 144:24
160:23 161:5,15
164:8 185:8
195:22 196:5
**looks** 23:12,15
113:5 219:14
224:9
**luncheon** 81:2
**Lybrand** 28:15
29:6

**M**

**M-U** 27:20
**Magna** 1:22 4:13
4:14 230:8,18
**main** 126:13
**maintain** 32:17
**Maintenance**
194:13,20 196:10
**majority** 94:10
**making** 59:21 73:3
73:5 75:20 86:15
96:17 119:2 127:9
140:6,8,19 170:2
205:21
**manage** 72:23
74:20 77:8 140:14
**managed** 36:15
90:24
**management** 38:1
71:24 72:6,15
144:5 191:24
204:12 215:9
216:20 217:10,13
217:22 218:9,13
**manager** 68:6
**mandates** 65:25

**manifest** 78:22
**manner** 132:4,16
**mark** 14:13 15:20
58:1 144:18 194:4
**marked** 14:13,15
15:23 58:3 60:19
66:13 70:11,13,14
164:1 179:20,22
194:5,7 197:10
**market** 187:7
190:12 191:15
**marketed** 191:19
**marketing** 191:2
192:6,21 193:8
**Mass** 33:22
**Massachusetts** 2:16
230:5
**matching** 35:15
**material** 212:20
**materials** 15:7
206:12
**Matt** 4:19 116:24
156:7 164:3
**matter** 4:5 10:13
11:6,8,11,22 13:8
13:10 14:20 16:15
19:6 20:19 51:24
75:17 78:6 79:2
98:10,19 103:23
113:10 114:18
132:17,22
**Matthew** 2:6
230:22
**MBA** 27:21,25
**mean** 12:16 17:19
19:23 29:1,5 34:3
35:7 36:3 39:4
41:25 42:16 45:18
46:3 49:17 50:4
50:24 52:8 57:17
65:20 77:6 89:25
90:3,17 91:12
97:4 101:13
110:13 111:7
113:19 115:11
119:22 120:5



134:22 137:5
139:13,19 141:21
153:16 158:5
169:8,19 183:16
189:8 195:2 202:8
225:2,14,17
**meaning** 91:16
92:8 157:22
162:13 166:7
176:13 182:14,17
**means** 17:20 31:1
73:1,4 74:6 80:3
138:13 139:20
140:19 167:23
174:10 175:15
176:1 182:3 187:8
188:2 225:7
**meant** 195:15
**medical** 7:17
**medication** 7:12
**meet** 37:4 64:9 71:9
73:21,24 76:16
78:5 82:16 128:21
133:16 157:8
159:6 160:16,25
161:7 173:13
**meeting** 93:1
201:22 206:12
**meets** 65:13 68:6
68:16,24 69:14
72:11 73:10 74:1
76:23 77:15 78:14
128:17
**member** 49:25
211:10
**member's** 110:21
**members** 49:13
96:2,7 97:8,21
98:7 150:3 210:4
210:13,19 211:21
**mention** 211:22
**mentioned** 9:25
20:22 28:6 38:20
80:9 151:12
186:22 203:10
211:23 221:2,24

**mentions** 212:2
**menu** 202:21
**Merit** 229:6
**met** 9:4 63:5 79:3
**methodology** 116:9
**Miami** 2:5
**Michael** 2:18 4:25
**Microsoft** 8:6
24:10
**middle** 5:17 58:10
67:2 216:11,13
**million** 136:16
187:19
**mind** 33:19 59:23
92:7
**mine** 219:13
**minority** 88:11
**minutes** 206:12
**mischaracterizat...**
131:16
**mischaracterize**
127:11
**mischaracterizing**
127:5
**missing** 86:20
**misspoke** 21:3
**Misstates** 38:23
84:5 131:8 146:8
146:22 148:3,4
149:4 176:24
182:8
**mistake** 186:6
**misunderstands**
145:4
**modify** 80:10 82:25
**monetary** 167:17
167:24 169:9,14
169:15 170:10
171:12 173:6,8
175:24
**money** 116:5
**monies** 67:11
**monitor** 37:11,22
93:6 97:9 107:5
107:15,20 201:21
202:16

**monitored** 203:7
**monitoring** 38:16
91:23 108:10
109:15 110:11
203:24 214:13
**morning** 4:2 222:4
222:17,24
**Morningstar** 97:4
**move** 81:9 95:24
122:18 126:7
**moved** 154:21
**moving** 83:25
93:22 156:7
**Mukamal's** 104:4
**multiple** 74:23,24
139:4 225:4
**Muskingum** 27:18
**mutual** 33:23 55:21
55:22 96:25,25
97:2,4 123:19
185:12 202:21
221:10,21 222:1,9
223:10 225:24
**mvaglica@good...**
2:19
**mweinshall@pod...**
2:6

## N

**N** 3:1
**name** 5:16 104:6
**named** 64:15 68:7
121:22 122:6
124:7 125:9,16
212:20 213:6
216:22,24
**names** 153:15
**NAPA** 211:24
**narrative** 85:4
96:14
**narrow** 36:5
**nature** 17:23 153:4
**near** 194:14 212:14
**Nebraska** 13:12
**necessarily** 12:15
43:19 52:18 56:19

56:20 63:7 72:24
75:12 83:3,12
90:10 111:7 114:5
119:21 121:17
199:23 210:21
214:1,3
**necessary** 57:1,9
58:24 59:11 96:3
107:22 108:9
109:13 119:4
204:1 207:12,18
**need** 7:8 15:11
16:13,24 40:3,10
40:13,21 86:2
153:3 154:14
176:2 226:4
**needed** 77:3 121:9
**needs** 39:22 42:25
43:2,6 44:17
113:8
**neighborhood** 27:4
187:21
**neither** 129:9
130:23 184:4
212:1
**net** 53:3 175:12
**never** 14:1,1 43:11
43:24 83:21 163:5
180:14 188:24
202:6
**new** 21:17 24:6,8
154:21 156:8
**non-explicit** 187:3
**nontaxable** 176:9
**Northern** 2:16
230:4
**Notary** 228:16
**note** 3:22 119:25
122:10 135:2
193:4
**noted** 84:16 117:25
157:13 159:22
184:16 206:25
220:14
**notes** 9:19 229:13
**notice** 39:14,18

40:1 41:16 42:1
44:1 45:3,7 187:5
**notices** 45:8 56:15
160:22
**NOTIFICATION**
230:1
**November** 164:23
228:12 229:20
230:2
**number** 4:4 13:9
19:11 25:12,19,19
29:21 46:16 50:6
70:12 88:9 90:23
97:13 111:3 113:2
150:19 155:6
165:1 187:23
194:6 196:6 203:1
220:2 223:22,23
**numbers** 187:22
**numerous** 98:23
151:4 189:7,8
202:17

## O

**O** 2:17 230:3
**oath** 3:5 6:3,5
228:1
**objection** 21:1 22:9
22:15 30:21 31:13
31:23 35:24 36:11
38:6,23 40:5,15
40:23 41:20 42:19
44:8,23 48:7 49:3
52:3,14,17 54:3
55:15 56:8 57:3
57:11 59:14 62:9
62:20 63:6 64:10
65:19 66:6,18
67:19 68:17 69:1
69:16 74:8 78:8
78:18 79:6,19
82:19 83:11 84:5
87:20 88:15 89:10
91:9 94:7,13 95:6
96:9 97:23 98:16
99:20 100:21



101:6,24 102:13
103:8,15 104:16
104:23 105:7,25
106:9,23 107:7,25
108:12 109:16
110:12 113:24
115:22 116:7,19
116:22 117:5,16
118:8,21 119:8
120:20 121:16
122:17 128:25
129:24 130:13
131:8 133:3,11,18
134:4,20 137:7,23
138:14 139:22
140:22 141:7,19
143:17 145:8
146:8,22 148:3,4
148:22 149:4,12
163:21 169:21
170:7,17,25
172:20 175:8
176:24 180:22
181:17 182:8,21
184:12 187:16
188:5 190:8
191:21 197:2
199:4 201:8
202:10 203:16
209:17 213:25
215:7 217:4,16,24
219:21 220:7
221:17 222:12,20
223:4,12 224:4,11
224:20
**objections** 6:19,20
**obligated** 55:12
**obligation** 44:22
128:23 129:23
192:22
**obligations** 36:9
38:21 39:3 79:18
80:5 88:10,12
166:11
**observed** 221:4
224:17

**obtain** 60:7,8 97:5
97:15 99:14
121:23 125:10,22
**obtained** 60:2
96:16 122:6 124:7
**obtaining** 19:10
**obviously** 26:10
37:1,10 82:24
181:11 183:13
189:17
**October** 1:17 4:8
12:19 227:14
228:10 230:7
231:4
**offer** 73:17 85:23
86:3 87:23 119:3
125:8 151:15
170:16 205:22
223:7
**offered** 58:23 59:18
59:24 170:14
190:4 221:19
223:1
**offering** 41:5 45:23
46:7,10,11,20,23
46:25 47:2,6,14
47:21 48:1,4,9,20
48:24 49:8,12,24
50:7 61:11 62:1
65:11 71:8 72:8
72:10 74:3 77:22
85:7,13 87:7,17
132:7 157:6 159:5
159:7,15 160:15
160:24 161:6,16
161:18,25 162:22
**offers** 225:23
**office** 164:10,12,15
164:21 166:20,24
168:20 169:6
230:11,13
**offset** 31:17 52:7
188:15 189:11,19
189:22 211:2,2
**oftentimes** 12:20
60:5 120:3

**Oh** 25:17 58:18
81:14,18 179:18
**okay** 5:22,25 6:9,14
6:18,24 7:10,22
8:2,5,9,13,19,22
9:10,14,17,22
10:9,12,20 11:5
11:13,18 12:10
13:3,6,11,20,24
14:3 15:2,5,10
16:5,9,16 18:6,16
18:22 19:19 20:1
20:13,16,21 21:19
23:9 25:3,17,23
26:3,14,21 27:5
27:22 28:3,6,11
28:21 29:11,15,19
30:2,6,14,18 31:8
31:20 32:2,12,22
33:5,9,12,25 34:7
34:21 35:3 38:4
38:20 39:11 40:3
40:12,20 41:8
42:9,16,24 43:16
44:2,19 46:11,19
46:25 48:1,17,20
48:24 49:6,12
50:21 51:16,23
52:12 53:15 56:3
56:24 57:22 58:12
58:19 59:1,3,8,20
60:11,15,16,20,20
61:3,10 62:1,6,17
62:24 63:2,9 64:6
64:17 65:9,16
66:2,11,14,24
67:1,4,16,22,24
68:5,14,21 69:22
70:7,11,15,21,23
70:24 71:7 72:8
72:18 73:9 74:12
75:7,22 76:14
77:14,24 78:25
79:13 80:12,23
81:18,22 82:6,9
83:8,15,18,21

85:11 86:20 87:6
88:4,8 89:14,22
90:3,8,14,17 91:4
91:12,19 92:6,10
92:20 93:8 94:1,4
94:20,23 95:4,11
95:16,20,24 97:16
98:11 99:4,25
100:12,18 101:2
101:19 102:6
103:11,19 104:10
104:19 105:15,19
106:4,19 107:4,17
107:20 108:5
109:9 110:8,19
111:18 112:12,25
113:16,19 114:25
115:15 116:2,12
118:2 120:13
121:12 122:5
123:3,11 124:2,15
124:20,24 125:8
125:25 126:7,20
126:20 127:20,22
127:25 128:3,10
128:20 129:20
130:14 132:6,12
132:24 133:7,23
134:16 137:11,19
140:18 141:2,12
141:13,16 142:8
142:10,24 143:8
144:2,10,14,23
145:2 146:5,18
147:7,15,21 150:9
150:22 151:12,18
152:1,10,18 153:5
153:11 154:1
155:1,12,17,22
156:4 157:4,15
158:3 159:2,14
160:7,10,15
161:15,24 162:7
162:11,18 163:3
163:12,14 164:22
165:1,21,25

166:15 167:2,4,5
167:12,13,16,20
167:22 168:9,12
168:22 169:7,12
169:18 170:2
172:9,12 173:4,10
173:20 174:21
175:5,22 176:19
177:13,21 179:1,9
179:18,19 183:25
184:3 185:2
186:13,16,25
188:2,19,24 189:3
189:10 190:6,24
191:5,18 192:13
192:16 193:5,16
193:19 194:8,8,17
195:1,12,25
196:13,17,23
197:7,11,16,18
199:1,18 200:12
200:17 201:12
202:7 203:6,10,14
204:14,24 205:6,9
206:3 208:4,11,15
210:2,12,15
212:14,16,17,24
213:8,20 215:16
215:22 216:3,7,8
216:14 218:2,16
218:18,22,25
219:12,18 220:23
221:2 222:3
223:17,21 224:8
224:15,24 226:21
**ones** 19:13,22 222:8
**open** 8:5,9 24:9
223:19
**operate** 149:25
150:25 151:6
153:2,8 201:13
**operates** 199:11
**operating** 92:1
201:9 206:14
**opine** 37:3 83:4
170:22 172:18



**opining** 35:1 40:24
42:5 52:6 77:17
127:4 181:9
206:21
**opinion** 19:5 41:5
43:12 46:7,10,11
46:21,24 47:2,21
48:2,5,9,20,25
50:7 51:16 52:16
61:3,6,11 62:2
63:23 64:6,17
65:1,11 68:15,24
69:11,17 71:8
72:8,10 73:17
74:4,7 77:21
78:20 79:10 81:25
82:5,7,11 83:25
84:15 85:2,7,10
85:14,23 86:3,4
86:14 87:8,18,21
87:24 88:3 89:14
89:23 91:22,25
92:3 95:24 97:6,7
97:11,25 98:2,5,9
98:11 99:16,17,21
99:24 110:20
111:18 112:20
113:1,9,11 119:2
121:22 125:9
129:16 130:21
131:15,15,19,21
132:7,10,12,21,25
133:24 135:13,18
145:3 151:20
152:4 157:6,10
159:3,5,8,15,18
160:15,24 161:6
161:16,18,25
170:14,16 171:13
177:9 198:5
207:25 208:9,11
208:13 209:3
221:3 224:5,9,15
224:25
**opinions** 15:8,14,17
29:15,17 45:23

47:6,15 49:8,12
49:24 50:22 51:2
60:22 61:5 79:15
81:8,12 82:25
83:9,10,19,22
103:20 130:17
162:22 206:16
223:23
**opportunity** 97:9
116:18
**opposed** 136:7
**opposite** 180:17
**option** 28:17
114:16 178:2,10
200:18 202:19
203:1 205:11
214:8
**options** 38:3 55:7
90:24 91:21
139:17 155:6
177:18 200:6,15
200:25 204:21
205:3,11
**order** 7:3 51:13
109:14 203:20
225:16 226:20,24
**organization**
102:15
**organizations**
211:24 212:2,6
**Orseck** 2:3 4:12,20
**outlined** 86:4
133:25
**outset** 20:7 121:6
207:21
**outside** 43:15
**outweighed** 210:6
**overall** 28:21 114:3
114:24 116:4,14
117:4 127:2
165:19 199:16
200:4 201:3,4
208:17 209:5,6
215:4
**oversight** 34:16
36:16,20 37:14

38:3 93:4 154:16
154:23
**owe** 201:6
**owned** 137:17
**owner** 54:21 55:1,3
55:11 136:3 175:3
177:2,4
**ownership** 31:15
136:7
**ownerships** 135:4
135:22

---

**P**

**P** 2:6
**P.A** 2:3,9,15 4:12
230:4
**p.m** 1:17 81:1,3,3,4
156:12,15 193:22
193:25 227:13,16
**P.O** 2:10
**page** 3:2,9 5:24
14:24 16:5 19:15
19:16,17 58:13,16
58:17 60:24,25
66:24 67:2,23
70:22 81:22
112:21 127:13
165:21,23 166:19
166:19 167:8,10
167:14 171:2
172:23 194:23,24
194:25,25 195:1,2
195:15,19,23
196:5 197:16
208:2 210:2
212:15 213:9
216:5,6,10,11,12
216:13,15 218:19
218:20,22 219:12
219:23 223:22
224:1 231:6
**pages** 1:15 229:10
**paid** 11:19 107:5,21
122:2 158:7,8,15
158:16 175:20
197:21

**Palm** 2:9,10
**pandemic** 26:15
58:10
**papers** 43:22
**paragraph** 67:22
81:8,9,14,15,16
81:17,19 86:5
96:14 112:19,21
124:12,16 125:4
126:8,9,14,14,15
126:16,18 127:1
127:19,23 130:17
131:3 133:25
144:2,22,23 145:3
145:12,13 146:9
146:15,24 147:3
147:16 149:23
150:5,6,17 156:20
156:25 157:11
165:3,6 166:8,9
166:10 167:7,8
168:2,3 169:10
170:14 171:1,15
172:23 173:20
179:1,8,19,20
180:11,25 181:1
182:16,17,22,22
182:24 183:23
184:2,8 185:8
186:16 187:6
188:12 195:19
197:19 208:2
209:21 210:2
211:22 212:17
216:4,13,15
217:14,19 218:3,7
218:15
**paragraphs** 127:23
128:4 139:12
168:8 179:10,25
180:4 184:3,4
224:10,16
**Pardon** 180:19
**parentheses** 68:7
**parse** 48:8
**part** 20:18 36:20

37:25 54:5,24
55:7,21 56:22
65:9 69:7,10 83:1
83:9 115:16
123:16 131:19
137:18 150:17
151:5 152:5,7
154:9,24 164:2
190:6 198:23,24
199:16 200:4
201:2,3 205:5
212:12
**participant** 28:8
74:19,21 115:20
115:25 214:9,12
215:1
**participant's** 32:10
113:8
**participants** 36:14
39:13,15 56:1
71:17,21 74:16
78:6 89:3 90:23
111:25 114:22
115:9,10,12,16,18
123:7 150:2 151:2
158:11 181:19
186:4 214:20
226:1
**participants'** 127:8
**participate** 54:22
**participating** 55:5
**particular** 19:6
21:13 26:5 74:2
76:5 98:19 141:17
164:2 169:1,10
190:19 195:9
200:17 202:20
207:7
**parties** 4:15 229:16
**parties'** 229:17
**parts** 24:18 82:20
168:13
**pass** 55:12 101:16
101:21 102:1
111:24 114:12
118:19 125:21



127:7 176:8
177:17 178:3,5
**pass-through**
177:16
**passed** 55:23 111:5
116:2 123:19
**passes** 175:5,9
214:22
**passing** 84:1
113:10 119:20
176:10 177:23
210:25
**passively** 90:24
**passthrough** 101:3
101:7
**pattern** 53:10
**Paul** 5:2
**pause** 116:18
**pay** 175:2
**payer** 173:22,23
174:1,5,7,18
**paying** 97:1,1
**payment** 174:22
175:6,12,17
**pays** 53:1 175:4
**PDF** 16:6 19:17
66:25 70:22
165:23 167:9
194:25 195:1,3,16
195:20 197:17
216:6,12,16
218:21,23 223:22
**penalties** 45:4
231:21
**pending** 7:9
**pension** 166:2
**people** 224:17
**percent** 26:13,17
27:5,11 53:7
187:8,8,13,21
209:4,18
**percentage** 26:8,12
111:9,17 112:5,6
112:10 119:13,13
119:15 120:18,23
120:24 121:7

188:3 208:24
**perform** 28:16 39:6
73:20 103:24
**performance** 37:11
37:16,23 38:16
97:9 201:22
**performed** 17:7
73:19 102:9
**period** 12:13 94:10
**periodic** 192:25
**perjury** 231:21
**person** 64:8 77:14
143:2
**personal** 52:22
53:9,17
**perspective** 34:23
34:24 37:6
**pertain** 47:17 144:5
149:6 216:19
217:22
**pertains** 47:20
**phrase** 91:17
134:24 162:3
**picture** 120:4
**pieces** 117:18
**PINELLAS** 228:5
229:4
**Pingree** 9:15
146:11,17 147:5,8
147:17 148:1
196:3
**Pingree's** 97:7
127:15
**placed** 134:2,12
145:15
**plaintiff** 13:25 51:8
216:23,24
**plaintiffs** 1:5 2:2
4:20,22 49:9 70:1
84:13,20 96:7
97:20 98:6,10
99:8,8,13,14,18
100:3,6 105:5
121:23 122:6,12
124:7 125:1,9,16
127:10 213:6

**plaintiffs'** 3:22 9:4
61:4 84:8 96:1
126:22 129:6
144:3 146:10,13
146:15 147:19,22
148:6 149:10
202:7 212:20
216:18 217:20
**plan** 3:21 21:21
25:19,20,20 29:8
30:5,7 34:14,15
34:17 35:9,10,10
35:12,18,21 36:10
36:13,14,14,16,18
36:20 37:4,12,17
38:1,2,9,17,19
39:8,10,12,15,17
39:19 41:13,14,15
45:1,3,9,19 47:9
47:16 48:19 49:18
49:21 50:5 56:3
58:22 59:17,24
60:3,6,9 61:22
63:14,17 67:12
68:11 69:6 71:13
71:20 72:16,20
74:15 75:1 77:3,9
84:19 90:7,19,25
91:15 92:1 93:4,7
93:23 95:15 97:13
99:1 101:15,16
106:5 107:4,10,10
107:14 108:9
109:13 110:3,5,9
110:9,14 111:2
113:3,7,8,12
114:3,13,24
115:17,18,20,21
115:25 116:6
119:14,15,20,24
120:19 121:2,9
123:6,20 124:21
128:24 129:8,23
130:12,20,23
131:6,23 134:1,2
134:19 135:7,8,9

135:22,25 136:1,2
136:3,8,8,14,15
136:16 137:1,9,11
137:17,22 138:5
138:10,13,15,19
139:2,8,10,17,21
140:3,7,8,13,15
140:16,20 141:4
141:12 142:2,15
142:23 143:1,2,11
143:15,21 145:18
145:22 150:1,2,25
151:1 152:18,19
152:24 153:6,7,9
153:11,12,14,20
153:21,22 154:23
155:13 156:3
157:13 158:7,8,9
158:11,16 159:21
166:3,5 169:17
171:6,8,21 173:2
173:18 175:19
177:5 178:6
181:10,19 185:1
185:13 186:3
188:9 189:17
192:15 193:9
194:11,22 195:11
197:15 198:18,18
198:20 200:5,11
200:15 201:4
202:22 203:15,24
204:18,20 205:11
205:13,16 206:1
207:5,8 208:16,18
208:20,21 209:1,5
209:5,8,9,15,16
209:19 210:9
211:14 214:12,19
216:23,24 226:5
**plan's** 139:14
**plan-by-plan**
118:24
**planning** 87:23
207:10
**plans** 28:9,22 29:2

29:4,7,9 30:12
33:10,11,12,13
34:19,20 35:23
39:5 54:22 55:3,5
55:25 64:25 68:18
89:18 98:24 100:7
100:9,10 101:17
101:22 102:21
112:4,4,16 115:6
115:9,10,16 117:7
117:10 120:17
121:18 127:17
131:18 132:5
141:3,4 151:11
153:18,20 154:5
175:7 187:9,18,22
187:23 191:20
201:7 209:14
210:6 225:25
226:1
**platform** 14:10
28:17,24 29:3,4
29:10 32:17,23,24
53:22,24 117:11
123:9 134:10
154:10,14,21
191:25 193:2
199:8,10,17,25
200:3,7,16,18
201:1
**platforms** 29:18,20
30:1 187:14,19,24
187:24 188:3,7,8
188:8
**please** 5:6,15 7:9
15:21 58:16 194:4
**Podhurst** 2:3 4:11
4:20
**point** 6:11 12:4,6
19:13 21:8 70:6
108:19 121:4
154:4 168:21
177:22 185:24
187:7
**pointed** 218:20
**points** 195:22



214:23
**policies** 90:6
**policyholders**
55:13 84:3 118:7
118:20
**portal** 18:9,21
**portfolio** 154:13
175:16
**portion** 137:15
187:13 215:10
218:12
**portions** 165:8
**positions** 33:25
34:2
**possibility** 190:5
**possible** 76:14,19
88:4 89:2,6,7
189:3
**post** 18:11,17,21
**posted** 18:8,13,14
169:2
**potential** 22:3
49:13
**potentially** 83:3
**power** 72:22,22
73:1 77:8
**practical** 34:24
35:3 36:25 37:5
42:22 43:11 56:11
62:10,15 63:25
65:2 132:11
**practice** 25:4 27:10
37:10,22 41:19,21
42:13 77:23,25
84:1,3,9,12,14,20
85:3,14,15 86:5
86:12,14,15,16,18
86:19 87:2,5,9,9
87:11,12,15,19,19
88:1,3,5,5,9,14,14
88:18,23,25 89:1
89:3,9,23,24 90:1
90:4,5,9,15 91:1,2
91:5,6,8,13,16,17
91:18,20,22,24
92:5,7,8,14,18

93:5,6,9,10,12,14
93:17 94:6 95:4,7
95:12,16 142:18
162:17,20 177:10
177:13 192:17
198:11 203:2
**practices** 92:20,22
94:2 107:14
188:25 189:1
**practicians** 190:14
**practitioner** 41:2
41:14 44:16 72:13
**precise** 100:19,22
105:22
**precluded** 122:11
**predicate** 61:4
**predicated** 130:17
**prediction** 211:18
**predominant** 90:9
90:11
**prefer** 136:6
**preferences** 210:19
**preparation** 10:10
**prepare** 8:25 10:1
39:6 45:8 51:13
54:10
**prepared** 14:20
17:6 54:13 230:10
**preparing** 15:7
17:5,21,25 50:22
51:2 52:13
**present** 2:22 4:15
122:13 205:2,10
206:16
**presented** 20:10
22:3 125:17 205:4
**presenting** 40:20
**presents** 205:11
**President** 2:24
**prespecified** 221:10
221:21,25 222:9
223:9 225:24
**presume** 66:17
**pretty** 92:16
**previous** 20:21
**previously** 194:5

**price** 112:4,4
189:11,13
**prices** 112:16
**Pricewaterhouse...**
28:15,23
**pricing** 22:2,20,22
188:25 189:1,9
**Principal** 135:21
151:22
**prior** 24:22 27:1
30:10,14,18 31:12
32:3 75:22 94:15
125:2,12 126:2
155:1 211:5
219:15
**prioritize** 208:25
**probably** 5:22
10:18 12:4 13:1,1
19:24 26:12,16
29:6 152:14
191:14 226:23
**procedures** 90:6
**proceeding** 230:10
**proceedings** 4:1
227:16
**process** 125:23
154:24 205:5
207:22
**processes** 211:23
**Procter** 2:15 13:4
13:21 230:4
**produce** 35:19
74:17 75:12,14
**produced** 19:20
22:5 42:6 54:8,9
56:23 75:18 219:4
219:7,8
**produces** 42:1 45:5
83:9 112:1 115:13
**product** 32:9,11,16
32:19 96:18 97:5
98:1 143:6 154:8
154:12 155:20,21
175:21 177:6
199:10 200:3
220:25 221:5,8,24

**production@ma...**
230:13
**products** 135:25
138:18 155:5
**professional** 135:12
135:15 137:2
196:18
**professionals** 78:16
79:4,9,14,17,22
80:10 82:1,7,10
82:14,24 134:25
135:14,18 138:24
138:25 149:24
150:10,15,22
151:25 152:11
155:23 159:9
**professor** 34:3
53:25 54:1
**prohibited** 47:3
**promote** 193:5,6
**proof** 17:22
**proofing** 17:22
**proper** 34:21
**property** 67:11
**proposals** 22:17,21
**proposed** 96:1 97:7
110:21 150:3
210:4,12,19 211:7
211:10,20
**prospectus** 19:8
32:9 97:2,5
100:15,23 221:5
**prospectuses** 96:19
97:3 98:1 100:14
**provide** 7:2,15,20
22:12 31:21 36:19
37:14 38:3 39:12
39:17 45:2 51:18
56:21,25 57:8
59:10 76:22 90:23
95:14 101:3
106:14 114:21
118:6 151:19
153:15 154:15,23
177:19 186:24
191:19,24,25

198:17 204:14
**provided** 3:22
41:13 50:11 61:22
71:18 92:24 98:21
105:10,12 121:25
124:9 125:11
157:12 159:20
171:5,7,8,20,21
172:25 173:1,18
174:12 176:14
190:13 193:8
198:20 204:15
211:3 230:10
**provider** 21:17
22:3 30:4 33:9
35:19 39:20 53:19
60:3 65:4,17 76:1
76:15,20 78:5,14
79:1 84:19,21
86:19 88:18,22
89:21 95:19
101:15 107:23
108:17 111:1,13
111:19 112:9
113:14,21 119:18
125:18 132:13
152:2 153:22
158:9,17 166:6
171:3,24 172:1,9
172:12 173:22
174:7 200:14
211:16 222:5
**provider's** 199:2
**providers** 20:12
32:7 33:17 39:16
45:21 56:4,12,13
56:20 58:23 59:18
59:25 60:9 75:8
75:23 79:22 88:9
88:11 89:8,15,17
94:11,24 95:14
107:6,22 151:9,19
152:13 155:5,18
189:16 204:17,19
222:25 223:7
**provides** 10:21



17:16 39:14 53:11
  58:23 173:13
  174:10
providing 28:7
  41:24 172:7
  200:19
provision 35:14
  65:16 78:5 113:10
  165:5 169:19
  172:6 176:3 211:1
  214:5,24
provisions 35:11,18
  62:7 110:1 128:22
  176:22
proxies 71:16
prudent 36:15 38:1
Public 228:16
publicly 97:3
  104:14,21 105:4
published 50:8
  57:16 60:13 212:2
pull 40:17 158:1,25
  159:3 161:9
  166:21
purpose 25:15
  56:24 137:24
purposes 110:3
  161:21 162:12
  168:4 169:17
  177:25 181:20
pursuant 197:23
Pursuit 204:12
purview 43:15
push 213:22

Q

qualification
  181:15
quality 189:5 209:5
quantified 136:11
quantify 136:22
question 6:12,15
  7:8 20:22 21:10
  25:7,11 32:2 35:5
  38:17,18 41:10
  42:24 43:1,9,17

44:3,5,7,9 46:4
  47:11 48:8 49:4
  51:5,11 57:5
  59:22 60:4 61:14
  61:19 63:2 69:3
  69:10,23,24 70:22
  71:7 73:12 77:16
  78:10,11 82:11,21
  85:11,18 87:13,17
  91:18 97:17,19
  98:13,14 102:2
  108:6,14 109:2,4
  109:24 116:23,25
  118:9 123:11
  130:1 135:16
  139:1 141:11
  156:5 158:19
  159:15 160:1,3
  161:4,4 172:13,15
  175:22 180:8
  182:2 185:15
  186:7 196:17
  198:21 220:23
  221:11 222:13,23
  223:6 224:13
questions 6:10,19
  6:20 7:14,15,19
  7:20 22:8 165:11
  215:15,18,21
  223:22,24 225:9
  226:9,11 227:13
quite 29:1 51:5
  122:17
quotation 217:2,8
  218:8,12
quote 82:2,3 92:5
  96:2 113:17
  144:22 145:11
  147:4 155:24
  175:25 179:4
  180:3 182:2,3,6,9
  188:14 189:11
  212:18
quoted 62:17 123:3
  144:11
quotes 144:24

146:7 148:2 149:3
  190:12
quoting 189:16

R

raise 5:5 136:19
raised 136:12,17
range 26:17
ranked 25:18
rate 11:16
ratio 114:20 178:1
  178:9 214:23
rationale 123:12
ratios 112:2
reach 82:7,11 96:21
  210:13,15
reached 188:19
reaching 12:15
read 3:6 20:19
  23:10 24:15,20
  58:12,19 59:5,15
  60:12 68:2 71:21
  74:1 83:15,18
  98:2 105:15,18
  123:3 130:16
  163:18 168:5
  181:1 185:19
  216:25 227:9,9,10
  231:21
readily 58:22 59:17
  59:23 225:5
reading 85:6,12
  162:8 163:15
  176:21 177:14
  198:9 212:18
real 115:11
reality 135:10
realize 201:2
really 29:21 136:10
  194:25 224:21
reason 7:1 45:13
  111:5 189:22
  199:20 231:6
reasonable 121:15
  145:19 166:1,7
  213:23

reasonableness
  96:4 97:10 107:5
  107:15,21 213:10
  213:15 214:13
reasons 211:11
rebate 192:14
rebuttal 3:10 7:25
  12:18 14:19 15:8
  23:10 54:1,5,9,11
  54:12,13 60:15
  81:9,11,12,25
  112:20 122:9
  126:8,11 144:3,17
  156:19 179:6
  182:23 187:6
  216:1,12 223:17
rebutting 87:1
recall 9:20 11:23
  28:25 29:7 32:18
  32:19 54:14 60:3
  66:22 83:20,24
  103:1,23 104:7
  105:19 122:24
  124:3 129:11,12
  142:16 157:21
  158:3 225:8
recalling 103:22
receipt 94:17 207:5
receive 11:18 18:6
  27:25 31:10 45:3
  45:9 51:24 86:7
  103:2 119:18
  120:19 152:6
  178:20 214:18,19
received 43:4 82:3
  94:12,25 96:8
  97:21 98:7 99:1,9
  99:19 100:4
  102:16,17 104:13
  104:21 106:7
  109:7 121:10
  126:1 141:5
  143:10 151:22
  156:22 157:8
  169:13 173:11,17
  174:4 175:25

185:11 188:23
  192:24 194:14,21
  196:11 207:7
  213:14 214:20
receives 52:2
  101:23 103:12
  106:21 107:24
  113:22 116:13
  117:3 118:3,17
  119:6 121:12
  213:22 214:11,14
  215:6
receiving 178:4,8
  190:15
recess 23:24 81:2
  156:14 193:24
recitation 84:23
reciting 48:21
recognize 166:15
  168:12,15
recognizing 114:13
recollection 12:8
  29:11 222:2
recommend 91:14
  92:21,22 93:13,23
  204:19
recommendations
  37:17 201:23
recommended 93:5
recommending
  93:18 204:17
  206:3
record 4:3,16 5:16
  23:17,21,23 24:1
  24:3 80:14,15,24
  81:1,5 99:7 100:2
  106:5 120:1
  122:10 124:25
  126:1,5 132:19
  141:3 156:11,13
  156:16 193:23
  194:1 226:15
  227:7,15 229:12
recorded 120:9,12
recordkeeper
  45:12,21 84:16,17



96:17 97:15
114:14 119:4,5,20
120:22 127:5
156:22 171:20
174:12 199:9,14
199:18 200:9,19
201:6 203:8
211:23 214:11,14
225:17,22
**recordkeepers**
43:23 45:2,7 82:3
86:11 94:11,16,24
95:22 96:22
121:25 124:9
125:11,21 150:21
151:9,11 186:18
187:10 198:17,19
199:7 202:4
**recordkeeping** 28:8
28:16 34:16,18
60:8 68:22 69:13
69:25 71:9 72:11
73:10 113:2 144:7
144:12,25 145:6
145:14 146:6
147:25 148:8,21
149:15,17 152:6
158:10 171:9
172:5,7 173:12
176:2,5 188:8,14
194:18,24 195:6,8
195:16 198:25
200:5,18,20 201:2
208:17 209:11
210:24 212:21
215:2 216:21
217:3 218:8,12
**records** 10:17
26:18
**recover** 113:23
**recurring** 27:10
198:24
**redirect** 226:9
**reduce** 51:20 112:2
112:7 177:18
214:6

**reduced** 116:4
**reduces** 31:24
214:7,25 215:4,5
215:8,9
**reducing** 114:20,23
178:1,9 189:25
215:2
**reduction** 51:25
101:17 214:23
215:12
**reductions** 191:24
**refer** 46:15 48:12
68:1 161:2 183:25
184:8 186:2 204:8
**reference** 33:24
39:23 43:24 44:14
44:15 83:19
128:22 129:16
148:9 157:15
164:20 166:22
168:20 176:16
178:18,24 180:11
180:13 187:3
223:10
**referenced** 9:8,21
76:10 124:12
134:19 160:3
161:19 162:1
163:5,13 183:14
186:18 195:10
222:17
**references** 19:7,9
21:7 159:19
178:19 198:14
212:10
**referencing** 146:11
146:24 147:12
164:14 166:19
188:22 196:6
**referred** 30:3 39:13
39:18 40:2 83:22
98:3 100:12
128:12 194:12
196:15 197:4
207:19
**referring** 13:13

21:2 30:23 31:5
32:24 43:3 46:4
49:16 66:4,9 67:4
67:5,14,17 95:21
95:22 97:24 100:7
101:19 102:12,14
112:19 116:9
117:6,19 123:1
126:16 129:3
136:23 147:3,11
152:11,12 156:25
164:11 179:14,17
182:16 183:2,3,22
184:16 195:5,7
202:24 204:9
213:5,6
**refers** 124:16 125:4
147:18,20 158:12
181:22
**refine** 15:17
**reflect** 139:8
**reflective** 35:20
**refusing** 85:18
186:5
**regard** 46:1 74:24
99:21
**regarding** 20:17
22:1,2 50:8,12,16
57:16,17 60:7
70:19 82:10
100:13 102:8
104:12 105:6,15
105:16 113:1
141:5 150:16,20
160:4 165:13
192:17 193:1
206:9 212:19
**regardless** 78:16
143:1
**registered** 171:5
229:6
**regs** 43:21
**regulation** 43:18
44:6,13,21,22,25
82:18 94:23 95:1
108:8 109:9,18

157:9,18,23 158:5
158:22 159:7,17
160:4,7,11,24
161:5 162:4,8,19
162:24 163:5,16
164:7,17,18 165:2
165:8,14 167:23
168:1,10,16,18,23
168:24 169:8
170:15 176:21,22
**regulations** 42:8,15
42:17 45:6,9
108:15,20 109:22
110:1 158:2,23,25
159:11,18 161:1
161:13,20 162:6
163:2,8,9,17,18
164:24 165:19
169:2 198:13
**related** 13:9,10
20:19 21:5 26:9
39:16 75:6,20
157:12 173:17
176:5
**relates** 225:7
**relation** 69:6 222:6
**relationship** 209:6
**relative** 19:5 90:7
121:18 229:15,16
**relevant** 22:7
124:14 211:9
**reliable** 208:12
209:2
**relied** 22:12 104:10
164:17 208:8
**relying** 25:6,25
30:6 44:19 83:10
165:7,7
**remember** 104:6
220:25 223:24
226:23,24
**remote** 1:12 2:1
229:9
**remotely** 4:10
228:9
**removed** 201:25

**renders** 67:9
**renewal** 166:6
**repeat** 47:11 57:4
78:11 116:25
221:11 222:14
**rephrase** 25:10
69:2 76:4 209:23
**report** 3:10,11,18
7:25,25 8:1 9:3,9
9:21,22 12:17,17
12:18,24 14:19
15:6,11,14,16,21
16:2,17,22,25
17:3,8,21,25 19:4
19:15 20:16 23:10
23:10 24:22 25:1
25:13 26:1,4 28:6
37:16 39:24 40:17
48:11 53:11,25
54:1,4,13 56:5
60:15 66:7 67:25
69:18 81:9 85:4,7
85:9,12,22,24
86:1,2,21 87:4,7
87:21 88:2 96:14
96:15 102:19,19
102:23 103:4,6,14
104:1,4,7 105:8
117:25 122:9,21
124:3,13,16 126:8
126:11 129:16,18
134:25 144:2,3,13
144:17,17,18,24
145:9,11 147:4,5
147:9,13 148:18
148:24,25 156:19
159:22 170:14
179:6,9,21 180:5
180:18,21 181:7
181:15 183:15,17
184:9 186:9,10,11
186:12,14,16
187:18 198:16
206:7,19 207:1,2
207:10,13,15,19
207:24 208:1,3



213:8 216:1,12
218:17 223:18
229:8
**reported** 1:21
56:14 103:3 138:2
159:24 161:23
162:14,17,21
171:14
**reporter** 3:6 4:13
4:17 5:4,12 6:24
27:19 28:13 47:10
96:10 104:5 131:9
156:24 183:21
202:23 229:1,7
**Reporter's** 3:22
**reporting** 203:24
**reports** 9:4 17:6,10
17:15,18 23:8
24:15 25:4 50:23
51:3,14 52:13
99:12 103:20
206:13,15
**represent** 4:17
182:19
**represents** 87:9
94:5 158:7
**request** 4:11 20:1
230:12
**request's** 149:6
**requested** 19:23
20:25 21:16 22:16
105:9 229:11
**requests** 18:22
20:22 42:2
**require** 42:18,21
62:8 65:21 181:3
226:17
**required** 6:20
35:10 39:5,12,17
41:5,9 44:5 56:5
69:20 108:24
111:1,2,6,9,16,16
112:4,6,7,9 118:6
118:10,19 119:12
119:13,15 120:18
120:23,24 121:2,7

121:13 127:6
129:21 131:5
179:3 180:1
189:24
**requirement** 38:5,9
38:17 95:8,11
**requirements**
35:16 36:18 37:3
37:5,8 94:15
109:23 166:9,10
188:10
**requires** 35:23
36:13,23 43:18
76:22 166:16
**reserve** 15:17
215:20
**resolve** 128:23
129:21 131:5,22
**resolved** 132:4
**resolving** 129:7
130:11
**respect** 17:17 20:7
25:19 36:14,16
37:15 47:9,16
48:10,19 49:1
52:21,21 63:16
67:11 68:11,21
69:6 71:13 74:18
75:4 96:16 100:6
107:13 123:8
129:2,7 130:12,19
131:6,17 142:6,23
145:17 154:16,19
154:23 161:21
177:3 193:2
201:16,20 205:16
208:23,24 209:11
211:13,15 222:25
**respectfully** 230:12
**respond** 135:16
**responded** 61:19
**response** 35:4
151:5 152:1
209:23
**responses** 7:3
188:22 189:16

**responsibilities**
73:14,18 75:16,19
75:21,24 76:9
83:5 89:19,20
127:12 131:17
133:16 143:3,5
144:5 145:5,6,16
145:21,25 147:24
148:7,13,20 149:6
149:14,16,18
150:21 152:3,8
216:19 217:22
**responsibility**
67:12 71:23 72:5
74:22,25 75:2,3
76:13 77:7,12
107:15 128:16
133:13 142:22
143:24 151:10
154:18 155:9
200:7,10,11
201:25 203:23
204:3 217:10
**responsive** 22:13
**result** 80:8 145:16
174:15 188:16
189:14
**resumé** 16:10,12
**retain** 202:16
**retained** 10:25
11:21 12:10 13:20
24:21 30:20
143:22 201:7,24
**retention** 202:18
**retirement** 28:9,22
29:23 30:12 33:13
34:14,15,17 35:9
35:23 39:5 53:7,8
54:22 55:5,25
56:3 64:24 82:1,6
82:10,13,23 90:7
94:20 101:15
102:21 117:7,10
120:17 134:1,11
134:17,21,24
135:18 137:2,9,11

149:24 150:10,14
152:11 154:5
155:23 158:8
175:7,13 192:25
194:18 196:18
202:22
**return** 23:2 31:18
159:20 171:20
174:12,15 176:14
202:5 230:12
**returned** 184:25
**Returning** 198:15
**returns** 52:6 55:13
**revenue** 27:9 82:23
110:24 111:1,2,6
111:9,16,17,21
112:5,6,7,10
119:12,13,15,18
120:18,23,24
121:1,2,7,10,13
157:15 180:13,15
181:8,11,14,23,24
183:14 184:1,8
185:11 186:1,8
188:15 189:12,20
189:24,25 190:1
194:14,20 196:11
196:25 197:20,25
214:18,20 215:13
**revenue-sharing**
158:14 174:10
192:15
**revenues** 82:3,15
156:22 157:12
159:24 179:4
180:3,10 181:6,16
181:20 182:6,15
182:18 183:12
184:5,15 185:4,20
**review** 9:6,10,21,22
17:25 23:1,5,8
42:2 53:25 102:23
103:20 117:14
122:23 144:13
168:17 220:17
229:10 230:11,12

**reviewed** 9:3,3,4
32:6 33:2,3 43:21
54:5 101:25
102:11 118:1
220:11,19
**reviewing** 9:20
43:21 54:14 87:6
96:18 103:1 145:9
180:25
**revision** 112:16
**RFI** 21:7
**RFP** 121:5 123:12
123:16 125:17,23
151:5 188:22
189:16 198:23
205:5 207:22
211:23 212:11
**RFPs** 20:10 151:3
151:22 152:2,5
204:18,20
**right** 5:6 6:3,7 9:11
10:2 13:22 14:9
14:10 15:3,17
16:10,18 19:12,21
21:22 23:1 24:6,8
24:10 25:13 28:9
30:4,8,16 31:22
33:14 34:8,22
37:23 38:22 40:4
41:24 42:4,13
44:7,22 46:13
48:22 49:2,22
50:1,3,3,17,19,19
51:6 52:2,13 56:1
56:18 57:2,10
58:10,10 59:13
60:17 61:8 62:4,8
64:4,21 65:3,24
66:5 67:18 69:10
70:3 71:4,5 74:5
75:10 76:2 77:16
78:21 81:7 82:4
84:4,23 85:15
87:16 88:21 89:2
89:4 90:9 94:21
95:5,17 96:4 98:8



100:14 101:11,12
103:7,21 104:15
105:17,24 109:2,5
109:11 110:19,24
111:11,14 112:18
112:24 113:17
114:4 115:8,10,21
118:14 120:10
123:14,22,25
126:4,24 128:6
129:9 130:16
131:20 132:9
133:2,10,17
134:12 135:19
138:13,22 139:8
140:3,4,8 141:18
142:16 143:3
144:8,14,25 145:7
146:7 148:2
152:13,19 156:1,5
160:5,8 162:4,9
162:11,15 163:7
166:25 168:5
169:20 170:6
172:1,3,22 173:7
173:10,15 175:1,2
175:17 176:11
177:15 178:4,23
179:5 180:18
181:23 186:19
187:11,15 188:4
188:17,21,25
189:6,14 190:4
191:9,20 192:18
193:11 196:21
198:11,15,18
200:9,13 202:22
203:12 206:17
209:3 210:20
211:7,24 212:3,22
212:25 213:4,11
213:16,24 214:10
214:15 215:14,21
216:14 226:8,12
227:1,6,12
**rise** 80:4

**RMR** 1:21 228:15
229:22 230:17
**Roger** 9:11
**role** 48:12 61:15,15
61:21,21 62:22,25
69:7 71:15 75:2
76:12 78:1 92:21
127:5 132:14,17
132:20 137:19
155:16 199:2
201:18,21 202:9
205:16 206:1
207:19,21 214:12
**roles** 30:2 48:3
75:15 76:9 127:11
131:17 144:4
145:4 147:23
148:7,20 149:6,14
216:19 217:21
**romanette** 67:17,18
110:19 111:11
112:22 121:21
166:3 167:13
171:23
**Romano** 1:3 3:21
4:5 61:23 77:2
99:11 100:7,10
101:17 121:2
122:24 124:2,17
136:15 141:4
194:11,17 195:11
197:15 205:16
211:13 220:6,6
230:7 231:3
**Romano's** 123:23
123:25
**Romanos** 20:5,6
120:17 121:8
122:23 125:7
126:1
**room** 8:13
**rough** 227:4
**RPR** 1:21 228:15
229:22 230:17
**rule** 3:17 39:22
40:22 43:6 129:2

160:7 162:21
163:24 166:16
172:17,19
**rules** 5:23
**ruling** 80:8 129:2
**rulings** 79:22 80:11

---

## S

**S** 3:8 27:20
**S-T-E-V-E-N** 5:17
**Saez** 2:24 5:1
**sake** 108:5 141:10
**sales** 151:25
**Sam** 5:18 27:20
**Sankary** 1:21 4:14
228:15 229:6,22
230:17
**Sanofi** 53:1
**satisfied** 109:18
110:1 132:9 166:9
176:5
**saw** 102:5 132:18
136:19
**saying** 20:24 25:10
42:21 63:9 67:16
67:25 69:4 81:15
84:11 87:11 88:16
88:17 106:13
127:10 129:5,6
130:4,4,11 138:22
146:10 149:2,16
153:5,19 160:2
162:12,18 170:15
173:16 182:3
189:10 214:21
**says** 48:22 68:5,9
71:2,14 111:24
146:15 164:9
166:1,2,3 167:16
168:3,4 174:2
177:16 180:14
197:19,20 206:20
219:8,24 220:20
**SCAROLA** 2:8
**schedule** 138:3
227:5

**schedules** 39:7
**scope** 23:7 65:18
129:22
**scroll** 14:23 16:5
66:24 67:22 68:9
167:5 197:16
**searched** 169:22
**Searcy** 2:8 4:22
20:8 22:3,18 77:1
78:1 96:21 98:20
99:8,14,18 100:3
105:10,16 121:23
122:6,24 125:1,4
125:17 188:23
203:23 204:10,15
204:25 205:1,24
205:24 206:8,20
207:3,25 220:6
**Searcy's** 20:4 21:21
205:15 207:19
**second** 5:2 58:13
61:3 83:1 85:16
130:14 172:21
179:13 219:3,4,11
**second-to-last**
14:23 58:13
**section** 3:15 66:5,8
67:14 68:1,8
69:14 71:2 72:19
73:11 81:13 126:7
126:11 127:2,3,21
139:12 147:2,4,8
149:23 156:19,20
166:7,8,11 167:13
174:2 212:15,17
213:8 219:3,11,18
219:24 220:20
**Securian** 22:2,19
84:15,18,22,24
87:25 111:23,24
112:15,15 114:15
114:17,20 115:4
115:24 116:3
177:15,23 186:22
187:1 188:13,20
188:25 189:11,18

190:3,10 191:1,5
191:9 192:4,17
193:10 214:5,16
214:22 215:2,6,10
**Securian's** 84:1
87:8,18 178:11
187:7 189:3
**securities** 214:5
**security** 177:2,4
**see** 5:7 14:17 15:21
15:24 18:19 19:2
19:7,8 22:19,24
32:22 40:25,25
41:3 58:15,18
61:1 68:5,12 69:7
72:22 73:2 76:24
90:20 91:2 115:23
120:1,6 122:3
141:2 152:8
156:23 159:1
161:12 165:1,25
166:13,25 167:6
167:13,14,16,18
171:14 176:15
178:21 183:6
186:9,10,13 192:6
194:5,14,16,22
195:14,20,21,25
196:3,9,14 197:19
198:3 208:6
210:10 216:9
219:1,5,14,25
220:2,23
**seeing** 32:19 66:22
93:20 216:14
**seen** 33:22 41:2
43:11,24 56:22
66:16,20 73:7
74:23,24 75:5,7
75:11 76:6,10,23
80:11 83:21 106:4
107:3 108:23
162:17,20 163:5
167:20,21 168:25
169:2 194:10
197:13 207:4



222:5,24 223:6
select 55:6 113:14
  139:15,17 202:16
selected 21:14
  187:9,14,23 188:3
  188:4,8 211:11
  214:8 225:25
selecting 20:7
  124:4 140:3
  202:25 203:24
  206:4
selection 140:6,7,9
  142:14 200:11
  202:18 206:2,9
  207:20 211:15
selects 74:16
self-styled 145:16
semantics 184:14
Senior 2:24
sense 35:25 39:24
  43:11 52:4 115:12
  133:4 140:19
  176:12
sentence 25:16
  58:19 59:15 71:3
  71:22 216:17
  217:7,14,19 218:9
separate 31:12,15
  32:17 48:14 52:2
  54:15,19,20,24
  55:8,11,14,17,21
  55:24 57:1,9
  58:24 59:11 71:25
  72:6 86:9 99:4
  101:18 116:5
  134:2,5,11,14,18
  137:13,15,16,18
  137:21 138:1,16
  139:7 144:6 175:1
  175:3,18 180:2
  181:4 182:10
  183:18 200:18
  216:20 217:11
  221:9,14,25 222:7
  222:8,16,18 223:1
  223:8

separated 183:18
series 6:9
serve 8:22 13:21
  48:18,25 61:24
  62:3,12,13 63:21
  74:16 127:15
  155:24 201:15,18
  205:14
served 13:24 14:3,6
  48:6,10 61:5
  130:7 203:6
  206:20 207:6,25
service 21:17 25:20
  30:3 33:9,16
  39:16,20 45:21
  48:13 53:19 56:4
  56:20 58:23 59:18
  59:24 60:9 61:18
  65:4,17 73:15
  75:8,14,23 76:15
  76:20 78:4,14
  79:1,22 80:10
  88:9,11,17,22
  89:8,15,21 94:11
  94:24 95:14,19
  101:15 107:6,21
  107:23 108:16
  111:1,13,19
  113:14,20 121:9
  132:13 152:2,12
  153:22 155:18
  158:9,17 166:5
  171:2,4,23 172:1
  172:5,9,12 173:22
  174:7,15 198:1
  199:2 204:17,19
  209:6
serviced 68:18
services 1:22 4:13
  4:14 28:8,9,16
  75:4,6 91:22
  113:2,6,7 157:12
  158:7 159:20
  164:9,11,21 166:4
  166:20,24 169:5
  171:4,5,6,8,10,10

171:21 172:8
  173:1,12,13,17
  174:3,12 176:1,2
  176:5,14 177:25
  189:4 190:4,13
  198:25 200:20
  204:14,16 209:12
  210:5,24 215:3
  230:8,18
servicing 79:23
  199:17 200:3,5
serving 29:24 37:13
  63:19 69:13,18
  75:13 128:5,8
  153:23 205:12
set 24:5 51:2 63:4
  102:7 118:12
  134:9,10
sets 117:9 118:2,15
setting 116:14
  117:4
share 187:7 190:12
shareholder 198:1
Sharing 194:14,21
  196:11
sheet 3:7 230:13
  231:1
SHIPLEY 2:9
short 80:13 193:18
show 14:12 58:1
  66:11 138:5
  179:24
shown 168:22
  196:24
shows 16:9 53:11
  188:13 195:18
sign 3:6 227:9,9,10
signature 14:25
  16:6,8 134:10
Signed 228:12
significant 208:16
similar 33:12 75:5
  121:19 175:14
  178:22 205:6
similarly 1:4
  221:24

simple 180:8
simply 52:9 77:18
  86:17 151:8
  158:22 164:19
  178:1,9 199:16
  207:13 212:24
  213:3 214:25
Sincerely 230:15
single 113:12
  125:18
sir 23:19 80:22
  131:3 195:14
  211:25 216:6
sit 15:14 17:3 123:5
  123:17
site 18:9,12,15,17
  60:8 97:5 169:2
sites 58:23 59:17,24
situated 1:4
situation 110:4
  143:20 173:9
size 39:8,9 121:19
  179:12
skimmed 24:19
skip 149:22
slower 16:7
small 25:19,20
  34:20 84:19
smaller 26:11
smiling 58:9
sold 203:11
solely 225:23
solicited 151:22
somebody 106:14
  123:17 135:20,23
  136:14 140:11
  142:17 190:14
somewhat 168:9
sorry 13:16 16:7
  44:24 47:11 50:24
  60:20 69:2 97:18
  116:15 126:10
  131:9,11 133:20
  156:20 165:17
  167:8 168:14
  179:11 183:1

186:12 195:4,19
  196:3 205:21
  206:24 208:2
  209:22 218:4
sort 140:19
sounds 65:20
  176:19
source 189:25
  190:18 208:12
sources 97:13
  197:23
Southeast 2:4
Southern 1:1 4:7
space 164:10,12,15
  164:21 166:20,24
  168:21 169:6
Spark 211:24
speak 7:1 10:4,9
  82:9 116:19
  150:14 210:12
specific 3:20 11:23
  12:5 13:13 28:2
  29:8 32:19,25
  36:6 39:19 46:17
  46:18,24 48:3
  52:5,6 60:4 66:8
  68:18 73:6 76:8
  78:21,21,25 79:1
  79:1,11 85:10
  96:13 102:20
  104:6 105:13
  106:24 112:1
  114:16 117:7
  118:24 119:14
  121:1 124:14
  129:2,3,25 132:16
  133:12 134:6
  135:22 136:3
  137:8 138:10
  139:17,24 145:24
  150:13 151:13
  153:14 154:20
  158:6 160:17
  165:5 166:22,24
  167:25 173:9
  174:16 177:19



178:2,10 183:13
188:9 189:15
191:13 194:11
197:15 201:1,22
203:22 208:20
214:8
**specifically** 6:21
13:7 19:14 22:21
29:12 33:4 37:24
42:3 43:3 54:6
66:22 67:7 75:24
102:14 123:1
125:5 146:24
147:12 156:25
157:11 164:14
170:21 172:17
180:16 181:8
183:16 184:7
185:22 186:8,20
188:22 204:9
206:23 207:18
213:5,6 220:20
**specifics** 186:24
**speculating** 210:18
**speculation** 190:6
210:22
**spell** 27:19
**spent** 10:13 11:7
12:11
**spoke** 9:25 151:13
188:24
**spoken** 150:19,23
151:18 189:2
192:16
**sponsor** 25:20 30:5
35:21 37:13 38:10
38:19 45:19 58:22
59:17,24 60:3,6,9
63:14 74:15 90:19
90:25 92:1 93:23
101:16 107:10
113:3,7,13 114:13
119:14,20 120:19
140:13,17 142:23
153:14 200:11
204:21 206:1

208:16 209:8,9
**sponsors** 30:8
36:13,18 37:4
38:2 39:12,17
41:13,14,15 45:1
45:3,9 61:22
95:15 97:13 99:1
107:14 110:6,9
135:7,8 152:19,24
153:6,11,21
181:10 188:9
198:18,20 200:15
204:19 208:20,21
209:5,16,19
**sponsors'** 39:19
**STA** 197:21
**stable** 28:17
**stadium** 13:14
16:15
**stand** 33:6
**standard** 63:4
137:1
**standards** 63:11
**standing** 226:19
**standpoint** 29:23
29:24 36:25 93:4
192:9 199:15
201:1
**start** 12:21,23 27:2
119:20
**started** 13:1 58:11
**starting** 71:3 126:8
156:19 212:15
213:9
**starts** 157:3
**startup** 210:6
**state** 4:15 5:15
26:11 29:8 61:3
61:20 64:25 76:4
79:20 84:18 86:9
88:1 95:25 98:3
99:13,24 121:22
131:2,13 132:3
144:3 145:13
148:10 149:9,23
160:22 180:16

183:16,17 184:20
185:19,22,25
186:13,17 188:7
191:11,11,15
192:14 204:2
207:3,15,18
208:21 209:21
212:1 218:14
228:4,16 229:3
**stated** 69:17 72:21
84:6,6 86:14
87:21 96:5 99:17
127:18 131:15
180:17 188:18
206:23 212:9
227:8 231:22
**statement** 60:12,14
76:4 84:8 124:7
131:4 145:5
146:18 147:22
148:17,20 149:10
155:12 183:4
184:11 185:19
**statements** 26:4
39:9 135:3,5
146:6 150:16
152:1 219:9
**states** 1:1 4:7 68:13
72:4 124:2,19
144:9 150:8
166:14 179:8,25
185:9 191:10
198:4 216:17
217:1,12
**stating** 61:23 63:12
72:16 84:13 86:17
87:3 113:9 129:12
130:21 131:14
133:7 148:5 149:5
149:13,18 181:2
207:24
**status** 70:19 71:1
74:18 145:12,17
225:8,13
**statute** 3:15 63:24
66:4,16,20 67:6

68:5 71:10 72:3
73:22 74:2,13
76:17,22 79:3
161:15 177:14
**statutes** 62:19,25
63:5 64:9 225:1
**statutory** 128:21
164:9,11,20
166:20
**stay** 114:7
**stenographic**
229:12
**stenographically**
1:21 229:8
**step** 136:21 162:11
**Steve** 226:12
**Steven** 1:13 3:3,10
3:11 4:4 5:5,17
228:9 229:9 230:3
231:4,24
**stock** 53:1,9
**strike** 122:19
225:14
**structure** 28:21
153:1
**structured** 29:2,4
34:18
**structures** 65:8
**struggled** 78:10
**struggling** 166:23
**subaccount** 221:19
225:23
**subaccounts**
219:10 221:15
**subcontractor**
174:8
**subject** 42:8 45:8
46:14 64:11
124:14 150:2
151:1 152:17
156:8 226:9
**submitted** 16:3
**submitting** 17:8
**subparagraph** 67:8
171:15 183:16,22
184:16,24 185:10

**Subpart** 67:2
**subsection** 67:6
166:2,2 172:5
219:5
**subsequent** 220:16
**subtransfer** 197:5
198:1
**suffering** 7:17
**Suffice** 209:7
**suggestion** 37:25
**suggestions** 37:15
**suggests** 37:10,22
190:25
**Suite** 2:4
**summarized**
121:21
**summary** 60:22
81:8,12,19 95:25
112:23 126:13,15
194:13,19 196:10
223:23 224:1,3,5
224:6
**SunTrust** 2:4
**supercede** 79:9
**supplement** 15:13
17:2 207:10,12,24
208:1
**supplemental** 3:16
47:24 61:18 70:9
70:18 196:7
**supplying** 122:17
**support** 10:21 19:5
25:4 26:5 208:9
**supported** 213:1
**supports** 25:21
124:6
**supposed** 185:12
**sure** 5:24 6:1 18:25
19:15 24:9 31:25
47:13 48:14 49:4
51:1 57:8 66:2
72:9 78:13 79:24
91:10 112:12
117:2 125:16
134:8 153:10
162:10 204:5



221:12 222:16
225:22 227:8
**surrounding** 35:2
177:10
**survey** 25:21 82:6
150:9,13 208:5,8
208:19,23 209:2,4
209:7,13,19
210:15 211:17,20
**surveyed** 211:9
**swear** 4:18 5:8
**sworn** 228:10

**T**

**T** 3:8
**tactic** 191:2 192:6
192:21 193:8
**take** 6:6 12:21
52:18 75:23 77:12
80:12 82:6 102:25
155:10 160:21
193:17 205:25
**taken** 4:5,10 7:12
9:13 23:24 63:16
81:2 156:14 177:2
193:24 230:7
**takes** 142:14
**talk** 115:2 138:18
138:25 176:10
**talked** 51:19 61:17
82:21 131:25
135:20,23 139:11
169:5 185:10
191:23 198:12
201:14 213:17
214:4
**talking** 64:2 65:3
66:3 70:24 73:23
73:25 90:11 104:3
126:17 127:2,20
137:25 144:16
147:7,11 153:17
164:7 196:7
202:20
**talks** 176:11,12
**target** 3:13 57:23

92:12,14,15
**tasks** 36:19 128:16
**tax** 19:8,9 20:4,9
21:5 22:1,22,24
23:2 30:11,15,20
31:6,11,17,18
32:21 43:5,24
46:20 47:1,8,14
47:17 48:11 50:9
50:12,16 51:17,20
51:21,25 52:1,6,7
52:10,20 53:5,12
53:13 82:2,15,22
84:2 86:7,8 96:8
96:16,23 97:21
98:7,20 99:2,9,19
100:4,13,20 101:4
101:20,23 102:2,9
102:16 103:2,25
104:2,8,11,14,21
105:4,6,11,16,23
106:7,15,21 108:7
108:15 109:7
110:2,15,20 111:4
111:12,20,25
112:8,17 113:5,11
113:20,22 114:12
114:21 115:3,8,14
116:13 117:3
118:4,12,17 119:6
119:21 122:1,25
123:7,19 124:10
124:17 125:2,5,12
125:22 126:2
127:7 129:14
141:6,11 142:2,7
143:9,10,14,16,20
143:23 156:21
157:7,14 159:4,6
159:13,16,19,25
160:2,16,25 161:2
161:7,18 162:1,3
162:5,13,19,21,23
163:4,19 169:13
169:15,16,19,23
170:3,4,21,23,23

171:12,17,19
172:15,16,18,24
173:5,6,9,11,17
173:24 174:13,16
174:18,22,24
175:23,25 176:4,9
176:16,20 177:1,1
177:5,8,11,16,17
177:19,24 178:14
178:20,24 179:3
180:1,9,15 181:3
181:5,8,14 182:5
182:9,11,14,18
183:11,18,20
184:5,17,25 185:3
185:20 186:1,8,19
186:23 187:3
188:16 191:1,6,25
193:3 196:19
197:1 198:5,14
202:3,14 203:3
209:14,24 210:8
210:24 211:1,14
212:3,7,10,19
213:14 214:6,17
214:25 215:11
221:6 222:6,10
223:10
**tax-advantaged**
33:13
**tax-exempt** 177:7
**taxable** 31:24 53:14
**taxes** 52:8 53:3
97:1 122:2 174:22
175:2,4,7,12,18
175:20
**Teachers** 33:7
**Teams** 8:6 24:10
**technical** 24:12
**tell** 54:6 56:11
85:22 135:23
161:16
**template** 212:12
**templates** 212:11
**term** 42:20 62:14
68:6 72:22 73:6

90:1,14,18 91:5,7
91:8,13,24 101:10
106:18 126:25
133:25 135:19
136:4,6,8,8 137:4
137:6 138:5,10,24
157:16 159:1,9
169:23 180:12,13
181:6 183:14
184:8 204:6,7
210:22 217:13
**terminology** 62:21
**terms** 36:12 41:15
73:9 78:25 88:24
89:25 113:13
138:8 151:3
152:10 157:19
161:11 187:22
204:5 207:4
214:10 225:12
**testified** 50:14 58:6
59:8,12 123:11
124:3 132:6
164:16 165:13
206:15
**testify** 193:7
**testifying** 6:2
**testimony** 5:8 21:6
21:15,19 50:11
96:6,21 97:19
105:15 117:14,19
118:1 123:14
124:14,15,24
136:25 169:12
196:23 205:9
207:6 213:7
**text** 126:15,18
183:5 224:9
**texts** 224:25
**thank** 5:4,12,19
120:7,13 126:19
126:20 127:25
144:20 157:4
167:3 179:18
183:6 197:7 216:7
216:8 219:13

**theoretically** 89:2,7
**theory** 64:14
142:20
**thereto** 220:3
**thing** 16:13 66:3
181:25 184:15,21
227:1
**things** 17:22 37:9
37:21 46:16 51:1
51:4 90:12 109:25
110:17 114:11
153:3 215:18
**think** 12:6,13 19:3
20:3,18 26:18
29:8 33:7,20
38:18,18 41:11
44:10,11 46:14,16
49:6,6 51:19
54:25 60:18,23
61:14 64:25 69:22
70:8,15 72:3,22
72:25 73:13,13
76:3 78:19 79:10
79:20 81:7 82:20
82:23 84:17 93:1
93:8,19 94:14
95:13 97:16
100:23 102:19
103:22 109:20,20
112:14 118:22
120:8,9 124:6
129:1 135:2
139:23 144:21,21
145:2,23 146:9
147:10,11 148:5
148:23 149:13,15
152:15 154:1
155:3 156:2
158:18 173:8,9
174:17 175:14
181:1,18 184:13
184:13 185:25
186:9 187:17,20
188:6,6 190:9,13
191:14 192:7
195:15 203:17



205:1,15 206:11
207:17 208:20
211:8,10 212:9
221:2 227:3
**thinking** 104:1
124:4 161:11
**thinks** 193:10
**third** 2:4 13:17
81:25 197:19
**thought** 81:14
104:2 132:6
136:19
**thousand** 29:7 53:6
**thousands** 64:24
**three** 7:24 10:7
76:23 196:6
**thrown** 168:19
**Thursday** 1:17
**TI** 33:5
**TIAA** 13:9 32:16
32:16 33:5 220:24
221:5,23 222:16
223:1
**TIAA-CREF**
214:24
**tied** 139:7
**time** 4:9 6:18,18
8:11 10:12 11:7
12:13 13:20 15:15
15:18 17:4 20:9
20:11 21:8 23:22
23:25 29:1,14
79:21 80:25 81:2
81:4 94:2,6,10
102:25 119:16
120:25 121:4,10
152:16 154:4
156:15 179:11
193:22,25 215:14
**times** 8:16 13:6
**title** 68:9 165:14
195:10 196:14
**titled** 3:13 15:2
**today** 4:8 5:9 6:3
6:25 7:4 15:14
17:3 30:7 93:20

108:23 123:5,18
207:9
**today's** 8:25 10:1
226:18
**Todd** 124:2,16
220:6
**told** 99:7 105:16,19
105:22 153:12,21
154:2
**top** 25:18 151:24
158:3 165:25
172:22 194:15
195:22 216:10
218:24 219:23
**topic** 224:2
**topics** 57:19,20
**total** 27:6 113:6
114:9 188:20
209:1
**touch** 57:18,20
**trade** 226:2,5
**transactions** 47:3
**transcript** 7:4,5
9:10,14,17 227:2
227:4 229:11,12
230:10,21 231:2
**transcripts** 9:7
220:12,16 226:16
**transition** 153:2
154:9
**transitioned** 154:6
**transparency** 45:15
45:17
**treat** 137:20 141:5
**treated** 123:14
159:12
**treating** 177:24
**treatment** 46:20
47:1,7,14 48:11
125:2 177:11
**trial** 87:24,25
206:17,22
**trouble** 166:18
**true** 51:2,4,13
143:12 229:12
231:22

**trust** 28:23 53:22
53:24 55:4 138:16
138:18,20 155:21
175:15,21 177:6,7
177:8 187:14,24
188:3,7
**trustee** 29:4 55:3
68:7 154:8,14
156:3 226:5
**trustees** 71:17,20
77:5 150:3 151:2
**truth** 5:9,9,10
**truthful** 7:15,20
**try** 7:9 136:21
**trying** 21:23 136:13
**turn** 156:18 193:20
215:25
**Tussey** 13:10
**two** 10:22 24:14
25:4 27:22 39:25
48:14 50:22 51:3
70:8 82:20 99:11
117:18,23 122:23
126:13 156:8
157:19,24 176:22
180:4 201:15
211:23
**type** 65:21 128:11
128:14 223:1,8
**typical** 93:5 107:13
190:15
**typically** 12:19
27:8 32:8 73:15
110:25 113:3
128:15 152:5
155:4,8 174:9
187:18 199:24
200:22

---

**U**

**U.S** 3:15 174:16,19
187:9
**U.S.A** 1:7
**ubiquitous** 136:9
**Uh-huh** 26:25
109:10

**ultimately** 35:18
38:15 41:8 43:1
43:16 44:6,10,19
45:5 62:24 63:2
73:12 77:14 78:3
79:7 80:7 90:25
175:1,5,17 200:4
200:6 201:25
**uncommon** 38:2
**underlying** 96:25
196:25 197:21,22
197:24
**underperforming**
37:19
**undersigned** 228:8
**understand** 6:2,5
6:11,16,22 7:6,14
7:19 9:12 18:2
19:19 20:13 21:10
30:25 31:2,20
38:21 41:15 44:2
45:12 49:4 51:23
63:1 67:8 69:24
76:20 77:20 79:17
83:8 87:13 103:5
104:3 107:22
117:23 127:25
131:2 134:8
135:19 138:24
139:6 143:11
148:15 155:2
157:17 158:23
159:9 160:4,10
162:8 167:22
169:7 174:21
175:23 177:1
193:10 211:18
214:14
**understanding**
21:24 31:14 35:22
36:2,9 39:2,21
40:14 41:1 42:12
42:14,14,17 45:20
54:15 55:9 62:7
65:7,10 68:14
72:13,14 73:17

74:6 76:21 77:19
77:21 84:25 94:5
108:14 124:20
137:1 138:23
142:25 152:20
159:10,11 163:15
196:18 197:3
198:10
**understandings**
80:3
**understood** 112:12
154:9,13,17
**Unfair** 3:13 57:23
**unfamiliar** 168:10
**unique** 79:11
**United** 1:1 4:7
**unitholders** 55:23
**units** 137:17
**University** 27:19
27:21
**unlimited** 149:19
**unmuting** 193:21
**unrelated** 157:13
159:25
**update** 15:17
**updated** 16:14
**updates** 15:18
16:12
**usage** 91:20
**USC** 66:5
**use** 18:8 53:12 64:1
72:24 90:1,14,17
91:7 92:12,24
93:6,17 127:6
136:6 138:1
208:22 209:10
210:21
**uses** 204:11 217:13
**utilize** 91:22
**utilized** 221:9

---

**V**

**v** 230:7 231:3
**Vaglica** 2:18 4:25
80:16
**vague** 106:18



**VALIC** 151:22,24
    154:5,10,12,17,24
**value** 28:17 167:17
    167:24 169:9,14
    169:16 170:10
    171:13 173:7,8
    175:24
**Vanguard** 225:24
    226:6
**variable** 3:16 47:25
    70:10 86:6 134:14
    203:10 221:8,23
**varies** 26:10
**various** 32:7 36:17
    36:19 39:4,7
    45:20 55:7 79:21
    80:11 103:6
    150:21 151:25
    163:9 200:15
    205:4 211:11
**vary** 121:10
**vendor** 21:3
**venture** 169:22
**vernacular** 138:18
**versus** 4:6 13:10
    124:5
**Vice** 2:24
**video** 226:17 227:7
**videographer** 2:23
    4:2,12 23:12,15
    23:19,22,25 80:17
    80:20,22,25 81:4
    120:3,11 156:12
    156:15 193:25
    226:14,21,25
    227:6,12
**Videotape** 4:3
**videotaped** 1:12
    229:9
**view** 84:13 90:5
    91:24 112:3
    125:19 130:6
    131:16 135:13
    136:3 145:23
    174:13 190:25
    192:11 199:16

202:7 224:2
    225:12
**viewed** 37:19
**vii** 167:13
**virtue** 63:16 72:1
**volume** 26:19
**voting** 71:16
**vs** 1:6

---

## W

**waiting** 180:24
    185:6
**want** 19:7,8 21:13
    24:9 35:13,14
    48:14 66:2 102:25
    138:24 153:14,14
    209:22 225:11
**wanted** 19:2 22:19
    38:11 81:9 136:21
    153:2 154:23
**wants** 60:6
**wasn't** 122:13
    125:23 227:8
**way** 48:5 51:16
    74:15 85:8,13
    87:8,18,24 95:13
    104:19 113:23
    116:4 123:13
    131:21 133:7
    134:8 145:20
    159:8 181:1 186:2
    187:4 206:6
    221:13
**ways** 29:22 45:20
    189:7
**we'll** 7:9 14:13 58:1
    159:2 167:6 194:4
**we're** 4:2 5:24
    23:23 24:1 66:2
    75:13 81:1,5,22
    95:21,22 112:19
    126:12 129:3
    144:16 156:7,12
    156:16 170:8
    184:13,13 185:6
    194:1 206:24

227:14
**we've** 80:13 152:25
    227:4,10
**Wealth** 204:12
**web** 4:11
**website** 193:4,15
**weeks** 9:3
**Weinshall** 2:6 3:4
    4:19,19 5:14
    14:16 16:1 21:9
    22:11,23 23:12,14
    23:18,20 24:2
    28:20 30:24 31:19
    32:1 36:1,21
    38:14 39:1 40:11
    40:19 41:7,22
    42:23 44:18 45:16
    47:12 48:16 49:5
    52:11,15,23 54:7
    55:18 56:16 57:7
    57:14 58:4 59:19
    62:16,23 63:8
    64:16 66:1,10,15
    66:19 67:21 68:20
    69:9,21 70:20
    74:11 78:12,24
    79:12 80:1,12,19
    80:23 81:6,21,23
    83:7,14 84:10
    87:22 88:20 89:13
    91:11 94:9,19
    95:10 96:11 98:4
    99:3,22 101:1,9
    102:3,22 103:10
    103:18 104:9,18
    105:1,14 106:3,11
    107:1,11 108:4
    109:1,19 110:7,18
    113:15 114:1
    116:1,11 117:1,18
    117:20,21 118:13
    119:1,10,25 120:5
    120:8,14 121:11
    121:20 122:16
    123:2 126:17,21
    129:4 130:2 131:1

131:12 133:6,14
    133:22 134:7,23
    137:10 138:4,21
    140:1 141:1,9,23
    144:1 146:1,12
    147:1 148:14
    149:1,8,21 156:10
    156:17 157:2
    163:23 164:4,5
    165:4,9,12 170:1
    170:12,19 171:16
    173:3 175:11
    177:12 179:23
    180:23 181:21
    182:12,24 183:3,7
    183:24 184:19
    185:16,17 188:1
    188:11 190:17
    192:2 193:17,21
    194:2,9 195:4,7
    195:13,18,24
    196:2 197:6,12
    199:12 201:11
    202:12 203:5,18
    209:20 214:2
    215:14,19,20
    217:4,16,24 218:4
    218:20 219:21
    220:7,24 221:17
    222:4,12,20,24
    223:4,12,21 224:4
    224:11,20 225:6
    226:10,19 230:22
**well-defined** 63:14
    73:15
**went** 123:17 154:8
    154:14
**West** 2:10
**Westlaw** 169:1
**white** 43:22
**widely** 88:5
**willingness** 210:5
**winning** 123:16
**wishes** 141:24
**withheld** 53:3
**withhold** 53:6

**withholdings**
    174:25
**witness** 3:6 4:18
    5:11 8:20,23
    13:25 14:3 116:15
    116:20 120:9,12
    122:18 131:11
    133:20 215:16
    230:1,11,12
**wonder** 156:9
**wondering** 165:16
    165:18 166:21
    186:25
**word** 30:25 31:2
    57:5 72:24 73:4
    157:17,22 158:8
    158:22,24 162:2,5
    166:25 167:22
    187:1
**words** 90:8 92:23
    162:18 163:4
    173:23 174:17
**work** 11:13 13:11
    17:7 26:9 30:11
    31:11 38:9,12
    45:11 50:8,14
    52:20 54:16 62:11
    62:12 63:19 90:15
    92:25 152:12,21
    198:16 201:5,12
    201:15,15 202:2
    205:7
**worked** 11:6 13:3,8
    13:17 28:3 50:16
    64:23
**working** 10:13
    12:16,22,23 28:22
    34:19,24 35:4
    56:12 63:25 94:20
**works** 175:15
**World** 225:24
**wouldn't** 38:7 41:4
    57:12 73:13 90:10
    95:7,13 100:16
    116:5 119:4
    125:19



**write** 17:10,12 59:1
182:15 183:8,9
231:2
**writing** 35:12 68:10
69:5,20 71:12
77:13 140:13
**written** 57:15,22
152:17
**wrong** 131:20
**wrote** 58:6,8 59:4
**www.magnals.com**
1:23 230:19

**X**

**X** 3:1,8 112:6
**XYZ** 41:25 42:5

**Y**

**Y** 112:7
**yeah** 13:16 14:21
14:21 19:17 23:3
23:20 24:19,19
27:7 32:14 37:24
40:16 59:15 60:1
60:14 62:21 68:2
71:14 74:4,10
79:9 87:1 96:13
102:14 104:17
107:13 108:13,21
109:20 110:13,25
111:15 112:19,25
114:11 116:17,20
117:25 123:23
128:2 134:13
139:10 140:10
142:17 143:4,18
144:21 146:23
147:10 150:18
151:21 152:5
153:10 154:3
155:15 157:10
162:10 167:1
178:7 180:7
181:24 188:6
189:7,23 190:9
191:23 195:18

197:14 213:5
216:6 226:22
227:3
**year** 12:4,11,15
26:8,10,11,12,14
26:23,24 27:1,8
28:2 39:7 53:10
**years** 13:10 26:20
34:13 50:15 74:10
**yep** 14:18 67:3 71:6
152:22 164:4
179:7,16 194:10
**yesterday** 9:13 10:5
10:10
**yielded** 20:2

**Z**

**Zhadanovskiy** 2:11
4:21,21
**zhadanovskiytea...**
2:12

**0**

**02210** 2:16 230:5
**08/23/21** 3:11

**1**

**1** 1:15 4:4 136:16
164:13 166:2
168:8 194:25
229:10 230:2
**1/27/24** 228:17
**1:04** 81:3,4
**10** 187:19
**10/08/21** 3:10
**10:01** 1:17 4:1,9
**10:26** 23:22
**100** 2:16 230:4
**1002** 3:15 66:5
**11** 179:10,19
183:23 184:3
185:11
**11:04** 24:1
**1102(a)(2)** 68:8
**1118** 23:5
**12** 67:23

**12:24** 81:1,3
**12b-1** 94:12,18,25
158:14 197:4,21
198:1
**14** 3:10 128:2
149:23 150:6
164:23
**15** 3:11 157:1 179:1
179:8 181:1
182:17,22,25
**150** 3:10 14:14,15
215:25 223:18
**151** 3:11 15:22,23
60:16 218:17
**152** 3:13 58:2,3
**153** 3:15 66:12,13
71:11 72:12,18
**154** 3:16 70:11,14
74:1 194:19
195:17 196:6
**155** 3:17 163:24
164:1
**156** 3:18 179:21,22
**157** 3:19 194:4,7
196:13
**158** 3:20 197:9,10
**16** 157:11 170:14
182:22
**164** 3:17
**17** 186:16
**179** 3:18
**18** 86:5 124:18
**19** 86:14
**19-21147-CIV-G...**
1:2 231:3
**194** 3:19
**197** 3:20
**1984** 28:1
**1985** 28:1
**1st** 228:12 229:20

**2**

**2** 58:16,17 67:8
70:22 81:8,13,22
112:21 164:13
165:3,23 168:8

171:2 173:20
194:24,25 195:1
195:19,19,23
196:5
**2,000** 226:1
**2:51** 156:12
**20** 53:7 186:18
187:6
**2012** 94:15,21
164:23
**2013** 125:6
**2014** 21:25 124:23
125:17 144:7,11
146:6 147:24
149:7 205:2
216:21,23
**2015** 22:1
**2017** 20:15 124:18
219:15,19 220:16
**2019** 26:16
**2020** 12:6 20:11,14
20:17,20,23 21:2
21:7,17 125:24
205:4
**2021** 1:17 4:8 118:1
227:14 228:11,12
229:20 230:2,7
231:4
**21** 67:5,6 144:22,23
145:12 218:5,6,7
218:15
**21(A)** 67:2,3
**2139** 2:9
**215** 3:4
**22** 145:13
**228** 3:5 229:10
**229** 3:6
**230** 3:6
**2300** 2:4
**231** 1:15 3:7
**24** 179:10,20
180:11 184:4
185:9 188:12
218:3
**25** 180:25 209:4,18
**255** 165:3

**26** 96:14
**28** 1:17 4:8 97:6
179:17 183:2,3
227:14 230:7
231:4
**28th** 228:10
**29** 3:15 66:5 179:14

**3**

**3** 58:16 81:10,15,17
81:19 112:20
126:7,11 127:3,21
139:12 164:13
168:8 187:8
223:23 224:1
**3(16)** 128:13
**3(21)** 37:13 61:7,24
62:3,12,18 63:12
63:15,19 64:1,3,8
64:18,20 65:5,13
66:3 67:4,7,16
75:6 78:15 127:16
128:8 130:7,23
132:1,8,20,25
133:9,16 154:15
154:18,22 201:16
201:20 204:8,12
205:17 206:8
207:7,14 224:19
225:3
**3(38)** 61:7,24 62:3
62:13,18 63:13,22
64:1,4,8,18,20
65:13 66:3 67:25
68:4 69:19 72:2
72:14 73:8,14,18
74:22 75:4,9,15
75:21 76:1,7,12
76:16,24 77:12,15
77:21 78:15
127:16 128:8
130:8,24 132:2,8
132:20 133:1,9,17
139:16 140:12,24
142:3,12 151:10
224:18 225:8,12



**3:09** 156:15
**30** 26:17 81:14,16
   179:15 230:12
**300,000** 27:4
**305-358-2800** 2:5
**33** 208:2
**33131** 2:5
**33402-3626** 2:10
**338** 65:5
**35** 210:2
**3626** 2:10
**38** 67:22 69:8,10
   73:11
**38(C)** 68:16,25
   69:15 71:10 72:12
   72:19

---
**4**
---

**4** 60:24,25 126:8,14
   126:15,16,18
   127:23 128:2
   156:20 165:21
   172:23,23 195:2
   195:15 223:22
**4:15** 193:18,22
**4:33** 193:25
**40** 26:13 27:5,11
   34:13 50:15 74:10
   209:23
**401(k)** 33:10,12
   52:21,25 53:4,17
   53:20 54:17
**403(b)** 33:11
**404** 166:12
**404(a)(5)** 39:13
**408(b)** 57:12
**408(b)(2)** 3:17,20
   39:18,22,25 40:22
   41:1,16 42:1,10
   43:7 44:1 45:7
   56:6,15 59:9 60:5
   108:2,8 109:9
   157:9,18 159:24
   160:8 161:20,21
   161:23 162:2,6,12
   162:14,21 163:25

164:24 165:3,6
   166:7,16 168:24
   178:11,22,25
   181:20,22 186:17
   187:5 197:14
   198:13
**408(b)2** 163:6
**47** 209:21 210:2
**4s** 126:14

---
**5**
---

**5** 3:4 66:24 110:20
   112:21 214:23
   224:10,10,16
**5,000** 225:25 226:1
**5:25** 1:17 227:13,16
**50** 26:13 27:5,11
   187:21 211:22
**51** 123:1,3,22
**52** 123:1 124:2
**525** 11:17
**54** 212:15
**5500** 39:6 136:15
   138:1,3,6,8
**5500s** 41:4
**561-686-6300** 2:11
**58** 3:13 213:9

---
**6**
---

**6** 133:25 197:16
   216:11 224:10,10
   224:16
**617-570-1153** 2:17
**65** 16:5,8
**66** 3:15
**68** 19:15,16,17
   218:20,22

---
**7**
---

**7** 118:1 147:3 167:7
   167:8,8,10 213:8
**70** 3:16 10:19 11:5
   12:11
**75** 212:17
**76** 125:4
**761571** 230:8

**77** 124:12,16

---
**8**
---

**8** 216:6,12,15
**80** 53:7 212:18
**800** 53:8
**866-624-6221** 1:23
   230:18
**87** 208:5

---
**9**
---

**9** 144:2 145:3 146:9
   146:15 147:16
   216:4,13,15
   217:14,19
**90** 10:19 11:5 12:11
**944837** 228:16
**99.7** 187:8,13

