## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 19-21147-CIV-GOODMAN
### [CONSENT CASE]

ERIC ROMANO, et al.,

      Plaintiffs,

v.

JOHN HANCOCK LIFE INS. CO. (USA),

      Defendant.

_____/

## REDACTED ORDER
## ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**Initial Note:** The Undersigned filed an unredacted version of this Order under

seal. [ECF No. 295] This is the public version of the Order filed with minor redactions

requested by the parties.

## Introduction

Plaintiffs Eric and Todd Romano, trustees of an ERISA defined contribution plan

("the Romanos" or "Plaintiffs"), filed a two-count lawsuit against Defendant John

Hancock Life Ins. Co. (USA), which sold them, as trustees of a 401(k) Plan, a Group

Variable Annuity Contract. [ECF No. 1, (the "Complaint" or "Compl.")]. Plaintiffs sued

on behalf of a putative class of persons who owned variable annuity contracts from John

Hancock. They filed a motion to certify the class [ECF Nos. 94; 103], John Hancock filed

a response [ECF Nos. 109; 133] and a Notice of Supplemental Authority [ECF No. 142] and Plaintiffs filed a Reply [ECF Nos. 115; 120].[1]

The Undersigned held a hearing lasting more than three hours, and the parties then (in response to an Order requiring clarification [ECF No. 15]) submitted memoranda [ECF Nos. 156; 157] on the burden of proof for class certification.

The Undersigned has this case on full jurisdiction, following consent and a follow-through Order of Referral. [ECF Nos. 26; 27].

For the reasons outlined in greater detail below, the Undersigned **grants** the motion.

I.    <u>**Factual and Procedural Background**</u>

Plaintiffs Eric Romano and Todd Romano are trustees of the Romano Law, PL 401k Plan (the "Plan"). [ECF No. 1, ¶ 1]. The Plan is a defined contribution plan under ERISA, which allows participating employees to invest in options made available by the plan trustees. *Id*. at ¶ 11. Through their financial advisor, Plaintiffs purchased a group variable annuity contract (the "Contract") from John Hancock to make recordkeeping services and investments available for Plan participants. *Id*. at ¶ 1.

---

[1]    As mentioned in the preliminary note, the parties filed two versions of the motion, response, and reply -- one redacted (and filed on the public docket) and one in unredacted form (but filed under seal). This explains why two ECF docket numbers are associated with each motion/memorandum.

Plaintiffs' Complaint asserts two claims against John Hancock relating to tax credits attendant to investments that Plaintiffs chose for their Plan under the Contract that "invest in stocks and securities of foreign companies." *Id*. at ¶ 30 (defining these as "International Investment Options").

In Count I, Plaintiffs allege John Hancock breached the ERISA fiduciary duty of loyalty by receiving and retaining "Plan Foreign Tax Credits" with respect to the International Investment Options, resulting in an alleged reduction in the value of the Plan's assets. *Id*. at ¶¶ 60-66. In Count II, Plaintiffs allege that John Hancock caused the Plan to enter into an ERISA prohibited transaction by not crediting their Plan with the value of Foreign Tax Credits ("FTCs"). *Id*. at ¶¶ 67-73.

In profiting from FTCs without disclosing them or passing through a commensurate benefit to Plans that generated such credits, Plaintiffs contend, John Hancock failed to act solely in the best interest of the Plans and failed to defray reasonable expenses of administering the Plans.

Plaintiffs have sued on behalf of a putative class of "all trustees, sponsors and administrators of all 'employee benefit plans' under ERISA, 29 U.S.C. § 1002(1), that owned variable annuity contracts from" John Hancock. *Id*. at ¶ 46.

As originally filed, Plaintiffs sought equitable relief under ERISA against John Hancock under both Counts I and II. *Id*. at ¶¶ 65-66, 72-73.

Shortly after the hearing, however, Plaintiffs withdrew their requests for injunctive and declaratory relief. [ECF No. 152]. Specifically, Plaintiffs withdrew requests for:

> B. Declaratory Judgment that Defendant breached ERISA fiduciary duties owed to the Plan and Participants;
> F. An Order permitting the withdrawal of any and all amounts payable under the Contract without imposition of a surrender fee; and
> G. An Order enjoining Defendant from any further violations of its ERISA fiduciary obligations.

In Count I, Plaintiffs allege John Hancock is "liable to personally make good to the Plan any losses to the Plan resulting from each breach under 29 U.S.C. § 502(a)(2)." [ECF No. 1, ¶ 65] Similarly, in Count II, Plaintiffs seek the same relief, alleging John Hancock is "liable to personally make good to the Plan any losses to the Plan resulting from these prohibited transactions under 29 U.S.C. § 502(a)(2)." *Id*. at ¶ 72. Plaintiffs further allege in both Count I and Count II that "[p]ursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief to the Class." *Id*. at ¶¶ 66, 73. However, as noted, Plaintiffs have withdrawn their request for declaratory and injunctive relief.

Plaintiffs still seek a constructive trust on amounts that result from the alleged breaches.

### Plaintiffs' General Theory of Liability

Plaintiffs describe this case as arising from John Hancock's allegedly disloyal, undisclosed retention of FTCs generated by retirement assets entrusted to it by the Plans.

Using standardized form contracts, the Plans placed retirement assets in John Hancock's "Separate Accounts" for investment in various mutual funds. Some of these mutual funds held foreign securities and incurred foreign taxes. But *John Hancock* did not actually pay these foreign taxes; rather, the *Plans* effectively did, as the value of their investments fell by the amount of taxes paid.

But, according to Plaintiffs, John Hancock received and retained the benefit of the dollar-for-dollar FTCs that the payment of these taxes generated. John Hancock, however, did not disclose this foreign tax credit compensation to the Plans, contrary to federal law. Nor did it use the compensation to offset the fees that it charged the Plans, contrary to the terms of its standardized form contracts. This uniform conduct towards the Plans enriched John Hancock by more than $100 million and violated the strict fiduciary obligations of the Employee Retirement Income Security Act of 1974 ("ERISA").

<u>Detailed Factual Background</u>

**John Hancock's "Signature" Platform**

John Hancock is an insurance company that provides, among other things, investment and recordkeeping services to 401(k) retirement plans. While John Hancock offers a variety of products or "platforms" to retirement plans, this action concerns the services it provides through its "Signature" platform, which is run by its Retirement Plan Services ("RPS") division. With each retirement plan that signs up for the Signature

platform (the "Plans"), John Hancock enters into two standardized form contracts -- a group annuity contract and a recordkeeping agreement.

Plaintiffs, as Trustees of the Romano Law, PL 401(k) Plan, entered into a group annuity contract and recordkeeping agreement with John Hancock in October 2014. Under these contracts, John Hancock provides a menu of investment options and recordkeeping services to Plans like the Romano Law 401(k) Plan.

The investment options made available on the Signature platform include a number of mutual funds. John Hancock first chooses a group of mutual funds for the platform, and each Plan then chooses a subset of those funds for investment by its participants, with the Plan's choices specified on the group annuity application that becomes part of the group annuity contract.

From the subset of mutual funds chosen by a plan, the individual participants choose specific funds to invest in. Technically, however, the plans and their participants do not invest directly in the mutual funds. Rather, their retirement assets are placed in "Separate Accounts" at John Hancock. The Separate Accounts are established, administered, owned, and managed by John Hancock, but they are not chargeable with any of John Hancock's liabilities outside of the group annuity contracts and recordkeeping agreements -- hence the "Separate" name.

The Separate Accounts, in turn, are divided into sub-accounts that correspond to the mutual funds and other investment options available under the contracts that John Hancock maintains with the Plans.

The sub-accounts are divided into "Units" that track the performance of shares of a selected mutual fund investment, with the price per Unit calculated by dividing the total value of the assets of the sub-account by the number of Units in the sub-account. This structure of Separate Accounts and sub-accounts allows John Hancock to pool the investments of thousands of Plans. Based on the combined contributions to the sub-accounts made by all the Plans and their participants on the Signature platform, John Hancock sells and purchases mutual fund shares on an omnibus basis and acts as a single shareholder vis-à-vis the mutual funds. And it provides recordkeeping services to track the value of these investments for each Plan and participant.

John Hancock's contracts with plans, as well as supplemental disclosure forms, purport to disclose the compensation it receives in connection with these activities. In these contracts and disclosures, John Hancock represents that it will "appl[y] the total revenue received from the underlying funds and the sub-accounts (i.e., 'Total Revenue Used towards Plan Cost') to offset the cost of the Recordkeeping Services provided under your Contract."

But none of the Contracts or disclosures that John Hancock provides to Plans or participants discloses that it receives and retains substantial foreign tax credits from the mutual fund shares owned in the Separate Accounts.

### Foreign Tax Credits

The Internal Revenue Code (the "Code") taxes all income of U.S. taxpayers earned worldwide. 26 U.S.C. § 61(a) To avoid double taxation of a U.S. taxpayer's income earned abroad -- by the country in which it was earned as well as the United States -- the "foreign tax credit" regime was established. Under the regime, when a U.S. taxpayer pays income tax to another country due to its business activities in that country, the taxpayer can claim a dollar-for-dollar credit against its U.S. tax liability for the foreign taxes paid. 26 U.S.C. §§ 901-909. This "foreign tax credit" then mitigates double taxation by offsetting the taxpayer's overall U.S. tax bill.

The Code permits certain regulated investment companies, such as mutual funds, to pass through tax credits to their shareholders. 26 U.S.C. § 853. Many mutual funds that invest in foreign stocks and fixed income securities, including a number of mutual funds available on John Hancock's Signature platform ("International Investment Options"), elect to operate under this provision and pass through FTCs to their shareholders.

Because John Hancock is the technical owner of the shares of International Investment Options -- which are purchased with assets from and held for the benefit of

8

the Plans -- it receives (when eligible in a given tax year) the passed-through FTCs from such mutual funds. [In certain tax years, John Hancock was unable to use FTCs, because ███████████████████████████████████. But FTCs, when unused, can be carried forward up to ten years. John Hancock's tax returns for the tax years 2013-2019 show that it carried forward tens of millions of dollars of unused FTCs when they could not be used, and it then used them when it ████████████████████████████████████████ ██████ in later years.].

Thus, even though the Separate Accounts are comprised of the assets of the Plans and those assets effectively pay the foreign taxes that generate FTCs, John Hancock is the entity that receives the foreign tax credits. As noted, John Hancock does not pass through any benefit of the FTCs to the Plans, whose assets are reduced by the amount of the paid foreign taxes. In addition, John Hancock did not disclose to the Plans or their participants the benefits it receives from the FTCs.

During the class period, from 2013 to 2019, these undisclosed, retained benefits from FTCs generated from the Plans were in excess of $100 million.

### John Hancock's Consistent Conduct

The two contracts that John Hancock enters into with retirement plans -- a group annuity contract and a recordkeeping agreement -- are standardized form contracts generated by a computer program. Neither of the contracts disclose that John Hancock

receives and retains FTCs generated by the retirement assets placed in its Separate Accounts. Nor do any of the standardized disclosures disseminated to Plans and their participants. The management and administration of John Hancock's Separate Accounts are the same across all retirement plans. And John Hancock retains the credits generated by the assets of all plans and does not pass through benefits to any plans.

**The Romanos Establish a 401(k) Plan to Avoid Current U.S. Taxes.**

In 2014, Plaintiffs Eric and Todd Romano, brothers who are each 50% owners of Romano Law PL ("Romano Law"), decided to establish a 401(k) plan (the "Plan") to minimize their personal tax liability as a result of recent financial success.

Plaintiffs had little knowledge of financial investments at the time. Nonetheless, Plaintiffs appointed themselves as trustees to manage the Plan. Christian Searcy Jr. ("Searcy") sent them a presentation estimating that the Romanos personally would achieve $44,437.41 in U.S. tax benefits by establishing the Plan. They agreed to Searcy's proposal to "minimize the[ir] tax[es]", and also chose him to be the Plan's investment advisor. Searcy is also the son of the Romanos' counsel, Christian Searcy, Sr., who is a "close professional colleague[] and close friend[]" of Plaintiffs' father, John Romano. Searcy also serves as a litigation consultant in this action, apparently since at least 2016.

Plaintiffs "rely heavily" on Searcy's judgment and recommendations about the Plan.

**Searcy Presents the Romanos with a Recordkeeping Proposal.**

Searcy and the Romanos then looked to hire a Plan recordkeeper. Searcy did not conduct a request for proposal ("RFP") process, as advisors often do when a plan is selecting a recordkeeper. Instead, Searcy provided only one proposal, from John Hancock. When soliciting the Proposal, Searcy directed that it be one that would provide him an annual fee of 50 basis points.[2]

Plaintiffs received their information about John Hancock's services through Searcy, who presented them with the Proposal. No one from John Hancock was present with the Romanos. This is consistent with John Hancock's practice: a financial advisor like Searcy solicits a proposal and presents it to plan trustees, and no John Hancock representative is typically present.

The Romanos accepted the Proposal without negotiation. As with other John Hancock contracts, the Proposal allowed the Romanos to have their company, i.e., Romano Law, pay for recordkeeping fees; Plaintiffs elected instead to have the Plan and its participants bear all fees (which includes Searcy's fee). Todd Romano, however, did not know how Searcy is paid.

Searcy did not discuss FTCs with the Romanos in 2014—he has discussed FTCs with them only in the context of this litigation, years later.

---

[2]   A basis point, or "bp", is one-one hundredths of one percent, or 0.01%.

In 2014, however, *Searcy* knew about FTCs, and he knew that John Hancock did not promise to credit the Plan or its participants based on FTCs, in contrast with a different recordkeeper, Securian, that marketed to him since at least 2013 that it "was the ONLY company that daily credits . . . foreign tax credits."

Searcy specifically asked John Hancock's Regional Vice-President of Sales, Bruce Cobey, how John Hancock handled FTCs.

According to Don Reiman, a plan advisor with over 40 years' experience -- and confirmed by Joe Almada, John Hancock's head of retirement pricing -- the process of selecting a recordkeeper and negotiating services, and the ultimate cost of services, is highly individualized. The negotiations and resulting agreement and fees are dependent on myriad factors. For example, trustees may prioritize differing services and consider different factors. Fee arrangements for plan services vary significantly, particularly for startup plans like that of Plaintiffs.

**The Romanos Picked Investments That They Did Not Understand**.

On October 7, 2014, the group variable annuity contract ("Contract") and Recordkeeping Agreement became effective. In addition to providing Plan recordkeeping services, John Hancock made available to Plaintiffs a large menu of investment options through its Separate Accounts. Plaintiffs had the right to select any of 207 sub-accounts within John Hancock's Separate Accounts, each of which owns shares

12

of a pre-specified mutual fund.

Searcy initially selected the investment options for the Plan, and the Romanos approved without question. Those investments included ones that were subject to foreign taxes.

Plaintiffs did not adopt an investment policy statement or any set of criteria to determine whether funds should be removed from the Plan lineup or put on a "watch list." Rather, Plaintiffs relied on Searcy's direction and "expertise" without performing any independent review.

Searcy regularly provided Plaintiffs with materials instructing them to review the prospectuses and other offering documents of the mutual funds that underlie each sub-account, yet they never did. On one occasion, Plaintiffs and Searcy decided that funds should be removed; yet, months later, the funds were still available.

### Plaintiffs Switched to Fidelity as Recordkeeper in 2020 Without Considering How Fidelity Treats FTCs.

In late 2020, Searcy conducted an RFP for recordkeepers, the first ever for the Plan. Searcy solicited bids from John Hancock, Fidelity and OneAmerica. The contemporaneous minutes of the Romanos' deliberation shows that, in reviewing proposals, the Romanos and Searcy considered cost and "other features and benefits of each company ranging from technology & aps, to flexibility & customization, to brand recognition and integration across other platforms." Although Plaintiffs filed this

litigation in 2019 over the treatment of FTCs by John Hancock, there is no indication in the minutes that they considered the treatment of FTCs as part of their 2020 RFP.

Searcy did not solicit any bid from any recordkeeper that offered to "credit back" FTCs. Plaintiffs are not even aware whether Fidelity -- whom they ultimately selected -- provides any fee concessions or credits to their Plan for FTCs.

Searcy, however, *does* know how Fidelity treats FTCs -- because of its trust model, no domestic taxes are paid by Fidelity as to the Plan; so, like John Hancock, Fidelity provides no credit to the Plan with respect to FTCs.

Even if Searcy sought a bid from Securian (the only recordkeeper identified as reducing fees with respect to FTCs), there is no evidence that the Plan would have paid less for recordkeeping services. The only record evidence suggests the contrary: where Securian and John Hancock both offered to provide recordkeeping services for a plan, John Hancock's total fee was lower than Securian's, even after Securian applied credits supposedly for FTCs. In other words, Securian's higher asset-based fee more than offsets the benefit of the foreign tax fee concession it provides.

After selecting Fidelity as their new recordkeeper, Plaintiffs terminated their Contract with John Hancock effective March 22, 2021; the Plan was not subject to a surrender fee when Plaintiffs received the value of their Contract upon termination.

**Plaintiffs' Class Claims**

14

Plaintiffs seek to certify a class of:

All trustees of all defined-contribution employee benefit plans covered by [ERISA] with which [John] Hancock had group annuity contracts and recordkeeping agreements from at any time **from March 25, 2013** the date of class certification, and that have, since March 25, 2013, allocated assets through [John] Hancock's Signature Platform to International Investment Options that have passed through foreign tax credits to [John] Hancock.

(hereinafter referred to as the "Proposed Class") (emphasis supplied).

II.   <u>**Applicable Legal Standards**</u>

   **A. ERISA**

Plaintiffs assert two claims against John Hancock under the civil remedy provision of ERISA § 502, 29 U.S.C. § 1132.

First, Plaintiffs assert that John Hancock breached its fiduciary duties under ERISA § 404(a), which requires a fiduciary to discharge its "duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) deferring reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

According to Plaintiffs, in profiting from foreign tax credits without disclosing them or passing through a commensurate benefit to Plans that generated such credits, John Hancock failed to act solely in the best interest of the Plans and failed to defray reasonable expenses of administering the Plans.

Second, Plaintiffs assert that John Hancock engaged in prohibited transactions under ERISA § 406, which forbids a fiduciary from "deal[ing] with the assets of the plan in his own interest or his own account" and "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(1) & (3).

Plaintiffs allege that John Hancock, in retaining the full benefit of the foreign tax credits generated by the Plans' investments without disclosing them, and thereby collecting far more than reasonable compensation for the services it provided, dealt with the assets of the Plans for its own account and received consideration for its own personal accounts from mutual funds, which dealt with the Plans in connection with transactions involving assets of the Plans.

ERISA § 408(b) exempts certain transactions from the strict prohibitions of § 406, including "[c]ontracting or making reasonable arrangements with a party in interest for . . . accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2)(A). The Department of Labor, in turn, has issued a regulation interpreting this ERISA provision, 29 C.F.R. § 2550.408b-2. The regulation requires covered service providers, such as John Hancock, to disclose "all direct compensation" and "all indirect compensation" that the

"provider, an affiliate, or a subcontractor reasonably expects to receive in connection with the services" provided. 29 C.F.R. § 2550.408b-2(c)(iv)(C)(1)-(2).

"Compensation" is broadly defined as "anything of monetary value"; "direct compensation" is defined as "compensation received directly from the covered plan"; and "indirect compensation" is defined as "compensation received from any source other than the covered plan, the plan sponsor, the covered service provider, or an affiliate." § 2550.408b-2(c)(viii)(B)(1)-(2).

A covered service provider's failure to make the disclosures required in the regulation renders its contract or arrangement with the plan unreasonable under § 408(b)(2), and thus precludes the service provider from relying on the § 408(b)(2) exemption from the strict prohibitions of § 406. § 2550.408b-2(c)(1)(i) ("No contract or arrangement for services between a covered plan and a covered service provider, nor any extension or renewal, is reasonable within the meaning of section 408(b)(2) of the Act and paragraph (a)(2) of this section unless the requirements of this paragraph (c)(1) are satisfied.").

As alleged by Plaintiffs, because John Hancock failed to disclose the foreign tax credits it received and retained as direct or indirect compensation, its agreements with the Plans (Plaintiffs allege) are not "reasonable within the meaning of section 408(b)(2)" of ERISA, and thus constitute prohibited transactions.

17

An important issue for each of Plaintiffs' claims is whether John Hancock qualifies as a fiduciary under ERISA "when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). Under ERISA, a person or entity attains fiduciary status by either being named as a fiduciary in the plan, 29 U.S.C. § 1102(a), or by performing or possessing the authority to perform certain functions, 29 U.S.C. § 1002(21)(A).

Specifically, a person is a so-called "functional" fiduciary with respect to the plan

to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

*Id.*

Plaintiffs allege that John Hancock is a functional fiduciary because it exercises authority or control respecting management or disposition of Plan assets, and it has discretionary authority or discretionary responsibility in the administration of the Plans. [ECF No. 1, ¶¶ 41-42]. Plaintiffs contend that there is no dispute that John Hancock controls and has custody of the Separate Accounts and sub-accounts, uses that custody and control to obtain foreign tax credits, and otherwise credits and charges the Separate Accounts and sub-accounts for income and fees -- except for foreign tax credits -- associated with allocations to International Investment Options and other mutual funds.

According to Plaintiffs' theory, John Hancock exercises its discretion to compensate itself with foreign tax credits generated by the Plans. In addition, the foreign tax credits themselves constitute plan assets within the custody and control of John Hancock, because it receives the foreign tax credits as a result of its fiduciary role, and the foreign tax credits resulted from the payment of foreign taxes by investments to which the assets of the Plans were allocated.

If Plaintiffs establish that John Hancock was acting as a fiduciary and breached its fiduciary duties or engaged in prohibited transactions, then John Hancock is "personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a).

Plaintiffs seek this relief on behalf of the Romano Law 401(k) and all other similarly situated Plans. In other words, Plaintiffs seek class treatment under Federal Rule of Civil Procedure 23.

**B. Federal Rule of Civil Procedure 23**

<u>Standing</u>

Federal Rule of Civil Procedure 23 governs class actions. Although not technically a Rule 23 prerequisite, "any analysis of class certification must begin with the issue of standing." *Griffin v. Dugger,* 823 F.2d 1476, 1482 (11th Cir. 1987).

"[I]t is well-settled that prior to the certification of a class . . . the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman v. Bush,* 221 F.3d 1266, 1279 (11th Cir. 2000). "Only after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a) to assert the rights of others." *Id.* at 1280 (internal citation omitted).

Thus, district courts have addressed class plaintiff standing early in litigation -- before a motion for class certification has been filed. *See, e.g., Weiss v. General Motors LLC,* No. 19-cv-21442-RNS, 2019 WL 5394621, at *3 (S.D. Fla. Oct. 22, 2019). In the instant case, of course, the Court is evaluating the propriety of class action treatment because Plaintiffs filed a motion for class certification.

The Eleventh Circuit has acknowledged that standing is "perhaps the most important jurisdictional doctrine." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005) (internal citation omitted). The doctrine "stems directly from Article III's 'case or controversy' requirement." *Id.* (quoting *Nat'l Parks Conservation Ass'n v. Norton*, 324

F.3d 1229, 1242 (11th Cir. 2003)). And it "implicates [the] subject matter jurisdiction" of a federal court. *Id.*

Consistent with the rules outlined above, the party seeking certification must demonstrate that the named plaintiffs have standing to bring the claim for which certification is sought. *See AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1174 (11th Cir. 2019).

A plaintiff must show that she "personally suffered actual or threatened injury as a result of the putatively illegal conduct." *Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 335 (1990).

John Hancock argues that Plaintiffs lack standing because they have not suffered an "injury-in-fact." According to Defendants, Plaintiffs incurred no injury from John Hancock's actions. They say that Plaintiffs conceded that none of the disclosures provided to them caused Plaintiffs to negotiate different pricing. Furthermore, John Hancock notes that Plaintiffs did not rely on any John Hancock disclosure, because they instead followed Searcy's recommendations. Consequently, John Hancock's argument continues, Plaintiffs suffered no injury due to a purported lack of disclosure about the foreign tax credits because Searcy already knew about the FTCs when he presented the John Hancock proposal to Plaintiffs.

John Hancock similarly emphasizes Plaintiffs' post-lawsuit conduct -- selecting another recordkeeper to replace John Hancock and choosing a replacement which also did not provide any specific disclosures or credits regarding FTCs. Moreover, Plaintiffs continue to allow the Plan to include investments subject to foreign taxes even though their Plan receives no credit for those investments.

At bottom, John Hancock argues, there is no evidence to establish that different disclosures would have in any way changed Plaintiffs' behavior. In other words, John Hancock contends, it is Plaintiffs' *own* decisions which caused their injury, not John Hancock's failure to disclose or failure to credit Plaintiffs for the FTCs. When given an opportunity to select a replacement which uses FTCs in the way they say John Hancock should have (or to exclude investments subject to foreign taxation in the first place), Plaintiffs decided to not select that alternative. Therefore, John Hancock concludes, its own actions could not have caused Plaintiffs' injury.

In response, Plaintiffs argue that John Hancock has incorrectly and incompletely portrayed their claims as challenging only inadequate disclosures and then has unfairly contended that Plaintiffs have not demonstrated an injury in fact (because they have not established that they would have made different decisions if John Hancock had made adequate disclosures about the FTCs). But Plaintiffs explain that their lawsuit challenges far more than the failure to disclose. Specifically, Plaintiffs say, the lawsuit challenges

John Hancock's **conduct** in keeping more than $100 million. According to Plaintiffs, by keeping money which it should have credited to Plaintiffs, John Hancock caused Plaintiffs to suffer a concrete injury in fact.

Although the optics of the arrangements between Plaintiffs and John Hancock may at times portray Plaintiffs in a negative light, the critical point alleged by Plaintiffs is that John Hancock improperly kept the FTCs. This is sufficient to confer standing. *See generally Haddock v. Nationwide Fin. Servs., Inc.* 293 F.R.D. 272, 283 (D. Conn. 2013) (granting motion for class certification filed by trustees of profit-sharing retirement plans against financial service provider under ERISA based on allegations that the defendant breached its fiduciary duties by collecting revenue sharing payments from mutual funds); *Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, No. 3:11-CV-282, 2012 WL 10242276 (D. Conn. Sept. 27, 2012) (similar claim; motion granted).

Plaintiffs have adequately distinguished the authorities on which John Hancock relies for its lack of standing theory. For example, in *Bryant v. Wal-Mart Stores, Inc.*, No. 16-cv-24818, 2020 WL 4333452, *16-18 (S.D. Fla. July 15, 2020), the defendant provided an improper disclosure regarding COBRA insurance, but no plaintiff suffered a lapse of coverage, nor paid increased insurance premiums, nor acted differently as a result.

Here, in contrast, Plaintiffs have asserted breach-of-fiduciary-duty claims -- which have "traditionally been regarded as providing a basis for a lawsuit in English or

American courts," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) – challenging John Hancock's conduct, which directly resulted in John Hancock earning more than $100 million that should have been credited to class members. Phrased differently, it resulted in class members losing FTCs. That is an actual injury -- something not present in *Bryant.*

Similarly, the circumstances here are dramatically different than the scenario in *Ortiz v. Am. Airlines, Inc.*, 5 F.4th 622 (5th Cir. 2021) First, *Ortiz* did not consider prohibited transaction claims, which are asserted here, because the plaintiffs abandoned them on appeal. Second, the nature of the claims and alleged harms in *Ortiz* are much different. The *Ortiz* plaintiffs alleged that a plan trustee should have offered participants one investment option over another, and that if the better option had been offered, participants would have allocated funds to it and earned additional investment income.

Thus, the *Ortiz* claim, by its nature, depended on plan participants making different investment decisions -- allocating funds to the better-performing investment option -- which the plaintiffs failed to prove would have happened **but for** the defendant's conduct. In contrast, Plaintiffs' claims here do not turn on allegations that the Plans would have made different decisions *but for* John Hancock's conduct. Rather, the harm to Plaintiffs results directly from John Hancock's retention, and failure to pass through to the Plans, the substantial benefits of FTCs.

24

Therefore, the testimony and arguments that John Hancock relies upon, such as whether Plaintiffs would have negotiated different fees or requested different investment options, are not the be all and end all of Plaintiffs' actual claims, which focus on John Hancock's retention of the FTCs.

By way of summary on the standing issue, Plaintiffs' reliance[3] on Searcy's recommendations and their later decision to select another entity to replace John Hancock without knowing if that entity provided FTCs may generate some eye-rolling, but that potential response is inadequate to override the fundamental point that Plaintiffs have demonstrated an injury in fact caused by John Hancock's conduct -- i.e., standing.

<u>General Principles and Plaintiffs' Burden</u>

In a class action, representative litigants may bring claims on behalf of absent persons called class members. Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Because of this, the presumption is *against* class certification. *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016).

Although district courts have traditionally enjoyed broad discretion in deciding whether to certify a class, *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566,

---

[3]     It is John Hancock, not Plaintiffs, who has raised the issue of reliance. Plaintiffs' Class Action Complaint nowhere mentions reliance, a fact which Plaintiffs' counsel highlighted at the hearing on the class certification motion.

1569 (11th Cir. 1992), that discretion must be carefully exercised according to the dictates of Federal Rule of Civil Procedure 23. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004).

To proceed as a class, the named representatives must complete a burdensome checklist. Specifically, they "must satisfy an implicit ascertainability requirement, the four requirements listed in Rule 23(a), and at least one of the requirements listed in Rule 23(b)." *Ohio State Troopers Ass 'n, Inc. v. Point Blank Enters., Inc.*, 481 F. Supp. 3d, 1258, 1270 (S.D. Fla. 2020), *aff'd*, 2021 WL 4427772 (11th Cir. Sept. 27, 2021).

Rule 23(a) requires that:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

These requirements are generally referred to as "numerosity, commonality, typicality, and adequacy of representation." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009).

If the plaintiffs have affirmatively demonstrated both ascertainability and that the requirements of Rule 23(a) are satisfied, then the district court moves on to Rule 23(b). Here, since Plaintiffs proceed under Rule 23(b)(3), they must show that "questions of law

or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Plaintiffs must also establish that "damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast Corp. v. Behrend,* 569 U.S. 27, 35 (2013).

"A district court must conduct a **rigorous** analysis of the rule 23 prerequisites before certifying a class." *Vega v. T-Mobile USA, Inc.,* 564 F.3d 1256, 1266 (11th Cir. 2009) (citation omitted) (emphasis added).

"A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes,* 564 U.S. at 350. "In other words, 'the party seeking class certification has a burden of *proof,* not a burden of pleading.'" *Reyes v. BCA Fin. Servs.,* No. 16-cv-24077, 2018 WL 3145807, at *7 (S.D. Fla. June 26, 2018) (quoting *Brown v. Electrolux Home Prods., Inc.,* 817 F.3d at 1234 (11th Cir. 2016)).

Plaintiffs have the burden to establish that Rule 23 is satisfied and, as noted, that rule does not set forth a mere pleading standard. Determining whether Plaintiffs have satisfied their burden on class certification may entail some overlap with the merits of the

underlying claim, but the Supreme Court has cautioned that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 133 S.Ct. 1184, 1194–95 (2013).[4]

Moreover, if a question of fact or law is relevant to the determination, then the district court "has a duty to actually decide it and not accept it as true or construe it in anyone's favor." *Brown*, 817 F.3d at 1234 (quoting *Comcast,* 133 S. Ct. at 1432-33).

Plaintiffs' burden of proof and a court's obligation to conduct a rigorous analysis has caused some courts to say that doubts are resolved against class certification. *Brown,* 817 F.3d at 1233-34 (explaining that "the entire point of a burden of proof is that, if doubts remain about whether the standard is satisfied, 'the party with the burden of proof loses,'" and also noting that "all else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation").

---

[4]     "The purpose of a class-certification ruling is not to adjudicate the case, but to select the method best suited to adjudication of the controversy." *Gayle v. Meade*, No. 20-21553, 2020 WL 2744580, at *14 (S.D. Fla. May 22, 2020) (internal quotations omitted), adopted as amended, 2020 WL 3041326 (S.D. Fla. June 6, 2020).

However, although *Brown* does in fact say that "a district court that has doubts about whether the requirements of Rule 23 have been met should refuse certification until they have been met[,]" *Id.* at 1234 (internal quotation omitted), that does not necessarily mean that the mere existence of *a* doubt of any degree is sufficient to preclude class certification -- as that standard would be *more* burdensome than the "beyond-a-**reasonable**-doubt" standard for criminal convictions. That result -- a plaintiff seeking class certification must overcome the criminal conviction burden -- generates questions, and the Undersigned directed [ECF No. 150] the parties to submit focused memoranda on the burden-of-proof issue.

In its required memorandum [ECF No. 157], Defendant John Hancock took the position that the Eleventh Circuit's opinions "do not explicitly establish a standard that is as high as, or higher, than the criminal standard" -- but then argues that the authorities "strongly suggest" a burden of persuasion higher than a preponderance of the evidence. John Hancock posited that *Brown* may well illustrate that, at least in the Eleventh Circuit, the burden of persuasion is higher than a preponderance of evidence standard, "*perhaps* one approaching clear and convincing evidence." [ECF No. 157, p. 1] (emphasis added).

In their memorandum [ECF No. 156], Plaintiffs cited myriad post-*Brown* cases where courts have used the preponderance of the evidence standard (or simply say that Plaintiff "has the burden," without further elaboration) for determining whether a

plaintiff has established the requirements for class certification.[5] Indeed, one post-*Brown* district court case noted that the burden of proof "appears to be contested in this Circuit" and then explained that the burden is either a preponderance of the evidence or "a much *lighter* burden." *McCullough v. city of Montgomery*, No. 2:15-cv-463, 2020 WL 7647634, at *3, n.1 (M.D. Ala. Dec. 23, 2020) (emphasis added).

---

[5]     *Stanton v. NCR Pension Plan*, No. 1:17-CV-2309, 2021 WL 1170109, at *5 (N.D. Ga. Mar. 29, 2021); *McCullough v. City of Montgomery*, No. 2:15-CV-463, 2020 WL 7647634, at *3 (M.D. Ala. Dec. 23, 2020); *Pizarro v. Home Depot, Inc.*, No. 1:18-CV-01566, 2020 WL 6939810, at *4 (N.D. Ga. Sept. 21, 2020); *In re Acuity Brands, Inc. Sec. Litig.*, No. 1:18-CV-2140, 2020 WL 5088092, at *3 (N.D. Ga. Aug. 25, 2020); *Cordoba v. DIRECTV, LLC*, No. 1:15-CV-3755, 2020, WL 5548767, at *2 (N.D. Ga. July 23, 2020); *Coffey v. WCW & Air, Inc.*, No. 3:17CV90, 2020 WL 3250744, at *2 (N.D. Fla. Mar. 25, 2020); *Vision Constr. Ent Inc. v. Argos Ready Mix LLC*, No. 3:15CV534, 2019 WL 11075886, at *6 (N.D. Fla. Nov. 7, 2019); *Ray v. Jud. Correction Servs., Inc.*, 333 F.R.D. 552, 567 (N.D. Ala. 2019); *Monroe Cty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 377 (N.D. Ga. 2019); *Lawrence v. S. Fla. Racing Ass'n, LLC*, No. 18-CV-24264, 2019 WL 3890314, at *2 (S.D. Fla. June 28, 2019); *Askew v. S. Pan Emp. Stock Ownership Plan*, No. 1:18-CV-309, 2019 WL 12536148, at *5 (N.D. Ga. June 27, 2019); *S. Indep. Bank v. Fred's, Inc.*, No. 2:15-CV-799, 2019 WL 1179396, at *6 n.2 (M.D. Ala. Mar. 13, 2019); *Thompson v. Jackson*, No. 1:16-CV-04217, 2018 WL 5993867, at *2 (N.D. Ga. Nov. 15, 2018); *Teggerdine v. Speedway, LLC*, No. 8:16-CV-03280T27, 2018 WL 2451248, at *5 (M.D. Fla. May 31, 2018); *Shuford v. Conway*, 326 F.R.D. 321, 328 (N.D. Ga. 2018); *Foster v. Green Tree Servicing, LLC*, No. 8:15-CV-1878-T-27, 2017 WL 5508371, at *3 (M.D. Fla. Nov. 15, 2017); *Altman v. White House Black Mkt., Inc.*, No. 1:15-CV-2451, 2017 WL 8780202, at *2 (N.D. Ga. Oct. 25, 2017); *Molina v. Ace Homecare LLC*, No. 8:16-CV-2214-T-27, 2017 WL 4155353, at *2 (M.D. Fla. Sept. 18, 2017); *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1303 (N.D. Fla. 2017); *Lee-Bolton v. Koppers Inc.*, 319 F.R.D. 346, 381 (N.D. Fla. 2017); *Smith v. Triad of Alabama, LLC*, No. 1:14-CV-324, 2017 WL 1044692, at *1 n.1 (M.D. Ala. Mar. 17, 2017); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 679 n.4 (N.D. Ga. 2016).

But not all of the cases cited contain only the holding which Plaintiffs describe. For example, in *Vision Constr. Ent. Inc. v. Argos Ready Mix LLC*, No. 3:15cv534, 2019 WL 11075886, at *6 (N.D. Fla. Nov. 7, 2019), the Court, citing *Brown*, held that "[t]he plaintiff bears the burden of proof by a *preponderance* of the evidence to show that its claims are capable of classwide proof under the Rule 23 standard, and any *lingering doubts are resolved against* class certification." (emphasis added). Plaintiffs cited this case and the quoted excerpt in its memorandum to support its view that *Brown's* references to "doubts" simply "reject placing a thumb on the scale in favor of class certification and describe how a burden of proof works: when a decisionmaker is not convinced that a party has met its burden of proof—i.e., when doubts remain about whether the burden has been satisfied—the party with the burden loses. In other words, doubts work against, not for, the party with the burden of proof." [ECF No. 156, p. 3].

According to Plaintiffs, John Hancock is urging this Court to make the same mistake identified in *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 484 (3d Cir. 2015). In *Reyes*, the district court misread language from *Hydrogen Peroxide* that a court should "not suppress doubt as to whether a Rule 23 requirement is met," 552 F.3d at 321, as meaning that a court "cannot have any doubt as to whether the Rule 23 requirements are met," 802 F.3d at 485 -- i.e., identical to John Hancock's position here. The Third Circuit reversed,

holding that "the plaintiff's burden is not proof beyond 'any doubt' as the District Court required, but whether the claims are supported by a preponderance of the evidence." *Id.*

The Undersigned does not conclude that the Eleventh Circuit in *Brown* radically broke from a consensus (that the preponderance of the evidence standard applied) and adopted a beyond-a-reasonable-doubt standard -- or something even more demanding -- for class certification. Instead, the Undersigned reads *Brown* to stand for the unremarkable view that "when the scales are evenly balanced and the relevant evidence leaves a trier of fact in 'equipoise,' then the party with the burden of proof loses." *Simmons v. Blodgett*, 110 F.3d 39, 42 (9th Cir. 1997).[6]

<u>Ascertainability</u>

In evaluating compliance with Rule 23, courts **begin** by determining "whether the proposed class has been adequately defined and is ascertainable." *Reyes*, 2018 WL 3145807, at *9. Courts next consider whether a plaintiff satisfies Rule 23(a)'s prerequisites: numerosity, commonality, typicality, and adequacy. The class must also satisfy one of the three additional requirements of Rule 23(b).

So the first step for a plaintiff seeking class certification is to establish that the proposed class is adequately defined and clearly ascertainable. *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012). In other words, the plaintiff must show that class

---

[6]     The *Brown* Court cited *Simmons* with approval. 817 F.3d at 1233.

members can be identified by reference to objective criteria. *Bussey v. Macon Cty. Greyhound Park, Inc.,* 562 F. App'x 782, 787 (11th Cir. 2014). And such objective criteria must enable an identification process that is administratively feasible, requiring little, if any, individual inquiry. *Id.*

> Plaintiffs seek to certify the following class:

> All trustees of all defined-contribution employee benefit plans covered by the Employee Retirement Income Security Act of 1974 with which [John] Hancock had group annuity contracts and recordkeeping agreements at any time from March 25, 2013 the date of class certification, and that have, since March 25, 2013, allocated assets through [John] Hancock's Signature Platform to International Investment Options that have passed through foreign tax credits to [John] Hancock.

> Plaintiffs contend that the proposed class definition is adequate because "its membership is capable of determination." *Cherry v. Dometic Corp.,* 986 F.3d 1296, 1304 (11th Cir. 2021). They note that Defendant's own records can be used to determine class membership.

> More specifically, Plaintiffs point to John Hancock's production of documents which detail the number of retirement plans with which it has entered into contracts each year, from 2013 to 2020, and documents identifying the International Investment Options that have passed through FTCs to John Hancock, as well as the amount of such FTCs.

> Plaintiffs also point to John Hancock's witnesses, who have confirmed that it records each plan's investments in particular sub-accounts. The Plans that meet the Class

definition can therefore be determined with reference to objective criteria in John Hancock's own records. This, Plaintiffs argue, easily satisfies the implicit ascertainability requirement of Rule 23. *See Owens v. Metropolitan Life Ins. Co.*, 323 F.R.D. 411, 416 (N.D. Ga. 2017) (finding, in an ERISA class action lawsuit, that ascertainability was satisfied because the proposed class and subclass definitions are adequately defined by objective criteria).

For all practical purposes, John Hancock did not mount much of an opposition on the ascertainability factor. It made a passing reference to ascertainability in a footnote [ECF No. 109, p. 9 n.7], claiming that Plaintiffs have not demonstrated that John Hancock's recordkeeping system can identify only those Plans that invested in International Investment Options during the class period.

But Plaintiffs say the footnote argument is wrong. John Hancock's recordkeeping system tracks and *can* be queried to identify which Plans invested in specified investment options, as explained in deposition by Jim Lewis, vice president and head of operations for John Hancock's Canadian and U.S. retirement businesses.

Furthermore, at the hearing, John Hancock's counsel advised that Defendant was **withdrawing** the argument at the bottom of footnote 7 of its Response (i.e., that Plaintiffs "have not demonstrated, nor could they, that John Hancock's recordkeeping system can

identify only those plans that invested in International Investment Options during the class period").

Because John Hancock's own records can identify class members with the objective criteria of the class definition, Plaintiffs have established ascertainability.

Rule 23(a) -- Numerosity

John Hancock does not challenge numerosity.

To satisfy the numerosity requirement, Plaintiffs must show that the "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although this requirement is not tied to any fixed numerical threshold, Plaintiffs must "proffer some evidence of the number in the purported class or a reasonable estimate." *Leszcvnski v. Allianz Ins.*, 176 F.R.D. 659, 669 (S.D. Fla. 1997) (noting that more than forty is generally adequate).

John Hancock's own records show that the Class includes tens of thousands of Plans. This far exceeds the requirement that the putative class be so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a); *see also Legg v. Spirit Airlines, Inc.*, 315 F.R.D. 383, 387 (S.D. Fla. 2015) (more than 100,000 members); *Rensel v. Centra Tech, Inc.*, No. 17-24500-Civ, 2021 WL 4134984 (S.D. Fla. Sept. 10, 2021) (granting class certification motion and noting that the numerosity requirement is a "generally low hurdle").

Plaintiffs have met the numerosity factor.

<u>Rule 23(a) – Commonality</u>

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This "commonality" requirement "is a 'low hurdle' easily surmounted." *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 652 (S.D. Fla. 2012). It requires only "at least one issue common to all class members." *Id.* (quoting *Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. 602, 604 (S.D. Fla. 2003)).

Therefore, "not all questions of law or fact raised by the dispute need to be common." *Palm Beach Golf Center-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 695 (S.D. Fla. 2015).

On the other hand, "it is not just the presence of common questions that matters, but the ability of the class action device to 'resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Manno v. Healthcare Revenue Recovery Grp.*, LLC, 289 F.R.D. 674, 685 (S.D. Fla. 2013) (quoting *Dukes*, 564 U.S. at 350 (2011)). This requirement is satisfied when the defendant has "engaged in a standardized course of conduct that affects all class members," *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 685-86 (S.D. Fla. 2004), or when "a group of plaintiffs suffer under a uniform policy," *In re Checking Account Overdraft Litig.*, 286 F.R.D. at 652.

"In general, the question of defendants' liability for ERISA violations is common to all class members because a breach of a fiduciary duty affects all participants and

beneficiaries." *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 452 (S.D.N.Y. 2004) (internal quotation marks omitted).

According to Plaintiffs, there are several key questions of law and fact -- including (1) whether John Hancock was a fiduciary of the Plans with respect to Plaintiffs' claims; (2) whether John Hancock disclosed its receipt and retention of foreign tax credits; (3) whether John Hancock breached its fiduciary duties; and (4) whether John Hancock engaged in prohibited transactions. Plaintiffs say these are all "common questions [that] satisfy Plaintiffs' burden under Rule 23(a)(2)." *In re Marsh*, 265 F.R.D. at 143; *see Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15 Civ. 9936, 2017 WL 3868803, at *4 (S.D.N.Y. Sept. 5, 2017) ("Typically, the question of defendants' liability for ERISA violations is common to all class members.").

As outlined in the class certification motion, Plaintiffs contend that class members' claims all rise or fall on the common answers to these common questions. This commonality exists, Plaintiffs argue, because John Hancock's challenged conduct was uniform with respect to the Class. It used form contracts, treated each Plan the same with respect to foreign tax credits, and failed to disclose its receipt and retention of foreign tax credits in any documents.

Because of this uniformity, Plaintiffs say, resolution of the common questions of law and fact will not depend on any evidence unique to any individual class member. Rather,

the evidence concerning John Hancock's conduct, as well as expert testimony on fiduciary standards and monetary relief, will be the same for each class member. Class treatment, therefore, will allow the Court to resolve these issues "central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

But John Hancock disagrees, pointing to facts and questions which it considers to be unique. John Hancock begins its challenge concerning commonality by highlighting Plaintiffs' allegation that Defendant collected "far more than reasonable compensation for the services it provided." But, John Hancock explains, Plaintiffs cannot demonstrate that all members of the Proposed Class were charged unreasonably high compensation for recordkeeping services.

It notes that the United States Department of Labor states, in a federal regulation, that "whether compensation is 'reasonable' under sections 408(b)(2) and (c)(2) of [ERISA] depends on the **particular facts and circumstances** of each case." 29 C.F.R. §2250.408c-2(b)(1) (emphasis supplied). And it further argues that Plaintiffs cannot establish that members of the Proposed Class would have negotiated and obtained better pricing with different disclosures.

From a practical perspective, John Hancock contends, determinations of whether it received more than unreasonable compensation will vary because, for example, some plans paid no fees at all, each negotiation for recordkeeping fees and services is unique

(as "no two are priced exactly alike") and a deeply individualized inquiry would be needed to see if the recordkeeper received excessive compensation as to any Plan.

In addition, John Hancock rejects the notion that the Court could simply determine that the amount of damages is the amount of FTCs which John Hancock retained. For example, John Hancock argues, one recordkeeper which explicitly credits Plan participants for FTCs has proposed to charge higher recordkeeping fees than John Hancock does, even after the FTCs are factored into the calculation. As a result, John Hancock reasons, an individualized inquiry is necessary.

Similarly, John Hancock also contends that an individualized inquiry would be required to determine whether different disclosures would have had any impact on a trustee. To further this argument, John Hancock focuses on **reliance**, and it cites case law authority where reliance issues "present[] problems of individualized proof that preclude class certification." *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1334 (11th Cir. 2006) (vacating and remanding order certifying ERISA beneficiaries as a class on a breach of fiduciary duty claim [for imposing calendar year deductibles when the summary plan descriptions stated no deductible was necessary] because the need to prove individual reliance -- which is a "critical element of the [p]laintiffs' case there -- made class certification inappropriate). *See also Hudson v. Delta Air Lines*, 90 F.3d 451 (11th Cir. 1996) (per curiam), *cert. denied*, 519 U.S. 1149 (1997) (affirming Order declining to

certify a class of employees who alleged their employer violated ERISA by disseminating a message concerning a special retirement plan).

The *Hudson* Court held that a class could not be certified, even if a uniform false message had been disseminated, because there needed to be a showing that "all members of the class would have deferred their retirement" – i.e., relied to their detriment – based on the false message. *Id.* at 457. As explained by the Court, "this sort of a decision would necessarily have been highly individualized." *Id.*

John Hancock emphasizes that each plan fiduciary and each plan advisor would have their own independent knowledge of FTCs when negotiating with John Hancock for services. For example, it notes, each point-of-sale discussion is unique. It further highlights the practical reality that John Hancock is typically not present when advisors present and sell its services. Therefore, at bottom, the questions which John Hancock deem important can be determined only on an individualized basis: (1) whether members of the putative class knew about the FTCs and the source of that information (i.e., from their own personal advisor or otherwise); and (2) whether and how that information (or lack of information) impacted decisions.

But Plaintiffs say that no individualized inquiry is needed to determine whether John Hancock engaged in prohibited transactions. They say that John Hancock never disclosed

to Plaintiffs or class members that it was taking more than $100 million in FTCs – and that this failure to provide written disclosures renders its contracts *per se* unreasonable.

Furthermore, Plaintiffs say, they are not challenging the reasonableness of other fees which John Hancock charged, which mean there is no need to assess the reasonableness of those fees, which, in turn, means that there is no need to engage in individualized inquiries.

Plaintiffs also take issue with John Hancock's focus on fee negotiations or their reliance on its disclosures because reliance[7] is not a required element of a breach of fiduciary duty claim. They contend that the issue of whether they would have made different decisions with different disclosures is irrelevant to their causation theory because John Hancock's conduct (i.e., keeping for itself the FTCs) is the cause of a uniform harm to each class member.

Plaintiffs underscore the point that they are not bringing simple misrepresentation claims as a way to distinguish *Hudson v. Delta Air Lines*, which involved an employer's misrepresentations that a more-lucrative retirement package would not be offered in the future. To establish that the employer's misrepresentations -- the only conduct challenged in *Hudson* -- caused them harm, the *Hudson* class members needed to show that they

---

[7]     As mentioned earlier, the Complaint does not allege reliance, a procedural fact arising from Plaintiffs' approach to avoid making misrepresentation claims against John Hancock and focusing instead on its actual conduct – keeping the FTCs for itself.

"would have deferred their retirement in the hope that they would be eligible for [richer benefits] to be offered in the future," a decision that "would necessarily have been highly individualized for each potential retiree." But, Plaintiffs say, there is no need to engage in a similar person-by-person individualized inquiry here because the disclosure violations are not what caused the harm -- the actual taking of the benefits by John Hancock is the responsible scenario.

For purposes of the commonality assessment, the Undersigned is not persuaded by John Hancock's arguments because "reliance is not an element plaintiffs must prove to establish a breach of fiduciary duty, which if proved would entitle the Plan to recovery." *George v. Kraft Foods Glob., Inc.*, 251 F.R.D. 338, 349 (N.D. Ill. 2008) (granting motion for class certification in ERISA case); *see Peters v. Aetna Inc.*, 2 F.4th 199, 237 (4th Cir. 2021) (reversing order denying class certification motion in ERISA case as an abuse of discretion) ("[D]etrimental reliance is unnecessary to pursue disgorgement of [defendant's] improper gains, if any, obtained from its breach of fiduciary duties."); *See also Nauman v. Abbott* Laboratories, No. 04 C 7199, 2007 WL 1052478, at *2–3 (N.D. Ill. Apr. 3, 2007) (certifying class after stating that individual reliance issues do not preclude class certification); *Smith v. Aon Corp.*, 238 F.R.D. 609, 616 (N.D. Ill. 2006) ("[I]ndividual

[p]laintiffs are not required to establish detrimental reliance" where claims are brought on behalf of plan).[8]

Moreover, one of John Hancock's arguments undermines its position. It contends that, if the class is certified, it will show that (1) "no member of the class" suffered redressable injury; (2) it is not a fiduciary; and (3) foreign tax credits are not compensation. [ECF No. 109, pp. 10, 13, n. 10]. These are all common questions, for which no individualized inquiry is needed. In other words, the message implicit in John Hancock's argument is that these questions arise from *uniform* conduct.

The Court is satisfied that commonality has been satisfied.

<u>Rule 23(a) - Typicality</u>

The typicality test is not demanding. *Tershakovec V. Ford Motor Co.*, No. 17-21087, 2021 WL 2700347 (S.D. Fla. July 1, 2021) (citing *In re Checking Acct. Overdraft Litig.*, 307 F.R.D. 630, 642 (S.D. Fla. 2015)). Typicality requires that "the claims or defenses of the

---

[8]     *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330 (11th Cir. 2006), another case on which John Hancock relies, is of no use to Defendant here. The nature of the *Heffner* plaintiffs' specific claims, which involved statements on a plan summary that conflicted with actual terms of the plan, required them to prove reliance, because the Eleventh Circuit had held that in order "to prevent an employer from enforcing the terms of a plan that are inconsistent with those of the plan summary, a beneficiary must prove reliance on the summary." *Id.* at 1340. The need to establish reliance in *Heffner*, under the specific facts of that case and under the nature of the claims there, precluded class certification. *Id.* at 1344. Here, given that the claims are different than those in *Heffner*, reliance is not an element of Plaintiffs' claims, so *Heffner* is inapposite.

representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality test centers on "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named class plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

Although similar to commonality in that it concentrates on the "nexus" between class members and their designated representative, typicality differs from commonality in that it focuses on the class representative's individual characteristics in comparison to those of the proposed class. *Piazza v. EBSCO Indus. Co.*, 273 F.3d 1341, 1346 (11th Cir. 2001); *Prado–Steiman v. Bush*, 221 F.3d 1266, 1269 (11th Cir. 2000). Typicality is satisfied (i.e., the nexus exists) where the named plaintiffs' claims "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of the class. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985).

The claims of the named Plaintiffs and the class arise from the same event and are based on the same legal theory – i.e., John Hancock breached its fiduciary duty by taking more than $100 million in FTCs.

John Hancock argued that Plaintiffs have no standing to seek injunctive relief (and are therefore not typical of other unnamed class members) because (1) a plaintiff must

show a real and immediate threat of future injury; (2) Plaintiffs were not subject to any surrender fee when they cancelled the contract in March 2021; (3) Plaintiffs no longer have a contractual relationship with John Hancock; (4) John Hancock no longer services the plan and the Plan no longer uses John Hancock's investment options; and (5) these factors establish that the Plan could not suffer future harm or injury if the alleged violations continue.

But Plaintiffs have now dropped their demand for injunctive relief, which moots the argument. Plaintiffs' decision, even if strategic, to withdraw the injunctive relief claim would not cause denial of class certification based on a failure to establish typicality. *See Dickens v. GC Servs. Ltd. P'ship*, 706 F. App'x 529, 536 (11th Cir. 2017) (reversing denial of class certification where plaintiff did not seek all possible forms of relief); *Aldapa v. Fowler Packing Co., Inc.*, 323 F.R.D. 316, 331 (E.D. Cal. 2018) (certifying damages class after finding that named representative lacked standing to seek injunctive relief); *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) (holding that class representative is permitted to forego forms of relief "in order to achieve class certification").[9]

Finally, John Hancock contends that Plaintiffs' "own breaches of duties" preclude a finding of typicality. The grounds which John Hancock relies upon are, for the most

---

[9]     If seeking the injunctive relief which the named Plaintiffs withdrew were important to any class members, they "could simply opt out of the class and pursue litigation on [their] own." *Dickens,* 706 F. App'x at 536.

part, the same grounds it asserted in its now-denied Motion to File a Third-Party Complaint and an Amended Answer and Counterclaim (to pursue contribution claims against Plaintiffs and Searcy) [ECF Nos. 89; 139]. John Hancock lists several ways in which Plaintiffs supposedly breached their duties, such as not understanding the investments they selected for the Plan or the financial arrangements with their current and former recordkeeper.

As noted, John Hancock is not now pursuing those theories as claims in a Third-Party action or in a Counterclaim. In addition, it has not cited any case law authority to support its theory that a class certification motion should be denied on these grounds. The Undersigned is not convinced that Defendant's argument is persuasive. On the other hand, I am convinced that Plaintiffs have met their burden of establishing by a preponderance of the evidence the element of typicality, which is not a demanding hurdle in the first place.

<u>Rule 23(a) – Adequacy of Representation</u>

Rule 23(a)(4) requires that the representative parties will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This "adequacy-of-representation requirement "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Busby v. JRHBW*

46

*Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008) (internal quotation marks omitted).

The purpose of the adequacy requirement is to "protect the legal rights of absent class members." *Lyons v. Georgia–Pacific Corp. Salaried Employees Ret. Plan*, 221 F.3d 1235, 1253 (11th Cir. 2000). Adequacy of representation is primarily based on "the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the . . . class" and "whether plaintiffs have interests antagonistic to those of the rest of the class." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987). This inquiry requires the Court to consider both whether there are any inter-class conflicts and whether class counsel and named plaintiffs will prosecute the case with zeal. *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181 (11th Cir. 2003).

A named plaintiff is adequate if she shares common interests with the class members and seeks the same type of relief for herself as she seeks for the class. *Pottinger v. City of Miami*, 720 F. Supp. 955, 959 (S.D. Fla. 1989). The existence of minor conflicts of interest between the plaintiff and the class "alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy." *Valley Drug Co*, 350 F.3d at 1189.

John Hancock contends that "the numerous, close relationships between Plaintiffs, class counsel, and . . . Searcy preclude Plaintiffs, and their counsel, from serving as adequate representatives of the Proposed Class." [ECF No. 133, p. 19]. It cites *London v.*

47

*Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003) as support. In *London*, the court held that a named plaintiff could not fairly and adequately represent a class "because the personal **and** financial ties between [the plaintiff] and [class counsel] are very close." *Id.* at 1249. (emphasis in original). But the relationships between the Romanos, Searcy, and the Searcy law firm are substantially dissimilar to the relationships in *London.*

In *London*, 340 F.3d at 1249, the plaintiff and his attorney had been "close friends since high school." The attorney also "had made a large deposit with [the plaintiff, a stockbroker] after [the attorney] had obtained a settlement in a very similar suit." *Id.* at 1253. Although the attorney had moved his brokerage account after filing the *London* case, "nothing prevent[ed] his returning to that role after" the *London* case concluded, which would have provided the plaintiff "an additional incentive to increase [the attorney's] fees at the expense of the class." *Id.* at 1255.

But Plaintiffs in the instant case are not "close friends" and have no financial ties whatsoever with proposed Class Counsel. The Romanos have no prior relationship with any attorneys at Podhurst Orseck and have never had any fee-sharing relationship or referral agreements with Searcy Denney. While Plaintiffs have been *acquaintances* with Chris Searcy, Sr., they have not been "friends outside of seeing each other perhaps at certain legal conventions over the years."

John Hancock's argument refers to extended family members. For example, it

48

points out that Mr. Searcy, Sr. and the Romanos' *father* are "close friends." John Hancock further highlights the fact that the Romanos have known Mr. Searcy, Sr.'s son, Christian Searcy, Jr., from "[m]any professional and social events over the years" and from Mr. Searcy, Jr.'s work as a financial advisor. But Mr. Searcy, Jr. has never made any referrals to the Romanos.

John Hancock cites no authority for its position that these types of ties between family members of attorneys and clients make the clients inadequate class representatives. Nor is there any reason to extend *London* to these circumstances. Unlike in *London*, one of the proposed Class Counsel firms has no connections whatsoever with Plaintiffs, and this distinction undermines John Hancock's argument. *See Innovative Acct. Sols., Inc. v. Credit Process Advisors, Inc.*, 335 F.R.D. 106, 112 (W.D. Mich. 2020).

In addition, unlike in *London*, there is no evidence to suggest that the Romanos would have any conflict of interest, because there are no prior transactions in which they have received compensation from proposed Class Counsel, and there is no reason to believe that their father's friendship with Mr. Searcy, Sr. would cause them to disregard their obligations to the class. *See generally Sobel v. Hertz Corp.*, 674 F. App'x 663, 666 (9th Cir. 2017) (affirming district court's ruling that "previous professional connections with class counsel were not so extensive as to make [plaintiffs] inadequate representatives"); *Williams v. Duke Energy Corp.*, No. 08-CV-46, 2014 WL 12652315, at *11 (S.D. Ohio Mar. 13,

2014) (distinguishing *London*); *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 300 F.R.D. 347, 373 (C.D. Cal. 2013) (same).

The Undersigned concludes that Plaintiffs' interests are aligned with those of other Class Members and that they are adequate class representatives, as they will be proving the claims of absent Class Members as they prove their own claims. *Hastings-Murtagh v. Texas Air Corp.*, 119 F.R.D. 450, 459 (S.D. Fla. 1988) (holding that named plaintiffs "share the true interests of the class").

### Rule 23(b) – Common Questions of Law and Fact Predominate

Rule 23(b)(3) has two requirements: "(i) that questions of law or fact common to class members predominate over any questions affecting individual members, and (ii) that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *In re Checking Account Overdraft Litig.*, 286 F.R.D. at 655.

### Rule 23(b) – Superior to Other Methods of Adjudication

"Common issues of fact and law predominate if they 'have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.'" *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004) (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001)). This predominance requirement "is met when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis." *Allapattah Servs., Inc. v.*

*Exxon Corp.*, 333 F.3d 1248, 1260 (11th Cir. 2003).

At the same time, "[i]t is not necessary that all questions of law or fact be common, but only that some questions are common and that they predominate over individual questions." *Klay*, 382 F.3d at 1254 (internal quotation marks omitted). In addition, the common questions need not be dispositive of the entire action because "predominate" as used in the rule should not be equated with "dispositive." *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 694 (S.D. Fla. 2002).

The core issues in this action -- whether John Hancock is a fiduciary and whether it breached its statutory fiduciary duties and engaged in prohibited transactions -- are subject to generalized proof and will be established using common evidence applicable to Plaintiffs and all members of the Class. The significance of these two issues are not in dispute, as they form the basis for John Hancock's pending summary judgment motion. [ECF No. 255]. Indeed, the following argument headings in its motion confirm that these two issues are in a limited list of primary issues: "John Hancock Was Not a Relevant Fiduciary," "John Hancock Did Not Act Disloyally," and "Plaintiffs' Prohibited Transaction Claims Fail." [ECF No. 255].

The evidence of John Hancock's conduct -- which Plaintiffs say will be the same for each class member because John Hancock's conduct was uniform with respect to all class members -- will have a direct, identical impact on every class member's effort to

establish liability and entitlement to relief. *Klay*, 382 F.3d at 1255.

Because Defendants' challenged conduct involves form contracts that are identical in at least one key respect -- none of them disclose John Hancock's receipt and retention of foreign tax credits -- and John Hancock's conduct involving foreign tax credits applies to all class members in the same way, the predominance requirement is met. *See, e.g., Tershakovec*, 2021 WL 2700347, at *16 (finding predominance satisfied where defendant engaged in "uniform course of conduct"); *Allapattah Servs.*, 333 F.3d at 1261 (holding that predominance was satisfied and "the issue of liability was appropriately determined on a class-wide basis" where the subject "agreements were materially similar" and whether the defendant "breached that obligation was a question common to the class").

Plaintiffs contend that the uniform conduct here is illustrative of the uniform conduct involved in other ERISA claims where courts find that the predominance requirement is satisfied in ERISA cases because the evidence "will inevitably focus on Defendant's conduct and communications and will not vary among class members." *Haddock*, 293 F.R.D. at 283 (finding predominance satisfied because "the two core determinations that must be made at trial—namely, (1) whether [the defendant] functioned as an ERISA fiduciary with respect to the Plans, and (2) whether [the defendant's] conduct . . . violated its fiduciary obligations—both hinge on the ERISA consequences of [the defendant's] basic investment process, a process that was relatively

uniform across the proposed class"); *Healthcare Strategies, Inc. v. ING Life Insurance & Annuity Co.*, No. 3:11-CV-282, 2012 WL 10242276, at *13 (D. Conn. Sept. 27, 2012) (finding predominance satisfied in ERISA case because whether "revenue sharing payments constitute prohibited transactions poses both a legal and factual question that is common to the members of the proposed class" and "the proof of their circumstances is not individual to class members, but rather is shared across all of the class members whose plans offered those funds").

Moreover, the entire amount of FTCs retained by John Hancock will, if Plaintiffs prevail, be allocated to the various Plans, in amounts based on their relative allocations to each sub-account. But "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Allapattah Servs.*, 333 F.3d at 1261; *see also Klay*, 382 F.3d at 1259.

But John Hancock challenges Plaintiffs' ability to establish that common questions predominate.

It notes that "common issues will not predominate over individual questions if, as a practical matter, the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." *Cordoba v. DIRECTTV, LLC*, 942 F.3d 1259, 1274 (11th Cir. 2019).

According to John Hancock, there is no uniformity in its pricing or the point-of-

sale disclosures (which it says are "conducted by potentially tens of thousands of unaffiliated plan advisors"). [ECF No. 133, p. 22]. Relying on *Bacon v. Stiefel Labs, Inc.*, 275 F.R.D. 681, 698 (S.D. Fla. 2011), John Hancock also minimizes the importance of form contracts, arguing that "questions of reliance, investment strategy and damages necessitate individual inquiry."

Similar to arguments it made in connection with the Rule 23(a) commonality assessment, John Hancock contends that there are several scenarios (such as what each member of the Proposed Class may have been told by an advisor at the point of sale) which require individualized inquiries.

Not surprisingly, Plaintiffs brand John Hancock's arguments as repeating the mistakes of its commonality challenge -- i.e., incorrectly presuming that reliance is an element of the claims.

To highlight a point made earlier in this Order, Plaintiffs emphasize that their claim is based on John Hancock's misconduct in wrongfully retaining, without authorization, the FTCs -- not on what representations were made to the Plaintiffs personally. Therefore, Plaintiffs say (and previously said), none of the arguably "different things" that John Hancock believes may have been discussed at the point-of-sale events matter because John Hancock concedes that none of its form contracts with class members authorizes it to retain FTCs as compensation.

The Undersigned is convinced that for class certification purposes Plaintiffs have established that common questions of law and fact predominate. For all practical purposes, John Hancock has recycled its arguments against commonality and raised them again here for a Rule 23(b) analysis. Given that all the contracts are similar in that none disclose John Hancock's retention of the FTCs, a primary issue in the case, there will be generalized proof using common evidence equally applicable to Plaintiffs and other Class Members. Moreover, the other primary issue of whether John Hancock was a fiduciary will similarly be established (or not) depending on common evidence.

<u>Rule 23(b) – Superior to Other Methods of Adjudication</u>

Neither side spends much time in their memoranda on this requirement. Nevertheless, Plaintiffs still must establish it.

Rule 23(b)(3) identifies four factors pertinent to the "superiority" analysis: "(1) separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action." *Sarris*, 311 F.R.D. at 699.

These factors militate in favor of class treatment.

"Separate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts." *In re Checking Account Overdraft Litig.*, 286 F.R.D.

at 659 (quoting *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983)). For this reason, courts often find the superiority requirement satisfied for ERISA cases. *See, e.g., Haddock*, 293 F.R.D. at 287.

## Conclusion

The Undersigned grants Plaintiffs' class certification motion. "Requiring every issue to be common would defeat the utility of the class action device." *Tershakovec*, 2021 WL 2700347, at *21.

However, the Court will, unless the parties reach an agreement, hold a hearing on the issue of the specific timeframe to be used to define the class. John Hancock notes that the Contract did not become effective until October 17, 2014 but the proposed class period begins March 25, 2013. Therefore, John Hancock says, Plaintiffs cannot represent the Proposed Class for the 18.5-month period (from March 25, 2013 through October 17, 2014). The parties will need to present argument on whether Plaintiffs have standing to pursue claims during the gap period.

Finally, the Court appoints Plaintiffs as Class Representatives and appoints Podhurst Orseck, P.A. and Searcy Denney Scarola Barnhart & Shipley, P.A. as class counsel, and counsel are directed to give absent class members appropriate notice under Rule 23.

At the risk of stating the obvious, this ruling hardly means that Plaintiffs will

56

prevail on the merits. In fact, John Hancock has presented myriad substantial, substantive arguments in its still-pending summary judgment motion. John Hancock needs to convince the Court of only one of these arguments in order to obtain a favorable summary judgment ruling. The Undersigned will be holding a hearing on the summary judgment motion, as well as the six pending motions challenging expert witnesses.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on January 14, 2022.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All Counsel of Record