UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 19-21147-CIV-GOODMAN
[CONSENT CASE]

ERIC ROMANO, et al.,

       Plaintiffs,

v.

JOHN HANCOCK LIFE INS. CO. (USA),

       Defendant.

_____/

## OMNIBUS ORDER ON THE PARTIES' *DAUBERT* MOTIONS[1]

"For every expert, there is an equal and opposite expert."

- Sir Arthur C. Clarke (author of *2001: A Space Odyssey* and co-writer of the screenplay for a film by the same name)

"People who have expertise just love to share it. That's human nature."

- David Baldacci (attorney and bestselling American novelist)

The phrase "leave it to the experts"[2] is used to invoke the idea that people should

---

[1] Initial Note: The Undersigned previously uploaded a version of this Order under seal so that the parties could propose redactions, if necessary. [ECF No. 330]. At the Undersigned's direction, Defendant filed a version of the Order containing its proposed redactions. [ECF No. 335; 335-1]. Because the Undersigned denied Defendant's requested redactions [ECF No. 337], this public version of the Order is uploaded in whole and is substantively identical to the under-seal version.

[2] *How to Pack for Children? Leave It to the Experts*, NEW YORK TIMES (December 17, 2019), https://www.nytimes.com/2019/12/17/travel/family-travel.html (last visited March

follow the guidance of those with an expertise in the subject matter. When building a bridge or a skyscraper, it is best to use expert architects and engineers for design and construction decisions. When victimized by a cyber-security attack, it is best to seek advice from computer information technology experts. When confronted with a patient suffering from appendicitis, it is necessary to leave the medical response to an expert surgeon.

The law accepts the premise underlying this "leave-it-to-the-experts" view. The law allows experts to testify and provide expert opinions when a case intertwines with the subject matter of their expertise. On issues of the *law*, however, the fact finder does not need a party's expert to explain legal intricacies to her; the Court comes equipped with its own expert on these issues -- the Judge.

---

18, 2022); *What NFL Commissioner Roger Goodell needs to do now to help end the lockout*, WASHINGTON POST (September 25, 2012), https://www. washingtonpost.com/national/on-leadership/what-nfl-commissioner-roger-goodell-needs-to-do-now-after-seahawks-pack ers-game/2012/09/25/f8c3194c-072f-11e2-afff-d6c7f20a83bf_story.html (assessing the validity of an alleged blown referee call during a referee-focused labor dispute, stating "I'll leave it to the experts to describe what happened") (last visited March 21, 2022); *Warm, wise musical about mental illness*, CHICAGO TRIBUNE, https://digitaledition. chicagotribune.com /tribune/ article_popover.aspx? guide=6 065bca4-6759-4259-b61a-05cea919f8f1 (stating that it would be best to "leave it to the experts" in evaluating the accuracy of a bi-polar character's portrayal of somebody suffering from the illness) (last visited March 21, 2022); *The Experts*, WALL STREET JOURNAL, https://www.wsj. com/news/experts (a series of articles by "a group of industry and academic thought leaders who weigh in on topics covered in The Journal Report") (last visited March 21, 2022).

It is well settled that experts are not permitted to offer legal conclusions as opinions. On questions of the law, the fact finder does not look to the parties, the lawyers, or the witnesses for the answers; she looks to only the Court.

Despite this no-legal-opinions principle, Plaintiffs' and Defendant's experts each offer legal conclusions grounded in either the Internal Revenue Code or ERISA.[3] To be sure, both sides appear aware that the other side's experts have offered legal conclusions as opinions because the parties have sought to exclude multiple opinions on this basis. Remarkably, though, each side argues that its *own* expert's opinion on the same issues is somehow not an impermissible legal conclusion. So both sides are engaging in what is informally known as "the-pot-calling-the-kettle-black" strategy.

As will be discussed in this Order, these types of legal opinions -- regardless of which side the conclusion benefits -- are impermissible. In addition to challenging the opposition's expert for providing legal opinions, both sides also raise other concerns about the opposition's expert. This Order will address those, as well.

## Overall Background

Plaintiffs Eric and Todd Romano, trustees of an ERISA-defined contribution plan ("the Romanos" or "Plaintiffs"), filed a two-count lawsuit against Defendant John

---

[3]      ERISA is the Employment Retirement Income Security Act of 1974.

3

Hancock Life Ins. Co. (USA) ("John Hancock"), which sold them, as trustees of a 401(k) Plan, a Group Variable Annuity Contract. Plaintiffs sued on behalf of a putative class of persons who owned variable annuity contracts from John Hancock. The Court granted Plaintiffs' motion for class certification [ECF Nos. 295; 307]. Plaintiffs' counsel was required to send notice to all potential class members by March 15, 2022. [ECF No. 315]. The deadline for potential class members to opt out was April 29, 2022. *Id.*

In support of their claims, Plaintiffs enlisted the following four experts: (1) Bruce Pingree, a retired attorney currently offering expert witness and benefits consulting services [ECF No. 260-1]; (2) Roger Levy, a former attorney and current fiduciary assessment analyst for the Center of Fiduciary Excellence ("CEFEX") [ECF No. 257-1]; (3) Barry Mukamal, a Certified Public Accountant ("CPA") and co-managing partner at KapilaMukamal, LLP [ECF No. 259-1]; and (4) Dr. Lisa De Simone, an Associate Professor of Accounting at the McCombs School of Business at the University of Texas at Austin [ECF No. 258-1].

In support of its position, Defendant enlisted the following two experts: (1) Dr. David LaRue, an Emeritus Professor of the University of Virginia, who taught graduate and undergraduate courses in the fields of federal taxation, financial accounting, international finance, and economic analysis [ECF No. 264-2]; and (2) Steven Gissiner, a retirement plan administration and plan specifics consultant [ECF No. 265-2].

4

Both parties filed *Daubert*[4] motions seeking to exclude either the entirety of, or some opinions from, the opposing party's experts' reports. Each *Daubert* motion has been fully briefed with a response and a reply. In addition, the Undersigned held a more than five-hour hearing on the individual *Daubert* motions and Defendant's pending Motion for Summary Judgment.[5] [ECF Nos. 293; 313].[6]

For the reasons outlined below, the Undersigned **grants** Defendant's Motion to Exclude the Testimony of Bruce Pingree [ECF No. 260]; **grants in part and denies in part** Defendant's Motion to Exclude the Testimony of Roger Levy [ECF No. 257]; **denies** Defendant's Motion to Exclude the Testimony of Barry Mukamal [ECF No. 259]; **grants in part and denies in part** Defendant's Motion to Exclude the Testimony of Dr. Lisa De Simone [ECF No. 258]; **grants in part and denies in part** Plaintiffs' Motion to Exclude the Testimony of Dr. David LaRue [ECF No. 264]; and **grants in part and denies in part**

---

[4]     *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993).

[5]     The Undersigned's ruling on Defendant's Motion for Summary Judgment will be in a separately-issued Order.

[6]     "*Daubertizing*" is "an informal term lawyers sometimes use when referring to efforts designed to challenge (and ultimately exclude) the other side from offering expert witness opinion testimony at trial (or in connection with a summary judgment motion)." *Carido v. Whet Travel*, No. 16-23658, 2018 WL 1367444, at *1 (S.D. Fla. Mar. 16, 2018). As explained by the *Whet Travel* Court, "[i]n some cases, both sides engage in *Daubertizing*." (emphasis in original)). That is the scenario here, where there is a substantial amount of *Daubertizing* in multiple motions filed by both sides.

Plaintiffs' Motion to Exclude the Testimony of Steven Gissiner [ECF No. 265].

## I.    PLAINTIFF'S CLAIMS AND INTRODUCTION

The Romanos jointly own Romano Law PL ("Romano Law"). In 2014, Plaintiffs established a 401(k) plan for Romano Law: the Romano Law PL 401(k) Plan (the "Plan"). The Romanos named themselves trustees of the Plan, and they engaged Christian Searcy, Jr. ("Searcy") to recommend service providers and investments for the Plan, among other responsibilities.

John Hancock is an insurance company that, relevant to this case, offers recordkeeping services to 401(k) plans. The retirement product at issue is the John Hancock Signature product, which is provided through a group variable annuity contract.

In connection with establishing the Plan, the Romanos entered into a group variable annuity contract ("GAC" or "Contract") and a Recordkeeping Agreement ("RKA") with John Hancock to provide "administrative and recordkeeping services" and a platform of investment options for the Plan.

The Contract provided Plaintiffs, on behalf of their Plan, with access to John Hancock separate accounts, which could then be used as the Plan's funding mechanism. An insurance company separate account is "an accounting entity created by and under the control of an insurance company." John Hancock was the legal owner of the assets

held in the separate accounts. Each separate account is divided into sub-accounts, and each sub-account serves as a "conduit" vehicle to allow investment in a pre-specified mutual fund.

Certain sub-accounts available under the Contract use mutual funds that invest in foreign securities. Investments in foreign securities may be assessed income or related taxes by the country of domicile (foreign taxes) on income linked to those investments. U.S. taxpayers who accrue or pay foreign taxes to a foreign country on income that is also subject to U.S. taxes may, under certain circumstances, be able to take a foreign tax credit ("FTC") against their U.S. tax liability, I.R.C. §§ 27, 901–09, or, alternatively, deduct such amount from their U.S. taxable income.

Upon Searcy's recommendations, the Romanos selected some of these funds.

The foreign taxes paid by John Hancock that are at issue in this case, and that are factored into the determination of the FTCs, involve foreign taxes paid by retirement-plan-funded mutual funds owned by John Hancock separate accounts which are deemed paid by John Hancock pursuant to Internal Revenue Code provisions applicable specifically to mutual funds and their shareholders.

During certain years at issue in this case, John Hancock, as owner of the mutual fund shares held in the separate accounts, qualified for offsetting FTCs.

At bottom, Plaintiffs allege that John Hancock improperly "took" the FTCs by not

disclosing its FTC use and by not returning or refunding or crediting those amounts back to them. Although Plaintiffs themselves could not have used the FTCs, they argue that John Hancock should have somehow passed on to them the financial *benefit* of the FTCs through a rebate or credit.

Plaintiffs bring two ERISA counts against John Hancock. Count I alleges a breach of the "fiduciary duty of loyalty" by "receiving and retaining Plan Foreign Tax Credits for [John Hancock's] own benefit, and by failing to appropriately disclose its retention of Plan Foreign Tax Credits . . . ." [Compl. ¶ 63, ECF No. 1]. Count II alleges violations of two prohibited transaction provisions, ERISA §§ 406(b)(1) and (b)(3), 29 U.S.C. §§ 1106(b)(1) and (b)(3), also relating to FTCs. *Id*. ¶¶ 67-73.

Plaintiffs ask the Court to require John Hancock to "make good to the Plan all losses to the Plan" and "damages paid to the Plan." *Id*. (prayer for relief ¶¶ C and H). They also seek an imposition of a constructive trust as to amounts by which John Hancock was allegedly "unjustly enriched," and "equitable restitution and disgorgement." *Id*. (prayer for relief ¶¶ D and E).

Plaintiffs withdrew their requests for injunctive and declaratory relief. [ECF No. 152]. They also withdrew their demand for an Order permitting the withdrawal of any and all amounts payable under the Contract without imposition of a surrender fee.

Guided by this backdrop, each side has filed reports from multiple experts seeking

to offer opinions on topics such as FTCs, the Internal Revenue Code, ERISA, the retirement fund industry, recordkeeping practices, and damages calculations. Many of these experts have authored both affirmative and rebuttal reports. And all of these experts are subject to a *Daubert* challenge by the opposing party.

## II.    LEGAL FRAMEWORK

The district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993). Federal Rule of Evidence 702 governs the admission of expert testimony, as explained and refined by the United States Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 582 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Under this framework, district courts are charged with a gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

Rule 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

9

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry: (1) whether the expert is qualified to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

As an overarching principle, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey*, 298 F.3d at 1256. "In order to be admissible, an expert's testimony must be based on 'more than subjective belief or unsupported speculation.'" *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996) (quoting *Daubert*, 509 U.S. at 590). There should be "[s]cientific method; good grounds and appropriate validation." *U.S. v. Masferrer*, 367 F. Supp. 2d 1365, 1371 (S.D. Fla. 2005).

Reliability of the methodology requires "an exacting analysis of the proffered expert's methodology." *McCorvey*, 298 F.3d at 1257. That analysis takes into consideration a number of factors, including: (1) whether the expert's methodology can be, and has been, tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method employed has a known rate of error; and

(4) whether the technique is generally accepted in the scientific community. *Rink*, 400 F.3d at 1292; *see also Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

These reliability factors, however, are non-exhaustive. *Kumho Tire*, 526 U.S. at 150; *Rink*, 400 F.3d at 1292. Thus, "[i]n evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n.7. The burden of establishing the reliability of an expert's opinions rests on the proponent of that expert's testimony. *U.S. v. Frazier*, 387 F.3d 1244 (11th Cir. 2004). The party proffering the expert also has the burden of "laying the proper foundation for the admission of the expert testimony . . . and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

"It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341. Thus, the district court cannot exclude an expert because it believes the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

A less-than-perfect expert opinion may still be admitted, even if it contains gaps. *See In re Trasylol Prods. Liab. Litig.*, No. 08–MD–01928, 2010 WL 1489793, at *6 (S.D. Fla. Feb. 24, 2010) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.").

Furthermore, courts "must be careful not to conflate questions of admissibility of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder." *Id.* at *7 (quoting *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341).

On the other hand, courts do not hesitate to exclude purported expert testimony which does not pass muster. *See Allison*, 184 F.3d 1300 (affirming summary judgment in favor of silicone breast implant manufacturers and upholding district court's exclusion of proffered expert's causation testimony under *Daubert*); *Rink*, 400 F.3d at 1286 (affirming exclusion of expert testimony in products liability and toxic trespass claims against pesticide manufacturer and therefore affirming summary judgment for defendant); *Frazier*, 387 F.3d 1244 (finding trial court in criminal case did not abuse its discretion in excluding proffered expert testimony from forensic investigator); *Hendrix v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010) (affirming defense summary judgment for infant car seat manufacturer in products liability lawsuit involving child who sustained traumatic brain injuries and upholding trial court ruling which excluded expert testimony because the experts were not sufficiently reliable).

Passing muster, however, is not the only requirement. There are certain categories of opinions that are impermissible regardless of the qualifications of the expert or the reliability of the opinion.

Among these off-limits topics, experts may not offer opinions on a person's state of mind. *Omar v. Babcock*, 177 F. App'x 59, 63 n.5 (11th Cir. 2006); *In re Seroquel Prods. Liab. Litig.*, No. 6:06–md–1769–Orl–2DAB, 2009 WL 3806436, at *4 (M.D. Fla. July 20, 2009) (excluding expert testimony with regard to the state of mind, intent, or motives of defendant or any of defendant's employees because those matters are not the proper subjects of expert testimony). Experts generally may not interpret unambiguous contracts. *Peterson v. Lexington Ins. Co.*, 753 F.2d 1016, 1018 (11th Cir. 1985); *In re NationsRent Rental Fee Litig.*, No. 06-60924-CIV, 2009 WL 87607, at *2 (S.D. Fla. Jan. 12, 2009) ("[A]bsent any need to clarify or define terms of art, science or trade, expert opinion testimony to interpret contract language is inadmissible." (citation omitted)). And experts are also not permitted to offer legal conclusions. *United States v. Long*, 300 F. App'x 804, 814 (11th Cir. 2008) ("[An] expert witness may not testify as to his opinion regarding ultimate legal conclusions.").

## III.  ANALYSIS

Plaintiffs' experts and Defendant's experts offer opinions on very similar, and often identical, topics. Among other opinions, many of the experts opine on whether

13

FTCs are compensation or revenue, whether FTCs have any monetary value, whether a prohibited transaction occurred, or whether John Hancock was acting as a fiduciary during its use of FTCs originating from the Romanos' Plan.

Despite the subject matter similarities, Plaintiffs and Defendant often both seek to strike the opposing party's expert's opinion -- on grounds of either relevance or improper legal conclusion -- yet in their responsive filings argue that their own expert's opinions *on the same issue* (but reaching the contrary result) are neither irrelevant nor an improper legal conclusion. Not surprisingly, this leads to many inconsistent arguments by both sides, depending on whether a reader is reviewing a party's affirmative motion to strike or that same party's opposition to the other side's affirmative motion to exclude.

In addition to providing affirmative expert reports, many of the parties' experts also authored rebuttal reports. Because the rulings on an expert's affirmative report may have an impact on the ruling concerning the opinion of the expert rebutting that report, the Undersigned will first address all affirmative reports and will then address all rebuttal reports. In situations where the Undersigned is striking a section or the entirety of an affirmative report, the Undersigned will also strike, if it exists, the corresponding sections of the opposing party's rebuttal report.

a.  <u>INITIAL REPORTS</u>

      i.  *Bruce Pingree[7]*

Pingree is a retired lawyer whose former practice revolved almost exclusively around employee benefits and executive compensation matters. Since retiring from the practice of law, Pingree has shifted his work to benefits consulting and expert witness services.

Plaintiffs hired Pingree to describe the procedures, considerations, and "best practices" an individual in Plaintiffs' position should use to determine: (1) who owns the economic benefit of the subject FTCs; (2) a recordkeeper's fiduciary duty with respect to the economic benefit; (3) whether John Hancock committed a "prohibited transaction" under ERISA in its application of FTCs; and (4) assuming the answer to (3) is "yes," then how the individual in Plaintiffs' position should remedy the prohibited transaction(s).

Before offering his opinion on these issues, Pingree described in detail his perspective on the "ever-increasing litigation since the turn of this century relating to the fees and components of fees charged to 'employee pension benefit plans.'" In his view, this case is a "novel but logical follow-on" to the increase and focus of this type of

---

[7]     A copy of Pingree's expert report, including his qualifications, is filed in full on CM/ECF, with no redactions. [ECF No. 260-1]. The Undersigned's summary of Pingree's background and opinions is derived from this exhibit.

litigation.

Pingree offered his opinions through the eyes of a hypothetical administrative fiduciary and what he "would conclude [] if he were [that] administrative fiduciary." Framed by this hypothetical, Pingree opined that the Plan owns the economic benefit of the FTCs; FTCs are compensation under ERISA; and that John Hancock violated the prohibited transaction rules of ERISA. Ultimately, Pingree concluded that the "best practice" for an administrative fiduciary who has made discoveries similar to those made in his report would be to file this lawsuit.

Defendant seeks to strike pages 15-23 of Pingree's report as irrelevant and as improper legal opinions. [ECF No. 260]. Defendant takes the stance that "Mr. Pingree's opinion as to whether Plaintiffs should have filed a lawsuit – one that has already been filed—has no relevance to this case nor could it assist a finder of fact." *Id.* But Plaintiffs refer to this defense characterization of Pingree's opinions as a "self-serving distortion" and as a "strawman." [ECF No. 270].

According to Plaintiffs, Pingree presented his best practices opinions "from the perspective of hypothetical plan fiduciaries evaluating particular transactions by investment fiduciaries like Defendant because that is the most common situation in which the best practices are implicated and utilizied [sic]." *Id.* at p. 3. This, they claim, will greatly assist the jury in determining whether Defendant's retention of FTCs were

prohibited transactions. *Id.*

Defendant makes an alternative argument that these same opinions should be excluded because they are improper legal opinions on whether a prohibited transaction occurred, whether FTCs are compensation, and the meaning and interpretation of the contract between Plaintiffs and Defendant. [ECF No. 260]. Plaintiffs again contend that John Hancock is distorting Pingree's opinions (which are, in their view, limited to best practices) and that he only *predicts* the answers to those issues.

Plaintiffs' attempt to portray Pingree's opinion as only a best practices analysis and to describe his legal conclusions as mere predictions falls flat. The following excerpts from Pingree's report reveal that it is, in effect, a seemingly self-congratulatory roadmap about how Plaintiffs were justified and should be commended for filing their lawsuit (and his legal conclusions supporting that position):

> Frankly, I am amazed that Plaintiffs even discovered the use of foreign tax credits, given Defendant's non-disclosure. But they have, and everything in this Report follows from that discovery.
>
> This leads to the conclusion that the Defendant has violated the prohibited transaction rules of ERISA. There is no available defense that the prohibited transaction is 'good' for the plan.
>
> To the contrary, I would conclude, if I were an administrative fiduciary, that several propositions support the beneficial ownerships (the economic benefit) of the foreign tax credit by the Plaintiffs [a position Plaintiffs have taken in bringing this lawsuit].
>
> At this point in my analysis and advice to the administrative fiduciary, it

17

cannot be disputed that the foreign tax credits have monetary value.

These positions strongly suggest that the foreign tax credits should beneficially attach to the . . . assets of the pension funds that are used in the transaction generating the foreign tax credit." [i.e., foreign tax credits are plan assets].

Aside from committing the prohibited transaction, the Defendant has arguably violated its own promise [in the contract] to disclose and adjust its fees from "all revenue it derives from the investment of Plan assets."

In light of all these considerations, I would conclude that a prudent administrative fiduciary would or should, more likely than not conclude that the Defendant had committed a prohibited transaction. A prudent administrative fiduciary would conclude that the best interests of plan participants would be served by bringing this action.

Defendant contends that this opinion -- whether Plaintiffs engaged in the best practices for evaluating their claim and were required to bring a lawsuit when following these practices -- is irrelevant to any of Plaintiffs' claims. As Defendant notes, it has not raised any defenses suggesting Plaintiffs acted prudently or imprudently in bringing this lawsuit. Although Plaintiffs try to paint Pingree's opinions as something more than an analysis of Plaintiffs' actions, the content of Pingree's report does not support such a leap. However, even if the Undersigned were to accept Plaintiffs' expansive view of Pingree's opinions and treat it as a "best practice" opinion, Pingree's opinions would still run afoul of the other rules of evidence or be otherwise excludable under *Daubert*.

"The *Daubert* analysis does not operate in a vacuum." *Allison*, 184 F.3d at 1309. Thus, an expert's testimony, even if it satisfies *Daubert*, may still be excluded under the

other rules of evidence. *Id.* Defendant initially challenges Pingree's opinions on the basis that they are inadmissible under Federal Rule of Evidence 401.

Rule 401 defines "relevant evidence" as that which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401(a)-(b). Plaintiffs allege Pingree's opinions meet this hurdle because he expressly writes that his opinions are on the practices that should be applied to "evaluate whether the Defendant has committed a prohibited transaction under ERISA." [ECF No. 270 (citing Pingree's report)]. There is little in Pingree's report to support this characterization. Although Pingree and Plaintiffs both use the term "best practice," Pingree's opinions offer little analysis on what the best practice is in this case. Instead, he offers opinions which are either an improper expert opinion, irrelevant, or both.

First, the manner in which Pingree provided his opinions results in an implicit (and, at times, explicit) validation of Plaintiffs' purported wisdom in bringing this lawsuit. Pingree commends Plaintiffs for discovering the FTC issue, endorses the actions they took in assessing the FTC issue, and concludes that prudence required Plaintiffs to file this case.

The Eleventh Circuit has made clear that "[e]xpert . . . testimony concerning the truthfulness or credibility of a witness is generally inadmissible because it invades the

jury's province to make credibility determinations." *United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996). Pingree's opinions, as articulated by Plaintiffs -- concerning how Plaintiffs' actions constitute the best practice in evaluating whether a prohibited transaction occurred -- are, in effect, credibility assessments of Plaintiffs, which is inadmissible. *Pellegrino v. Wengert*, No. 15-CV-60535, 2016 WL 3678600, at *9 (S.D. Fla. July 12, 2016) (excluding expert testimony concerning the "credibility of the other witnesses" because such testimony is "not permitted"); *Lohr v. Zehner*, No. 2:12CV533-MHT, 2014 WL 3175445, at *2 (M.D. Ala. July 8, 2014) (finding "credibility determination [was] not sufficiently reliable to go before a jury as expert opinion"); *United States v. Falcon*, 245 F. Supp. 2d 1239, 1248 (S.D. Fla. 2003) ("Permitting [expert's] testimony would run contrary[] to the well-established principle that, absent extraordinary circumstances, credibility determinations are for the jury, and not expert witnesses.").

Second (and still treating Pingree's opinion as a "best practice" opinion), Pingree's analysis is little more than an examination of the elements of the offense.[8] Under Plaintiffs' view of admissibility, a party should be able to present an expert witness in a breach of contract case to offer a best practice opinion that a plaintiff should first

---

[8]     Because Pingree concludes that it was proper to bring a lawsuit, this analysis also implicitly endorses the merits of the case. Certainly, Pingree would not suggest that bringing a lawsuit was the best practice unless he was *also* opining that Defendant is in fact liable.

determine if there is a valid contract, should next determine whether the defendant failed to perform a portion of the contract, and finally determine whether any damages were suffered before ultimately opining that all of these elements have been met and that the plaintiff was justified in filing a lawsuit. This type of evidence is not relevant: it makes no *fact of consequence* more or less probable than it would be without the evidence. Courts throughout the country regularly exclude this type of opinion testimony concerning the merits of a lawsuit or the propriety in bringing it. *See, e.g., Lacaillade v. Loignon Champ-Carr*, Inc., No. 10-CV-68-JD, 2011 WL 5520942, at *2 (D.N.H. Nov. 14, 2011) ("[Expert's] opinion as to whether or not Loignon is at fault for Lacaillade's death, as well as her opinion on the merits of the lawsuit, essentially tell the jurors what result to reach. Such opinions are precisely the type that Rule 701 precludes."); *Advanced Physical Therapy, LLC v. Apex Physical Therapy, LLC*, No. 6:20-CV-03043-RK, 2022 WL 303345, at *2 (W.D. Mo. Feb. 1, 2022) (excluding expert opinions that "(1) Apex lacked probable cause to file the Illinois Lawsuit, (2) the Illinois Lawsuit order was 'correct,' (3) litigants like Ball and Linebarger frequently suffer an emotionaltollfrom [sic] litigation, and (4) the attorney's fees incurred in the Illinois Lawsuit were necessary and reasonable"); *Ogilvie v. Swan*k, No. 2:14-CV-354-SPC, 2016 WL 1554407, at *2 (M.D. Fla. Apr. 18, 2016) (prohibiting expert from "testify[ing] as to his personal opinions on the merits of the suit"); *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 495 F. Supp. 3d 687, 703 (N.D. Ill. 2020) (prohibiting experts,

on statute of limitations issue, from "testifying that Motorola should have filed this lawsuit before 2017"); *Zamora v. Tarrant Cty. Hosp. Dist.*, 510 S.W.3d 584 (Tex. App. 2016) (striking portions of "declaration by employee's expert stating opinion that employee's counsel exercised reasonable and due diligence in filing and serving lawsuit on defendant and that it was reasonable to have case served on defendant within 30 days of filing it").

If this type of testimony were permitted, then every plaintiff would enlist an expert to testify to the jury that the lawsuit is justified, righteous and meritorious.

This type of analysis explains only the law -- an area left to the exclusive purview of the Court -- and, in effect, tells the jury the verdict it should reach. Fed. R. Evid. 704 at committee notes (merely telling the jury what result to reach is not helpful to the jury and therefore is not admissible testimony).

Because of this, the Undersigned also agrees with Defendant's argument that Pingree's report contains multiple impermissible legal conclusions.[9] Plaintiffs try to paint

---

[9]     This is not the first time that a court has excluded Pingree's opinions for containing inadmissible legal conclusions. In *Vyas v. Vyas*, No. 15-02152, 2017 WL 4621539, at *6 (C.D. Cal. Oct. 13, 2017), aff'd 765 F. App'x 195 (9th Cir. 2019), the plaintiff retained Pingree, who, testifying as an expert, concluded that the defendant, Schwab Retirement Plan Services, Inc., was a fiduciary and that it breached its duties to the plaintiff by implementing a freeze on her 401(k) Plan account and improperly allocating the funds in a Keogh Plan account. The Court, which granted Schwab's summary judgment motion and denied the plaintiff's summary judgment motion, sustained Schwab's objections to Pingree's deposition testimony and his expert report because the conclusions "go to the ultimate question in this matter and are thus inadmissible legal conclusions."

these legal conclusions as mere predictions, but Pingree's actual statements, which I

provided examples of earlier, contradict this assertion.

Although "[a]n expert may testify as to his opinion on an ultimate issue of fact[,]"

an expert may not "tell the jury what result to reach" nor "testify to the legal implication

of conduct; the court must be the jury's only source of law." *Montgomery v. Aetna Cas. &*

*Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (citations omitted). Even when hidden behind

the phrases best practice or prediction, Pingree opines on the result the reader should

reach in assessing many of the main legal issues in the case. [10]

Though there are situations where an expert's framework "may alert jurors to

certain areas of inquiry that he believes they should pay particular attention to when

evaluating evidence," ultimately it is the Court's instructions on the law that creates the

---

[10]     In the class certification context, Plaintiffs identified the following common issues
of law and fact: "(1) whether [John] Hancock was a fiduciary of the Plans with respect to
Plaintiffs' claims; (2) whether [John] Hancock disclosed its receipt and retention of foreign
tax credits; (3) whether Hancock breached its fiduciary duties; and (4) whether [John]
Hancock engaged in prohibited transactions[.]" [ECF No. 94].

         In their response to Defendant's summary judgment motion, Plaintiffs say that
"[t]he question whether a party is an ERISA fiduciary is a mixed question of law and
fact." [ECF No. 267]. They also later take the unequivocal position that John Hancock *was*
a fiduciary, which implicitly assumes that there are no remaining factual disputes to
prevent a court from deciding the legal issue. Plaintiffs also indicate that whether an FTC
is a plan asset is determined by two approaches of law, both of which involve reaching a
legal conclusion. *Id.* Likewise, both the determination of whether John Hancock breached
its duty of loyalty and whether it engaged in prohibited transactions are presented as
legal questions (albeit ones for which Plaintiffs argue there are factual disputes). *Id.*

framework through which the jury must evaluate the evidence. *Kleiman v. Wright*, 18-cv-80176, 2020 WL 6729362 at *24 (S.D. Fla. Nov. 17, 2020).

Further, an expert may not simply "quote[] and summarize[] relevant statutory provisions"; this "is not helpful to the jury because it is nothing more than impermissible legal standard testimony." *Cordoves v. Miami-Dade Cty.*, 104 F. Supp. 3d 1350, 1365 (S.D. Fla. 2015) (citing *Pleasant Valley Biofuels, LLC v. Sanchez-Medina*, No. 13–23046–CIV, 2014 WL 2855062, at *5 (S.D. Fla. June 23, 2014)). For this reason, the sections of Pingree's report where he simply includes the language of a statute or regulation are also inadmissible.

Likewise, because Plaintiffs have alleged no ambiguity in the GAC or RKA, Pingree's opinions on whether Defendant may or may not have violated the promises made in the contracts is also inadmissible. *Nova Cas. Co. v. Waserstein*, No. 04-20755-CIV, 2005 WL 5955694, at *2 (S.D. Fla. Sept. 7, 2005) (citing *TCP Industries, Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 549 (6th Cir. 1981) ("Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible.")).

The effect of this ruling is the exclusion of Pingree's initial report from page 15 through page 23 because in all of those pages he is either expressing an irrelevant opinion, making a legal conclusion, reciting statutory language, or interpreting a contract. Once those pages are stricken, the only sections left of Pingree's report are those summarizing his experience and his comments on the increase in ERISA litigation. Without the final

nine pages of his report, the rest of Pingree's report contains no information relevant to this case. Therefore, the Undersigned **grants** Defendant's request and strikes the **entirety** of Pingree's initial report.

> ii. *Roger Levy[11]*

Roger Levy is a former attorney and current CEFEX analyst.[12] As a CEFEX analyst, Levy performs fiduciary assessments and advises clients on fiduciary best practices, including best practices relating to defined contribution plans.

In Levy's report, he summarizes his ultimate opinions and conclusions:

> Assets held under a group variable annuity contract in an insurance company separate account on behalf of a retirement plan constitute plan assets and are generally held by the insurance company in a fiduciary capacity, and, specifically so, when the insurance company represents that

---

[11]   A copy of Levy's expert report, including his qualifications, is filed in full on CM/ECF. [ECF No. 257-1]. There are no confidentiality-based redactions in this publicly-filed document. The Undersigned's summary of Levy's background and opinions are derived from this exhibit.

[12]   The Centre for Fiduciary Excellence ("CEFEX") offers certificates to Investment Stewards, Investment Advisors, Fiduciary Advisors (United States only), Investment Managers, Retirement Plan Service Providers, and Investment Support Service Providers. *Registration Types* CEFEX, https://www.cefex.org/registration-types.shtml (last visited April 4, 2022). CEFEX's certification indicates that an entity has been assessed typically via document review, client file sampling, and on-site visits and interview with senior representatives to ensure the firm is adhering to a standard representing the best practices in their industry. *What it Means*, CEFEX, https://www.cefex.org/index.shtml (last visited April 4, 2022). "If a firm is CEFEX-certified, it means they follow what's called a Global Fiduciary Standard of Excellence. This means they are required to act in investors' best interests." *What it Means for an Advisor to be CEFEX-Certified*, Rachel Cautero, Feb. 4, 2020, SMARTASSET, https://smartasset.com/investing/cefex (last visited April 4, 2022).

it is acting in a fiduciary capacity when holding such assets.

As a fiduciary, an insurance company must deal with plan assets solely in the interest of the plan's participants and beneficiaries and for their exclusive benefit.

The disposition by an insurance company of foreign tax credits received with respect to mutual fund holdings in a separate account poses a conflict of interest: to use the foreign tax credits for the insurance company's own exclusive use and benefit; or to credit the foreign tax credits back to the separate accounts that generated them and to disclose such foreign tax credits as indirect compensation.

It is a best practice for insurance companies who issue group variable annuity contracts and receive foreign tax credits from mutual funds held in the insurance company's separate accounts to credit such foreign tax credits back to the separate accounts that generated them and to disclose such foreign tax credits as indirect compensation.

The Defendant did not act in accordance with best practice and its conduct was disloyal to the Plaintiffs and to the Romano Law, PL 401(k) Plan, its participants and beneficiaries by: (1) not resolving in their favor the conflict of interest posed by Defendant's access to foreign tax credits resulting from holding in its separate accounts plan assets of the Romano Law, PL 401(k) Plan as a plan fiduciary; and (2) retaining the benefit of foreign tax credits for its own exclusive use and benefit.

Following this section, Levy continues by detailing the facts and assumptions he applied to his analysis to reach these conclusions.

Defendant seeks to strike discrete sections of Levy's report for myriad reasons: (1) paragraphs 11c, 11d, 11e, 18, 24 (second sentence), 25 (first, seventh, and eighth sentences), 26, 27, (first sentence and n.27), and 30 because Levy is unqualified to offer

these opinions; (2) paragraphs 11d, 11e, and 27-30 because the opinions are unreliable; and (3) paragraphs 1, 11a-c, 11e, 13-16, 20-23, 22 n.20, 24 (first and last sentences), 24 n.23, 25 (seventh and eighth sentences), 25 n.24, 30 (second and third sentences), and 30 n.32 because the opinions are impermissible legal conclusions. [ECF No. 257].

### 1.   Levy's Qualifications

In Defendant's view, although Levy has 52 years of experience as a lawyer and as a professional working in the retirement industry, he is unqualified to offer many of his opinions because he hasn't dealt explicitly with FTCs. Plaintiffs argue that Levy's decades of experience in fiduciary best practices qualifies him to offer best practice opinions concerning retirement plans and FTCs even if he has not worked specifically with foreign tax credits in the past. [ECF No. 271]. According to Plaintiffs, Defendant is improperly attempting to impose a requirement that all experts must have hyper-specialized knowledge of subcategories in a field.

Certainly, it might be preferable to retain only experts who have decades of experience in the minutia of a precise topic. However, there is nothing so unique about FTCs that would render an attorney with decades of experience in the retirement field -- and who has advised a heavily ERISA-centric client base on their fiduciary responsibilities and currently operates as a CEFEX analyst performing fiduciary assessments and offering advice on best practices -- *unqualified* to offer an opinion on

ERISA-related best practices merely because the conduct in question implicates FTCs.

By Defendant's logic, one of its own experts, Steven Gissiner, would be unqualified to offer many of his opinions based on this exchange during his deposition:

> Q: Have you published any work regarding foreign tax credits?
> A: No.
> Q: Have you provided expert testimony in any other litigation regarding foreign tax credits?
> A: No.
> Q: And you testified earlier, your work as a consultant over the past 40 years, you have not worked on any issues regarding foreign tax credits; is that right?
> A: No.
> Q: It's not right, or it is right?
> A: I have not.

*See* Deposition of Steven Gissiner, p. 50, 8-20 [ECF No. 265-4].

Experts are not required to have hyper-focused experience in order to be qualified to offer an expert opinion: "so long as the expert is minimally qualified, objections go to the credibility and weight of the testimony, not its admissibility." *Altidor v. Carnival Corp.*, 550 F. Supp. 3d 1322, 1333 (S.D. Fla. 2021) (citing *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009)). Indeed, "'Rule 702 contemplates a broad conception of expert qualifications[,]' as is evidenced by the advisory committee notes thereto 'emphasiz[ing] that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert.'" *Peck v. Carnival Corp.*, No. 16-20214, 2017 WL 7726728, at *2 (S.D. Fla. July 13, 2017) (quoting *Hangarter v.*

*Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004)) (alterations in original).

As stated by the Eleventh Circuit, "[a] witness is qualified as an expert if he is the type of person who should be testifying on the matter at hand." *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 852 (11th Cir. 2021). The plain language of Rule 702 indicates that expert status may be based on "knowledge, skill, *experience*, training, or education." Fed. R. Evid. 702 (emphasis added). Although Plaintiffs bear the burden of demonstrating that Levy's experience renders him qualified, *McCorvey*, 298 F.3d at 1257, the mere fact that Defendant has challenged the degree of his experience with FTCs in particular does not mean Plaintiffs must show some more particularized form of expertise.

District courts regularly qualify experts who have sufficient general experience even when they lack lengthy experience on discrete subtopics in their field. *See, e.g., Altidor*, 2021 WL 3163650, at *7 (permitting civil engineer to offer expert opinion on the mechanics of a cruise ship barstool despite lack of experience with maritime engineering when opponent failed to demonstrate why specialized experience was necessary); *Edmondson v. Caliente Resorts, LLC*, No. 8:15-CV-2672-T-23TBM, 2017 WL 10591833, at *10 (M.D. Fla. Aug. 31, 2017) (finding expert qualified to testify in a Lanham Act case in the field of marketing research and conducting survey evidence despite lack of focus on Lanham Act cases because such focus is not required); *Buccellati Holding Italia SPA v. Laura Buccellati LLC*, No. 13-21297-CIV, 2014 WL 11901585, at *3 (S.D. Fla. Apr. 14, 2014)

(rejecting argument that expert was not qualified because, although he has "little direct work experience in the jewelry or handbag industry," his "extensive experience in the luxury good industry generally" was sufficient and cross-examination was an acceptable means to challenge the opinion).

The Undersigned is satisfied that Levy's substantial experience qualifies him to offer an opinion on the topics he was retained to assess.

2.   Reliability of Levy's Opinions

Defendant seeks to strike certain Levy opinions on the additional basis that the opinions are unreliable. According to Defendant, Levy's best practice opinions are grounded in "nothing more than his own *ipse dixit*."[13] Plaintiffs argue that this worrisome label does not apply to Levy's opinions and that Defendant has not established any reason to believe that disclosure obligations and conflict of interest resolution should be handled any differently than other matters in the retirement field.

---

[13]      "*Ipse dixit* is a Latin phrase that translates to "he said it himself." *Ipse dixit* means a person's own assertion without relying on any authority or proof. It usually implies an assertion of authority, as in a statement is true based on the speaker's authority and not back by any proof." https://www.law.cornell.edu/wex/ipse_dixit (last visited March 23, 2022); *see also Earle v. Ratliff*, 998 S.W. 2d 882, 890 (Tex. Sup. Ct. 1999) ("An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must **explain** the basis of his statements to link his conclusions to the facts.") (emphasis added); *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (on remand), 43 F.3d 1311, 1316 (9th Cir. 1995) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that "the expert's bald assurance of validity is not enough").

A court must be careful not to conflate an expert's satisfactory qualifications with the reliability of the expert's opinions. Although there is overlap between the two factors, they are distinct in their function. The Eleventh Circuit has summarized this interplay as follows:

> Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express. As we observed in *Quiet Technology*, "while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability. ... [O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." 326 F.3d at 1241-42. Quite simply, under Rule 702, the *reliability* criterion remains a discrete, independent, and important requirement for admissibility.

*Frazier*, 387 F.3d at 1261 (en banc).

"If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Id.*

As Plaintiffs' final assertion of reliability, they state "[b]ecause [Levy] has explained how his experience led to the conclusions he reached, the experience was a sufficient basis for the opinion, and he reliably applied his experience to the facts, [] his conclusions are reliable and warrant admission." This claim, however, merely tracks the language of the Committee Note to the 2000 Amendments of Rule 702, which states that

[i]f the witness is relying solely or primarily on experience, then the witness

must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function **requires more than simply "taking the expert's word for it.**"

Fed. R. Evid. 702 advisory committee's note (2000 amends.) (emphasis added).

This argument is difficult to accept because, although Plaintiffs argue that Levy is basing his opinion on his experience and aver that his experience causes him to reach that conclusion, Levy fails to articulate with specificity what in his experience is causing him to reach that opinion. Plaintiffs' response posits that Levy could not rely on CEFEX standards -- which do not address FTCs -- so he relied on other standards. However, as Defendant notes in its Reply, the specifics of these "other standards" are absent from both Levy's report and from Plaintiffs' response.

In assessing the reliability of an expert's particular opinion, the Court should consider, to the extent possible: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341. As mentioned previously, however, these factors are non-exhaustive. *Id.*

The Undersigned finds that the majority of these factors weigh against a finding that the challenged opinions are reliable. Although Levy's theory can be tested, no evidence has been put forth to demonstrate that it *has* been tested. Levy has not cited any

other article or publication that shares his opinion, nor has he provided any publication authored by him on the application of FTCs in qualified retirement plans. Finally, Levy has pointed to no industry standards adopting his view (and Plaintiffs concede that CEFEX -- the standards in Levy's professional employment -- does not address the issue).

Additional factors also cut against the reliability of Levy's opinions on this topic. This case is the first time Levy has offered this opinion on this subject, a status which generates this natural corollary: Levy came to this opinion for the purpose of this litigation. *See Summer v. Biomet, Inc.*, 434 F. App'x 834, 842-43 (11th Cir. 2011) (affirming district court's determination that the fact that an expert's theory appeared to have been arrived at for purposes of the litigation weighed heavily against the opinion's admissibility); *see also* Fed. R. Evid. 702, 2000 amend. note ("Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying" is relevant to determining the reliability of expert testimony) (internal quotation marks omitted).

Moreover, only a single recordkeeping entity, Securian, follows Levy's proposed best practice. Plaintiffs are correct that the most common practice is not the same as the best practice. However, Securian is a lone wolf amongst every other recordkeeper. The lack of industry recognition of this practice further undermines Levy's reliability in the

33

context of a recordkeeper's purported duty under ERISA.

The Undersigned agrees with United States District Court Judge Greg Kays' finding after a bench trial that Levy's testimony should be afforded no weight on this subject matter because the standards he champions, although admirable, are not necessarily the standards of ERISA. *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 696 (W.D. Mo. 2019) (in a bench trial for an ERISA lawsuit alleging claims for breach of fiduciary duty and prohibited transactions, the Court gave "no weight" to Levy's expert testimony and noted that "his approach has not won wide acceptance in the retirement plan industry, with only fourteen to sixteen retirement plans out of approximately 500,000 conforming to these standards").[14]

Because this will not be a bench trial, as in *Wildman*, there is too much risk a jury will be unduly influenced by unreliable expert testimony on this subject. *See generally Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

---

[14] Levy's opinion was that the defendants failed to employ a prudent process when adding and retaining funds in the Plan and that there was a failure to adhere to a set of standards he promotes for **fiduciary conduct.** Nevertheless, and most significantly, Judge Kay explained that "[w]hile the Court agrees with Mr. Levy that fiduciaries should strive to attain the standards he champions, **they are not the standards ERISA requires**." *Id.* (emphasis added).

34

For these reasons, Levy will not be permitted to offer any testimony on the best practices of insurance companies who issue group variable annuity contracts in handling FTCs generated by the mutual funds held in separate accounts. *See also Birse v. Century Link*, No. 17-cv-02872, 2020 WL 1062902, at *7 (D. Col. Mar. 5, 2020) (granting the defendant's summary judgment motion and holding that Levy's opinions could not form the basis of a genuine dispute of material fact regarding whether the defendants breached their fiduciary duties under ERISA because his opinions "are based on an unrelated standard"). Although Defendant's request is targeted and focuses on the specific paragraphs and sentences it believes fall under the "best practice" opinion category, the sections it seeks to exclude are not *all* in the category.

By way of example, the entirety of Paragraph 11d falls within the "best practice" category because Levy states,

> It is a best practice for insurance companies who issue group variable annuity contracts and receive foreign tax credits from mutual funds held in the insurance company's separate accounts to credit such foreign tax credits back to the separate accounts the generated them and to disclose such foreign tax credits as indirect compensation.

In contrast, only the bolded portion of Paragraph 27 falls within the "best practice" category and the remaining section is simply a factual statement:

> **One insurance group, in particular, stands out as representing best practice and acting in the best interest of a plan, its participants and beneficiaries: Minnesota Life Insurance Company and Securian Life Insurance Company, whose annuities are offered through Securian**

35

**Financial Services, Inc., a registered investment advisor (collectively "Securian").** Among the attributes of GVAs offered through Securian is that foreign tax credits are credited back to the separate accounts that generated them. This is described by Securian among its "Client-First investment practices", as follows: Foreign tax credits are credited back to the separate accounts that generated them, resulting in lower separate account expenses and increased performance.

Thus, the Undersigned strikes the best practices opinions in paragraphs 11d, 11e, 27, and 30, and denies Defendant's request as to the other paragraphs on this ground.

### 3. Legal Conclusions

Defendant's final argument in support of excluding certain opinions offered by Levy are that the opinions qualify as impermissible legal conclusions. Specifically, Defendant challenges Levy's statements that John Hancock was a fiduciary of the Plan, that FTCs are indirect compensation within the meaning of ERISA and John Hancock had a duty to disclose them to the Plan, and that John Hancock labored under a legal conflict of interest when it filed its tax returns. Plaintiffs counter that these topics are either assumptions Levy was required to make -- and, thus, not actual opinions -- or are factual, not legal, conclusions.

It is well settled that while experts may offer testimony on ultimate issues of fact, an expert may not offer legal conclusions. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Count, Fla*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) ("[T]estifying experts may not offer legal conclusions[.]"); *see also United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977)

("Rule 704 abolishes the per se rule against testimony regarding ultimate issues of fact. By the same token, however, courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law.").[15]

The reasoning for this principle is simple: "the court must be the jury's only source of law." *Aetna Cas. & Sur. Co.*, 898 F.2d at 1541. For this reason, a witness "may not testify to the legal implications of conduct[.]" *Id.* As a corollary to this rule, it is also impermissible for an expert to "merely tell the jury what result to reach." *Id.* (citing Fed. R. Evid. 704 at committee notes (merely telling the jury what result to reach is not helpful to the jury and therefore is not admissible testimony)). Levy's opinions on Defendant's identified topics run afoul of either one or both of these principles.

To begin, the Undersigned rejects Plaintiffs' contention that any of the opinions Defendant seeks to exclude are questions of fact. Whether something is a plan asset, whether an entity is a fiduciary, and the interpretation of a contract have all been decided to be matters of law. *See, e.g., Pantoja v. Edward Sengel & Song Exp., Inc.*, 500 F. App'x 892, 893 (11th Cir. 2012) (affirming district court's summary judgment ruling that unpaid fringe benefit contributions were not "plan assets" within the meaning of ERISA as a

---

[15]     The Eleventh Circuit has adopted as precedent the decisions of the former Fifth Circuit rendered before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

matter of law); *Cotton v. Massachusetts Mut. Life Ins. Co.*, 402 F.3d 1267, 1278-79 (11th Cir. 2005) (holding that life insurance company was not a fiduciary as a matter of law and claims that it "(a) 'sold Policies and helped establish the Plan,' (b) 'administered, managed, and controlled such Policies,' (c) exercised discretionary authority over plan assets, and (d) 'exercised discretionary authority with respect to plan management and administration'" were merely "conclusions of law"); *Clyce v. St. Paul Fire & Marine Ins. Co.*, 850 F.2d 1398, 1401 (11th Cir. 1987) ("The interpretation of a contract . . . is a question of law within the scope of the trial court's determination.").

Moreover, "[i]f testimony 'track[s] the language of the applicable statute' or uses a term that 'has a specialized legal meaning that is more precise than the lay understanding of the term,' the testimony is an impermissible legal conclusion." *Cordoves*, 104 F. Supp. 3d at 1365 (quoting *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997)) (some alterations in original).

Thus, other opinions -- such as whether FTC retention qualifies as direct or indirect compensation or whether a duty of loyalty has been violated -- are legal conclusions because they are terms defined in ERISA's statutory framework. *See* 29 U.S.C. § 1108 (dd)(AA)-(CC) (defining "compensation," "direct compensation," and "indirect compensation"); 29 U.S.C. § 1104(a)(1)(A)(i)-(ii) (defining the manner in which a fiduciary is required to discharge its duties under its duty of loyalty).

Finally, Plaintiffs' argument in support of allowing this testimony is further undermined by the contrary position they have taken in seeking to strike the opinions of Defendant's experts, David LaRue and Steven Gissiner, on these **same** issues (albeit, with different conclusions) as impermissible legal conclusions. *See* [ECF No. 265 (seeking to strike Gissiner's opinions about "whether [John] Hancock qualifies as a fiduciary under ERISA" and "whether [John] Hancock's retention of the benefit of foreign tax credits constitutes 'compensation' under ERISA")]; [ECF No. 264 (seeking to strike LaRue's opinions "as to whether foreign tax credits constitute 'compensation' under ERISA," "whether foreign tax credits are 'plan assets' under ERISA," and "whether [John] Hancock engaged in a prohibited transaction under ERISA")].

Plaintiffs make a fallback argument that any potential prejudice can be cured through the use of an appropriate jury instruction. For this proposition, Plaintiffs cite *Maiz v. Virani*, 253 F.3d 641 (11th Cir. 2001). *Maiz*, however, does not state that such an instruction permits experts to testify to legal conclusions; rather, it addresses situations and cites cases where district courts through corrective jury instructions have *cured* the error or rendered the error *harmless*. *Id.* at 667-68 (collecting cases). Here, while it is possible that an instruction could cure any error in admitting legal conclusions, the fact that Levy is a lawyer increases the potential that the jury will give undue weight to his improper legal conclusions. Rather than issue a curative instruction, this Court would act

more prudently by not making the error in the first place.

Accordingly, the Undersigned grants Defendant's motion in part and excludes Levy from offering testimony on whether John Hancock was operating as a fiduciary, whether FTC retention is compensation, and whether John Hancock faced a legal conflict of interest and acted disloyally.

Certain paragraphs that Defendant seeks to strike fall outside the above ruling. By way of example, the Undersigned will compare two paragraphs which Defendant seeks to strike: 11b and 11c.

11b states, "[a]s a fiduciary, an insurance company must deal with the plan assets solely in the interest of the plan's participants and beneficiaries and for their exclusive benefit." 11c states,

> The disposition by an insurance company of foreign tax credits received with respect to mutual funds holdings in a separate account poses a conflict of interest: to use the foreign tax credits for the insurance company's own exclusive use and benefit; or to credit the foreign tax credits back to the separate accounts that generated them and to disclose such foreign tax credits as indirect compensation.

The difference between the two paragraphs is that 11b is merely a statement of the law and how a fiduciary must act under ERISA and 11c is a legal conclusion because it makes stated legal conclusions based on the facts of this case, such as FTCs constituting indirect compensation and the existence of a conflict of interest as well as insinuated legal conclusions such as the determination that Defendant acted disloyally by resolving

Levy's defined conflict in its favor. The first type of statement -- (11b) -- is permissible because it is foundational background for why Levy considers certain facts important; the second statement -- (11c) -- is impermissible because it makes a legal conclusion that either usurps the role of the Court or of the jury.

Based on these principles, the Undersigned strikes the following paragraphs (or sentences from paragraphs) from Levy's expert report as part of this ruling: Paragraphs 11c, 11e[16], 22-23, 24 (first and last sentences), 24 n.23 (first sentence), 25 (seventh and eighth sentences), 25 n.24, 30 (second and third sentences), and 30 n.32 because the opinions are impermissible legal conclusions.

### iii.   Barry Mukamal[17]

Mukamal is a Florida-licensed CPA with forty years of experience in the public accounting profession and financial services industry. His areas of expertise include financial accounting, business valuation, forensic accounting in litigation proceedings, economic damages, bankruptcy, and insolvency matters.

---

[16]   In Section III(a)(ii)(2), the Undersigned struck the portion of this paragraph, which opines that Defendant failed to abide by the "best practices." This ruling strikes the section opining that Defendant acted disloyally. As a result of these two rulings, the entire paragraph is stricken.

[17]   A copy of Mukamal's expert report, including his qualifications, is filed in redacted form on CM/ECF. [ECF No. 259-1]. So is his supplemental calculation. [ECF No. 259-2]. The Undersigned's summary of Mukamal's background and opinions is derived from the unredacted portions of those two publicly-filed exhibits.

As Plaintiffs' damages expert, Mukamal opines on the amount he believes Defendant benefited through its use of qualifying FTCs. Mukamal summarizes this opinion in his initial report, as follows:

> Plaintiffs' and the Class's aggregate monetary relief is estimated at $119,661,319 for the period 2013 through 2019, as detailed in Table 4. Prejudgment interest in accordance with IRS rates totals $10,071,284 calculated on a simple interest basis, or $10,576,952 calculated on a quarterly compounded basis, as summarized in Table 5.

In Mukamal's supplemental calculation, he lowers the estimated relief based on newly provided documents but does not alter his substantive analysis or procedure.

Defendant argues multiple reasons for striking Mukamal's opinions: (1) Plaintiffs' disclosure violated Federal Rule of Civil Procedure 26; (2) Mukamal's opinions rely on inaccurate factual assumptions and ignore John Hancock's overall tax position; and (3) Mukamal's opinions rely on an incorrect statement of law provided by Plaintiffs. [ECF No. 259].

### 1.  Rule 26 Disclosure

Defendant argues that Mukamal's report, although timely, does not meet the disclosure requirements of Rule 26. Specifically, Defendant contends that Mukamal's report offered no explanation of what he means by "monetary relief," nor did it explain why Mukamal used various inputs in his calculations. *Id.* Plaintiffs respond that Mukamal's report is more than compliant and, even if it is not, there is no prejudice to

Defendant. In Defendant's Reply, it reiterates many of its main points and further argues

that Plaintiffs have not met their burden to demonstrate lack of prejudice. [ECF No. 282].

Federal Rule of Civil Procedure 26(a)(2)(B) requires an expert report to contain the

following information:

> (i)    a complete statement of all opinions the witness will express and the
>        basis and reasons for them;
>
> (ii)   the facts or data considered by the witness in forming them;
>
> (iii)  any exhibits that will be used to summarize or support them;
>
> (iv)   the witness's qualifications, including a list of all publications
>        authored in the previous 10 years;
>
> (v)    a list of all other cases in which, during the previous 4 years, the
>        witness testified as an expert at trial or by deposition; and
>
> (vi)   a statement of the compensation to be paid for the study and
>        testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).

These obligations do not, however, require a report to detail the entirety of the

expert's trial testimony. *Kleiman*, 2020 WL 6729362, at *7 ("Rule 26(a)(2)(B) does not

require that a report recite each minute fact or piece of scientific information that might

be elicited on direct examination to establish the admissibility of the expert opinion under

*Daubert*. Nor does it require the expert to anticipate every criticism and articulate every

nano-detail that might be involved in defending the opinion on cross examination at a

*Daubert* hearing.") (internal quotations omitted)).

Mukamal's report meets this standard. Defendant says that Mukamal failed to provide his reasoning behind his consideration of certain data. However, the detail provided in his steps -- which is substantial -- makes the reasoning obvious.

Mukamal is not required to include in his report a sentence specifically saying that he is assessing how many FTCs John Hancock used so that he can determine how much John Hancock's tax liability was reduced by FTC use. This can be easily deduced from the graphs itemizing John Hancock's FTC utilization and Mukamal's statement that Defendant "derived a financial benefit to the extent it utilized foreign tax credits generated by the Plaintiffs' assets managed by [John Hancock]. For this same reason, Defendant's criticism about Mukamal's use of the term "monetary relief" is equally unpersuasive; especially given the fact that Mukamal states that "monetary relief claimed by the Plaintiffs are [sic] calculated as the excess of the (i) RPS FTC utilized by [John Hancock] over (ii) taxes paid by [John Hancock] on RPS FTC."

An expert need not provide a pre-opinion glossary defining the obvious terms and procedures in his report in order for the report to be compliant with Rule 26.

Moreover, even if Mukamal's initial report was deficient, the Undersigned finds that any deficiency is harmless. Generally, courts consider four factors when evaluating whether a party's failure to disclose is substantially justified or harmless: "(1) the

importance of the excluded testimony; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, No. 09-60351-CIV, 2010 WL 1837724, at *4 (S.D. Fla. May 3, 2010).

Here, factors one and three weigh heavily in favor of finding any so-called deficiency is harmless. This is Plaintiffs' only damages expert; thus, the testimony is crucial to their case. Finally, the Undersigned finds there would be no prejudice to Defendant if this testimony were admitted. Defendant had an opportunity to take Mukamal's deposition and inquire about the issues it felt were unexplained. Further, any claim of prejudice by Defendant is undermined by the fact that (1) its own expert was able to issue a rebuttal report and (2) it was able to file a comprehensive *Daubert* motion.

For these reasons, the Undersigned denies Defendant's request to exclude Mukamal on this ground.

## 2. Purported Factual Errors

Defendant contends that Mukamal's calculations are premised on material factual missteps which render the entire premise of his calculations completely unreliable. According to Defendant, Mukamal's first factual misstep is assuming that John Hancock receives a dollar-for-dollar reduction for the net-of-foreign-tax income and his second

factual misstep is ignoring the totality of John Hancock's tax position.

In Mukamal's report, he assumes that John Hancock is taxed on only the "grossed-up"[18] amount of the Plan's foreign source income. This is because Mukamal assumes that John Hancock receives a corresponding dollar-for-dollar reduction in its taxes on the net-of-foreign-tax-income by increasing its reserves. According to Defendant, it reports the full amount of foreign income on its taxes, not just the "grossed-up" amount and Mukamal's assumptions to the contrary are speculative and unsupported.

Plaintiffs respond that witnesses from John Hancock's tax department confirmed that, "when income is received in a separate account tied to a retirement plan, [John] Hancock increases its reserves by an offsetting amount, which eliminates the possibility that [John] Hancock pays income taxes on such amounts received in the separate accounts, because reserve increases create a tax deduction." [ECF No. 268 (citing ECF Nos. 268-2 at 108:7-109:10; 122:2-24; 268-3 at 72:2-13)]. This, they argue, more than

---

[18]     The "grossed-up" amount refers to the amount of foreign taxes paid by the plan. By way of example, if a mutual fund receives a $100.00 dividend in foreign income and is taxed at 10%, then the mutual fund will pay 10% in taxes to the foreign government and the remaining $90.00 will go into the mutual fund. Because Defendant is the legal owner of the mutual fund, it reports the full $100.00 dividend as income. This is because under the tax code, Defendant must report the $90.00 that went into the mutual fund and add the "grossed-up" $10.00 that was paid in foreign taxes.

The entire basis of Plaintiffs' lawsuit arises from the reality that, in addition to receiving this tax obligation, Defendant also receives the corresponding $10.00 FTC.

supports Mukamal's assumption.

Defendant takes the position that, although these witnesses both spoke generally on reserve deduction, neither confirmed a *dollar-for-dollar* reduction. Defendant's distinction is unpersuasive. Certainly, if Defendant put forth evidence to *show* that it did not actually receive a dollar-for-dollar reduction, then its position would stand a stronger chance of being well taken. Defendant has not done this, though. Instead, Defendant is taking a "maybe I do, maybe I don't" approach to whether it receives a dollar-for-dollar reduction. This equivocal assertion is insufficient to undermine the foundation of Mukamal's opinion to the point where it cannot be presented to a jury.

The Court's gatekeeper role is not intended to supplant that of the jury: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Allison*, 184 F.3d at 1311 (quoting *Daubert*, 509 U.S. at 596) (alterations in original). "Indeed, 'in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.'" *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1345 (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)).

This type of complained-of flaw (if it is even a flaw) is similar to that addressed in *Quiet Tech.*, where the Eleventh Circuit upheld the district court's decision to admit

evidence challenged as "fail[ing] to use the proper equation" and "that the specific numbers [the expert] used were wrong" because these types of "alleged flaws in [an expert's] analysis are of a character that impugn the accuracy of his results, not the general scientific validity of his methods." *Id.*

Maybe Defendant receives a dollar-for-dollar reduction, maybe it does not receive a dollar-for-dollar reduction. If it does not receive a dollar-for-dollar reduction and has admissible evidence to prove that this is the case, then certainly the area is ripe for Defendant to undermine Plaintiffs' entire damages theory on cross-examination. Defendant's cryptic concerns, however, are insufficient to justify exclusion.

Defendant's next contention (i.e., that Mukamal's opinion is unreliable because it fails to properly take into account John Hancock's overall tax position), suffers from the same flaws as its earlier arguments concerning reductions.

First, Defendant claims that Mukamal didn't account for the fact that its 2017 and 2019 tax returns are still subject to audit. In advancing this argument, Defendant ignores the principle of *Bahr v. NCL (Bahamas) Ltd.*, 19-CV-22973, 2021 WL 4845789 (S.D. Fla. Oct. 18, 2021), a case cited in its reply. *Bahr* supports the proposition that an expert may offer damages calculations based on speculation about future events. Although Defendant's 2017 and 2019 tax returns have been submitted to the IRS, Defendant claims the potential for change -- a speculative future event -- renders Mukamal's opinion flawed to the point

necessitating exclusion.

This, like Defendant's argument on reductions, is properly addressed via cross-examination at trial, rather than complete exclusion.

Second, Defendant claims that Mukamal failed to account for the fact that other provisions of the Internal Revenue Code "impact the extent to which foreign taxes paid result in an FTC and the ultimate impact of any such FTC on the taxpayer's liability." [ECF No. 259]. Defendant alleges that this is a fatal misstep by Mukamal because it files its tax returns as a *consolidated* group, which increases the complexity of its tax filings. As examples of the sections of the tax code it claims Mukamal failed to consider, Defendant cites I.R.C. §§ 38(a), (c); 383(c); and 901(k)(1)(A)(ii).

As Plaintiffs correctly note in their response, "there is no evidence in the record that any other provisions of the [Internal Revenue] Code actually interacted with the FTCs or John Hancock's tax liability to affect the substantial benefit that John Hancock extracted from the FTCs." [ECF No. 268]. The Undersigned also notes that John Hancock has not even *argued* that there is actual evidence that these other provisions impacted its FTC use.

Defendant attempts to paint this line of reasoning as shifting the burden onto it to *disprove* reliability. This is an inaccurate characterization of Plaintiffs' argument. Although the burden is on Plaintiffs to prove reliability, Defendant cannot simply allege

49

speculative tax implications -- which it has not shown have an *actual* impact on the FTCs that Mukamal considered -- and then expect Plaintiffs to counter this speculation.

Mukamal's analysis, when broken down, is fairly simple: (1) How many FTCs did John Hancock have available; (2) How many of the available FTCs originated from qualifying plans; (3) How many FTCs did John Hancock use each year and by how much money did the use decrease its tax obligation; and (4) Was the value decreased by any additional taxes John Hancock had to pay on the "grossed-up" income.

The speculation that (1) John Hancock could have used other deductions, (2) may have other credits available to use in the stead of FTCs, or (3) may sometimes be prohibited from using FTCs is a basis to attack Mukamal's evaluation on cross-examination (if John Hancock can make an evidentiary showing that these tax provisions are relevant, which it has not done in its motion), but it is not a basis to simply exclude the testimony.

### 3.   Purported Legal Errors

Defendant also makes the argument that Mukamal's opinion should be excluded because it is based on an incorrect statement of law provided to him by Plaintiffs' counsel. According to Defendant, the Internal Revenue Code does not allow mutual funds to pass through tax credits; instead, it allows mutual funds to pass through tax obligations. Plaintiffs disagree and argue that Defendant ignores other relevant provisions of the tax

code and is attempting to "foster semantic confusion." Although Defendant filed a Reply addressing many of the arguments raised by Plaintiffs in response to its earlier challenges to Mukamal's opinion, it neglected to address any of the arguments Plaintiffs raised in response to this claim.

While Defendant's argument here focuses on Internal Revenue Code provisions, in the Undersigned's view, this is merely a re-purposing of Defendant's earlier argument that Mukamal erred by assuming John Hancock received a dollar-for-dollar reduction for the net-of-foreign income. In support of its current position, Defendant cites I.R.C. § 853(b)(2)(A)-(B) and argues this means the legal owner of the mutual fund "must include in gross income and treat as paid by him his proportionate share of the foreign taxes paid by the fund, i.e., gross-up the taxpayer's revenue to include foreign taxes paid by the mutual fund." [ECF No. 259] (internal quotations and emphasis removed).

The Undersigned rejects this argument about the "unconsidered tax obligation" for the same reasons I rejected it in Defendant's reliability challenge. While Defendant is correct that I.R.C. § 853 passes through a tax obligation, Mukamal is not incorrect (and Defendant downplays the fact) that it *also* passes through a tax credit. *See* Mertens Law of Federal Income Taxation § 41:19. Foreign Tax Credit (stating that Section 853 allows the mutual fund to "pass[] through to its shareholders a credit or deduction for the foreign taxes it has paid during its taxable year").

51

Despite conceding that, under I.R.C. §§ 853, 901-09, John Hancock "may [] also qualify for offsetting foreign tax credits," it claims that Mukamal erred when he assumed (and opined) that John Hancock "received the benefit of passed-through tax credits instead of a passed through tax obligation." Defendant's argument is internally inconsistent (which is perhaps why it was left out of its reply memorandum). As the Undersigned sees it, it does not seem certain that Mukamal has made a fundamental error on this issue.

Defendant, of course, can challenge this point on cross-examination if it believes the position to be merited. There is, however, no basis to *exclude* Mukamal's testimony on any of the grounds alleged by Defendant.

### iv.   Doctor David W. LaRue, Ph.D.[19]

LaRue is an Emeritus Professor of the University of Virginia, where, for 25 years, he taught graduate and undergraduate courses in the fields of federal taxation, financial accounting, international finance, and economic analysis. He has published several articles and testified on tax issues before the Ways and Means Committee of the U.S. House of Representatives and before the Treasury Department.

---

[19]   A copy of LaRue's expert report, including his qualifications, is filed in full on CM/ECF. [ECF No. 264-2]. There are no redactions in the publicly-filed version of his report. The Undersigned's summary of LaRue's background and opinions is derived from this exhibit.

52

Defendant retained LaRue to "analyze and opine" on assertions made by Plaintiffs in their Class Action Complaint and Motion for Class Certification. LaRue was also asked to provide answers to the following questions posed by defense counsel:

(1) Do U.S. foreign tax credits have any intrinsic, stand-alone economic value?

(2) From an economic perspective, is the value of a foreign tax credit equal to the "face amount of the credit"?

(3) Can one taxpayer's foreign tax credits be sold exchanged, assigned, or allocated, and distributed to another taxpayer?

(4) Were the Foreign Tax Credits at issue in this dispute "assets of the Plan"?

(5) Are U.S. foreign tax credits "compensation" for service rendered?

(6) Did Defendant "improperly [retain], for its own benefit, foreign tax credits . . . arising from assets and investments held for the benefit of the Plan"? Was Hancock "enriched" by "more than $100 million" as a result?

(7) Were the Plan's assets "diminished by the amount of the foreign tax credits retained by Defendant but not credited to the Plan and the income those overcharges would have earned had they been properly credited to the Plan's Account"? Stated differently, was the Defendant's use of these credits to reduce its U.S. taxes "at the expense of the Plan and its participants"?

(8) Would reasonable U.S. investors invest in the stock or securities of a foreign corporation if dividends, interest or capital gains from that investment was expected to incur foreign taxes for which the investor did not expect to receive a foreign tax credit?

Before substantively addressing these questions, LaRue provides an overview of the relevant provisions of the tax code and how these provisions interact with mutual funds similar to the Plan.

Plaintiffs seek to strike discrete paragraphs from LaRue's report on isolated or

overlapping grounds: (1) the opinions in paragraphs 15-93 and 97-102 of LaRue's initial report because they are generalized opinions which are unconnected to the facts of this case; and (2) paragraphs 89-96 of his initial report as impermissible legal conclusions.

### 1.  Generalized Opinions

Plaintiffs claim that paragraphs 15-93 and 97-102 of LaRue's report are irrelevant because the paragraphs concern "the general structure or operation of the U.S. tax code." [ECF No. 264]. Plaintiffs highlight that their claims are brought under ERISA, not under the U.S. tax code. *Id.* Defendant responds that the Complaint concerns its retention of FTCs, which are a creature of the U.S. tax code and that Plaintiffs' own expert, Dr. De Simone, admits that "calculations with respect to foreign tax credits can be very complicated." [ECF No. 276].

Although Plaintiffs argue for the exclusion of 83 paragraphs (approximately 35 pages of LaRue's 99-page report), they provide only two examples of LaRue's purportedly irrelevant opinions: (1) instances where LaRue states the net benefit of FTCs to the usual taxpayer is zero; and (2) LaRue's opinion that FTCs cannot be sold, exchanged, assigned, or allocated to another taxpayer. [ECF No. 264].

The Undersigned disagrees with Plaintiffs in large part and finds that the majority of LaRue's opinions on this subject matter are relevant to the claims and could be helpful to the jury. By way of example, whether FTCs can be sold, exchanged, assigned, or

allocated to another taxpayer, while not determinative, is certainly relevant to Plaintiffs'
claim that FTCs have monetary value. Indeed, if the tax code allowed for the sale or
transfer of FTCs, then it would likely be a focus of Plaintiffs' argument in support of a
determination that FTCs have monetary value.

In other areas, LaRue explains how FTCs originate, when they may be applied to
offset a tax obligation, distinctions between FTCs and other foreign taxes, and the general
tax requirements of a company in John Hancock's position. Certainly, all of these topics
could have an impact on a jury's decision as to whether an FTC has value and, if so, how
much value -- decisions which could impact questions the jury must decide about
monetary value, compensation, and plan assets.

Thus, in the Undersigned's view, the nature of FTCs and how they operate within
the tax system is relevant to this case and is an appropriate topic for expert testimony. *See
e.g.*, Fed. R. Civ. P. 702 committee note ("Most of the literature assumes that experts testify
only in the form of opinions. The assumption is logically unfounded. The rule
accordingly recognizes that an expert on the stand may give a dissertation or exposition
of scientific *or other principles relevant* to the case, leaving the trier of fact to apply them to
the facts." (emphasis added)); *United States v. Barnette*, 800 F.2d 1558, 1569 (11th Cir. 1986)
(permitting an IRS agent to testify about tax consequences of the defendant's actions),
superseded by statue on other grounds, *Blaik v. United States*, 161 F.3d 1341 (11th Cir.

55

1998); *United States v. Tartaglione*. 815 F. App'x 648, 651 (3d Cir. 2020) (experts can provide background testimony to contextualize relevant facts); *In re Trasylol Prod. Liab. Litig.*, 2010 WL 4259332, at *9 (permitting expert to testify about factual basis for FDA drug approval, including by "explaining the regulatory context, defining any complex or specialized terminology and drawing inferences that would not be apparent without the benefit of regulatory expertise").

The large majority of LaRue's analysis in the paragraphs Plaintiffs seek to strike falls within this permissible realm. However, the Undersigned finds that the bullet point under Paragraph 91 and the entirety of Paragraph 98 have little to no relevance to this case because they speak to only the typical taxpayer's use of FTCs, not to a taxpayer in Defendant's situation. Thus, the Undersigned excludes these paragraphs and prohibits LaRue from offering any testimony on the effect FTCs have on the usual or typical taxpayer.

2.  Legal Conclusions

Plaintiffs next seek to exclude LaRue's opinions in paragraphs 89-93 and 94-96 as impermissible legal conclusions. In paragraphs 89-93, LaRue opines that FTCs are not plan assets and in paragraphs 94-96, LaRue opines that FTCs do not qualify as compensation. Despite seeking to prohibit Plaintiffs' experts from offering the contrasting opinions (i.e., FTCs *are* plan assets and *do* qualify as compensation) as legal

56

conclusions, John Hancock argues that these are not impermissible legal conclusions because they are based on the tax code and are appropriate under LaRue's expertise.

Defendant's positions are inconsistent. Here, John Hancock falls victim to the very same gap in logic which it asserted against Plaintiffs in its Reply in support of striking portions of Levy's testimony as legal conclusions. [ECF No. 280 ("[The argument that Levy's opinions are not legal conclusions] cannot be squared with Plaintiffs' own arguments in support of their motions to exclude the testimony and expert reports of John Hancock's experts [as legal conclusions.]")].

Although Defendant attempts to distinguish LaRue's opinions -- by arguing that LaRue is "explain[ing] the policy and purpose behind certain provisions of the [I.R.C.] relevant to FTCs and how those provisions actually work -- this argument is unsupported by LaRue's report and suffers from a relevancy issue, if accurate.

First, LaRue begins paragraphs 89-93 with the following question and answer: "Question 4 Were the Foreign Tax Credits at issue in this dispute 'assets of the plan'? [] Short Answer: No." Likewise, he begins paragraphs 94-96 as follows: "Question 5 Are U.S. foreign tax credits 'compensation' for services rendered? Short Answer: No." In the analysis section of the two sets of paragraphs, LaRue's opinions are replete with legal standard and legal conclusion testimony. As argued by Defendant in its many motions to strike similar opinions by Plaintiffs' experts, this type of expert opinion is inadmissible.

Defendant makes another unpersuasive attempt to distinguish LaRue from Plaintiffs' experts by contending that LaRue's opinions are limited to the tax code. While the tax code is certainly relevant to explain the nature and creation of FTCs, whether something qualifies as compensation or a plan asset under ERISA is to be determined by ERISA's framework, not the Internal Revenue Code. Thus, if, as Defendant argues, LaRue's opinions are whether FTCs are compensation or plan assets under the tax code, then the opinions are also irrelevant. If LaRue's opinions are whether FTCs are compensation or plan assets under ERISA, then the opinions are relevant. Under *either* situation, however, they are impermissible legal standards or legal conclusions.

At bottom, although LaRue can testify as to the facts intrinsic to FTCs that he believes it important for the jury to know, for the same reasons the Undersigned is prohibiting Plaintiffs' experts from offering these opinions, LaRue cannot offer an opinion as to whether FTCs are compensation or plan assets.

## v. Steven Gissiner[20]

Gissiner has worked in the retirement industry for approximately forty years. He previously served in consulting roles managing teams providing recordkeeping and consulting services to clients and provided consulting services to clients directly in the

---

[20]   A copy of Gissiner's expert report, including his qualifications, is publicly filed in full, in unredacted form, on CM/ECF. [ECF No. 265-2]. The Undersigned's summary of Gissiner's background and opinions is derived from this exhibit.

areas of plan design, compliance, administrative procedures, and more.

Currently, Gissiner consults with clients in the areas of retirement plan cost determination and fee benchmarking, understanding and implementing administrative fee arrangements, developing and distributing Requests for Proposals and Requests for Information, monitoring the performance of plan investment funds, and providing consulting and expert witness services in the area of retirement plan fee litigation.

Gissiner's opinions cover the following topics: (1) background on the litigation and an overview of recordkeeping services and FTCs; (2) ability of proposed class members to obtain information on FTC treatment from Defendant; (3) whether additional disclosure of FTC treatment would have affected the number of individuals engaging Defendant's services; (4) whether Plaintiffs' proposed fee concessions would have affected the total charged recordkeeping fees; and (5) whether Defendant's compensation was in line with that of other recordkeepers.

Plaintiffs seek to strike large portions of Gissiner's opinions in his initial report on the basis that the opinions are either irrelevant or are an improper factual narrative.

### 1.   Relevancy of Opinions

Plaintiffs argue that Gissiner's opinions offered in paragraphs 42-63, 64-80, and 91-86 should all be stricken because they bear no "relevance to the actual claims that Plaintiffs have asserted in this case -- specifically, that John Hancock's unauthorized

retention of benefits from foreign tax credits generated by ERISA retirement plans breached its fiduciary duty of loyalty and constitutes a prohibited transaction under ERISA." Defendant takes the opposite position and contends that Plaintiffs' own expert, Levy, also addressed many of these topics.

In the first set of opinions Plaintiffs seek to exclude (paragraphs 42-63), Gissiner opines generally on whether consumers would have chosen a different recordkeeper if John Hancock had provided additional disclosures about its FTC retention practice. Gissiner organizes his opinions under the following headings and subheadings:

V. Based on My Experience, It Is My Opinion that Additional Disclosures of John Hancock's Allowance of Foreign Tax Credits Would Not Have Affected How Many Proposed Class Members and Proposed Class Advisors Evaluated Recordkeepers and Investment Options

A. Foreign Tax Credits Are Not Among the Various Factors Plan Sponsors and Plan Advisors Typically Consider in their Evaluation of Plan Recordkeepers

1. Plan sponsors and plan advisors typically focus their evaluation of recordkeepers on the types and quality of administrative services recordkeepers offer and the overall fee for these services

2. The Request for Proposal processes retirement plans undertake to evaluate recordkeepers do not typically consider foreign tax credits

3. Foreign tax credits are not typically featured among the wide variety of services that recordkeepers advertise

B. Foreign Tax Credits Are Not Relevant Among the Various Factors Plan Sponsors and Plan Advisors of Retirement Plans Typically Consider in

their Evaluation of Plan Investment Options, Including International Funds

1. While plan lineup design and investment option selection varies from plan to plan, most, if not all, plans offer investment options that provide participants exposure to international securities that may pay foreign taxes

2. When evaluating international funds, plan sponsors focus on whether the fund addresses participant needs and not on whether, or to what extent, the fund pays foreign taxes

The substance of Gissiner's opinions tracks closely with the heading and subheading under which the opinion falls.

Defendant argues that these opinions about industry practice are relevant because Plaintiffs base their claims, in part, on "John Hancock['s] . . . alleged failure to 'disclose its receipt and retention of the Plan Foreign Tax Credits.'" [ECF No. 277]. According to Defendant, Gissiner's opinions about the type of disclosures he observes in the retirement industry and his experience as to how plan sponsors and their advisors treat disclosures will assist the trier of fact in determining a fact at issue. Defendant also argues that Plaintiffs' expert, Levy, opines that Securian (the only recordkeeper which credits plans with FTCs) engages in the best practice.

These arguments are unpersuasive. The core issues are whether John Hancock's use of the FTCs was a breach of its fiduciary duty (assuming it had one) and if this use and retention of the FTCs was a prohibited transaction under ERISA. Gissiner's opinions

offer no insight into those issues, nor do they make any relevant fact more or less likely; his opinions, instead, address whether FTCs are a factor considered in choosing a plan, whether anybody would change plans if FTCs were advertised more prominently as a feature, and whether evaluating entities consider FTCs in their evaluation.

Concerning the issue of Defendant's disclosures about its use of FTCs, Plaintiffs have taken inconsistent positions on whether disclosure is relevant. Indeed, as noted earlier, Plaintiffs' counsel provided an unclear answer about whether he would even seek to introduce evidence on the topic.

But, setting aside the issue of whether the disclosure issue will be presented at trial, Defendant successfully obtained the exclusion of Levy's best practices opinion. *See supra* Section III(a)(ii)(2). Therefore, its argument that Levy is being permitted to testify about best practices (and that Gissiner should therefore be afforded the same flexibility) is no longer valid.

Accordingly, Gissiner is not permitted to offer any of the opinions contained in paragraphs 42-63.

Plaintiffs also contend that paragraphs 64-80 should be excluded as irrelevant to the issues in the case. In these paragraphs, Gissiner opines generally on whether a recordkeeping fee concession for FTCs would have affected the total recordkeeping fees charged to members. Gissiner organizes his opinions on this topic under the following

headings and subheadings:

> VI. Based on My Experience, It Is My Opinion that Plaintiffs' Proposed Fee Concessions for Foreign Tax Credits Would Not Have Affected the Total Recordkeeping Fees for Many Plans of the Proposed Class
>
> > A. Recordkeepers Do Not Generally Provide Fee Concessions for Foreign Tax Credits
> >
> > B. Fee Concessions for Foreign Tax Credits Proposed by Plaintiffs Are Unlikely to Materially Change a Plan's Total Recordkeeping Fee
> >
> > > 1. Fee concessions must be evaluated in the context of each Plan's overall recordkeeping fee arrangement.
> > >
> > > 2. Implementing a fee concession for foreign tax credits, as Plaintiffs assert, would not necessarily decrease total recordkeeping fees.
> >
> > C. Foreign Tax Credits Were Not Material to Named Plaintiffs' Recordkeeping Fee Arrangement with John Hancock

The substance of Gissiner's opinions tracks closely with the heading and subheading under which the opinion falls.

Plaintiffs claim that Gissiner's opinions on these topics are irrelevant to either their duty of loyalty claim (and whether there is a conflict of interest) or their prohibited transaction claim. Defendant says these opinions are relevant because ERISA's duty of loyalty provision, set forth in ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), require fiduciaries to "defray[] reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(ii). Because Gissiner's opinions assess whether John Hancock's FTC retention impacted its recordkeeping fees, Defendant says these opinions are relevant to

the requirement it defray the reasonable expenses of administering the plan.

Although Plaintiffs' Class Action Complaint does not mention the defrayment provision or allege that Defendant failed to properly defray the costs, it does include an allegation that "[h]ad Defendant properly exercised its duties, the expenses and fees under the Contract charged against the Assets would have been reduced by the amount of the Plan Foreign Tax Credits." [ECF No. 1, ¶ 62]. Further, in its motion for class certification, Plaintiffs state, "[i]n profiting from foreign tax credits without disclosing them or passing through a commensurate benefit to Plans that generated such credits, John Hancock failed to act solely in the best interest of the Plans and failed to defray reasonable expenses of administering the Plans." [ECF No. 94].

However, as alleged by Defendant in a separate filing addressing Plaintiffs' purported inconsistent positions, Plaintiffs have shifted theories throughout this litigation. [ECF No. 312]. Currently, it is unclear to the Undersigned whether Plaintiffs still intend on proceeding on either of these theories or whether the fact that Mukamal -- Plaintiffs' only damages expert -- addresses only unjust enrichment or disgorgement theories is evidence that they have abandoned this theory of liability and damages.

Because the Undersigned does not know whether Plaintiffs will be proceeding on damages or liability theories which make this testimony relevant, Plaintiffs' request to strike Gissiner's opinions on this subject is denied without prejudice. Plaintiffs may

renew this argument immediately before or during trial.[21]

Plaintiffs' final relevancy argument attacks Gissiner's opinions in paragraphs 81-86. In these paragraphs, Gissiner offers a general opinion on the reasonableness and competitiveness of John Hancock's recordkeeping compensation. Gissiner organizes his opinions on this topic under the following headings and subheadings:

> VI. Contrary to Plaintiffs' Claim, John Hancock's Compensation Was Reasonable and In Line with the Fees Received by other Recordkeepers
>
>> A. Plaintiffs' Claim that John Hancock Received "More than Reasonable Compensation" Is Implausible Given the Competitive Nature of the Retirement Plan Recordkeeping Industry
>>
>> B. John Hancock's Total Plan Fees for the Named Plaintiff Plan at Inception Were in Line with the Total Plan Fees Received by Other Recordkeepers

Again, Gissiner's opinions in the relevant paragraphs tracks closely with the heading and subheading under which the opinion falls.

Plaintiffs' arguments in support of exclusion of these opinions and Defendant's arguments in support of inclusion of these opinions are identical to the arguments made regarding Gissiner's opinions about the effect an FTC concession would have on the recordkeeping fees. The Undersigned's ruling on this issue is the same: it is currently unclear whether Plaintiffs intend on presenting a failure to defray or more-expensive fee

---

[21]     The potential vitality of Gissiner's opinions on these specific issues will, of course, hinge on the Court's ruling on John Hancock's summary judgment motion.

theory, so Plaintiffs' request is denied without prejudice. Plaintiffs may renew this argument immediately before or during trial.

## 2. Improper Factual Narrative

Plaintiffs argue that Gissiner's opinions in paragraphs 75-80 should be excluded because he "simply summarizes deposition testimony and presents it as an opinion." [ECF No. 265].

Gissiner begins this section in paragraph 75 by stating "[d]ocumentary evidence reflects that additional disclosures of John Hancock's allowance of foreign tax credits or fee concessions for foreign tax credits would not have affected the recordkeeping fee arrangement between the Named Plaintiffs and John Hancock for the Named Plaintiff Plan." In the remaining portion of paragraph 75 and in paragraphs 76-79, Gissiner summarizes deposition testimony and available evidence.

Ultimately, in paragraph 80, Gissiner concludes with a near-identical sentence to the first sentence in paragraph 75: "Based on the evidence described above, it is my opinion that additional disclosures of John Hancock's allowance of foreign tax credits or fee concessions for foreign tax credits would not have affected the recordkeeping fee arrangement between the Named Plaintiffs and John Hancock for the Named Plaintiff Plan." Elsewhere in this portion of Gissiner's opinion, it becomes abundantly clear that what Gissiner means by these statements is that, even if Defendant had disclosed its FTC

retention, Plaintiffs (the Romanos, specifically) would not have chosen an alternative recordkeeper:

> Despite having information on foreign tax credits and access to John Hancock's sales representatives, [the Romanos] and Mr. Searcy never sought to renegotiate the recordkeeping fee arrangement between [the Romanos'] Plan and John Hancock throughout the Proposed Class Periods, or to replace John Hancock with a recordkeeper that could incorporate fee concessions for foreign tax credits in its new recordkeeping fee arrangement -- indicating that foreign tax credits are not relevant to how [the Romanos] select recordkeepers or negotiate fee arrangements.

Defendant contends that this section is permissible because it provides necessary background so that the jury can understand how recordkeepers are chosen by plan sponsors and fiduciaries. Plaintiffs note in their reply that Gissiner's conclusion paragraph is devoid of analysis of industry custom or norm.

The Undersigned agrees that this is an improper factual narrative. Gissiner's five-paragraph summary of record evidence leads him to the conclusion that the recordkeeping fee arrangement would not have been altered by FTC retention disclosure. This is not what Defendant argues the opinion is -- an industry custom. Rather, it is a specific opinion about the Romanos' state of mind.

This type of expert opinion is inadmissible. *In re Trasylol Prod. Liab. Litig*, 2010 WL 4259332, at *8 ("The question of intent or motive is a classic jury question and not one for experts."). Although this is not an argument specifically raised by Plaintiffs, Defendant shoulders the burden of establishing the admissibility of its experts' opinions. Its

proffered justification is factually inaccurate, and the offered opinion and the evidence summary are both inadmissible.

For these reasons, Gissiner is prohibited from providing testimony on his opinions contained in paragraphs 75-80.

### b. REBUTTAL REPORTS

A rebuttal expert witness' testimony is permitted under Rule 26 only if it "'contradict[s] or rebut[s] evidence on the same subject matter identified by' an opposing expert." *Teledyne Instruments, Inc. v. Cairns*, No. 6:12-cv-854-ORL-28TBS, 2013 WL 5781274, at *16 (M.D. Fla. Oct. 25, 2013) (citing Fed. R. Civ. P. 26 (a)(2)(D)(ii)); *see also In re Trasylol Prods. Liab. Litig.*, 2010 WL 4065436, at *2 (citation omitted) (stating rebuttal testimony must "directly address[] an assertion raised by an opponent's expert[]"). A rebuttal witness cannot "advance new arguments or new evidence." *Blake v. Securitas Sec. Servs., Inc.*, 292 F.R.D. 15, 17 (D.D.C. 2013) (quotation omitted).

As a result of this principle, in situations where the Undersigned has struck the opinion an expert is seeking to rebut, I will also be striking the rebuttal opinion because, once the originating opinion is eliminated, there is no longer anything to contradict or rebut[22].

---

[22]    Rebut vb. (14c) To refute, oppose, or counteract (something) by evidence, argument, or contrary proof. REBUT, Black's Law Dictionary (11th ed. 2019).

i. *Pingree*[23]

Pingree authored a rebuttal report challenging the opinions of Defendant's expert, Gissiner. In its own affirmative request for relief, Defendant seeks to strike Pingree's report in its entirety or, alternatively, strike isolated portions. [ECF No. 260]. Defendant specifically seeks to: (1) strike pages 4 (beginning at line 5) through 5 (through line 14) and 6 (beginning at line 8) through 7 (through line 3) because Pingree opines on whether John Hancock engaged in a prohibited transaction; (2) strike pages 6 (beginning at line 1) through 7 (through line 3) as impermissible and irrelevant legal conclusions; and (3) strike page 7 (beginning at line 4) through 8 (through line 3) as an impermissible contract interpretation. Defendant also seeks to strike the entire rebuttal report because it is merely a legal argument in response to Gissiner's report.

In the first section Defendant challenges as an improper legal conclusion, Pingree opines about whether John Hancock engaged in a prohibited transaction. This section shares many similarities with -- and is often identical to -- Pingree's prohibited transaction opinion in his *initial* report, which the Undersigned has already excluded, *see supra* Section III(a)(i). In fact, Pingree begins this section by informing the reader that he is "**restat[ing]** the prohibited transaction rules as listed on page 15 through page 16 of

---

[23]   Pingree's rebuttal report is filed in full (without redactions) on CM/ECF. [ECF No. 260-2]. The Undersigned's references to his opinions are derived from this exhibit.

[his] Expert Witness Report." (emphasis added).

In the opinions that follow this introduction, Pingree restates ERISA regulations, implicitly opines that FTCs are compensation, and concludes that "[b]ecause the Defendant failed to disclose the foreign tax credits it received and retained as direct or indirect compensation, the compensation it receives as a result of its agreements with the Plans are not "reasonable", within the meaning of section 408(b)(2) of ERISA, and thus constitute prohibited transactions." These paragraphs contain either unhelpful legal standards testimony or impermissible legal conclusions. For the same reasons the Undersigned struck this type of opinion from Pingree's initial report, I grant Defendant's request to strike it from Pingree's rebuttal.

John Hancock's second request includes the first six lines of page six. Here, Pingree offers legal standard testimony couched with contract interpretation ("Nothing in the disclosed materials indicates that the Defendant described the economic benefit produced by foreign tax credits received by it from the investment of Plan assets") and a legal conclusion ("The Defendant's failure to make such disclosure required to secure the exemptions renders its contract or arrangement with the Plan unreasonable under 408(b)(2) of ERISA . . ."). For the same reason I granted Defendant's request to strike similar opinions in Pingree's initial report and from other expert's opinions, I grant its request to strike this section as well.

Defendant next seeks to strike the pages from Pingree's rebuttal in which he opines on whether John Hancock complied with the Plan Contract. In this section of Pingree's rebuttal report, he begins by stating, "[f]urther it *can be argued* that the Defendant has failed to conform to its own contracts . . ." and ends by stating "the Defendant has *arguably* violated its own promise to disclose and adjust its fees 'from all revenue it derives from the investment of Plan assets.'"

To begin, the equivocal nature of Pingree's opinion on this subject (i.e., "*can* be argued" and "*arguably* violated" renders it unduly speculative and of no assistance to the trier of fact. *See Allison*, 184 F.3d at 1319-21 (affirming exclusion of expert's opinion that there was a *possibility* that the plaintiff's breast implants played a role in her medical improvement because the degree of certainty was insufficient) (emphasis added); *Bowers v. Norfolk Southern Corp.*, 537 F. Supp. 2d 1342 (M.D. Ga. 2007) (expert's opinion that the plaintiff "*may* have injured his back while sitting on a locomotive seat" conveyed only that something is "merely possible, not probable" which did not "logically advance a material aspect" of the plaintiff's case) (emphasis supplied).

However, even if the opinion had been provided in a more-certain way, the Undersigned agrees that this opinion amounts to no more than contract interpretation and the Undersigned therefore grants Defendant's request. *Loeb v. Hammond*, 407 F.2d 779, 781 (7th Cir. 1969) ("The question of interpretation of the contract is for the jury and

the question of legal effect is for the judge. In neither case do we permit expert testimony.").

Defendant also takes the position that the entirety of Pingree's rebuttal report should be stricken as pure legal argument. In support of this position, Defendant contends that Pingree's report reads more like a *Daubert* motion than it does like a rebuttal expert report. As Defendant correctly notes, Plaintiffs do not directly address this argument in their response.

The Undersigned has already found it appropriate to strike the entirety of Pingree's initial report for myriad reasons. I have also found it appropriate to strike large sections of Pingree's rebuttal report for offering the same impermissible opinions from his initial report. The Undersigned agrees with Defendant that Pingree's rebuttal report reads like the rebuttal report excluded in *Cordoves*, 104 F. Supp. 3d at 1365. Moreover, Plaintiffs have also failed to respond to Defendant's argument on this point. *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) ("[A] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him.").

Because Pingree's report is riddled with impermissible legal conclusions and is written more as if Pingree is an attorney seeking exclusion of Gissiner's initial report than

as an expert challenging those opinions, I grant Defendant's request to strike the entirety of Pingree's rebuttal report.

ii. *Levy*[24]

Levy authored a rebuttal report addressing many of the opinions offered by Defendant's expert, Gissiner. In its *Daubert* motion seeking to strike targeted opinions in Levy's initial report, Defendant also seeks to strike portions of Levy's rebuttal report. Defendant specifically seeks to: (1) strike paragraphs 4 (fourth and fifth sentences), 6 (third through sixth sentences), and 8 (second and third sentences) because Levy is not qualified; (2) strike paragraphs 4 (first through third sentence) and 6 (third through sixth sentence) as unreliable or irrelevant; and (3) strike paragraphs 1, 4 (fourth and fifth sentence), and 7 (second and third sentence) as legal conclusions.

John Hancock's first argument is based on its position that Levy is unqualified. The Undersigned already rejected that argument in my discussion of Levy's initial report and does so again here for the same reasons. *See supra* Section III(a)(ii)(1).

In the next section, Defendant seeks to strike portions of Levy's rebuttal which it claims are unreliable or irrelevant. On these issues, the Undersigned previously determined that Levy's opinions on the best practices of a fiduciary in handling FTCs

---

[24]     Levy's rebuttal report is filed in full (in unredacted form) on CM/ECF. [ECF No. 257-2]. The Undersigned's references to his opinions are derived from this exhibit.

73

generated by a mutual fund in a separate account are unreliable. *See supra* Section III(a)(ii)(2). While the third through sixth sentence of paragraph six address this issue (and are impermissible), the first through third sentence of the fourth paragraph address only the industry practice in plan negotiation and investigation, which could be helpful to the jury.

Therefore, the Undersigned grants in part this request and strikes only the third through sixth sentence of paragraph six of Levy's rebuttal report.

Defendant next seeks to prohibit Levy from offering purported legal conclusions in his rebuttal report. Levy's rebuttal report (and Defendant's argument on the issue) addresses many of the same impermissible legal conclusions the Undersigned has struck from the reports of other experts, i.e., FTC definition and conflicts of interests.

First, the Undersigned rejects Defendant's request to strike the first paragraph of Levy's rebuttal report because it is not a legal conclusion, it is merely a statement of why Levy was retained. However, the Undersigned grants Defendant's request as to the fourth and fifth sentence of paragraph four and the second and third sentence of paragraph seven because they speak only to the impact of FTCs (and whether Defendant has a duty to disclose them) and John Hancock's alleged conflict of interest (which he

concludes requires disclosure). Both of these opinions constitute legal conclusions.[25]

### iii. LaRue[26]

Although LaRue authored only one rebuttal report, he offers rebuttal testimony to three of Plaintiffs' experts: Levy, Pingree, and Mukamal. LaRue's report is divided into sections and each section concerns the opinions meant to rebut only a single expert.

Plaintiffs seek to strike paragraphs 9, 14, and 15-60 on the basis that LaRue is not an ERISA expert and is therefore unqualified to offer opinions on ERISA; paragraphs 45-53 as an impermissible legal conclusion on whether FTCs are plan assets; and 54-55 as an impermissible legal conclusion on whether John Hancock engaged in a prohibited transaction.

Paragraph 9 is not an ERISA opinion; it is a statement about what LaRue believes Plaintiffs' experts are saying -- that FTCs are compensation or revenue -- and a statement that their assertion is without support. While the Undersigned disagrees with Plaintiffs' characterization of paragraph 9, Plaintiffs' experts are prohibited from offering the opinions underlying this specific rebuttal, so I am striking this paragraph on that ground.

---

[25] It is also appropriate to strike paragraph seven in its entirety because it seeks to rebut paragraphs 42 through 63 of Gissiner's report, which was stricken earlier in this Order. *See supra* Section III(a)(v)(1).

[26] LaRue's rebuttal report is filed in full (with no redactions) on CM/ECF. [ECF No. 264-3]. The Undersigned's references to his opinions are derived from this exhibit.

Although Plaintiffs seek to strike paragraph 4 on the grounds that it is an ERISA opinion and LaRue is unqualified to offer ERISA opinions, a reading of the paragraph reveals that LaRue is merely discussing Defendant's tax status. Here, LaRue states,

> Mr. Levy also fails to recognize or acknowledge that the JHFC consolidated group was subject to U.S. federal income taxes on the grossed-up foreign-source income that [John] Hancock derived from the RPS assets, and that but for the allowance of a credit for foreign income taxes imposed on such income, [John] Hancock would have been double-taxed on some or all of its RPS foreign-source taxable income, a result clearly at odds with the U.S. tax policy supporting the allowance of foreign tax credits.

LaRue is qualified to offer this opinion and it does not implicate ERISA. Therefore, Plaintiffs' request to strike this paragraph is denied.

Paragraphs 15-26, likewise, are not ERISA opinions. But these opinions do, however, contain impermissible legal conclusions on revenue, indirect compensation, plan assets, and conflicts of interest, all of which were struck from Levy's testimony. *See supra* Section III(a)(ii)(3). Thus, the opinions in these paragraphs are struck because the opinions which they are meant to rebut have also been struck.

Paragraphs 27-32 contain an opinion on ERISA best practices, which is outside LaRue's expertise. *See generally* [ECF No. 264-3 (stating that "'[b]est practice' is not an ERISA term of art . . . insurance companies, like all companies, have several constituencies to which they owe various duties and obligations . . . [and] [i]t is difficult to see how a practice that systematically fails to recognize, respect, and balance its legal, contractual

and ethical obligations to each of the company's constituencies can be considered a 'best practice'")]. LaRue's opinion is also rebutting Levy's best practice opinion, which has been struck. *See supra* Section III(a)(ii)(2). Thus, the opinion in these paragraphs is also excluded.

Paragraphs 33-60 all concern Pingree's expert report, which has been struck in its entirety. *See supra* Section III(a)(i). Thus, the Undersigned also strikes LaRue's rebuttal opinions on these issues.

The Undersigned denied Defendant's request to strike Mukamal's opinions and Plaintiffs have not asserted any independent ground to strike LaRue's opinions rebutting those of Mukamal. Therefore, LaRue may offer all opinions meant to address the contents of Mukamal's report and supplemental report.

      *iv.  Gissiner*[27]

In addition to his initial report, Gissiner also authored a rebuttal report in response to the opinions offered by Plaintiffs' experts, Levy and Pingree. Plaintiffs' arguments in support of striking Gissiner's rebuttal opinions are similar to some of their arguments made in support of striking Gissiner's initial opinions. Specifically, Plaintiffs claim that Gissiner's rebuttal report contains impermissible legal conclusions and narrative

---

[27]    Gissiner's rebuttal report is filed in full (without redactions) on CM/ECF. [ECF No. 265-3]. The Undersigned's references to his opinions are derived from this exhibit.

testimony.

Concerning their first argument, Plaintiffs ask that this Court strike paragraphs 4-17 as impermissible legal standard testimony.

In paragraph 4, Gissiner addresses Levy and Pingree's opinions that John Hancock was required to disclose its use of FTCs, pass on the benefits of FTCs, and resolve any conflicts of interest in favor of the Plan. Although Gissiner does not offer an actual opinion in this section, other than to say that the opinions of Plaintiffs' experts rest on an incorrect assumption about John Hancock's discretionary authority, the Undersigned will still strike this paragraph because it is premised on opinions that Plaintiffs' experts have been precluded from offering. *See supra* Sections III(a)(i); III(a)(ii)(3).

In paragraphs 5 and 6, Gissiner states generally that John Hancock did not serve as an ERISA 3(21) or 3(38) investment fiduciary to the Plan. This opinion is a counter to Levy and Pingree's opinions that John Hancock was a fiduciary without limits. Although some of Gissiner's opinions on this topic are appropriately based on industry practice and understanding, it is also filled with impermissible legal conclusions about contract interpretation and John Hancock's purported status as a fiduciary. Because this type of testimony is impermissible and Plaintiffs' experts have been prohibited from offering similar testimony, the Undersigned strikes these paragraphs from Gissiner's rebuttal report.

Paragraphs 7 through 10 provide Gissiner's rebuttal to Levy and Pingree's opinions regarding industry customs and the interpretation of the recordkeeping agreement. Gissiner begins by stating that industry professionals would, among other things, not expect John Hancock to provide fee concessions for foreign tax credits. He follows this by opining on how the recordkeeping agreement describes the limits of John Hancock's discretionary authority. Pingree's entire report has been excluded and Levy's best practice opinion has been excluded, which means that Gissiner's opinions offered in these paragraphs no longer have an underlying opinion to rebut. Thus, the Undersigned strikes these rebuttal opinions on that ground and as impermissible contract interpretation. *Peterson*, 753 F.2d 1016 at 1018.

Gissiner continues to interpret the Plan's recordkeeping agreement in paragraphs 11 through 14, this time expanding his analysis by providing excerpts from four other companies' recordkeeping agreements and opining that these isolated paragraphs support the contention that "it is common for recordkeeping agreements between other recordkeepers and plan sponsors to include language stating that the recordkeeper does not have any discretion over plan assets."

He uses this assessment to support his conclusion in paragraph 14 that retirement industry professionals would not consider John Hancock to be a fiduciary in this situation. These opinions are impermissible for the same reasons other similar opinions

throughout this Order have been stricken. *See supra* Section III(a)(i); Section III(a)(ii)(3).

Finally, in paragraphs 15 through 17, Gissiner opines about whether FTCs constitute revenue or compensation. This is an impermissible legal conclusion.

Plaintiffs' remaining argument focuses on paragraphs 26 through 28, which they say is an impermissible narrative. Unlike in Gissiner's initial report, here, he doesn't merely recount deposition testimony and documentary evidence; instead, he describes the availability of information in industry practice and uses Plaintiffs' experiences as an illustration. This is not impermissible narrative testimony.

However, paragraphs 26 through 28, as well as paragraphs 21 through 25, offer an opinion meant to rebut a Pingree opinion. Because Pingree's expert report has been struck in full, the Undersigned also strikes these paragraphs and any other opinions offered in rebuttal to a Pingree opinion. *In re Trasylol Prods. Liab. Litig.*, 2010 WL 4065436, at *2. Likewise, Gissiner's opinions in paragraphs 18-20 are excluded because they offer an opinion meant only to rebut Levy's best practice opinion (which has been excluded). *Id.*

The cumulative effect of these rulings is exclusion of the entirety of Gissiner's report except for two sections: the materials reviewed and introduction sections. Because the totality of his substantive rebuttal opinions have been struck and there is no need for the two remaining sections, the Undersigned strikes the entirety of Gissiner's rebuttal report.

*v.  Dr. Lisa De Simone*[28]

De Simone is currently an Associate Professor of Accounting at the McCombs School of Business at the University of Texas at Austin, where she teaches a variety of international tax and financial planning courses. Before beginning that role in July 2020, De Simone served as either an Assistant Professor or Associate Professor of Accounting at the Graduate School of Business at Stanford University from 2013 through 2020. De Simone has a BA in economics and German studies from Stanford University, an MS in accounting from the University of Missouri-Kansas City, and a PhD in accounting from the University of Texas at Austin.

De Simone's report is meant to rebut LaRue's opinions provided in response to the first, fourth, fifth, sixth, and seventh questions posed to him by defense counsel. Specifically, De Simone offers rebuttal opinions on the manner in which John Hancock obtains FTCs, the manner in which John Hancock can use FTCs, the impact FTCs have on John Hancock's required financial reporting as a publicly traded firm, and on whether FTCs have monetary value and constitute compensation.

Defendant first seeks wholesale exclusion of De Simone's report on the ground that it is an affirmative report masquerading as a rebuttal report. [ECF No. 258]. As

---

[28] A copy of De Simone's rebuttal expert report, including her qualifications, is filed in full (in unredacted form) on CM/ECF. [ECF No. 258-1]. The Undersigned's summary of De Simone's background and opinions is derived from this exhibit.

fallback arguments, Defendant seeks to exclude discrete sections of De Simone's opinions on the basis that the opinions are unreliable and speculative or are legal conclusions. *Id.* In Plaintiffs' view, Defendant's challenges to De Simone's opinions are "each entirely devoid of merit." [ECF No. 269].

### 1.  Nature of De Simone's Report

According to Defendant, "De Simone's opinions in her report are nothing more than those of an initial expert . . . [and] Plaintiffs are trying to improperly shoehorn her opinions as 'rebuttal.'" Plaintiffs respond by providing examples of opinions in De Simone's report which they claim rebut opinions offered by LaRue. Defendant contends, however, that these examples show only that De Simone was opining on the same subject matter, not that she was rebutting actual, substantive opinions offered by LaRue. [ECF No. 281 (titling its reply subsection: "Even Though the De Simone Report Covers Some of The Same Topics as Dr. LaRue's Report, it is Still Not a Rebuttal Report")].

Although the section of De Simone's report immediately following her background section is titled "Rebuttal Opinions Regarding Questions 1 and 4-7 in the LaRue Report," the substance of her discussion does not *specifically* reference any of the opinions in LaRue's report. De Simone's lack of LaRue-focused discussion, in Defendant's opinion, demonstrates that her report is merely a dressed-up, late, affirmative report. Plaintiff, however, points to the following examples of rebuttal

opinions:

> [LaRue] opines that FTCs do not have any intrinsic, stand-alone economic value. Ex. B (LaRue Rept.) at 3 (Question 1). [De Simone] disagrees, opining that they do have economic value, even when they are not utilized against foreign-source income. [ECF No. 258-1, ¶41].

> [La Rue] opines that foreign tax credits are not assets of the plan. Ex. B (LaRue Rept.) at 5 (Question 4). [De Simone] contends they are. [ECF No. 258-1, ¶40].

> [LaRue] opines that foreign tax credits are not compensation for services rendered. Ex. B (LaRue Rept.) at 7 (Question 5). [De Simone] opines that they are. [ECF No. 258-1, ¶42].

> [LaRue] opines that [John] Hancock was not enriched from the retention of FTCs. Ex. B (LaRue Rept.) at 7 (Question 6). [De Simone] opines to the contrary. [ECF No. 258-1, ¶42].

> And [LaRue] opines that the FTCs were not used at the expense of the plan. Ex. B (LaRue Rept.) at 7 (Question 6). Whereas [De Simone] recognizes that they were. [ECF No. 258-1, ¶46].

[ECF No. 269].

In Defendant's view, there are myriad reasons why the Court should not be persuaded by these examples. In general, Defendant's counterarguments focus on (1) the fact that De Simone does not directly mention LaRue's opinions as she offers her own; (2) its view that LaRue's opinions are based exclusively on the tax code and De Simone's are based, in part, on ERISA; and (3) an argument that De Simone did not actually offer the opinion Plaintiffs provided as an example.

These arguments all fail for the same type of flawed reasoning: they too narrowly

construe the requirements of a rebuttal report; they too narrowly view the opinions offered by LaRue; and they too narrowly view the opinions offered by De Simone.

Under Defendant's contention, a rebuttal report would need to follow this format to be admissible: first, identify with particularity the opinion stated by the opposing expert (and include the opposing expert's name); second, identify the flaw in the opposing expert's reasoning and apply a different standard or reasoning; and, finally, reach a contrary or different result.

The Federal Rules do not require this type of specific formula. Rather, they require only that the evidence "is intended solely to contradict or rebut evidence on the same subject matter." Fed. R. Civ. P. 26(2)(D)(ii). An expert is improperly classified as a rebuttal expert only "where the rebuttal reports are not offered to rebut the *subject matter* of the [opposing party's] expert opinions" and are, instead, used "to present new legal theories or better experts than those it identified initially." *ITT Corp. v. Xylem Grp., LLC*, No. 1:11-CV-3669-WSD, 2012 WL 12871632, at *5 (N.D. Ga. Oct. 15, 2012) ("The opinions and conclusions of Defendant's initially disclosed experts and those identified in rebuttal are similar, but have nuanced differences and the differences in the rebuttal reports, while nuanced, still are offered to rebut the opinions and conclusions offered by Plaintiffs' identified experts.").

Here, Defendant does not identify any new legal theories presented by De Simone,

nor does it explain how this report is simply a better version of one of Plaintiffs' other experts. Rather, Defendant focuses its position on the fact that De Simone does not address LaRue's report in an obvious fashion and states that the fact "De Simone covers some of the same topics as [LaRue] does not transform [her report] into a rebuttal report."

Contrary to Defendant's position, its strict formula for an expert report is not required. *Lebron v. Royal Caribbean Cruises, Ltd.*, No. 16-24687-CIV, 2018 WL 3583002, at *3 (S.D. Fla. July 26, 2018) (rejecting arguments that expert was not a proper rebuttal expert because he did "not discuss MacLaughlin's report or conclusions at all and does not address MacLaughlin's examination findings," he "fail[ed] to directly address an assertion raised by an opponent's expert," and he "was not even aware that he was going to be called as a rebuttal witness to MacLaughlin").

Because De Simone's opinions do not advance any new evidence or legal theories, and, in fact, cover the same subject matter as LaRue, her opinions are permissible to rebut LaRue's opinions in his initial report. Therefore, the Undersigned rejects John Hancock's contention that her rebuttal report is actually an impermissibly tardy initial report.

### 2.   Unreliable and Speculative

Defendant levies the same attack on De Simone's opinions that it made in its request to exclude Mukamal's opinions: "[S]he ignores the well-establish fact that JHFC calculates its tax liability on a consolidated basis, of which John Hancock (and its RPS

business) is only one part." Defendant contends that this issue is compounded by De Simone's failure to review the deposition transcripts of the three witnesses from its tax group and her failure to review the foreign tax credit forms produced in this case.

These arguments are even less persuasive than they were when used to challenge Mukamal's opinions. Unlike Mukamal, De Simone does not offer a specific damages calculation. Her opinions, instead, address the inherent characteristics of FTCs as applied to mutual funds and retirement plans, and their general function in the tax code. Moreover, as Defendant concedes, De Simone states in her deposition that this type of information -- John Hancock's overall tax position -- "was not particularly important within the scope of [her] opinion."

As an example of why this purported error warrants exclusion, Defendant points to years when it was not allotted any FTCs despite FTCs being available. However, Defendant has not shown how this information (even if not properly considered) actually impacts De Simone's opinion. As Plaintiffs note, "conspicuously absent from John Hancock's attack is any suggestion that the information in those documents would refute her opinions."

Defendant's response to this point is that "the question at this juncture is not the weight a fact-finder should give Dr. De Simone's testimony, but rather whether her testimony is reliable and therefore admissible under *Daubert*." Based on this statement, it

86

is unimportant to Defendant whether De Simone's opinion is accurate -- because that would go only to the weight -- and it is sufficient to exclude testimony based on a party's claim that additional information should have been considered.

This position is untenable with the purpose of *Daubert*. A party cannot obtain wholesale exclusion of an expert's opinion based on its own claim that certain information not considered by the expert is *necessary* without explaining why it is necessary or how its omission impacts the opinion. If that were the case, then exclusion would likely occur as a matter of course in nearly every case because the opposing side would simply allege that the opposing expert failed to consider some fact that it believes (or claims to believe) to be a necessary component of the opinion.

Certainly, if these additional facts are a necessary foundation for De Simone's opinion to be valid, then John Hancock or its expert (if the opinion has been properly disclosed) can explain the facts' necessity to the jury (because it has failed to explain the necessity to the Court), and Defendant can use "vigorous cross-examination" to test De Simone's conclusions. *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341.

Defendant also argues that De Simone offers speculative opinions because they are based on an "oversimplified hypothetical that is untethered to the actual facts of this case" and because she uses hedging language such as "typically" or "generally."

Although Defendant may believe De Simone's hypothetical to be oversimplified,

she is not offering a damages opinion. Instead, she is rebutting LaRue's general opinion
-- which, at times, addresses general FTC principles -- on FTCs, their function, and their
characteristics. There is no requirement that, in explaining the characteristics of FTCs, De
Simone employ a hypothetical identical to the situation Plaintiffs' Complaint confronts.
It is sufficient that the opinion or hypothetical, in addressing the same topic as LaRue, is
helpful to the jury in explaining the function of FTCs.

Further, as Plaintiffs correctly emphasize, LaRue's expert report is riddled with
the same (or similar) type of hedging language which Defendant challenges in seeking to
exclude De Simone's opinions. Defendant attempts to distinguish this fact by pointing
out that LaRue uses this language in the context of background information and De
Simone uses it in the context of her opinions.

In De Simone's report, she states that

For an employee retirement plan governed by a group annuity contract, the
amount of the reserve will *typically* be equal to the net asset value held in
the separate account. Thus, payments by the insurance company to a
separate account for an employee retirement plan governed by a group
annuity contract will *generally* increase the reserve and therefore result in a
deduction for the insurance company.

[ECF No. 258-1 (emphasis added)].

In LaRue's report, he opines that

The economic benefit that a U.S. taxpayer typically derives from qualifying
for and claiming its foreign tax credits is, therefore, literally and
figuratively, netted out, dollar-for-dollar, against the economic detriment

that the taxpayer would otherwise have incurred by paying, in full, U.S. taxes on the foreign-source income that gave rise to the creditable foreign taxes.

\*\*\*

But for the allowance of a credit for foreign income taxes imposed on such income, [John] Hancock may have been double-taxed on some or all of that income . . .

[ECF No. 264-2].

Notably, DeSimone's and LaRue's "hedged" opinions about double taxation and reserves both deal, in part, with the issue about the effect the mutual funds have on John Hancock's tax liability and whether John Hancock actually pays its own U.S. taxes on the increase in value of its separate accounts. And, most importantly, both opinions used the same "hedging" language of which Defendant complains. At bottom, the Undersigned sees no difference by the location of the language -- whether in the background or opinion -- because the language implies only that there may be circumstances where this conclusion or procedure (to reach a conclusion) does not apply, both of which impact the certainty of the conclusion.

Moreover, the cases cited by Defendant do not support its contention that the mere presence of hedging language warrants exclusion. For example, in *Frazier*, 387 F.3d at 1265, the Eleventh Circuit affirmed the exclusion of testimony where it was unclear from the expert's report or deposition whether the term "expect" meant "more likely than

89

not[,]" "substantially more likely than not[,]" "or that discovery was a virtual certainty."

Likewise, in *Edwards v. Shanley*, 580 F. App'x 816, 824 (11th Cir. 2014), the appellate court

affirmed the exclusion of testimony because the expert refused to define the term

"prolonged" as used in his deposition other than saying it was "more than 60 seconds"

and "probably more than 90 second[,]" stating, "I'm not going to give a specific number,

because truthfully I can't." (internal quotations omitted).

The uncertainty and lack of specificity provided by the experts in those cases is

markedly different than De Simone's mere use of the terms "typically" or "generally."[29]

---

[29]   The language in De Simone's and LaRue's opinions is also different from Pingree's use of the term "arguably" or the phrase "it could be argued," which the Undersigned determined is a separate basis to strike sections of Pingree's opinions. *See supra* Section III(b)(i).

The terms "typically" and "generally" both invoke a stronger degree of confidence than the term "arguably," which is more akin to the words "possibly" or "maybe." 29 Wright & Gold, Fed. Prac. Proc. § 6264 (2009) ("Courts generally also defer to the jury's ability to weigh the evidence where an expert's opinion is equivocal. For example, an expert may give an opinion that there is a causational link between defendant's activities and plaintiff's injuries, but the expert may be unable to state the opinion with a high or even reasonable degree of medical certainty. In such a case, most courts will admit the opinion while permitting cross-examination to reveal for the trier of fact the expert's uncertainties. But courts will reject expert testimony where it is based on rank speculation."); 2 MICHAEL GRAHAM, HANDBOOK OF FEDERAL EVIDENCE, § 702.1 (4th ed. 1996) ("While questions to an expert designed to elicit an opinion as to a fact of consequence including an expression of his estimate of probabilities of the facts expressed in the opinion are frequently couched in terms of reasonable certainty, such phraseology is generally not mandated.") CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, MODERN EVIDENCE, § 7.6 (1995) ("The fact that an expert cannot be categorical, and admits some uncertainty in his conclusions, does not mean his testimony fails the

90

Therefore, the Undersigned denies Defendant's request to strike De Simone's opinions on these grounds. Any problems with the equivocal or general language can be handled in cross-examination.

3.   <u>Compensation and Plan Assets</u>[30]

In De Simone's report, she offers opinions on whether FTCs are compensation within the meaning of ERISA and whether FTCs are Plan Assets. Throughout this Order, the Undersigned has prohibited the parties' experts, including LaRue, from offering opinions on these two issues on the basis that they are legal conclusions. Because LaRue has been prohibited from offering his opinions on the issues (which means there is no longer an opinion to rebut) and because De Simone's opinions are also improper legal conclusions, the Undersigned grants Defendant's request to exclude De Simone from offering these two legal-conclusion opinions.

---

helpfulness requirement . . . . Where reasons for reservations can be made intelligible to a lay jury, it is entirely appropriate to let the expert lay them out so the jury may better evaluate his testimony and reach its own conclusion as to its worth. On the other hand, uncertainty that is so acute that the testimony would amount to little more than a guess or a shrug does not implicate the helpfulness criterion, and it may properly be excluded as unhelpful.")

[30]   Defendant also raises alternative challenges to these opinions. Specifically, Defendant claims that the opinions are irrelevant, were not properly disclosed, or that De Simone is not qualified to offer the opinions. Because the Undersigned is excluding the opinions on the grounds that they are impermissible legal opinions and on the grounds that LaRue's companion opinions have also been excluded, I decline to reach the merits of these other arguments.

## IV.    CONCLUSION

Based on the foregoing, the Undersigned Orders as follows:

(1) Defendant's Motion to Exclude the Testimony of Bruce Pingree is **granted**. The

   opinions in Pingree's initial and rebuttal reports are stricken in their entirety;

(2) Defendant's Motion to Exclude the Testimony of Roger Levy is **granted in part**

   **and denied in part**. Levy may not offer the best practice opinions contained in

   paragraphs 11d, 11e, 27, and 30 of his initial report; he may not offer any of the

   opinions contained in 11c, 11e, 22-23, 24 (first and last sentences), 24 n.23 (first

   sentence), 25 (seventh and eighth sentences), 25 n.24, 30 (second and third

   sentences), and 30 n.32 of his initial report; and he may not offer any of the

   opinions contained in paragraphs 4 (fourth and fifth sentence), 6 (third through

   sixth sentence), and 7 (second and third sentence) of his rebuttal report;

(3) Defendant's Motion to Exclude the Testimony of Barry Mukamal is **denied**;

(4) Defendant's Motion to Exclude the Testimony of Dr. Lisa De Simone is **granted**

   **in part and denied in part**. De Simone may not offer any opinions about

   whether FTCs are compensation or plan assets;

(5) Plaintiffs' Motion to Exclude the Testimony of Dr. David LaRue is **granted in**

   **part and denied in part**. LaRue may not offer the opinions contained in the

   first bullet point under paragraph 91 or the entirety of paragraph 98 of his

initial report; he may also not offer testimony about whether FTCs are compensation or plan assets, including his opinions in paragraphs 89-96 of his initial report; he may also not offer any of the opinions contained in paragraphs 9 and 15-60 of his rebuttal report;

(6) Plaintiffs' Motion to Exclude the Testimony of Steven Gissiner is **granted in part, denied without prejudice in part, and denied in part**. Gissiner may not offer any of the opinions contained in paragraphs 42-63 or 75-80 of his initial report; he may also not offer any of the opinions contained in his rebuttal report; Plaintiffs may renew their objection to the opinions contained in paragraphs 64-86 at or immediately before trial.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on May 9, 2022.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All Counsel of Record