FUNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 19-21147-CIV-GOODMAN
[CONSENT CASE]

ERIC ROMANO, *et al.*,

      Plaintiffs,

v.

JOHN HANCOCK LIFE INS. CO. (USA),

      Defendant.

_____/

**REDACTED[1] ORDER ON DEFENDANT'S SUMMARY JUDGMENT MOTION**

    *"Life is a sum of all our choices."*

        -Albert Camus (French philosopher, author and journalist, 1913-1960)

    Plaintiffs Eric and Todd Romano, trustees of an ERISA[2]-defined contribution plan

("the Romanos" or "Plaintiffs"), filed a two-count lawsuit against Defendant John

Hancock Life Ins. Co. (USA) ("John Hancock"), which sold them, as trustees of a 401(k)

Plan, a Group Variable Annuity Contract. Plaintiffs sued on behalf of a putative class of

---

[1]     Initial Note: The Undersigned filed an unredacted version of this Order under seal. [ECF No. 331] This is the public version of the Order filed with minor redactions requested by Defendant [ECF No. 336-1].

[2]     ERISA is the Employee Retirement Income Security Act of 1974. The Department of Labor, the Pension Benefit Guaranty Corporation and the Internal Revenue Service are the agencies responsible for administering ERISA. *Mead Corp. v. Tilley*, 490 U.S. 714, 722 (1989).

persons who owned variable annuity contracts from John Hancock. The Court granted Plaintiffs' motion for class certification; notice of this has been sent to Class Members. [The Court wanted to have the notice provided and the opt-out period completed before ruling on the merits of John Hancock's summary judgment motion. That procedural preference has now been achieved, and the Defendant's summary judgment motion is now ripe for a merits-based ruling.].

For the reasons outlined below, the Undersigned **grants** the motion. At bottom, by way of overall summary, John Hancock did not have an obligation under ERISA to provide its customers with rebates for the foreign tax credits ("FTCs") *it* used. Likewise, the contracts at issue here did not impose such a requirement on John Hancock. Its customers (such as Plaintiffs) could not themselves have used those FTCs, which are not transferable. Only John Hancock could have used the FTCs at issue.

Without John Hancock's advice or other involvement, Plaintiffs chose investments which generated FTCs for which John Hancock did not provide a rebate. And although Plaintiffs could have tried to negotiate with John Hancock for rebates or credits (for the FTCs) or other, better pricing, they did not, choosing instead to invest in the funds which they selected. John Hancock did not violate a fiduciary duty of loyalty or engage in a prohibited transaction by complying with the parties' contracts and by engaging in FTC transactions authorized by the federal tax code.

Moreover, when Plaintiffs replaced John Hancock with another entity to provide similar recordkeeping services for their 401(k) plans, they chose a firm which *also* did not provide rebates or credits for FTCs. There is no evidence in this record that Plaintiffs have filed an action against the replacement entity, nor is there evidence that Plaintiffs even voiced any dissatisfaction with the new arrangement, which they also chose, even though it lacks the same FTC rebates or credits as the agreements Plaintiffs challenge here. Plaintiffs' fundamental theory, while creative,[3] does not support their claims under the undisputed facts. Accordingly, the Court concludes that summary judgment for John Hancock is warranted.[4]

## I.     Summary of Plaintiffs' Claims and Overall Introduction

The Romanos jointly own Romano Law PL ("Romano Law"). In 2014, Plaintiffs established a 401(k) plan for Romano Law, the Romano Law PL 401(k) Plan (the "Plan").

---

[3]     Plaintiffs have not called the Court's attention to any case law authority in which an insurance entity was held to have violated its fiduciary duty under ERISA or to have engaged in a prohibited transaction by using FTCs unavailable to the Plan trustee or beneficiaries. Of course, John Hancock has not relied on any case law authority which specifically holds to the contrary. Apparently, Plaintiffs' theory about FTCs in an ERISA setting is a novel one.

[4]     In the Order granting Plaintiffs' class certification motion, the Undersigned flagged the possibility of a potential defense summary judgment, noting that the certification ruling "hardly means that Plaintiffs will prevail on the merits." I also highlighted the point that John Hancock "needs to convince the Court of only *one* of these [multiple] arguments [in its then-pending summary judgment motion] in order to obtain a favorable summary judgment ruling." [ECF No. 295, p. 60] (emphasis added).

The Romanos named themselves trustees of the Plan, and they chose to engage Christian Searcy, Jr. ("Searcy") to recommend service providers and investments for the Plan, among other responsibilities.

John Hancock is an insurance company that, relevant here, offers recordkeeping services to 401(k) plans. The retirement product at issue is the John Hancock Signature product, which is provided through a group variable annuity contract.

In connection with establishing their Plan, the Romanos entered into a group variable annuity contract ("GAC" or "Contract") and a Recordkeeping Agreement ("RKA") with John Hancock to provide "administrative and recordkeeping services" and a platform of investment options for the Plan.

The Contract provided Plaintiffs, on behalf of their Plan, with access to John Hancock separate accounts, which could then be used as the Plan's funding mechanism. An insurance company separate account is "an accounting entity created by and under the control of an insurance company." John Hancock was the owner of the assets held in the separate accounts. The separate accounts are divided into sub-accounts, and each sub-account serves as a "conduit" vehicle to allow investment in a pre-specified mutual fund.

Some sub-accounts available under the Contract use mutual funds that invest in foreign securities. Upon Searcy's recommendations, the Romanos selected some of these funds. Investments in foreign securities may be assessed income or related taxes by the

country of domicile (foreign taxes) on income related to those investments.

U.S. taxpayers who accrue or pay foreign taxes to a foreign country on income that is also subject to U.S. taxes may, under certain circumstances, be able to take an FTC against their U.S. tax liability (Code §§ 27, 901–09), or, alternatively, deduct such amount from their U.S. taxable income.

The foreign taxes paid by John Hancock that are at issue in this case, and that are factored into the determination of the FTCs, involve foreign taxes paid by mutual funds. Those funds are owned by John Hancock separate accounts which are deemed paid by John Hancock pursuant to Internal Revenue Code provisions applicable specifically to mutual funds and their shareholders.

During certain years at issue in this case, John Hancock, as owner of the mutual fund shares held in the separate accounts, qualified for offsetting FTCs.

Plaintiffs allege that John Hancock improperly "took" the FTCs by not disclosing what it did and by not rebating (or returning or refunding or crediting) those amounts back to Plaintiffs. Although Plaintiffs themselves could not have used the FTCs, they argue that John Hancock should have somehow passed on to them the financial *benefit* of the FTCs through a rebate or credit.

Plaintiffs bring two ERISA counts against John Hancock. Count I alleges a breach of the "fiduciary duty of loyalty" by "receiving and retaining Plan Foreign Tax Credits

for [John Hancock's] own benefit, and by failing to appropriately disclose its retention of Plan Foreign Tax Credits . . . ." [Compl. ¶ 63, ECF No. 1]. Count II alleges violations of two prohibited transaction provisions, ERISA §§ 406(b)(1) and (b)(3), 29 U.S.C. §§ 1106(b)(1) and (b)(3), also relating to FTCs. *Id*. ¶¶ 67-73.

Plaintiffs ask the Court to require John Hancock to "make good to the Plan all losses to the Plan" and "damages paid to the Plan." *Id*. (prayer for relief ¶¶ C and H). They also seek an imposition of a constructive trust as to amounts by which John Hancock was allegedly "unjustly enriched," and "equitable restitution and disgorgement." *Id*. (prayer for relief ¶¶ D and E).

Plaintiffs withdrew their requests for injunctive and declaratory relief. [ECF No. 152]. They also withdrew their demand for an Order permitting the withdrawal of any and all amounts payable under the Contract without imposition of a surrender fee.

John Hancock asserts three grounds to support its summary judgment motion: (1) John Hancock is not an ERISA fiduciary for offering or administering separate accounts as conduit vehicles for retirement plan investments; (2) John Hancock's compliance with the Internal Revenue Code in taking the FTCs into account in the determination of its consolidated U.S. federal income tax liability does not violate ERISA; and (3) Plaintiffs cannot establish a loss or an injury required for the monetary relief they seek because their retirement plan paid no U.S. taxes (and therefore is not eligible for FTCs) and

incurred no loss on account of John Hancock's own tax obligations. For all practical purposes, a portion of John Hancock's third theory is akin to the argument that Plaintiffs lack Article III standing to seek monetary damages. John Hancock asserts this Article III argument, as well.

## II.        Undisputed Facts[5]

---

[5]        The undisputed facts are generated from the paragraphs in the statement of facts or response to the statement of facts which the respective opposing party expressly agreed are undisputed. For those purported facts which the opposing party classified as partially or fully disputed, the Undersigned analyzed the position to see if the facts are *genuinely* disputed. The statement of facts used in this Order (1) includes only the undisputed portions; (2) notes the partial dispute; or (3) clarifies a partially or fully disputed response to reflect the *actual* undisputed portion.

The Undersigned will retain the paragraph numbering used by the parties. The abbreviation "N/A" means that the paragraph is disputed (and cannot be clarified or used at all as an undisputed fact). Most of the facts that the parties say are disputed are, in fact, either undisputed or could be clarified or modified to result in an undisputed fact. The Undersigned sometimes changed the wording of an undisputed fact for stylistic and/or grammatical purposes. In addition, to enhance readability, I removed the specific record citations. They can be found in the source document, if needed.

If a party relied upon an expert witness opinion to support a purportedly undisputed fact but I granted a motion to strike or exclude that opinion, then the fact is deemed disputed if the opposing party challenged it with a still-viable evidentiary reference.

If a party argued that a fact was disputed but did not provide record evidence to support the contention, then I deemed the fact to be *undisputed* if otherwise supported by record evidence. And if a party merely quibbled over the wording but substantively did not adequately challenge the relevant portion of a purportedly undisputed fact, then the Court deemed the core fact to be undisputed.

7

<u>John Hancock's Statement of the Relevant Undisputed Facts</u>

1. John Hancock is an insurance company that, among other things, offers recordkeeping services to 401(k) plans.

2. John Hancock offers a retirement product called the John Hancock Signature product, which is provided through a group variable annuity contract ("GAC").

3. A GAC is a contract used as "a funding vehicle to administer a group retirement plan; and that vehicle would use separate accounts and subaccounts to invest in underlying investment products that would be offered to plan participants."

4. GACs are sold through registered broker dealers and investment advisors.

5. The Romanos jointly own Romano Law.

6. In 2014, the Romanos established a 401(k) plan for Romano Law, the Romano Law, PL 401(k) Plan (the "Plan").

7. Christian Searcy, Jr. ("Searcy") received an M.B.A. from the Duke University Fuqua School of Business in 2009.

8. Searcy has been a licensed financial advisor since 2003.

9. Searcy holds a State of Florida Life, Health, and Variable Annuity license and other credentials, including being an Accredited Investment Fiduciary and Certified Private Wealth Advisor.

10. As of July 2014, the Romanos had little prior investment experience.

11. The Romanos named themselves trustees of the Plan.

12. The Romanos engaged Searcy as the Plan's investment advisor to "assist them with selecting investments to be made available under the [P]lan" and in "reviewing the [Plan's] service providers" (i.e., recordkeepers), among other responsibilities.

13. Searcy professed to have had some understanding of foreign tax credits ("FTCs") before 2014. [Plaintiffs provided a one-word response -- "disputed" -- but did not, contrary to Local Rule 56.1, provide any record cites for support. Accordingly, the Undersigned deems this statement to be undisputed.].

14. On August 15, 2013, Searcy received an email from John McGuire, a representative from Securian Financial Group ("Securian"), stating that Securian was the "ONLY company that daily credits 100% of ALL . . . foreign tax credits."

15. "Securian's retirement plan products are offered through a group variable annuity contract issued by Minnesota Life Insurance Company."

16. Searcy spoke with Bruce Cobey ("Cobey"), a regional vice president for John Hancock, who confirmed to Searcy that John Hancock did "not credit foreign tax credits." [But, according to Plaintiffs' clarification, Cobey did not recall *when* these discussions occurred.].

17. On June 16, 2014, Searcy sent an email to Cobey with information relating to

the Plan.

18. On June 19, 2014, Katrina Porter of John Hancock emailed Searcy a proposal for the Plan, stating that "all related documents can be accessed" through a link in the proposal that redirects to a John Hancock website.

19. On June 24, 2014, Searcy forwarded the proposal to the Romanos and a colleague of theirs, Elliot Richman.

20. Searcy and the Romanos scheduled a meeting to discuss the John Hancock proposal on June 26, 2014.

21. Eric Romano scheduled to meet again with Searcy on July 17, 2014, to sign "the paperwork to get the [P]lan up and running."

22. On July 17 and July 28, 2014, Eric Romano and Todd Romano, respectively, signed the Contract application and Recordkeeping Agreement for the Plan ("RKA").

23. The RKA authorized the Plan to pay fees to John Hancock and Searcy for their services, as reflected in the proposal Searcy presented. [But Plaintiffs emphasize that the RKA did not authorize John Hancock to charge the Plan for unspecified fees or to retain FTCs. This is not exactly a dispute – it is merely a response designed to provide *additional* background to arguably place the fact in context].

24. Those fees were "lower than at least 75 percent of the total plan fees" charged by providers at that time, as reflected in an industry survey. But this analysis did not

10

evaluate the foreign taxes paid or the FTCs generated.

25. The document "Understanding Your Administrative Services" "provides information on the services . . . provided under the [RKA]."

26. The Contract specifies that John Hancock "agrees to perform certain administrative and recordkeeping services related to the Contract . . . in addition to providing the investment and distribution options contained herein . . . ."

27. Cobey provides "proposals and related materials to [] advisors and consultants [who] then present contract proposals to their clients . . . ."

28. Cobey is "not usually involved at the point of sale when advisors or consultants present a [John Hancock] proposal."

29. John Hancock does not control which documents advisors decide to provide, if any, to trustees in meetings concerning service arrangements. But John Hancock provides materials which investment advisors can use, if they wish, in discussions with trustees.

30. John Hancock does not "decide whether [a] client comes on board with John Hancock," and is "not involved in their decision-making process." Plaintiffs say that John Hancock *influences* the decision-making process with the information it provides. (emphasis by the Court).

31. Plaintiffs did not recall anyone from John Hancock speaking or meeting with

them before entering into the Contract.

32. As defined in the John Hancock GAC with the Romanos, as Trustees, an insurance company separate account is "an account which is **segregated** from the general funds of the Company. Any income, gains, or losses whether realized or unrealized, from assets in a Separate Account will be credited to or charged against said account without regard to the other income, gains, or losses of the Company. Assets allocated to a Separate Account shall not be chargeable with liabilities arising out of any other business the Company may conduct. The **Company owns the assets held in the Separate Accounts** and is **not a Trustee** as to such amounts." (emphasis added).

33. John Hancock "owns the assets held in the Separate Accounts and is not a Trustee as to such amounts."

34. The separate accounts are divided into sub-accounts and "each subaccount corresponds to an investment option that is offered in the Signature platform" "that ha[s] been selected by the plan sponsor."

35. John Hancock made available more than 200 sub-accounts from which the Romanos could select for their Plan.

36. John Hancock does not provide advice to plan fiduciaries as to which sub-accounts should be selected for a retirement plan.

37. The Contract provides that "[w]ithdrawals from Sub-accounts . . . will be made

12

at Market Value" which, when used in reference to a Sub-account, means "the value of an investment on a Valuation Date. It is computed by using closing prices, on nationally recognized stock exchanges or over-the-counter markets where no formal exchange exists, on that date to the extent possible. When the investment is in shares of a mutual fund, trust or portfolio thereof, it is computed by using the net asset value per share provided by that mutual fund, trust or portfolio on that date."

38. Keith Holden, John Hancock's 30(b)(6) witness concerning separate account operation, explained that John Hancock "act[s] on instructions from plans and participants" and executes "transactions as a result" of those instructions. [Plaintiffs contend that this is an incomplete description of his testimony, but none of the other transcript pages reveal contradictory or inconsistent testimony. Every reference to a deposition transcript in any lawsuit is, by definition, "incomplete" because it focuses on less than the entire transcript. But Holden's testimony excerpted above is a fair and accurate summary of the point at issue, so this is not actually a legitimate factual dispute. Instead, it is an undisputed fact.].

39. In the Contract, Plaintiffs and John Hancock agreed that John Hancock "does **not assume any fiduciary responsibility** of the Contractholder, Plan Administrator, Plan Sponsor or any other Fiduciary of the Plan . . . ." (emphasis added) [Plaintiffs contend that this is a disputed fact, but that position is merely referencing other language which

is discussed in paragraph 40, below].

40. The RKA states, in part: "To the extent John Hancock maintains a separate account(s) in which the [P]lan invests, John Hancock is a **limited** fiduciary for the **exclusive purposes** of holding plan assets in its separate account(s), voting proxies, and acting only in accordance with directions from trustee(s), participants and beneficiaries, as provided in this agreement, the [C]ontract and the supplementary documents." (emphasis added).

41. The RKA's section on "fiduciary status" concludes by stating: "John Hancock will not have any discretionary authority or responsibility for the management or control of the separate accounts." [Plaintiffs note that the RKA also discusses the situation in which John Hancock is a limited fiduciary. This reality does not, however, render this statement "disputed." Plaintiffs' so-called dispute is simply a note that the RKA contains other language in which the term "fiduciary" is mentioned.].

42. The RKA incorporates documents, including the Supplemental Information Guide ("SIG"), Services Guide, Fund Information Guide ("FIG"), and Summary of Administrative Maintenance Charge (AMC) and Revenue Sharing Received ("Supplemental Disclosures" or "Supp. Disclosures").

43. The Contract, SIG and Supplemental Disclosures address fees and credits applicable to John Hancock's separate accounts.

14

44. John Hancock applies "direct administrative charges" to the sub-accounts, called the "Annual Maintenance Charge" and "Sales and Service Fee."

45. John Hancock also receives fees referred to as "revenue sharing." Specifically, "[t]he revenue sharing as well as the credits that the Company receives in respect of an underlying investment vehicle affiliated with the Company are sometimes generically referred to as 'revenue from underlying fund.' The amount of revenue received by the Company from the underlying vehicle varies from Fund to Fund. The Company uses all revenue received from the underlying mutual fund, trust or portfolio and the AMC is equal to 0.60% of your Contract assets invested in each Sub-account. If we do not receive any revenue from an underlying mutual fund, trust or portfolio, the AMC for the Sub-Account will be equal to 0.60%. In the event of any change to the revenue received from an underlying mutual fund, trust or portfolio, the AMC for the applicable Sub-account will be increased or decreased, as appropriate, so that the sum of the AMC and such changed revenue continues to equal 0.60%."

46. The SIG states that John Hancock "applies the total revenue received from the underlying funds and the sub-accounts (i.e., 'Total Revenue used towards Plan Cost') to offset the cost of the Recordkeeping Services provided under your Contract (as described in the Understanding Your Administrative Services Guide ) as well as, if applicable, to pay for other plan costs that you have approved (for example, the costs for payment of

15

the compensation of plan intermediaries such as the financial representative or plan consultant)."

47. N/A

48. The FIG contains additional information about the sub-accounts, and their investments and fees, after which it explains, in bold type, that the: . . . prospectuses, or offering memorand[a] for each sub-account's underlying investment vehicle . . . are available upon request. These documents contain complete details on investment objectives, risks, fees, charges and expenses as well as other information about the underlying investment vehicle, which should be carefully considered. Please read these documents carefully prior to investing.

49. The Supplemental Disclosures state that "prospectuses provide disclosure of the payments received by John Hancock and its affiliates that are eligible indirect compensation." [But, as Plaintiffs note, the prospectuses do not disclose the FTCs which John Hancock uses, when available].

50. John Hancock also advised: "For more information on a particular investment option, please refer to the Investment Comparative Chart (ICC) or your John Hancock representative."

51. Plaintiffs could not recall reading the prospectus of any fund that they selected for the Plan.

52. Plaintiffs could not recall performing any independent due diligence or research on any investment option before they agreed to Searcy's recommendations.

53. Upon Searcy's recommendations, Plaintiffs selected some sub-accounts that use mutual funds that invest in foreign securities.

54. Investments in foreign securities may be assessed income or related taxes by the country of domicile (foreign taxes) on income related to those investments.

55. "To figure its NAV, a [mutual] fund adds up the total value of its investment holdings, subtracts the fund's fees and expenses, and divides that amount by the number of fund shares that investors are currently holding." [Plaintiffs contend that this describes a "general process that is not necessarily applicable to each mutual fund."].

56. The Vanguard Total World Stock ETF was one of the mutual funds held in a Plan sub-account.

57. The prospectus of the Vanguard Total World Stock ETF states, in part:

The Fund may be subject to foreign taxes or foreign tax withholding. . . . If at the end of the taxable year more than 50% of the value of the Fund's assets consists of securities of foreign corporations, and the Fund makes a special election, you [the shareholder] will generally be required to include in your income, for U.S. federal income tax purposes, your share of the qualifying foreign income taxes paid by the Fund in respect of its foreign portfolio securities. . . . You may qualify for an offsetting credit or

17

deduction under U.S. tax laws for any amount designated as your portion of the Fund's foreign tax obligations, provided that you meet certain requirements. See your tax advisor or IRS publications for more information.

58. John Hancock is required to "increase [its] taxable income", or "gross it up for the foreign taxes that were paid", as to mutual fund shares owned in its separate accounts if the fund elects to require its shareholders to do so. [Citing the De Simone expert report, Plaintiffs say the statement is "disputed because this statement does not reflect the foreign-tax-credit component of the transaction. But this point does not make the statement *disputed*; it merely tries to place the statement in context by adding an additional consideration].

59. Because "any income distributed in . . . [a] 401(k) account from U.S.-based sources will be untaxed, but any income distributed from foreign sources will have been reduced by any foreign taxed paid on those distributions, [there is] no way for the [401(k)] accountholder to offset those foreign tax payments by using the foreign tax credit or deduction." [Plaintiffs challenge this as disputed, saying that John Hancock "can provide benefits to offset the tax payments, just as a Hancock competitor, Securian, does." But this does not make John Hancock's undisputed fact disputed. Instead, Plaintiffs are merely

offering an additional, but not contradictory, point.].[6]

60. John Hancock's U.S. Tax group is responsible for the company's consolidated corporate tax filings, which are filed together for all of its separate and general accounts, and across all of its business units on a consolidated basis as part of an affiliated group of companies under John Hancock Financial Corp.

61. In applying any allowable FTCs during the putative class period, the U.S. Tax group complied with Internal Revenue Service ("IRS") Private Letter Ruling 9528004 (March 29, 1995).

62. Plaintiffs periodically reviewed the Plan's investments and performance with Searcy and, at times, one of Searcy's colleagues, Melanie McDonald.

63. On February 13, 2019, Plaintiffs and Searcy determined that "everything was in pretty good order" with the Plan and its investments.

64. On August 10, 2020, Plaintiffs resolved that Searcy would "coordinate the beginning of an RFP [request for proposal]" for recordkeeping services.

65. Searcy determined which recordkeepers would be selected for the 2020 RFP.

---

[6]  To provide a factually-simple analogy, assume that a plaintiff in a garden-variety car collision personal injury case submits an affidavit that the traffic light at issue was red for the defendant driver. Assume that the defendant submits a response, arguing that the fact is disputed, and submitting affidavits that it was storming and the visibility was poor. The weather and visibility might be additional facts leading to *another* argument, but they do not prevent the fact about the traffic light being red from being treated as undisputed.

66. The 2020 RFP recipients included John Hancock, Fidelity, and One America.

67. Searcy does not recall whether he solicited a proposal in the 2020 RFP from Securian or any provider other than John Hancock, Fidelity, and One America.

68. The minutes of the November 19, 2020 meeting regarding the RFP do not reflect discussion of FTCs.

69. Plaintiffs, with Searcy's participation, selected Fidelity as their new recordkeeper, given factors such as recordkeeping cost, brand recognition, "high level technology," and "a single login integration." [Plaintiffs brand this as disputed, arguing that this statement "does not identify all of the factors that were considered." But Plaintiffs do not provide a record cite, nor do they explain what other factors were in fact considered. So the Undersigned deems this to be undisputed. Furthermore, even if other factors were considered, this would not render the statement genuinely *disputed.* Instead, it would mean that there might have been some *additional (*but not contradictory*)* factors considered.].

70. Fidelity uses a trust platform for offering investment options to the Plan.

71. Under a trust platform, a trust that does not file U.S. taxes directly owns a plan's investments.

72. Trusts established for qualified retirement plans "do not have the ability to file for the foreign tax credit."

20

73. After selecting Fidelity as their recordkeeper in 2020, the Romanos, relying upon Searcy's recommendation, selected as Plan options mutual funds that invest in foreign securities.

74. Even after March 22, 2021, when Fidelity became its recordkeeper, the Plan still does not receive any credits relating to foreign taxes.

75. Plaintiffs and the Plan were not charged any withdrawal or discontinuance fee on the termination of the Contract with John Hancock, consistent with the lack of any such fee on the Contract's "Withdrawal/Discontinuance Charge Scale."

76. Plaintiffs' expert, Barry Mukamal, testified that his calculations concerned only the "monetary benefit that John Hancock or Manulife actually received . . ." from its retention of FTCs. He conceded that his report does not use the word "damages." He used the term "monetary relief," and said, when asked what he meant by "monetary relief", "I don't know if these -- under -- in legal terminology rise to the level of damages. I mean, one could say they are monetary damages. Monetary relief is a measure of the relief that the plaintiff is claiming that the class is entitled to under ERISA. My -- my calculation is a **monetary benefit that John Hancock or Manulife actually received** in monetary relief if plaintiffs reveal in the case." (emphasis supplied).

Mr. Mukamal was asked if he was offering an opinion one way or the other on whether Plaintiffs were *damaged* by John Hancock's actions. His answer was:

Well, my -- if they're entitled to monetary relief in plain vernacular they were damaged by not receiving it. So I don't want to parse words, but it's **not really a damage calculation in the traditional sense** that I'm used to. It's a **benefit conferred** on one party to a lawsuit if the other party prevails on its legal theories. (emphasis supplied).

<u>Plaintiffs' Statement of Additional Undisputed Facts</u>

77. The RPS business unit administers 401K accounts.

78. Rick Carlson, vice president Tax and Tax Controller for John Hancock, testified that a mutual fund can elect under certain circumstances to pass the foreign tax credit to the shareholder.

78-a.[7] Mr. Carlson testified that "[a] tax credit will reduce a tax liability."

78-b. When asked "what effect claiming the credit, assuming you're able to claim it, what effect that has on tax liability. It reduces it by the value, it reduces the tax liability by the value of the credit; is that correct?", Mr. Carlson testified, after an objection, "Yes."

79. N/A

79-a. N/A

---

[7]    Some of Plaintiff's additional facts contain sub-paragraphs, such as 78-1 or 79-b, because the Court required Plaintiff to resubmit certain facts in a streamlined format. Because this requirement occurred after John Hancock already filed a response to the additional facts, the Court determined it would be more efficient to include sub-paragraphs, which would enable all other paragraph numbers to remain as originally designated.

79-b. Some separate accounts own mutual funds which incur foreign taxes to which foreign tax credits may be allowed under the Code.

80. When John Hancock is not able to utilize foreign tax credits in a certain year, the "[f]oreign tax credits can be carried back one year and carried forward ten years as a general rule."

81. A foreign tax credit "comes through the income statement [of John Hancock] when the credit is claimed."

82. John Hancock's U.S. Tax Division provides quarterly reporting which reflects the estimated foreign taxes paid attributable to business units for a given year. John Hancock's reports also provide estimates of the FTCs it will be able to use for a tax year.

82-a. Some John Hancock documents and testimony refer to foreign tax credits as tax benefits. The foreign tax credit is a reduction to tax liability and the foreign tax gross up is the increase to taxable income for the foreign taxes paid.

82-b. John Hancock uses this data for financial reporting, including quarterly financial statements.

82-c. In general, these data show that foreign tax credits increase John Hancock's post-tax earnings approximately $15 million to $20 million per year.

83. John Hancock calculated the tax expense for foreign tax credits by multiplying the value of the foreign tax credit by the applicable tax rate for the year.

23

84. For purposes of this litigation, John Hancock created and produced spreadsheets with the amount of foreign tax credits generated on an annual basis from each mutual fund owned in the RPS separate accounts from 2013 through 2020.

84-a. Jacqueline Alvino, an assistant vice president in US Tax for John Hancock, testified that John Hancock "could do a pro rata allocation" when asked "if John Hancock wanted to give credits back to these different funds that generated the foreign tax credits, it could use this spreadsheet to determine how much to credit each of those funds."

85. N/A

85-a. N/A

85-b. N/A

86. Mr. Carlson testified to his belief that if a mutual fund in an RPS separate account earns a $10 dividend abroad and $2 is withheld in foreign taxes, then the separate account receives $8, John Hancock's reserve increases by a corresponding $8, and John Hancock reports $10 as income. [But Mr. Carlson noted that he is not responsible for those amounts].

87. The foreign tax gross up amount is equal to the amount of foreign tax credit.

88. John Hancock attributes the benefits from foreign tax credits to the business units that generate them.

89. The RPS business unit offers retirement plan services through group annuity

contracts.

90. John Hancock paid foreign taxes and is allowed a credit of the same amount. If the foreign tax credit is not available in a given year, then it can be carried forward and used in a later year. It is not, however, an asset in the sense that it can be purchased or sold.

91. John Hancock analyzes the profitability of the RPS business unit each quarter on a pre-tax and a post-tax basis.

92. The foreign taxes that give rise to the RPS foreign tax credits are paid through the withholding of taxes from dividends that mutual funds earn abroad, not from Hancock's general assets.

93. The total FTCs allowed to John Hancock Financial Corporation ("JHFC") on its Form 1118 as originally filed with the Internal Revenue Service was ███████████ in 2017. The subsequently determined total FTCs allowed to JHFC was ███████████ in 2017.

93-a. The total FTCs allowed to JHFC on its Form 1118 as originally filed with the IRS was ███████████ in 2019. The subsequently determined total FTCs allowed to JHFC was ███████████ in 2019.

93-b. Ms. Alvino agreed that, in her view, the FTCs allowed to JHFC as reflected on its Form 1118 in 2019 "would qualify as material as that term is generally used by accountants."

25

97. Paddy Subbaraman, chief financial officer of John Hancock and Manulife Retirement Plan Services in the United States since November 2016, testified that the RPS business unit earned approximately ██████████ on a post-tax basis.

97-a. Mr. Subbaraman testified that the post-tax earnings "may be less" and that "many things go into that," and he "would think" that FTCs was one factor.

94. John Hancock "is allowed a foreign tax credit equal to the amount of foreign taxes paid to a foreign country."

95. For the years that John Hancock did not utilize a foreign tax credit, it is reasonable to infer that ████████████████████████████.

96. In 2017, the CFO of the RPS business unit[8] asked the Tax Controller "what transactions . . . created the foreign tax credits in the first place?" The Tax Controller responded that "[t]he majority of the foreign tax credits are generated by the underlying RIC's held by the separate accounts," where "RIC's" referred to regulated investment companies, "[w]hich is in this case a mutual fund." In other words, the majority of foreign tax credits at John Hancock are generated by the underlying investments held by the separate accounts.

---

[8]   As phrased by Plaintiffs, the word "unique" was used, rather than "unit." But "unique" makes no sense in the context of the sentence. John Hancock's response [ECF No. 287, p. 4, n.3] assumes that the word should have been "unit," rather than "unique." The Undersigned deems this response logical and likely, and I therefore am using "unit," as well.

97. In the most recent year, the RPS business unit earned around ████████ on a post-tax basis. The pre-tax earnings were less, and one reason the post-tax earnings were higher was because of foreign tax credits.

98. John Hancock sets its prices for retirement plan services independent of the amount of foreign taxes generated.

99. Contributions that are made to retirement plans that have group annuity contracts with John Hancock are placed into separate accounts. John Hancock ultimately owns the assets in the separate accounts, even though the funds come from retirement plans.

100. John Hancock does the accounting and recordkeeping for the processing of transactions. But John Hancock says it does not have "control" of the separate accounts, however.

101. John Hancock makes no effort to pass on the benefit it receives from foreign tax credits to the various retirement plans and sub-accounts that generated the benefit.

102. Hypothetically, sub-accounts could be credited by the value of foreign tax credit benefits to distribute the benefits to retirement plans on a pro rata basis.

103. Mr. Holden testified that he presumes that John Hancock does "not consult with the trustee [of a retirement plan]" when a decision is made to not credit the benefit of foreign tax credits to Separate Accounts.

103-a. John Hancock performs administrative and recordkeeping services for the separate accounts.

103-b. John Hancock administers the assets in the Separate Accounts on behalf of plans and participants.

104. N/A

105. Plaintiffs' expert opined that the monetary benefit that John Hancock received from the FTCs, including prejudgment interest, exceeds $90 million. [But John Hancock denies that Plaintiffs have any viable claim against it or any right of relief, so it deems the expert's opinion to be disputed.].

## **Plaintiffs' Different/Changing Positions**

John Hancock contends that there are inconsistencies and changes in Plaintiffs' legal position regarding the role that disclosures (or non-disclosures) play in connection with each of the two causes of action asserted in the Complaint:

I. Plaintiffs' Original Position: John Hancock's alleged non-disclosure of its retention of tax benefits forms a basis of liability as to both Count I (breach of the duty of loyalty) and Count II (prohibited transactions)

Plaintiffs originally asserted that Count I of their Complaint, for breach of the duty of loyalty under 29 U.S.C. § 1104(a), was based in part on John Hancock's alleged failure to disclose its retention of foreign tax credits:

- "By receiving and retaining Plan Foreign Tax Credits for its own benefit,

and by **failing to appropriately disclose** its retention of Plan Foreign Tax Credits, Defendant failed to perform its duties for the sole benefit of the Plan, in breach of its fiduciary duty of loyalty." [Complaint, ECF No. 1, p. 14 (emphasis added) (March 25, 2019)].

•        "In profiting from foreign tax credits without disclosing them or passing through a commensurate benefit to Plans that generated such credits, [John] Hancock failed to act solely in the best interest of the Plans and failed to defray reasonable expenses of administering the Plans." [Plaintiffs' Motion for Class Certification and Incorporated Memorandum of Law ("Class Cert. Motion"), ECF No. 94, p. 9 (July 26, 2021)].

Plaintiffs asserted in their Motion for Class Certification that John Hancock's alleged failure to disclose was also relevant to liability under Count II, the prohibited transaction claim brought under 29 U.S.C. § 1106(b)(1) and (b)(3):

• "A covered service provider's failure to make the disclosures required in the regulation renders its contract or arrangement with the plan unreasonable under § 408(b)(2), and thus precludes the service provider from relying on the § 408(b)(2) exemption from the strict prohibitions of § 406. § 2550.408b-2(c)(1)(i) ("No contract or arrangement for services between a covered plan and a covered service provider, nor any extension or renewal, is reasonable within the meaning of section 408(b)(2) of the Act and paragraph (a)(2) of this section unless the requirements of this paragraph (c)(1) are

satisfied."). Because [John] Hancock failed to disclose the foreign tax credits it received and retained as direct or indirect compensation, its agreements with the Plans are not "reasonable within the meaning of section 408(b)(2)" of ERISA, and thus constitute prohibited transactions." [Class Cert. Motion, ECF No. 94, p. 10 (July 26, 2021)].

II.   Plaintiffs' Revised Position: Plaintiffs have not brought a misrepresentation claim, but disclosures are still relevant to Count II

A. Plaintiffs' statements that they have not asserted a misrepresentation or disclosure claim, and that disclosures are relevant only to Count II

After John Hancock opposed Plaintiffs' motion for class certification, Plaintiffs took the position that they had not asserted a misrepresentation or non-disclosure claim:

• "Because Plaintiffs are not bringing simple misrepresentation claims, *Hudson v. Delta Air Lines*, 90 F.3d 451 (11th Cir. 1996), does not help [John] Hancock. That case involved an employer's misrepresentations that a more lucrative retirement package would not be offered in the future. *Id.* at 453. To establish that the employer's misrepresentations—the only conduct challenged in *Hudson*—caused them harm, class members needed to show that they 'would have deferred their retirement in the hope that they would be eligible for [richer benefits] to be offered in the future.'" [Plaintiffs' Reply in Support of Motion for Class Certification ("Class Cert. Reply"), ECF No. 115, p. 7 (August 20, 2021)].

30

• "No such individualized inquiries are needed here because [John] Hancock's challenged conduct—taking for itself benefits generated by Plaintiffs' assets, not mere disclosure violations—directly caused each class member to suffer the same harm. Whether Plaintiffs would have made different decisions with different disclosures is irrelevant to the causation theory of Plaintiffs' claims." [Class Cert. Reply, ECF No. 115, p. 8 (August 20, 2021)].

• "This is not a simple misrepresentation claim, so Plaintiffs do not and need not allege that fee negotiations with [John] Hancock would have been any different with accurate disclosures, or that Plaintiffs relied on [John] Hancock's misleading statements." [Class Cert. Reply, ECF No. 115, p. 6 (August 20, 2021)].

• "Certainly if there's a claim alleging some sort of misrepresentation, that could give rise to a reliance claim. But that's not the claim we have here. We have a claim that John Hancock took benefits that were created by these plans, that are assets of the plans, kept it for itself when it had no right to do so." [Transcript of October 5, 2021 Motion Hearing ("10/5/21 Hearing Tr."), ECF No. 154, 24:10-15].

• "Maybe in some cases, like some of the cases they cited in which the theory of liability is that someone would have made a different investment decision if a disclosure had been made, or someone would have acted differently if a disclosure had been made, those types of cases could require reliance, because if you can't prove that you would

have acted differently if different information was provided, then I can understand then you can't prove that damages would have been different. That's not our claim here. We're not alleging that the Romanos would have invested in different plans. We're not alleging that other class members would have invested in different plans. Instead, we're simply alleging: John Hancock basically took something that wasn't John Hancock's. And it breached its fiduciary duty in doing so." [10/5/21 Hearing Tr., ECF No. 154, 24:18-25:7].

• "I don't think that existence or absence of disclosures is necessary to prove that John Hancock is in essence self-dealing by taking the foreign tax credits that are generated by the assets of retirement plans and keeping it for itself without passing on a benefit to the plans themselves." [10/5/21 Hearing Tr., ECF No. 154, 14:11-15].

• "[THE COURT:] Aren't you at trial, Mr. Weinshall, going to present to the jury evidence that the contract didn't disclose the foreign tax credit; the contract didn't disclose that John Hancock was going to keep the credit; there were no disclosures about not helping defray expenses by using some or all of the tax credit; that nobody from John Hancock made a disclosure? Aren't those things that you're going to be bringing out to the jury because you think it helps your claim? I mean, listen, if I was a plaintiff's lawyer in your case, I would certainly do that. Aren't you planning on doing that? MR. WEINSHALL: I'm not sure it's essential to the claims." [10/5/21 Hearing Tr., ECF No. 154, 13:18-14:4].

- "[THE COURT:] My question was: At a trial, aren't you going to mention to the jury and in fact maybe even highlight to the jury the nondisclosures? MR. WEINSHALL: I think I will highlight what the contract says. And I will highlight what the fee disclosures say, just because that's what defines the relationship. And I'll say, you know: This is what the contract obligates John Hancock to do. This is what the regulation obligates John Hancock to do. And it didn't do that. It actually kept the benefit for itself. And that's it. It's pretty simple." [10/5/21 Hearing Tr., ECF No. 154, 14:22-15:7].

- "[THE COURT:] So can we fairly say that disclosure is part of your claim, part of your theory, part of your proof? Or is it largely irrelevant? MR. WEINSHALL: I'd say what matters is in the contract. And as to the prohibited transaction claim, what matters is in the specific fee disclosures. Other disclosures are not relevant." [10/5/21 Hearing Tr., ECF No. 154, 9:8-14].

In a memorandum [ECF No. 312] filed before the summary judgment hearing, John Hancock posited that "these statements differed from Plaintiffs' earlier statements . . . because they indicated that Plaintiffs' claim for breach of the duty of loyalty in Count I was no longer based on John Hancock's alleged failure to disclose its retention of foreign tax benefits."

B. Plaintiffs' explanation that disclosures were relevant only to a defense of a safe harbor from prohibited transactions (Count II) under 29 U.S.C. § 1108(b)(2)

Plaintiffs also explained during the class certification briefing and argument that disclosures were relevant as to the question of whether John Hancock could defend against Count II (prohibited transactions) by relying on the disclosure safe harbor under 29 U.S.C. § 1108(b)(2):

- "So in a way, the disclosure or nondisclosure was sort of a preemptive attack of ours to undercut what is sometimes used as a defense in cases like this." 10/5/21 Hearing Tr., ECF No. 154, 12:25-13:2.

- "So the disclosure could only potentially be relevant -- and when I'm saying 'disclosure,' I mean in the contract -- could only potentially be relevant if the contract's laid out some sort of right for John Hancock to either receive this foreign tax credit or if it said: We're not going to give you this benefit; we're going to take this as compensation, or they said: We are going to give you this benefit. However it played out in the contracts. So we know the contracts don't contain any reference to foreign tax credits; and that again is from Ms. Hamilton's deposition testimony. And that's it. That's the only relevance it has to the contract and as to the prohibited-transaction claim. John Hancock cannot take advantage of the safe harbor unless it discloses in one of these regulatory disclosures that it receives compensation in the form of foreign tax credits. We know it didn't do that, again, because of Ms. Hamilton's testimony. And therefore, it cannot proceed under that safe harbor." 10/5/21 Hearing Tr., ECF No. 154, 12:7-24.

• "The failure to disclose this compensation is what makes it unauthorized and a per se prohibited transaction under 29 U.S.C. § 1106 and 29 C.F.R. § 2550.408b-2." [Class Cert. Reply, ECF No. 115, p. 4] (August 20, 2021).

• "Its uniform failure to provide written disclosures of this compensation violates 29 C.F.R. § 2550.408b-2(c)(iv)(C)(1)-(2), rendering its contracts with Plaintiffs and class members per se unreasonable under § 2550.408b2(c)(1)(i), and thus prohibited transactions under 29 U.S.C. § 406 [sic]." [Class Cert. Reply, ECF No. 115, p. 6] (August 20, 2021).

III.    Plaintiffs' Further Revised Position: Disclosures are no longer relevant to Count II, but instead relate only to the duty of loyalty claim in Count I

Subsequently, in opposing John Hancock's Motion for Summary Judgment and *Daubert* motions, Plaintiffs asserted that John Hancock's alleged failure to disclose its retention of foreign tax credits evidenced a breach of duty of loyalty under Count I and acknowledged that 29 U.S.C. § 1108(b)(2), and the disclosures provided for under its regulations (i.e., 29 C.F.R. § 2550.408b-2), do not apply to 29 U.S.C. § 1106(b)(1) and (b)(3).

• "Plaintiffs agree with Hancock that satisfying ERISA § 408(b)(2) and its regulations does not exempt a fiduciary from liability under ERISA § 406(b). (ECF No. 193 at 20.) Still, the disclosure obligations specified in ERISA § 408(b)(2) remain relevant to Plaintiffs' loyalty claim under ERISA § 404. 'The duty of loyalty is one of the common

law trust principles that apply to ERISA fiduciaries, and it encompasses a duty to disclose.'" [Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment ("Summary Judgment Opposition"), ECF No. 267, p. 23] (December 14, 2021).

• "That [John] Hancock not only refuses to adhere to this provision, but also declines to even disclose the substantial FTC benefits it receives, more than suffices to establish its breach of loyalty." [Summary Judgment Opposition, ECF No. 267, p. 18] (December 14, 2021).

• "The summary judgment evidence establishes that the FTCs are something 'of monetary value,' and [John] Hancock's Rule 30(b)(6) witness testified that it did not disclose in writing to Plan fiduciaries its receipt and retention of FTCs. (PSOF, ¶ 23.) This is sufficient to establish a breach of the disclosure duty." [Summary Judgment Opposition, ECF No. 267, p. 24] (December 14, 2021).

• "Thus, [John] Hancock's failure to comply with the disclosure obligations set forth in ERISA § 408(b)(2) provide[s] additional evidence to support Plaintiffs' loyalty claim." [Summary Judgment Opposition, ECF No. 267, pp. 21-22] (December 14, 2021).

• "He has opined that [John] Hancock acted disloyally and has not followed best practices; and the entire case hinges on whether [John] Hancock breached its duty of loyalty to the Plan by improperly handling foreign tax credits and failing to provide the Plan with appropriate disclosures regarding their treatment." [Plaintiffs' Opposition to

Defendant's Motion to Exclude Expert Reports and Testimony of Roger Levy, Esq. and Memorandum in Support ("Levy Opp."), ECF No. 271, p. 10] (December 14, 2021).

• "As Plaintiffs explain in their summary judgment response, which Plaintiffs incorporate herein, even if ERISA § 408(b)(2) does not provide an exemption to Plaintiffs' ERISA § 406(b)(1) and (b)(3) claims, [John] Hancock's failure to disclose its compensation to Plaintiffs is still relevant for Plaintiffs' breach-of-fiduciary-duty claim under ERISA § 404." [Plaintiffs' Response in Opposition to Defendant's Motion to Exclude Expert Report and Testimony of Lisa De Simone, PhD ("De Simone Opp."), ECF No. 269, p. 8] (December 14, 2021).

According to John Hancock, these statements differ from Plaintiffs' statements during the class certification proceedings (*see supra* Section II) because (1) they assert that John Hancock's failure to disclose its retention of foreign tax benefits is an independent basis for liability under Count I, and (2) they no longer tie John Hancock's liability under Count II to the disclosure requirements of the regulations promulgated under 29 U.S.C. § 1108(b)(2).

## The Summary Judgment Motion Hearing

The Court held a two-hour Zoom hearing on the summary judgment motion. In addition to repeating the arguments raised in the memoranda, the parties provided some additional points. The Court will highlight some of them:

John Hancock contends that Plaintiffs, in effect, want to avoid paying foreign taxes on their international investment selections. That is an understandable goal, of course, but John Hancock contends that it is not what Plaintiffs bargained for in their contracts.

John Hancock also urged the view that it is improper to use ambiguous language as a basis for establishing fiduciary duties.

John Hancock emphasized that there is no law requiring it to disclose its tax situation and activities to Plans like the ones for which Plaintiffs are trustees. As highlighted by defense counsel, Plaintiffs never requested information from John Hancock about whether it used FTCs for itself (or about any other aspect of its tax position), and John Hancock had no affirmative obligation to provide that information.

Similarly, because the contracts are silent about John Hancock's ability to retain and use the FTCs, it was permitted to use them.

According to John Hancock, Plaintiffs did not suffer any monetary loss, and the Plan is in the same position, regardless of whether John Hancock used the FTCs.

John Hancock advised, in response to a question from the Undersigned, that there is no evidence in the record explaining why it chose to not disclose to the Plan trustees its view that it could use the FTCs. But, defense counsel noted, Plaintiffs likely would have still chosen John Hancock even if they had been provided with a disclosure -- because they later selected another entity to take over for John Hancock and that firm did

38

not credit back or rebate FTCs either.

Plaintiffs noted that FTCs are listed on John Hancock's financial statements, which means that it kept track of them even though it had no discussion with the Plan about its treatment and use of FTCs.

Plaintiffs argued that the absence of contractual language about FTCs actually *helps* them, not John Hancock. As teed up by Plaintiffs, if John Hancock had wanted to retain the FTCs to increase its revenue and profits, then it could have easily disclosed that fact to the Plans.

Likewise, Plaintiffs argued, ERISA is designed to protect Plans when there is an ambiguity or an absence of language.

Plaintiffs acknowledged that they would be in the same financial position had John Hancock not used the FTCs against its overall tax liability, but they argue that the relevant question is a different one: what would have happened if John Hancock had "lived up to its fiduciary obligations" (by paying the Plan the amount of the FTCS it used through a rebate or credit)?

## Analysis

*Applicable Legal Standards – Summary Judgment*

Summary judgment must be entered against a party who fails to show a genuine issue as to a material fact, thus enabling a court to decide the case as a matter of law.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citations omitted) (affirming summary judgment for the defendant). *See generally Quintero v. Geico Marine Ins. Co.*, 983 F.3 1264 (11th Cir. 2020) (affirming summary judgment for the defendant).

To obtain summary judgment, a defendant may either (1) produce evidence that refutes an essential element of the plaintiff's claim or (2) "point[] out . . . that there is an absence of evidence to support the [plaintiff's] case." *Celotex Corp.*, at 325, 331. The burden is on the non-moving party to come "forward with sufficient evidence on each element that must be proved." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990) (citation omitted) (affirming summary judgment for the defendant).

Moreover, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to preclude summary judgment for the movant]; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Consideration of a summary judgment motion does not lessen the burdens on the non-moving party: the non-moving party still bears the burden of coming forward with sufficient evidence on each element that must be proved. *Rollins v. TechSouth, Inc.*, 833

F.2d 1525, 1528 (11th Cir. 1987). "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the [movant's] substantive evidentiary burden." *Anderson*, 477 U.S. at 254, 106 S. Ct. at 2513. The trial judge must bear in mind the "actual quantum and quality of proof necessary to support liability" in a given case. *Id.* "[I]f on any part of the prima facie case there would be insufficient evidence to require submission of the case to a jury, we must affirm the grant of summary judgment [for the defendant]." *Barnes v. Southwest Forest Indus., Inc*., 814 F.2d 607, 609 (11th Cir. 1989).

Where, as here, discovery has been conducted, "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely *colorable*, or is *not significantly probative*, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S. Ct. at 2511 (citations omitted) (emphasis added)[9]; *accord Hudson v. Southern Ductile Casting Corp.,* 849 F.2d 1372, 1376 (11th Cir. 1988).

### *Is John Hancock A Relevant ERISA Fiduciary To The Plan?*

Both sides agree that the issue of whether John Hancock is a relevant ERISA

---

[9]      *Earley v. Champion Intern. Corp*., 907 F.2d 1077, 1080 (11th Cir. 1990) (adding emphasis to the "merely colorable" and "not significantly probative" language from *Anderson* in affirming a summary judgment for Defendant).

fiduciary to the Plan is a mixed question of fact and law. *Cotton v. Massachusetts Mut. Life Ins. Co.*, 402 F.3d 1267, 1277 (11th Cir. 2005) ("The question whether a party is an ERISA fiduciary is a mixed question of law and fact."); *David P. Coldesina, D.D.S. v. Est. of Simper*, 407 F.3d 1126, 1131 (10th Cir. 2005) ("Whether a party is an ERISA fiduciary is a mixed question of fact and law." (citing *Hamilton v. Carell*, 243 F.3d 992, 997 (6th Cir. 2001)). John Hancock further notes that the material facts underlying this mixed question are not genuinely in dispute, so summary judgment is available. *See, e.g., Useden v. Acker*, 947 F.2d 1563 (11th Cir. 1991) (agreeing that material factual issues would not preclude summary judgment and affirming summary judgment for defendant in ERISA action because defendant bank was not a fiduciary).

Under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), ". . . a person [or company] is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

Determining whether an individual or company is acting as a fiduciary is a

threshold consideration:

> In every case charging a breach of ERISA fiduciary duty, . . . the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was **performing a fiduciary function**) when taking the action **subject to complaint**.

*Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) (emphasis added).

"[A] party is a fiduciary only 'to the extent' that it performs a fiduciary function." *Cotton*, 402 F.3d at 1277. "[F]iduciary status under ERISA is not an 'all-or-nothing concept,' and 'a court must ask whether a person is a fiduciary with respect to the **particular activity at issue**.'" *Id.* (citation omitted) (emphasis supplied); *see also Srein v. Frankford Tr. Co.*, 323 F.3d 214, 220 (3d Cir. 2003) (concluding that trustee was a fiduciary with respect to one life insurance policy but not concerning another policy).

Here, Plaintiffs complain that John Hancock "retained the benefit of [FTCs] and did not credit the Plan's Separate Account or Participant Accounts in an amount equal to the value of the [FTCs] it retained." Compl. ¶ 35. But FTCs had no intrinsic value to Plaintiffs' Plan -- which is not a taxable entity that can apply FTCs. The only way in which FTCs have value to anyone here is by their application on John Hancock's taxes, because John Hancock, the shareholder, is subject to U.S. taxes.

The question, then, is whether John Hancock was an ERISA fiduciary (1) when it used FTCs for its own taxes or (2) concerning the elections made by funds selected by

Plaintiffs. It was not. Several reasons support this conclusion.

**First,** John Hancock is not an ERISA fiduciary for preparing its taxes and using the FTCs available to it (but not to Plaintiffs). ERISA does not reach business functions that are conducted in capacities other than those relating to a retirement plan: a company is not a fiduciary when "conduct[ing] business that is not regulated by ERISA." *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1283 (11th Cir. 2012) (quoting *Local Union 2134 v. Powhatan Fuel, Inc.*, 828 F.2d 710, 714 (11th Cir. 1987)); *see also Barnes v. Lacy*, 927 F.2d 539, 544 (11th Cir. 1991) ("[P]lan administrators assume fiduciary status only when and to the extent that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA." (quotation marks omitted)).

In *Lanfear*, the Court held that a company was not acting as an ERISA fiduciary when it filed documents with the U.S. Securities and Exchange Commission, even if those documents related to a fund used in its retirement plan. *Id.* at 1283. Specifically, the Court held that the defendants were acting in their corporate capacity, not as ERISA fiduciaries, when they engaged in those acts. Similarly, here, the only act that resulted in an alleged economic benefit -- John Hancock applying FTCs to its own corporate taxes -- was not conducted in an ERISA fiduciary capacity.

The John Hancock U.S. Tax group prepares tax returns -- applying all applicable rules concerning income, deductions, credits and the like across the consolidated group

44

of companies -- under John Hancock Financial Corp., not with respect to any specific retirement plan serviced by isolated business lines of one of its component companies.

Moreover, FTCs are uniquely creatures of the federal tax law. They may be applied by an insurance company subject to U.S. taxes if certain predicate conditions are satisfied, including, among others, that the taxpayer has sufficient net taxable income and foreign source income, and that the taxpayer paid (or incurred) the foreign tax to be credited (or deducted). *See, e.g.,* I.R.C. §§ 901–09. The IRS specifically allows the application of FTCs by life insurance companies offering separate accounts for qualified retirement plans subject to certain limitations not at issue here. IRS P.L.R. 9528004 (March 29, 1995).[10]

Thus, John Hancock simply is not an ERISA fiduciary for filing its tax returns.

**Second**, Plaintiffs do not challenge John Hancock's contention that every appellate court to address whether an insurance company is an ERISA fiduciary in a context such as the one here, arising from its administration of assets held in a separate account used as a conduit vehicle for funding qualified ERISA plans, has held that the insurer is **not** a relevant fiduciary. *See Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 840 (9th Cir. 2018) (reversing order denying insurance company's motion to dismiss and remanding

---

[10]     The Eleventh Circuit treats private letter rulings as "persuasive authority because they represent the views of the IRS, which is charged with administering the Tax Code." *McKenny v. United States*, 973 F.3d 1291, 1300 n.6 (11th Cir. 2020) (internal marks and citations omitted). During the putative class period, John Hancock complied with the requirements set forth in IRS P.L.R. 9528004 (March 29, 1995).

with instructions to dismiss the complaint); *McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1002 (8th Cir. 2016) (affirming order dismissing class action ERISA lawsuit against insurance company providing investment services); *Santomenno v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 295–96 (3d Cir. 2014) (affirming order dismissing John Hancock because it was not a functional fiduciary); *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 913 (7th Cir. 2013) (affirming order granting summary judgment for service provider because its activities and omissions did not render the defendant a fiduciary).

**Third,** these decisions are consistent with the Eleventh Circuit's repeated holding that a service provider -- be it an insurer, third-party administrator or a bank-- is not an ERISA fiduciary absent actual **control** of a retirement plan's assets. *See Carolinas Elec. Workers Ret. Plan v. Zenith Am. Sols., Inc.*, 658 F. App'x 966, 970–71 (11th Cir. 2016) (affirming order dismissing ERISA lawsuit because of insufficient allegations that the defendant was a fiduciary); *Cotton*, 402 F.3d at 1277 (insurance company not an ERISA fiduciary); *Useden*, 947 F.2d at 1575–76 (11th Cir. 1991) (affirming order granting summary judgment for defendants in ERISA case because neither defendant was an ERISA fiduciary); *Howard v. Parisian, Inc.*, 807 F.2d 1560, 1564 (11th Cir. 1987) (ERISA does not regulate the duties of non-fiduciary plan administrators).

A financial institution is not an ERISA fiduciary when it acts only under "a pre-existing framework of policies, practices and procedures." *Chapman v. Klemick*, 3 F.3d

46

1508, 1510 (11th Cir. 1993). Phrased differently, "an entity which assumes discretionary authority or control over plan assets will **not** be considered a fiduciary if that discretion is sufficiently limited by a pre-existing framework of policies, practices and procedures." *Useden*, 947 F.2d at 1575 (citation omitted) (emphasis added).

Therefore, to provide an illustration, an insurance company is not an ERISA fiduciary where "decisions to purchase, amend, and borrow against the policies were made by the plaintiffs themselves." *Cotton*, 402 F.3d at 1279.

In *Leimkuehler*, an insurance company provided services to retirement plans that used group annuity contracts and separate accounts as investment vehicles for 401(k) plans. 713 F.3d at 908. A plan trustee challenged attributes of mutual funds held in the separate accounts over which the insurer exercised no control, a fact which precluded fiduciary status. *Id*. at 914. Similarly, here, John Hancock had no control over which sub-accounts Plaintiffs selected; no control over Plan participants' allocations to those sub-accounts; and no control over the mutual funds' investments and tax elections.

Separate accounts are simply "conduit" vehicles, which do not confer fiduciary status. *Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 74 F.3d 20, 22 (1st Cir. 1996) ("[I]t is the driver, not the vehicle, that chooses the route.").

"The performance of administrative and ministerial tasks by a mere custodian of plan assets does not amount to practical control." *Edmonson v. Lincoln Nat'l Life Ins. Co.*,

899 F. Supp. 2d 310, 323 (E.D. Pa. 2012) (citing cases), *aff'd*, 725 F.3d 406 (3d Cir. 2013). Similarly, John Hancock was not a fiduciary in administering the separate accounts on a fully-directed basis.

Plaintiffs affirmatively argue in their opposition [ECF No. 267, p. 3] that John Hancock "qualifies as a fiduciary" under two prongs of ERISA: § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). By asserting this argument, Plaintiffs are, in effect, representing that John Hancock's fiduciary status can, and should be, decided as a matter of law. To be sure, a heading in their opposition memorandum mentions some purported issues of material fact concerning John Hancock's fiduciary status, but their actual argument focuses on only a legal dispute (and certainly does not represent that the Court is precluded from deciding the issue because a material factual dispute exists).

Plaintiffs argue that John Hancock has the "authority or control respecting management or disposition of [plan] assets" sufficient to render it a fiduciary under the second prong of ERISA, § 3(21)(A)(i). To support this argument, Plaintiffs rely on the testimony of Keith Holden, who handles "the accounting and recordkeeping and transactions" and "administers . . . assets." Mr. Holden is John Hancock's vice president and head of retirement platform development and management for North America, and he had worked for John Hancock for 16 and a half years as of his July 21, 2021 deposition as a Rule 30(b)(6) representative.

48

Mr. Holden testified that John Hancock acts only "on the instructions of a plan or participant in executing [a] transaction." These actions are ministerial activities, and they do not confer ERISA fiduciary status. *Useden*, 947 F.2d at 1575 (explaining that "an entity which assumes discretionary authority or control over plan assets will not be considered a fiduciary if that discretion is sufficiently limited by a pre-existing framework of policies, practices and procedures," noting that clear standards circumscribed a bank's discretion concerning the plan and holding that the bank was not a fiduciary "in light of this web of legal and contractual standards").

In their opposition, Plaintiffs try to distinguish *Useden* by pointing out that it involved a "pre-existing framework of policies, practices and procedures."[11] While true, that point is not persuasive because John Hancock's role here was *also* cabined by policies, practices and procedures. Indeed, the framework managing the Plan's assets is governed by the Contract, RKA and incorporated documents. John Hancock managed and disposed of the fund shares held in the separate accounts as Plaintiffs directed. *Cf. Martin v. Feilen*, 965 F.2d 660, 669 (8th Cir. 1992) (holding that accountants were fiduciaries, where they not only provided professional accounting services, but **also** recommended transactions, structured deals, and provided investment advice to such an extent that

---

[11]     The defendant bank's exercise of its rights in *Useden* did not trigger the attachment of fiduciary duties because the bank, which had made a loan to the Plan, merely exercised remedies offered to creditors.

they exercised effective control over the plan's assets).

To be sure, Plaintiffs argue that John Hancock should not have "used for itself" the FTCs. But FTCs are created by the Code and they could have been used only by the taxpayer -- John Hancock. At bottom, Plaintiffs are seeking to transform John Hancock into a fiduciary merely because it followed the contractual arrangement the parties reached. *See, e.g., McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1002 (8th Cir. 2016) (explaining that adherence to an agreement does not implicate any fiduciary duty and affirming order dismissing class action ERISA lawsuit against investment services provider because, among other reasons, provider did not owe any fiduciary duty).[12]

Moreover, although Plaintiffs contend that John Hancock took steps to "extract" the FTCs, the Undersigned does not view this as an accurate description and deems the argument unconvincing.

Plaintiffs selected the sub-accounts which were subject to foreign taxes, and they did so without John Hancock's advice. John Hancock did not control whether, and to what extent, any participant invested in mutual funds, whether those funds elected to pass through foreign taxes or FTCs or whether the Code would allow John Hancock to apply FTCs. Therefore, it is illogical to conclude that John Hancock took affirmative steps

---

[12]     The *McCaffree* Court held that the only fees charged (i.e., the ones being disputed in the class action lawsuit) were authorized by the contract.

to "extract" FTCs when it was *Plaintiffs*, not John Hancock, who decided that the Plan would be responsible for foreign tax payments by selecting the funds at issue.

The FTCs arose from **Plaintiffs'** acts and choices, not from John Hancock's supposed fiduciary functions. Just as in *Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 840 (9th Cir. 2018); *Carolinas Elec. Workers Ret. Plan v. Zenith Am. Sols., Inc.*, 658 F.App'x 966, 970–71 (11th Cir. 2016)[13]; *McCaffree Fin. Corp.*, 811 F.3d at 1002; *Santomenno v. John Hancock*, 768 F.3d 284, 295–96 (3d Cir. 2014)[14]; and *Leimkuehler 713* F.3d at 913 (7th Cir. 2013), John Hancock is not a fiduciary for Plaintiffs' choices.

Plaintiffs admit that **they** selected the funds, some of which were subject to foreign taxes. This inescapable factual reality renders their arguments about fiduciary status

---

[13]     In *Carolinas*, the Court noted that a third-party administrator who performs purely ministerial functions, such as calculating benefits, maintaining participant records and communicating with participants is not a fiduciary. The Court held that the defendant, which recommended a change (to convert a plan's assets from a cash-based accounting method to an accrual method), was not a fiduciary because it lacked discretionary authority to make the change on its own. Moreover, it held that other activities -- recalculating benefits based on the trustee's decision to change accounting methods, reconciling accounts and sending notices to participants -- were purely ministerial functions.

[14]     John Hancock's lead counsel in the instant case also represented John Hancock in *Santomenno*, where the appellate court affirmed an order granting a motion to dismiss an ERISA lawsuit because John Hancock was not a fiduciary concerning the particular acts in question. In that case, the Secretary of Labor filed an amicus brief in support of the plaintiff participants, urging reversal. As noted, however, the appellate court affirmed the dismissal order.

unconvincing. *See generally*, *in re Fidelity ERISA Fee Litig*., 990 F.3d 50, 56–57 (1st Cir. 2021) (affirming dismissal where plans and participants chose the funds that paid the challenged fees).[15]

In addition, the factual record here is not one where a defendant acted contrary to directions it received. Therefore, those cases (i.e., where a defendant did violate instructions) Plaintiffs rely on to support their fiduciary status theory are inapplicable. *Chao v. Day*, 436 F.3d 234, 237–38 (D.C. Cir. 2006) (not purchasing insurance premiums as directed); *David P. Coldesine, D.D.S. v. Estate of Simper*, 407 F.3d 1126, 1134 (10th Cir. 2005) (not writing checks as directed); *Srien v. Frankford Trust Co.*, 323 F.3d 214, 221–22 (3d Cir.

---

[15] In *In re: Fidelity*, the appellate court held that a financial services company did not act as a fiduciary by determining which mutual funds it included or removed from the investment platform offered to the plans. In addition, it held that the defendant did not act as a functional fiduciary by charging mutual funds for inclusion on the investment platform offered to the plans. The court's explanation provides guidance:

> [t]he fund would only be listed by Fidelity as an available option on the FundsNetwork. It would remain for the plan's fiduciary investment advisors to decide whether to make the fund available to that plan's participants. In other words, even if Fidelity puts the fund on FundsNetwork (sometimes called its "Big Menu"), **a plan must select** that fund for its "Small Menu" before it becomes a permissible investment option for the plan's participants. And it would **ultimately be up to the participants to decide whether to invest in the fund.** Only then would the theoretical pass-through of infrastructure fees posited by the plaintiffs occur.

990 F.3d at 57 (emphasis added).

2003) (not placing insurance proceeds in plan's account as directed); *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997) (signing checks to pay corporate creditors rather than the plans, as required); *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1418 (9th Cir. 1997) (paying benefits "in violation of the terms of the plan"); *Int'l Painters & Allied Trades Indus. Pension Fund v. Aragones*, 643 F. Supp. 2d 1329, 1333 (M.D. Fla. 2008) (the defendant retained checks even after being informed by plan that she must return them).[16]

**Fourth**, the parties' agreements themselves confirm that John Hancock was not a fiduciary for the activities at issue in this lawsuit (i.e., using FTCs which did not belong to Plaintiffs and which Plaintiffs could not have used).

Plaintiffs argue that John Hancock is a fiduciary for FTCs because the RKA states:

> To the extent John Hancock maintains a separate account(s) in which the [P]lan invests, John Hancock is a limited fiduciary for the exclusive purposes of holding plan assets in its separate account(s), voting proxies, and acting only in accordance with directions from trustee(s), participants and beneficiaries . . . .

[ECF No. 267, pp. 4–7 (relying on RKA)].

---

[16]     In *Briscoe v. Fine*, 444 F.3d 478, 492 (6th Cir. 2006), the defendant was a fiduciary for exercising control of plan assets after the contractual relationship ended -- which, by definition, was unauthorized.

Likewise, in *Leimkuehler*, the insurer could be a fiduciary if it "mismanaged the separate account -- say, by losing track of participants' contributions or **withdrawing funds** . . . to pay for a company-wide vacation to Las Vegas." 713 F.3d at 913 (emphasis added). Yet Plaintiffs offer no facts that John Hancock withdrew and converted funds from any separate account.

This does not confer fiduciary status on John Hancock for its taxes for multiple reasons.

"A person should not be attributed fiduciary status under ERISA and held accountable for performance of the strict responsibilities required of him in that role, if he is not clearly aware of his status as a fiduciary. . . ." *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1015 (11th Cir. 2003) (citation omitted). Here, the Contract specifically provided that John Hancock did not assume fiduciary responsibility over separate account investments. The Contract specified that John Hancock was **not assuming "any fiduciary responsibility,"** and the RKA reiterated that it "will **not have any discretionary authority** or responsibility for the management or control of the separate accounts." (emphasis added).

The one, narrow fiduciary role which John Hancock acknowledged as to the separate accounts is not implicated here. John Hancock agreed that, "[t]o the extent John Hancock maintains a separate account(s) in which the plan invests, John Hancock is a **limited** fiduciary for the exclusive purposes of holding plan assets in its separate account(s), voting proxies, and acting only in accordance with directions from trustee(s), participants and beneficiaries, as provided in this agreement. . . ." *Id*. (emphasis added). Plaintiffs do not challenge John Hancock's conduct in proxy voting, nor do they assert that John Hancock failed to hold assets or that it disregarded directions.

Plaintiffs' focus on the quoted language from the RKA overlooks the principle that the Court does not interpret contractual language in isolation. Instead, "Courts construe ERISA plans, as they do other contracts[,]" using "[o]rdinary contract interpretation principles." *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 102 (2013).

In effect, Plaintiffs ask the Court to ignore the remaining language in the RKA and the Contract, arguing that it "does 'not override[] . . . functional status as a fiduciary.'" [ECF No. 267, p. 10] (citation omitted). That is not persuasive. The "limited fiduciary" status John Hancock contracted for must be read in context of its entire agreement, including that it "will not have any discretionary authority or responsibility for the management or control of the separate accounts." Plaintiffs' theory that John Hancock is a fiduciary for funds it holds, but did not select, would create expansive liability — e.g., including liability for fund performance, which "arise[s] from the separate accounts." John Hancock argues [ECF No. 278, p. 5] that this "well exceeds the bargained-for scope," and the Undersigned agrees.

Even if the Court accepted Plaintiffs' invitation to ignore the entirety of the RKA and Contract except for the isolated provision they cite (which it should not), the RKA still does not create fiduciary status for John Hancock's taxes. Holding plan assets in a

separate account and owning mutual fund shares (even shares that may be plan assets[17]),

are two separate things. Plaintiffs admit that John Hancock owns the mutual fund shares

in its separate accounts.[18] Anyone can hold something that she does not own; a

custodian's role is to hold assets it does not own. John Hancock's application of FTCs

comes not from any act it takes in holding and disposing mutual fund shares, but from

*owning* the shares.

"[A] person may be an ERISA fiduciary with respect to certain matters but not

others, for he has that status only 'to the extent' that he has or exercises the described

authority or responsibility." *Harris Trust and Sav. Bank v. John Hancock Mut. Life Ins. Co.,*

302 F.3d 18, 28 (2d Cir. 2002) (citing *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d

1250, 1259 (2d Cir. 1987); and also citing *Siskind v. Sperry Ret. Program, Unisys.,* 47 F.3d

498, 505 (2d Cir. 1995) ("[O]nly when fulfilling certain defined functions, including the

exercise of discretionary authority or control over plan management or administration,"

---

[17]     John Hancock has not disputed that the Plan holds an interest in the separate accounts under 29 C.F.R. § 2510.3-101(h)(1)(iii). Plaintiffs purport to rely on 29 C.F.R. § 2550.401c-1(d)(2), but they have not adequately explained how that language expands John Hancock's limited fiduciary status for holding those assets or how it overrides other contractual language specifying that it is not a fiduciary.

[18]     Plaintiffs dispute John Hancock's statement [ECF No. 256, ¶ 33,] which asserts that "John Hancock 'owns the assets held in the'" separate accounts. Yet they later concede, in part, that "[John] **Hancock** ultimately **owns** the assets in separate accounts." [ECF No. 266,¶ 99] (emphasis supplied). Ownership is therefore not *genuinely* disputed.

does a person become a fiduciary under ERISA)).

To summarize, John Hancock was not a relevant fiduciary as to the mutual funds in its separate accounts, which it held exactly as instructed. *See, e.g., Santomenno*, 883 F.3d at 840; *Santomenno,* 768 F.3d at 295-96; *Leimkuehler,* 713 F.3d at 912-913 (noting that Leimkuehler was "free to seek a better deal with a different 401(k) service provider if he felt that [the defendant's] investment options were too expensive"); *Srein,* 323 F.3d at 221–23. By using the FTCs in years when they could be used, John Hancock did not breach a non-existent fiduciary duty.[19] *In re Fidelity ERISA Fee Litigation*, 990 F.3d at 59 ("Fidelity does have *some* fiduciary duties vis-à-vis the plans and their participants" but the "point

---

[19]     Plaintiffs argue that John Hancock exercised discretionary authority or control over management of the Plan, and they rely on *Charters v. John Hancock*, where the Court dismissed one of Plaintiffs' arguments, ruling that mere holding of assets in separate accounts was "unlikely" to make John Hancock a fiduciary. 583 F. Supp.2d 189, 197 (D. Mass. 2008). The *Charters* Court held that John Hancock was a fiduciary to the extent it retained the unilateral right to increase its fees, which is different from the facts here, where there is no dispute over the fee John Hancock actually charged. *Id*. at 197–98 (citing *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250 (2d Cir. 1987)). Other courts have rejected *Charters. See, e.g., Santomenno,* 768 F.3d 284, 295 n.6 (finding it "unavailing")*; McCaffree,* 65 F. Supp. 3d 653, 671–72 (S.D. Iowa 2014) (granting motion to dismiss filed by investment services provider because it was not functioning as a fiduciary).

Plaintiffs also cite to *Harris Trust v. John Hancock*, 302 F.3d 18 (2d Cir. 2002). which actually supports John Hancock (who also cited it). The Court held that John Hancock had no fiduciary duty to provide extracontractual funds: it "did not breach its fiduciary duties by **adhering to the bargained-for terms of the [c]ontract**." *Harris Trust*, 302 F.3d at 30 (emphasis supplied). It was a fiduciary only where it made actual discretionary investments for the plan at issue, *id*. at 31, which is not the case here.

is that Fidelity's actions in a fiduciary capacity are not the subject of plaintiffs'

complaint.") (emphasis added).


### Are The FTCs Plan Assets?

Plaintiffs allege that John Hancock "is also a fiduciary as to Plan Foreign Tax

Credits specifically." Compl. ¶ 42. But John Hancock argues that FTCs are not "plan

assets," as that term is used in ERISA § 3(21)(A)(i).

In their Reply, Plaintiffs say that the issue of whether FTCs themselves constitute

plan assets is a disputed issue, but they also contend the issue is "not material at this

stage" and does not need to be resolved for summary judgment purposes. Moreover,

Plaintiffs say that their claims do not depend on FTCs being deemed plan assets.

On the other hand, Plaintiffs also take the position [ECF No. 267, p. 11] that

"[n]onetheless, the summary judgment evidence **establishes** that, contrary to [John]

Hancock's claims, FTCs **are**, in fact, **ERISA plan assets."** And that certainly sounds like

an issue which *can* be decided, one way or the other, in a summary judgment setting.

But whether something is a plan asset is a question which has been determined to

be a matter of law. *See, e.g., Pantoja v. Edward Sengel & Song Exp., Inc.*, 500 F. App'x 892,

893 (11th Cir. 2012) (affirming district court's summary judgment ruling that unpaid

fringe benefit contributions were not "plan assets" within the meaning of ERISA as a

matter of law); *cf. Trustees of Michigan Regional Council of Carpenters' Emp. Benefits Fund v. H.B. Stubbs Co.*, 33 F. Supp. 3d 884 (E.D. Mich. 2014) (reviewing case law authority and concluding as a matter of law, in granting the defendants' motion to dismiss, that unpaid employer contributions were not plan assets).

As both sides recognize, there are two approaches used to determine whether something is a plan asset, a concept which ERISA does not specifically define. *See Acosta v. Pac. Enterprises*, 950 F.2d 611, 620 (9th Cir. 1991) ("ERISA does not expressly define the term 'assets of the plan.'").

Moreover, both sides agree that the Eleventh Circuit has not selected a particular approach (or used a different approach).

But the mere fact that our appellate court has not decided the question does not immunize the argument from a summary judgment analysis. It merely means that the Undersigned needs to select an approach.

One approach, which the Department of Labor ("DOL") endorses, identifies plan assets "on the basis of ordinary notions of property rights under non-ERISA law." *U.S. Dept. of Labor, Advisory Op. No. 93–14A*, 1993 WL 188473, at *4 (May 5, 1993). A number of circuit courts have also adopted this approach, which is the majority approach. *See, e.g., Tussey v. ABB, Inc.*, 746 F.3d 327, 339 (8th Cir. 2014) (using DOL-endorsed definition and holding that participants failed to show the float was a Plan asset, which means the

district court erred in finding Fidelity breached a fiduciary duty of loyalty by paying the expenses on the float accounts and distributing the remaining float to the investment options)[20]; *see also Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 105-106 (2d Cir. 2011) (explaining that ERISA's "limited definition" of "plan assets" is not "helpful" and noting that the DOL, the agency "charged with administering and enforcing Title 1 of ERISA, has "repeatedly advised" that "plan assets should be identified based on 'ordinary notions of property rights'").[21]

This DOL-definition includes "any property, tangible or intangible, in which the plan has a beneficial ownership interest." *Id*. In addition, it includes "any contributions to the Policy Trust, any earnings on the contributions, the Group Policy itself, any reserves under the Group Policy, and any retrospective rate credits declared under the Group Policy." *Id.*

The second approach, which is the minority view, to identifying plan assets

---

[20]   Although Plaintiffs cited *Tussey*, the *Tussey* Court explained that "absent proof of any ownership rights to the funds in the redemption account, the Plan had no right to float income from that account." *Id.* at 340. John Hancock cited it, as well.

[21]   The *Faber* Court described the DOL view as "persuasive" and used that approach to hold that MetLife's "retained assets" were not "plan assets" because "the [p]lans did not have an ownership interest – beneficial or otherwise – in them." *Id.* at 106. The Court affirmed an Order dismissing the ERISA claim because MetLife did not retain plan assets by holding funds backing the Total Control Account, which is an interest-bearing account backed by funds that the insurer retains until the account holder writes a check or draft against the account.

considers "whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants or beneficiaries." *Patelco Credit Union v. Sahni*, 262 F.3d 897, 908 (9th Cir. 2001) (internal quotation marks omitted).

Here, using the first approach, FTCs are not assets that can be owned by plans under ordinary notions of property law. FTCs are attributes of U.S. tax law, unique to the taxpayer to whom the Code specifically allows the credit. *See, e.g.*, I.R.C. §§ 901–09. Not only do FTCs belong as a matter of tax law only to the taxpayer who owns and is taxed on the mutual fund shares (i.e., John Hancock), but they are also one of many tax attributes, positive and negative, that impact John Hancock's taxes.

FTCs are not "passed through" to John Hancock, as Plaintiffs allege in paragraph 34 of their Complaint. Instead, the special election made by mutual funds is one that requires John Hancock to increase its taxable income and treat as paid by it the foreign taxes paid by the mutual funds selected by the Plan and its participants.

While treating such taxes as paid by John Hancock results in John Hancock potentially qualifying for an FTC, any resulting FTC is an attribute taken into account in the computation of John Hancock's federal tax liability -- an inalienable, nontransferable tax attribute specific to John Hancock. It is not analogous to an asset subject to ordinary notions of property rights, much less an ERISA plan asset of a retirement plan that is not entitled to such tax credit.

Using the second, minority approach (which the Undersigned is not adopting as applicable law; I am merely discussing it in the alternative while selecting the DOL approach), John Hancock's use of FTCs is not at the expense of Plan participants because the Plan is not entitled to, and could not use, the FTCs given that the Plan has tax-exempt status. The FTCs are not available under the Code "at the expense" of Plan participants, who are in the same position regardless of how John Hancock files its tax return.

To be sure, Plaintiffs are correct when they argue that John Hancock "can" rebate a portion of its fee to serve as a substitute for the FTCs (which Plaintiffs could not have used themselves anyway), but that possibility does not create liability.

The FTCs do not transform themselves into Plan assets merely because John Hancock *could have* paid Plaintiffs an amount equivalent to the FTCs. *Cf. Harris Trust*, 302 F.3d at 27 (reversing in part trial court judgment awarding damages of almost $85 million against John Hancock in ERISA lawsuit and explaining that "[o]f course, [John] Hancock **could** choose to waive the contractual requirement, just as **could** any party to any contract, but that cannot mean that [John] Hancock had an *obligation* to do so") (emphasis in italics by the Court; bold emphasis added by the Undersigned); *see generally Hecker v. Deere & Co.*, 556 F.3d 575, 584 (7th Cir. 2009) ("Once the fees are collected from the mutual fund's assets and transferred to one of the Fidelity entities, they become Fidelity's assets

– again, not the assets of the Plans.").[22]

The Undersigned concludes, as a matter of law, that the FTCs are not plan assets and that this determination can properly be made in the summary judgment context. *See generally Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 429 (3d Cir. 2013) (affirming summary judgment ruling for defense in ERISA putative class action lawsuit alleging breach of fiduciary duty of loyalty and seeking disgorgement of profit the insurer earned by investing the benefits owed to her -- and concluding that "the retained assets were **not plan assets**" because, once the insurance company set up a SecureLine Account, "the plan no longer had an interest in the assets and, under ordinary notions of property rights, Lincoln and Edmonson were in a creditor-debtor relationship") (emphasis added)).

The Undersigned deems *Edmonson* particularly illuminating, so I will discuss it here in some detail.

The SecureLine Account at issue in *Edmonson* was a retained asset account, established after the plaintiff's husband, who was insured under a group life insurance

---

[22]     In *Hecker*, the appellate court affirmed an order dismissing a putative class action lawsuit against an employer, trustee and investment advisor. The appellate court explained that "[b]efore we delve into the question of whether any of the Defendants breached a fiduciary duty, we must identify who owed such duties to Plaintiffs with respect to the actions at issue here." *Id.* The Court held that the trustee and investment advisor were not functional fiduciaries of the plan, noting that merely playing a role in the selection of investment options does not transform a company into a fiduciary. John Hancock's lead counsel in the instant case represented Defendants in *Hecker*.

policy issued by Lincoln, died. The plaintiff was entitled to $10,000 in benefits. The policy did not state that Lincoln would pay the benefits using a retained asset account and did not otherwise specify how Lincoln was to pay the plaintiff the benefits. In other words, it was silent about this issue of payment. After Lincoln approved the plaintiff's claim for the $10,000 death benefit, it sent her a checkbook from which she could draw checks on the SecureLine Account. Lincoln explained that the plaintiff would receive interest on the account in the amount of the Bloomberg national average rate for interest-bearing checking accounts, plus 1%.

Significantly, Lincoln did not deposit any funds into the account. Instead, it merely credited the account with the benefit. When a beneficiary like the plaintiff would write a check on the account, Lincoln would transfer funds into the account to cover the check. Until that time, however, Lincoln retained the money owed to a beneficiary like the plaintiff and could invest the retained assets for its own profit.

Three months after Lincoln established the SecureLine account, Edmonson withdrew the full amount of the insurance proceeds. Lincoln also wrote her a check for $52.33 of interest. Edmondson contended that the profit Lincoln earned from investing the retained assets was greater than the amount of interest paid to her, and that Lincoln made approximately $5 million in profit in one year alone by investing retained assets credited to her account and the accounts of other beneficiaries.

64

Edmondson brought an ERISA lawsuit, contending, among other claims, that Lincoln violated its fiduciary duties by investing the retained assets for its own profit. The appellate court concluded that the assets were not plan assets because, "[a]lthough Lincoln used the assets for its own benefit, it did not use 'them at the expense of plan participants or beneficiaries.'" Therefore, given that the retained assets were not plan assets, Lincoln's conduct "was not constrained by ERISA's duty of loyalty." *Id*. at 429.

Some of the basic principles at issue in *Edmonson* are implicated here. Lincoln *used* the plaintiff's retained asset balance to earn interest; John Hancock *used* the FTCs created as a result of Plaintiffs' investments to lower its tax exposure. Lincoln did not violate an ERISA duty of loyalty by earning interest for itself because plan assets were not involved; John Hancock did not violate that same duty because FTCs are not plan assets. The insurance company was permitted to make a profit; John Hancock is permitted to use the FTCs to its financial advantage. The actions taken by the insurance company were not an ERISA act; John Hancock's use of the FTCs was not an ERISA act either.

The Court agrees with John Hancock that, similar to the retained assets in *Edmondson*, the FTCs are not plan assets.

### Did John Hancock Breach ERISA By Acting Disloyally?

Because John Hancock was not an ERISA fiduciary to the Plan and because the FTCs are not plan assets, the Court could end its analysis here and grant summary

judgment to John Hancock. However, in an abundance of caution, the Undersigned will also evaluate the claims that John Hancock was in breach for allegedly acting disloyally and for engaging in a prohibited transaction. The Undersigned will first analyze the claim that John Hancock violated the duty of loyalty.

Plaintiffs allege a breach of the duty of loyalty -- i.e., a breach of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

The duty of loyalty is analyzed under "a subjective standard; what matters is *why* the defendant acted as he did." *In re Wells Fargo ERISA 401(k) Litig.*, 331 F. Supp.3d 868, 875 (D. Minn. 2018) (emphasis in original), *aff'd sub nom. Allen v. Wells Fargo & Co.*, 967 F.3d 767 (8th Cir. 2020). Plaintiffs must show that John Hancock "[was] motivated by disloyal reasons." *Allen*, 967 F.3d at 776. It is not enough to show that a defendant obtained some benefit: "ERISA section 404(a) does not require a fiduciary to don the commercial equivalent of sackcloth and ashes." *Vander Luitgaren v. Sun Life Assur. Co. of Canada*, 765 F.3d 59, 65 (1st Cir. 2014) (citing *Edmonson* and affirming summary judgment against claims administrator in ERISA lawsuit alleging breaches of fiduciary duties).

Where "a fiduciary takes action that arguably benefits both plan and non-plan interests, courts have held that some incidental benefit to other interests is permissible under the statute as long as the primary purpose and effect of the action is to benefit the plan." *Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337-CIV.-JORDAN, 2007 WL 2263892,

at *45 (S.D. Fla. Aug. 10, 2007). As the First Circuit explained, there is no breach of duty where participants received the promised plan benefit and a fiduciary's action -- even one that benefits a fiduciary -- "does not unfairly diminish, impair, restrict, or burden the beneficiary's rights. . . ." *Vander Luitgaren*, 765 F.3d at 65.

These principles apply here even if John Hancock were held to be a fiduciary, which the Undersigned has already held it is not. There is no record evidence that John Hancock had a subjectively disloyal intent when it complied with U.S. tax law and the Contract and RKA. The Undersigned agrees with John Hancock's position that the undisputed record evidence demonstrates that the Plan obtained precisely what Plaintiffs bargained for -- John Hancock's recordkeeping services at an agreed-upon price, and the opportunity to invest through its platform in sub-accounts holding pre-specified mutual funds, with withdrawals at the NAV of mutual funds.

John Hancock's tax positions did not "diminish, impair, restrict, or burden" those rights because there "is no way" for a plan "to offset . . . foreign tax payments by using the [FTC];" *Vander Luitgaren*, 765 F.3d at 65; *accord Marshall v. Northrop Grumman Corp.*, No. 2:16-06794, 2019 WL 4058583, at *11–12 (C.D. Cal. Aug. 14, 2019) (granting summary judgment on loyalty claim).

Nothing in the Contract changes this result. Contrary to Plaintiffs' allegations (Compl. ¶ 38), John Hancock did not promise to credit the Plan the amounts of any FTCs

that it applied. The Contract described only three types of revenue related to the separate accounts: (i) direct fees; (ii) "revenue sharing . . . paid" by the mutual funds; and (iii) credits from John Hancock related to "investment management fees paid" to John Hancock affiliates. Such amounts are used to offset recordkeeping costs.

FTCs are none of these. They are not direct fees and are not related to investment management fees. And the SIG explains that revenue sharing paid by mutual funds are those payments made "pursuant to agreements or arrangements between John Hancock and the underlying fund and/or their affiliates." In contrast, FTCs are not payments and they are not "receive[d] from the mutual funds." Instead, they are tax attributes created by Congress. Additionally, Plaintiffs have identified no agreements between any mutual fund and John Hancock relating to foreign taxes or FTCs.

At its core, and as John Hancock correctly points out, Plaintiffs do not actually seek the FTCs themselves -- because their Plan cannot use FTCs. Instead, Plaintiffs seek to have John Hancock "reduce[]" "the expenses and fees under the Contract . . . by the amount of the" FTCs John Hancock applies. Compl. ¶ 62. This would mean John Hancock giving the Plan money, or waiving other fees or expenses.

Therefore, to effectuate any "rebate," as Securian claims to do, John Hancock would have to pay the amount from its own account, which is not something the parties negotiated for John Hancock to do. For all practical purposes, Plaintiffs are seeking

nothing more than to have John Hancock reduce its fees, which is not required under the Contract. Nor would such a rebate be necessary under ERISA to "defray[] reasonable expenses of administering the plan" as described in ERISA § 404(a)(1)(A): the record evidence is that John Hancock's recordkeeping fees were reasonable in 2014 without any additional credits.

Plaintiffs' cases all involve a fact-pattern that is not present here: a defendant taking **affirmative**, **discretionary** actions with respect to a plan, such as a decision for a plan to purchase stock involved in a tender offer, *Donovan v. Bierwirth*, 680 F.2d 263, 264 (2d Cir. 1982); investing a plan in funds advised by the fiduciary's affiliates or business partners, *Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337-cv-Jordan, 2007 WL 2263892, at *36 (S.D. Fla. Aug. 7, 2007), and *Pledger v. Reliance Tr. Co.*, No. 1:15-CV-4444-MHC, 2019 WL 10886802, at *19 (N.D. Ga. Mar. 28, 2019*);* investing a plan in stock of a company in which the defendant had a substantial interest, *Hugler v. Byrnes*, 247 F. Supp. 3d 223, 228 (N.D.N.Y. Mar. 28, 2017); and paying itself or other plans, rather than paying claims of the plan that provided the funds, *Guyan Int'l, Inc. v. Pro. Benefits Adm'rs, Inc.,* 689 F.3d 796, 97 (6th Cir. 2012).

Here, by contrast, Plaintiffs point to no affirmative, discretionary step that John Hancock took with Plan assets that was **contrary to their directions** -- the separate accounts were invested precisely as Plaintiffs directed.

69

John Hancock's actions did not deprive the Plan of any contractually-required benefit. Plaintiffs have not demonstrated that John Hancock was somehow required to copy the contractual arrangements offered by Securian, the only recordkeeper identified in the records to provide rebates for FTCs.

Accordingly, the Court agrees that John Hancock's summary judgment motion should be granted as to Count I for the independent reason that there was no breach of the duty of loyalty.

### Did John Hancock Engage in A Prohibited Transaction?

ERISA § 406(b)(1) prohibits a plan fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1). ERISA § 406(b)(3) prevents a fiduciary from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3). The Eleventh Circuit has long cautioned that "Congress did not intend an expansive interpretation of section 1106. . . ." *Evans v. Bexley*, 750 F.2d 1498, 1500 n.3 (11th Cir. 1985). Here, Plaintiffs' claims do not fit within the actual (non-expansive) limits of ERISA §§ 406(b)(1) and (b)(3).

By their terms, both ERISA §§ 406(b)(1) and (b)(3) require involvement of "assets of the plan." *See generally Dupree*, 2007 WL 2263892, at *42 (§ 406(b)(1) prohibits a "fiduciary from dealing with assets of the plan in his own interest or for his own

account"); *McGarry v. E. Air Lines, Inc.*, No. 86–2497–Civ-Ryskamp, 1987 WL 13900, at *6 (S.D. Fla. July 6, 1987) (§ 406 applies only when dealing with assets of the plan).

As analyzed above, FTCs are not ERISA plan assets.

An ERISA § 406(b)(3) violation further requires the defendant to "receive any consideration" from a "party dealing with" the Plan "in connection with a transaction" involving plan assets. 29 U.S.C. § 1106(b)(3); *see generally Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213–18 (2d Cir. 1987). That is not present here.

John Hancock's consolidated U.S. tax filings are not a transaction under ERISA involving plan assets. Further, while Plaintiffs allege that John Hancock received FTCs from third parties dealing with the Plan (Compl. ¶ 70), the Code (not any party) provides the FTCs; mutual funds whose shares are held in sub-accounts that Plaintiffs have selected for their Plan merely make an election under the Code that requires John Hancock to report its share of foreign taxes paid by the mutual funds as income on its own tax return. The Code, in turn, allows John Hancock to claim a related deduction or credit subject to certain limitations. Nothing more.

This is not a "transaction" involving the Plan or a "party dealing with such plan" within the meaning of § 406. *See Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1472 (11th Cir. 1986) (affirming summary judgment for defendant and holding that ERISA § 1106 "applies **only** to transactions to which the plan itself is a party or in which the monies,

property or fiscal assets of the plan are involved") (emphasis supplied)). In *Phillips*, the Eleventh Circuit held that when a defendant "is not administering the plan or investing its assets," it may act in its own interest and neither ERISA §§ 404 or 406 are implicated – which is what John Hancock did here when filing its taxes. 799 F.2d at 1471–72.

Even if John Hancock was a fiduciary for its taxes or the FTCs (which it is not), John Hancock took no active steps to be entitled to FTCs, it merely applied the provisions set forth in the Code that resulted from the decisions and actions and choices taken by *others*. This is significant because cases addressing both §§ 406(b)(1) and (b)(3) find liability only where a defendant took active steps directed to plan assets that benefitted itself. *See, e.g., Sec'y, Dep't of Lab. v. Seibert*, 464 F. App'x 820, 822 (11th Cir. 2012) (trustee violated § 406(b)(1) by admitting, in his plea agreement, to siphoning money from the plan as loans for companies he owned); *Lowen*, 829 F.2d at 1214 (fiduciary exchanged favorable investment recommendations for personal gain and pursuant to which he received consideration from party dealing with plan in violation of § 406(b)(3)); *Chao v. Baugh*, No. 07-80450-CIV, 2008 WL 11409999, at *3–5 (S.D. Fla. July 8, 2008) (defendant utilized participant contributions to pay obligations of the company in violation of § 406(b)(1)).

Here, by contrast, the FTCs at issue flowed exclusively from the actions of others--Plaintiffs' choice of selecting certain sub-accounts as Plan options, the Plan participants'

allocation among those options, and decisions of the mutual funds held in those sub-accounts to require John Hancock to gross up its income by the foreign taxes paid by such mutual funds.

John Hancock did not retain any money in contravention of any Plan term or contractual obligation, nor did it control the selection of, and investment in, funds.

Thus, John Hancock did not engage in a prohibited transaction.[23]

### Have Plaintiffs Established Loss Causation?

John Hancock contends that Plaintiffs have not shown, and cannot show, any loss or injury in fact. It argues that Plaintiffs (1) have not established loss causation and (2)

---

[23]     Plaintiffs rely on *Haddock v. Nationwide Fin. Servs., Inc.*, 419 F. Supp. 2d 156, 171 (D. Conn. 2006). The *Haddock* Court explained that if a participant makes a decision resulting in payments to an insurer (such as selecting insurance and paying premiums), then there would be no § 406(b) violation because the insurer did not exercise fiduciary authority to secure compensation. *Id*. at 169.

It is undisputed that Plaintiffs (not John Hancock) selected the Plan's funds, including those paying foreign taxes. But for their selection of those funds, and Plan participants' decisions to invest in those funds, there would be no FTCs. John Hancock did not decide that. Plaintiffs offer no cases holding that a defendant commits a prohibited transaction based on a plaintiff's and participant's own investment decisions.

Courts recognize that *Haddock* does not apply where, like here, a defendant had no authority or control over the selection of and investment in funds. *See, e.g., Hecker,* 556 F.3d at 584 (*Haddock* is neither "helpful [n]or persuasive"); *Columbia Air Servs., Inc. v. Fidelity Mgt. Tr. Co.*, No. 07-11344-GAO, 2008 WL 4457861, at *5 (D. Mass. Sept. 30, 2008) (distinguishing *Haddock*).

lack Article III standing. The Court will first discuss the loss causation argument.

To recover damages under ERISA, it is not enough to prove a breach; the burden is on plaintiffs to also show a loss to the plan **resulting from** the alleged breach. *See Useden*, 947 F.2d at 1576 n.17 (affirming defense summary judgment in an ERISA lawsuit and noting "the record [was] devoid of facts" showing that the alleged breach of fiduciary duty "in some way" caused harm to retirement plan, which is required to establish breach of fiduciary claim); *see also Ironworkers Loc. No. 272 v. Bowen*, 695 F.2d 531, 536 (11th Cir. 1983) (plaintiffs are not entitled to a monetary recovery if the breach does not **cause** a loss ); *cf. Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir. 1982) (highlighting that "a causal connection is required between the breach of fiduciary duty and the losses incurred by the plan").[24]

John Hancock argues that Plaintiffs' only damages expert based his calculations on the "monetary benefit" *to* John Hancock, not the damages incurred *by* Plaintiffs. According to John Hancock, a monetary benefit to a defendant is not a loss to a plaintiff. It notes that Plaintiffs' position remained constant regardless of how John Hancock prepared its taxes or whether it used FTCs in any given year.

Defendant further argues that Plaintiffs are in the same position both before and

---

[24]      In *Useden*, the Eleventh Circuit cited *Brandt* with approval for this point. 947 F. 2d at 1576 n.17.

after they changed recordkeepers because neither recordkeeper rebates or credits the FTCs to them.

Plaintiffs challenge these arguments, saying that they "ignore[] the fiduciary obligation imposed on [John] Hancock." [ECF No. 267, p. 23]. According to Plaintiffs, "if [John] Hancock had complied with its [fiduciary] obligation, it would have passed the benefit of the FTCs, which Mr. Mukamal[25] calculated, to the Plan." *Id.* But this response depends on John Hancock owing a fiduciary duty to Plaintiffs concerning the FTCs, which the Undersigned has already determined does not exist.

The Undersigned agrees with John Hancock. Its alleged benefit from the FTCs is not a measure of the Plan's loss.

Plaintiffs agree that their Plan never received the amount of the dividends from foreign securities that were used to pay foreign taxes; such amounts were withheld by the foreign taxing authorities. They also agree that, today, their Plan continues to utilize as investment options mutual funds that invest in foreign securities, which are still subject to those same foreign taxes. And they admit that the Plan, today, does not receive any FTC rebates or credits from their current recordkeeper, Fidelity, for those withheld foreign taxes.

---

[25]   Barry Mukamal is Plaintiffs' damages expert. In a separate Order, the Court denied John Hancock's *Daubert* motion to strike his testimony.

The Plan is in the same position today vis-à-vis foreign taxes and FTCs -- foreign taxes are withheld from dividends on foreign securities owned by the Plan's mutual funds, and the Plan receives no benefit of FTCs. Therefore, it suffered no loss caused by John Hancock's alleged misconduct and is not entitled to damages.

Plaintiffs' response is that ERISA § 409(a) allows disgorgement of a breaching fiduciary's profits. [ECF No. 267, at pp. 23–24]. But as a leading treatise on remedies authored by Professor Dan B. Dobbs explains, and the Eleventh Circuit agrees, restitution is not a measure of damages: "The fundamental difference between restitution and actual damages . . . is that the former is measured by the defendant's gain, while the latter is measured by the plaintiff's loss." *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1368 (11th Cir. 2021) (citing Dan B. Dobbs, Law of Remedies ["Dobbs"] § 4.1(1), at 555 (2d ed. 1993)). John Hancock argued this precise point in its summary judgment motion, and Plaintiffs did not refute it. *See* [ECF No. 219, p. 23 (citing Dobbs § 1.1)].[26]

---

[26] A party is deemed to have waived an argument when it offers no response to an argument made by its opponent. S.D. Fla. L.R. 7.1(c) (failure to respond to a motion or argument "may be deemed sufficient cause for granting the motion by default"); *Grant v. Miami-Dade Cty.*, No. 13-22008-CIV, 2014 WL 7928394, at *9 (S.D. Fla. Dec. 11, 2014) ("Where a plaintiff fails to respond to an argument in a motion for summary judgment, he waives the argument.") (citing *Mitchell v. ConAgra Foods, Inc.*, 448 F. App'x 911, 914 (11th Cir. 2011)); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) ("[A] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him." (internal quotations omitted)).

Therefore, while *restitution* might be available if John Hancock breached a duty as a fiduciary (which it did not), Plaintiffs are not entitled to *damages* even if they prove a breach, because there was no *loss* to their Plan caused by the challenged conduct, which makes a damages recovery unavailable.

### Do Plaintiffs Have Article III Standing?

Article III vests the judicial power in the federal courts and extends that power to "Cases" and "Controversies." *U.S. Const. art. III, §§ 1-2*. One tool for determining that the matters before us are truly cases or controversies, as understood by Article III, is the doctrine of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "The law of Article III standing . . . serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 408 (2013). Even when those political branches appear to have granted federal courts jurisdiction by statute and rule, the Court is still obliged to examine whether jurisdiction exists under the Constitution.

As the Supreme Court has explained, the "irreducible constitutional minimum" to establish Article III standing requires three elements. *Lujan*, 504 U.S. at 560. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

---

decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560-61); *see also Franchise Tax Bd. Of Cal. V. Alcan Aluminum Ltd.*, 493 U.S. 331, 335 (1990) (a plaintiff must show that she "personally suffered actual or threatened injury as a result of the putatively illegal conduct").

These principles apply to class actions. "[I]t is well-settled that prior to the certification of a class . . . the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).

The Court concludes that Plaintiffs have not established Article III standing, which means that this is another ground on which to grant John Hancock's summary judgment motion.

To be sure, the Court earlier decided to reject John Hancock's position, raised at the class certification stage, that Plaintiffs lacked standing. However, that ruling on standing focused on Plaintiffs' allegations that Defendant improperly retained the FTCs in violation of its fiduciary duty. It did not determine whether John Hancock was in fact a fiduciary for the FTCs, whether the FTCs are plan assets, or whether Plaintiffs' situation would have remained the same regardless of whether Defendant used the FTCs in any particular year.

A court should consider standing in light of two important considerations. First,

the plaintiff bears the burden to satisfy the standing requirements. *Lujan*, 504 U.S. at 561

("The party invoking federal jurisdiction bears the burden of establishing these

elements."). Second, these elements are "not mere pleading requirements." *Id*. Instead, a

plaintiff must show "each element . . . in the same way as any other matter on which the

plaintiff bears the burden of proof." *Id.*

In the instant case, of course, the Court first evaluated the Article III standing

requirement in connection with Plaintiffs' motion for class certification, which the

Undersigned granted over John Hancock's opposition. John Hancock's summary

judgment motion raises again the standing issue, which requires the Undersigned to have

another look at the doctrine here.

Courts may always evaluate their own jurisdiction in a case, and courts have

jurisdiction to determine whether they have jurisdiction. "[I]t is familiar law that a federal

court always has jurisdiction to determine its own jurisdiction." *In re Nica Holdings, Inc.*,

810 F.3d 781, 789 (11th Cir. 2015) (citing *United States v. Ruiz*, 536 U.S. 622, 628, 122 S. Ct.

2450, 2454, 153 L.Ed.2d 586 (2002)). Therefore, the mere fact that this Court previously

concluded for class certification purposes that Plaintiffs have standing does not

immunize the standing requirement from further inquiry. *Baghdasarian v. Amazon.com,

Inc.*, No. 05–8060, 2009 WL 4823368, at *4 (C.D. Cal. Dec. 9, 2009) (allegations of standing

found sufficient at the class certification stage do not definitively establish standing for

purposes of summary judgment), aff'd, 458 F. App'x 622 (9th Cir. 2011); *Coleman v. Gen. Motors Acceptance Corp.*, 220 F.R.D. 64, 87 (M.D. Tenn. 2004) (certifying class with the caveat that "[s]hould discovery fail to substantiate the plaintiffs' allegations and the inferences the court now draws in their favor, GMAC may again challenge [the] plaintiffs' ability to establish standing on a motion for summary judgment"); *Antenor v. D & S Farms*, 39 F. Supp. 2d 1372, 1376-77 (S.D. Fla. 1999) ("In deciding whether to certify the class, this Court was required to look only to the allegations of the Complaint" but "[o]nce a class is certified and class representatives are appointed . . . those class representatives . . . must demonstrate their standing in opposition to summary judgment." (citing 1 HERBERT B. NEWBERG & ALBA CONTE, 1 NEWBERG ON CLASS ACTIONS § 2.07, at 40–41 (2d ed.)).

The Eleventh Circuit has acknowledged that standing is "perhaps the most important jurisdictional doctrine." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005) (internal citation omitted). The doctrine "stems directly from Article III's 'case or controversy' requirement." *Id*. (quoting *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003)). And it "implicates [the] subject matter jurisdiction" of a federal court. *Id.*

As the United States Supreme Court confirmed relatively recently, "there is no ERISA exception to Article III." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020)

(affirming ruling that participants in defined benefit pension plan lacked Article III standing to bring class action ERISA lawsuit).

For purposes of meeting the critical Article III standing requirement, Plaintiffs have not shown an injury attributable to John Hancock's use of the FTCs. Their Plan could not use FTCs and their Plan's contractual entitlement was to assets valued using a mutual fund's NAV -- which is set net of foreign taxes. Therefore, they have no standing to seek any monetary relief because they have not incurred a redressable injury. *See, e.g., Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020) (no standing where disclosures did not mislead plaintiffs; informational injury that causes no adverse effects cannot satisfy Article III); *Trustees of Upstate New York Engineers Pension Fund v. Ivy Asset Mgmt.,* 843 F.3d 561, 569 (2d Cir. 2016) (no standing in ERISA suit where plaintiffs did not sustain an actual, cognizable investment loss).

To the extent this ruling is substantively different than the earlier standing discussion in the class certification motion, a district court has inherent power to "modify or rescind its orders at any point prior to final judgment in a civil case. *Dietz v. Bouldin,* 579 U.S. 40, 46 (2016); *see also Securities and Exchange Comm'n v. Management Solutions, Inc.,* 824 Fed. Appx. 550, 553 (10th Cir. 2020) (inherent power to "manage its own affairs so as to achieve the orderly and expeditious disposition of cases" includes "the power to modify or rescind its orders at any time prior to final judgment in a civil case"); *Mowrer*

*v. United States Dept. of Transportation,* 14 F.4th 723, 733 D.C. Cir. 2021) (court was not bound by earlier comment and noting that the district court "changed course long before final judgment" and then "reasonably explained its revised position").

Plaintiffs have not met their burden of establishing Article III standing, another ground on which to support an Order granting Defendant's summary judgment motion.

## Conclusion

This Order began with a quote from a famous philosopher, and it will end with one, from Nobel Prize-winning French philosopher and writer Jean Paul Sartre (1905-1980), who famously said, "We are our choices." At its core, Plaintiffs' lawsuit is inconsistent with the choices they made about their ERISA plan and the party with whom they contracted to provide ERISA-related services.

There was nothing disloyal about John Hancock's using for itself the FTCs which only it, as the taxpayer, could use. Not only could Plaintiffs not use the FTCs, but they do not pinpoint any contractual language requiring John Hancock to give them the functional equivalent of the FTCs -- a rebate or credit. Moreover, Plaintiffs did not cite any on-point legal authority supporting their unique premise that John Hancock was required to provide rebates or credits merely because Plaintiffs themselves chose to invest in mutual funds which invested in foreign securities. Likewise, Plaintiffs did not submit legal authority establishing that John Hancock's use of the FTCs breached a fiduciary

duty or was somehow a prohibited transaction even though authorized by the federal tax code.

It was Plaintiffs, not John Hancock, who decided that the Plan would be responsible for foreign tax payments by selecting the funds that they did. It was Plaintiffs who decided to terminate their relationship with John Hancock by selecting another entity to provide the services which John Hancock had been providing even though the replacement did not provide FTCs (or rebates or credits for the FTCs) either. Plaintiffs chose to enter into a contract with John Hancock which expressly and unequivocally disclaimed John Hancock's possible role as a possible fiduciary except in limited ministerial-act circumstances inapplicable here.

The Court grants John Hancock's summary judgment motion for all the reasons outlined above.

Defendant will need to publicly file a redacted version of this Order on CM/ECF within three business days of this Order.

In addition, the parties shall within five business days of this Order meet and confer and, assuming there is agreement, submit a proposed Notice (discussing this summary judgment ruling so that class members will learn of it). If a joint proposal is not reached on the specific wording, then each side shall submit its own version of the proposed Notice by the same deadline.

The Parties shall also by the same deadline submit jointly (if possible) a proposal concerning the logistics of providing notice (e.g., mailings, websites, etc.) to class members about this summary judgment ruling. This proposal shall also discuss which party (or parties) will be financially responsible for the Notice. If a joint filing is not possible, then each side shall submit its own proposal by the same deadline.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on May 9, 2022.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All Counsel of Record